# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MILTON OMAR COLON and ARLENE DAVIS,<br>   *Plaintiffs*,<br><br> v.<br><br>METRO-NORTH COMMUTER RAILROAD COMPANY, and METROPOLITAN TRANSPORTATION AUTHORITY,<br>   *Defendants*.<br><br>———————————————<br><br>METRO-NORTH COMMUTER RAILROAD COMPANY and METROPOLITAN TRANSPORTATION AUTHORITY,<br>   *Third-Party Plaintiffs*,<br><br> v.<br><br>UNITED ILLUMINATING COMPANY,<br>   *Third-Party Defendant*. | No. 3:13-cv-00325 (JAM) |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

The cities of New Haven and New York have long been connected by a busy railroad line. For many decades this stretch of railroad tracks has also featured "catenary" towers that carry high-voltage electric lines high above the tracks below. The catenary towers are metal, and they are easily climbable with an "X"-like latticework design.

Plaintiff Milton Omar Colon was severely injured after he foolishly climbed up one of these catenary towers. As he ascended quite high upon the tower, he was suddenly victim of an "arc" electric shock that likely jumped from one of the nearby high voltage wires. He then fell helplessly on top of electrical wires beneath him, where he continued to be agonizingly

1

electrocuted until he was quite miraculously rescued. Plaintiff's injuries include burns over most of his body and the forced amputation of both his legs.

Plaintiff has now sued defendants Metro-North Commuter Railroad Company (Metro-North) and the Metropolitan Transportation Authority (MTA). He claims that they were negligent (Count One) and that they otherwise engaged in willful, wanton, and reckless misconduct (Count Two).[1] Defendants have filed a cross-claim against third-party defendant United Illuminating (UI). All parties have moved for summary judgment, and some of them have moved for sanctions relating to alleged discovery misconduct.

For the reasons set forth below, I will deny the cross-motions for summary judgment as to plaintiff's negligence claim, but will grant Metro-North and MTA's motion for summary judgment as to plaintiff's claim for willful, wanton, and reckless misconduct. I will deny UI's motion for summary judgment on the count for contractual indemnification, but will grant it as to the rest of the counts in UI's third-party complaint. Finally, because no party has been irreparably disadvantaged by any other party's discovery misconduct, I will largely deny all motions for sanctions and/or adverse inferences.

## BACKGROUND

On the morning of March 17, 2011, plaintiff walked up a footpath near the railroad tracks in New Haven, Connecticut. He went up a hill and then into a field, ending at a large circular track where people often ride dirtbikes. Doc. #147, Ex. H. He spotted a family of deer that allegedly piqued his interest, and when the deer fled, plaintiff walked down the hill towards the railroad tracks to try to find them.

---

[1] Plaintiff's spouse has also filed a claim for loss of consortium due to defendants' alleged negligence (Count Three); her cause of action is wholly dependent on the success of plaintiff's negligence claim and is not otherwise disputed in the parties' papers.

The railroad tracks that plaintiff approached lie in a railroad right-of-way which leads to and encircles the base of Tower #1043, one of many catenary towers along the railroad line. Doc. #181-20 at 28. The State of Connecticut (not a party to this action) owns the tracks, the right-of-way, and the catenary equipment used to power trains on those tracks. Metro-North operates the railroad pursuant to a contract it has with the Connecticut Department of Transportation (CT DOT), and the MTA. Metro-North controls the right-of-way, and it maintains the equipment on the tracks including the towers. The MTA provides a police presence to patrol the right-of-way.

Plaintiff allegedly had never been on the path leading to the dirtbike tracks, had never been that close to railroad tracks, did not know whether trains actively passed along these tracks, and had never climbed a catenary tower before. But once plaintiff reached the right-of-way, he decided to climb Tower #1043, pictured below, in an attempt to regain sight of the deer.



*See* Doc. #179-1 at 7. The base of the tower had one completely illegible and graffiti-covered warning sign, *see* Doc. #147, Ex. BB, which plaintiff did not see. Plaintiff looked up at the tower

and saw the electrical apparatus, but it was unfamiliar to him. Although plaintiff was 26 years old on the date of his injury, he had a pre-injury IQ of 72, placing him into the category of having a mild intellectual disability and a "functional mental age" of a 14- to 15-year-old teenager.

To ascend the tower, plaintiff climbed the inherently climbable "X"-like lattice structure. *See* Doc. #181-20 at 36. Once he got around 20 feet high, he climbed up the truss, which had 3 distinct footholds. He then continued up the lattice structure to a total height of about 45 feet. At that height, he tried to turn around to look for the deer. But an arc flash jumped off the wires near him, and he was electrocuted and lost consciousness. His leg got caught in part of the tower, leaving him dangling backwards over the live wires below him until he was rescued.

Officer Russell, a representative of the MTA, testified in his deposition that the MTA is aware that people—and especially teenagers—frequent the private dirtbike track on the hill near Tower #1043, that people trespass along the right-of-way east and west of Tower #1043, and that the MTA actively arrests or gives warnings to trespassers in the area and uses extra patrols and enforcement to try to prevent trespassing near Tower #1043.

