UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
MILTON OMAR COLON and ARLENE    :   No. 3:13CV325(JAM)
DAVIS,                          :
                                :
        Plaintiffs              :
                                :
      vs.                       :
                                :
METRO-NORTH COMMUTER RAILROAD   :
COMPANY, and METROPOLITAN       :
TRANSPORTATION AUTHORITY,       :
                                :
        Defendants              :
                                :
- - - - - - - - - - - - - - - - :
                                :
METRO-NORTH COMMUTER RAILROAD   :
COMPANY, and METROPOLITAN       :
TRANSPORTATION AUTHORITY,       :
                                :
        Third-Party Plaintiffs  :
                                :
      vs.                       :
                                :
UNITED ILLUMINATING COMPANY,    :
AUTHORITY,                      :
                                :   New Haven, Connecticut
        Third-Party Defendant   :   August 9, 2017
                                :
- - - - - - - - - - - - - - - - x

JURY TRIAL
VOLUME III

B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.,

                    and a Jury

                         Diana Huntington, RDR, CRR
                         Official Court Reporter

1    A P P E A R A N C E S:

2

3         FOR THE PLAINTIFFS:

4              WOODLIEF & RUSH, P.A.
                   3411 W. Fletcher Ave., Suite B
                   Tampa, Florida 33618
5              BY:  BRIAN P. RUSH, ESQ.

6

         FOR THE DEFENDANTS AND THIRD-PARTY PLAINTIFFS:

7

8              RYAN RYAN DELUCA, LLP
                   707 Summer Street
                   Stamford, Connecticut 06901
9              BY:  ROBERT O. HICKEY, ESQ.
                   BECK S. FINEMAN, ESQ.

10

11        FOR THE THIRD-PARTY DEFENDANT:

12             LOUGHLIN FITZGERALD, P.C.
                   150 South Main Street
13                 Wallingford, Connecticut 06492
               BY:  CHARLES P. REED, ESQ.
14                 JAMES E. RINGOLD, ESQ.

15

16

17

18

19

20

21

22

23

24

25

1

<u>TABLE OF CONTENTS</u>

2

PLAINTIFFS'                                                           VOIR
WITNESS          <u>DIRECT</u>   <u>CROSS</u>    <u>REDIRECT</u>    <u>RECROSS</u>   <u>DIRE</u>

ROBERT THOMPSON
  By Mr. Rush        390
  By Mr. Fineman            420
  By Mr. Rush                         429

JOSÉ CORREA
  By Mr. Rush        434
  By Mr. Fineman            485
  By Mr. Reed              491
  By Mr. Rush                         493

ROBERT THOMPSON
  By Mr. Rush        495
  By Mr. Fineman            520
  By Mr. Rush                         544

ALISA SAVETAMAL, M.D.
  (Video deposition) – 545

1                          **8:35 A.M.**

2              THE COURT:  We're here today for the third day

3    of trial in the matter of Colon, et al. vs. Metro-North,

4    et al.

5              May I have appearance of counsel, please, and

6    those at counsel table?

7              MR. RUSH:  Good morning, Your Honor.  This is

8    Brian Rush for the plaintiffs.

9              THE COURT:  Good morning.

10             MR. HICKEY:  Good morning, Your Honor.  Bob

11   Hickey from Ryan Ryan Deluca for the defendants

12   Metro-North and the MTA.  To my left is Attorney Beck

13   Fineman.

14             MR. REED:  Good morning, Your Honor.  Charlie

15   Reed for the third-party defendant United Illuminating

16   Company.  And my associate to my left with me is Jim

17   Ringold.

18             THE COURT:  Good morning.

19             Are there any initial matters to take up this

20   morning?

21             MR. RUSH:  Your Honor, I wanted to introduce the

22   new translator/interpreter, Julia Ayala Gonzales.

23             THE COURT:  Ms. Gonzales, good morning.

24             Could you describe a little about Ms. Gonzales'

25   qualifications?

1            MR. RUSH:  She would have to do that.

2            THE COURT:  Ms. Gonzales, can you come up to the

3    lectern?  Can you describe to me what your qualifications

4    are to serve as an interpreter?

5            THE INTERPRETER:  Yes.  I'm a certified

6    interpret by the State of Connecticut.  I'm also certified

7    by the Consortium of Interpreters.  I have 44 years of

8    experience.  I have worked at the United Nations.  I have

9    worked independently with private attorneys on personal

10   injury cases, workers' compensation, and social security

11   disability.  I just retired from judicial, the State of

12   Connecticut, covering Part A in Stamford, Connecticut, as

13   well as criminal court in Norwalk.

14           THE COURT:  Okay, great.

15           Any objection to the interpreter's

16   qualifications?

17           MR. HICKEY:  No objection from Metro-North.

18           MR. REED:  No, Your Honor.

19           THE COURT:  I'm going to have you sworn in at

20   this point in time.

21           (Interpreter sworn.)

22           THE CLERK:  Please state your name.

23           THE INTERPRETER:  Julia Ayala Gonzales.

24           THE COURT:  Ms. Gonzales, at the point in time

25   when we need your services, we'll ask you to sit in that

1   chair right behind the witness stand for you to do your

2   interpreting.  Thank you for coming today.

3              Are there other matters initially to take up?

4              MR. RUSH:  Your Honor, only a little heads-up.

5   I think we may have fixed the problem with the Doody

6   deposition.  We have the ability when we show him a

7   document to hit a button and the screen goes blank.

8              THE COURT:  Okay.

9              MR. RUSH:  And the audio continues and then when

10  we're done showing a photograph, my assistant will hit a

11  button and it will come back up with his picture.

12             THE COURT:  That sounds fine.

13             Are there other matters to take up?

14             MR. RUSH:  No, Your Honor.

15             THE COURT:  Okay.

16             I do anticipate issuing a ruling shortly with

17  respect to United Illuminating's motion, 316.  And I want

18  to just give you a sense of how I'm going to rule so you

19  can prepare, the parties can prepare for the examination

20  with respect to Dr. Stern.

21             The Court intends to largely deny the motion and

22  allow cross-examination by Metro-North and the MTA

23  concerning the views of Dr. Stern as stated in his

24  deposition testimony.  The Court does conclude that it is

25  within the scope of the disclosure and the report because

1    of the necessity of the expert in this case, in the

2    Court's view, to explain the basis for his overall

3    conclusions as plaintiff seeks to elicit them concerning

4    the cause of the electric shock.

5         It's my understanding that Mr. Rush on his

6    direct examination of Dr. Stern does not intend to try to

7    elicit anything about comparatively whether it was UI's

8    wires or Metro-North and MTA's.  At least you stated that

9    you did not intend to do so at our June 1st conference,

10   I'm not sure if that's changed.  My anticipation would be

11   that still, for purposes of Metro-North and the MTA

12   defending themselves against the overall conclusions here,

13   it is necessary to go into his more specific thoughts

14   about possible relative contributions.  And I think

15   there's been ample notice of that as well.

16        And that will all be set forth in the written

17   ruling.  I wanted to let you all know about that for your

18   own preparation purposes.

19        MR. REED:  Thank you, Your Honor.

20        MR. RUSH:  Your Honor, we in fact will ask

21   Dr. Stern about the effect of those wires.  He testified

22   about them in his deposition and he also testified about

23   them in his report.  What we tried to communicate on

24   June 1st was that we feel that Metro-North alone is

25   liable --

```
 1              THE COURT:  As a matter of legal liability.

 2              MR. RUSH:  Yes, sir.  But in terms of the

 3  science, I think Dr. Stern's been quite clear that he

 4  thinks that -- I think he said there's a lot of energy up

 5  there and although he hasn't done any calculations --

 6              THE COURT:  That's the problem I have.  I just

 7  don't think there's any way to separate those two.  It

 8  were one thing if he issued an initial report that

 9  specifically only targeted Metro-North, its wires, I

10  should say, then I could see why I would see more of UI's

11  arguments on this.  I think UI's arguments are

12  substantial, I understand why you filed the motion.  But I

13  think that it doesn't do that.  I think he speaks to and

14  gave ample notice from the start that it was due to

15  collection of wires up there.  It would be really only

16  logical to presume that he would be referring as well to

17  the UI's wires in light of the very substantial voltage

18  differential there, granted that they're farther away from

19  where Mr. Colon was than the Metro-North wires at the

20  time.

21              That will be the Court's ruling.  Hopefully

22  we'll be issuing that at a later time today.

23              Anything else to take up initially?

24              Okay.  Great.  We will be back in touch with you

25  as soon as our jury is here.  It's 20 minutes of, so we're
```

1    running on time.  When we're ready to go, we'll notify the

2    parties.  Stand in recess.  Thank you.

3                    (Whereupon, a recess followed.)

4                THE COURT:  All set for the jury, I understand?

5                    (Whereupon, the jury entered the

6                    courtroom.)

7                THE COURT:  Welcome back.  Please be seated.

8                We're going to continue now with our third day

9    of trial.  As you recall, we were about to start a video

10   deposition yesterday, but in light of witness availability

11   and all that, I think we have a slightly different plan.

12                Is that right, Mr. Rush?

13                MR. RUSH:  Yes, Your Honor.  We have a live

14   witness.

15                THE COURT:  We'll get to the video deposition

16   later on.  And then we'll start with our live witness now.

17                Please call your next witness.

18                MR. RUSH:  Your Honor, we call Bob Thompson of

19   New Haven.

20                THE CLERK:  Please remain standing.  Please

21   raise your right hand.

22

23

24

25

```
 1                    ROBERT THOMPSON,

 2          called as a witness, having been first duly

 3          sworn, was examined and testified as follows:

 4

 5              THE CLERK:  Please be seated.

 6              Please state your name.

 7              THE WITNESS:  Robert Thompson.

 8              THE CLERK:  Please spell your last name.

 9              THE WITNESS:  T-H-O-M-P-S-O-N.

10              THE CLERK:  Please state your address by city

11  and state only.

12              THE WITNESS:  New Haven, Connecticut.

13              THE CLERK:  Thank you.

14              THE COURT:  Please proceed.

15              MR. RUSH:  Thank you, Your Honor.

16

17                    DIRECT EXAMINATION

18  BY MR. RUSH:

19  Q.   Mr. Thompson, good morning.

20  A.   Good morning.

21  Q.   Have you ever had occasion to testify in court

22  before?

23  A.   No.

24  Q.   Welcome.  It's just conversational.  I'll try to talk

25  to you in that way.  I hope you'll talk to the jury and
```

1    tell them what the truth is; is that clear?

2    A.    Yes.

3    Q.    You understand that whatever you say today has to be

4    the truth to the best of your ability to give the truth?

5    A.    Yes.

6    Q.    Okay.  How old are you, sir?

7    A.    Forty-nine.

8    Q.    And where were you born?

9    A.    New Haven, Connecticut.

10   Q.    And can you tell the jury where you went to school

11   when you were a child and in high school?

12   A.    I went to West Haven High School.

13   Q.    And have you lived in the West Haven and New Haven

14   area most of your life?

15   A.    All my life.

16   Q.    What type of work do you do, sir?

17   A.    Heating and air-conditioning.

18   Q.    How long have you been in the heating and

19   air-conditioning business?

20   A.    Sixteen years.

21   Q.    Okay.  Where do you live?

22   A.    17 Morris Street, New Haven.

23   Q.    That's Morris Street?

24   A.    Yes.

25   Q.    That's M-O-R-R-I-S?

```
 1    A.    Yes.

 2    Q.    How long have you lived at Morris Street?

 3    A.    For at least 20 years.

 4    Q.    And who lives there with you?

 5    A.    My brother and my elderly mother.

 6    Q.    And has your mother lived at that location for very

 7    long?

 8    A.    Longer than I have.

 9    Q.    And why is it that you're there living with your

10    mother?

11    A.    Because she needs taken care of.  Between me and my

12    brother, we take care of her.

13    Q.    Is she ill?

14    A.    Yes.

15    Q.    Can you tell the jury how close your house on Morris

16    Street is to the railroad right-of-way at Ella Grasso?

17    A.    Approximately 100 feet.  200 feet, maybe.

18    Q.    Are there any other homes between your home and the

19    Metro-North Railroad at Ella Grasso Boulevard?

20    A.    No.

21    Q.    Mr. Thomas, I'm going to show you an aerial

22    photograph, Exhibit 190 in this case, it's been introduced

23    in evidence.  I'll show this photograph to you now.

24          See if we can get it focused there.

25               THE COURT:  Is your screen not working?
```

```
 1              JUROR:  No.

 2              THE COURT:  Is it just your screen or

 3    everybody's screens?

 4              Is it working now?

 5              JUROR:  Yes.

 6              THE COURT:  Please proceed.

 7              MR. RUSH:  Thank you.

 8              THE COURT:  It's the grain of the picture,

 9    probably.

10              MR. RUSH:  The picture is clear, Your Honor.

11    It's not -- it's not picking up the picture on the screen.

12    The photograph is completely clear.

13              THE COURT:  You'll have to do the best you can.

14    It's a somewhat grainy photograph.  Do the best you can.

15              MR. RUSH:  Okay.

16              Is that better?

17    BY MR. RUSH:

18    Q.   Okay, Mr. Thompson, do you see that photograph on the

19    screen?

20    A.   Yes, sir.

21    Q.   And I'm going to circle a triangle structure or I'm

22    going to put maybe a line by a triangle structure.  Do you

23    see that triangle structure?

24    A.   Yes.

25    Q.   Can you tell the jury what that is?
```

```
1    A.   It's a compost pile where they bring leaves, roots,

2    stuff like that from the town and they dump it there.

3    Q.   Okay.  And that is sort of pie-shaped, isn't it?

4    A.   Yes.

5    Q.   This pie points in the direction of looks like a

6    major road.  Do you recognize that major road it points

7    toward?

8    A.   95.  Interstate 95.

9    Q.   And then along the side of that pie-shaped mulch area

10   is another sort of way.  Do you recognize what that

11   structure is next to it?

12   A.   That's the train tracks.

13   Q.   Okay.  Now, you also see this dark area.  What is

14   this dark area?

15   A.   That's the river.

16   Q.   Okay.  And the train tracks run over the river, do

17   you see that?

18   A.   Yes.

19   Q.   And then they continue underneath a road or a

20   boulevard.  Do you know what road or boulevard this is?

21   A.   Ella Grasso Boulevard.

22   Q.   Okay.  Now, where exactly in this photograph is your

23   house?

24   A.   Do I touch the screen?

25   Q.   I think you have a stylus that you can actually make
```

```
 1    a mark.

 2         Approximately where is your house?

 3    A.    Right about in here (indicating).

 4    Q.    And your house overlooks the railroad right-of-way?

 5    A.    Yes.

 6    Q.    And there's no house between you and the railroad

 7    right-of-way?

 8    A.    No.

 9    Q.    Now, are you able to tell us or tell the jury what

10    street this is that goes over the river over here; do you

11    know what that street is?

12    A.    I can't put the name on the street.

13    Q.    Let me ask you, is it either Spring or Washington

14    Street?

15    A.    It's Spring Street.

16    Q.    And that road intersects here with Ella Grasso?

17    A.    Yes.

18    Q.    And then again your house you marked as being right

19    about here; is that right?

20    A.    Yes.

21    Q.    Do you see this driveway or -- do you see a driveway

22    within that circle that I'm circling now?

23    A.    Yes.

24    Q.    Can you tell the jury what that driveway is?

25    A.    That used to be a roadway.  It's an old dump up
```

```
 1    there.  And that used to be a roadway to go in there.
 2    Q.   Okay.  Have you had occasion to drive by that
 3    entryway off of Spring Street into that wooded area?
 4    A.   Yes.
 5    Q.   Do you recognize this photo as a picture of that
 6    entryway with these one, two, three, four, five, six,
 7    seven rocks in front of it?
 8    A.   Yes.
 9              THE COURT:  Exhibit number, please?
10              MR. RUSH:  It's previously been an exhibit.
11    It's Exhibit 504.  I think it's a defendants' exhibit.
12    BY MR. RUSH:
13    Q.   Now, Mr. Thompson, have you ever been up in that
14    area?
15    A.   No.
16    Q.   Are you aware that some of that area is used by
17    motorbikes for motocross area?
18    A.   Yes.
19    Q.   How are you aware of that?
20    A.   Honestly, because I know people that ride up there.
21    Q.   Okay.  Acquaintances or friends?
22    A.   Yes.
23    Q.   And have you seen motorbikes going up into that area
24    from one direction or another?
25    A.   Yes.
```

```
 1   Q.   Okay.
 2              THE COURT:   Could we make sure to ask questions
 3   that are specific to the year 2011 unless there's some
 4   reason why you need to elicit testimony about the current
 5   state?
 6              MR. RUSH:   Yes.
 7   BY MR. RUSH:
 8   Q.   You've lived in your house 15, 20 years?
 9   A.   Yes, sir.
10   Q.   In this case we're looking at an incident that
11   occurred on the railroad right-of-way on March 17, 2011.
12   So my questions are largely directed to that time and
13   before, the weeks, months, and years before that date.
14        Are your answers that you've given so far today
15   accurate for that time frame, the time frame of March 17,
16   2011, and the weeks, months, and years before?
17   A.   Yes.
18   Q.   Okay.  Mr. Thompson, have you had occasion to see
19   motorcyclists drive on the right-of-way past the view of
20   your house --
21   A.   Yes.
22   Q.   -- prior to March 2011?
23   A.   Yes.
24   Q.   Can you tell the jury what you saw and about when you
25   saw it?
```

```
 1   A.   I seen kids on ATVs, dirt bikes, walking, just
 2   playing around down there.
 3   Q.   How frequent was that during the summer months?
 4   A.   Very frequent.
 5   Q.   And when you say very frequent, can you tell the jury
 6   whether that would be on the weekends or daily or every
 7   day or what would it be?
 8   A.   Mostly the weekends.
 9   Q.   Okay.  And these children or teenagers, do you know
10   approximately what their ages were, what they appeared to
11   be?
12   A.   No.  They were -- they wear masks and stuff like
13   that.  They would be just basically, by looking at them,
14   they were in their teenage years to early twenties.
15   Q.   Some of them wore motorcycle helmets?
16   A.   Yes.
17   Q.   Okay.  The ones who were walking, were they wearing
18   motorcycle helmets also or not?
19   A.   No.
20   Q.   In what -- as you look at this photograph, if your
21   house was here, in what direction were these children and
22   teenagers walking?
23   A.   Actually, up and down.  They would basically be
24   walking up and back the other way too.
25   Q.   So toward 95 and then away from 95 also, depending on
```

1   whether they were coming or going?

2   A.   Yes.

3   Q.   Was that true for the motorcycle or ATV drivers also?

4   A.   Yes.

5   Q.   Were you ever present when Metro-North personnel were

6   present and these children and teenagers would either ride

7   or walk by on the right-of-way in the presence of those

8   Metro-North employees?

9   A.   Yes.

10  Q.   What did the Metro-North employees do?

11  A.   They were working.

12  Q.   Did they stop and try to stop the walkers or the ATV

13  riders?

14  A.   No.

15  Q.   Did they try to warn them to get off the

16  right-of-way?

17  A.   Not that I could see, no.

18  Q.   Did trains go by from time to time while children and

19  teenagers were walking, riding on the right-of-way?

20  A.   Yes.

21  Q.   Did the trains take any action to warn the walkers or

22  riders as they went by?

23  A.   They would blow the horn.

24          MR. FINEMAN:   I have to object.   There's been a

25  series of leading questions, I think.

```
 1              THE COURT:  Well, no, I'll allow it.  I'll allow
 2   this question.
 3              Go ahead.
 4   A.   They would blow a horn at them, that's about it.
 5   BY MR. RUSH:
 6   Q.   They wouldn't slow down or stop?
 7   A.   You can't slow down a train.
 8   Q.   After the trains stopped, can you tell the jury
 9   whether or not any MTA police showed up?
10   A.   Not during the time they were down there.
11   Q.   Okay.  Have you seen MTA police on the right-of-way
12   from time to time?
13   A.   Once in a while.
14   Q.   When you say once in a while, was it frequent or
15   infrequent?
16   A.   Infrequent.
17   Q.   And did you observe the policemen doing anything?
18   A.   Sitting in their cars.
19   Q.   Did the policemen, while you were watching them, get
20   out of their cars?
21   A.   Not that I could see them.
22   Q.   Looking at this river that I'm circling that's in the
23   middle of the tracks, is there a bridge -- can you tell
24   the jury whether or not there's a bridge over that river?
25   A.   The railroad bridge.
```

```
 1    Q.    Okay.  And have you had occasion to see people walk
 2    over that bridge to fish?
 3    A.    Yes.
 4    Q.    And have you in fact gone down to fish at that river?
 5    A.    Yes.
 6    Q.    When you have gone down to fish at that river, have
 7    you seen children and teenagers either walking or riding
 8    their motorbikes over that railroad bridge?
 9    A.    Yes.
10    Q.    Did you see anybody try to stop them or warn them to
11    get off the railroad bridge?
12    A.    No.
13    Q.    When you would go fishing, how long would you
14    typically stay to fish?
15    A.    An hour or two.
16    Q.    During that time, do you recall -- during a one- or
17    two-hour period, do you recall how many children or
18    teenagers walked or rode their motorbikes or ATVs over
19    that bridge?
20    A.    I wasn't counting them.  I mean, there was plenty of
21    them.
22    Q.    From the river where you would fish, could you hear
23    the motorbikes up in the abandoned landfill, the covered
24    landfill up there?
25    A.    Oh, yeah.
```

```
 1   Q.   Have you ever gone up there to watch the motocross
 2   activity yourself?
 3   A.   No.
 4   Q.   Do you know -- well, can you tell the jury once the
 5   motorcyclists past where you were fishing on the river,
 6   did they continue or stop somewhat?
 7   A.   Well, they continued as far as I could see them.  I
 8   wasn't really like watching saying where are you going.
 9   They just kept going.  You could just hear their bike
10   scream the horn.
11   Q.   Could you see where or how the motorcycle or ATV
12   riders would access this motocross track that I've circled
13   here?
14   A.   No.
15   Q.   When you -- when you have been on the right-of-way,
16   have you seen graffiti on the towers and signs that are on
17   the towers?
18            THE COURT:  I'm going to ask you again to talk
19   about specific dates.
20            MR. RUSH:  Very good, Your Honor.
21   BY MR. RUSH:
22   Q.   Just to be clear, all my questions now are about
23   March 17, 2017, or the months and years before that.
24            THE COURT:  2011.
25            MR. RUSH:  Sorry.
```

1    Q.   March 17, 2011, or the months and years before March

2    of 2011.  Is that clear?

3    A.   Yes.

4    Q.   For all of the answers that you've given so far, do

5    they apply to the time period before March 17, 2011?

6    A.   Yes.

7    Q.   During that time period before March 17, 2011, can

8    you tell the jury whether or not you had occasion to

9    observe graffiti on the railroad towers and the railroad

10   signs?

11   A.   Yes.

12   Q.   Mr. Thompson, let me show you a slightly larger

13   picture.  It is Exhibit Number 121.

14       Mr. Thompson, you see this slightly larger picture of

15   that same railroad bridge --

16   A.   Yes.

17   Q.   -- which I'm circling here?

18   A.   Yes.

19   Q.   And your house on this photograph, am I circling the

20   correct area approximately where your house would be?

21   A.   Approximately.

22   Q.   On this photograph -- well, first of all, does

23   Exhibit 121 accurately depict the area in and around your

24   home and the river just to the west of Ella Grasso

25   Boulevard?

    1    A.    Yes.

    2    Q.    And again, that would be for the time period, say, in

    3    2010 or earlier than March of 2011?

    4    A.    Yes.

    5    Q.    Can you again make a mark where your house was,

    6    approximately.

    7    A.    (Complies.)

    8    Q.    Can you again show the jury where you would have

    9    been --

   10              THE COURT:  Have you moved this into evidence?

   11              MR. RUSH:  No, Your Honor.

   12              THE COURT:  He's not able to show the jury

   13    something if it hasn't been moved into evidence.

   14              MR. RUSH:  Very good, Your Honor.

   15              Your Honor, I move 121 into evidence.

   16              THE COURT:  Any objection to 121?

   17              MR. FINEMAN:  No objection.

   18              THE COURT:  Full exhibit.

   19              (Plaintiffs' Exhibit 121 marked in evidence.)

   20              MR. RUSH:  Thank you, Your Honor.  I hadn't

   21    noticed it wasn't up there yet.