Officer Russell also testified that he is aware that Tower #1043 and surrounding towers have graffiti-covered bases and graffiti-covered warning signs, but noted that the MTA had not placed any "no trespassing" signs in the area. Much of the graffiti on the towers is at ground-level—that is, applied by trespassers who did not climb the towers. But a nearby tower—Tower #1041—has graffiti painted as high as 25 feet. *See* Doc. #181-20 at 21–22.

Defendants produced reports in discovery of trespasser arrests and other accidents that occurred along the right-of-way over the years. Additionally, in the past 25 years, at least seven non-employees (including plaintiff) have been shocked by catenary towers in Connecticut.

4

Defendants acknowledge that many people do not know that high voltage energy in the power lines can extend out beyond the wires, charging the air around the lines and causing an arc flash that can electrocute a person despite that person's having no contact with the wires. Even the tower itself can hold electric energy that causes electrocution.

Plaintiff and his wife brought suit against defendants for negligence, wilful and wanton misconduct, and loss of consortium, and defendants, in turn, filed a third-party complaint against UI for apportionment under Conn. Gen. Stat. § 52-572h(o), common-law indemnification, and contractual indemnification. All parties have moved for summary judgment.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The parties' cross-motions for summary judgment depend on an assessment of what duty, if any, defendants owed to plaintiff. "The status of an entrant on another's land, be it trespasser, licensee or invitee, determines the duty that is owed to the entrant while he or she is on a landowner's property." *Salaman v. City of Waterbury*, 246 Conn. 298, 304–05 (1998); *see also Eichelberg v. Nat'l R.R. Pass. Corp.*, 57 F.3d 1179, 1183 (2d Cir. 1995) (same); *McPheters v. Loomis*, 125 Conn. 526, 533 (1939) (noting same principles apply not only to the landowner but "with equal force to one who, though not the owner of the land, is using it under a grant or license from the owner").

Although plaintiff claims that he was a licensee or invitee, he does not point to any evidence to create a genuine issue of fact about his status. Not a shred of evidence suggests that anyone invited or licensed him expressly or by implication to be on defendants' land, much less to climb any catenary towers. Plaintiff was unquestionably trespassing upon defendants' land and particularly upon Tower #1043 when he climbed it. I will now discuss each count of plaintiff's complaint in view of his status as a trespasser.

### Count Two – Willful, Wanton, and Reckless Misconduct

Landowners have certain duties of care even to intruders or trespassers. To begin, a landowner may not intentionally or wantonly try to harm a trespasser. "It is well established that a possessor of land is under no duty to keep his or her land reasonably safe for an adult trespasser, but has the duty only to refrain from causing injury to a trespasser intentionally, or by 'willful, wanton or reckless conduct.'" *Maffucci v. Royal Park Ltd. P'ship*, 243 Conn. 552, 558 (1998).

No reasonable jury could conclude that Metro-North or the MTA intended to or wanted to harm plaintiff. No evidence has been presented about any plan or "design to injure" him or

trespassers in general. *Dubay v. Irish*, 207 Conn. 518, 533 (1988); *Katko v. Briney*, 183 N.W.2d 657 (Iowa 1971) (homeowner may not set spring gun trap against trespasser). The most that can be said here is that Metro-North and the MTA failed to post warning signs around the towers or otherwise to take more steps to prevent plaintiff from climbing Tower #1043. These omissions fall well short of establishing intentional, willful, wanton, or even reckless conduct. *See Dubay*, 207 Conn. at 533 (noting that "[w]hile we have attempted to draw definitional distinctions between the terms wilful, wanton or reckless, in practice the three terms have been treated as meaning the same thing" and that these terms require "an extreme departure from ordinary care, in a situation where a high degree of danger is apparent"); *cf. Kurisoo v. Providence & Worcester R. Co.*, 68 F.3d 591, 596 (2d Cir. 1995) (failure to post "no trespassing" signs not willful or malicious misconduct under Connecticut recreational use law in the absence of intended injury or a "substantial certainty"—not merely a foreseeable risk or even a strong probability—that injuries would result from that failure). Accordingly, because there is no genuine fact issue to suggest that defendants engaged in willful, wanton, or reckless conduct by not taking greater precautions to deter trespassers from climbing catenary towers, I will grant defendants' motion for summary judgment as to plaintiff's claim in Count Two of willful, wanton, and reckless misconduct.

### Count One - Negligence

As to plaintiff's negligence claim, the law of Connecticut allows for a landowner to be liable even to a trespasser under certain circumstances and even in the absence of willful, wanton, or reckless conduct. Plaintiff claims three grounds for such negligence liability in this case.

### 1. "Constant Intrusion" Liability

Connecticut law allows for a landowner to be liable to a trespasser under certain circumstances if there have been "constant intrusions" known to the landowner upon the landowner's premises. Connecticut courts reason that "if the owner or his servants know that the presence of trespassers is to be expected, then the common obligation of exercising reasonable care gives rise to the correlative duty of taking such precautions against injuring trespassers as a reasonable foresight of harm ought to suggest." *Carlson v. Connecticut Co.*, 95 Conn. 724, 730 (1921).