   22    BY MR. RUSH:

   23    Q.    Mr. Thompson, the top circle is where your house is?

   24    A.    Yes.

   25    Q.    The other circle below by the river is where you

1    would be fishing?

2    A.   Yes.

3    Q.   And from that vantage point when you were fishing,

4    you would be looking toward I-95?

5    A.   Yes.

6    Q.   Can you draw a line on the pathway that the --

7    generally the direction that motorcycle riders and young

8    children walking on the right-of-way would be walking?

9              MR. FINEMAN:  Objection.

10             THE COURT:  Sustained.  Young children is a

11   mischaracterization.

12   BY MR. RUSH:

13   Q.   The teenagers or children, maybe they weren't young,

14   maybe they were older children, but can you show the

15   direction that they were going?

16             MR. FINEMAN:  Same objection.

17             THE COURT:  Sustained.

18   BY MR. RUSH:

19   Q.   Okay.  These riders, did you recognize those as

20   teenagers or recognize them as adults?

21   A.   They were in their late teens or early twenties.

22   Q.   Now, the people who were walking, did you notice

23   whether those people who were walking seemed to be younger

24   from time to time, children or teenagers?

25   A.   They ranged from anywhere from being teenagers to

1    being adults.

2    Q.    Okay.  So can you show me the direction that these

3    people would be walking and riding their motocross or ATV

4    bikes?

5    A.    Like I said before, they would be going both ways.

6    They'd be going this way and they'd be going that way.

7    Q.    About how far down the track could you continue to

8    watch them from your vantage point on the river?

9    A.    I don't know, close near the compose pile down here

10   somewhere.  You know, over here (indicating).

11   Q.    And at some point you would lose track of them or

12   just go back to fishing, what would you do?

13   A.    I would just go back to fishing.

14   Q.    Okay.  Now, have you had occasion to look at the

15   right-of-way and that area around the railroad bridge and

16   the river since March of 2011?

17   A.    Yes.

18   Q.    Okay.  In 2011 and 2012, did that area change very

19   much?

20              MR. FINEMAN:  Objection, relevance.

21              THE COURT:  Sustained.

22   BY MR. RUSH:

23   Q.    Okay.  Let me show you a photograph that's dated

24   March 29, 2012, and ask you if you recognize that

25   particular photograph which is Exhibit 125?  Do you

1    recognize that as a true and accurate photograph of the

2    railroad bridge and river?

3    A.    Yes.

4    Q.    And again, it's dated in 2012.  Can you tell the jury

5    whether the appearance of the right-of-way and the river

6    has changed in any significant way since 2012 from March

7    of 2011?

8              MR. FINEMAN:  Objection.

9              THE COURT:  On grounds of failure to

10   authenticate the date, of this witness to do that?

11             Sir, do you know that this photograph may have a

12   date of March 29, 2012?  Did you put that date on the

13   photograph, sir?

14             THE WITNESS:  No.

15             THE COURT:  Do you know for a fact that this

16   photograph was taken on March 29, 2012?

17             THE WITNESS:  No.  Google maps, there's Google

18   maps.  I don't know the exact date it was taken.

19             THE COURT:  You're asking the witness to testify

20   about a document that's not been admitted into evidence.

21             MR. RUSH:  Yes, Your Honor.

22             THE COURT:  So if you wish to ask the witness

23   whether anything that he recalls something occurring

24   differently, that's a different kind of question than

25   asking the witness to testify about a document that's not

 1    in evidence or a photograph that's not in evidence.

 2             MR. RUSH:  Very good, Your Honor.  We have an

 3    expert who has looked at all of the Google maps and will

 4    be here tomorrow, I think, to go over --

 5             THE COURT:  That's great.  We'll look forward to

 6    hearing from that expert then.

 7             MR. RUSH:  So I'll pull it back.

 8    BY MR. RUSH:

 9    Q.   Mr. Thompson, did you -- can you tell the jury

10    whether -- well, can you tell the jury in the time period

11    before March 2011 what kind of surface you walked on when

12    you went down to fish at the river near the railroad

13    bridge?

14    A.   Hard and compacted.

15    Q.   I'm sorry?

16    A.   Hard and compacted.

17    Q.   And can you tell the jury whether or not there was a

18    well-worn path along the edge of the railroad

19    right-of-way?

20    A.   Yes.

21    Q.   From your -- in fact, you used that path to go

22    fishing?

23    A.   Yes.

24    Q.   Can you tell the jury what you believe had caused

25    that pathway to become compacted and well-worn?

1    A.   Heavy traffic.  People walking, people riding

2    vehicles.  After a while, it just gets hard and compacted.

3    Q.   Mr. Thompson, let me show you Exhibit 128 which I

4    believe is in evidence.  It's a composite which is

5    numbered 1 through 4.

6         Mr. Thompson, can you look at that Exhibit Number 128

7    and tell me if that is the type and appearance of a path

8    that is similar to the one you walked on near the river

9    and the railroad bridge?

10   A.   Similar.

11   Q.   Okay.  How is it different in any way?

12   A.   The one that I was on was just more sandier and less

13   rocky.

14   Q.   Did you have any difficulty walking on this compacted

15   path?

16   A.   No.

17             MR. FINEMAN:  Objection.  I don't think he

18   walked on this area.

19             THE COURT:  Sustained.  The answer is stricken.

20             You can ask the witness if he has walked in this

21   area.

22             MR. RUSH:  No, my question -- when I said the

23   path, I was talking about the path -- my previous question

24   was about the path that he walked on on the river.  I just

25   said the path again.  So I'll be a little bit clearer.

1    BY MR. RUSH:

2    Q.    When you say you walked on a path that was sandier

3    and not as rocky, where was that path?

4    A.    Down by the river by my house.

5    Q.    Okay.  Did you have any trouble walking on that

6    particular path that you walked down down by the river?

7    A.    No.

8    Q.    Okay.  During all of your observations on that

9    pathway while you were down fishing, did you ever see

10   Metro-North police?

11   A.    No.

12   Q.    When you were down fishing, did you have Metro-North

13   trains pass the area?

14   A.    Yes.

15   Q.    And did they pass you while you were fishing?

16   A.    Yes.

17   Q.    Did the trains take any action as they passed you

18   while you were fishing?

19   A.    No.

20   Q.    Did you see other people out fishing when you were

21   there fishing?

22   A.    Yes.

23   Q.    And just for a little bit clearer date, during that

24   time period before March 2011, can you tell the jury how

25   many times you would have seen people either fishing or

1    carrying fishing poles toward or from the river?

2    A.    Hundreds.  I can't give you a specific amount, but

3    hundreds.

4    Q.    Okay.  And that would be over the entire period of

5    time of approximately ten years or more before March 2011?

6    A.    In that time period, it would probably be in the

7    thousands.

8    Q.    Okay.  And during any of that time, did you see

9    Metro-North police ticketing people who were fishing?

10   A.    No.

11   Q.    Mr. Thompson, did you have occasion to see graffiti

12   on the walls underneath the Ella Grasso overpass when you

13   were walking on the railroad right-of-way path before

14   March of 2011?

15   A.    Yes.

16   Q.    Can you tell the jury what you would see there from

17   time to time before March 2011?

18   A.    Just a bunch of graffiti on the walls down there.

19   Q.    From time to time did the graffiti change?

20   A.    Yes.

21   Q.    Okay.  Have you seen graffiti on railroad towers

22   between your house and the area in and around the river

23   that had graffiti up above the signs?

24   A.    Sometimes, yeah.

25   Q.    In your experience has the -- well, did you notice

1   any effort by Metro-North or the MTA to clean up any of

2   that graffiti on the towers and signs, including above the

3   signs?

4   A.   The towers they did, but not on the bridges or

5   nothing.

6   Q.   I'm sorry?

7   A.   Around the towers they did.  But not the bridges or

8   anything.

9   Q.   Okay.  Now, prior to March 2011, can you tell the

10  jury whether -- to what extent the towers and signs near

11  your house had graffiti covering them?

12  A.   Can you repeat that question?

13  Q.   Can you -- in the years and months before March 2011,

14  can you tell the jury to what extent the bridges -- I'm

15  sorry, the towers and signs on those towers had graffiti

16  near your house?

17  A.   I don't understand what you mean to an extent.

18  Q.   Well, did most of the signs have graffiti on them?

19             MR. FINEMAN:  Objection, leading.

20             THE COURT:  Sustained.

21  BY MR. RUSH:

22  Q.   Okay.  Let me try to rephrase it.

23        When I'm saying to what extent, I'm asking you in

24  your own words to tell the jury what amount or what

25  percentage of the towers and signs between your house and

1    the river had graffiti on them.

2              MR. FINEMAN:  Objection, foundation.

3              THE COURT:  Sustained.

4    BY MR. RUSH:

5    Q.   Did you have occasion when you were walking along the

6    right-of-way to look at the towers and signs along the

7    right-of-way?

8    A.   Yes.

9    Q.   And was that something you did before March of 2011?

10   A.   Yes.

11   Q.   And do you recall what you saw on the towers and

12   signs before March of 2011?

13   A.   Just paint, graffiti, stuff like that.  I didn't

14   examine it.

15   Q.   Okay.  Mr. Thompson, can I ask you to look at a

16   exhibit which is not in evidence yet.

17        Now again, this Exhibit Number 68 is not in evidence.

18   And I've got two exhibits, 68 and 69.  Do you recognize

19   that photograph as a photograph of the wall under Ella

20   Grasso Boulevard?

21   A.   Yes.

22   Q.   And do you recognize the structure behind the wall as

23   being a structure that is next to or near Ella Grasso

24   Boulevard which I just circled?

25   A.   Yes.

```
1    Q.   Is that a true and correct photograph of the type of
2    graffiti that you would have seen on the walls underneath
3    Ella Grasso Boulevard?
4    A.   Yes.
5    Q.   Now, this photograph may not be the exact same type
6    of graffiti; do you understand that?
7    A.   Yes.
8    Q.   In fact, the only thing I'm asking you, is this an
9    accurate photograph of the structures that are under Ella
10   Grasso Boulevard?
11   A.   Yes.
12   Q.   And do you recognize those walls and those pylons as
13   being the walls and pylons that you had seen with graffiti
14   on them, although different graffiti?
15   A.   Yes.
16   Q.   Otherwise is the photograph accurate?
17   A.   Yes.
18   Q.   Let me show you one other exhibit, they go together.
19   Exhibit 69, which has not been admitted.  Do you see that
20   photograph?
21   A.   Yes.
22   Q.   Does that wall and pylon, do you recognize that wall
23   and pylon as being underneath Ella Grasso Boulevard?
24   A.   Yes.
25   Q.   And you see the green space behind it?
```

1    A.    Yes.

2    Q.    Now, can you tell the Court whether you recognize

3    this as a true and accurate photograph of the structures

4    although not exactly the same graffiti that you've seen in

5    years before March 2011?

6    A.    Yes.

7    Q.    And for that location it's true and accurate?

8    A.    Yes.

9    Q.    You would agree or is it -- well, can you tell us

10   whether this graffiti is -- has changed over time?

11   A.    Yes.

12   Q.    And that's true for both 68 and 69?

13   A.    Yes.

14        MR. RUSH:  Your Honor, I would move 68 and 69

15   into evidence as evidence of the structures that are

16   underneath Ella Grasso Boulevard.

17        THE COURT:  Any objection?

18        MR. FINEMAN:  Yes, Your Honor.  I think there's

19   a relevance issue here.  These are completely different

20   structures.  I don't know what this would tend to prove

21   that's relevant to this case.

22        THE COURT:  The argument is they're different

23   structures?

24        MR. FINEMAN:  Yes.

25        THE COURT:  Or different graffiti?

1              MR. FINEMAN:  Both.  My objection is based on

2     the fact that these are different structures and don't

3     intend to show anything that Mr. Rush needs to prove in

4     the case.

5              THE COURT:  Sir, as you look at these

6     photographs, you didn't take these photographs, I take it?

7              THE WITNESS:  No.

8              THE COURT:  Do they look like the area that

9     you're familiar with?

10             THE WITNESS:  Yes.

11             THE COURT:  Both photographs show graffiti?

12             THE WITNESS:  Yes.

13             THE COURT:  Is the graffiti that you see in the

14    photograph similar to the graffiti that you saw before

15    March 17, 2011?

16             THE WITNESS:  Yes.

17             THE COURT:  I'll overrule the objection and

18    allow Exhibits 68 and 69 subject to those limitations that

19    you just heard from the witness.  Full exhibits.

20             (Plaintiffs' Exhibits 68 and 69 marked in

21              evidence.)

22    BY MR. RUSH:

23    Q.   Mr. Thompson, the jury now can see that structure

24    that you have identified as Exhibit 69.  Can you explain

25    to the jury what you saw in terms of graffiti or painting,

1    urban art on these structures in the years and months

2    before March 17, 2011?

3    A.   Explain --

4    Q.   Well, let me ask you:  Can you explain to the jury

5    whether this type of graffiti was the type of graffiti

6    that you saw in the months and years before March 17,

7    2011?

8    A.   Yes.

9    Q.   And can you explain to the jury what you mean when

10   you say that the graffiti changed over time?

11   A.   Kids paint over each other's tags.  That's called a

12   tag.  Kids paint over each other's tags.

13   Q.   Okay.  Have you had occasion to see anybody paint

14   anything on those structures that were shown in

15   Exhibit 69?

16   A.   No.

17   Q.   Okay.  Have you seen those graffiti and urban art

18   change over time?

19   A.   Yes.

20   Q.   Let me show you Exhibit Number 68.  Again, you see

21   that electrical structure behind the wall?

22   A.   Yes.

23   Q.   What is that electrical structure?

24   A.   High voltage electricity.

25   Q.   And looking at this wall, can you tell the jury where

1    that wall is located approximately?

2    A.   Across from -- say that again?

3    Q.   This wall here that I'm circling --

4    A.   Yeah.

5    Q.   -- where approximately is that located in regard to

6    Ella Grasso Boulevard?

7    A.   It's right below it.

8    Q.   And how far is this particular area from the railroad

9    right-of-way?

10   A.   10 feet.

11   Q.   Okay.  In the years and months before March 2011, did

12   you see any MTA police doing anything to try to prevent

13   this type of urban art or graffiti on these walls as shown

14   on Exhibit 68?

15   A.   No.

16   Q.   Or in Exhibit 69?

17   A.   No.

18   Q.   Mr. Thompson, did you have occasion to see an

19   automobile driving on the railroad right-of-way, on the

20   Metro-North railroad right-of-way near Ella Grasso

21   Boulevard?

22   A.   Yes.

23   Q.   Was that before March 2011 or after March 17, 2011?

24   A.   I want to say it was after.

25   Q.   Okay.  Can you tell the jury what you noticed about

1    that car?

2              MR. FINEMAN:  Objection, relevance.

3              THE COURT:  I'll allow the answer to this, but

4    you may raise the objection again after this answer.

5    A.   Can you repeat that again, please?

6    BY MR. RUSH:

7    Q.   What did you see the car doing?

8    A.   It drove down onto the tracks and it got stuck on the

9    tracks.

10   Q.   What did you do?

11             THE COURT:  Hold on a second.  Objection of

12   relevance, this occurred after 2011.  I'll see counsel at

13   sidebar.

14

15    SIDE BAR CONFERENCE, AS FOLLOWS:

16             THE COURT:  So why are you asking about what he

17   saw after 2011?

18             MR. RUSH:  In his deposition I thought he

19   indicated it was before.  He had a different answer.  I'm

20   not going to impeach him.

21             THE COURT:  Okay.  So on relevance, it's

22   stricken.  Go on to the next.

23                  (Sidebar conference concluded.)

24

25

```
 1    BY MR. RUSH:

 2    Q.   Mr. Thompson, in the time you were walking on that

 3    path toward the river to fish during any of those times in

 4    the five or ten years before March 17, 2011, did you

 5    yourself see any "no trespassing" signs?

 6    A.   No.

 7    Q.   Did you see any "do not enter" signs?

 8    A.   No.

 9    Q.   Did you see any "keep off" signs?

10    A.   No.

11    Q.   Did you see any signs along the river warning people

12    not to trespass?

13    A.   No.

14              MR. RUSH:  Thank you.  No further questions.

15              THE COURT:  Cross-examination.

16              MR. FINEMAN:  Yes, thank you, Your Honor.

17

18                        CROSS-EXAMINATION

19    BY MR. FINEMAN:

20    Q.   Good morning, Mr. Thompson.

21    A.   Good morning.

22    Q.   We met a couple months ago, but by way of

23    reintroduction, my name is Beck Fineman.  I represent

24    Metro-North and the MTA in this case.  I just want to ask

25    you a couple of follow-up questions about your testimony
```

1    this morning.

2         Let me start where Mr. Rush left off.  So these are

3    the photographs you were shown, I'm going to show them to

4    you again, this is Exhibit 69 and Exhibit 68.

5         You identified this area as being over by Ella Grasso

6    Boulevard, right?

7    A.   Underneath.

8    Q.   And the structure -- I'm sorry, that's a little

9    crooked there.  The structure that we see here, these

10   actually support the roadway above, right?

11   A.   Yes.

12   Q.   And do you know whose property that is?

13   A.   No.

14   Q.   You don't know who owns that particular structure, do

15   you?

16   A.   Honestly, no.

17   Q.   And you don't know who is in charge of maintaining or

18   controlling that particular area, do you?

19   A.   No.

20   Q.   Just to be clear, while we're talking about Ella

21   Grasso and just to reorient ourselves here, I'm going to

22   show you Exhibit 190.  This is page 2 of 190.

23        Okay.  So --

24             THE COURT:  Trying to get a pen?

25             MR. FINEMAN:  Yes.

1          THE COURT:  I think it's the multicolored pallet

2     there.

3     BY MR. FINEMAN:

4     Q.   So Ella Grasso I think we established is over here;

5     is that right?

6     A.   Yes.

7     Q.   You said your house is where?  Can you show us on the

8     photo?

9     A.   Approximately right here (indicating).

10    Q.   And when you went fishing, that's down by the river

11    over here?

12    A.   Yes.

13    Q.   You've actually never gone past that particular area

14    on the right-of-way yourself, have you?

15    A.   Years and years ago, yes.

16    Q.   In the years leading up to 2011, five years before

17    that, you've never been down to another part of the

18    right-of-way, have you?

19    A.   Before 2011?

20    Q.   Before 2011.

21    A.   Yes.

22    Q.   You have.

23         We met a couple of months ago when we took your

24    deposition?

25    A.   Yes.

```
 1    Q.   You were asked questions the same way you're under

 2    oath today?

 3    A.   Yes.

 4    Q.   And Mr. Rush was there and Mr. Reed was there and I

 5    was there, right?

 6    A.   Yes.

 7    Q.   And I asked you a question whether you had walked

 8    farther down the tracks than that area when you went

 9    fishing.  Do you remember me asking you that question in

10    the deposition?

11    A.   Yes.

12    Q.   Do you remember what you told me?

13    A.   You asked me if I ever walked down there after 2011.

14         MR. FINEMAN:  May I approach, Your Honor?

15         THE COURT:  Sure.

16    BY MR. FINEMAN:

17    Q.   I'm looking at page 28, line 8.

18    A.   28, yeah.

19    Q.   Didn't I ask you to identify the area where you had

20    been fishing?

21    A.   Yes.

22    Q.   And wasn't my next question, had you ever walked

23    farther down the tracks in that area?

24    A.   Yes.

25    Q.   And your answer to me was no, you had not?
```

```
 1   A.    It says that I could remember, no.  But afterwards
 2   when I was thinking about the case and thinking about
 3   years ago, I had walked down there.  I've actually walked
 4   from my house on those tracks almost into Milford.
 5   Q.    Today you member something different than what you
 6   told me at your deposition?
 7   A.    Yes, yes.
 8   Q.    May I take that back?
 9   A.    Yes, sir.
10   Q.    I went on to ask you in that same line of questioning
11   whether you ever saw anybody else while you were out there
12   fishing walking farther down the tracks; do you remember
13   me asking you that?
14   A.    Yes.
15   Q.    And you said not where the bridge is but further down
16   on the other side of the water, right?
17   A.    Yes.
18   Q.    And then I asked you:  Did you see them from where
19   you were fishing?  Did you see them on the other side of
20   the water?
21         Do you remember what your answer to me was at that
22   point?
23   A.    I mean, I've seen people walk down there, but I
24   didn't keep an eye on them to see how far they went down.
25   I seen them walk past me over the bridge and keep walking.
```

1    Q.   Do you remember telling me that you had seen one

2    person in all those times you've been down there fishing,

3    you saw one person walking on the other side of the

4    tracks?

5    A.   No.

6              THE COURT:  On the other side of the tracks or

7    other side of the bridge?

8              MR. FINEMAN:  I'm sorry, other side of the

9    river.  Thank you, Your Honor.

10   BY MR. FINEMAN:

11   Q.   May I show you again?

12   A.   I believe you.  I just don't remember saying that, I

13   don't know why.

14   Q.   I'd like you, if you would, to read your answer from

15   your deposition.

16             MR. RUSH:  What page are you on?

17             MR. FINEMAN:  I'm sorry, Brian.  This is

18   page 28, line 19.

19   BY MR. FINEMAN:

20   Q.   My question to you on line 19 was whether you had

21   seen people walking on the other side of the river.  Would

22   you please read to the jury your answer under oath at that

23   time starting on line 21?

24   A.   Yeah.

25   Q.   Would you read that out loud, please, starting on

1    line 21?

2    A.    From where -- actually, to be honest with you, when I

3    was fishing I only seen one person in all the times I went

4    down there fishing walking on the other side of the

5    tracks.

6    Q.    And it's only when you've been down there fishing

7    that you've ever seen anybody on the other side of that

8    river, right?

9    A.    On the other side of the river, yes.

10   Q.    Now, the people that you told us you could see

11   walking past your house over here, you have no idea how

12   far down the tracks in either direction they went, right?

13   A.    Once they went underneath the bridge, you really

14   can't see them from there.

15   Q.    So you have no idea how far they went?

16   A.    No.

17   Q.    You don't know where they were coming from or where

18   they were going those times that you saw them, right?

19   A.    No.

20   Q.    I think you told us you weren't able to tell us how

21   many of those people were under the age of 18 and how many

22   were over the age of 18?

23   A.    No.

24   Q.    The people that you saw walking or riding motorbikes

25   on the tracks, you never told Metro-North about those

1    people, did you?

2    A.    No.

3    Q.    Never told the MTA about them?

4    A.    No.

5    Q.    Never reported them to the police?

6    A.    No.

7    Q.    Okay.  And when you were asked questions about

8    whether you yourself ever observed MTA police down in the

9    tracks at least where you could see them from your vantage

10   point, you said yes, you did occasionally see them down

11   there patrolling, right?

12   A.    I saw them sitting in their cars.

13   Q.    Okay.

14   A.    They would pull down off the boulevard and they would

15   park down there.  Like I said, I didn't know whether they

16   were MTA or if they were New Haven PD.

17   Q.    So you saw some police presence out there?

18   A.    I just saw the lights.  It was at night most of the

19   time.

20   Q.    Okay.  And you yourself don't know anything about the

21   MTA's or the local police, their procedures or routines

22   for patrolling any area of the right-of-way, do you?

23   A.    No.

24   Q.    And you're obviously not out there all the time, so

25   you can't tell you how frequently they're out there?

```
 1    A.    No.  But over my years of living there, maybe a

 2    handful of times.

 3    Q.    But you're not out there all the time, are you?

 4    A.    During the summer, yes.  We're always outside.

 5    Q.    And you're out in that particular area?

 6    A.    Right at the end of the street.

 7    Q.    So you don't know what they're doing anywhere else

 8    along the line, do you?

 9    A.    No.

10    Q.    The beaten down or well-worn area that you talked to

11    Mr. Rush about, that sandy area where you yourself walked,

12    it's your conclusion based on your observations that that

13    was beaten down by people walking on it, right?

14    A.    Walking, riding bikes, cars.

15    Q.    Cars, okay.

16          So those would be trespassers, some of them?

17    A.    Pretty much.

18    Q.    All right.  Also Metro-North employees?

19    A.    Yes.

20    Q.    And United Illuminating employees?

21    A.    Yes.

22    Q.    Okay.  And the Metro-North employees use their

23    vehicles and their equipment down there?

24    A.    Yes.

25    Q.    You'd actually seen Metro-North employees working and
```

```
 1    walking down there hundreds of times before 2011; isn't
 2    that right?
 3    A.   Yes.
 4    Q.   In all the times that you've seen anybody out on the
 5    right-of-way, you have never seen anybody climb one of
 6    those catenary towers, have you?
 7    A.   No.
 8    Q.   You yourself never tried climbing a catenary tower?
 9    A.   No.
10    Q.   And you never would, would you?
11    A.   No.
12              MR. FINEMAN:  Nothing further right now.  Thank
13    you.
14              THE COURT:  Mr. Reed?
15              MR. REED:  No questions, Your Honor.
16              THE COURT:  Anything on redirect?
17
18                      REDIRECT EXAMINATION
19    BY MR. RUSH:
20    Q.   Mr. Thompson, I wanted to give you a chance to read
21    what you said to that first question Mr. Fineman asked you
22    where you were talking about walking farther down the
23    tracks beyond the river.  Let me show you page 28,
24    beginning at line 11 here.  Beginning with the word "did,"
25    now, that reads:  Did you ever walk farther down the
```

1    tracks toward the bottom of the page?  And your answer

2    was:  That I could remember, no.