Connecticut follows the rule as set forth in § 335 of the Restatement (Second) of Torts, which provides that a possessor of land "who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area of the land, is subject to liability for bodily harm caused to them by an artificial condition on the land, if (a) the condition (i) is one which the possessor has created or maintains, and (ii) is, to his knowledge, likely to cause death or serious bodily harm to such trespassers, and (iii) is of such a nature that he has reason to believe that such trespassers will not discover it, and (b) the possessor has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved." *Maffucci*, 243 Conn. at 559–60 (quoting § 335).

As to each of these elements of the "constant intrusion" exception under § 335, it is clear that there is at least a genuine fact issue in dispute for trial. Metro-North and the MTA arguably maintain an artificial condition—a catenary tower with live electrical wires—and that artificial condition is likely to cause death or serious bodily harm to trespassers who climb these structures. Additionally, defendants do not meaningfully dispute that they did not warn plaintiff

or trespassers in general of the risk posed by climbing catenary towers—the photographs in evidence show that there are no legible warning signs around the towers.

There is also sufficient evidence for a jury to conclude that defendants knew of the "constant intrusion" of trespassers on the "limited area of the land" that constitutes the artificial condition and reason to believe that this condition contains a hidden risk. For purposes of the "constant intrusion" exception, the Connecticut Supreme Court has defined the "limited area of the land," as the "structure creating the condition," not just "other portions of the property." *Id.* at 560 n.10 & 562–63; *see also Eichelberg*, 57 F.3d at 1184 (railroad liable if it "had notice, not merely that a trespasser might reasonably be expected to be somewhere along its tracks, but that [railroad] had reason to believe that trespassers would be near the particular place where the accident occurred, or at another place with similar characteristics").

This issue arose in *Maffucci*, which involved a trespasser who was electrocuted after he entered private property and opened locked switchgear cabinets to steal copper wire. The trespassing plaintiff in *Maffucci* argued that defendants owed him a duty of care, pointing to the "constant intrusion" exception to the trespasser rule and arguing that defendants knew that trespassers constantly entered the property and building that housed the switchgear cabinets. But the Connecticut Supreme Court affirmed the grant of summary judgment in favor of the defendants, holding that plaintiff needed to show not just constant intrusion on the property, but also constant intrusion *into the switchgear cabinets* themselves, because they were "the structure creating the condition" that posed a hidden risk of electrocution.

In support of this conclusion, the court cited cases in which trespassers climbed utility poles and were electrocuted. In those cases, the mere presence of trespassers in the area surrounding the poles was insufficient to show a constant intrusion up the poles. *Maffucci*, 243

9

Conn. at 560–61 (citing *Henderson v. United States*, 846 F.2d 1233 (9th Cir. 1988) ("Despite the presence of picnickers and vandals, the government had little reason to foresee that thieves might climb power poles to steal copper wires.")).

Here, plaintiff has not only presented evidence of defendants' knowledge of constant trespassing at ground level along the right-of-way near Tower #1043, but he has also raised a triable issue regarding defendants' knowledge of constant intrusion *on the structure creating the artificial condition*—Tower #1043 and other catenary towers in the area. Viewed in the light most favorable to plaintiff, the railroad defendants were well aware that most (if not all) of the towers in that area have graffiti on them, and that at least one tower in that area has graffiti up to a height of 25 feet, which is comparable to the height plaintiff climbed. *See* Doc. #172-4 at 11; *e.g.*, Doc. #173-3 at 44. Defendants were also aware of catenary injuries and death over the years. And contrary to defendants' claim that plaintiff has not adduced evidence of constant intrusion onto Tower #1043, plaintiff has shown the existence of several layers of graffiti on Tower #1043, suggestive of multiple intrusions on the tower at different times, including at a height that might have required climbing. Unlike the sparse record presented to the court in *Maffucci*, there is evidence in the record before me on which a jury could reasonably find that defendants had actual or constructive knowledge of constant intrusion up Tower #1043 and the surrounding towers.

The "constant intrusion" exception also requires a hidden danger—evidence that defendants had reason to believe that the risk posed by the artificial condition is of such a nature that trespassers would not know of or discover it. While the "condition" here involves the live electrical wires that were certainly visible, plaintiff has adduced evidence that a particular risk posed by these high voltage electrical wires—an arc flash, which can electrocute a person

without direct contact with electrical wires—is hidden, in the sense that its likely incidence is

unknown to potential trespassers:

> The public knows that it is dangerous to touch a live wire, but very few know that there exists danger of death from this powerful current by near approach to the wire so charged, without actually coming in contact with the wire. Only those who are engaged in the business, and those who have stood beside some inanimate form whose scorched and burned flesh bears mute evidence to its tremendous power, know this.

*McCoy v. Texas Power & Light Co.*, 239 S.W. 1105, 1110 (Tex. Com. App. 1922).[2]

As plaintiff's evidence shows, the risk from arc electricity is the subject of safety training

even for experienced railroad employees. *See Klein v. Nat'l R.R. Passenger Corp.*, No. 04-cv-

00955, Doc. #208 at 9 (E.D. Pa. 2008) (ruling upholding jury verdict against railroad arising

from electrocution of trespassers by catenary wires; "If the dangers [of electrical arcs] were so

obvious, why would there be a need to provide on-going training to experienced employees?"),

*vacated by* Doc. #225.