3         Have you remembered since your deposition walking

4    farther down the tracks?

5    A.   Yes.

6    Q.   And can you tell the jury how you came to remember

7    that?

8    A.   Just thinking about over the years what I'd done down

9    there between fishing and everything else.  And I remember

10   a long time ago, one time I walked from -- I walked down

11   the hill next to my house onto the side of the tracks and

12   I walked almost all the way to Milford to get to a

13   friend's house.

14   Q.   Okay.  Now, the next section is talking about -- it

15   says -- the question at line 19 on page 28, you saw them

16   from where you were fishing is the question?

17   A.   Yes.

18   Q.   You saw them from where you were fishing?

19   A.   Yes.

20   Q.   And then you said:  From where -- well, actually, to

21   be honest with you, when I was fishing I only seen one

22   person in all the times I went down there fishing walking

23   on the other side of the tracks.

24        See that?

25   A.   Yes.

```
 1    Q.   Now, the use of the word "other," can you explain to

 2    the jury what you meant when you said the other side of

 3    the tracks?

 4    A.   On the other -- on the other side of the bridge.

 5    Q.   Okay.  When you were fishing -- when you were

 6    fishing, can you tell the jury where approximately you

 7    would be fishing in relation to the railroad bridge?

 8    A.   Right alongside it.

 9    Q.   And so this answer where you're talking about the

10    other side of the tracks where you saw only one person on

11    the other side of the tracks, what did you mean by "the

12    other side of the tracks"?

13    A.   On the other side of the bridge.

14    Q.   So can you tell the jury whether that phrase "other

15    side of the tracks" means --

16              MR. FINEMAN:  Objection, Your Honor.  I think

17    he's answered what he meant.  Any question beyond that is

18    going to be leading.

19              THE COURT:  I think he's answered what he said.

20    BY MR. RUSH:

21    Q.   With that clarification, can you tell the jury

22    whether you've seen teenagers or other people riding their

23    ATVs and motorcycles beyond the river in the direction

24    toward I-95?

25    A.   Yes.
```

1          MR. FINEMAN:  Objection, asked and answered.

2          THE COURT:  I'll allow it.

3     BY MR. RUSH:

4     Q.   I'm sorry?

5     A.   Yes.

6     Q.   And again, before March 17, 2011, you've seen that?

7     A.   Yes.

8     Q.   And do you know the exact number of people that

9     you've seen in the five or ten years before March of 2011

10    riding their ATVs beyond the river toward I-95?

11    A.   No.

12    Q.   Can you tell the jury whether you've seen teenagers

13    or other young people driving -- or walking on that path

14    beyond the river in the direction toward I-95, again in

15    the five to ten years before March 2011?

16    A.   I've seen the kids riding their bikes up and down

17    that way.  But as far as walking, I only seen one person,

18    I believe, maybe.  Maybe two, if that.  But mostly it's

19    all motorbike action.

20    Q.   Okay.  Now, in the area overlooking from your house,

21    looking down on the track from your house, not by the

22    river, have you seen young people or teenagers walking

23    along the path along the right-of-way?

24    A.   I've seen all ages walking.

25    Q.   Not just young people and teenagers, but also adults?

```
 1    A.    Yes.
 2    Q.    Do you know the exact number of people that you saw
 3    in the five or ten years before this incident?
 4    A.    No.  I'm not keeping count.
 5              MR. RUSH:  Thank you very much.
 6              THE COURT:  Mr. Fineman, anything else?
 7              MR. FINEMAN:  Nothing further.  Thank you,
 8    Your Honor.
 9              MR. REED:  No questions.
10              THE COURT:  You're excused.  Thank you for
11    coming in, sir.
12              Next witness, please.
13              MR. RUSH:  Your Honor, I would call José Correa
14    Ayala.
15              Mr. Thompson is released?
16              THE COURT:  Yes, he is.
17              Thank you, Mr. Thompson.
18              THE CLERK:  Please raise your right hand.
19
20                        JOSÉ CORREA,
21         called as a witness, having been first duly
22         sworn, was examined and testified as follows:
23
24              THE CLERK:  Please state your name.
25              THE WITNESS:  My name is José Correa.
```

 1               THE CLERK:  Please spell your last name.

 2               THE WITNESS:  C-O-R-R-E-A.

 3               THE CLERK:  Please state your address by city

 4    and state.

 5               THE WITNESS:  I live in the city of New Haven,

 6    Connecticut, 1496 Quinnipiac.

 7               THE CLERK:  Please be seated.

 8               THE COURT:  We'll ask our interpreter if you

 9    would use that microphone so we can make sure the jury

10    hears everything.

11               THE INTERPRETER:  Sure, Your Honor.

12               THE COURT:  Please proceed.

13

14                       DIRECT EXAMINATION

15    BY MR. RUSH:

16    Q.   Good morning, sir.

17    A.   Good morning.

18    Q.   Mr. Correa, where do you live?

19    A.   I live in the city of New Haven.

20    Q.   Now, Mr. Correa, do you speak some English?

21    A.   Correct.

22    Q.   What is your native language?

23    A.   Spanish.

24    Q.   And are you more comfortable speaking in Spanish in a

25    formal way rather than English today?

```
 1    A.    Correct.
 2    Q.    Mr. Correa, what do you do for a living?
 3    A.    I do repairs and maintenance work for the housing
 4    agency for the City of New Haven.
 5    Q.    How long have you worked for the City of New Haven,
 6    sir?
 7    A.    Approximately 12 years.
 8    Q.    Shall I address you as Mr. Correa?
 9    A.    Correct.
10    Q.    Mr. Correa, where were you born?
11    A.    I was born here in the city of New Haven.
12    Q.    And how old are you?
13    A.    I am 39 years old right now.
14    Q.    What is your relationship to Omar Colon?
15    A.    He's my brother.
16    Q.    And how much older are you than him?
17    A.    Seven years.
18    Q.    Did you have occasion to leave Connecticut and move
19    to Puerto Rico with your family?
20    A.    That was when I was about one year old, my family
21    moved back to Puerto Rico.
22    Q.    And how long after that time did you stay in Puerto
23    Rico?
24    A.    It was until 2005 when I made the decision to move
25    back to the United States.
```

```
1    Q.   And how old were you then?

2    A.   I would say that I was 25, 24 years old.

3    Q.   Okay.  Now, where did you graduate from high school?

4    A.   In Bayamón, Puerto Rico.

5    Q.   Did you have to go to a regular high school or a

6    special high school to graduate?

7    A.   No, I went to a regular public school.

8    Q.   Okay.  Now, after high school, did you have occasion

9    to join the United States military?

10   A.   Yes.  After I graduated, when I was 18 years old, I

11   had the opportunity to sign up with the National Guard in

12   Puerto Rico.

13   Q.   Okay.  And how long did you continue in the National

14   Guard?

15   A.   Eight years consecutive.

16   Q.   Approximately what years did those cover, from when

17   to when?

18   A.   If I am correct, I signed up in April 1987 and I did

19   that until April 25, 2005.

20   Q.   Are you able to tell the jury in English what you did

21   in the United States Army?

22   A.   Did you say to say it in English or Spanish?

23   Q.   Tell it in Spanish then.

24   A.   Well, I made a lot of different assignments, many

25   different experiences I had there.  I was in my unit,
```

1    which is called 12 Bravo.  We handled explosives, heavy

2    equipment, schools, and we did some time in Honduras as

3    well.

4    Q.   In your service in the United States military, did

5    you have occasion to build schools and bridges?

6    A.   Yes.  After the Hurricane Mitch, I don't remember

7    exactly when that was, we were moved to Honduras where we

8    had to build schools, bridges, et cetera.

9    Q.   After your service in the United States military, did

10   you have occasion to come back to New Haven, Connecticut?

11   A.   Yes.  Basically every year I would come back here

12   during vacation to visit my family in New Haven.

13   Q.   And when you -- when approximately did you begin

14   working for the City, which year?

15              THE INTERPRETER:  Excuse me?

16   BY MR. RUSH:

17   Q.   In what year, approximately, did you begin working

18   for the City of New Haven?

19   A.   I started in 2006, but it wasn't until October 2007

20   that I got my permanent position.

21   Q.   And do you have a job title or job description?

22   A.   Yes.  We have a title which is called BMW 3, which

23   translates to Building Management Worker number 3.

24   Q.   And in just basic terms, can you tell the jury what

25   you do on a day-to-day basis?

1    A.    Under that job, we're in charge of maintenance,

2    general maintenance, construction, setting up, windows,

3    installing floors, painting.  So basically we take care of

4    an apartment.  We do an apartment from the floor to

5    ceiling to make it available for somebody to reside there,

6    somebody in the community.

7    Q.    Can you tell the jury whether you do that work all

8    over the city of New Haven?

9    A.    Yes.  We work with a unit all over New Haven, it's

10   called like Kater 250.  And we work in East Haven,

11   New Haven, and the border of West Haven.

12   Q.    Okay.  What is the border of West Haven between

13   West Haven and New Haven?

14   A.    I can't give a physical description, but we all know

15   that what divides West Haven from New Haven is the river.

16   Q.    Have you ever lived or had close family members who

17   lived in West Haven?

18   A.    Yes, I have friends and relatives that live in

19   West Haven as well.

20   Q.    Mr. Correa, let me show you Exhibit Number 190 which

21   is an area photo of a portion of New Haven and West Haven.

22   I believe it's been admitted into evidence.  We're looking

23   at page 2 of that two-page exhibit now.

24        Are you familiar with the composting center that's

25   located in West Haven that I'm circling on this map?

1    A.    Yes.

2    Q.    Have you had occasion to drive by that particular

3    area?

4    A.    Correct.  On several occasions I have been in that

5    area.

6    Q.    And is that true for the time period in the months

7    and years before Omar Colon's March 17, 2011, incident?

8    A.    Definitely.

9    Q.    Okay.  Now, let me ask you a question about another

10   area in West Haven.

11        Are you familiar with this area of green space that

12   is next to the composting area?

13   A.    Yes.  That is the green area where people do

14   motocross and it is basically like a cutoff, like a

15   shortcut that people use to get from one area to the

16   other, that's what it is.

17   Q.    Okay.  Now, you moved back to Puerto Rico when you

18   were a very young child of one or two; is that correct?

19   A.    Correct.

20   Q.    Can you tell the jury how frequently you would visit

21   New Haven during your childhood?

22   A.    Basically once a year during summer, during

23   Christmas, but sometimes three times a year.

24   Q.    Do you have relatives who are permanent residents of

25   New Haven?

```
 1    A.    Yes, I have uncles and cousins that live here.
 2    Q.    Can you tell the jury when you were on your visits,
 3    would you visit with them here in New Haven?
 4    A.    Always.
 5    Q.    Okay.  Mr. Correa, are you familiar with the river
 6    area located immediately below this triangular area where
 7    the compost piles are?
 8    A.    Yes.  I'm very familiar.  I have been there for
 9    several years, and I know the area where people go
10    fishing.
11    Q.    Have you had occasion to fish in that river in that
12    area along and nearby the railroad track?
13    A.    Yes.  Several times.
14    Q.    And how would you get down to the river in relation
15    to the railroad tracks when you would go fishing as a
16    young person, teenager or young person?
17    A.    I would walk over the rails.  Or if not, we would go
18    around Washington Avenue.
19    Q.    You have a stylus.  Can you mark how you would get to
20    the river to fish?
21    A.    We would go like this, going there (indicating).  But
22    if we were going with friends that lived in that other
23    area, then we would do this and go around.
24    Q.    Okay.  Now, what time frame are we talking about?
25    How many years before your brother's injury would you have
```

1   been fishing either over the railroad right-of-way or on

2   this other area here by Washington Avenue?

3   A.   Practically, I would say around 2001 was the last

4   time that I was in that area.

5   Q.   Okay.  And when would have been the first time before

6   2001 that you have been fishing near the railroad tracks,

7   near the railroad bridge?

8   A.   It would be around 1989, 1990.

9   Q.   Now, in regard to the motocross area, can you tell

10  the jury how you're familiar with this motocross area that

11  I'm circling here?

12  A.   Very familiar because I used to go there.  Actually,

13  I used to use one of my machines there in the motocross

14  area.  And almost every weekend everybody goes there.

15  Q.   Can you show the jury how it is that you would enter

16  this green space area to get to the motocross?

17           MR. FINEMAN:  Your Honor, I have an objection.

18  We're talking about time frame 1989 to 2001?  I have an

19  objection on relevance grounds.

20           THE COURT:  Can you clarify time frame when he

21  would enter the motocross area?

22           MR. RUSH:  Yes, Your Honor.

23  BY MR. RUSH:

24  Q.   Mr. Correa, can you tell us the approximate year or

25  years in which you would have been driving your machines

1  in that motocross area?

2  A.   It would be around the year 2000 the last time that I

3  run a machine there in that area.

4  Q.   Okay.  And have you been by that area before Omar

5  Colon's March 17, 2011, incident between 2000 and 2011?

6  A.   I cannot say precisely about the time, but after I

7  was there the last time, I don't think I ever returned to

8  that area.

9  Q.   Okay.  Let me ask you some questions about the day of

10  March 17, 2011.  Before we get to that --

11            THE COURT:  If you're about to go to that day,

12  we might take our morning break.  Do you have something

13  else?

14            MR. RUSH:  No, I have to do another time period

15  before that, so I'll stop now.

16            THE COURT:  Ladies and gentlemen, we'll take our

17  morning break and reconvene in approximately 15 minutes'

18  time.

19            Same advisories not to talk about the case,

20  engage anyone in conversation, or do any kind of research.

21  Thank you.

22              (Whereupon the jury left the courtroom.)

23            THE COURT:  Sir, you can step down.

24            Please be seated.

25            Anything to take up at this point?

1           MR. RUSH:  I don't think so.

2           THE COURT:  You're about to go into a different

3    area?

4           MR. RUSH:  I think I'll go back in time to cover

5    his brother's problems with learning and what he observed

6    about his brother's problem --

7           THE COURT:  Growing up?

8           MR. REED:  Yes, sir.

9           THE COURT:  That's fine.

10          Yes?

11          MR. REED:  Your Honor, I neglected to mention

12   this at the beginning.  Just to advise the Court and I've

13   advised counsel that in today's *New Haven Register* on the

14   front page below the fold appeared an article about the

15   case, a fairly in-depth article going on to the second

16   page. So I wanted to make the Court aware of that if the

17   Court hadn't seen that article.  I'll leave it at that.

18          THE COURT:  Hold on.  The witness can step down

19   and take a break.  We'll get back to you in 15 minutes.

20          MR. REED:  I wanted to make Your Honor aware.

21          THE COURT:  I know there's been news coverage.

22   Do the parties wish me to query the jury whether they've

23   seen the news coverage?

24          MR. REED:  I don't think that's necessary.

25   Since I had seen it this morning, I wanted to make the

```
 1    Court aware of that article having been published in this
 2    morning's paper.
 3              THE COURT:  I was aware.  I think I saw the
 4    reporter here yesterday.  So it seems that there's going
 5    to be some publicity about the case.  If the parties
 6    recommend it, I can make or consider whether to make an
 7    inquiry of the jury, but it doesn't sound like that's what
 8    the parties are asking me to do.  I've repeatedly warned
 9    the jury that they must avert their eyes about any
10    coverage on the case.
11              MR. REED:  Fair enough.
12              THE COURT:  Mr. Hickey, do you have anything
13    else?
14              MR. HICKEY:  No.
15              THE COURT:  We'll take our break and resume in
16    approximately 15 minutes.
17                  (Whereupon, a recess followed.)
18              THE COURT:  Please be seated.
19              We'll call the jury.
20                  (Whereupon, the jury entered the
21                   courtroom.)
22              THE COURT:  Welcome back, ladies and gentlemen.
23              The witness is taking the stand.  We'll continue
24    with the direct examination.
25              Please proceed.
```

1    BY MR. RUSH:

2    Q.   Mr. Correa, your mother testified at length on I

3    think Monday.  Without going over everything she said, can

4    you tell the jury a little bit about your brother and his

5    early life on the farm where you all lived?

6    A.   We live our early years at the farm.  We had a very

7    good relationship with our grandparents.  And during that

8    years we had great fun at the farm.  We had our pets,

9    horses, cows, ducks.  And Omar had great attachment to

10   animals.  He would take care of them, he would look after

11   them.  If he found them injured or something, he would

12   take care of them to the point that he would bring them

13   inside the house.  Like, for instance, little pigs, goats,

14   et cetera.  He would look after them.

15   Q.   What kind of relationship did Omar have with animals

16   as opposed to his relationships with people outside the

17   family?

18   A.   He relied a lot on his pets.  They were his friends.

19   He would confide in them.

20   Q.   When you were growing up, did you -- well, when you

21   were going up, can you tell -- when Omar was growing up,

22   when he was a young man, can you tell the jury whether

23   Omar had many friends outside the family?

24   A.   I can count them with the fingers in one hand, maybe

25   one, maybe two.

```
 1   Q.   Can you explain to the jury what your understanding
 2   was as to why Omar did not have many human friends?
 3   A.   At that early age, it was hard for me to identify
 4   what the problem was.  It wasn't until I became a teenager
 5   that I could identify the problem.
 6   Q.   And at that time when you were a teenager, how did
 7   you identify the problem?
 8   A.   Well, it wasn't halfway through elementary school
 9   that he started having problems with classmates, teachers.
10   It was difficult.
11   Q.   Can you explain to the jury how you -- what your
12   observations were of this difficulty that he had with
13   classmates and/or teachers?
14   A.   He was basically bullied from the other kids because
15   he wasn't able to develop yet be able to read like other
16   children or speak or hold a normal conversation with
17   others.
18   Q.   Can you tell the jury whether you observed other
19   children making fun of Omar as a young child and as a
20   school child?
21            THE COURT:  Just a moment.  Is there an
22   objection?
23            MR. FINEMAN:  Relevance, Your Honor.
24            THE COURT:  I'll allow it.
25            Proceed, please.
```

```
 1   BY MR. RUSH:
 2   Q.   Do you have the question?
 3            THE INTERPRETER:  I'm sorry, could you repeat
 4   it?
 5            MR. RUSH:  Yes.
 6   BY MR. RUSH:
 7   Q.   Can you tell the jury your observations of other
 8   children making fun or bullying Omar when he was a school
 9   child?
10   A.   Well, basically it could be like, for instance, he
11   would have to stand in front of the class to read a poem
12   or tell a poem and then he wouldn't be able to say it and
13   he would just stand there.  And that would create other
14   people start laughing at him.
15   Q.   Did you have occasion to attend school events where
16   he was trying to read something and was not able to carry
17   it out?
18   A.   Correct.
19   Q.   Does your brother have a driver's license?
20   A.   No, never.  He has never driven.
21   Q.   Can you tell the jury whether Omar, as an adult, has
22   asked you to read things to him?
23   A.   Always.
24   Q.   Okay.  Why does Omar have you read things for him to
25   him?
```

1    A.   Well, I can attest that in fact he cannot read and it

2    has always been the practice, mine and our mother, to read

3    to him or read things for him, like a letter from the

4    government.

5    Q.   Mr. Correa, can you tell the jury about Omar in the

6    months and years shortly before the March 2011 incident,

7    about your observations of Omar's thought process?

8    A.   I can say that around 2006 when Omar came back to

9    New Haven, he tried to work.  He looked for work.  Did a

10   few things.  Went through an employment agency.  And the

11   idea was to do something, move up, improve, get a better

12   life.

13   Q.   Okay.  Now, let me ask you what -- can you explain to

14   the jury how Omar physically appeared before the

15   March 2011 accident?

16   A.   Well, he was a tall man, he was elegant.  He was

17   friendly and very compassionate with others.

18   Q.   Now, if you can, so the translator can translate all

19   of your thoughts, can you try to give me relatively short

20   answers and I'll ask follow-ups; is that clear?

21   A.   Yes.

22   Q.   Now, physically, you said Omar was elegant, tall.

23   Fuerte?  Strong also?

24   A.   Correct.

25   Q.   Can you explain briefly how Omar appeared to think

1    and reason?

2    A.   Even though Omar does always appear like a normal

3    man, he has always had the mind of a child.

4    Q.   What do you mean by that, the mind of a child?

5    A.   I can say that like his judgment is not that of a

6    normal person.

7    Q.   How would you characterize Omar Colon's judgment

8    before the March 2011 injury incident?

9    A.   Well, I would say he's like -- he's like a child.

10   And we have always been aware that he's not normal.

11   Q.   Can you tell the jury whether Omar fully considers

12   things that he's facing before he makes a decision, again,

13   before the March 2011 incident?

14            MR. FINEMAN:  Objection.  Calls for speculation.

15            THE COURT:  I'm going to sustain that.  If he

16   wants to talk about any examples, he's welcome to do that.

17   I think you're asking for more than what he can testify to

18   as a lay witness.

19            MR. RUSH:  Thank you, Your Honor.

20   BY MR. RUSH:

21   Q.   José, approximately when did Omar come to Connecticut

22   to live from Puerto Rico?

23   A.   I would say at the end of 2006.

24   Q.   Have you had occasion to associate with Omar since

25   that time?

```
1    A.    Yes.

2    Q.    Can you tell the jury how much time you would

3    regularly spend with Omar on a weekly basis from 2006 up

4    until March 2011?

5    A.    Well, I did and I continue doing that, I see him in

6    the morning before work, in the afternoon after work, and

7    on the weekends.

8    Q.    Have you had occasion to employ Omar in your home

9    repair business?

10   A.    Yes.  Correct.

11   Q.    Now, to be clear, you have a job with the City that

12   you were talking about -- strike that.

13         Do you have a side business where you do weekend and

14   evening home repairs aside from your employment at the

15   City of New Haven?

16   A.    Well, yes, then I had it.  I don't have it now.  And

17   during that time Omar did cover with me at that time.

18   Q.    Okay.  During what period of time did you operate

19   this home repair business in Connecticut, the side

20   business?

21   A.    I would say about approximately three years.  I would

22   say 2007 to 2010, 2009.

23   Q.    Okay.  And what did you employ Omar to do in this

24   side business?

25   A.    It would be like daily cleaning, would do some
```

```
 1   painting and garbage removal, basically.
 2   Q.   Did he do any design work or architectural or
 3   drafting work?
 4   A.   No, nothing.
 5   Q.   Did he -- can you tell the jury whether he did
 6   anything besides menial labor?
 7   A.   Basically he would do like washing cars so he could
 8   earn some money, but I wouldn't say that he did anything
 9   besides that.
10   Q.   And for you, did he do anything particularly
11   complicated?
12   A.   Complicated how?
13   Q.   Complicated in terms of using his brain?
14   A.   He wasn't able.
15   Q.   Mr. Correa, are you married?
16   A.   Correct.
17   Q.   How many children do you have between you and your
18   wife?
19   A.   Four children.
20   Q.   After Omar was injured, can you tell the Court or
21   tell the jury what you did on the day he was injured?
22            THE INTERPRETER:   I'm sorry?
23   BY MR. RUSH:
24   Q.   On the day that Omar was injured, what did you do?
25   A.   I worked a whole day that day.
```

```
 1   Q.    And when did you hear that Omar had been injured?

 2   A.    It was exactly at 4:30 in the afternoon when Omar's

 3   wife called me and told me that he was in the hospital due

 4   to an accident.

 5   Q.    What did you do then?

 6   A.    At that moment I didn't know where the hospital was.

 7   So I called my cousin and I went to meet him.

 8   Q.    And then what did you do?

 9   A.    I was looking for him until 11:00 at night is when I

10   found my brother's body in the hospital.

11   Q.    Did you have occasion -- well, what did you do the

12   next day?

13   A.    The next day I was in the hospital and then I called

14   a friend who would take me to the site.

15   Q.    Okay.  And on the next day after Omar was injured in

16   March, did you actually go out to the railroad

17   right-of-way and look at Tower #1043?

18           THE INTERPRETER:  I'm sorry, can you --

19   BY MR. RUSH:

20   Q.    On the day after Omar was injured, did you then go

21   out to the Tower #1043?

22   A.    Correct.

23   Q.    Let me show you Exhibit 21, page 1 of that multipage

24   exhibit which has been admitted into evidence.

25           Do you recognize that picture as showing Tower #1043?
```

1   A.   Yes.

2   Q.   How long did you spend out at the site of Tower #1043

3   the day after Omar was injured in 2011?