A reasonable jury could conclude that defendants had reason to believe that the risks of

an arc flash created by the electrical wires would not be known to or discovered by trespassers

who were known to climb these very towers. Because plaintiff has raised genuine factual issues

as to the applicability of the "constant intrusion" exception to the trespasser rule, I will deny

---

[2] I am not persuaded by the contrary reasoning of the Supreme Court of Texas in *Texas Utilities Elec. Co. v. Timmons*, 947 S.W.2d 191 (Tex. 1997), in which the court concluded in an analogous context of the child-trespasser doctrine under § 339 of the Restatement (Second) of Torts that "ignorance of arcing is not enough to satisfy the third element of the attractive nuisance doctrine . . . if the child is aware of the dangers of electricity generally." *Id.* at 195. In my view, a particular condition may have dangers that are both manifest and hidden. The fact that one or more of the dangers is manifest (*e.g.*, electrocution from touching wires) should not immunize the landowner for the additional hidden dangers that arise from or are related to the same condition (*e.g.*, electrocution from jumping or arcing electricity) if there is reason to believe that the injured party would have taken additional or different precautions had the hidden danger been known. Suppose, for example, that a homeowner has an unfenced pool in his backyard and that he decides to fill the pool with hydrochloric acid. If teenagers sneak on to the property for a swim late one night, the homeowner should not be free from liability simply because the teenagers knew the pool was there and should know there is a risk of drowning from swimming. The hidden (unexpected) danger is the presence of hydrochloric acid, and the fact that swimming and swimming pools are dangerous for other obvious reasons should not immunize the property owner from potential liability for a different danger that is not manifest.

defendants' motion for summary judgment. On the other hand, although plaintiff has established a genuine fact issue, plaintiff has not further and conclusively shown that defendants must necessarily be liable under the constant intrusion exception; I will likewise deny plaintiff's motion for summary judgment. A jury should decide whether plaintiff can prove the requisites for liability under the "constant intrusion" exception.

### 2. *"Child Trespasser" Liability*

Plaintiff additionally argues that defendants may be liable under the "child trespasser" exception of § 339 the Restatement (Second) of Torts (which is also sometimes described as the "attractive nuisance" doctrine). The Connecticut Supreme Court has indeed adopted § 339, which provides in part that "a possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition [on] the land if (a) the place where the condition exists is one [on] which the possessor knows or has reason to know that children are likely to trespass, and (b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and (e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children." *Ruiz v. Victory Properties, LLC*, 315 Conn. 320, 333 n.6 (2015) (quoting Restatement (Second) of Torts, § 339; *see also Wolfe v. Rehbein*, 123 Conn. 110 (1937) (applying § 339).

Plaintiff has adduced sufficient evidence for trial as to all of these requirements. *See Yeske v. Avon Old Farms Sch., Inc.*, 1 Conn. App. 195 (1984) (noting that "[i]t is a question for the jury to decide if a defendant is maintaining a latently dangerous instrumentality on his premises which is so exposed that he may reasonably anticipate that a child is likely to be hurt by it" and that "[i]t is also for the jury to decide if a defendant knows or has reason to know that children are likely to trespass on that portion of his land where the instrumentality is located," and that "[e]ven if there is no evidence that any child had previously trespassed on the site, it remains a jury question whether, based on all of the evidence, the defendants knew or had reason to know that children were likely to trespass on the place where the condition existed"). *See* Doc. #173-3 at 18, 29 ("mostly teenagers" frequent that stretch of the right-of-way)

The closer question is whether plaintiff qualifies as a "child" at all within the meaning of the child trespasser rule, because he was not a child at the time of this incident but was 26 years old. Although his medical evidence suggests that he had the mental development of a 14- or 15-year-old child, Doc. #177-2 at 44 (opining that plaintiff had lesser ability to appreciate risk because of his functional mental age), he does not cite any cases in which the child trespasser rule has been applied to an adult with diminished mental development. The commentary to the Restatement suggests that there is no fixed age limit but does nothing to suggest that the doctrine should apply beyond a child who is 16 years old and to apply generally to adults of any age who have mental disabilities. *See* Restatement (Second) of Torts, § 339 cmt. (c). Some precedent also runs contrary to plaintiff's position. *See, e.g., Estate of Zimmerman v. Southeastern Pa. Transp. Auth.*, 168 F.3d 680, 687–88 (3d Cir. 1999) (declining to apply "child trespasser" exception to plaintiff who was 23 years old and who suffered from bipolar disorder); *Wever v. State ex rel. Dept. of Human Servs., Enid State Sch.*, 839 P.2d 672, 673 (Okla. Civ. App. 1990) (stating that

13

purpose of doctrine "is for the protection of *children* of tender age" and that "[w]e decline to extend the doctrine of attractive nuisance to adults, regardless of their mental capacity," because "[w]e find no compelling societal interest to do so").