4   A.   I would say about an hour, an hour 20 minutes, an

5   hour and a half.

6   Q.   How did you get onto the right-of-way?  Did you walk

7   or ride?

8   A.   I drove there.

9   Q.   And where did you stop your car and get out?

10   A.   Basically, at the end of the highway.  I don't know

11   the name of the highway, but it was basically there

12   underneath the highway.

13   Q.   Can you tell the jury how close you were to I-95 when

14   you got out of your car?

15   A.   Exactly underneath.

16   Q.   Exactly underneath I-95?

17   A.   Correct.

18   Q.   And then after you got out of your car, where did you

19   go then?

20   A.   I walked there.  I saw some people, some workers, and

21   I asked them.  And they indicated to me where Tower 1043

22   was, and I walked there.

23   Q.   When you say Tower 1042, do you mean Tower 1043?

24        THE INTERPRETER:  I'm sorry, 1043, that's

25   correct.

1    BY MR. RUSH:

2    Q.   Let me show you page 4 of the MTA photographs,

3    Exhibit 21 which is in evidence.

4         Do you recognize that photograph as being essentially

5    accurate of the area leading to Tower #1043?

6    A.   Correct.

7    Q.   Now, on that side of the road of Tower 1043 where I'm

8    circling, as you approach Tower 1043, is there a warning

9    sign?

10   A.   No, there was none.

11   Q.   Okay.  And in this area from about here up the

12   75 feet or so before the Tower #1043, do you see any other

13   warning signs or no trespassing signs?

14   A.   No, there wasn't.

15   Q.   Okay.  And then looking here, I'm going to circle

16   this little post that's off to the side, it's in the weeds

17   here.  Do you see that post?

18        Do you see that post that I've circled here in blue?

19   A.   I see.  Yes, I see it.

20   Q.   Now, when you were out there, did you see this

21   particular sign?

22   A.   Never.

23   Q.   Now, when this photo was taken on the day of the

24   accident by the MTA, can you read that sign in this

25   photograph?

```
 1   A.   No, I can't.
 2   Q.   Okay.  And now, you don't know the exact route that
 3   Omar took to Tower 1043, do you?
 4   A.   No, I don't know.
 5   Q.   If he came into the right-of-way behind this post and
 6   then went to Tower 1043, he would not have been able to
 7   see that sign, would he?
 8   A.   I understand now.
 9   Q.   Okay.  Now, again, as you approached this, there's no
10   warning sign on this side, as you've said, correct?
11   A.   No, there was none.
12   Q.   Let me show you Exhibit 123 which is in evidence.
13        Let me ask you if you recognize that sign from
14   Tower 1043, the far side of Tower 1043?
15   A.   Yes, I recognize it.
16   Q.   Okay.  And did you see that sign on Tower 1043 on the
17   far side of the tower when you went out the day after Omar
18   was injured?
19   A.   Correct, yes.
20   Q.   Mr. Correa, let me show you Plaintiffs' Exhibit
21   Number 134 which has been admitted into evidence, single
22   page.
23        Do you see the sign 1043 on the truss that goes
24   across the tracks?
25   A.   Correct.
```

1    Q.    And do you see this sign here on the far leg of

2    Tower 1043?

3    A.    Correct.

4    Q.    Let me show you now Exhibit 138, which is a slightly

5    larger enlarged picture of that sign that I circled.

6          Where I'm circling, do you see the sign that has

7    graffiti on it?

8    A.    Yes, I see.

9    Q.    Now let me put the two photographs together.  You see

10   those two signs are the same sign?

11   A.    Yes.

12   Q.    Now, when you went out there the day after Omar was

13   injured, can you tell the jury whether you saw this sign

14   on the far leg of Tower 1043 bearing that type of

15   graffiti?

16   A.    Yes, I saw it.

17   Q.    You see this sign from -- or this tower is on a

18   concrete base; do you see that?

19   A.    Correct, I see it.

20   Q.    And then on top of that concrete base is a steel

21   structure that goes up many feet, correct?

22   A.    Correct.

23   Q.    When you went out to the Tower 1043 on the day after

24   Omar was injured, did you stay on this side of the

25   railroad or did you ever cross over?

1    A.    No, I stayed on this side here (indicating).

2    Q.    And from this side here when you were over at Tower

3    #1043, were you able to read that graffiti-covered sign on

4    the far side?

5    A.    Not exactly from that position, but when I was

6    walking, I could see it.

7    Q.    Okay.  And could you tell what the graffiti -- what

8    the graffiti said from the far side?

9    A.    Yes, it said the word "once."

10   Q.    And underneath the "once" -- well, did the "once"

11   cover up the warning sign that was below the words "once"?

12   A.    I didn't know that was a warning sign.

13   Q.    Oh, okay.  Well, let me show you the next photograph,

14   Exhibit Number 136, a single page which has been admitted

15   into evidence.

16        Do you see within the circle there on the base of

17   that far tower a phrase?

18   A.    Yes.

19   Q.    What does that graffiti phrase say?

20   A.    It says the word "once."

21   Q.    What does "once" mean in español?

22   A.    Eleven.

23   Q.    On this side of that far leg of Tower #1043, do you

24   see a warning sign facing the same side as the "once"

25   phrase?

1   A.   No, nothing.

2   Q.   Now, when you were --

3         THE COURT:  Can I ask you, Mr. Rush, the Elmo

4   allows you to magnify.  Especially if you're asking folks

5   to read words, if there's a way you can zero in on the

6   words, that would be helpful.  You can zero right in nice

7   and close and that way the jurors can have a better idea

8   what it is you're showing the witness.

9   BY MR. RUSH:

10  Q.   In this enlarged, zoomed in, can you tell the jury

11  what that word is, that graffiti word at the base?

12  A.   I understand that that word says number 11.

13  Q.   Now, when you went out the day after Omar was injured

14  on March 17, 2011, did you see that graffiti at that time?

15  A.   Well, correctly, I saw it when I decided to leave.

16  Q.   When you decided to leave?

17  A.   Well, I walked there around until I found Tower 1043

18  where I learned that Omar had been injured.  And then when

19  I was walking away, that's when I saw the graffiti.

20  Q.   Okay.  Let me show you another photograph,

21  Exhibit 135, which has been admitted into evidence.

22        When you were out at Tower #1043 the day after Omar

23  was injured, can you tell the jury whether you had

24  occasion to see this graffiti on the base of Tower #1043?

25  A.   Definitely, yes, I saw it.

1    Q.   This graffiti is on the metal base slightly above the

2    concrete base; do you see that?

3    A.   Correct.

4    Q.   Let me show you Exhibit Number 203 which has been

5    admitted into evidence.

6         Mr. Correa, after your first visit to the site of

7    Tower 1043, did you have occasion to go back out to the

8    site with your cousin Vincent and other people?

9    A.   Yes, about a week later.

10   Q.   Okay.  And I'm circling on this Exhibit Number 203,

11   there are two people in the center left portion of this

12   photograph.  Do you know who those two people are?

13   A.   Yes, I recognize them.

14   Q.   Can you tell the jury who these two people are?

15   A.   Yeah.  That's Mr. Vincent Hendricks and this is me.

16   Q.   The first person you marked was the person in the

17   light coat, that's Vincent Hendricks?

18   A.   Correct.

19   Q.   Okay.  And the second person you mentioned or you

20   described is yourself; is that correct?

21   A.   Correct.

22   Q.   Who else was with you on that day?

23   A.   Brian, Mr. Rush.

24   Q.   Okay.  And on that day did you see any "no

25   trespassing" signs?

```
 1   A.   Not that I remember.  I don't believe so.

 2   Q.   Okay.  Did you see any "do not enter" signs?

 3   A.   No.  Nothing.

 4   Q.   Did you see any signs saying "keep out" or "stay

 5   off"?

 6   A.   Never.

 7   Q.   And did you see any signs in this area that said

 8   "danger"?

 9   A.   No.  Never.

10   Q.   Okay.  Now, if you look to sort of behind you, do you

11   see this pole that's sort of in the weeds here?

12   A.   Yes, I see it.

13   Q.   Can you tell the jury whether that pole is actually

14   in those weeds or on this path that you're standing on?

15   A.   Looking at the photo, I would say that it is in the

16   weeds.

17   Q.   Okay.  Now, when you were out there from this vantage

18   point, can you tell the jury whether you saw any trash or

19   garbage on the right-of-way where I've circled?

20   A.   Yeah, there was a variety of garbage there, cups,

21   metal things, and some debris.

22   Q.   Can you describe to the jury what you saw in regard

23   to this area which has been described as a footpath?  Can

24   you describe what you actually saw?

25   A.   Aside from the garbage, there were pieces of metal
```

1   near this side.

2   Q.   Can you tell the jury what this area, this dirt and

3   gravel area, looked like to you?

4   A.   I would say that that is like a little walkway that

5   the workers use to get from one end to the other alongside

6   the rail.

7   Q.   Okay.  Now, this photograph looks towards I-95; do

8   you see that?

9   A.   Correct.

10  Q.   Okay.  Now, I want to show you a photograph that was

11  taken by the MTA the day of the incident.  Exhibit

12  Number 21, photograph number 1.

13       Do you see that same path looking in the opposite

14  direction toward Ella Grasso Boulevard?

15  A.   Correct.  I see it.

16  Q.   And did you walk on this camino or walkway yourself?

17  A.   Yes.  Correct.

18  Q.   And on that second visit about a week later, a week

19  after your first visit, do you remember how far you walked

20  down this pathway toward Ella Grasso Boulevard?

21  A.   I would say that I walked like three towers to this

22  tower here.

23  Q.   And on any of those other towers that are beyond

24  Tower 1043 where you walked, did you see any signs with

25  graffiti on them?

1    A.   Not that I can remember right now.  I don't believe

2    so.

3    Q.   Okay.  But you don't remember one way or the other?

4    A.   Well, there is graffiti all over.

5    Q.   All over what?

6    A.   In the towers, on the bottom on the base, even on the

7    bridge.

8    Q.   Okay.  Did you have occasion to go out one more time

9    to Tower #1043 in the area under I-95?

10   A.   After those two previous occasions when I was there?

11   Q.   Yes.

12   A.   No.

13   Q.   Okay.  Now, let me show you one other picture,

14   Exhibit 82.

15        Let me show you Plaintiffs' Exhibit 82 and it's a

16   two-photograph picture of a catenary with the phrase "epik

17   owl" on it.  Do you see that writing, that graffiti on the

18   catenary tower?

19   A.   Correct, I see it.

20   Q.   Now let me turn to the second page of Exhibit 82

21   which shows the top of that tower.

22        Do you know see that graffiti up by the wires here?

23   A.   Correct.

24             MR. RUSH:  Your Honor, we have another exhibit I

25   don't think there's an objection to.  It is a clearer

 1    picture of that same tower, it's Exhibit Number 204.  It

 2    has not yet been admitted.

 3              THE COURT:  No objection?

 4              MR. HICKEY:  Same thing, Your Honor.

 5              THE COURT:  Full exhibit, 204.

 6              MR. RUSH:  Thank you.

 7              (Plaintiffs' Exhibit 204 marked in evidence.)

 8    BY MR. RUSH:

 9    Q.   Mr. Correa, you see this first exhibit is a little

10    bit dark here underneath this -- on the lower portion of

11    the top of the tower, the photograph is dark?

12    A.   Yes.

13    Q.   Let me show you the second page of Exhibit 204 --

14    well, the first page is the same as the first page of the

15    previous exhibit.  Do you see that?

16    A.   Yes, I see it.

17    Q.   And now the second page of Exhibit 204 is a little

18    bit lighter and clearer of the graffiti on that catenary?

19    A.   Yes.

20    Q.   Now, when you were out there during your visit in

21    March or perhaps in April with me, did you see this

22    particular graffiti on that catenary?

23    A.   Yes.

24    Q.   Okay.  Have you had occasion to see graffiti like

25    this high up on catenaries in the New Haven and West Haven

1  area before?

2  A.   Exactly that one, I haven't seen it before; but there

3  is graffiti all over New Haven, not like that.

4  Q.   Okay.  And is there graffiti all over New Haven on

5  railroad towers when you've driven around?

6       THE COURT:  Hold on a second.  Before you

7  answer --

8       MR. FINEMAN:  Objection, relevance.  I'm not

9  sure where in New Haven.

10      THE COURT:  You can reform the question if you

11 want.

12      MR. RUSH:  Okay.

13 BY MR. RUSH:

14 Q.   In your job, you're required to drive around

15 New Haven?

16 A.   Correct.

17 Q.   And in driving around over the last 12 years while

18 you worked for the City, have you seen graffiti on towers

19 on railroad towers from time to time in New Haven or

20 West Haven?

21      THE COURT:  Hold on a second.  I assume the

22 objection is that you want more specific time?

23      MR. FINEMAN:  Time and location, Your Honor.

24      THE COURT:  Is it possible to ask him what he

25 saw before the accident rather than afterwards?

```
 1              MR. RUSH:  Very good, Your Honor.

 2              THE COURT:  And then be specific, ask the

 3    witness to be as specific as possible as to where he saw

 4    this in New Haven and West Haven.

 5    BY MR. RUSH:

 6    Q.   Before the 2011 accident, did you have occasion to

 7    drive around New Haven and West Haven in your job?

 8    A.   Yes.

 9    Q.   Okay.  And in driving around in New Haven and

10    West Haven before the March 2011 accident, have you had

11    occasion to see graffiti high up on railroad towers or

12    railroad bridges or other taller structures?

13              THE COURT:  Hold on just a second.  Is there

14    objection?

15              MR. FINEMAN:  Same objection, Your Honor.

16    New Haven and West Haven are large areas.  I haven't heard

17    anything that puts it near 1043 or the location that's

18    going to be relevant.

19              THE COURT:  Can you ask him what ways -- if he's

20    driving around New Haven or West Haven, how is it that

21    he's observing these towers and where he's seeing these

22    towers that you're asking if he's seen graffiti on?

23    BY MR. RUSH:

24    Q.   Mr. Correa, can you explain to the jury where your

25    driving takes you when you're driving around either
```

```
 1  New Haven or perhaps coming into West Haven?
 2  A.   I drive in the area what they call Hillside in
 3  New Haven and also what they call Orange in West Haven.
 4  Q.   Okay.  Is that a daily activity that you do in your
 5  job, driving?
 6  A.   Correct, yes.
 7  Q.   Okay.  Have you had occasion in those areas that
 8  you've described, was it Hillside and Orange, have you had
 9  occasion to come near the railroad right-of-way during
10  your drives?
11  A.   Yes, in New Haven, and also West Haven, I believe so.
12  Q.   And have you had occasion to drive over the many and
13  various bridges that cross over the railroad right-of-way
14  in the years before the 2011 accident?
15  A.   You're referring to highways?
16  Q.   Highways, yes.  Bridges that go over the rail line.
17  A.   Correct, yes.
18  Q.   Okay.  And in any of those when you crossed over
19  these bridges that go over the rail line, have you ever
20  seen graffiti painted at height on the railroad structures
21  or the railroad bridges or the railroad towers at height?
22          THE COURT:  Hold on just a second.  Is there an
23  objection?
24          MR. FINEMAN:  I'm sorry to keep objecting,
25  Your Honor.  I just don't think we have any clarity if
```

 1  this is anywhere near the area we're talking about.  We've

 2  lost track of time frame as well.

 3          THE COURT:  We have a lot of aerial views of

 4  New Haven.  Is it possible to show the witness so he can

 5  describe where it is he was driving?

 6          MR. RUSH:  Your Honor, over a long period of

 7  time in a city, I mean, I don't know -- I think it's -- I

 8  think the objection is not well-taken because someone who

 9  drives in the city drives various --

10          THE COURT:  Okay.  So the objection is

11  sustained.  Move on to the next area and we'll take up

12  this issue at the lunch break.

13          MR. RUSH:  Okay.

14  BY MR. RUSH:

15  Q.   Mr. Correa, after your brother was injured, did you

16  visit him in the hospital?

17  A.   Practically every day during all the time he was

18  there.

19  Q.   And do you recall how long he was in the hospital,

20  approximately how many months?

21  A.   I would say close to five, six months.

22  Q.   Okay.  After he was released from the hospital, where

23  did your brother go to live?

24  A.   He went to live with me in my house.

25  Q.   Okay.  And did your mother have occasion to come from

```
 1    Puerto Rico to take care of him?

 2    A.   Yes.

 3    Q.   For how long did she live with you and your wife and

 4    Omar taking care of him?

 5    A.   Basically three years.

 6    Q.   Three years?

 7    A.   Correct.

 8    Q.   During that time were you required to buy a larger

 9    house in order to accommodate Omar's need for space and

10    your mother's need for space?

11    A.   Absolutely.

12    Q.   And that house also held your wife and the two older

13    children?

14    A.   Correct.

15    Q.   You have two younger children now, relatively newly

16    born?

17    A.   Yes.

18    Q.   They were not there when Omar was there?

19    A.   No, no.  Only the two older ones.

20    Q.   Okay.  Let me show you a picture on Exhibit 25 just

21    very briefly which has been admitted.

22              THE COURT:  It's up on the screen now.

23    BY MR. RUSH:

24    Q.   What room is that -- is that room in your house?

25    A.   Correct.  That was originally the dining room.
```

```
 1    Q.    Okay.  And was that converted into a room for Omar?
 2    A.    Correct.
 3    Q.    Can you tell the jury how it is -- how it affects
 4    your family to care for Omar and your mother for a
 5    three-year period after his injuries?
 6    A.    It was a big thing because this changed all of our
 7    lives and every member of my family.
 8    Q.    How is this in terms of increasing stress for your
 9    wife to have so many people outside of the immediate
10    family in her home for an extended three years?
11              THE COURT:  Is there an objection?
12              MR. FINEMAN:  Yes.  Relevance.
13              THE COURT:  Relevance, sustained.
14    BY MR. RUSH:
15    Q.    Let me show you another photograph.
16          Can you explain -- this is page 3 of Exhibit 205,
17    it's not numbered yet, but it's page 3 of that exhibit
18    which has already been entered showing Omar on the stairs.
19    Can you explain to the jury what Omar is doing there?
20    A.    Well, he has to go up and down on his own using his
21    hands because I cannot afford to have a lift.
22    Q.    How does Omar get to his house now when he's living
23    with his wife but he wants to visit you at your house?
24    A.    He uses his wheelchair.
25    Q.    How does he get his wheelchair from his apartment to
```

1    your house?

2    A.    Manually.  Sometimes he takes the city bus.

3    Q.    Okay.  Is there a school nearby your house?

4    A.    Yes, across the street.

5    Q.    And do you recall the name of that school?

6    A.    Yeah, it's Bishop Woods.

7    Q.    Is that a high school or a junior high or what?

8    A.    It's elementary.

9    Q.    Now, what street do you live on?

10    A.    Quinnipiac Avenue.

11    Q.    During rush hour is that a busy street?

12    A.    Always.

13    Q.    In order to get back and forth between your house and

14    Omar's apartment, does Omar have to cross any busier

15    streets in order to get where he's going?

16    A.    Yes, of course.  One of them is Avenue 80 or Foxon

17    Road like we all know it.

18    Q.    Okay.  And is there a four-lane road that he has to

19    cross or -- is there a four-lane road between you and

20    Omar's apartment?

21    A.    Yes, Foxon Road.

22    Q.    Are you concerned -- can you tell the jury whether

23    you have any concern for Omar's safety in going back and

24    forth between your house and his apartment?

25    A.    It's a big thing constantly.

```
 1    Q.   What are your concerns about that?

 2    A.   Well, mainly that a car can hit him or he can be

 3    assaulted or he can be a victim of robbery.

 4              MR. RUSH:  Your Honor, I have about a 20-minute

 5    new area to go into.

 6              THE COURT:  Ladies and gentlemen, we'll take an

 7    hour lunch break.  The usual advisories not to talk about

 8    the case, et cetera, et cetera.  Thank you.

 9                   (Whereupon the jury left the courtroom.)

10              THE COURT:  Sir, you can step down.  Please be

11    back by 1:00 p.m. or a little before that.

12              Please be seated.  We'll let the witness depart

13    the room, and then we'll follow up on that area that we

14    reserved.

15              Okay, the witness has departed.

16              So we were talking about the questions

17    concerning -- help me understand, Mr. Rush, to the extent

18    that you're asking about graffiti in other parts on the

19    Metro-North line, the concern is relevance here in terms

20    of where it is that these are located.  I'm not sure why

21    it's not possible to show this witness particular parts of

22    the city.  He actually identifies particular neighbors.

23    You've taken great pains to put in multiple aerial

24    photographs, so many aerial photographs.  Yet it's kind of

25    left unclear at this point what it is you're seeking to
```

1    elicit from the witness.

2           And the other concern is you're stating graffiti

3    "at height."  Does that mean a foot above the stanchion?

4    Up at the wires?  I can really understand why there's

5    objections to this.  Tell me what you expect the witness

6    to say.

7           MR. RUSH:  I really don't know what he's going

8    to say, Your Honor.  I have not asked him that question

9    before.  I don't know what his answer is going to be.  But

10   the concern I have, as I develop this case, is that the

11   defense says I have to prove that there are facts known to

12   Metro-North that they should have anticipated that there

13   would be intrusion at height.  And I've heard that phrase

14   a bunch of times.  I don't know what it means exactly.  I

15   don't know what they mean by it.  I thought there was a

16   reference to it in your preliminary instruction "at

17   height."  I don't know what it means.  I think we can

18   show -- well, I think -- without digressing a whole lot,

19   I'm not sure what he's going to say.  I don't live in

20   New Haven, I live in Tampa.  I have gone all over parts of

21   New Haven myself and I've crossed a lot of the railroad

22   bridges.  And they, in fact, give very good views of other

23   railroad bridges and of railroad towers and structures.

24           It's my contention that under *Maffucci*, I have

25   to show constant intrusion on a limited area of the

1  structure.  *Maffucci* just says intrusion on the structure.

2  The defense says no, no, no, it means you have to show

3  intrusion on the structure at height, that's what you have

4  to show.  I don't read *Maffucci* to say that, but I'm

5  uncertain as to what my obligations of proof are in this

6  case.  So I'm trying to cover that base.  And I'm asking a

7  question I don't know the answer to.  And that's just the

8  way it is.  And so if he knows the answer to that

9  question, he can answer it.

10            But if you think about it, it's not really

11  reasonable to say to somebody in all your travels over a

12  long period, it has to be before that accident, three

13  years, five years, ten years, we can pick the time, can

14  you tell us exactly where you saw these things.

15            THE COURT:  So you've been the lawyer in the

16  case for some number of years and you've worked closely

17  since the day of the accident with the witness.

18            MR. RUSH:  No, I have not worked closely with --

19            THE COURT:  You've elicited testimony today

20  about your being on the railroad right-of-way with the

21  witness.

22            MR. RUSH:  Yes, I've been to --

23            THE COURT:  And now you're asking this witness

24  questions that you don't know the answer to.

25            MR. RUSH:  Oh, absolutely, Judge.  What I often

1    say is -- and people get mad at me -- I'm just a lawyer,

2    not a very good one.  But if -- I don't know what the

3    standard is I'm going to have to meet in order to beat a

4    motion for directed verdict.  With the uncertainty of

5    that -- and I've been told by the defense I'm not going to

6    be able to prove intrusion at height.  And so I'm left in

7    this situation -- last week, you know, for good reasons,

8    by the way, Judge, I read your orders.  Generally, I think

9    most of your orders are right on.  And I think your orders

10   in the last week have been generally right on.