In view of the substantial showing made by plaintiff about his intellectual disabilities—a showing missing from cases such as *Estate of Zimmerman*—I conclude on balance that it would be premature at this time to preclude plaintiff from attempting to prove facts at trial that would qualify for child trespasser liability. I will be prepared to reconsider whether plaintiff may qualify as a "child" for purposes of the child trespasser exception after a full presentation of the evidence at trial, and this issue may be addressed again for purposes of jury instructions at trial.

### 3. Highly Dangerous Condition

Plaintiff also argues that he may recover on the ground that defendants maintained a "highly dangerous condition" within the meaning of § 337 of the Restatement (Second) of Torts:

> A possessor of land who maintains thereon an artificial condition which involves a risk of death or serious bodily harm to persons coming in contact therewith, is subject to liability for bodily harm caused to trespassers by his failure to exercise reasonable care to warn them thereof if
> > (a) the possessor knows or, from facts within his knowledge, should know of their presence in dangerous proximity to the artificial condition, and
> > (b) the condition is of such a nature that he has reason to believe that the trespasser will not discover it or realize the risk involved therein.

Restatement (Second) of Torts, § 337. The Connecticut Supreme Court has yet to adopt or disapprove of this provision. In view that the evidence to support potential liability under this provision will be the same as for potential liability under the constant intrusion and child trespasser rules, there is no need for me at this time to resolve the applicability of § 337 in this case.

*Liability of MTA*

Apart from moving for summary judgment on the preceding bases, the MTA also seeks summary judgment on the basis of its contention that it does not control or possess the subject property. Doc. #148 at 14. I do not agree. Liability may be based on control or possession of the land at issue. *See Lin v. Nat'l R.R. Passenger Corp.*, 277 Conn. 1, 16 n.10 (2006). A reasonable jury could conclude that the MTA's significant police presence along the railroad right-of-way constitutes "control" over the property, *ibid.*, more so when coupled with the fact that the MTA is a signatory to the contract with the CT DOT and Metro-North, and the fact that it owns Metro-North. *See* Doc. #119 at 4. Because a reasonable jury could conclude that the MTA's significant control over the property and over Metro-North renders it possibly liable in this case, I will deny the MTA's motion for summary judgment on this basis.

*UI's Motion for Summary Judgment*

Third-party defendant UI moves for summary judgment as to defendants' third-party complaint for contractual indemnity, common-law indemnity, and apportionment. The source of UI's duty of contractual indemnity is the Transmission Line Agreement—entered into by UI and CT DOT—in which UI agreed to "indemnify, protect and save harmless . . . the State's Designee [Metro-North] . . . from any and all loss of life or property, or injury or damage to the person or property of any third person . . . and from any and all claims, demands or actions for such loss, injury, or damage *directly or indirectly caused by the presence or use . . . of the Transmission System* and appurtenances thereto, excepting such loss, damage or injury as shall be due solely to the negligence of the agents or servants of [Metro-North]." Doc. #207-7 at 23 (emphasis added).

As the evidence shows, the catenary towers carry at least two sets of electric lines—a lower level set of lines that carry electricity for operation of the railroad, and an upper set of lines

that carry electricity for UI's utility service needs. It is unclear from which set of lines plaintiff received the initial electric shock. If UI's electricity shocked plaintiff, there can be no reasonable dispute that his injury would have been caused "directly or indirectly" by the "presence or use" of UI's wires, falling within the ambit of the indemnity clause in the Transmission Line Agreement.

UI, however, maintains that its electricity could not have shocked plaintiff. Although plaintiff did not make physical contact with any UI wires, which were the top two sets of power lines "above the bonnet," the evidence does not exclude at this time a conclusion that he could have been within range of an arc flash from UI's wires at a height of 54 feet. *See* Doc. #147, Ex. O. Accordingly, I will deny UI's motion for summary judgment on the contractual indemnity count because there is a triable issue of fact regarding how high plaintiff climbed when he was shocked and, thus, whether plaintiff's injuries were caused directly or indirectly by the presence or use of UI's wires.

The contractual indemnity clause subsumes any claim for common-law indemnity because, unlike common-law indemnity, the contractual indemnity clause allows for UI to be liable even if it only indirectly caused plaintiff's injuries. *See Skuzinski v. Bouchard Fuels, Inc.*, 240 Conn. 694, 698 (1997) (common-law indemnity appropriate where (1) third-party defendant was negligent; (2) third-party defendant's negligence, rather than defendants' negligence, was *the direct, immediate cause* of the accident and injuries; (3) third-party defendant was in control of the situation—the dangerous condition—to the exclusion of defendants; and (4) defendants did not know of third-party defendant's negligence, had no reason to anticipate it, and could reasonably rely on third-party defendant not to be negligent). Additionally, and unlike the contractual indemnity claim, the remaining claims—common-law indemnity and

apportionment—require UI itself to have been negligent in some way. *See Crotta v. Home Depot, Inc.*, 249 Conn. 634, 641–42 (1999); Conn. Gen. Stat. § 52-102b(a).