11             THE COURT:  Let's just keep it to the subject

12   here.  We have time ongoing here.

13             I'm concerned about one witness.  It strikes me

14   that you're trying to ask the witness a vague question.

15   It's vague as to how he would have seen these structures.

16   It's vague as to where he was and what his vantage point

17   would have been to see these particular structures.  It's

18   vague as to if he saw the structures, what you mean by,

19   quote/unquote, at height.  And I'm hearing from you that

20   you don't even -- despite the fact that you've had access

21   to this witness and he's your client's brother for years

22   and years, you don't even know if he has information to

23   offer on this.  So under those circumstances, I don't see

24   why it's appropriate for you to elicit essentially some

25   very vague statement from this witness about whether he

 1   has seen graffiti when you don't know the answer and

 2   you've had ample opportunity to present this and to

 3   prepare this case to do that.  I don't understand it.

 4           MR. RUSH:  Your Honor, I know you don't

 5   understand it.  I don't think you understand how difficult

 6   it is to communicate with people in this context and try

 7   to learn everything they know over a 15-year period.

 8   That's not possible.  There's nobody on this side who

 9   knows what's happening.  Not the defense, not the

10   plaintiff.  So I take your criticism, I just don't accept

11   it.  I think --

12           THE COURT:  Sure.  Okay.  So --

13           MR. RUSH:  I'll do the best I can.

14           THE COURT:  In the absence of some foundation to

15   think that he's going to do that in the way the question

16   has been phrased, I'll sustain the objection to that line

17   of questioning of this witness.

18           Anything else to take up?

19           We'll see you at 1:00.

20               (Whereupon, a recess followed.)

21           THE COURT:  All set for the jury?

22           Maybe we can get our witness on the stand as

23   well.

24               (Whereupon, the jury entered the

25                   courtroom.)

1          THE COURT:  Welcome back, ladies and gentlemen.

2   Please be seated.

3          We're going to continue with the continued

4   direct examination.

5          I'll remind our witness and our interpreter as

6   well that you're still under oath.

7          Please proceed.

8          MR. RUSH:  Thank you.

9   BY MR. RUSH:

10  Q.   Mr. Correa, briefly.

11       Mr. Correa, I want to show you an exhibit not yet in

12  evidence, Plaintiffs' Exhibit 122.  Unless I'm wrong,

13  maybe it is in evidence, but maybe I'm wrong.

14          THE COURT:  Maybe you can zoom out so we can see

15  the whole thing.

16  BY MR. RUSH:

17  Q.   Mr. Correa, I'm showing you --

18          MR. RUSH:  This is in evidence or not?

19          THE CLERK:  No.

20          THE COURT:  Go ahead and show the exhibit to the

21  witness, for I.D.

22  BY MR. RUSH:

23  Q.   Mr. Correa, do you see that on your screen?

24  A.   Yes, sir.

25  Q.   That's Exhibit 122.  And let me ask you if this

1    photograph appears to be accurate and true of the site at

2    or about the time that you were present looking at the

3    site in March and April, approximately, of 2011?

4    A.    Definitely.  It is a different time, but it's the

5    same place.

6    Q.    Okay.  Does this photograph, Exhibit 122, reflect

7    accurately the I-95 area here?

8    A.    Yes.

9    Q.    And does it accurately reflect the alignment of the

10   railroad going underneath I-95?

11   A.    Correct.

12   Q.    And also does it reflect the presence of this

13   mulching center for West Haven, sort of pie-shaped, a

14   little bit bigger than that?

15   A.    Correct, yes.

16   Q.    Now, if you assume that Mix Avenue is over here

17   somewhere, do you recall -- does this sandy area, what I

18   call the sandpit, is that an accurate reflection of what

19   you saw essentially in March and April 2011?

20            THE COURT:  So, we're going to stop you there.

21   I ask you not to characterize the evidence if you can

22   avoid doing that, Mr. Rush.

23            MR. RUSH:  Very good, Your Honor.

24            THE COURT:  And also is there an objection to

25   this exhibit?  It's a Google photograph of the area.

1           MR. FINEMAN:  If the foundation gets laid here,

2    then no.

3           THE COURT:  Do you want to move it in so the

4    jury has the benefit of seeing it.

5           MR. RUSH:  Yes, I'd like to move it into

6    evidence.

7           THE COURT:  I think the foundation is adequate.

8    Exhibit 122, full exhibit.

9           (Plaintiffs' Exhibit 122 marked in evidence.)

10   BY MR. RUSH:

11   Q.   Now, Mr. Correa, you don't know the exact date this

12   photograph was taken, correct?

13   A.   No, I don't know.

14   Q.   And can you tell the jury whether you have ever seen

15   live this view either from a plane or some other airship?

16   Have you ever seen this view before?

17   A.   Yes, of course, on several occasions.

18   Q.   On several occasions you've seen it at ground level?

19   A.   That also, yes.

20   Q.   Now, are you saying that you have actually flown in

21   an airplane over this area before?

22   A.   Correct, yes.

23   Q.   Okay.  And in flying over this area, were you able

24   to -- does this photograph look essentially what you would

25   have seen in 2011 even though it may be a different date?

1    A.    Yes.

2    Q.    Okay.  When you were out in March and April of 2011

3    and you arrived at Mix Avenue, can you show the jury the

4    path you took from your car to Tower #1043, which is right

5    here?

6    A.    Yes, of course.

7    Q.    Okay.  Please show us.

8    A.    I parked near this area.  Then I walk all through

9    here (indicating), I went underneath the highway.

10   Q.    Okay.

11   A.    Until I got to Tower 1043.

12   Q.    Okay.  And let me ask you to explain to the jury

13   whether you saw this pathway leading down from the

14   motocross area?

15   A.    Yes.

16   Q.    Now, before this -- before the time that you went out

17   to see the Tower 1043 area the day after Omar's injury,

18   had you been aware that there was a pathway from the

19   motocross track down to the sandpit?

20   A.    I always knew -- I always knew about all those little

21   paths.

22   Q.    Can you explain to the jury how those paths were

23   made, do you know?

24   A.    Well, obviously they have been made by people

25   walking, all-terrain vehicles, and wildlife.

1   Q.   Okay.  Now, you see this sort of -- I'm not going to

2   characterize it.  See this structure that I'm circling?

3   A.   Yes, I see it.

4   Q.   When I say structure, I mean do you see this line

5   that goes through that particular circle that I made next

6   to the right-of-way?

7   A.   Correct, I see it.

8   Q.   Do you know what that is?

9   A.   From what I'm seeing how, I could say it's like a

10   little pathway or it's a difference in this level, the

11   terrain.  It's at two different levels.

12   Q.   Do you know whether water accumulates in this area

13   where there's a difference in the height of the terrain?

14   A.   I don't know.  I wouldn't be able to tell you.

15   Q.   Okay.  Mr. Correa, let me show you Plaintiffs'

16   Exhibit Number 57 which is not yet in evidence.

17        Do you recognize this photo as accurately depicting

18   that pathway down from the motocross track that you just

19   spoke of?

20   A.   Correct.

21   Q.   What is this area right here, that circle?

22   A.   From what I understand, that is what I know as the

23   turning point so they can turn.

24   Q.   So what can turn?

25   A.   Four-tracks or dirt bikes.

```
 1   Q.   Mr. Correa, is this a true and correct photograph of

 2   what you understood to exist in the months and years

 3   before the March 2011 injury incident?

 4   A.   Definitely, yes.

 5   Q.   Okay.

 6             MR. RUSH:  Your Honor, we move into evidence.

 7             THE COURT:  Is there an objection to this?

 8             MR. FINEMAN:  No objection.

 9             THE COURT:  Full exhibit.

10             MR. RUSH:  Exhibit Number 57, Your Honor.

11             (Plaintiffs' Exhibit 57 marked in evidence.)

12   BY MR. RUSH:

13   Q.   Now, Mr. Correa, you don't know the exact date of

14   this photograph, do you?

15   A.   No, I don't know.

16   Q.   And the last time that you were out on the motocross

17   track was about 2001; is that correct?

18   A.   Yeah, correct.  2000 to 2001.

19   Q.   And in 2000 and 2001, can you tell the jury whether

20   you were aware of this path down from the motocross to the

21   right-of-way?

22             THE COURT:  Is there an objection?

23             MR. FINEMAN:  Leading, and mischaracterizes the

24   previous testimony.

25             THE COURT:  I'll allow it.  Go ahead.
```

```
 1   A.    Before the accident?

 2   BY MR. RUSH:

 3   Q.    Yes, in 2001.

 4   A.    Correct, yes, I cannot say exactly like that, but I

 5   was aware of it.

 6   Q.    You were aware of this -- could you tell the jury

 7   whether this path down that you see in this photograph is

 8   substantially identical in nature to the path you saw when

 9   you went out to the side shortly after the March 2011

10   incident?

11   A.    Yes, it's the same.

12   Q.    Okay.  Mr. Correa, I'd like to shift gears and just

13   ask you some questions about what I hope is the last area

14   of my inquiry for you on direct.

15         Were you aware that your brother had a drug

16   dependency in 2006 and 2007?

17   A.    Correct, yes.

18   Q.    Can you explain to the jury what you knew about

19   Omar's addiction to heroin and his efforts to treat that

20   addiction through methadone treatment?

21   A.    Of course.  Well, yes, he started treatment to detox

22   from drugs a few months after he arrived in this country.

23   Q.    Can you tell the jury his struggles with staying away

24   from heroin that he tried to do through methadone

25   treatment?
```

1    A.    Aside from attending drug treatments and trying to

2    stay away from heroin, the family played a big role in

3    supporting him in this -- at that stage.

4    Q.    From 2007 to 2017, has Omar periodically fallen short

5    and used street drugs from time to time?

6    A.    Yes.

7    Q.    And does he -- can you tell the jury how frequently

8    he uses marijuana today to treat his pain and nausea?

9    A.    Daily.

10   Q.    Can you tell the jury your observations as to whether

11   the marijuana helps Omar cope with the nausea from

12   methadone?

13   A.    Of course not only with the nausea, but also with

14   anxiety.

15   Q.    Can you tell the jury your observations of how the

16   marijuana effects Omar's ability to deal with the pain

17   from his burns from the March 2011 injury?

18   A.    I couldn't say really how much the magnitude of the

19   help he gets, but it does help him a lot with what is

20   called ghost pains.

21   Q.    What do you understand ghost or phantom pain to be?

22   A.    From what I understand, it is feeling pain in his

23   extremities which he no longer has.

24   Q.    After the injury incident after Omar came home from

25   the hospital in the summer of 2011, was he -- can you tell

1    the jury what drugs he was using at that time in terms of

2    either -- what types of street drugs was he using at that

3    time?

4    A.   Definitely marijuana.  And I have also known heroin.

5    Q.   Okay.  And when he started using heroin again after

6    his accident in 2013 or 2014, what did you and the family

7    do for him?

8    A.   Well, we advised him strongly to return and go back

9    for treatment.  And I personally started taking him to the

10   program.

11   Q.   Can you tell the jury whether he stayed in that

12   program since returning?

13   A.   Yes.  To this day, yes.

14   Q.   Can you tell the jury whether you believe your

15   brother will always be at risk of a return addiction to

16   heroin?

17              THE COURT:  Just a second, I think we have an

18   objection to the --

19              MR. FINEMAN:  Objection, speculation.  And

20   relevance.

21              THE COURT:  I'll sustain that prediction.

22              MR. RUSH:  Thank you, Your Honor.

23              Thank you, Mr. Correa.  I have no further

24   questions.

25              THE COURT:  Cross-examination.

1          MR. FINEMAN:  Yes, sir, thank you.

2

3                    CROSS-EXAMINATION

4  BY MR. FINEMAN:

5  Q.   Good afternoon, Mr. Correa.  We haven't met, so let

6  me introduce myself.  My name is Beck Fineman, I'm one of

7  the lawyers for Metro-North and the MTA in this case.

8  A.   A pleasure.

9  Q.   I have a few follow-up questions for you.

10         First of all, let me start with this.  You talked a

11  little bit about your observations of your brother Omar

12  since the accident, right?

13  A.   Correct.

14  Q.   And you've spent a considerable amount of time with

15  him since the accident?

16  A.   Within what my life allows me, yes.

17  Q.   As far as you've observed, does he have any problems

18  with his memory today?

19  A.   Yes.

20  Q.   Before I ask you about the time frame immediately

21  surrounding the accident, I want to back up to your life

22  with your brother before the accident, okay?

23  A.   No problem.

24  Q.   I understand that he did some work for you, some

25  construction-type work?

```
 1    A.    Correct.
 2    Q.    And are you aware that he told us that he did stuff
 3    like sheetrocking and plumbing, things of that nature?
 4    A.    Yes, we were going to specify and go into that field.
 5    Yes, he did help with sheetrock, painting, some plumbing,
 6    things like that.
 7    Q.    He'd done some roofing also?
 8    A.    He has helped me.  He hasn't specifically done the
 9    work himself.
10    Q.    Okay.  Was it with you that he worked on rooftops
11    with fall protection?
12    A.    No, it wasn't with me.
13    Q.    Okay.  I want to talk to you briefly about these
14    photographs that you were shown.
15    A.    Okay.
16    Q.    I'm going to try to get the orientation the same way.
17          So this is Exhibit 122.  And I think you told us that
18    when you came in on the day after the accident to check
19    out the scene, you came in coming down this way; is that
20    right?
21    A.    Correct.
22    Q.    And you're aware that that's not Metro-North
23    property?
24    A.    Until then I had no idea who was the owner or what.
25    Q.    So you didn't know who owned any of this area over
```

1    here, did you?

2    A.    Until today, I still don't know.

3    Q.    And when you went out to the scene, you also talked

4    about Exhibit 57?

5    A.    Correct.

6    Q.    Again to be clear, you don't know actually when this

7    photograph was taken, right?

8    A.    No, I don't know, no.

9    Q.    This view is obviously very different from the view

10   that you had while you were on the ground there?

11   A.    Of course.

12   Q.    And Mr. Rush asked you some questions about these

13   areas in here; do you recall that?

14   A.    Correct.

15   Q.    You didn't actually walk up into this landfill area

16   when you went out to the site to see what had happened

17   after the accident, did you?

18   A.    No.

19   Q.    Okay.  So I want to talk to you a little bit about

20   the times that you did go down to the site after your

21   brother's accident.

22   A.    Correct.

23   Q.    I understand you went out there the day after the

24   accident; is that right?

25   A.    Yes.

```
 1    Q.   And was anybody with you at that time?

 2    A.   At that time, yes.  Vincent, my cousin, he was with

 3    me.

 4    Q.   No one from Metro-North went with you?

 5    A.   No.

 6    Q.   And you didn't tell anybody from Metro-North or the

 7    MTA or the police that you were going down there?

 8    A.   No.

 9    Q.   And at that point you were going down there to try to

10    figure out what had happened, weren't you?

11    A.   Correct.  More than trying to find out what had

12    happened, I wanted to see the area where the accident

13    happened.

14    Q.   You didn't know what had happened at that point, did

15    you?

16    A.   When I arrived at the site, no.

17    Q.   At that point you hadn't yet talked your brother

18    about what he remembers having happened?

19    A.   No.

20    Q.   And no one in your family had talked to Omar to find

21    out what had happened before you went out there that first

22    day?

23    A.   No, nobody.

24    Q.   The day after the accident when you get down to the

25    scene, you had no idea how Omar had gotten down to that
```

1   tower, did you?

2   A.   No, I have no idea.

3   Q.   You came in from Mix Avenue?

4          THE INTERPRETER:  Sorry?

5   BY MR. FINEMAN:

6   Q.   You came in from Mix Avenue?

7   A.   Correct.

8   Q.   And at that point you didn't know that your brother

9   had actually come in from the old landfill area?

10          THE INTERPRETER:  I'm sorry, I can't hear you

11   well.

12   BY MR. FINEMAN:

13   Q.   At that point you didn't know that your brother had

14   come in from the old landfill area?

15   A.   No, absolutely not.

16   Q.   You had no idea at that point why he had climbed the

17   tower?

18   A.   No.

19   Q.   So then I understand that you went back out to the

20   scene about a week later; is that right?

21   A.   Correct, one week.

22   Q.   And at that time Mr. Rush was with you?

23   A.   Yeah, that's right, yes.

24   Q.   So sometime during that first week after the

25   accident, somebody in your family calls down to Mr. Rush

1    and hires him to come up?

2              MR. RUSH:  Objection, Your Honor, privileged

3    maybe.

4              THE COURT:  I'll allow it.  Just yes or no.

5    A.   Yes.

6    BY MR. FINEMAN:

7    Q.   And still at that point, one week after the accident

8    you're out there with Mr. Rush, you still have not talked

9    to Omar, have you?

10   A.   No.  No.

11   Q.   Omar actually had been in a coma, a medically-induced

12   coma that whole time, hadn't he?

13   A.   Correct, yes.

14   Q.   So again, nobody has found out from Omar his

15   explanation for what he was doing there or how he got

16   there?

17   A.   No.

18   Q.   I guess sometime within that first week by the time

19   Mr. Rush comes up and goes out to the scene with you, you

20   are at least -- or someone in your family is at least

21   thinking about bringing a lawsuit in connection with the

22   incident?

23             MR. RUSH:  Objection, Your Honor.  Relevance.

24             THE COURT:  I'll allow it.

25   A.   In reality, what happened, I received a call from a

 1    cousin of mine from Michigan.  He is an attorney, and he

 2    advised me to contact a lawyer.

 3    BY MR. FINEMAN:

 4    Q.   Okay.  So you contacted a lawyer, the lawyer comes up

 5    within the first week, and you're out on the site looking

 6    for evidence, aren't you?

 7    A.   Yes.  I -- I made a comment about what had been

 8    suggested to me for me to do.  And then, yes, I got in

 9    touch with Mr. Rush.

10          MR. FINEMAN:  Thank you.  I don't have anything

11    further.

12          THE COURT:  Mr. Reed.

13

14                    CROSS-EXAMINATION

15    BY MR. REED:

16    Q.   Good afternoon, sir.  I represent the UI Company.

17    Just a question or two.

18          When were you first able to speak with your brother

19    after his accident concerning what had happened to him?

20    A.   Exactly the time frame, I cannot tell you, I don't

21    remember.  But after he woke up from the coma, a week

22    later.

23    Q.   And you don't recall how long he was in the coma?

24    A.   A lot.  I would say a couple of months.

25    Q.   So he was in a coma for a couple of months, and

1  during that time you obviously couldn't speak with him?

2  A.   No.

3  Q.   And then after he emerged from the coma, you were

4  then able to speak to him about a week later?

5           THE INTERPRETER:  I'm sorry?

6  BY MR. REED:

7  Q.   After he emerged from the coma, you were able to

8  speak to him about a week later or a week after that?

9  A.   Correct.  Not a conversation, but we could hear what

10  he would mention.

11  Q.   And so during that first conscious communication that

12  your brother had, did he relate to you and your other

13  family members what had happened?

14  A.   Not necessarily.  It was about two weeks later after

15  that that he was conversing better.  And we asked him if

16  he recalled what had happened.  And that's when he

17  mentioned the deers.

18  Q.   What else do you remember him saying at that time

19  besides mentioning the deer?

20  A.   I cannot really tell you exactly the words, but he

21  mentioned like the deers and the pain.  He was in pain.

22  Q.   Did there ever come a point in time when he was able

23  to explain to you how he found himself in the

24  circumstances of this accident?

25  A.   Never clearly.  He has never been clear to me.

1   Q.   Even to the present day?

2   A.   He does mention like the animals and what they meant

3   to him, but the family and I, we decided to avoid

4   mentioning things to him.

5   Q.   Besides him mentioning the animals, has he mentioned

6   any other facts about what happened to him?

7   A.   No.

8   Q.   Thank you.

9             THE COURT:  Mr. Rush.

10            MR. RUSH:  Thank you, Your Honor.

11

12                     REDIRECT EXAMINATION

13  BY MR. RUSH:

14  Q.   Mr. Correa, briefly, when anybody directly brings up

15  the injury incident with Omar where he was burned very

16  badly, can you tell the jury how he reacts to being

17  confronted with that information?

18  A.   Pretty quickly he becomes angry and he gets very

19  defensive.

20  Q.   What is the reason why you don't bring up the facts

21  with your brother about how he was burned and what he was

22  doing?

23  A.   More than anything, I don't want to bring back bitter

24  memories for him of what happened.  I want to protect him

25  because in reality, I do love him.

```
 1   Q.   Thank you very much.

 2               MR. RUSH:  No further questions.

 3               THE COURT:  Anything else?

 4               MR. FINEMAN:  Nothing further, Your Honor, thank

 5   you.

 6               MR. REED:  Nothing further.

 7               THE COURT:  Thank you, sir, for coming in.

 8   You're excused at this time.

 9               Next witness, please.

10               MR. RUSH:  Your Honor, we call to the stand

11   Robert Powers, Ph.D., a toxicologist.

12               THE COURT:  And thanks to our interpreter today.

13               THE INTERPRETER:  You're welcome.

14               THE CLERK:  Please remain standing and raise

15   your right hand.

16

17                         ROBERT POWERS,

18        called as a witness, having been first duly

19        sworn, was examined and testified as follows:

20

21               THE CLERK:  Please be seated.

22               Please state your name.

23               THE WITNESS:  Robert H. Powers.

24               THE CLERK:  Please spell your last name.

25               THE WITNESS:  P-O-W-E-R-S.
```

1          THE CLERK:  Please state your address by city

2    and state.

3          THE WITNESS:  City is East Hampton, Connecticut.

4          THE CLERK:  Thank you.

5          THE COURT:  Please proceed.

6          MR. RUSH:  Thank you, Your Honor.

7

8                    DIRECT EXAMINATION

9    BY MR. RUSH:

10   Q.   Dr. Powers, can you tell the jury what you do for a

11   living?

12   A.   I am an associate professor at the University of

13   New Haven here in Connecticut.

14   Q.   And what is your area of expertise?

15   A.   Forensics, in general, but I'm a forensic

16   toxicologist, specifically.

17   Q.   What is a toxicologist?

18   A.   Well, a toxicologist studies the effects of drugs and

19   poisons on living systems.

20   Q.   Including humans?

21   A.   Including humans.

22   Q.   Can you tell us a little bit about your education

23   after high school?  Where did you go to college?

24   A.   I did a bachelor's in zoology at the State University

25   of New York, College at Oswego.  And I worked on a

1    master's at Western Michigan University.  And then

2    transferred to Michigan State University and completed a

3    Ph.D. in biochemistry at that institution in 1987.

4    Q.   And what is a Ph.D. in biochemistry, what is that?

5    A.   It just reflects advanced study in that field of

6    biochemistry, the effects of chemicals on living systems.

7    The chemistry of life, in essence.

8    Q.   What did you do after you obtained your doctorate

9    degree in biochemistry from Michigan State University?

10   A.   I joined the Zablocki Medical Center in Milwaukee,

11   Wisconsin, and the Medical College of Wisconsin.

12   Q.   What did you do there at the Zablocki Center?

13   A.   I was an analytical chemist/toxicologist directing a

14   laboratory oriented towards analysis of drugs and

15   medicinals in biological samples.

16   Q.   What did you do -- how long were you there?

17   A.   Gee, I think just a year or so.

18   Q.   And then what did you do next in your professional

19   career?

20   A.   I moved to another laboratory in the same city in

21   Milwaukee, a forensic laboratory and combined forensic and

22   clinical laboratory, and was scientific director of that

23   laboratory.

24   Q.   What did you do at that laboratory?

25   A.   We analyzed pharmaceuticals.  We also analyzed drugs

1    of abuse.  We were doing both clinical chemistry and

2    forensic chemistry for some hospitals in Milwaukee area

3    and also the forensic community in the Milwaukee area.

4    Q.   How long were you there, sir?

5    A.   I think a couple of years.

6    Q.   Okay.  So about 1990 did you start to do something

7    different?

8    A.   Yeah.  1992, actually, I moved to a laboratory in

9    Las Vegas, Nevada, Associated Pathologists Laboratories,

10   again, a combined clinical and forensic laboratory.  I

11   oversaw the forensic chemical testing in that laboratory.

12   Q.   And what types of chemical testing did they do in

13   that laboratory?

14   A.   Primarily drugs of abuse and pharmaceuticals in

15   postmortem cases.

16   Q.   How long were you at that Las Vegas laboratory?

17   A.   Two years.

18   Q.   And so in the early 1990s, did you do something

19   different?