Although a genuine issue of fact exists as to whether electricity from UI's wires shocked plaintiff, there is no triable issue regarding UI's negligence for purposes of the common-law indemnity and apportionment counts. Metro-North and the MTA do little more than assert that UI will somehow be "deemed" responsible for failing to warn plaintiff or take other safety precautions, even if they do not discuss in any specific terms what *duty* UI might have owed to plaintiff. *See* Doc. #261 at 10 ("If there is any possibility that [defendants] were negligent . . . then either party or both parties could be deemed to have failed some responsibility to implement [protective] measures.").

To the extent that Metro-North and the MTA discuss any duty owed by UI to plaintiff, they suggest first that UI's duty might be the same as their own duty, despite the fact that UI did not possess or control the lower portions of Tower #1043. I do not agree. Because of the lack of evidence that UI exercised control over efforts to prevent trespassers from climbing the tower, I conclude that there is no basis to conclude that UI was negligent or owed plaintiff any duty of care such as to warn him about its electricity wires.

Metro-North and the MTA also assert that UI owed a separate duty to plaintiff pursuant to the Regulations of Connecticut State Agencies, § 16-11-102(a), which provides that "[e]very utility shall use every effort to properly warn and protect the public from danger and shall exercise all possible care to reduce the hazard to which employees, customers, and others may be subjected by reason of its equipment and facilities." But, as the Connecticut Supreme Court has ruled, "§ 16-11-102(a), if it has any effect on common-law liability, addresses itself only to the latter aspect of the duty analysis by establishing *the scope of the duty owed*[,] . . . [not] *the*

*existence of a duty.*" *Maffucci*, 243 Conn. at 567. In the absence of a basis to impose a duty on UI in the first instance as to plaintiff, I need not consider the effect of § 16-11-102 on establishing the scope of that duty. *Ibid.* I will therefore grant UI's motion for summary judgment on the apportionment count.

Even if UI did not directly owe plaintiff a duty of care, UI might still be liable for common-law indemnity if it breached a duty—in tort or in contract—owed to Metro-North and the MTA. *See Valente v. Securitas Sec. Servs., USA, Inc.*, 152 Conn. App. 196, 204 & n.4 (2014); *Williams v. Hoffman/NewYorker, Inc.*, 923 F. Supp. 350, 352 (D. Conn. 1996). But Metro-North and the MTA have pointed to no conduct by UI that breached any duty or any provision of the Transmission Line Agreement, such as a failure comply with a contractual duty to post warning signs on any portion of the tower. I will therefore grant UI's motion for summary judgment on the claims for common-law indemnity and apportionment.

### Spoliation and Discovery Misconduct

Finally, plaintiff and defendants have cross-moved for sanctions based on each other's alleged discovery misconduct, with plaintiff alleging spoliation and failure to adequately respond to discovery requests, and defendants responding in frustration to plaintiff's deluge of filings. Rule 37(b)(2) of the Federal Rules of Civil Procedure grants broad discretion to fashion an appropriate sanction for discovery misconduct. *See Residential Funding Corp. v. DeGeroge Fin. Corp.*, 306 F.3d 99, 106–107 (2d Cir. 2002); *Davis v. Hunt Leibert Jacobson P.C.*, 2016 WL 3276948, at *2 (D. Conn. 2016). In addition to enumerating various sanctions a district court may impose, Rule 37(b)(2)(C) provides that, "[i]nstead of or in addition to the [enumerated sanctions], the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure

was substantially justified or other circumstances make an award of expenses unjust." *See Novak*

*v. Wolpoff & Abramson LLP*, 536 F.3d 175, 178 (2d Cir. 2008) (burden is on disobedient party to

avoid imposition of expenses by showing that his failure is justified or that special circumstances

make an award of expenses unjust).

On his claim of spoliation, plaintiff alleges that defendants buried the accident site by

laying crushed stone near and around Tower #1043 during railway maintenance almost three

years after the accident, destroying evidence of a well-worn path leading to the tower. Plaintiff

requests an adverse inference instruction, as well as an order precluding defendants from denying

the existence of a well-worn path leading to the tower. Defendants deny the charge of spoliation,

deny that they were required to preserve the accident site indefinitely, and deny that the path is

relevant to plaintiff's claim. They also note that plaintiff has ample evidence of the well-worn

path leading to Tower #1043 because defendants took pictures of the accident site on the date of

incident and produced those photographs to plaintiff. Moreover, within weeks of the incident

(and well prior to the date of the alleged spoliation), plaintiff's own attorney trespassed on the

railroad property to photograph Tower #1043 and the surrounding area, without defendants'

knowledge or consent. At a motion hearing before me, plaintiff's attorney represented that he has

been to the site a number of times. Doc. #103 at 64.

To be entitled to an adverse instruction inference, a party must establish "(1) that the

party having control over the evidence had an obligation to preserve it at the time it was

destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the

destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of

fact could find that it would support that claim or defense." *Residential Funding*, 306 F.3d at

107. Courts take a "case-by-case" approach to determine whether the failure to produce or

preserve relevant evidence results from a culpable state of mind because "such failures [may] occur along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." *Id.* at 108. Ultimately, any sanction imposed for spoliation is "part of our attempt to place the innocent party in the same position he would have been in had the evidence not been destroyed by the offending party." *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998).