20   A.   Yes.  I moved to the Onondaga County Health

21   Department where I was the director of the environmental

22   chemistry laboratory and eventually directed also the

23   forensic toxicology laboratory for the Onondaga County

24   Health Department, again doing both forensic work and

25   postmortem testing.

1   Q.   When you say postmortem testing, what does that

2   involve?

3   A.   Basically, when there is a death being investigated

4   by coroner or a medical examiner, depending on the nature

5   of the inquiry that's being carried out, there may be an

6   interest in knowing the levels -- on the part of the

7   pathologist of knowing the level of drugs or

8   pharmaceutical agents that may be present in the body to

9   help them determine the role that such compounds may have

10   played in the death.  So the problem then becomes

11   detecting what drugs are present and determining how much.

12   So postmortem analytical toxicology would be the kind of

13   general term for that.

14   Q.   Okay.  And does that take you up into the late 1990s?

15   A.   Approximately, it does.

16   Q.   What did you do next in your career?

17   A.   I moved to the Hamilton County Coroner's Office where

18   I directed their toxicology laboratory again in support of

19   the medical examiner's toxicology operation, and also

20   doing forensic testing for the local police agencies --

21   law enforcement agencies, sorry, that's what I was looking

22   for.

23   Q.   Where was that?

24   A.   That was in Cincinnati, Ohio.

25   Q.   How long were you there?

```
 1   A.    Eight years.

 2   Q.    That would take us up into the mid-2000s?

 3   A.    Yes.

 4   Q.    What did you do next in your career?

 5   A.    In 2004, I came to the state of Connecticut as

 6   Director of the Controlled Substances and Toxicology

 7   Laboratory for the Connecticut State Forensic Laboratory,

 8   and at that time it was in Hartford.

 9   Q.    And what is the Connecticut State Forensic

10   Laboratory?

11   A.    Well, it is a laboratory funded under at that time

12   the Department of Public Safety, subsequently became the

13   Department of Emergency Services and Public Protection.

14   That was a laboratory that provided analytical support for

15   police and other law enforcement agencies in the state of

16   Connecticut.  My end of that laboratory was toxicology,

17   the analysis of drugs and poisons in biological fluids,

18   and also oversaw the breath alcohol testing program in the

19   State of Connecticut.  And we also did -- well,

20   pharmaceuticals, when needed, in support of crimes other

21   than drug-abuse type testing, as necessary.  And also did

22   seized drug analysis or compounds that were suspected of

23   being illegal substances.  And we also did clandestine

24   laboratory investigations.

25   Q.    What is a clandestine laboratory investigation?
```

1    A.    A laboratory making illegal drugs.  The *Breaking Bad*

2    TV show is about a clandestine laboratory or a series of

3    clandestine laboratories.

4    Q.    Did you ultimately become the director of controlled

5    substances for the State of Connecticut toxicology

6    laboratory?

7    A.    I came in as director of the toxicology laboratory,

8    yes.

9    Q.    And how long were you there as director of the

10   toxicology laboratory for the State of Connecticut?

11   A.    Ten years.

12   Q.    Now, were you engaged by law enforcement departments

13   here in Connecticut to do toxicological analysis?

14   A.    That was part of the job, yes.

15   Q.    Can you tell the jury what types of analysis and

16   expert testimony you provided to Connecticut law

17   enforcement agents?

18   A.    Well, the analysis was simply what drugs, including

19   alcohol, were present in the samples we tested.  And I

20   would provide testimony explaining what those findings

21   would mean in a law enforcement setting usually with

22   regard to driving under the influence, was an individual

23   impaired or not.  And basically the implications of drugs

24   being present in poisoning cases, what the effects of the

25   drug would have been on the individual and how the drugs

1   work in individuals.  And I provided that support both for

2   the prosecution, much more often for the prosecution, but

3   I would also answer questions for defense counsel, as we

4   reviewed our responsibility to the entire community in the

5   state of Connecticut and not simply as being an arm of the

6   prosecution.

7   Q.   Did you have occasion during this process of being

8   the director of the Controlled Substance Toxicology

9   Laboratory of the State of Connecticut, did you analyze

10  toxicological studies regarding methadone or heroin?

11  A.   Certainly.  We analyzed those compounds quite

12  commonly, yes.

13  Q.   Okay.  Did you also do toxicological analysis of the

14  effects of marijuana in regard to impairment or

15  intoxication?

16  A.   As far as me doing -- we would analyze for the levels

17  of the drugs.  As part of my academic pursuits, I was

18  always researching and staying up to date on the effects

19  of the drugs so I could both talk about such questions in

20  legal forms, but I was also actively engaged in teaching

21  toxicology throughout this time period.  So for me the --

22  I had to not only stay current with the methods of

23  analysis, but also stay up on the actions of the drugs, so

24  the mechanisms of actions of the drugs because I was

25  actively teaching that to students.

1          THE COURT:  I'm sorry, I didn't quite understand

2   if we got the answer.  Did you look at the toxicological

3   analysis on the effects of marijuana?

4          THE WITNESS:  Certainly, yes.

5          THE COURT:  Thanks.

6   BY MR. RUSH:

7   Q.   Similarly, did you do the same type of toxicological

8   analysis of the effects of cocaine on the body?

9   A.   Yes, one of the more common drugs that we dealt with.

10  Q.   Okay.  What is your experience in dealing with and

11  analyzing urine toxicology screens?

12  A.   I've overseen the analysis of well over 10,000, and

13  probably a lot more than that, forensic urine toxicologic

14  screen analyses.

15  Q.   Okay.  Have some of those dealt with urine tox

16  screens dealing with trace elements of drugs such as

17  methadone, cocaine, marijuana, benzodiazepines?

18  A.   Very commonly those drugs are incorporated in such

19  screening paths, yes.

20  Q.   Can you explain to the jury the limits of scientific

21  reliability of toxicological urine screens?

22  A.   Sure.

23          There's two big problems.  The first problem is that

24  the screening assays are designed to be quick, efficient,

25  and cheap.  Which means they are not a hundred percent

1    reliable.  They tend to be very reliable if the results

2    are negative; but if the results are positive, it's only a

3    "maybe."  It can be a pretty good maybe, but it's still a

4    maybe.  So, for that reason, we don't consider screen

5    tests, be they on blood or on urine, to be forensically

6    reliable.

7         What we do is if we get a screen positive, we get

8    another aliquot of that sample and do another test with a

9    more reliable instrument to determine what exactly is

10   present and exactly how much.  It's called a confirmatory

11   assay.

12        So for a test to be considered forensically

13   defensible, you've got to have the screen positive and a

14   confirmatory assay and they have to agree.  So -- and the

15   basis for that is the screen assay just reacts to the

16   general size and shape of a particular molecule, kind of

17   like recognizing a hand or a glove fitting a hand.

18        The other test, the secondary test, the confirmatory

19   test, actually breaks down the molecule and looks for

20   individual specific fragments.  By that way we can know

21   exactly what we're looking for and exactly how much it is.

22        So again, the screening test itself is only

23   presumptive.  It's not reliable to a reasonable degree of

24   scientific certainty.

25        But there's another problem with urine tests that

1    people aren't normally -- we don't normally think of.  We

2    often think that a urine sample reflects what's in us at

3    the time that the urine sample is collected.  And it

4    really doesn't.  What it reflects is what was in us for

5    the last three days, more or less, in terms of drugs.  It

6    may be reflecting what's in us right now, but it may be

7    simply showing what was in us three days ago.  So for most

8    drugs, most drugs show up in the urine immunoassay screen

9    test for about three days.  Marijuana shows up for about

10   five days.  And all the positive urine sample gives you

11   then is a "maybe" with regard to whether or not the drug

12   was present; you need confirmatory analysis to know that

13   it really was.  And even if it's confirmed to be present,

14   it only shows you a fairly large window in which that drug

15   could actually have been ingested by the individual.

16        So that's the two problems with a urine sample.

17        Blood sampling is different in that it tells you

18   what's in the individual at the time the blood is

19   collected.

20   Q.   Did you have occasion to look at the hospital urine

21   toxicology screen of Omar Colon that was taken on or about

22   March 18, the early morning or day after this injury

23   incident?

24   A.   I did.

25   Q.   Can you explain to the jury what you saw in that

1  toxicology report?

2  A.   Well, let's see.  As I recollect, he screened

3  positive for benzodiazepines, opiates, cocaine metabolite,

4  and marijuana.

5       The benzodiazepines I'd expect.  Anybody hitting a

6  trauma center with burns is going to get benzos and

7  probably opiates.  I immediately wrote off the benzos and

8  the opiates as a consequence of therapy.

9       The cocaine metabolite, I would assume that more

10 probably than not Mr. Colon had used cocaine within the

11 last three days.

12      With marijuana, I would use that as a basis for a

13 similar assumption with a five-day window, based on those

14 results alone.  And again, that would be more probable

15 than not and not the reasonable degree of scientific

16 certainty.

17 Q.   Dr. Powers, are you aware that Omar Colon has

18 testified in deposition and in court that he went to a

19 methadone clinic on the morning of this incident?

20 A.   Yes.  And thank you, I forgot to mention the

21 methadone, my apologies.  There was methadone positive in

22 that group of drugs as well.  My fault.

23 Q.   And are you also aware that he has testified that he

24 consumed a single marijuana cigarette approximately or at

25 least one hour before the injury incident on March 17,

1   2011?

2   A.   Yes.

3   Q.   Did you have a chance to read Omar Colon's answers to

4   interrogatories and amended answers to interrogatories?

5   A.   I did.

6   Q.   Do you recall what those sworn statements said in

7   regard to his consumption of cocaine?

8   A.   Yes.  That it was, I believe, a couple of days prior

9   to the incident, if I recall correctly.

10  Q.   Okay.  Do you have experience regarding the

11  scientific protocols that are used at methadone clinics

12  for giving heroin addicts methadone treatment?

13  A.   Yes.

14  Q.   How are you familiar with those scientific protocols?

15  A.   One of my assignments at the Zablocki Medical Center,

16  my laboratory provided support for methadone maintenance

17  programs.  I became quite familiar with how those programs

18  worked and how methadone was utilized in that setting.

19  Q.   Can you tell the jury what the scientific protocols

20  are for prescribing the quantity of methadone that

21  patients typically receive?

22  A.   Sure.

23       People respond to opiates, including methadone,

24  individually differently.  And by that, I don't mean we

25  have different responses to the drug.  What I mean is it

1    takes different amounts in each of us to elicit those same

2    responses.  So you can't -- you can't just give an

3    automatic level to an individual.

4        So what happens with opiate therapy is the doses are,

5    the phrase they use is titrated, which means you adjust

6    the dose to achieve the desired therapeutic effect and

7    hopefully minimize any side effects.  So the effect of

8    methadone that was being sought for in the methadone

9    treatment centers is to provide a relief from the cravings

10   associated with opiate withdrawal or opiate addiction.

11   And so what they were trying to do is give the least

12   amount of methadone possible that would keep the

13   individual from seeking other opiates and yet avoid the

14   side effects which at that level, because it's really like

15   the lowest level of effects, at that level the side effect

16   you'd start to see would be drowsiness.  So they're

17   looking for just enough to alleviate the feelings of

18   cravings for opiates without having further effects,

19   further side effects of the opiate itself.

20   Q.   Can you tell the jury whether there's an anticipated

21   side effect of nausea from methadone treatment?

22   A.   A lot of people have nausea from opiates, in general.

23   In fact, that's why we have oxycodone and hydrocodone now.

24   People sometimes don't get nausea from those drugs where

25   they do from morphine.  It's an effect of opiates, not

1   methadone specifically.

2   Q.   Can you tell the jury the difference between opiates

3   and opioid medication?

4   A.   The opium plant produces a number of compounds that

5   are like morphine.  It produces morphine and codeine,

6   which we're familiar with, and another compound called

7   thebaine.  Thebaine doesn't do anything to us.  Morphine

8   is the ultimate pain reliever and also in high levels has

9   those euphoric effects.

10       So morphine and thebaine and codeine are opiates.

11  Compounds that are made from those compounds are

12  semisynthetic opiates.  Those would be oxycodone,

13  oxymorphone, hydrocodone, hydromorphone.  Those compounds

14  work because they bind to specific receptors in the body

15  based on their size and shape, not unlike that immunoassay

16  we discussed earlier.

17       There are some compounds that don't look anything at

18  all like morphine and yet they can bend and fold and twist

19  in such a way that they fit on the same receptor that

20  morphine fits on, but they don't look anything like

21  morphine.  Those are the opioids.  And they're compounds

22  like methadone, meperidine, fentanyl, carfentanil, those

23  are some of the more potent compounds that are out there.

24       But that's the difference between the opiates and the

25  opioids.

1           In terms of effects in the body, the body can't tell
2     the difference.  Which is why you can use methadone to
3     fool the body into thinking it's got its opiate so that
4     the body doesn't then generate the feelings of cravings or
5     of withdrawal.
6     Q.   Can you explain to the jury why opiates and opioids,
7     such as methadone and heroin and their related cousins,
8     are so addictive on the human body and brain?
9     A.    At high levels -- I'm sorry, let me start this again.
10          At very low levels, we can effect the feelings of
11    cravings.
12          The next level of effect of these drugs is on pain.
13    And these compounds are just the best things in the world
14    for alleviating pain.
15          When you get above the level of controlling pain,
16    these compounds have an effect on the brain causing an
17    excess of dopamine.  Dopamine is one of the compounds in
18    the brain that rewards.  It's in the brain reward system.
19    It's by increasing that level of dopamine that these
20    compounds produce that euphoric effect that people
21    associate with the drug.  The problem is when you get out
22    to that level, it also acts as a respiratory and CNS
23    depressant.  It's moving you towards sleep when you get up
24    to those high levels.
25    Q.   Can you explain to the jury how that euphoric

1    reaction in the brain releasing excess amounts of dopamine

2    has the effect of creating addiction?

3    A.    I don't think I can.  And I'm not sure anybody can.

4    We know that's the nexus of connection, but then what goes

5    on from, you know, why the brain translates "this is a

6    great thing, I want to do more" into those cravings, I

7    don't think I could give a good answer to that.

8    Q.    Okay.  Did you reach -- did you reach a conclusion as

9    to whether -- well, let me ask you this.

10        What is your understanding of the circumstances of

11   the morning of Mr. Colon's accident?

12   A.    My understanding is that he began his morning at the

13   methadone treatment center getting his daily dose of

14   methadone, which is kind of standard practice.  And he

15   left that methadone treatment center and sought out a

16   source of marijuana, got a source of marijuana, and had a

17   joint.  And on foot then crossed I think Ella Grasso

18   Boulevard into a wooded area north of the railroad tracks

19   between New Haven and West Haven and wandered around in

20   there trying to follow some deer for a while.

21        And so my understanding is that he was active and

22   moving about and moving both in the city and in the

23   semi -- "rural" isn't the right word, but unimproved area

24   between West Haven and New Haven.

25   Q.    You teach at the University of New Haven in

1  West Haven?

2  A.   That's correct.

3  Q.   Are you familiar generally with this particular area,

4  this wooded area that's between Spring and Ella Grasso and

5  the railroad tracks?

6  A.   I drive by it every day.  I go to the University of

7  New Haven, yes.

8  Q.   As you come over that overpass on I-95, are you able

9  to see that sort of ridge, that elevated area up over --

10  as you go over maybe looking over your shoulder, I don't

11  know if you do that --

12  A.   I do.  And on frequent occasions I see deer on that

13  ridge.

14  Q.   Have you reached a conclusion as to whether Omar

15  Colon -- well, let me back it up.

16       With a reasonable degree of scientific probability,

17  I'll be asking all of my questions under that theory.  So

18  I'd ask you to answer these questions within a reasonable

19  degree of scientific probability or within a reasonable

20  degree of scientific certainty, whichever is appropriate

21  from your perspective.  What I want you to do is tell the

22  jury what your conclusions are, as a toxicologist, and

23  then explain perhaps the reasons for it.

24       But first of all, within a reasonable degree of

25  scientific probability, did you reach a conclusion as to

 1  whether Omar Colon would have been intoxicated by the

 2  methadone that he had received that morning?

 3  A.   I did reach such a conclusion.

 4  Q.   What was that conclusion?

 5  A.   That he wasn't.

 6  Q.   And what are the reasons for that?

 7  A.   Well, again, if you're giving somebody too much

 8  methadone, they get lethargic and drowsy.  From my

 9  understanding, Mr. Colon was active and ambulatory,

10  walking around, meeting with people and engaging in what

11  might be called more or less routine activities.  So

12  that's just inconsistent with somebody suffering side

13  effect of a slightly elevated methadone dose of being

14  drowsy and sedated and sleepy.  It's not consistent.

15  Q.   If you assume that Mr. Colon ultimately climbed a

16  catenary tower approximately 45 feet in height, is that

17  fact consistent or inconsistent with your conclusion?

18  A.   I would say that would be consistent with my

19  conclusion.  Again, he was -- I doubt if he was feeling

20  any effects of methadone other than the lack of craving

21  for heroin.  Which, again, it's kind of like when a

22  headache disappears, you don't notice it or think about

23  it, it's just gone.  I would expect that because of the

24  methadone his cravings, however they were manifested in

25  him, were simply gone and he was able to carry out his,

 1  more or less, normal activities.

 2  Q.   Again, within a reasonable agreement of scientific

 3  probability, have you reached a conclusion as to whether

 4  Mr. Colon would have been intoxicated or significantly

 5  impaired by the marijuana which he had consumed

 6  approximately one hour before?

 7  A.   Yeah, I have reached a conclusion on that.

 8  Q.   What is your conclusion?

 9  A.   Again, for his activities, I can't see how he either

10  exhibited any impairment or would have been impaired.

11  Marijuana -- a single joint is not a particularly potent

12  level of drug.  It's not a high level of drugs.  He was

13  apparently able to carry out his normal activities.

14       The effects of a lot of marijuana are kind of similar

15  to a little too much methadone: drowsiness, lethargy.  And

16  again, he was apparently quite active, as evidenced by his

17  tracking the deer, choosing to do so, which requires a lot

18  of physical effort, and then finally engaging and actually

19  climbing the tower.  It doesn't sound like a lethargic

20  individual to me.

21  Q.   So not to beat a dead horse, but is the climbing of a

22  45-foot tower consistent or inconsistent with your

23  conclusion?

24  A.   I think it's consistent with my conclusion that he

25  was not impaired by the drug.

1   Q.   Assume that he had had cocaine one day or two days

2   before.  Have you reached a conclusion as to whether

3   Mr. Colon would have been feeling the effects of that drug

4   a day or two later?

5   A.   Yes.

6   Q.   What is your conclusion?

7   A.   No effect.  The effects of cocaine are gone within

8   several hours after use.

9   Q.   Are the acute effects of cocaine of shorter duration

10  than the overall effects of cocaine?

11  A.   There is a general assumption that there is a high

12  associated with cocaine that's followed by a low.  The

13  impression seems to be that the low is of long duration.

14  My understanding is that there can indeed be a crash from

15  cocaine use.  But the magnitude of the crash is a function

16  of how high the high was.  And further, you don't always

17  necessarily have such a crash.

18       So for me, looking at the effects of cocaine, I'm

19  looking at the acute effects of cocaine as lasting perhaps

20  an hour, perhaps two.  There may be a slight I'll say kind

21  of a CNS depressant, in fact a very mild CNS depressant

22  effect, feelings of mild depression thereafter.  But

23  that's not a guarantee.  That isn't necessarily going to

24  be exhibited by all cocaine users all the time.  In fact,

25  I think the way the drugs are looked at currently, I think

1    that's kind of overstated, unfortunately.  I would not

2    look for an effect beyond the acute effect of cocaine; and

3    again, that's going to be gone within three hours of use.

4    Q.   Okay.  Are your conclusions consistent or

5    inconsistent with the toxicology screen that was done at

6    the hospital on March 18, 2011?

7    A.   I think all my comments are consistent with those

8    findings.

9    Q.   Okay.  Does the toxicology screen in any way attack

10   or weaken your conclusions?

11   A.   No, neither.  They are what they are.  It formed, if

12   anything, the basis or part of the basis of my

13   conclusions.  They're certainly consistent.

14   Q.   Let me ask you a different line of questions, first

15   regarding methadone.

16        Have you reached a conclusion as to whether

17   Mr. Colon's consumption of methadone at the methadone

18   clinic that morning would have significantly impaired his

19   ability to read and follow a warning sign if such a sign

20   had been present on the towers?

21   A.   Yes.

22   Q.   What is your conclusion?

23   A.   Well, again, based on -- from my perspective, his

24   methadone dose was just right.  In other words, he was

25   able to carry out his normal activities.  He clearly was

1    not seeking opiates.  And yet he was active and -- so I

2    don't see -- I don't see a basis for any significant

3    effect on him.  It sounds like the methadone dose was just

4    right, eased the cravings and allowed him to carry out his

5    normal activities and duties.

6    Q.   Turning to the marijuana, I'm not sure if I asked

7    this.  If I did, I may have missed it; I'm getting a

8    little tired today.  Can you explain to the jury what the

9    effect of smoking a single marijuana cigarette would be on

10    the methadone side effect of nausea?

11    A.   Well, for a lot of people, marijuana is effective at

12    easing feelings of nausea.  It's not uncommonly utilized

13    in chemotherapy patients, which again, for different

14    reasons, has effects of causing GI stress.  So again, it's

15    not a universal.  It doesn't work for everyone, but it

16    does seem to work for a lot of people in that marijuana

17    eases nausea associated with some therapeutic regimens.  I

18    have no idea if it did or did not work with Mr. Colon.  If

19    that was the reason he was using it, fine.  I couldn't

20    possibly know.  I guess I would expect it to have had some

21    ameliorative effect, but I would recognize that it may

22    indeed not have.

23    Q.   Very good.

24    Have you reached a conclusion as to whether

25    Mr. Colon's reported consumption of a single marijuana

1    cigarette would have significantly impaired his ability to

2    understand a warning sign and follow its direction if one

3    had actually been present on the tower?

4    A.   Well, no, I would not expect any significant effect

5    on that at all for a couple of reasons.  This is a really

6    low dose of the drug.  One joint, I wouldn't expect a

7    significant effect.  Plus he had the opportunity to,

8    because he's on foot and walking, he can take as much time

9    as he wants to figure anything out as he wants.  So, no, I

10   wouldn't expect any impairment in that activity

11   whatsoever.

12   Q.   Would you -- have you reached a conclusion as to

13   whether the cocaine that he stated under oath that he had

14   approximately two days before the event, have you reached

15   a conclusion as to whether the consumption of that cocaine

16   would have affected his ability to see and understand a

17   warning sign on Tower #1043 if it had actually been

18   present?

19   A.   Yeah, I reached a conclusion.

20   Q.   What is your conclusion?

21   A.   That cocaine would have had no impact on that

22   whatsoever.  It was too far distant in the past to have

23   had any effect.

24   Q.   Shifting now to benzodiazepines, why are those

25   typically used in trauma centers to deal with pain?

```
 1    A.    Well, they're an adjunct to pain.  They help calm
 2    patients down and make patients more amenable to care and
 3    treatment.  And -- I'll stop with that.  Calms people
 4    down.
 5    Q.    In the toxicology test did you see any other evidence
 6    of any other street drugs being in his urine toxicology
 7    screen?
 8    A.    No.
 9    Q.    Do you have any other conclusions or opinions in
10    regard to the questions I've asked you that you have not
11    shared with me yet?
12    A.    I don't believe so, no.
13    Q.    Thank you very much, Doctor.
14              MR. RUSH:  No further questions.
15              THE COURT:  Thank you.
16              Maybe we'll take our afternoon break right now
17    and then we'll go to cross-examination.
18              We'll ask you to come back in 15 minutes.
19              THE WITNESS:  Thank you, Your Honor.
20              THE COURT:  Ladies and gentlemen, 15-minute
21    break.  The usual advisories, thank you.
22                   (Whereupon the jury left the courtroom.)
23              THE COURT:  You can step down, Doctor, if you'd
24    like.
25              In terms of the next witnesses after Dr. Powers,
```

```
 1    who do we have on tap?
 2              MR. RUSH:  I don't what the timing is, but we
 3    are watching the clock.
 4              THE COURT:  Marilyn Rodriguez?
 5              MR. RUSH:  We have two potential witnesses.  One
 6    is Marilyn Rodriguez, who is here, and the other is the
 7    Dr. Savetamal deposition which is an hour and 20 minutes.
 8    We have those two.
 9              THE COURT:  Sounds good.
10              Anything to take up?
11              MR. HICKEY:  No.
12              MR. REED:  I don't believe so, Your Honor.
13              THE COURT:  Mr. Fineman is not here, I see.
14    Everything okay?
15              MR. HICKEY:  Everything is fine.
16              THE COURT:  All right.  Thank you.  Stand in
17    recess.
18                   (Whereupon, a recess followed.)
19              THE COURT:  All set for the jury, I take it?
20                   (Whereupon, the jury entered the
21                   courtroom.)
22              THE COURT:  Welcome back, ladies and gentlemen.
23    Please be seated.
24              We'll now proceed with the cross-examination of
25    Dr. Powers.
```

1        Please proceed.

2        MR. HICKEY:  Thank you, Your Honor.

3

4                  CROSS-EXAMINATION

5   BY MR. HICKEY:

6   Q.   Good afternoon, Dr. Powers.

7   A.   Good afternoon, sir.

8   Q.   My name is Bob Hickey.  I know we haven't met.  I'm

9   one of the attorneys representing Metro-North and the MTA.