Defendants undeniably had control over the premises, notice of the claim, and a duty to preserve evidence relevant to this litigation. But this duty to preserve evidence does not extend indefinitely, *see Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 458 (2d Cir. 2007), and I do not conclude that defendants acted culpably when they allowed maintenance to occur near the accident site almost three years after plaintiff's accident. At most, defendants acted negligently with respect to their duty to preserve evidence, ostensibly because they complied with their other duties to maintain the railroad tracks in good condition for the safe passage of travelers.

Plaintiff has not been prejudiced by maintenance along the pathway because, by the time of that maintenance, defendants had already produced site photos taken on the date of the accident, which is the time frame most relevant in this case. Within two weeks of the accident, plaintiff's attorney had taken his own photos of the scene (albeit without defendants' knowledge or consent). There is sufficient evidence in the record to show (or attempt to deny) the existence of a path leading to Tower #1043, leading me to decline imposition of any sanction.

Plaintiff alleges several other species of discovery misconduct, including defendants' (1) unreasonable delay in production; (2) improper speaking objections; (3) failure to file a privilege log; (4) failure to answer interrogatories that would have identified pertinent witnesses; (5) failure to produce certain documents; and (6) presentation of Rule 30(b)(6) corporate

representative witnesses who could not testify to all topics plaintiff designated. At the outset, the defendants' delay in production and improper speaking objections fall well short of the extreme conduct for which courts generally impose sanctions. *See Gerber Scientific Int'l, Inc. v. Roland DGA Corp.*, 2010 WL 3803206, at *3 (D. Conn. 2010). I decline to impose sanctions on those bases.

As for defendants' failure to file a privilege log, I ruled on August 5, 2014, that defendants would file a privilege log if they withheld any discovery on the basis of privilege. Doc. #103 at 23. Although defendants claim to have made it clear that a privilege log was not warranted, the record does not disclose whether defendants withheld any answers or documents on the basis of privilege. Defendants are directed to file an affidavit within two weeks of this ruling representing whether any answers or documents have been withheld on privilege grounds and, if they have, an explanation for their failure to produce a privilege log. *See Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 37 (S.D.N.Y. 2009).

As for defendants' alleged failure to answer certain interrogatories and produce certain documents, all in violation of my discovery order of August 5, 2014, plaintiff asserts that they failed to (a) provide a list of claims concerning injuries or death that resulted from contact with high-voltage electrical wires; (b) produce records of maintenance, repair, or replacement of signs on Tower #1043; (c) produce records or documents of, or policies and procedures for maintenance of warning signs or the duty of any employee to report inadequate warning signs; and (d) provide the names of individuals responsible for patrolling, inspecting, repairing, and maintaining the catenary structure and warning sign. *See* Doc. #195-1 at 11 ¶ 61.

Defendants assert that they complied with the first request—the list of claims—and I agree. *See* Doc. #204-9 at 21–22. Insofar as plaintiff may quarrel with any search terms used to

uncover the claims information, his objection to such terms could and should have been raised earlier. I also agree that, although defendants did not respond to plaintiff's next two requests— maintenance records and policies—these requests were cumulative to some of plaintiff's other requests. *Compare* Doc. #195-2 at 2 ¶ 13, *with* Doc. #204-9 at 58 ¶¶ 11, 12 and 60 ¶¶ 17, 18; *compare* Doc. #195-2 at 3 ¶ 17, *with* Doc. #204-9 at 15 ¶¶ 11, 12; 17 ¶ 16; 47 ¶ 6. Plaintiff does not object to defendants' failure to answer any of the cumulative requests, and so defendants' failures appear to be harmless.

Defendants failed to adequately respond to the last category of information—the names of people responsible for patrolling, inspecting, repairing, and maintaining Tower #1043 and its warning signs. When defendants asserted that it would be difficult to name these individuals, I ordered defendants to "identify at least one person who is responsible for each of these categories," as well as to make due inquiry to determine who was responsible for that tower during the year of the accident. Doc. #103 at 27–29. Defendants concede that they did not answer this interrogatory, but they argue that their failure is excused because they offered the testimony of Robert Doody, a Metro-North representative, who could have answered the last request had plaintiff asked it at a deposition. *See* Doc. #204 at 6. It appears, however, that plaintiff *did* ask Doody this question (and several variants of it), and that Doody did not know the answer. *See* Doc. #172-3 at 48 ("Q: Who puts up those signs? . . . A: I don't know who put that up. That was years before I came here."), Doc. #172-4 at 3–6 ("Q: Do you know if anybody at Metro-North . . . has ever discussed that issue [of maintenance of the warning signs]? A. No."). I therefore cannot excuse or otherwise justify defendants' failure to respond to this crucial interrogatory.

This claim of misconduct melds with plaintiff's last claim that defendants failed to produce Rule 30(b)(6) witnesses qualified to cover all of the topics for which he requested testimony, in particular "persons who were knowledgeable in regard to the inspection, repair and maintenance of the metal structure of [the tower] and its warning signs . . . ." Defendants counter that they offered competent witnesses, that plaintiff wished to explore voluminous pages worth of topics that would have required multiple witnesses to address, and that "plaintiff had ample opportunity to depose additional corporate representatives. They simply never asked." Doc. #204 at 9.