10  And I'm going to ask you some follow-up questions with

11  regard to your testimony today, okay?

12  A.   Very good.

13  Q.   Just briefly, can you just name the substances again

14  for the jury that were present in the urine toxicology

15  screen after the accident?

16  A.   The screen positive result was for benzodiazepines.

17  And because the assay is not specific, it could be any

18  number of I think there's 50 or so benzodiazepines that

19  are out there that will cause a screen positive result.

20       Let's see.  There was opiates.  Again, we don't know

21  which one caused the screen positive result or if indeed

22  it was an opiate at all.

23       Let's see.  So that's benzos, opiates.

24       Methadone.  The methadone assay is pretty specific

25  for just methadone.  There's a metabolite that will

 1  sometimes react.  So that's methadone.

 2      There was the cocaine metabolite.  That tends to be

 3  pretty specific for that one compound.

 4      I feel I'm missing something.  Benzos, opiates -- oh,

 5  marijuana.  Cannabinoids.  Again, the assay doesn't react

 6  to just one compound, it reacts to many that are

 7  present -- that are similar in structure to -- it's an

 8  cannabinoids group type assay.

 9      I can't tell you specifically, with the probable

10  exception of benzoylecgonine, which is that metabolite of

11  cocaine, and methadone itself.  Other than that, it's

12  groups rather than specific compounds.

13  Q.  Fair enough.

14      If I understand your testimony, the first two, the

15  benzodiazepines and the opiates, you quickly reached the

16  conclusion that those were likely the result of medication

17  which had been administered to him after the accident; is

18  that fair?

19  A.  Yes.

20  Q.  Okay.  Did you go back and look at the entire chart

21  to determine what medications had been given to Mr. Colon?

22  A.  I don't recall that I did.

23  Q.  Okay.  And could you have done that?

24  A.  I believe I had the records, but I don't know.  It's

25  a long time ago that I looked at these.

1    Q.   Okay.  And to be fair, just so the jury knows, you

2    were retained by Mr. Rush a few years ago to work on this

3    case?

4    A.   That's correct, yes.

5    Q.   So in any event, the benzos, as you referred to them,

6    and the opiates, you didn't conclusively rule those out as

7    far as being administered medically; they could have come

8    from street drug usage, right?

9    A.   Conceivably.  But considering the medical condition

10   under which Mr. Colon was received, whatever underlying

11   signal may or may not have been present, I would have

12   expected opiates and benzos for a patient in that

13   condition.

14   Q.   Sure.  And you just don't remember, as you sit here

15   today, whether you confirmed that by way of review of the

16   balance of the chart?

17   A.   I do not.

18   Q.   Okay.  Fair enough.

19        Now, you did say that from the urine screen you're

20   confident that he likely had those substances that we just

21   named in his system at least within the days prior to the

22   accident; fair?

23   A.   Yes.

24   Q.   But you gave Mr. Rush the opinion that he was likely

25   not impaired at the time of the incident, correct?

1   A.   Yes.

2   Q.   Okay.  But now you can't say the opposite; in other

3   words, you cannot say that he was not impaired at the time

4   of this incident based on your review of the tox screen,

5   correct?

6   A.   Based on the review of the tox screen alone, that is

7   correct.  But we don't just look at screen results in the

8   absence of behavioral information.  We always take the

9   behavioral into account as well.  In this case we've got

10  an ambulatory individual who's engaged in physical

11  activity which informs our conclusions about the screen

12  results.

13  Q.   I'm going to talk to you a little bit about that more

14  later.  But what you're talking about is you look at all

15  of the circumstances or facts that you had available to

16  you, such as Mr. Colon walking around and also the time

17  after he consumed the marijuana, to come to your

18  conclusion; is that what you mean when you look at

19  everything?

20  A.   We use as much information as we have, yes.

21  Q.   Okay.  So getting back to Mr. Colon's activities that

22  day, you do realize that Mr. Colon purchased marijuana off

23  the street and smoked it before he climbed that tower; you

24  don't dispute that, right?

25  A.   That's my understanding, yes.

1    Q.    Okay.  And you also talked about the calming effect

2    that the marijuana can have on someone's stomach after

3    they take methadone; do you remember that?

4    A.    For some individuals, yes, that works.

5    Q.    Now, the user of the marijuana can't pick and choose

6    the effects, correct?  If you smoke it to calm your

7    stomach, you can't make the choice to not get high, right?

8    A.    Depending on dosage, yeah, I would agree.  And I

9    don't know if -- I don't know if one can calm the stomach

10   without the euphoria or the euphorigenic effects.  I

11   simply don't know that.

12   Q.    If I told you yesterday that Mr. Colon confirmed that

13   he did get high on marijuana after he smoked it that

14   morning, you wouldn't dispute that, right?

15   A.    I have no basis to dispute that.

16   Q.    You talked a couple times about the low dose that

17   Mr. Colon took in that it was one cigarette; do you

18   remember that?

19   A.    Yes.

20   Q.    Isn't there a lot of different kinds or strains of

21   marijuana that can be purchased?

22   A.    Absolutely.

23   Q.    And isn't it true that some marijuana is much more

24   potent than other marijuana?

25   A.    Absolutely.

```
 1    Q.    Okay.  And so just by virtue of it being one
 2    cigarette really doesn't tell us how much of the active
 3    ingredient of marijuana he consumed; isn't that fair?
 4    A.    Correct.
 5    Q.    So really that it was one cigarette -- if it's one
 6    cigarette of potent marijuana, he could really be
 7    intoxicated, if that's the right word?
 8    A.    Yes.  The answer to that question is yes, though it's
 9    been my experience -- I'm sorry, I would simply stop with
10    the yes.
11    Q.    Okay, fair enough.
12          It sounds like you have worked with law enforcement
13    over the years with regard to street drugs?
14    A.    Yes.  Again, I ran the controlled substances
15    laboratory for the State of Connecticut.
16    Q.    And you would agree with me, wouldn't you, that
17    buying illegal drugs on the street is risky behavior?
18    A.    I think we could probably discuss what risky -- I
19    tend to use risky behavior for -- I don't -- one could
20    certainly use those terms.  I don't -- I don't think I
21    would associate that for many people in many circumstances
22    with, quote, risky behavior.  I think for many people it's
23    a normal part of their daily life and not looked at as
24    risky at all.
25    Q.    Purchasing drugs on the street is not like purchasing
```

 1  drugs at a pharmacy, right?

 2  A.   Correct.

 3  Q.   I mean, there's no quality control?

 4  A.   Correct.

 5  Q.   You can think that you're buying marijuana and that

 6  marijuana could have something else in it, right?

 7  A.   Absolutely.

 8  Q.   And marijuana that Mr. Colon purchased that day, for

 9  all we know, could have had cocaine in it, right?

10  A.   Conceivably that's possible, I suppose.

11  Q.   And are you aware that Mr. Colon told another expert

12  in this case, Dr. Myers, that he didn't recall whether he

13  used cocaine that morning or not?

14  A.   I was not aware of that.

15  Q.   So hypothetically is it possible that even

16  inadvertently that Mr. Colon did consume cocaine that

17  morning along with the marijuana?

18          MR. RUSH:  Objection, Your Honor.  The standard

19  is not possible.

20          THE COURT:  Pardon?

21          MR. RUSH:  Objection.  The standard for a

22  question is not possible.  Anything is possible.

23          THE COURT:  I'll allow it.  You can follow up on

24  redirect.

25  A.   It certainly is possible, although it was my

1    experience that cocaine in combination with marijuana in

2    the state of Connecticut was pretty unusual.

3    BY MR. HICKEY:

4    Q.    Your experience with other people using, but you

5    didn't have any experience with Mr. Colon before this?

6    A.    That's correct.  Again, I had a fair bit of

7    experience with what was available on the street.  Cocaine

8    in combination with marijuana is not something we saw.

9    Q.    And we don't know who Colon bought this marijuana

10   cigarette from, right?

11   A.    Correct.

12   Q.    And we do know that his urine was positive for

13   cocaine along with the other substances?

14   A.    Yes.

15   Q.    Okay.  And there's really no way to know now, all

16   these years later, without more definitive testing on

17   either his blood or something else back at the time,

18   right?

19   A.    Correct.

20   Q.    Okay.  I just want to talk to you a little bit more

21   about marijuana.

22         Is it fair to say that marijuana is a depressant?

23   A.    It's actually -- it has mixed properties.  It has

24   both excitatory and depressant effects.  So it's kind of

25   mixed.

1    Q.    So it can make you excited about certain things?

2    A.    No, it's not like that.  It's just that the effects

3    on the brain, some excitatory circuits are activated and

4    some depressant circuits are activated.  And the end

5    result is it sits somewhere in the middle.  I'm sorry I

6    can't give you a better answer than that.  It's the reason

7    the synthetic cannabinoids are so potent.  They do the

8    excitatory half without doing the calming, relaxing half.

9    Whereas the marijuana people smoke has both the excitatory

10   half and the calming half.

11   Q.    Well, is it fair to say that marijuana can slow your

12   coordination, your physical coordination?

13   A.    Yeah, if you get enough on board, yes.

14   Q.    Can it like slow down your response to physical

15   stimuli?

16   A.    Again, if you get enough on board, yes.

17   Q.    For instance, if you were slipping, could it slow

18   your response to trying to right yourself?

19   A.    Again, if there's enough, an adequate level on board,

20   yes.

21   Q.    Mentally, can it cause you to essentially fail to

22   assess the situation around you accurately?

23   A.    Probably not so much as increase the time necessary

24   to do so.  In other words, it's not that it stops thought

25   processes, it's just that the thought processes take

1    longer.

2    Q.    The thought processes take longer.

3          You talked in your deposition about marijuana

4    probably not likely making you to engage in a risky

5    behavior but you could find yourself in a riskier

6    situation because of consuming the marijuana; do you

7    remember that?

8    A.    Not specifically, but it sounds like something I

9    would say.  I don't have a problem with that.

10   Q.    I think the example you used is somebody might make

11   the decision to try to pass a truck and just totally blow

12   it, so to speak; they didn't have enough time or enough

13   space and they didn't realize, because they were impaired,

14   that that was not a good move?

15   A.    Yeah, that's not the kind of thing I would associate

16   with marijuana.  That's more of a thing I would associate

17   with cocaine.  Your example is valid.  It involves an

18   inappropriate assessment of the reality in front of you.

19   But driving is a very different milieu than walking

20   because things happen so much faster in a driving

21   environment.

22   Q.    Did you say there could be an inappropriate response

23   to something in front of you?

24   A.    Yes.  An inappropriate assessment of what's going on

25   in front of you, yeah.  And we see that in the driving

1    situation.

2    Q.    Okay.  And that's with marijuana?

3    A.    Yeah.  If there's enough on board.

4    Q.    And can marijuana lower your inhibitions?

5    A.    Yes.  Yes.

6    Q.    Can it increase your confidence?

7    A.    I suppose so, yes.  But it's not in the same way

8    that, say, amphetamines or cocaine does.  It's more,

9    again, affecting your assessment.  I think, again, the

10   effect of marijuana that we normally see is more of the

11   calming -- we don't see aggressive behavior associated

12   with marijuana.  I'm not saying it can't happen, I'm just

13   saying we tend not to see aggressive behavior associated

14   with marijuana.  We see a calming affect more than

15   anything else.

16   Q.    I'm not suggesting any aggressive behavior.  What I'm

17   asking you is:  Can it increase your confidence?  I know

18   what you want to say, just let me finish, okay?  I'm not

19   talking about aggressive behavior.  I'm talking about

20   assessing a situation and feeling more confident about

21   something because you're not really adequately assessing

22   it because you're high, you're not sober.

23   A.    Well, again, I would say that marijuana can affect

24   your ability to rapidly assess a situation.

25         But to go back to that initial example of deciding to

1    pass or to not pass, while that's not physical aggression

2    on another individual, that's -- I would consider that

3    aggressive behavior.  Okay?  And that's the kind of thing

4    we don't see with marijuana.  So in a more passive

5    sense -- I'm trying to think of an example and I'm

6    blanking on a good example.

7        Again, yeah, there's an effect on the ability to

8    process information, but there isn't that -- that sense of

9    enhanced personal capability.  We don't see that with

10   marijuana.  We see it with cocaine.  We see it with

11   methamphetamine, with MDMA, those drugs.  Marijuana tends

12   to be more of a sedating drug, more -- well, I'll stick

13   with calming.

14   Q.   Okay.  Let me ask you this.  Would you get in the car

15   and drive with someone who you knew had just purchased

16   drugs off the street in New Haven within the last hour and

17   consumed it?

18   A.   No.

19   Q.   And you wouldn't let that person engage in any

20   activity where physical harm was possible, would you?

21   A.   Again, it depends.  The appropriate question with

22   regard to this case is, would I walk down the street with

23   that individual?  Sure.  Driving requires fast reactions.

24   Walking and perceiving the world around you, interacting

25   with individual at walking pace is another story entirely.

1    You know, do I -- if I want somebody to, you know, fly a

2    fighter jet, I don't want their reaction time affected at

3    all.  Walking down the street and engaging in a

4    conversation, I'm not sure a fast reaction time is

5    necessarily an important criteria.

6    Q.   Let me ask you thin.  Would you want somebody who

7    bought and consumed drugs off the street of New Haven to

8    make important decisions that would follow them for the

9    rest of their life?

10   A.   I would prefer that they not be affected by drugs

11   when making such decisions.

12   Q.   You certainly wouldn't let them handle anything

13   dangerous like a gun or a knife or something like that,

14   would you?

15   A.   Well, again, my concern would be focused on how

16   quickly and -- how quickly and rapidly someone has to

17   assess and react to the situation.  So -- and I would

18   prefer not to be in a dangerous situation or a potentially

19   dangerous situation with an individual who is affected by

20   drugs in any way.

21   Q.   Okay.  And so now we have Mr. Colon who has had all

22   of these five different chemicals in his body, and we're

23   trying to figure out how these may have affected him on

24   the morning of March 17, 2011.  There's really no way to

25   do that, is there?

1  A.   Looking at the urine results, no.  There's no way to.

2       However, again, from my perspective, what I see, and

3  normally when we deal with these in the criminal world, we

4  look at behavioral indices as well.  This individual was

5  ambulatory and walking around, engaging in socially based

6  activities, whether -- you know, he presumably engaged

7  with somebody and purchased marijuana and then he's off

8  chasing deer.  That tells me something about his level of

9  behavior.  It takes the CNS depressant effects of drugs

10 like opiates, in my mind, pretty much off the table.

11      So, yeah, we have some behavioral information.  This

12 guy was not apparently acting in a -- he's not falling

13 asleep, he's not sleepy, he's not sedated or lethargic,

14 apparently.  And so I think that tells us a lot about

15 his -- the effects of the drugs on him at the time.

16 Q.   And to the opposite effect, wouldn't you agree with

17 me that climbing a tower next to live railroad tracks

18 45 feet high is odd behavior?

19 A.   I would say this.  Who among us has not looked at a

20 tower and thought of climbing it?  For many of us, we

21 immediately have the reaction of, ooh, that can't be good,

22 and we haven't done it.  Some of us may have done it.  But

23 I can't speak to what was going on in Mr. Colon's mind,

24 his basis for knowing that that would or would not be a

25 dangerous enterprise.

1    Q.    The point I'm trying to make is that you're

2    suggesting him walking around suggests that he wasn't

3    under the influence because that's normal behavior, but it

4    seems like you're leaving out the abnormal behavior of

5    climbing a tower 45 feet above active railroad tracks.

6    A.    I can't know what was going on in his mind.  For me,

7    that would be absolutely -- I wouldn't contemplate it

8    because I know the danger of electric wires.  I can't know

9    what was in Mr. Colon's mind.  From his perspective, it

10   might have been an easily achievable observational

11   position to look at deer.  I can't possibly know what was

12   going through his mind as he was contemplating that

13   action.

14   Q.    Sure.  But it wouldn't surprise you -- you wouldn't

15   say to the conclusion, well, he consumed various

16   substances that were in there and perhaps those caused him

17   to be in a mental state which resulted in him making a

18   decision to climb the tower?

19   A.    Well, if it were LSD, I'd go along with that one.

20   But for the drugs that were found, you know, it doesn't

21   make sense.  The drugs that showed up in his screen I

22   think would tend to keep him in the ground leaning against

23   the tower taking a nap if they were actively affecting

24   him.  Again, he's engaged in physical activity.  I

25   wouldn't say that climbing towers is a normal activity for

1    20-year-olds, but I can't imagine there aren't some

2    perfectly unaffected-by-drugs-in-any-way 20-year-olds that

3    climb towers.  Hopefully not with the same result.

4    Q.   Yeah, okay.  So a couple more things about the

5    marijuana.

6        You don't kind of come down from marijuana in like a

7    minute, right?  You reach a height of intoxication and

8    then you slowly lose those effects?

9    A.   That is my understanding, yes.

10    Q.   Okay.  And so in your opinion, as I understand it,

11    one of the things that's important for you is that you

12    believe it was about an hour after he smoked the

13    marijuana, so you believe that he was not intoxicated

14    anymore, correct?

15    A.   Well, I always have troubles with the idea of

16    intoxication.  I wouldn't have an issue with the idea that

17    the feelings -- the mild sense of feeling good persisted

18    for some time.  But in terms of intoxication, intoxication

19    seems to imply physical detriments.  I'm not sure that a

20    sense of feeling good correlates to an impairment of

21    physical capabilities, necessarily.

22    Q.   You're not sure about that.  But you told me earlier

23    that marijuana can certainly impact your coordination and

24    your response to stimuli, right?

25    A.   If you get enough on board, yes.

```
 1    Q.   You don't know how much Mr. Colon had on board, did
 2    you?
 3    A.   That's correct, I do not.
 4    Q.   But you have given an opinion in this case that you
 5    don't think it was impairing him because he smoked it an
 6    hour earlier and he climbed a catenary tower?
 7    A.   Yes.
 8    Q.   Okay.  Sir, do you remember working on a case in
 9    October of 2016 called McNally vs. Olivier?
10    A.   Yes.  I remember the name McNally.  And I -- I'm
11    sorry, I'll stop with that.  I certainly remember the name
12    McNally.
13    Q.   You don't remember any of the specifics of the case?
14    A.   I'm hesitant to offer my recollection for fear that
15    it might not be the right case.
16    Q.   Did you write a report in that case?
17    A.   I wouldn't be surprised.
18         MR. HICKEY:  Your Honor, with your permission,
19    to refresh the witness's recollection?
20         THE COURT:  Certainly.
21         MR. HICKEY:  I have copies for everyone.
22         THE COURT:  That would be helpful.
23         THE WITNESS:  Thank you.
24    BY MR. HICKEY:
25    Q.   Dr. Powers, don't read anything into the record,
```

```
 1   okay?  Not that you were going to, but that's just to
 2   refresh your recollection, okay?
 3   A.   May I read it?
 4   Q.   Yes, sure.  Certainly.
 5   A.   Thank you.
 6        Sir?
 7   Q.   All set?
 8   A.   Yes.
 9   Q.   Does that refresh your recollection about the McNally
10   case?
11   A.   It does.
12   Q.   In the McNally case, you were retained on behalf of
13   the plaintiff, correct, just like this case?
14   A.   I was.
15   Q.   All right.  And the McNally case involved a motor
16   vehicle versus pedestrian collision in New Canaan, did it
17   not?
18   A.   Yes.
19   Q.   And in that case, the defendant, the driver of the
20   car, had consumed some marijuana prior to the accident,
21   correct?
22   A.   Yes.
23   Q.   All right.  And your ultimate conclusion was that it
24   must have been the marijuana or perhaps an antihistamine
25   that he took that caused him to not be alert and to strike
```

1    the pedestrian, correct?

2    A.    Well, it certainly was an explanation.  To me it

3    seemed the best explanation.

4    Q.    That seemed to be the best, okay.

5          Now, what time of day did the McNally accident

6    happen?

7    A.    Oh, boy.  7:25.

8    Q.    A.M. or p.m.?

9    A.    P.M.

10   Q.    And what time did the defendant in that case consume

11   the marijuana?

12   A.    I don't recall seeing that as I read through here.  I

13   don't know.

14            MR. HICKEY:  Your Honor, I have another document

15   that I could use the refresh the doctor's recollection.

16            THE COURT:  Certainly.

17            MR. HICKEY:  Would you like a copy as well?

18            THE COURT:  Please.

19   BY MR. HICKEY:

20   Q.    Doctor, to speed things along, I believe it's on

21   page 9.

22   A.    Thank you.

23          Okay.

24   Q.    So what time did the defendant in that case consume

25   that marijuana?

1  A.   He says, if it's the same day -- yeah, same day --

2  early morning hours, between 2:00 and 4:00 a.m.

3  Q.   And so if he consumed that marijuana at 4:00 a.m.,

4  that was 15 hours prior to the accident, right?

5  A.   Yes.

6  Q.   And you still concluded that it was likely the

7  marijuana that caused him to fail to avoid that accident?

8  A.   Some combination of drugs.  But if my decision had to

9  rest on that being the time that the marijuana had been

10  ingested, I would not have included it simply because

11  there is no way that there's going to be an effect almost

12  12 hours later from marijuana smoked at that time in the

13  morning.  So, yeah, that's what he said.  But I've got a

14  problem in explaining a failure of this individual to

15  perceive, react, and respond.  I've got drugs present.  To

16  me, the drugs provided the best explanation for his

17  failure to perceive, react, and respond.  So that was the

18  basis of my opinion in the case.

19  Q.   So you didn't put the time that he consumed that

20  marijuana in your report, did you?

21  A.   I don't necessarily -- I don't have anything to go on

22  other than his statement.  And I've still got the problem

23  of I've got -- I've got him failing to perceive motion

24  easily within his visual field, and he didn't.  And he's

25  driving a car when, you know, that's got to be up in his

1   sense of importance and responsibility.  So I've got a

2   phenomenon to explain.  And the drugs in his urine was the

3   best explanation, in my opinion, when I wrote my report.

4   Q.   And the police did a field sobriety test and tested

5   him immediately after that accident, didn't they?

6   A.   I don't recall.  I have no reason to doubt that.  I

7   can take a quick look.

8   Q.   And he passed that test, didn't he?

9   A.   Depends how you define "passing."  May I take a quick

10  look?

11  Q.   You can certainly look at that report.

12  A.   Thank you.

13  Q.   You had that report when you did your report, didn't

14  you?

15  A.   Certainly.  But I do a lot of these.

16       I was looking for the standardized field sobriety

17  test, and I don't see it.

18  Q.   If you look at your report, I think you state in your

19  report that no behavioral impairment of Mr. Olivia was

20  noted by the investigating officers; do you see that on

21  the first page?

22  A.   Yes, I do.

23  Q.   And he wasn't charged?

24  A.   That's correct.

25  Q.   Nonetheless, you concluded that the marijuana that he

1  smoked to go to sleep 15 hours beforehand was the cause of

2  the accident, not the pedestrian stepping into the street?

3  A.   I believe I said -- I'm sorry, I won't read this

4  exactly, but there were multiple drugs found and I

5  attributed his failure to perceive, react, and respond to

6  a mix of drugs.  I didn't specify which one.

7  Q.   One was the marijuana and one was the antihistamine,

8  right?

9  A.   I believe so.  Let me see.

10        Actually, it was THC.  There was Bupropion,

11  Diphenhydramine, and then a couple of other drugs that I

12  wouldn't normally associate with any psychotropic effect.

13  Q.   You would not?

14  A.   Not really, no.

15  Q.   So the only thing you found was the 15-hour prior

16  marijuana and then the antihistamine, right, that could

17  have contributed?

18  A.   And Bupropion.  So he's got -- you know, again, I've

19  got drugs and I've got him failing to perceive something

20  that I would expect a non-impaired individual to have

21  perceived.  He did not perceive it, therefore I'm left

22  explaining impairment.  I've got three drugs; I don't have

23  any other basis for explaining that.  I'm not saying that

24  that was the reason he did not turn his head, I think I

25  said -- I forget what it was, just a few degrees he had to

1   look.  Relatively -- he had to change his focus and

2   perceive some motion.  And he didn't.  So I've got a

3   behavior issue that I've got to explain.  I've got drugs

4   which provide an adequate explanation.  I have no other

5   explanation.  That was the basis for my conclusion in this

6   case.

7   Q.   Did you investigate all the other things he had

8   accomplished that day before 7:00 p.m.?

9   A.   Well, he's driving a car, so he's demonstrated some

10  physical capability right off the bat.  But again, I've

11  got a phenomenon I've got to explain.  I've got drugs

12  which provide in this case a basis for that.  It may be

13  that the drugs had nothing to do with it.  The bottom line

14  is he still failed to perceive motion, to perceive a

15  pedestrian in front of his car that most people would have

16  perceived.  The question is why did he not.

17  Q.   You know that fact was disputed, don't you?

18  A.   I'm conveying my understanding of the case as I have

19  it.

20  Q.   And you were retained by the plaintiff in that case?

21  A.   I was.

22  Q.   Just like you were in this case?

23  A.   Yes.

24  Q.   Okay.  I assume Mr. Rush has paid you for the time

25  that you've put into this case?

1    A.    Yes.

2    Q.    Okay.  And how much have you charged Mr. Rush for the

3    work that you have done?

4    A.    I have not charged him as yet.  I believe he's paid

5    me a retainer.

6    Q.    What are your charges for the time you put into this

7    case?

8    A.    I think at the time I made my arrangement with

9    Mr. Rush it would have been I think perhaps $300 an hour.

10   Q.    And do you know how many hours you have in this case?

11   A.    I do not.

12   Q.    Do you have any idea how many hours you have?

13   A.    Probably between 10 and 20.

14   Q.    Is that all for doing your report or coming to court,

15   or how does that break down?

16   A.    For reading and -- basically time spent on the case.

17   Q.    Okay.

18              MR. HICKEY:  Thank you, Your Honor.  That's all

19   I have right now.

20              THE COURT:  Thank you.

21              MR. HICKEY:  I'll collect those.

22              THE COURT:  Certainly.

23              Mr. Reed.

24              MR. REED:  No questions, Your Honor.

25              THE COURT:  Mr. Rush.

1          MR. RUSH:  May I approach the witness,

2    Your Honor?

3          THE COURT:  Certainly.

4

5                    REDIRECT EXAMINATION

6    BY MR. RUSH:

7    Q.   Let me just let you have these handy in case they

8    come up.

9          First of all, the only document that Mr. Hickey has

10   shown you in regard to the alleged time of consumption of

11   the marijuana is this New Canaan Police Department report;

12   is that correct?

13   A.   Yes.

14   Q.   Page 9 that he showed you?

15   A.   Yes.

16   Q.   And your report does not set forth -- I didn't see it

17   and I thought you said you didn't think you saw it, the

18   underlying fact of when you thought he might have consumed

19   the marijuana.  Did I misunderstand you or am I misreading

20   this three-page document?

21   A.   I did not associate marijuana use some 12 hours prior

22   to this accident with marijuana being present in the

23   individual at the time.  I was relying on the urine drug

24   tests.

25   Q.   So you weren't really looking at this report at all,

1    necessarily?

2    A.    I certainly looked at that report when I made my

3    report, certainly, yes.

4    Q.    Were you relying on the defendant's statement that it

5    had been 15 hours before the event that he consumed this

6    marijuana?

7    A.    No.  My focus in this kind of case was much more what

8    happened, was the driver impaired.  And this was a

9    situation, again, of a guy turning left and a woman

10   crossing the street.  And he saw the woman on the

11   sidewalk.  And if I recall correctly, made eye contact

12   with her, and he felt she was not going to enter the

13   sidewalk.  And then he continued his turn.  And my read

14   was that as she stepped into the roadway, he should have

15   perceived that motion and his attention should have

16   focused on her and he should have at least been stamping

17   on the brakes.  He might still have hit her, but he should

18   have been stamping on the brakes.  And my interpretation

19   of the information available to me was, for whatever

20   reason, he did not perceive, react, and respond to that

21   motion that was in his visual field, it wasn't way off to

22   the side.  It was kind of right here.  He didn't catch

23   that.  And he should have caught that, in my opinion.  The

24   fact that he didn't catch that required some explanation.

25   There's a bunch of possible explanations.  The fact that

1    he had a combination of drugs in his system that could

2    explain this behavior was to me the most reasonable

3    explanation, and that's what I indicated in my report.

4    Q.    Okay.  Your report on the bottom of page 2 mentions

5    the THC-carboxylic acid as a metabolite of THC.  That's

6    the active ingredient in marijuana?

7    A.    Yes.

8    Q.    Then further you go on, it looks like you're saying,

9    I'm not sure, that he has Bupropion, an antidepressant, in

10   his system?

11   A.    Yes.

12   Q.    Is that correct?

13   A.    Correct.

14   Q.    And then he has Diphenhydramine --

15   A.    Yes.

16   Q.    -- which is a mild sedative in his system; is that

17   right?

18   A.    Yes.

19   Q.    And then you say the sedative, the Diphenhydramine

20   drug, may have central nervous system depressant effects

21   that would aggravate -- well, you say exacerbate the

22   effects of other central nervous system drugs present.  Is

23   that right?

24   A.    Yes.

25   Q.    And then so that's -- so he has some marijuana?

1          THE COURT:  Just a moment.

2          MR. HICKEY:  Your Honor, I have to object to

3    reading from a document that's not in evidence.  This is

4    not proper use of this document.  This was used simply to

5    refresh the doctor's recollection.

6          THE COURT:  Is there some way for you to not

7    read the whole document and get to the point?

8    BY MR. RUSH:

9    Q.   Doctor, maybe you can look at those last three pages

10   that Mr. Hickey gave you and tell the jury what the

11   universe or totality of drugs that were in Mr. Olivier's

12   system at the time of the accident in this McNally vs.

13   Olivier case?

14   A.   Well, bearing in mind again that I've just got a

15   urine assay, so I don't know for a fact that what was in

16   the urine assay was in him at the time.  But these are the

17   drugs that have been him, were detected in the urine

18   sample.

19        We've got THC-Carboxylic acid, again a metabolite of

20   marijuana.

21        We've got Bupropion, which is an antidepressant.

22   It's not a rip roaring -- at therapeutic levels, you don't

23   expect a lot of side effects.

24        Diphenhydramine, the antihistamine.  We actually see

25   Diphenhydramine and some other, quote, medications in

1   driving under the influence cases not infrequently because

2   they have sedating effects.

3       Citalopram is an antidepressant.  Its most common

4   side effect can be drowsiness, but we don't see that a

5   lot.  Citalopram, in my opinion, is a relatively safe

6   drug.

7       And then there's another that compound, Lamotrigine,

8   which is an anticonvulsant.

9       None of these drugs -- you wouldn't expect any of

10  these drugs to have a significant effect on somebody's

11  level of consciousness.

12      My problem was, again, I've got a behavior that looks

13  like impairment to me.  And I've got an explanation in the

14  form of drugs that provide an adequate explanation for

15  that failure to perceive, react, and respond.  I don't

16  have another explanation, and that was the basis for my

17  report.

18  Q.   On the last page, the last paragraph seems to set

19  forth your conclusion, maybe the last sentence or two

20  talking about the presence of one or a mix of the drugs

21  determined to be present in Mr. Olivier's urine sample.

22  Can you tell the jury what your final conclusion was

23  regarding the mix of drugs determined to be in his urine

24  sample?

25  A.   Again, I had an individual that failed to perceive,

1   react, and respond to an individual crossing into their

2   path of travel and they didn't see him.  The mix of drugs

3   provides an adequate explanation for that failure.  Was it

4   really the explanation?  I don't know.  But to me, it was

5   the best explanation that I had based on the information I

6   had.  And that's what I indicated.

7   Q.   Now, this McNally vs. Olivier case or Olivier case,

8   it's a driving case; is that right?

9   A.   Yes.

10  Q.   And you were earlier trying to explain to Mr. Hickey

11  the difference between driving either a car or an

12  airplane, maybe you talked about a jet plane, I'm not

13  sure, but certainly a car, and the need to react quickly

14  in that situation to various things that were occurring in

15  front of you, as opposed to walking at your own pace as

16  Mr. Colon did through the wildlife area and then onto the

17  tower.  Can you explain to the jury what you were trying

18  to explain there?

19  A.   Yeah.  Simply in the -- the time available for

20  thinking about stimuli, reacting and processing

21  information about stimuli is just naturally much greater

22  at walking pace.  You've got a lot more time to figure

23  things out than you do driving.  If you're driving down

24  the road at 60 miles an hour and you have to determine,

25  well, is Exit 3B my right exit or do I need 3A, you don't

1    have a lot of time to sort that out.  Whereas at a walking

2    pace, you've got all the time you need or want.  Plus

3    there's no immediate consequence of just kind of stopping

4    and figuring things out at a walking pace.

5        So, yeah, the circumstances matter.  The jet fighter

6    simulator was -- the effects of a lot of drugs can be

7    detected with something that's really, really sensitive to

8    the real fast reaction time, where all other techniques

9    wouldn't determine any effect at all, which is why jet

10   fighter simulator is occasionally used as a means for

11   determining the effects of drugs on nerve systems, for

12   nervous system research.

13   Q.   Mr. Hickey asked you a question about whether you'd

14   want someone to be handling a knife if they had just

15   consumed street drugs.  If we focus on marijuana and

16   alcohol, do you have a -- first alcohol.  Do you have a

17   concern about somebody handling a knife while drinking a

18   glass of wine and eating a steak?  Do you have a problem

19   with someone handling a knife in that context?

20   A.   No.

21   Q.   And do you have -- if someone was eating a steak with

22   a real sharp knife and smoking a marijuana cigarette,

23   would that be something that would cause you a great deal

24   of concern?

25   A.   Again, no, for similar reasons.

1    Q.    And why is that that it's not -- it would not cause

2    you any concern?

3    A.    Well, again, this is something that doesn't -- it

4    certainly requires motor coordination, but it doesn't

5    require a lot of fine muscle control in a time-squeezed

6    environment.  You can take as long as you want to decide

7    where you're going to cut the steak.  You don't have to do

8    it right now and it doesn't have to be done as a part of

9    the sequence of a complex series of coordinated actions.

10   So the simpler the action is, the less likely it's going

11   to be affected by CNS depressant drugs or marijuana.

12            MR. RUSH:  May I approach the witness,

13   Your Honor?

14            THE COURT:  Certainly.

15   BY MR. RUSH:

16   Q.    I want to show you the drug screen toxicology for

17   Mr. Colon and ask you if that refreshes your recollection

18   of the four items that were found to be positive?

19   A.     It actually -- I was wrong in my earlier testimony.

20   I'm not sure of the way to correct that testimony, but I

21   was clearly wrong.

22        May I comment on that, Your Honor?

23   Q.    Well, I'll ask you a question.

24        There were two items of interest to me in that

25   report.  Is there a showing of a positive for the

1    diazepines?

2    A.    Yes, benzodiazepines.

3    Q.    What is your view of the most likely explanation of

4    the positive report of benzodiazepines?

5    A.    I would expect that would have happened in the

6    hospital pretty quickly.

7    Q.    Okay.  And then there's a reference to the not

8    cocaine, but cocaine metabolites; do you see that?

9    A.    I do.

10   Q.    And there's no telling when he actually specifically

11   had cocaine other than there's a window of approximately

12   three days?

13   A.    Yes, three days maximum.

14   Q.    And then he was positive for marijuana; is that

15   correct?

16   A.    That's correct.

17   Q.    And then he was positive for the methadone; is that

18   correct?

19   A.    That's correct.

20   Q.    He was negative for opiates?

21   A.    He was.  And that was my mistake earlier for which I

22   apologize.

23   Q.    He was also negative for any indication of heroin,

24   the 6 -- I don't know how to say that word.

25   A.    6-Monoacetylmorphine.  We often call it 6-MAM.  It's

1    a metabolite of heroin that is very specific and unique to

2    heroin.  It's the way you determine the difference between

3    an individual who is receiving morphine therapeutically

4    and somebody who is abusing heroin.  You get 6-MAM from

5    heroin and you don't get it from morphine.  That was

6    negative in this case.

7    Q.   So he was negative for heroin marker and he's

8    negative for opiates?

9    A.   That's correct.

10   Q.   What's the significance of that, if you can explain

11   to the jury?

12   A.   Back to some of my initial comments, the methadone

13   maintenance program is apparently adequate to keep him

14   from using heroin.  Again, we see about a three-day window

15   on this.  So he hasn't used heroin for three days at

16   least, based on this testing.  So my conclusion would be

17   that either the methadone maintenance program is working

18   for this individual or he's at a point where he doesn't

19   need even methadone maintenance program.

20   Q.   Dr. Powers, is there anything in Mr. Hickey's

21   cross-examine that changes your scientific conclusions

22   that you stated in direct examination?

23   A.   No.

24   Q.   I'm not going to go over them again then.  Thank you

25   very much.

```
 1   A.    Thank you, sir.
 2              THE COURT:  Mr. Hickey?
 3              MR. HICKEY:  Nothing further.
 4              MR. REED:  No questions, Your Honor.
 5              THE COURT:  Thank you, sir.
 6              Next witness, please.
 7              MR. RUSH:  Your Honor, we can start the
 8   Savetamal deposition.  We're ready to go.
 9              THE COURT:  Sounds great, okay.
10              Ladies and gentlemen, we're going to be looking
11   at a deposition now of Dr. Savetamal.  It lasts for about
12   an hour, 20 minutes total.  So we'll see part of it at
13   this point.
14              Some of the records that she'll be testifying
15   about will be admitted into evidence, such as primary
16   hospital records that you'll see the doctor testifying
17   about.  At times you'll also see during her testimony some
18   photographs.  They're graphic photographs of Mr. Colon's
19   condition.  You'll have an opportunity when you see her
20   testimony to see -- the camera will show you parts of that
21   photograph.  I just want you to be aware that you'll be
22   seeing those.  Those photographs are not otherwise
23   independent exhibits in the case, but you'll have the
24   opportunity during the course of her testimony to see
25   certain photographs, and I want you to be aware of that.
```

1            So we can start, if you'd like.

2            MR. RUSH:  Very well.

3            THE COURT:  Hopefully our court system will

4    work.

5            (Video deposition of Dr. Savetamal played.)

6            THE COURT:  I think, Mr. Rush, we'll stop there.

7            We'll end up picking up where we left off

8    tomorrow, ladies and gentlemen.  So that will be it for

9    today.

10           We'll just ask you to come on back tomorrow.  It

11   sounds like you've had no problems getting here.  We've

12   been able to start on time, had very productive, lengthy

13   days of testimony.  So let's expect the same for tomorrow.

14           I'm going to say the same thing.  As tempting as

15   it might be to talk about the case with anyone, please

16   don't do so.  Don't let yourself read anything or hear

17   anything about the case.  Don't do any research.  Avoid

18   communicating with anybody you see here in the courtroom.

19           Thank you, ladies and gentlemen.  We'll see you

20   tomorrow.

21           (Whereupon the jury left the courtroom.)

22           THE COURT:  Please be seated.

23           How are we looking for tomorrow's lineup?

24   What's the sense of witnesses?  Obviously finish this

25   deposition?

1          MR. RUSH:  Yes, sir.  I assume this will take

2     about an hour to finish, more or less.

3          And then I think we're calling Dr. Andrew Yuan.

4     He is the physiatrist/rehabilitation specialist for

5     Mr. Colon.

6          THE COURT:  Okay.

7          MR. RUSH:  Mr. Bordiere of the Connecticut DOT

8     will be following Dr. Yuan and following the deposition.

9          THE COURT:  Was it Bordiere?

10          MR. RUSH:  Yes.

11          We also have Dr. Stern in the afternoon.  And we

12     also have Arlene Davis, the plaintiff.  She will be here

13     tomorrow.  I don't know that we'll get to her, though,

14     Your Honor.  We might get to her briefly.

15          THE COURT:  Okay.  And then we had

16     Ms. Rodriguez, but we're holding off on her?

17          MR. RUSH:  She's been here off and on.  She was

18     here today.  She's kind of our -- her office is a few

19     blocks away.

20          THE COURT:  Close by.  Sounds fine.

21          MR. RUSH:  She can be here in about ten minutes

22     on call.

23          THE COURT:  Good.

24          So does the defense feel they have the

25     information they need for tomorrow?

1          MR. HICKEY:  Yes.

2          Your Honor, if I could indulge and ask for

3    Friday.  I just want to make sure -- Mr. Rush and I have

4    been texting.  I want to make sure if I should have -- he

5    has two people under subpoena from Metro-North.  That's

6    why Mr. Fineman left early today, just to make sure they

7    were on standby or call.  It's obviously safe for

8    tomorrow.  I don't mean to push Mr. Rush about his

9    schedule at all.  That's not the intent.  It's just to --

10         THE COURT:  But on Friday do you think you're

11   going to get to the Metro-North folks?

12         MR. RUSH:  I don't know, Judge.  He's asking if

13   we'll get to them on Friday.  I originally had two experts

14   to go on Friday.  I've tentatively pushed them to Monday.

15   So I'm just -- I'm sort of juggling.

16         And I'm very, very conscious of what you said

17   that you want me to don't have gaps.  So that's my primary

18   goal.  First I want to satisfy your direction, and then I

19   want to try to satisfy Mr. Milhelmy and these other folks

20   at Metro-North.  But I don't really know whether they'll

21   testify on Friday.  I usually know about midday the day

22   before.  So I can see tomorrow potentially we do the

23   deposition and then Dr. Yuan and then Mr. Bordiere, and

24   then we start with Arlene Davis and hopefully we get to

25   Dr. Stern.  But we may not.  I've told him to be ready on

1    Friday morning.

2              THE COURT:  Okay.

3              MR. RUSH:  These things keep rolling backwards.

4              THE COURT:  Maybe you should put your

5    Metro-North folks on notice that they may need to come

6    Friday.

7              MR. HICKEY:  We have them.  And again, I'm not

8    trying to --

9              THE COURT:  We'll get a lunchtime update

10   tomorrow and see if we know more.

11             MR. HICKEY:  My intent was not to pressure

12   Mr. Rush at all.

13             THE COURT:  Okay.  Anything else to take up?

14   Any anticipated evidentiary issues that would make sense

15   to try to iron out now, not lose jury time?

16             MR. RUSH:  What we said this morning about the

17   Doody and Russell depositions, we believe we can play

18   those now.  If something comes up that's not in evidence,

19   we can turn it down.

20             THE COURT:  Sure enough.

21             MR. RUSH:  Dr. Stern, presuming he testifies

22   Thursday afternoon or Friday morning, he's going to bring

23   in almost all of those Google photos.  He has personally

24   analyzed, he's printed them up, he's able to bring in most

25   of those documents --

1          THE COURT:  Okay.

2          MR. RUSH:  -- such that we can play the Doody

3    and Russell depositions.

4          THE COURT:  I want to make sure whatever is

5    played or whatever is elicited from the witnesses, you're

6    cognizant with respect to the Court's ruling about the

7    casualty reports and also the regulation of Connecticut

8    state agencies that the Court has concluded is not

9    applicable to Metro-North.

10          MR. RUSH:  They're already out is my

11    understanding.

12          THE COURT:  I want to make sure that we don't

13    find that information kind of leaking in where it

14    shouldn't.

15          MR. HICKEY:  Because actually I did receive some

16    communication from Mr. Fineman.  That was one of the

17    things he was looking at this afternoon.  He said perhaps

18    we could ask for a designation of what is going to be used

19    now.  Because the original designations by both parties

20    were done before those rulings came out.  So if we could

21    have --

22          MR. RUSH:  Judge, I don't have time to do a new

23    designation.  I have experts I have to prepare.  We have

24    taken out references to 16-11-100 and -102.  I'll have our

25    technology person and my staff re-look at that again.

```
1   They keep telling me it's out.  We took out the FRA
2   information.
3              THE COURT:  Okay.
4              That's what you want, right?
5              MR. HICKEY:  But I think -- and I could be
6   wrong; Mr. Fineman did this -- but I think there were
7   objections to certain parts of the Doody deposition
8   independent of the FRA and the regulation.  There were
9   objections lodged I think at the time of the deposition
10  and I think there's objections to it now.
11             THE COURT:  I see.  So I need to resolve those.
12             MR. HICKEY:  I think so.  Maybe there's very few
13  now because of the rulings that maybe obviated some of
14  those.  I wanted to alert Your Honor to it.
15             THE COURT:  So when are you anticipating playing
16  the Doody depo?
17             MR. RUSH:  I'm sensing that they don't like
18  depositions late in the day.  This juror here was asleep
19  at one point during that deposition.  So I'm going to --
20  I'm going to try to do them -- I'm going to try to finish
21  with live people rather than play depositions late in the
22  day.  I would have thought we'd play them on Friday and/or
23  Monday.  We might juggle them, depending who else we have
24  to deal with.
25             THE COURT:  I can't really rule on those
```

1    objections until we figure out what is in play.  So --

2              MR. RUSH:  And we've done all our designations

3    back in May.  We designated and they objected to them.  I

4    think it's mostly relevancy.  They're not like -- they're

5    not really dramatic other than the ones we've stricken

6    already.

7              THE COURT:  So can you just come up with a list

8    of what you want me to do, or is it going to make sense to

9    sit there and flip through the Doody deposition page by

10   page?

11             MR. HICKEY:  I think it is in the JTM, there

12   were designations and corresponding objections.  My only

13   concern is Your Honor would have to look at more than what

14   is required.  I believe some of those have been taken care

15   of.

16             THE COURT:  I'll know to skip over to the ones

17   that are covered by my rulings.  Okay.

18             MR. RINGOLD:  Your Honor, I'm not trying to butt

19   into a fight that I'm not a part of.  I know that

20   plaintiffs' counsel's IT person was able to provide us

21   some of the videos in advance so we could confirm some of

22   our designations were present.  I don't know if they could

23   simply provide the videos as they're currently edited so

24   that we can see what objections are remaining.

25             MR. HICKEY:  We would pay for that if there's a

```
 1   cost.  That's not what this is about.

 2               THE IT SPECIALIST:  I gave you the rough of

 3   Doody, not the edited.  It might be in a file format that

 4   you may not be able to access.  And I may be able to get

 5   the office to provide you guys with a DVD format of that

 6   edited.

 7               THE COURT:  Okay.  So it's just -- I'll let you

 8   all work that out.

 9               It's just the Doody deposition?  Is there

10   another deposition I need to be looking through to resolve

11   outstanding objections?

12               MR. RUSH:  I think they mean also the Russell

13   deposition.

14               But I really do think it's incumbent on you all

15   to sort of get this information, look at it, and make a

16   decision about whether there's a problem -- I think you're

17   going to see there's not much of a problem left, but

18   you'll probably have some concerns about some things that

19   you don't think are relevant.

20               MR. HICKEY:  I agree.  That's what we're asking

21   for is to know what is paired down.

22               MR. RUSH:  We'll give you a copy.

23               THE COURT:  Okay.  Just do that.  That would be

24   great.  And I'll take a look at those depos as well.

25               Anything else to take up?
```

1          MR. REED:  No, Your Honor.

2          THE COURT:  Thank you all.  Stand in recess.

3               (Proceedings adjourned at 4:09 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T E

3

4      RE:  COLON, ET AL. V. METRO-NORTH COMMUTER RAILROAD

5               COMPANY, ET AL., NO. 3:13CV325(JAM)

6

7           I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 381 through 564 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                         _____/s/_____

18                         DIANA HUNTINGTON, RDR, CRR
                               Official Court Reporter
19                         United States District Court
                                141 Church Street
20                         New Have, Connecticut 06510
                                (860) 463-3180
21

22

23

24

25