I agree with plaintiff. None of the witnesses proffered by defendants could speak to inspection of the tower and its warning signs.[3] The breadth of topics plaintiff wished to explore did not excuse defendants from producing qualified designees. Rule 30(b)(6) does not place a duty to ask for additional corporate designees—should the ones provided be incompetent—on *plaintiff*; the rule instead requires the *organization* to designate the officers that will cover each enumerated topic. *See Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 268–69 (2d Cir. 1999) ("[T]he corporate deponent has an affirmative duty to make available 'such number of persons as will' be able 'to give complete, knowledgeable and binding answers' on its behalf."). It is unclear whether plaintiff is unable to glean who is responsible for maintaining the signage

---

[3] Neither of Metro-North's designees knew who put the signs up or who was responsible for maintaining them. Doody knew that it was the obligation of the bridge and building department to maintain and inspect the towers, Doc. #172-1 at 19, and that the catenary department installed warning signs in the past, Doc. #172-3 at 49, but Doody could not testify as to who, specifically, put up the warning sign present on the date of the accident, or whether anybody at Metro-North ever discussed the issue of graffiti-covered warning signs. Doc. #172-3 at 48; Doc. #172-4 at 4, 6. He did testify that his department—the catenary department—put signs up on the tower *after* the accident, and installed other signs in other areas, but then testified that his department does not generally replace signs. Doc. #172-4 at 2–3. Phil Wilhelmy, another corporate designee for Metro-North, testified that he had no responsibility for replacing graffiti-covered signage along the right of way, even as district superintendent for operations of Metro-North. Doc. #175-2 at 7. Russell, a designee of the MTA, opined that various departments at Metro-North put the signs up, either the structures department, the track department, or maybe the police department. Doc. #173-1 at 17.

because of defendants' failure to produce qualified Rule 30(b)(6) designees, or because defendants have nobody responsible for that maintenance function. Doc. #172-4 at 33 ("Q: Who at Metro-North, if anyone, is in charge of repairing or maintaining warning signs on tower 1043 that have been covered up by paint or graffiti? A: We don't have a program to repair the signs if they have been covered up."). But it is quite clear that defendants have not complied with several of my discovery orders.[4] *See* Doc. #103 at 27–29.

Plaintiff is entitled to some relief for defendants' failure to provide qualified Rule 30(b)(6) designees. I will therefore reopen *limited* discovery subject to the following conditions: (1) defendants shall, within two weeks, "identify at least one person who is responsible for" each of the categories of patrolling, inspecting, repairing, and maintaining Tower #1043 and its warning signs, and make due inquiry to determine who was responsible for that tower during the year of the accident; *see* Doc. #103 at 27–29; (2) plaintiff is entitled to an additional round of Rule 30(b)(6) depositions from each defendant, but the matters for examination are limited to "patrol, inspection, repair, and maintenance of the towers and their warning signs"; (3) all deposition(s) taken as a result of this order shall be completed within 30 days of today's date and shall be limited to two days, or 16 total hours of testimony; and (4) defendants—not defendants' attorneys—shall pay for plaintiff's costs and attorneys fees to prepare for and attend these deposition(s) pursuant to Fed R. Civ. P. 37(b)(2)(C).

Because plaintiff has successfully defended the motion for summary judgment, I am not convinced at this time that any other sanctions are appropriate. The parties may include in the

---

[4] Plaintiff's blizzard of paperwork—to defendants and to this Court—at least partially explains defendants' lack of compliance with their discovery obligations; a reasonable person might understandably omit an answer or miss something when slogging through paperwork of this ilk. But even though plaintiff's requests are voluminous, duplicative, and disorganized, they do not excuse defendants from the obligation to comply with discovery orders in good faith, and any hassle in attempting to comply with their discovery obligations certainly does not entitle defendants to sanctions against plaintiff.

joint trial memorandum their positions, limited to one page double-spaced, on whether it would be appropriate to preclude testimony from additional Rule 30(b)(6) corporate representatives on any other topics that plaintiff claims were skipped over by defendants.

CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment (Doc. #209) is DENIED, and defendants' motion (Doc. #146) is DENIED IN PART and GRANTED as to wilful, wanton, and reckless conduct. UI's motion for summary judgment (Doc. #206) is GRANTED as to common-law indemnity and apportionment, and DENIED as to contractual indemnity. All motions for sanctions and/or adverse inferences (Docs. #190, #194, #203) are largely denied, save the limited discovery that will be allowed as set forth above. I also find as moot plaintiff's remaining documents mislabeled on my docket as "motions," including Docs. #182, #202, #219, #263, #264, #269. Plaintiff's counsel is requested to learn how to file and label documents properly on CM/ECF.

The parties shall file their joint trial memorandum by May 12, 2017, or within 30 days of completion of the 30(b)(6) depositions as set forth in this ruling. Please refer to the District of Connecticut website for my "Trial Preferences" and "Instructions for Joint Trial Memorandum." Jury selection will be held on July 6, 2017 at 8:30 a.m., with a back-up date of August 3, 2017.

It is so ordered.

Dated at New Haven, Connecticut, this 13th day of March 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge