UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
MILTON OMAR COLON and ARLENE    :   No. 3:13CV325(JAM)
DAVIS,                          :
                                :
        Plaintiffs              :
                                :
      vs.                       :
                                :
METRO-NORTH COMMUTER RAILROAD    :
COMPANY, and METROPOLITAN       :
TRANSPORTATION AUTHORITY,       :
                                :
        Defendants              :
                                :
- - - - - - - - - - - - - - - - :
                                :
METRO-NORTH COMMUTER RAILROAD    :
COMPANY, and METROPOLITAN       :
TRANSPORTATION AUTHORITY,       :
                                :
        Third-Party Plaintiffs  :
                                :
      vs.                       :
                                :
UNITED ILLUMINATING COMPANY,    :
AUTHORITY,                      :
                                :   New Haven, Connecticut
        Third-Party Defendant   :   August 15, 2017
                                :
- - - - - - - - - - - - - - - - x


JURY TRIAL
VOLUME VII - A.M. SESSION

B E F O R E:

      THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.,

                  and a Jury



                              Diana Huntington, RDR, CRR
                              Official Court Reporter

1    A P P E A R A N C E S:

2

3        FOR THE PLAINTIFFS:

4            WOODLIEF & RUSH, P.A.
                 3411 W. Fletcher Ave., Suite B
                 Tampa, Florida 33618
5            BY:  BRIAN P. RUSH, ESQ.

6

7        FOR THE DEFENDANTS AND THIRD-PARTY PLAINTIFFS:

8            RYAN RYAN DELUCA, LLP
                 707 Summer Street
                 Stamford, Connecticut 06901
9            BY:  ROBERT O. HICKEY, ESQ.
                 BECK S. FINEMAN, ESQ.

10

11       FOR THE THIRD-PARTY DEFENDANT:

12           LOUGHLIN FITZGERALD, P.C.
                 150 South Main Street
13               Wallingford, Connecticut 06492
             BY:  CHARLES P. REED, ESQ.
14               JAMES E. RINGOLD, ESQ.

15

16

17

18

19

20

21

22

23

24

25

1283

## TABLE OF CONTENTS

| PLAINTIFFS'<br>WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR<br>DIRE |
|---|---|---|---|---|---|
| LAWRENCE FORMAN | | | | | |
| By Mr. Rush | 1307 | | | | |
| By Mr. Fineman | | 1367 | | | |
| | | | | | |
| ROBERT DOODY | | | | | |
| Video Deposition – 1381 | | | | | |

1              **8:32 A.M.**

2              THE COURT:  We're here for the seventh day of

3      evidence in the matter of Colon vs. Metro-North, et al.

4              Appearance of counsel for plaintiff, please?

5              MR. RUSH:  Brian Rush for the plaintiff.

6              THE COURT:  Anyone else at counsel table?

7              MR. RUSH:  Margaret Murrell, and later Tiffany

8      Rivas and possibly Zack Marroquil.

9              MR. HICKEY:  Bob Hickey from Ryan Ryan Deluca

10     for Metro-North and MTA.  To my left again today is

11     Attorney Beck Fineman.  Thank you.

12             MR. REED:  Good morning, Your Honor,

13     Charlie Reed and Jim Ringold for the third-party defendant

14     the United Illuminating Company.

15             THE COURT:  Anything to take up this morning?

16             MR. RUSH:  Three things, Your Honor.

17             First of all, it's my understanding that Mr. --

18             MR. HICKEY:  Hickey.

19             MR. RUSH:  Mr. Hickey -- I didn't sleep much

20     last night.  But anyway, Mr. Hickey has agreed to the

21     entry of the last two exhibits for the Doody deposition,

22     but he would like an instruction, I think, regarding when

23     they were taken.  These were from a site inspection from

24     approximately April 2014, Exhibits 28 and 29.  28 is

25     identified earlier on.  At any rate, those are the two

1    exhibits.

2              THE COURT:  They were taken on what day?

3              MR. RUSH:  We had site inspection after the

4    filing of the suit for experts, where all the parties went

5    out to the site in April of 2014.  And it, of course, is

6    after the site was modified.

7              THE COURT:  All right.  And so how do you

8    propose to do that?  When that comes up during the

9    deposition, do you just want to --

10             MR. RUSH:  We propose to introduce them in

11   advance of the deposition, but Mr. Hickey wants an

12   instruction either by you or a statement by him.  And we

13   are perfectly fine with whatever he wants.

14             THE COURT:  Okay.  So what are the exhibit

15   numbers?

16             MR. RUSH:  Exhibits 71 and 72, Plaintiffs' Trial

17   Exhibits 71 and 72.

18             THE COURT:  So you want me simply to say -- upon

19   you all offering them in, I'll ask if there's any

20   objection, and I'll say, "I understand that these two

21   photographs were taken during a site inspection for

22   purposes of this law suit in April 2014."

23             MR. HICKEY:  My understanding is that these are

24   going to come in during the video playing of the Doody

25   deposition.  We didn't want to step on that process, so to

1    speak.  But my concern was the timing of the photographs.

2    I just don't want any confusion about when and where.

3         He identified those photographs so, I mean, my

4    preference would have been to keep them out.  But I

5    understand that they're going to come into evidence

6    because he did identify them.

7         But I think it's just a matter of explaining to

8    the jury, either at the end of the video or, you know, if

9    we pause the video -- I'll leave it up to Your Honor,

10   quite frankly.  I don't think I should interject and say

11   anything.

12         THE COURT:  The various -- I assume Doody will

13   be showing numerous exhibits.

14         MR. HICKEY:  I think a lot of exhibits are going

15   to come in through Doody.

16         THE COURT:  Are they all in already, other than

17   20, 71 and 72?

18         MR. HICKEY:  Mr. Rush could probably answer that

19   better than I.

20         MR. RUSH:  I'm sorry, what was the question?

21         THE COURT:  So I assume Mr. Doody is going to be

22   identifying a number of photographs --

23         MR. RUSH:  He is.

24         THE COURT:  -- or testifying about them?

25         MR. RUSH:  Yes, sir.

1    THE COURT:  So are they already in evidence?

2    MR. RUSH:  All except these last two that we're

3    talking about now.

4    THE COURT:  I would suggest then, that before

5    the Doody deposition begins, then, that you make a motion

6    to introduce 71 and 72.  I'll ask counsel if there is any

7    objection.

8    They'll say no objection, provided that there's

9    a clarification of the date.

10   And I'll say, "I understand the parties agree

11   these two photographs were taken during a site inspection

12   for purposes of this case in April of 2014."

13   Is that all right?

14   MR. HICKEY:  I think that's fine.

15   THE COURT:  And then everything is all set and

16   the groundwork is set for when the Doody deposition is

17   played.

18   MR. HICKEY:  I think that works.

19   THE COURT:  Okay, great.  That's issue number

20   one.

21   Two more?

22   MR. RUSH:  You directed the plaintiff, by

23   July 28, to file a notice of proposed admissions based on

24   answers to requests for admissions, answers to pleadings

25   and, I think, answers to interrogatories.

1      We did that on July 28.  We brought this up to

2  you before.  There's never been a stipulation between the

3  parties regarding basic facts.  There's been no response

4  to this.  Just at some point before the end of the trial,

5  we'd like either some, all, or none of these admissions to

6  be adopted.  Most of them are not controversial, but

7  probably some of them are.

8            THE COURT:  I see.

9            Defense?

10           MR. HICKEY:  Yes, Your Honor.

11           And perhaps this is just a mistake on my part or

12  miscommunication between the parties.  What Mr. Rush had

13  sent us was a proposed stipulation followed by a section

14  that he entitled Argument as to why it should be

15  stipulated to.

16           And in my experience, essentially stipulations

17  are:  Stipulation Number One, Metro-North operated the

18  rail line in 2011.  It's just a fact.  And if you can

19  agree to those, those are presented.

20           So maybe I didn't understand exactly what

21  Mr. Rush was trying to do.  We've tried to stipulate to

22  the essential facts:  The Amended Restated Agreement was

23  in place; the United Illuminating agreement was in place;

24  Metro-North ran the railroad and possessed it, controlled

25  it.

1    I mean, I think we've tried to stipulate -- we

2  haven't contested any of those, and I think we've readily

3  admitted those.  So if Mr. Rush wants to propose some more

4  true stipulated facts, I'm happy to try to work with him.

5  Based on what I saw, I could not stipulate to those

6  because it had his argument in there.  Perhaps that's

7  where --

8    THE COURT:  Clearly the argument doesn't go to

9  the jury.

10    MR. HICKEY:  Right.

11    THE COURT:  In the ordinary course there would

12  simply be a tone neutral stipulation.  This is very

13  standard.  This is something that is done in essentially

14  all trials in which the parties simply have facts that are

15  set forth as stipulated facts, but that they don't have

16  argument attached to them.  And ordinarily, for the jury's

17  usefulness, it just goes in as a document that's signed by

18  all counsel.

19    MR. RUSH:  That is not the case, and that was

20  not the procedure that you elected to follow in this case,

21  Your Honor.

22    First of all, in the JTM we sent them a list of

23  stipulations.  They did not agree to any of those.  The

24  JTM procedure has a section for stipulations.  We sent

25  them proposed stipulations without argument.  When that

1    was not agreed to, we listed as Exhibits 29 through 38.

2              You then ordered us, in late July, to file a

3    detailed explanation, what we wanted to be admitted.

4    We've done that.  There's about ten admissions here.

5    They're in bold.

6              We did what you told us.  There's been no

7    response.  They can simply go through here and say:

8    Complaint Paragraph 3 is admitted; Complaint Paragraph 24

9    is admitted; Complaint Paragraph 29 is admitted; Request

10   for Admissions Paragraph 1 is admitted; Request for

11   Admissions Paragraph 2 is admitted; Request for

12   Admissions --

13             THE COURT:  I got the idea.

14             MR. RUSH:  This is what you told us to do, so

15   we've done it.  I'm just -- it's just another thing that

16   we've done and hasn't, you know, resulted in the

17   admissions.  We proposed admissions.  There's been no

18   response.

19             THE COURT:  All right.  Let me take a look.

20   I'll take a look at our next break at that particular

21   document that was filed.

22             And you said that -- what's the document number

23   on that, Mr. Rush?

24             MR. RUSH:  I don't have a document number, but

25   it was filed on July 28, and it's plaintiffs' notice of

1   filing specific portions of pleads in discovery which

2   plaintiffs intend to use in trial.

3          MR. HICKEY:  I have a recollection -- I don't

4   know why this sticks in mind -- of 415, because I think I

5   went back and looked at this.  I might be wrong on that,

6   but that might be a place to start looking.  I think it's

7   right around there.

8          THE COURT:  All right.  Anything else?

9          MR. RUSH:  The MTA Police Department report

10  is -- we went -- I brought a copy of it.  It is a catenary

11  shock-burn case, as were all of the other ones in our

12  summary.  The only -- we've sent you a summary many, many

13  months ago, with seven catenary shock-burn cases.  The

14  only one we could document in this case was this one,

15  because the Court entered an order prohibiting us from

16  having any kind of discovery of these type of records more

17  than ten years before the incident.  So the only one we

18  could get under your discovery order was this one.

19         It involves a fellow by the name of Gajdosik,

20  Forest Gajdosik.  It was pretty clear he was burned on the

21  catenary.  I have this copy I can give you, if you'd like,

22  Judge.

23         THE COURT:  That would be helpful.

24         MR. RUSH:  Metro-North and MTA also have similar

25  records for this on all of the other records that were

1  stricken, but they're not required to produce them in this

2  case.

3          THE COURT:  I'll take a moment to review this.

4              (Pause.)

5          THE COURT:  Is this incident coming in in the

6  upcoming testimony?

7          MR. RUSH:  We expect to ask Mr. Milhelmy about

8  it.  He recalls being present at a shock-burn incident

9  2001, in his deposition.  We expect to ask him about it

10  tomorrow.  I think it's too late now for us to ask the

11  Court to order Mr. Milhelmy to bring all of the old

12  reports that would verify that the summary was completely

13  accurate.  You've already stricken that.  You struck that

14  whole summary, including that one.  And the defendants

15  asked you to strike it because none of the FRA report

16  summaries allegedly were similar in nature.

17          That one is clearly similar in nature.  So were

18  the rest, but they have all the reports, and you have

19  entered an order July 2014 precluding us.  Without that

20  summary, the summaries can't be verified.

21          THE COURT:  Do you have similar reports that

22  discuss the background and circumstances for any of the

23  other --

24          MR. RUSH:  You didn't let us get them.  You

25  prevented us from getting them.

1          THE COURT:  Please don't cut me off.

2          MR. RUSH:  You asked me a question.

3          THE COURT:  Mr. Rush, I'm going to ask you not

4  to cut the Court off while the Court is asking a question.

5          My question is:  Do you have any other police

6  reports like this with respect to the other incidents that

7  are described on the FRA casualty reports?

8          MR. RUSH:  And the answer is no, because on two

9  different occasions you precluded that.

10          First of all, you entered an order precluding us

11  from taking discovery and obtaining these police reports

12  that they have.  That prevented us from getting

13  information.

14          And then you directed me in the interest --

15  because they had a business to run, you directed me to

16  withdraw my FOIA request.

17          Until the Thursday before trial, the FRA

18  summaries were in.  So on the Thursday before trial -- or

19  the Wednesday before trial, while I was flying up here,

20  the FRA reports were knocked out.  So all I've got is what

21  I can get.

22          And they have all these reports.  They've had

23  them from the beginning.  But they were very clever.  They

24  got an order that protected them from having to produce

25  them.  And then the Thursday before trial, they knocked

```
 1   them out.

 2              THE COURT:  Okay.  So do defendants have

 3   anything to say about this particular incident, the

 4   2001 report?

 5              It's being -- it's an MTA police report.  I

 6   don't think it's been on plaintiffs' exhibit list in the

 7   case.  It looks like there's an exhibit identification in

 8   a deposition.  I don't see any other exhibit number, and I

 9   don't think I received a copy of this report in opposition

10   or as part of plaintiffs' opposition to the motion in

11   limine to preclude the FRA casualty reports.

12              This particular report that I'm looking at here

13   is not an FRA report.  It's an MTA police report for the

14   incident, I believe referenced yesterday, from July 1,

15   2001.

16              It does appear that it relates an incident in

17   which somebody was climbing a catenary pole, crossing from

18   one side to the other, looking at page 3 of this report.

19              So do defense have any -- are they seeking to

20   preclude any evidence of this report --

21              MR. HICKEY:  Yes.

22              THE COURT:  -- because it's going to come up in

23   Mr. Milhelmy's deposition.

24              MR. HICKEY:  Yes, Your Honor.  Absolutely.

25              As Your Honor has already ruled, the rule for
```

1    admitting something like this would be substantial

2    similarity.  And so admittedly it was an incident on the

3    catenary.  That's from -- from what we can tell from this

4    report, that's where the similarities end.

5              This was in South Norwalk.  I would estimate

6    South Norwalk to be at least 30, if not more, miles away.

7    This is -- apparently he was, at one point in time, across

8    the truss, which we know was a lot lower than where

9    Mr. Colon went.  This did not involve any 115 kV wires.

10             And the real danger with this, Your Honor, it's

11   going to create a trial within a trial.  If this is

12   admitted, are we not, on the defense side, going to have

13   to prove the dissimilarities of this, and perhaps why this

14   person did what he did.

15             In the report, it appears that he climbed over a

16   fence at a substation to gain access to where he was.  So

17   the details here are very scant, but the prejudice is

18   obvious.

19             And, you know, given what the plaintiffs have to

20   prove here, which is routine or regular trespassing in the

21   limited area where this happened on Tower 1043, to put in

22   a report from miles away, a decade earlier, is a very

23   difficult proposition for the defendants.

24             THE COURT:  I don't think that the report has

25   been offered as evidence.  It's not marked as -- it's not

 1    even marked as an exhibit in the case, is it?

 2             MR. HICKEY:  No, not to my knowledge.

 3             THE COURT:  And so this is all -- it wasn't

 4    called to my attention at the time that the motion in

 5    limine was filed as to the FRA casualty reports.  So this

 6    is the first time I am seeing this report, as I recall, in

 7    this case.  So I'm trying to understand a bit more about

 8    the potential admissibility of any information that's

 9    related in this report.

10             MR. HICKEY:  I think this report is covered by

11    your prior ruling on the FRA summaries.  I think this was

12    one of those that was recorded.  This was the one report

13    that, actually Mr. Fineman reminds me, we disclosed in

14    good faith because this was actually outside Your Honor's

15    discovery order as to geography.  But in good faith, we

16    disclosed it because it came out.  So it was one of the --

17    it was one of the listed incidents on the FRA summary.

18             And my understanding is that the older ones,

19    there were no reports available for those at all, from any

20    source.  So this is the first time that we're aware that

21    this is being offered.  It's going to create a lot of

22    confusion, I believe.  And if it's being offered as a full

23    exhibit now, obviously we need to object.

24             THE COURT:  Mr. Reed.

25             MR. REED:  Your Honor, I'd just point out that,

1       among the other reasons why this is wholly unlike the

2       facts that relate to the vicinity of Tower 1043, this

3       happened in South Norwalk which, pursuant to Plaintiffs'

4       Exhibit 46 and yesterday the confirmatory testimony of

5       Mr. Bordiere, is outside the geographic service area of

6       UI's transmission line.

7               This is some kind of incident, I'm not sure of

8       the actual cause in terms of what was the content of the

9       electricity and whose was it that caused the injury.  At

10      issue in this case it would appear that potentially

11      combined influences of the two systems, as to say the

12      Metro-North and the UI system.

13              UI is not doing business down in South Norwalk,

14      so I think it would lead to confusion on the part of the

15      jury as to whether this is an incident that involves

16      UI system or a high voltage transmission system of the

17      same kind, operated by another utility company; on top of

18      which, what Mr. Hickey has pointed out, the facts are

19      quite different.

20              So it just seems to me that since it's far

21      outside our service territory -- and that's been

22      well-established through, as late as yesterday, through

23      the testimony of Mr. Bordiere -- it's not geographically

24      proximate at all to the location of this incident.

25              THE COURT:  Anything else on this?

1    MR. HICKEY:  Not from me.

2    THE COURT:  Mr. Rush, anything else?

3    MR. RUSH:  Very briefly, Judge.

4    This was not outside -- there's a rewrite of

5    history going on, and I don't think it's intentional

6    because that would be not right.  But the order that you

7    entered said that they had to give us all records for

8    ten years in the whole state of Connecticut, not a mile on

9    either side, for similar catenary shock-burn incidents.

10    So when Mr. Hickey said this is actually beyond

11    that, they actually gave us extra stuff, that's not

12    correct.  I'm sure he didn't mean to mislead you.  Your

13    order was the whole state of Connecticut.  This was within

14    it.

15    Secondly, it appears to me -- maybe I'm reading

16    it wrong, I don't think so -- that Mr. Gajdosik was

17    walking on the south side of the tracks; climbed up the

18    pole; went across the truss somehow; and was shocked

19    somewhere on the far side, where the fence is located.

20    If you look at the first -- if you look at the

21    fourth paragraph, it's talking about at 4:15 a.m. hours I

22    arrived on the scene, interviewed Brian Shepard, who

23    stated that he and Forest Gajdosik were walking along the

24    south side of the tracks from an unknown direction when he

25    saw Forest climbing the catenary pole ahead of him.

1    There's no mention that he climbed the fence

2 there.  He climbed the pole, just like Mr. Colon did.

3 There's a substation on the other side that is fenced, and

4 either he fell in there or they rescued him from there,

5 maybe it's not clear.  But it says the gates were locked,

6 and there were no holes in the fence noted.

7    This was produced under the very limited order

8 of discovery that you allowed.  They moved to strike this,

9 along with all the other FRA reports because --

10    THE COURT:  What do you mean "the other FRA

11 reports"?  This is not an FRA report.

12    MR. RUSH:  But this corresponds to Item 1 --

13 corresponds to one of our summaries.

14    THE COURT:  When Metro-North moved in limine on

15 grounds that the FRA casualty reports, the incidents there

16 were not substantially similar, did you give me a copy of

17 this report at that time?

18    MR. RUSH:  Neither side did.  The moving party

19 did not bring it to your attention, and neither did I.

20    THE COURT:  Okay.  I wanted to make sure that I

21 wasn't operating under -- had overlooked something that

22 had been brought to my attention.

23    This is the first time now that you're calling

24 this particular report to my attention.

25    MR. RUSH:  Yes, Your Honor.

1    The Thursday before trial, you struck all my FRA

2    summaries that would have just come in as admitted as --

3    THE COURT:  Why didn't you -- I'm sorry.  Why

4    didn't you just give me a copy of this report and say it's

5    not true when Metro-North says these other incidents are

6    not substantially similar?

7    MR. RUSH:  I think, Your Honor -- I hope I won't

8    hurt your feelings.  You're the smartest judge I've ever

9    appeared before, and you're fair.  But the practicalities

10   of running a plaintiffs' case I do not think you

11   understand at all.  You do not understand how difficult it

12   is to be one lawyer handling all these issues and being

13   hit with not just one motion that you're talking about

14   now, but a plethora of motions in the last five days while

15   we're trying to have meetings with our clients, trying to

16   prepare witnesses, and trying to move up here.  That's the

17   reason.

18   If you give me 25 or 26 or 28 hours of work in a

19   day, I'm not going to get to everything perfectly.  I am

20   prepared to interview Mr. Milhelmy tomorrow.  He talked

21   about this.  He talked about a event he went to.  He

22   mentioned that there was a fence.  So I'm prepared to ask

23   him about this tomorrow.

24   The defense, in their motion, I can't catch

25   every misstatement.  And I'm not saying it's intentional,

1   because that would be calling them liars, and I'm not

2   calling them liars.  I can't catch every misstatement of

3   Mr. Fineman, or Mr. Hickey, or the UI lawyers.  I can't do

4   that.  I don't have the time to do it.

5          So, yes, this is the first time I'm bringing

6   this to your attention.  I am showing you that their

7   motion in limine was not accurate.  This is part of the

8   FRA summaries.  They struck it.

9          I got to tell you Judge, I don't care who wins

10  the case anymore.  I do not care.  This is way beyond what

11  I want to do anymore.  So if you don't want this in,

12  that's okay with me.  I'm just going to do the best I can.

13         When they filed this motion in limine, this is a

14  substantially similar event, this 2001.  It shouldn't have

15  been excluded.  They shouldn't have moved to exclude it.

16  Now I've finally caught up to it.  I'm bringing it to your

17  attention.  You can let it in or not.  It doesn't matter

18  to me.

19             THE COURT:  You don't care who wins the case?

20             MR. RUSH:  I do not care one wit who wins this

21  case anymore.  It is not my problem.  My job is to put on

22  this case as best I can, and they decide and you decide.

23  You make the instructions, they make the decision.  I

24  don't make the decision.

25             My job, as a professional and as a plaintiffs'

1    lawyer for the last seven years, is to put this case on as

2    best as I can.  I've done that against overwhelming paper.

3    And right now it doesn't matter to me who wins or loses.

4    I am completely neutral.  If my client wins, great for

5    him.  But it doesn't change the effect.  It doesn't matter

6    if I care, if I wake up every morning saying, "I care, I

7    care, I care," those jurors will decide and you will

8    decide.  It's not up to me.  And I owe my client zealous

9    representation, but I don't owe him any more caring about

10    this case.

11            THE COURT:  I see.  Okay.

12            So what I'm going to do is, just to be clear, I

13    need to think a little bit more about this, now that I've

14    seen this MTA report.  I need to look at it more

15    carefully.

16            As I understand it, Mr. Rush, your proposal is

17    to cross-examine Mr. Milhelmy about this report?

18            MR. RUSH:  Yes, sir, I intend to cross-examine

19    him about it.  I don't know if he'll say he remembers.

20    Given his deposition, he claims not to remember very much,

21    so he may not remember.

22            THE COURT:  Okay.  All right.

23            Okay.  So I will take a look at this report, and

24    we'll have to return to this topic.

25            Are there other matters to take up before we --

1    MR. FINEMAN:  Very briefly, Your Honor.

2         I understand the Doody deposition is going to be

3    played today, and I did have an additional

4    cross-designation that I had requested the plaintiffs to

5    include in the video over the weekend.

6         They were not inclined to do so; but I would

7    like, in the interest of fairness, to read that

8    cross-designation at the end of the playing of the video.

9    This is my cross-examination Mr. Doody on the

10   1971 Congressional report that Your Honor ruled the other

11   day was going to be allowed into evidence.

12        Because it's now allowed in, I would like the

13   opportunity to let the jury know that Mr. Doody had never

14   seen that report before and had nothing to do with it.

15        THE COURT:  It's not possible to -- he had never

16   seen the report?

17        MR. FINEMAN:  He had never seen the report.

18        THE COURT:  Okay.  And had nothing to do with

19   that report?

20        So you just want that to be -- so your proposal

21   is -- tell me what part of the deposition.  I want to see

22   what specific lines.

23        MR. FINEMAN:  I'm looking at page 215, line 9,

24   through page 216, line 14.

25        THE COURT:  215, line --

1        MR. FINEMAN:  215, line 9.

2        THE COURT:  So you just want lines 9 through --

3        MR. FINEMAN:  Through page 216, line 14.

4        MR. RUSH:  What line on 219?

5        MR. FINEMAN:  215, line 9.

6        MR. RUSH:  Through what?

7        MR. FINEMAN:  216, line 14.

8        THE COURT:  Okay.  What's the basis for not

9   allowing this?  I'm asking Mr. Rush, why not --

10        MR. RUSH:  First of all, Your Honor, this is the

11   first time they've asked me.  I don't see any problem with

12   it.

13        THE COURT:  Okay.

14        MR. RUSH:  It doesn't matter to me whether it

15   comes in or not.

16        THE COURT:  Is it possible for your tech person

17   to add --

18        MR. RUSH:  Not now.

19        THE COURT:  It's too late now.

20        MR. RUSH:  I don't see any -- this is the first

21   time anybody has asked me to add this.

22        Mr. Fineman, if you want to add it, it's okay

23   with me.

24        MR. FINEMAN:  I did request this over the

25   weekend.

1   THE COURT:  Let's do this.  Maybe when the Doody

2   deposition is done, we'll say there was one other portion

3   of this deposition that concerned Mr. Fineman's

4   examination of Mr. Doody.

5   And how would you propose to do the reading?

6   MR. FINEMAN:  If I could just read the portion

7   in, that would be sufficient with me.

8   THE COURT:  Is that okay, Mr. Rush?

9   MR. RUSH:  Yeah, that's fine.

10  THE COURT:  We'll go ahead and do that.  That

11  sounds fine.  Great.

12  Anything else?

13  MR. RUSH:  No, sir.

14  THE COURT:  See if our jury is there.

15      (Whereupon, the jury entered the

16      courtroom.)

17  MR. RUSH:  Your Honor, shall I bring in the

18  first witness?

19  THE COURT:  Yes, please.

20  Ladies and gentlemen, welcome back.  Please be

21  seated.

22  We're prepared to start another day of evidence

23  in this case.  We'll ask if plaintiff would like to call

24  the next witness.  I think I see him.

25  Come on up, sir.  There's a witness chair right

1    over here.

2             THE WITNESS:  Thank you, Your Honor.

3             THE CLERK:  Please remain standing, and please

4    raise your right hand.

5

6                      LAWRENCE FORMAN,

7         called as a witness, having been first duly

8         sworn, was examined and testified as follows:

9

10            THE WITNESS:  Yes.

11            THE CLERK:  Please be seated.

12            Please state your name.

13            THE WITNESS:  Lawrence Stuart Forman.

14            THE CLERK:  Please spell your last name.

15            THE WITNESS:  F-O-R-M-A-N.

16            THE CLERK:  Please state your address by city

17   and state only.

18            THE WITNESS:  114 -- I'm sorry.  Miami, Florida;

19   Buffalo, New York; and Manhattan, New York.

20            THE CLERK:  Thank you.

21            THE REPORTER:  Please spell your first and

22   middle names.

23            THE WITNESS:  L-A-W-R-E-N-C-E, S-T-U-A-R-T.

24

25

1                    DIRECT EXAMINATION

2    BY MR. RUSH:

3    Q.    Good morning.

4    A.    Good morning, sir.

5    Q.    Could you tell the jury what your profession is?

6    A.    I'm a medical case manager, rehabilitation counselor,

7    and a lifecare planner.

8    Q.    Can you tell the jury, what is a habilitation

9    counselor?

10   A.    Habilitation is working with an individual who

11   sustained an injury at a point in their life where they

12   had not learned certain things, and you have to train them

13   to do those things for the first time.

14   Q.    And what is vocational rehabilitation?

15   A.    Rehabilitation is working with an individual who

16   already had sustained life skills; and, because of a

17   particular situation, their life was altered.  Then you

18   try to get them back to the occupational information that

19   they used to be able to carry out.  If not, you get them a

20   multi-interdisciplinary evaluation and you come up with a

21   new treatment plan, and try to make them as healthy and as

22   independent as possible.

23   Q.    Mr. Forman, can you tell the jury, what is lifecare

24   planning, and what does a lifecare planner do?

25   A.    When I teach at the university, I use this analogy.

1    If you wanted to take a trip, you need a way to get

2    there.  If you wanted to know what you're going to do when

3    you get there, you pack your suitcase with the appropriate

4    case.

5    A lifecare plan is a continuum of services that helps

6    an individual go through the diagnostic process, the

7    treatment process, the rehabilitative process, the

8    maintenance process, and hoping you can get a stainable

9    life in the future.

10   So lifecare plan contains certain things, and

11   vocational evaluation is determining a person's interest,

12   aptitude, intelligence, and physical ability.  And you

13   hopefully can direct them to an occupation which they will

14   be successful in.

15   Q.   Mr. Forman, can you tell the jury what medical case

16   management involves?

17   A.   You're part of a team, and you work in concert with

18   psychologists, psychiatrists, doctors, physical

19   occupational and speech therapists, family members, and

20   the impaired party on their own.  And together you can

21   diagnose within your area of expertise, determine whether

22   that condition is something that could be treated.  And

23   then you go forward with that plan, you know what you need

24   to do, when you need to do it, how you need to do it, and

25   how much it will cost.

1  Q.   In your professional career as a life planner, have

2  you been involved with a company by the name of

3  Comprehensive Rehabilitation Consultants Incorporated?

4  A.   Yes.  That's my own company, and I started it with

5  two others.

6  Q.   How many employees do you have?

7  A.   I'm sorry, I didn't hear you, sir.

8  Q.   How many employees, approximately, do you have at

9  Comprehensive Rehabilitation?

10  A.   In our pediatric program, we have about 75 to 100;

11  and in our case management program, we have about

12  40 to 60.

13  Q.   What are the objectives of this company that you run,

14  Comprehensive Rehabilitation Consultants?

15  A.   First of all, to assist the family or the second

16  party in understanding the nature and needs of the family

17  member who's become impaired, or to help someone who has a

18  parent or a family member that will eventually need

19  services beyond the scope of what we have.  So we try to

20  work with the family to improve their ability.

21       The second thing that we try to do is to work with

22  the others to educate them, to get educated by them, and

23  to come up with an integrated plan which is ultimately

24  reviewed by the key players.

25  Q.   Mr. Forman, can you tell the jury what Children's

1    Rehab Network is?

2    A.   I don't want to get too excited, but that's a program

3    that serves medically fragile and technologically

4    dependent children, respirators, ventilators, apnea

5    monitors, gastrostomies, amputations, and cancer.  They

6    come to us from about 6:00 in the morning until 6:00 at

7    night; and we give them nursing care, respiratory therapy,

8    and all of the other services on an intense basis so we

9    can get them hopefully out of our program and to the next

10   appropriate program.

11   Q.   Well, are there any other objectives for the

12   Children's Rehab Network?

13   A.   First of all, we want to help keep the child within

14   the family situation.  We don't want them to go to nursing

15   homes, long-term residential facilities.

16        The second we want to do is to try to see if there's

17   anything we can do to stabilize and improve their

18   condition so they can have as normal a life as possible,

19   go out with their families and do certain things.

20        And I don't' want to be disrespectful to them, one of

21   the most important objectives is to help people in life.

22   Q.   Mr. Forman, can you tell the jury what types of

23   individuals you work with on a regular basis?

24   A.   Individuals who have sustained spinal cord injuries,

25   head injuries, amputations, burns, organ transplants, and

1    many others.

2    Q.    Approximately how many individuals do you see on a

3    weekly basis?

4    A.    You're talking about me personally?

5    Q.    Well, you personally, and then we'll talk about the

6    organization.

7    A.    I try to see no more than 15 a week.  And the staff,

8    each probably sees about 15 and 25 a week.

9          And let me say something:  They repeat, sometimes

10   we'll see the same person over a five-week period.

11   Q.    How do you get most of the referrals for your

12   professional business?

13   A.    Family members, physicians.  About 90 percent of our

14   legal work comes from plaintiffs' attorneys, 10 percent of

15   our legal consulting comes from defense attorneys.  If

16   we're asked to consult, it's about 40 percent defense, and

17   obviously 60 percent plaintiff.

18         And then we get them from third parties who have a

19   responsibility for managing certain aspects of the

20   person's life.

21   Q.    In addition to the injured people that you consult

22   with and advise, can you tell the jury whether you also

23   work with their families in your practice?

24   A.    Only if you'll let me correct you on one -- we don't

25   call them injured people.  We call them people with

```
 1    special needs.

 2         I'm sorry, what was the rest of your question?

 3    Q.   Can you tell the jury whether you provide any

 4    consulting or services to the families of these people

 5    with special needs?

 6    A.   It's critical.  Yes.

 7    Q.   What do you do for the families?

 8    A.   We try to tell them what is going on in the various

 9    services that are being provided.  We try to give them

10    consistency so they know how the skills are being

11    introduced, how they're being provided, and how they're

12    being reinforced so there's no confusion in the way in

13    which the therapist or the nurses do it, by the family

14    doing it differently.  And of course, we provide crisis

15    intervention for families, if and when required.

16    Q.   Mr. Forman, can you tell the jury about your

17    education and experiential background that allows you to

18    assess the needs of these persons with disabilities and

19    special needs?

20    A.   I'll try not to be long-winded.  If I do, I'm sorry.

21         I started out, believe it or not, as an employee of

22    American Airlines and was unfortunately, because of the

23    industry, relieved of that position.

24         I then went to become a teacher for the Board of

25    Cooperative Educational Services, teaching socially
```

1   maladjusted and emotional disturbed.  I was fortunate to

2   receive promotions until I ultimately went to work in the

3   central office, developing programs for that population.

4       I then went to work at Miami-Dade Community College

5   and developed a program of continuing education for people

6   with impairments.

7           THE WITNESS:  I'm sorry, I'm not making that

8   noise, am I?

9           THE COURT:  I think you might be a little close

10  to the microphone.

11          THE WITNESS:  Thank you, Your Honor.  I

12  apologize.

13          And then from there, I went to work for the

14  State of Florida.  I was assistant superintendent of a

15  935-bed institution, and then I was superintendent, and

16  then I was honored to be asked to come in on the

17  evaluation of Willowbrook and the state hospital and

18  others which are being closed.

19          I then went on to be the regional director for

20  Diagnostic and Evaluative Services for the State of

21  Florida.  Then I went on to be various positions within

22  the community.  And then, of course, I helped found the

23  Learning Workshop, Children's Rehab Network, and

24  Comprehensive Rehab.  And I've had various governmental

25  appointments where I've been allowed to exercise those

1    skills at the national and international level.

2    BY MR. RUSH:

3    Q.   Mr. Forman, can you tell the jury about your

4    employment background in relation to counseling,

5    habilitation, and lifecare planning?

6    A.   My first real indoctrination to that was in the Army.

7    The second was at Pilgrim State Hospital, which is a

8    now-closed mental health facility in Brentwood, New York.

9        I then went on to do various things.  And I think

10   that -- did you say employment background?

11   Q.   Yeah.  I asked you:  Could you tell the jury about

12   your employment background in regard to counseling,

13   habilitation, and lifecare planning?

14   A.   I think I've given you most of it, except the fact

15   that I did develop, with a number of other people, a

16   program called Into the Future.  And it's a program where

17   we provide tools and resources so that if a family member

18   passes away, there's enough information to the party who

19   steps in to take over the management of that impaired

20   person.  And if they complete that book and keep it up to

21   date, there will be little disruption to the continuation

22   of the impaired person's services.

23   Q.   Mr. Forman, have you had occasion to speak at

24   national organizations on the subjects of lifecare

25   planning for the disabled?

1    A.    In the United States government in Washington, and

2    state governments such as in Connecticut and others, and

3    in foreign countries, yes.

4    Q.    Have you published anything in regard to individuals

5    with disabilities and lifecare planning?

6    A.    I think I have about four or five.  One is called

7    *Into the Future*.  The other one is *Being a Guardian is a*

8    *Big Responsibility*.  The other is *The Adaptive Behavior*

9    *Checklist.  Independent Travel Training*.  And I apologize

10   if I don't remember the others.

11   Q.    Have you lectured on the subject?

12   A.    Yes, sir.

13   Q.    Have you served on advisory boards or committees that

14   deal with the disabled?

15   A.    Sure.  I'm four-time representative to the

16   president's committee on the employment of disabled, and

17   there's been many others.

18   Q.    Mr. Forman, how long have you been associated with

19   Comprehensive Rehabilitation Consultants?

20   A.    At least 25 years ago, and maybe more.

21   Q.    And how long have you been associated with Children's

22   Rehab Network?

23   A.    Probably about 20 years.

24   Q.    Can you tell the jury about your experience in

25   developing employment programs for people with

1  disabilities?

2  A.   My master's thesis was on that.  I worked with some

3  others to come up with information that's been used by

4  American Express, it's been used by a large supermarket

5  chain, it's been used by some furniture manufacturers.

6      And what we did was go into each of those

7  environments.  We asked the personnel officer where they

8  had the hardest time in sustaining employment and what

9  those jobs were.  We then determined whether the party

10  doing the job needed new hearing, needed new vision,

11  needed orthopedic ability.

12      And we tried to provide on-the-job training so the

13  potential employer could evaluate the individual who they

14  were providing an internship to, and could they be hired.

15  And we've done many other things.

16  Q.   Mr. Forman, have you had occasion to work as a

17  consultant to private industry in regard to people with

18  disabilities?

19  A.   Yes, Coca-Cola, Aloan and Keenan (phonetic), many

20  banks, and various other sources, as well as, as I've

21  already said, corporations, families, and healthcare

22  providers.

23  Q.   Have you had occasion to become certified in any

24  areas?

25  A.   Yes, sir.

```
 1    Q.   Can you explain that to the jury?

 2    A.   I'm a certified rehabilitation counselor, certified

 3    disability analyst.  I'm a fellow in the International

 4    Academy of Lifecare Planning.  I'm a medical case manager

 5    and a rehabilitation counselor.  I'm a certified

 6    vocational evaluator.  And there's been others.

 7    Q.   Mr. Forman, have you been recognized by the court as

 8    an expert in the rehabilitation field and lifecare

 9    planning?

10    A.   Yes, sir.

11    Q.   Both state and federal courts?

12    A.   Yes, sir.

13    Q.   Have you ever been denied the ability to testify on

14    one of your lifecare plans?

15    A.   Not that I'm aware of, sir.

16    Q.   How frequently do you testify?

17    A.   Used to be more.  I think -- if it's 10, 12 times a

18    year, it's a lot now.

19    Q.   Are you paid to testify?

20    A.   Yes, sir.

21    Q.   Are you paid for the work you do, in terms of meeting

22    with the client and preparing a lifecare plan?

23    A.   If I heard you correctly, you asked if I was --

24              THE COURT:  Can you hold on a second.

25              There's some noise.  It's a little distracting.
```

```
 1   I want people to focus on the witness.
 2              THE WITNESS:  Could you repeat the question,
 3   sir?
 4   BY MR. RUSH:
 5   Q.   Are you paid to prepare your lifecare plans and to
 6   meet with the injured person with special needs?
 7   A.   The entity that I am part of, Comprehensive Rehab,
 8   receives the money.  I don't get it personally.
 9   Q.   Okay.  Do you charge for your time?
10   A.   Yes, sir.
11   Q.   What is your hourly rate when you charge for time?
12   A.   I believe it was 225 at the time this file was
13   opened.
14   Q.   Now, can you tell the jury whether or not my law firm
15   retained you to work on this case?
16   A.   Yes, sir, you did.
17   Q.   And has my law firm paid fees to your company?
18   A.   Yes, sir.
19        May I get some water for a second?
20   Q.   Sure.
21              THE WITNESS:  May I stand up for a second,
22   Your Honor?
23              THE COURT:  Pardon?
24              THE WITNESS:  Can I stand up for a second?
25              THE COURT:  Of course.
```

 1          THE WITNESS:  Would you repeat that question,

 2    please.

 3    BY MR. RUSH:

 4    Q.   I think it was:  Has my law firm agreed to pay you?

 5    A.   Yes, sir, through the company.

 6    Q.   And has my law firm, in fact, paid your company?

 7    A.   Yes, your law firm has paid us.

 8    Q.   Okay.  Do you recall testifying in a case for one of

 9    my clients, Ron McKibbon, back in 2011?

10    A.   I believe so.  Sometimes I forget things; but, yes, I

11    do know I've worked with you on another occasion.

12    Q.   I was bringing that up because I can't remember you

13    testifying in any other case for me.

14         Do you recall -- or can you tell the jury whether

15    you've testified for me other than the McKibbon case?

16    A.   If my memory serves right, this is the second time in

17    a long time.

18    Q.   Okay.  I was younger in 2011.

19    A.   But not as good-looking.

20    Q.   Have you testified in multiple states?

21    A.   I've testified in New York through the tragedy; Ohio,

22    in a tragedy; California; Michigan; Oklahoma.  So, yes,

23    I've testified in other states.

24    Q.   Okay.  And you've also testified in the state of

25    Florida?

1   A.   Yes, sir.

2   Q.   Have you been appointed by the court to develop

3   lifecare plans for submission to the court for people who

4   have sustained burns and/or amputations?

5   A.   Yes, sir.

6   Q.   Can you tell the jury a little bit about that past

7   work where you have prepared these lifecare plans for

8   people who have either or both burns or amputations?

9   A.   The first experience I had while I was at Long Island

10   University.  And the professor, who was very direct, made

11   us walk around with various conditions:  Blindfolded on

12   one day; cotton in our ears so we couldn't hear people; as

13   if our legs were not functional; and so forth.  That was

14   the first experience we had.

15        The second experience was working in the criminal

16   justice system to ascertain whether people who were in

17   those institutions could benefit from some further

18   education.

19        Next area was to work with a wonderful organization

20   called the National Amputee Association and Shake A Leg,

21   where modifications were made to build some cars so they

22   could drive.

23        The next was to work with the Burn Association,

24   particularly in Florida and other states, to help

25   individuals who had burns, along with their physicians, to

1    be able to work out to some degree to prevent further

2    breakdowns of their skin.

3        And most recently, I worked with the National

4    Paralympics, and specifically the amputee part of it, with

5    individuals from the University of Miami.

6    Q.   After being appointed by the court to develop these

7    lifecare plans for persons with burns and/or amputations,

8    have you been asked by the court to testify as an expert

9    in relation to the needs and nature of these individuals

10   with these injuries?

11   A.   Yes, sir.

12   Q.   Can you tell the jury your professional experience

13   with determining the various types of services and

14   equipment that people with disabilities or special needs

15   will need over the length of their lifetime?

16   A.   I'll try to give it in the order in which I undertake

17   it.

18       I ask someone like you to send me some records.  I

19   like to review the records to see whether or not I feel

20   that I have the capacity to properly coordinate an

21   evaluation.

22       The next thing I do is ask if I'm allowed to move

23   forward as I want.  If you would put any restrictions on

24   me, no offense, but I would not work with you.

25       The next thing I do is I call the individual,

1    depending upon whether they can understand the

2    conversation, and introduce myself, and I ask them if they

3    would mind if I came over to meet them.

4        After I've met with them, I begin to outline my

5    recommendations in a certain format and certain order.

6        After that, I try to speak to any physicians who may

7    be knowledgeable about this person, have evaluated this

8    person or treated this person.  And from them, I try to

9    get the diagnosis, I try to get the areas of concern.  I

10   discuss with them various recommendations that they have.

11       I incorporate them into the report, and I add my

12   recommendations.  I send it to the people who I've got

13   information from.  I speak to them and go over the report

14   and make any changes they want, if possible.

15       I go over the report with the individual himself, and

16   I try to -- try to look at the individual's growth and

17   development, not only today but over the rest of the life,

18   so I will alternate the level of care depending upon their

19   age, their circumstances, and how long they're expected to

20   live.

21   Q.   Mr. Forman, can you tell the jury how often you see

22   individuals such as Milton Omar Colon?

23   A.   I really apologize -- it's not your fault, it's

24   mine -- would you mind repeating that question?

25   Q.   Sure.

1    Can you tell the jury how often you see individuals

2  such as Milton Omar Colon who have the kinds of injuries

3  he has?

4  A.   Wow.  I didn't mention South Florida State Hospital,

5  where I was the liaison for the Department of Health.  I

6  saw quite a few there.

7    When we were in the criminal justice system, we saw

8  quite a few.  And now, involved with the community on a

9  volunteer and professional basis, I see individuals who:

10  A, have just had serious burns; B, who have amputations;

11  and C, who have both.  So I see quite a few on a regular

12  basis.

13  Q.   Can you tell the jury approximately how many hours

14  you have put in on the Colon case on Mr. Colon's behalf?

15  A.   Since the time that I began on this, I've got to have

16  at least 20, 30 hours.  It may be more.

17  Q.   Does your staff have additional time?

18  A.   Sure.  I just talked to him and saw him the other

19  day.

20  Q.   How is it that you came in contact with Omar Colon?

21  A.   You asked me to evaluate him.

22  Q.   And did you subsequently meet with Mr. Colon to

23  evaluate him?

24  A.   Sure.  On two occasions face to face, and numerous

25  occasions with an interpreter over the phone.

1   Q.   When did you first meet Mr. Colon, approximately?

2   A.   I think it was 2014, if I'm not mistaken.

3   Q.   And can you tell the jury, briefly, how you assess

4   somebody like Mr. Colon in that first meeting?  What is it

5   that you do, and what is it that you try to learn?

6   A.   The first thing I try to do is determine their

7   emotional state and how much detail I can go in, because I

8   don't want them to break down and not be able to see me as

9   a positive force.

10       The next thing I do is perform a psychosocial

11  evaluation, and then a functional capacity evaluation.

12       The next thing I try to do is to talk to an

13  interested third party.  In this case, it was his wife.

14       I then, as I said, outline my information.  I call

15  him back and go over it.  I check additional information.

16       And I take a look at all that information, and I

17  consult with the physicians to see what it is that they

18  would recommend about evaluations, about treatment, about

19  therapy, about support care, about community reentry, and

20  about long-term complications.

21       Some of them, such as urinary and bowel program, may

22  be intense when I first meet him, but not now; so I'll

23  modify the report to exclude those things that were needed

24  when I first met him.

25       And there are other things that I do.  I don't mean

1  to be short-winded.

2  Q.   When you met with Mr. Colon, exactly where did you

3  meet with him personally?

4  A.   His apartment.

5  Q.   Was his wife present at the time?

6  A.   Sure.  I asked her to be involved as long as he

7  agreed, and she was.  And I did speak to him one or two

8  times over the phone without her there.

9  Q.   When you met with Mr. Colon in person, did you have a

10  Spanish-to-English interpreter?

11  A.   Of course.

12  Q.   Can you tell the jury what you observed in that first

13  meeting with Mr. Colon?

14  A.   I'll give you my opinions.

15      He was confused.  He wasn't sure what the benefit of

16  some of the services would be.  He was perplexed about the

17  medication he required.  He felt good about his upper

18  body, and he had not resolved functional issues with his

19  lower body.  He was willing to listen.

20      I was pleased that he was willing to consider

21  volunteering at some point.  I was pleased that he

22  understood that the service he had provided to his wife,

23  he was no longer able to provide.

24      And I found him to be somewhat confused; but, at the

25  end of the conversation, I think we left as colleagues who

1    could work together.

2    Q.   Mr. Forman, can you tell the jury, in general, the

3    types of problems that someone like Mr. Colon will

4    encounter throughout the rest of their lifetime?

5    A.   I think, first and foremost, they're pretty obvious.

6    He's not going to be able to walk to the degree he used

7    to.  He's not going to be able to bend to the degree he

8    used to.  He's not going to be able to squat to the degree

9    he used to.

10        He's not going to be able to protect himself as he

11   used to.  He's not going to be able to protect his wife as

12   he used to.  He's not going to be able to do the grocery

13   shopping as he used to be able to.  He's not going to be

14   able to repair things around the apartment or home,

15   depending on where he moves at some point.  If it's a

16   modified home, he's not going to be able to do it if the

17   modifications aren't proper.

18        I don't know if I'm being responsive to your

19   question, but I found him sometimes to be resistant to

20   hearing how things can interfere with his life.  I found

21   him to have difficulty in acknowledging money was needed,

22   how it should be managed.

23        I did have some concern about his stooping and

24   squatting again, his keeling again, his running again, his

25   difficulty to push, pull, and hold things.

```
 1        I went through a functional assessment with him, some

 2   of which he performed and some of which he didn't:

 3   Transferring from the chair to the bed; gross motor

 4   activities such as sitting on the floor; difficulty with

 5   eating, he didn't have a problem there; difficulty with

 6   dressing, he had some issues there, and time constraints;

 7   difficulty with meal preparation, as I said; difficulty --

 8   no, he was pretty good at some of his personal activities

 9   except helping to take care of his spouse.  He had some

10   difficulty in working at a desk, and obvious difficulties

11   in household chores.

12        There's many other things, but those are indication

13   of functional capacity.

14   Q.   Did you also speak with his wife at that time?

15   A.   Yes.

16   Q.   What did you learn from Arlene Davis in regard to her

17   husband?

18   A.   She's a tough cookie.  She has her own opinions;

19   she's not afraid to say them in front of him.  And she

20   doesn't want him to become overly depressed because of his

21   inability to take care of her.

22        She left him with the opinion, she's staying there,

23   she ain't going anywhere.  I'm sorry to use "ain't," but

24   she did have some concern about her inability to take care

25   of him.
```

1    I don't want to go outside of the scope.  I think I'm

2  responsive to.  I liked her.  I thought she cared about

3  her husband and wanted to help him.

4  Q.   Did you analyze, during that first meeting,

5  Mr. Colon's need for care relating to his burns?

6  A.   Sure.

7  Q.   What did you -- coming away from that first meeting,

8  what were you thinking about his need for future care

9  related to the problems of his burns?

10  A.   They have to be monitored to see if there's any skin

11  breakdowns.  They have to be monitored to see if there are

12  any more grafts.  They have to be monitored to see if

13  there are any infections.  They have to be monitored to

14  see if they're adverse to him doing certain activities,

15  particularly outside.  And depending on where the injuries

16  are, they do become somewhat uncomfortable when other

17  people look at his burns and amputations.

18  Q.   Let me change subjects here briefly and ask you about

19  medical needs versus rehabilitative and support-care

20  needs.

21      First of all, what is a medical need in your

22  profession?

23  A.   Typically, something that has to be provided or

24  recommended by a physician.  And it's typically something

25  that you want the physician to input on.  The difference

1    is an impairment versus a disability.  I'm not qualified

2    to do an impairment.  I am qualified to do a disability.

3    Q.    What is a rehabilitative need?

4    A.    It's a life-sustaining activity.  For some people,

5    it's using a cane when they can't see.  For some people,

6    it's using a hearing aid when they can't hear.  For some

7    people, it's using a wheelchair when they can't walk.  For

8    some people, it's just using prosthetics for the

9    appearance of people not looking at their stumps.

10          So it's a functional piece of equipment or an

11   activity that will make up, if possible, for loss of

12   capacity or future medical need.

13   Q.    All right.  And what is a support care need?  How is

14   that different from rehabilitative or medical needs?

15   A.    A support care need is a physical and emotional

16   assistant who can help the party who requires it becoming

17   the boss, and let them tell these people what they'd like

18   to do and how they'd like to do it:  I'd like this picture

19   put up; I'd like the tire changed on a car; I'd like to

20   surprise my wife and go out and get her flowers and

21   things; I'd like to protect myself if there's somebody who

22   invades my home or there's somebody who tries to create

23   some sort of difficulty.

24          A physical need is a requirement that is typically

25   associated with what our body does:  Our brains, our eyes,

1    our ears, our nose, our mouth, arms, legs, and so forth.

2    Q.   Are all the items and services in your lifecare plan

3    and report based solely on medical need?

4    A.   No, sir.

5    Q.   And why is that?

6    A.   Because medically, to some degree, what

7    rehabilitation is has to be done in concert with a

8    physician, and you have to get the physician's input, but

9    you are able to recommend the therapy.

10        In my case, you're able to recommend the counseling.

11   In my case, you're able to recommend the support, care,

12   and adaptive equipment.  But if you're smart, you'll

13   consult with a physician on those things.

14   Q.   In preparing your report, did you have occasion to

15   review the hospital reports regarding Mr. Colon's surgery

16   at Bridgeport Hospital?

17   A.   Yes, sir, I did.

18   Q.   And did you have occasion to review his past medical

19   bills?

20   A.   Yes, sir.

21   Q.   Can you tell the jury what your interaction was with

22   Dr. Andrew Yuan, the physiatrist?

23   A.   I called him, I spoke to him.  I sent him some

24   questions and a copy of the notes on the conversations we

25   had.

1    He sent me back or called me with some changes that

2    possibly were more clarified than what I did.  He reviewed

3    the report and asked me to change a couple things.  He

4    asked me to add a section at the end, as did Myers, to

5    address the loss of functional capacity to his spouse, and

6    he asked me to discuss pharmacological management

7    intervention through adaptive devices such as laboratory

8    procedures and other tests.  So he gave me a pretty good

9    overview of psychiatric, functional, and emotional care.

10   Q.   After you prepared your draft report, did you have

11   occasion to discuss that report with Dr. Yuan?

12   A.   Dr. Yuan was his psychiatrist, and he gave me quite a

13   bit of information about personal needs; professional

14   needs; and psychotropic needs, if possible.  But he wasn't

15   actively pushing that last recommendation.

16   Q.   Okay.  Andrew Yuan is a rehabilitation and

17   physiatrist.  Did you have an opportunity to read his

18   report in this case?

19   A.   Yes.  He was his physiatrist.

20   Q.   And there was also a psychiatrist by the name of Wade

21   Myers, who has testified in this case.

22       Can you tell the jury what your interaction was with

23   Wade Myers, the psychiatrist?

24   A.   Let me qualify something because I didn't hear you

25   properly.  Some of what I said before did relate to Myers,

1    as well Yuan.

2         Now, you just asked me what Myers said, correct?

3    Q.   Yes.  Myers, the psychiatrist.

4    A.   Okay.

5    Q.   What was your interaction with Dr. Myers, especially

6    in regard to brain injury?

7    A.   He talked about the neurological dysfunction, to some

8    degree, which preexisted, and the exacerbation of that,

9    and difficulty in comprehending some of the

10   recommendations were made, the long-term benefit that

11   would be provided, and participation in periodic

12   aggressive and passive recreation -- not recreation,

13   rehabilitation.

14   Q.   Did you have occasion to read Dr. Myers' expert

15   reports?

16   A.   Yes, sir.

17   Q.   And after you prepared your report, did you have

18   occasion to discuss that report further with Dr. Myers?

19   A.   Of course.

20   Q.   First of all, I'd like to go over a continuum of care

21   plan.  And I'd like you to explain to the jury, what are

22   the components of a continuum of care plan?

23   A.   One of the things I did was also speak to the

24   prosthetic people, and they were kind enough to send me a

25   plan, and I neglected to mention that I spoke to them at

1    great length.

2        As far as the outline of the continuum of care,

3    there's various categories.  Did you want me to go through

4    each of the categories?

5    Q.   I think going over the major categories would be

6    helpful for the jury to understand what you did with

7    regard to this continuum of care or life plan.

8    A.   Sure.  I put it in a specific place.  Give me two

9    seconds.  The file might have got mildly disoriented.

10   Here it is.

11       I addressed medical evaluations tests, short and long

12   term.  I addressed medical diagnostic tests for follow-up

13   on the evaluations.  I evaluated therapeutic evaluations,

14   along with medical care, which is a follow-up for medical

15   evaluations.

16       I recommended ongoing therapy of a physical and

17   emotional nature.  I reevaluated, with the help of the

18   physicians, any further surgical intervention, any pain

19   management, and any functional capacity.

20       I recommended if and when he was able to -- that he

21   get some sort of additional residential setting.  And I

22   recommended that some money be deducted for what he would

23   have needed anyway, and only what the difference is, but I

24   left that to the economist as other issues to assess.

25       I then went through what modifications.  You know,

1    special bathroom, widened door for quick exit, modified

2    driveway, modified laundry room, so he could reengage in

3    some of the activities.

4        I then went through with him certain particular areas

5    like the bathroom and the kitchen.  I know they seem to be

6    counter-indicative of each other, but early on he had some

7    difficulty with bowel and bladder.  I think that's been

8    resolved.  And he likes to cook, according to what he told

9    me, or would like to learn to cook.

10        Without going into too much detail, there's mobility

11    equipment, there's the prosthetics and orthotics, which is

12    very detailed, and I included it in the report.

13        There's some form of assistance with transportation,

14    support care.  And then there's some assessment of the

15    loss of services that he was concerned about that he's no

16    longer able to provide with his same desire to his wife.

17    Q.   Can you explain to the jury, in terms of your report,

18    what is an impairment versus a disability?

19    A.   An impairment is set by a physician.  It's an

20    anatomical or psychological or psychiatric assessment of

21    how your body has been altered.

22        A disability is how you use your body, whether it's

23    altered or not, to perform tasks of work, living, and

24    leisure time.  And I'm not trying to pick on Mr. Colon,

25    but he may not be able to walk, but if I had him on -- I

1    don't want to be disrespectful, if I had him under my

2    direct control, I would want him to volunteer somewhere,

3    okay?  I'd want him to get involved in some sort of

4    program where he could feel good about himself.

5        So a disability is a limitation from a functional

6    capacity.  It prevents somebody from doing something.

7    Just hold your hands over your eyes, you'll know what a

8    disability is.

9    Q.   Mr. Forman, can you tell the jury whether you've

10   reached any conclusions about Omar Colon's problems,

11   impairments and disabilities; and if so, what are they?

12   A.   Well, with the help of the physicians, I clearly got

13   some insight to his future medical needs and the problems

14   there; his future psychiatric needs and the problems

15   there; the question about whether he could manage his own

16   resources properly, spend them and use them in an

17   appropriate way.  In my opinion, with the help of the

18   physicians, quickly came to the conclusion that he was not

19   competent and needed assistance in those areas.

20       I came to the conclusion that, as he got older, his

21   body would further deteriorate; as he got to wear his

22   prosthetics, he would get skin breakdowns; and he would

23   have secondary complications in his back and his hips.

24   And there are many others.

25   Q.   Once you reached these conclusions about his

1   impairments and his disabilities and his problems, can you

2   tell the jury how you went about determining Mr. Colon's

3   needs over his entire lifetime?

4   A.   Well, I think I may have said this:  First thing I

5   wanted to do is see how he felt about himself.

6        The second thing I wanted to do is to see what he was

7   worried about, because maybe I could reassure him why I

8   was there.

9        The third thing I try to do is fairly common, and

10  that's what did he receive already and what did he need.

11       The next thing I wanted to do was to explain to him

12  the importance of doing certain things; and that if you

13  didn't do them, his condition was only going to get worse.

14       The next thing I did was try to give him some hope.

15  He liked the volunteering activity.  He liked the idea of

16  getting some physical assistance.  He just didn't want

17  them running his life; he wanted to be running their

18  lives.

19       There's so many things.  I'm sorry to be cutting it

20  short, but I could go on for an hour.

21  Q.   Mr. Forman, have you ultimately developed a model of

22  care for Mr. Colon?

23  A.   Absolutely.

24  Q.   Can you tell the jury what that model of care is?

25  A.   Sure.  It's the roadmap that I talked to you about

1    later, that will help identify each of the critical areas,

2    determine how he could become educated about them to the

3    best of his ability, determine what he could do to relieve

4    some of his depression, make him feel better, help him

5    overcome the inadequacy that he felt because he was in a

6    wheelchair and only had stumps.

7        So I wanted to look at each of the medical

8    conditions, functional conditions, rehabilitative

9    conditions, and put them together in a way where they

10   built upon each other and didn't work in opposition to

11   each other.

12   Q.   Did you prepare a preliminary report before you

13   prepared your final lifecare report?

14   A.   Sure.

15   Q.   And what did you do with this preliminary report in

16   regard to the physicians and other professionals you had

17   consulted with?

18   A.   I'm sorry, I cut you off.

19       I sent it to the physicians looking for their

20   comments, looking for things that I need added, and to

21   have them review it, to make sure that I understood what

22   they said and that they understood what I was saying; and

23   if there were any questions, we could talk to each other.

24       One of the doctors mentioned that I didn't address

25   the needs his wife had, and I added that.

1   Q.   Did the physicians make any revisions or changes to

2   your report, Dr. Yuan especially, and Dr. Myers, the

3   psychiatrist?

4   A.   Sure.  If you don't mind, I have a list of the exact

5   changes they made.

6        One had to do with the bowel and bladder and the

7   issues of the maintenance for that.  Some had to do with

8   the therapy and the purpose of it.  Some of the changes

9   had to do with surgery that he might require and future

10  complications.

11       Here it is.  Some felt that he didn't need the water

12  prosthesis; that I should add the neurologist, the

13  cognitive therapy, the activity program, and the

14  counseling for Mr. Colon and his wife.

15       And there are other changes.  Oh, we also took out I

16  think it was adaptive physical conditioning program.

17  Q.   After -- well, after you received these comments to

18  your preliminary report, did you revise your report based

19  on the recommendations you'd received from these

20  professionals and physicians?

21  A.   Sure.  I have a list of those, too, of what I deleted

22  and what I added.

23       The significant thing I did was look at the physical

24  condition from an occupational therapy and other activity.

25  But yes, I have a listing of what I added and what I

1    deleted based upon their input.

2    Q.   Can you tell the jury the knowledge you have in

3    regard to the area of adaptive equipment, transportation

4    equipment, and leisure-time activities, as well as the

5    cost of these items for Mr. Colon's residence?

6    A.   I came from the school of hard knocks.  I learned it

7    in class, but I learned more from the people that I was

8    helping than anybody else.

9         I was very involved with the real estate association,

10   the builders association, the Miami project and others, to

11   look at a person's ability to enter their home, leave

12   their home, turn on the lights, turn off the lights, go

13   into the bathroom and transfer onto commode chair, have a

14   proper mattress, and have resources to do therapy and to

15   store their equipment, and to give them an environment

16   where, if you could set a room aside, they could engage in

17   a leisure-time activity that would be appropriate and

18   stimulate their mind, particularly when they have a

19   neurological dysfunction.

20        And you'll probably think I'm crazy, but even certain

21   computer games have been developed at NYU to help people

22   with cognitive disorders.

23   Q.   How do you determine the cost of services in a

24   specific area of either equipment or transportation

25   equipment?

1    A.    It's a very specific methodology that I use, as I've

2    been trained.

3          The first thing you want to do is determine what the

4    service is.

5          Second thing you want to determine is where the

6    service has to be provided.

7          The third thing you want to determine is who has to

8    provide the service.

9          And then you want to determine if there's a relative

10   value for that service.  And then you want to survey, if

11   possible, three providers.  If you can't get three, you

12   try to get at least two.  And if there's a range, you try

13   to put the range in your report.  It's very similar, you

14   put the average in the report; and if you can't get the

15   fee, to leave the line blank until you're able to get one.

16   Q.    Mr. Forman, did you ultimately prepare a detailed

17   lifecare and continuum of care report for Omar Colon?

18   A.    Sure.  That was my purpose, along with working with

19   him to encourage him.

20   Q.    Now, with attachments, can you tell the jury

21   approximately how many pages this report is?

22   A.    Sure.

23         There's a cover page and two definitions.  There's a

24   report that goes up to about 20 to 25 pages with the

25   addendum.

1    Q.    And what does this report contain, this 25 to

2    30 pages of report?

3    A.    I'll give you the headings:  Medical evaluations;

4    diagnostic tests; therapeutic evaluations; medical care;

5    laboratory procedures; stumps and surgical procedures,

6    okay; rehabilitative issues for pain; support care;

7    resident acquisition; services in the home, if and when he

8    acquires one; equipment for activities of daily living,

9    now and in the future; prosthetic care, now and in the

10   future -- and if the service is in the report and I wasn't

11   sure, I put "if needed" or "as needed," and that was not

12   to be included -- mobility equipment; leisure and

13   recreation equipment; and then the services that Mr. Colon

14   provided to his life before he was injured; and then the

15   addendum for care that Dr. Myers had recommended from a

16   psychiatric and functional perspective; and then there's

17   two pages of information to prepare the report, and that's

18   it.

19   Q.    Looking at page 1 of this report, can you tell the

20   jury why you would have analyzed Mr. Colon's need for

21   lifecare over his lifetime, as well as in the present, for

22   ENT physician services, plastic surgery, prosthetics,

23   urology, and neurological care by physicians?

24   A.    I felt that he was very intimidated by his injuries

25   in spirit.  I felt that he broke down when he tried to

1    address in his own mind what his body was like, what his

2    mind was like, and what his future was like.

3        And I wanted him to get a clear educational and

4    medical perspective on what he needed to do to keep

5    himself healthy, and I thought the doctors were the most

6    qualified people to do that.

7        I then felt that he needed to feel better about

8    himself.  He needed to see improvement in his body.  And I

9    think he needed to have something functional to do during

10   the day, and I felt he needed to engage, believe it or

11   not, in going to the movies or having dinner outside, or

12   going to a park where he couldn't walk long distances.

13   Even playing pool; I know you may not like that, but even

14   playing pool.  Even going bowling and things like that.

15   Q.   In regard to this report on page 1 where you go over

16   these medical-type evaluations, there's a column dealing

17   for the amount of time over which the services will be

18   provided, and a number of the entries say "life."

19       What does "life" mean?

20   A.   It means from now until the physical or medical

21   indication that he will no longer, unfortunately, be with

22   us.

23   Q.   Okay.  And then there's another column dealing with

24   frequency, how many times per year or how many times every

25   few months these services will be needed.

1    Can you explain to the jury why you've analyzed the

2    frequency of care?

3    A.   I did that in most instances with the help of the

4    physician.  I did it for getting a screening assessment,

5    and then management if it was required, and I only

6    included it once.

7        I then included things on an occasion of maybe two

8    times a year, such as skin assessment.  And then I reduced

9    the neurological care to one time a year.

10       So it falls into three categories:  Evaluations,

11   treatment, and monitoring.  And hopefully it can reduce

12   the amount of active treatment and just go to a monitoring

13   mode.

14   Q.   The next column deals with cost, and it looks like

15   you have a range of cost on page 1.

16       Can you explain to the jury what this cost column is,

17   and why do you use a range?

18   A.   I go to the AMA Guides, to the evaluation impairment.

19   I go to the Physicians' Desk Reference.  I go to the

20   relative value scale.  I then go to the DRGs and CPTs.

21       If you've been to a doctor or a hospital, you get a

22   bill, and it has a series of numbers, and then it has a

23   description of the service.  That's pretty uniform

24   throughout the country.  In various places it's more

25   expensive than others, so I went to those statistics.

1    Then, as I said, I have notes in my file.  I listed

2   who I called, who I spoke to.  Sometimes calls came in

3   when I wasn't there, so somebody else may have taken the

4   information.

5    And I asked them to give me their average price.  If

6   it was a similar price, I only put in one number and

7   averaged them.  If there was a range, I put in the low and

8   the high end.  And that's the method that I used.

9   Q.   The last column deals with comments by physicians.

10   For instance, it says urology, and then it says:  Per

11   Dr. Yuan, to manage neurogenic bowel and bladder.

12    What's the purpose of those comments sections next to

13   each medical need?

14   A.   I wanted to give the people who were seeing this

15   report, as well as Omar, an understanding of what the

16   procedure was; in some instances who recommended, who

17   would be the people that they would talk to if he had any

18   uncertainty in his mind; and how the team would be brought

19   together, hopefully in one center where they could

20   collect, duly evaluate him, talk to each other and develop

21   that uniform plan.

22   Q.   Page 2 of your life plan deals with radiology,

23   x-rays, and MRIs.

24    Could you explain to the jury why you analyzed those

25   future medical needs?

 1  A.    The physiatrist, Dr. Yuan, had given me that

 2  information from a preventative nature, the name of the

 3  procedure, the length of the procedure, the frequency of

 4  the procedure, and then I called on my own to get the

 5  prices.

 6  Q.    Page 3 deals with physical therapy, occupational

 7  therapy, recreation therapy, burn rehab clinic program,

 8  and environment home survey.

 9        Can you explain to the jury why you analyzed those

10  lifecare needs for Mr. Colon over the rest of his life?

11  A.    Let me correct one thing you said.  These are only

12  evaluations and not ongoing treatment.  These are

13  diagnostic tests to assess what he does and does not need

14  help in.

15        Physical therapy is muscle development and gait

16  training.

17        Occupational training is getting dressed, you know,

18  combing his hair, putting on his pants and things like

19  that, functional.

20        Recreation therapy is using his leisure time and

21  doing it in a way in which he could engage some enjoyment

22  from it.

23        I already talked about the annual assessment.

24        The environmental home setting I talked about.  It

25  says to assess an environment.

1    And there's cognitive therapy I didn't mention, but

2    that's over a period of time at reduced frequency.

3    Q.   In performing these analyses, can you explain to the

4    jury what you have -- what assumptions have you made in

5    regard to Mr. Colon's progress in the future.

6    A.   I think he can do a better job of wearing his

7    prosthetics.  I think he can go do a better job of

8    managing his time.  I think he can go a better job of not

9    feeling emasculated in relation to his wife.  I think he

10   can do a better job of having appropriate social

11   activities, and I think he can feel better about himself

12   to a degree that he won't be as self-degrading or

13   depressed.

14   Q.   Page 4 of your report deals with plastic surgery,

15   physiatry, appointments with the doctor, burn specialists,

16   and neurologists over his lifetime.

17       Can you explain to the jury why you analyzed those

18   areas of Mr. Colon's medical care?

19   A.   Dr. Yuan suggested that I did.  I also offered them

20   as recommendations in relation to my background and

21   training.  And I included, in my perspective, the two most

22   important were the pain and physical limitations and, of

23   course, the mobility and physiatric.  Those are enumerated

24   there.

25   Q.   Page 5 deals with laboratory procedures that

1    Mr. Colon will need over his lifetime.

2         Can you explain to the jury why you analyzed these

3    lab procedures as part of his lifecare plan?

4    A.   These have to be recommended and prescribed by a

5    physician.  Dr. Yuan gave me the CBC, the electro profile,

6    and the sequential multiple analysis which is

7    computerized, and he gave me the frequency and the

8    duration.

9    Q.   Page 6 is titled Surgical Procedures and references

10   stump revisions and stump sores over his lifetime.

11        Can you tell the jury why you analyzed this

12   particular area as part of Mr. Colon's lifecare plan and

13   continuum of care plan?

14   A.   I thought about them, and I also got some comments

15   from the prosthetist.  I'm not diminishing my capacity,

16   and I'm not picking on the prosthetist, but neither one of

17   us have the ability to absolutely recommend, to the degree

18   I've included here, whether these things will or will not

19   be provided.  I know what's going to be provided.

20        But I went to the prosthetist, I went to Dr. Yuan,

21   and I got those recommendations as to how long and how

22   often.

23   Q.   In regard to page 7 of your report, you deal with the

24   issue of rehabilitation care, including pain management,

25   pharmacologically-based pain management, and physical and

 1    cognitive rehabilitation.

 2         Can you explain to the jury why you analyzed that

 3    area of care in Mr. Colon's lifecare plan?

 4    A.   He informed me, and the doctors too, that pain is a

 5    critical point for him.  There's certain things he does to

 6    manage his pain, and certain things he's supposed to do

 7    that he doesn't do.  And the underlying pain would be a

 8    wonderful thing if it could be removed.

 9         And the physical conditioning, I think, speaks for

10    itself.  And the cognitive rehabilitation gives him a

11    better opportunity to deal with the unfamiliar and unknown

12    future situation from overall development perspective.  I

13    mean, if he's not going to cooperate, it's not going to

14    work.

15    Q.   Looking at page 8, that page deals with areas, and it

16    says:  Therapy, all therapies, 50 weeks per year unless

17    otherwise stated, and then mentions additional physical

18    therapy, gait training, occupational therapy, recreation

19    therapy, and day activity program.

20         Can you explain those areas and why you considered

21    them in developing a lifecare plan for Mr. Colon?

22    A.   Day activity program is not a baby-sitting service,

23    it's a volunteer service where he could go.  I talked to

24    him about maybe he could talk to young people who

25    sustained amputations.  I talked to him about playing

1  dominoes or checkers with some kids.  I talked about him,

2  maybe he could work in a library if he would.  I talked

3  about some sort of day activity.  But it's not a place --

4  I'm not being offensive -- where you color or play

5  mahjong, or things like that.  It's therapeutic activity

6  where you're involved in helping others.

7      Recreation speaks for itself.  It's a very limited

8  amount.  It's a total of two to five hours a week of some

9  kind.  And that's leisure time.

10     I think occupational, I've talked about itself, it's

11 self-serving.

12     I think physical therapy and gait training -- gait

13 training is how you walk if you can:  Do you use crutches;

14 do you use a walker; do you use side rails and things like

15 that.  And sometimes you can't walk.

16 Q.  Page 9 of your report deals with support care and

17 mentions analysis of physical assistant, attendant

18 live-in, physical assistant, relief live-in, food and

19 related expenses for live-in, attendant care, housekeeper,

20 home maintenance, and lawn maintenance.

21     Can you explain to the jury why you analyzed these

22 needs for Mr. Colon's lifecare plan?

23 A.  First and foremost, this is probably the section that

24 he got most angry at me for, and had some facial and

25 physical reactions which almost made me want to leave.

1    He doesn't want help.  He thinks he's Superman.  And

2    he doesn't guide himself.  So I felt, and the doctors

3    ultimately agreed with me, that he could be more

4    functional if he has -- what if he has to go to the

5    bathroom at night, what if he has to stay up beyond his

6    wife, what if he wants to get up earlier, what if he wants

7    to go out.  And it could become a facilitator.  It's not a

8    nurse.  It's not a CNA.  I like to call it a companion who

9    can work with, live with, in addition to his wife and get

10   some help from.

11   Q.   How important is -- can you tell the jury how

12   important a companion can be, in terms of protection of

13   Mr. Colon in the future?

14   A.   Well, they could be in a situation where they don't

15   have a safe harbor where they're living.  If they live on

16   the third floor, and there's an elevator that doesn't work

17   all the time, and they have to go down the stairs, you're

18   in trouble.

19       If you want to engage in an activity in public, some

20   people may be concerned about you may not want your

21   children to go near you because they may feel that you're

22   contagious.

23       If you want to do something working with plants or,

24   you know, going outside and you don't want something to

25   fall on you or hurt you, and if you want somebody to

1    motivate the person so they don't sit home all day and do

2    nothing, this is a way that a companion could help.

3        I don't mean to be so angry at him.  I just mean to

4    imply that if he gets the reasonable care and follows it,

5    there's room for improvement.

6    Q.   Mr. Forman, assuming that Mr. Colon's brain injury

7    worsens over time and he experiences dementia in the years

8    to come, in the near future, how does this housekeeper

9    attendant-care component deal with that problem?

10   A.   Well, the first thing you have to deal with is lack

11   of an individual's ability to understand, to remember, and

12   to be part of the participating process so they don't

13   withdraw or take out their feelings of incapacity through

14   anger.

15       If they don't remember anything at all, then they had

16   difficulty carrying out the task with some

17   self-initiation.  And they're basically somewhat unable to

18   feed themselves, to communicate with themselves, and to

19   let other people know what's going on.  And they basically

20   need, in addition to what he's already getting, 24-hour

21   7-day-a-week wait care.

22   Q.   Mr. Forman, can you explain to the jury how this

23   attendant care or housekeeping care might assist Mr. Colon

24   in avoiding institutionalization in a nursing home as his

25   dementia may increase?

1  A.   If I could correct you again, the only time I really

2  have attendant care on its own is after the surgical

3  procedure for a short period of time.

4       Under the physical, I have assistant first, and then

5  attendant care if his conditions significantly

6  deteriorates.  If you asked me how this could help, it

7  could facilitate his engagement in activities.

8       He could sit there and say, "I want to hang this

9  picture," and not know how to do it.  He could say, "We

10  need to change that lightbulb," and not be able to get on

11  the ladder.  He may say, "I want to make dinner for my

12  wife," you know, and he would need somebody to help him do

13  that.  He might want to go buy her flowers and have

14  difficulty in doing that.

15       So there's many activities that this assistant can do

16  to help make up for any deficits of cognitive or physical

17  nature that he has.

18  Q.   Let me ask you about page 10 of your report.  It

19  talks about a larger residence acquisition for Mr. Colon.

20       Can you explain that?

21  A.   Sure.

22       If and when he gets a home, there would be a cost

23  associated with buying that.  I got that from the Board of

24  Realtors.  If there's a down payment, that's from the

25  banking industry.  And if I got the amount financed,

1    there's typically an amount.  And then there's the monthly

2    payment.  I took the offset for what current rent would be

3    for someone like himself and deducted that.  So the only

4    thing that was left was the difference between a normal --

5    a regular residence that we could all live there, and what

6    his was before the modifications, not the whole thing.

7    Q.    And what's the purpose of having a

8    handicap-accessible residence for Mr. Colon and his

9    attendants?

10   A.    Safety, functionability, participating in activities

11   and, you know, feeling that we can come up with ways to

12   make up for certain circumstances:  Can't walk,

13   wheelchair; can't go to the supermarket on his own, many

14   of you have probably seen devices that you can ride with

15   baskets in the front.  If he can't reach the high shelf,

16   then we give him what's called a reacher.  So there's ways

17   to come up with the help, physically, mechanically and

18   functionally.

19   Q.    Looking at page 11, the subjects in your report deal

20   with laundry and appliances, air-conditioning, a shower

21   for someone in his condition, accessibility features,

22   extended driveways, extended garage, extended walkways,

23   extra exit doors, hallway ramps, and handicap installation

24   ramps.

25         Can you explain to the jury why those would be

 1   important for the lifecare plan of Mr. Colon?

 2   A.   I think that's obvious.  I didn't recommend that they

 3   be developed until such time that he's in a home.  I did

 4   say that I'd like to reengage him in certain activities:

 5   Laundry room, modification of certain appliances,

 6   modification of the closets so he doesn't have to stand

 7   up, rotating shelf for certain things that you can store

 8   stuff on and it comes down to the level you're at.

 9       If it's inclement weather, you don't want him to

10   rolling out the van.  You want him to go under an overhang

11   or into the garage.

12       So the reason these things are advisable, again, they

13   make him more functional with an accommodation through

14   assistants.  He can get into the bathroom, he can get in

15   and out of a vehicle, he can have a walkway around his

16   house, he can have exit doors that are big enough and wide

17   enough.

18   Q.   Page 12 similarly is titled Home and Work

19   Modifications.

20       Can you explain why you analyzed those additional

21   ramp, doorway, kitchen closet, and bathroom modifications?

22   A.   He's going to need a portable ramp if he wants to go

23   to somebody else's home.  He's going to need a generator

24   if the power goes out, particularly if he has a certain

25   type of bed.

1    He's going to need modified closets, as I said.  He's

2    going to need to make the doorways so they open up

3    basically with him hitting by electric kind of sensor that

4    the door will open when he breaks the continuity between

5    it.  He's going to need a security system if he's in a

6    bedroom and he needs help from the attendant.

7        There are a number of things here.  I don't mean

8    security system to prevent somebody from breaking in.  I

9    mean something if he needs something right away and can't

10   get out of bed to get it.

11   Q.   Can you explain to the jury what function the

12   security system would provide in case of a fire?

13   A.   Oh, wow.  That's another thing altogether.  That's

14   what we call an emergency button or a phone button.

15   That's a whole different system.  I didn't even put that

16   in there because I thought he might have needed it anyway.

17   Q.   Very good.

18       Page 13 is titled Equipment for Activities of Daily

19   Living, and it lists a mobile stool; a shower spray,

20   hand-held shower spray; a bench; a chair; a grab bar;

21   raised toilet seat; a reacher; and a bed and mattress.

22       Can you explain to the jury why those items would be

23   important in Mr. Colon's lifecare plan?

24   A.   Let me qualify something.  Patterson has been bought

25   by somebody else and is out of business.  It's now

 1    Performa Healthcare.  I wanted to make sure you knew that

 2    I changed that out.

 3         And if I heard you correctly, you wanted to know why

 4    these things are needed and why he required them.

 5         First of all, some of these things will make it safer

 6    and better for him.  A transfer bench he could take with

 7    him, if he needs to go somewhere.  A safety shower chair,

 8    you probably seen it, it's got four legs, he could take

 9    that with him.  Grab bar is permanent.  They're pretty

10    much installed in the bathroom, and you just hold onto

11    them.

12         A reacher is what I talked to you about when you want

13    to get high places.

14         And the therapeutic bed and mattress, I think, is

15    self-explanatory.  He's not going to raise his legs that

16    aren't there.  He is not going to be able to sit up.  This

17    will help prevent skin breakdowns and other things.

18              THE COURT:  Ladies and gentlemen, we'll take a

19    20-minute break at this point in time.  I'll give you the

20    usual advisories not to talk about the case, engage in any

21    conversation with anybody you might see in the courtroom,

22    or any kind of research.

23              Thank you very much.

24              (Whereupon the jury left the courtroom.)

25              THE COURT:  You may step down.

```
 1              THE WITNESS:  I'm sorry if I asked you a

 2   question in front of the jury.

 3              THE COURT:  That's fine.  Just be back in

 4   20 minutes.

 5              THE WITNESS:  Sure.

 6              THE COURT:  Is there anything to take up?

 7              MR. RUSH:  No, Your Honor.

 8              THE COURT:  Do you have a sense how far you are

 9   along in the examination?

10              MR. RUSH:  I'm going to just -- I'm on page 14.

11   I'm going to go through 19, and then I'm going to not go

12   over the other detailed attachments.  I just want to give

13   them a sense of what he's done.

14              THE COURT:  Right.  Okay.

15              What's your estimate in terms of how much

16   longer?

17              MR. RUSH:  After I complete that, it will be

18   less than a half-hour.

19              THE COURT:  Half-hour or so?

20              MR. RUSH:  After I complete that.

21              THE COURT:  All right.  Anything else?

22              We'll stand in recess.

23                  (Whereupon the jury left the courtroom.)

24              THE COURT:  All set for the jury?

25              MR. RUSH:  Yes, Your Honor.
```

1     (Whereupon, the jury entered the

2     courtroom.)

3     THE COURT:  Welcome back, ladies and gentlemen.

4  Please be seated.

5     We'll continue at this time with direct

6  examination.

7  BY MR. RUSH:

8  Q.   Mr. Forman, let's do the lightning round.  Let's do

9  this as quickly and as efficiently as we can.

10     Talk to me about wheelchair costs and wheelchair

11  replacement; did you look at that?

12  A.   Sure.  There are a number of different types of

13  wheelchairs.  There's in-motion wheelchair which are not

14  electric wheelchairs, but they have a battery system in

15  them that makes it easier to propel.  There's reclining

16  wheelchairs that are good for people who need to raise

17  their lower extremities.  Clearly there's electric

18  wheelchairs, there's rough terrain wheelchairs.  There's

19  even wheelchairs -- I'm sorry to snicker -- even if you

20  want to go to the beach.

21     Now, let me see what we have here.

22  Q.   Your mobility equipment accessories is covered on

23  page 16 of your report.

24  A.   I'm there.

25     Quickie 7 is a very light wheelchair.  A backpack is

1   a backpack but it goes on the wheelchair.  A cushion is

2   kind of like a ROHO cushion where anti-tipping devices

3   come out of the back of the wheelchair, so if you go over

4   a curb and lean back you won't fall over as easy.  Service

5   manual wheelchair, I think is self-explanatory.

6        That's all I did, just one wheelchair, the backup,

7   and the service for it.

8   Q.   Now, in regard to prosthetic care, on page 15,

9   there's an attached report from the prosthetist.

10       Can you explain to the jury why you've attached this

11   detailed cost analysis to the report?

12  A.   Let me tell you, I never saw a report as detailed as

13  this.  And I spoke to him, and we went over it.  And in my

14  opinion, he explained to me, A, what I already knew; and,

15  B, what he wanted to do in addition to that.

16       Not only did he do that, he gave me the name of the

17  item, he gave me the cost per the item, and he gave me the

18  cost over his lifetime, and I used it.

19  Q.   Doctor -- or, Mr. Forman, this prosthetic lifecare

20  plan goes to age 82.

21       Do you see that?

22  A.   Yes, sir.

23  Q.   If the plaintiff, because of his family background,

24  were to live longer than age 82, would he need prosthetics

25  and wheelchairs after that time?

```
 1   A.    That's a double-edged sword.  He'll be older and more

 2   infirm.  He may not need the prosthetics, but he sure as

 3   heck will need more care, probably by someone who has some

 4   various nursing training to look at the vital signs to

 5   make sure he's doing okay.

 6        So it's a doubled-edged sword:  One, he'll be in

 7   worse condition; and, two, he'll need more care; and,

 8   three, it would be a more medical model.

 9        I didn't include it.  He'll be without it, if you go

10   on my model alone.

11   Q.    Doctor Yuan --

12   A.    Mister.

13   Q.    Well, strike that.

14        Are there experimental-type prosthetics, low -- I'm

15   getting an echo there -- low-weight prosthetics that are

16   available to United States military for amputees; can you

17   tell the jury about that?

18   A.    They're the state of the art.  A number of people

19   from various parts of our United States military came back

20   with various amputations.  The VA, with the help of

21   outside resources, has done quite a bit of research on

22   them.

23        They're just outrageous -- that's not the word to

24   use.  They're very, very, very expensive, and they haven't

25   found a way to mass produce them.  They're still being
```

 1  used, but they're on the drawing board.  Unless you want

 2  to spend an awful lot of money, they're not available to

 3  everyday people.

 4  Q.   Would Mr. Colon benefit from that type of prosthetic?

 5  A.   Again, it may be my hearing, did you say, "Would he

 6  be able to use it"?

 7  Q.   Would he benefit from that use?

 8  A.   It would be magnificent if he could use it.

 9  Q.   On pages 17 and 18, you deal with transportation and

10  exercise equipment.

11       Can you briefly tell the jury why that's important?

12  A.   Sure.

13       If the vehicle breaks down, he's not going anywhere

14  to get it fixed.  If it's a tire, he's not doing that, and

15  he'll need some help with that.  I mean, it's very

16  expensive, and it's provided by the AAA.  Disabled parking

17  doesn't cost you anything, it's free.

18  Q.   Page 19 of your report, you deal with the loss of

19  services that Mr. Colon had previously provided as a

20  caregiver to his wife.

21       Can you explain to the jury what those were and why

22  you selected 25 hours per week?

23  A.   Sure.

24       By talking to Arlene first, and then to, I guess,

25  Colon, we went through what he did from the morning when

1  she gets up to when she goes to sleep.  Obviously, she

2  needed help with some dressing, some she could.

3  Obviously, she needs help getting into a wheelchair,

4  obviously has difficulty doing that.  Obviously she had

5  difficulty preparing her meals, cooking.  Obviously she

6  had limitations with some cleaning, shopping, laundry, and

7  maintaining.

8      She has a complete hemiparesis and an underlying

9  condition.  She needs help with assembling and

10  disassembling her scooter, getting to doctors'

11  appointments, and getting medications.

12      He estimated it at 25 an hour -- excuse me --

13  25 hours a week.  He estimated 25 to 30.  She

14  estimated 25.  I used the 25 hours a week.

15  Q.    I think you've covered this briefly already, but

16  attached to the 19-page report is a addendum regarding

17  psychiatric attendant and guardianship expenses per

18  Dr. Myers, as well as a report -- a statement by Dr. Yuan,

19  and then a detailed report from Dr. Myers.

20      Can you explain to the jury why you've attached those

21  to your report?

22  A.    I attached it based upon what he had recommended.

23  And in some instances it was contingent upon something

24  else, and I put the note in there.  But I think, as an

25  example, he recommended the stump provision, I didn't

1    include it.  I already had the physical therapy after the

2    prosthesis.  I just put it in, saying he did it.

3        I included case management, guardianship management,

4    based upon the physician.  I hadn't had that.  I included

5    some additional laboratory tests.  And, as you'll see in

6    the footnotes, that came predominantly from Dr. Myers, as

7    indicated on the bottom of the page.

8    Q.   Mr. Forman, as we get to the end of this, can you

9    tell the jury whether there are services and items which

10   you could have included but you did not include in this

11   lifecare plan?

12   A.   Sure.

13       I could have given him -- it sounds kind of absurd, I

14   could have given him a vacation where he could have gone

15   on some means.  I know that sounds facetious.  The best

16   way for him to go on a vacation is a cruise line because

17   you don't have to get on and off without help, you don't

18   have to do things.

19       There's plenty of things I could have included.  I

20   could have included, you know, some resources to assist

21   him in working with other people and not only working with

22   themselves, assistants I could have given him that would

23   have helped him with additional accommodations and

24   modifications.

25       I mean, we all have electric devices to turn the TV

1    off and on, but there's peripheral things like stereos and

2    records and DVRs, and some of them are up high, some are

3    not.  His assistant is going to have to help him with

4    that.  There's so many things that we take for granted,

5    and I didn't include any of those.

6    Q.  Mr. Forman, as he ages with his amputations and burn

7    and brain injury, how will that affect Mr. Colon different

8    or more from the average person who does not have those

9    conditions?

10   A.  Well, I'll use myself as an example.  We all get

11   older.  Some of us get gray hair, some don't.  Some of us

12   gain weight, some don't.  Some of us become more

13   sedentary.  That's a choice we make and we go through, but

14   it's a normal progression.

15        The normal aging process is going to hit him harder

16   than us.  He'll be aged and more in need of physical

17   assistance far before we will.  So I think this long-term

18   outlook is somewhat pessimistic.

19   Q.  Doctor --

20   A.  Let me say something.  That's unfair.  Pessimistic

21   from a physical perspective.  I'm hoping it's more

22   optimistic from a functional perspective.

23   Q.  Mr. Forman, you're not a medical doctor; is that

24   correct?

25   A.  I'm not a what?

1   Q.   Not a medical doctor?

2   A.   Not at all.

3   Q.   And I may have called you "doctor" from time to time,

4   but you don't have a Ph.D., do you?

5   A.   Not really.  By experience, but I didn't get the

6   degree.

7   Q.   Okay.  I just want to make sure that that was clear.

8        I'd like you to tell the jury whether the conclusions

9   and opinions you've given today were given within a

10  reasonable degree of rehabilitative and lifecare

11  probability.

12  A.   Sure.  And beyond that, the input and review from the

13  physicians too.

14  Q.   Today, can you tell the jury whether your

15  conclusions, especially every item in this continuum of

16  care life plan, is reasonable and customary?

17  A.   Sure.  I wanted to enable him.  I don't want him to

18  be disabled to the degree he is.  I want to enable him.

19       I'm going to be self-serving here.  To me, it's all

20  pretty clear.  It's based upon the loss of his legs and

21  diminished cognitive capacity.  I didn't go beyond that.

22  Q.   Is that opinion within a reasonable degree of

23  probability?

24  A.   For me it is, yes.

25  Q.   And also the amount of cost that you assess for each

1    item and service, were those costs reasonable and

2    customary?

3    A.    Depending upon the year in which they're ultimately

4    going be to be expended.  I think we all know that the

5    costs go up.  But, yes, they're reasonable based upon

6    today's dollars.

7    Q.    Is that conclusion within a reasonable degree of

8    rehabilitative probability?

9    A.    Yes.

10   Q.    Similarly, your conclusions regarding loss of

11   household services that Mr. Colon previously provided to

12   his wife, is that within a reasonable degree of

13   rehabilitative probability?

14   A.    Sure.  Yes, sir.

15   Q.    Is Mr. Colon's condition irreversible and permanent?

16   A.    Not in my opinion.  I mean, I don't know what the

17   physicians are going to say.  Again, I'm not trying to be

18   funny.  I'm not going to help him grow back his legs, but

19   I'm going to help him find another way to use his body.

20            MR. RUSH:  Thank you, Mr. Forman.

21            No further questions, Your Honor.

22            THE COURT:  Cross-examination.

23            MR. FINEMAN:  Thank you, Your Honor.

24

25

1    CROSS-EXAMINATION

2    BY MR. FINEMAN:

3    Q.    Good morning, Mr. Forman.

4    A.    Nice to meet you.

5    Q.    Nice to meet you.  My name is Beck Fineman.  I

6    represent the MTA and Metro-North in this case.  I just

7    want to ask you a couple follow-up questions.

8    A.    Whatever you need.

9    Q.    Let me back up to the very beginning of your

10   examination with Mr. Rush.  You had mentioned some figures

11   in there, 90 percent and 10 percent, when you were talking

12   about the work that either you or your company does.

13         Can you just explain what that was?

14   A.    Sure.

15         There are two numbers.  If I'm asked to come in and

16   testify, it's predominantly by the plaintiff.  It's at

17   least 90 percent by the plaintiff.  If I'm asked just to

18   consult, not to come to court, it's about 60/40; 60 for

19   the plaintiff, and obviously 40 for the defense.

20   Q.    Okay.  And Mr. Rush had asked you about one case in

21   the past in which you had actually come to court and

22   testified; is that right?

23   A.    I believe so.  He may have a better memory, but

24   that's all I remember.

25   Q.    And he's retained you to consult on other cases where

1  you didn't end up testifying, true?

2  A.   I don't think so.  Again, I apologize.  I don't

3  remember.  I don't think so.

4  Q.   Okay.  Your hourly rate in this case was what?

5  A.   I think it was 225.  It may have been 250.

6  Q.   And how many -- you said you put in 20 to 30 hours of

7  work so far.

8      Does that include the time that you've spent in court

9  with us; does that include the time that you have spent in

10  court with us over the last day or two?

11  A.   No, not at all.  I'm not billing for waiting time.

12  The only time I'll bill for is here, and you know I waited

13  all day yesterday.

14  Q.   All told, when the final numbers are in, how much

15  will you have been paid for your work in this case?

16  A.   I'm sorry, I don't know that.  I think I said that at

17  my deposition.  I think you could take the number of hours

18  and multiply by the hourly rate.  I don't bill for

19  secretarial time.  I don't bill for supplies.  I'm not

20  billing for travel.  But that might be a way to do it.

21  Q.   Do you have that figure today, or can you give it to

22  me?

23  A.   I don't have it.

24  Q.   You don't even know, okay.

25      I want to go through some of the items in the report,

 1   not all of them, but some of the things you included in

 2   your plan of care for Mr. Colon.

 3       So if you need to refer to that, please do, okay?

 4   A.   The only favor I ask of you, it will go faster, just

 5   give me the page number.

 6   Q.   Will do.

 7       Now, this report that you gave, what was the date

 8   that you prepared that?

 9   A.   First time, I think I did it in either late 2014 or

10   early 2015.  And I finished this report in February 26,

11   2015, except for the addendum which came in after.

12   Q.   And that was based on, you told us, a number of

13   things, including your interview with Mr. Colon himself,

14   right?

15   A.   Yes, sir.

16   Q.   And so you're relying on Mr. Colon to accurately

17   describe for you his condition?

18   A.   No, sir.  No offense to Mr. Colon, and I'm being

19   disrespectful, he left with the impression he could do

20   more than what the doctor said and I saw, okay?

21       Yeah, I relied on it to some extent, of course.

22   Q.   Okay.  And you also -- you mentioned that you had

23   relied on reports and records from Dr. Myers, the

24   psychiatrist, right?

25   A.   Yes, sir, definitely.

```
 1   Q.   And so you're assuming that everything that he said

 2   and he reported was accurate, right?

 3   A.   Yeah.  I don't know if I'm going to get in trouble.

 4   I had him sign off on the report, saying he agreed with

 5   it.

 6   Q.   Okay.  But the input you got from him, I'm saying you

 7   assumed that the input that you received from Dr. Myers

 8   was accurate?

 9   A.   Oh, of course.

10   Q.   So let's look at some of these items, and I want to

11   start with page 8.

12   A.   I'm with you.

13   Q.   You're with me?

14   A.   Yeah.  Thank you, I'm right there.

15   Q.   So you had, for instance, physical therapy for

16   Mr. Colon, 30 sessions per year, up to $180 per session,

17   for the rest of his life; is that right?

18   A.   Yes, sir.

19   Q.   And so how many times has Mr. Colon actually had

20   physical therapy since the accident?

21   A.   I'm not exactly remembering because it wasn't that

22   much.  I think he had some Gaylord and some others.

23   Q.   And the treatment that you had discussed before,

24   reevaluations at the burn clinic, how many times has he

25   been reevaluated since he was discharged in 2012?
```

1  A.   I'm only aware of two or three times.

2  Q.   Backing up for one second to page 7, if you would --

3  A.   I'm with you.

4  Q.   -- you have him -- you talked about physical and

5  cognitive inpatient rehabilitation, right?

6  A.   Yes.

7  Q.   That's where he actually goes and he lives full-time

8  at some facility to receive that treatment, right?

9  A.   For only three months.

10  Q.   For only three months, okay.

11       And that's up to $800 a day that you have it?

12  A.   It's 549 to 800, yes.

13  Q.   He never actually went and lived in a facility and

14  received that treatment, did he?

15  A.   Not the community reentry program, no.  Hospital to

16  home, and that was it.

17  Q.   Going forward again to page 8, if you would.

18  A.   I'm with you.

19  Q.   So you have him also receiving recreational therapy?

20  A.   Absolutely.

21  Q.   Two to three hours a week, $180 per hour?

22  A.   Yes, sir.

23  Q.   And you have this as being at least 50 weeks per

24  year; is that true?

25  A.   Yeah, sure.

1  Q.   Okay.  So 180 hours times, let's say on the

2  conservative side, 2 hours per week, that's $360 per week,

3  right?

4  A.   Sure.

5  Q.   Fifty weeks a year, you're up to $18,000 a year for

6  this recreational therapy that you have Mr. Colon

7  participating in, right?

8  A.   I don't want to get myself in trouble again, but

9  that's a low number.  That's reasonable.  I'm sorry to say

10  that.

11  Q.   I'm just asking you if you can confirm the amounts.

12  Your math might be better than mine.

13      So that's $18,000 a year that you have him for

14  recreational therapy for the rest of his life?

15  A.   I didn't do the math.  I left that to the economist.

16  Q.   Oh, you didn't.  Okay.

17      The day activity program, you have him -- you had

18  mentioned that that's so he can go and interact with other

19  people, right?

20  A.   (Nodding.)

21  Q.   Yes?

22  A.   I'm sorry.  Yes.

23  Q.   If you go to page 9 of your report, you also have --

24  Mr. Colon, you have a physical live-in attendant for him,

25  24 hours a day, 7 days a week, right?

1    A.   Yeah, as long as you remember I corrected and said, I

2    wanted an assistant, only an attendant if his condition

3    gets worse.

4    Q.   I'm sorry, I didn't --

5    A.   I recommended an assistant, only an attendant if he

6    gets in worse condition.  So it says assistant/attendant.

7    I'd prefer an assistant.

8    Q.   Twenty-four hours a day, seven days a week?

9    A.   Absolutely.

10   Q.   And food and related expenses you have for the

11   live-in attendant as well, right?

12   A.   Sure, that's normal, 78 to 89 a week.

13   Q.   Okay.  So for the live-in attendants, the money that

14   you have for their time and for their food and related

15   expenses, that adds up, you have $70,000 per year, plus

16   $32,000 per year, plus another 90 -- roughly 80 or 90

17   dollars per week, right?

18   A.   I don't do it that way.  I take the average, okay?  I

19   don't want to do the high number for somebody's advantage,

20   and the low advantage for somebody's number.  I take the

21   midpoint.

22   Q.   Okay.  So on the upper end of that, though, part of

23   your calculation in finding the midpoint is, you have

24   about $102,000, plus the living expenses per year for the

25   assistant or the attendant live-in?

1    A.    Yeah.   That's actually lower than I would expect,

2    daily rate instead of an hourly rate.

3    Q.    $102,000 a year though.   I'm just asking you to help

4    me with the math here.

5    A.    That's easy to repay, given the health needs.

6    Q.    In addition to the live-in attendant, you have

7    somebody separate coming in once a week to do housework?

8    A.    Absolutely.

9    Q.    Okay.   And in addition to the housework, then you

10   have someone coming in to do home maintenance.   So I guess

11   that would be anything that needs to be taken care of

12   around the house?

13   A.    Sure.

14   Q.    And then if he has a lawn, you have money in here

15   allotted for lawn maintenance as well?

16   A.    Absolutely.   Things that he could have done that he

17   can't do anymore.

18   Q.    Let's go to the next page where you talk about this

19   residence acquisition.

20   A.    I'm with you.

21   Q.    Okay.   Residence acquisition, you have money allotted

22   in here for Mr. Colon and his wife to purchase their own

23   home?

24   A.    Yes, sir.

25   Q.    $400,000 for the sale price, right?

1    A.    Yeah.   399,050, but you're close enough.

2    Q.    Then you have money in here for all of the appliances

3    that they would need to buy, so we're assuming the house

4    they buy has no appliances in it?

5    A.    Not at all.   If it does, I'd like to sell them and

6    get the money for them, and replace them with the

7    appropriate ones.

8    Q.    So on page 11, you talk about the laundry and utility

9    room appliances, you're going to put in central air for

10   the house.   And those are included in the figures that you

11   were talking about earlier, right?

12   A.    Sure.

13   Q.    Okay.   That's, again, on top of the $400,000 purchase

14   price.

15   A.    Oh, yeah.   That -- I mean, it's like sitting in that

16   chair all day.   How do you feel when you get up?   At least

17   you can get up.

18        I acknowledge that he would have had them anyway.   I

19   acknowledge it's a value to him.   I acknowledge that they

20   should be sold.   And I just gave the price of the handicap

21   item above and beyond.   I take no exception to what you

22   said.

23   Q.    So you have him in a house; you're going to buy new

24   appliances, at least some of them; you're going to put in

25   central air; and you also talked about you're going to

1    make some modifications to make the house handicap

2    accessible, right?

3    A.   With some qualifications.  The central air is only

4    once every 12 years.

5        And I didn't hear the other two.  I'm sorry it's

6    either me or the --

7    Q.   There's an echo in here.  I'm having difficulty

8    hearing you too, if it makes you feel better.

9    A.   Thank you.

10   Q.   What I was saying, Doctor, you have the purchase

11   price; you're going to buy some new laundry and

12   utility-room appliances; you're going to put in central

13   air; and then you get into this area where you have all of

14   these modifications that you would have to make to the

15   house to make this $400,000 house handicap accessible,

16   right?

17   A.   Sure.  We don't want to get a washing machine -- even

18   I know this -- where you have to put the clothes in

19   through the top.  We want to go in through a side door.

20   That's all the modification is.

21   Q.   Okay.  So you have money in there for that.

22       And then, talking about these modifications to the

23   house itself, you have extended driveways; you have

24   extended garage, extended walkways; you're going to put in

25   an extra exit door, hallway rails; you're going to install

1   ramps on the outside, right?

2   A.   Yeah, that's when he gets a house.

3   Q.   Okay.  You have $20,000 every 10 years for a

4   generator for the house?

5   A.   Absolutely.

6   Q.   Okay.  You're going to modify the bathrooms, the

7   closets, the kitchen, the portable ramp; widen the

8   doorways, widen the hallways.  And that's all, again, to

9   make this handicap accessible for Mr. Colon, right?

10  A.   Sure.

11  Q.   Okay.  There are apartments available in the

12  New Haven area that are already equipped to be handicapped

13  accessible, are there not?

14  A.   If you're talking about the ones I've seen too, I

15  wouldn't want to live there --

16  Q.   Okay.

17  A.   Please let me finish.

18  Q.   I'm sorry, sir, go ahead.

19  A.   They're isolated areas that have been designed at the

20  minimal level for people who may have serious conditions.

21       But, yes, you can sometimes find a house that a

22  person with an impairment or disability lived in, with a

23  modification to their -- you've just gotta hope they're

24  not too old.  I'm not aware of any -- and if you know,

25  please, after the trial let me know -- homes that are

1    modified to the level that he needs.

2    Q.   I'm talking about apartment complexes, an

3    assisted-living facility, did you look at any of those or

4    price any of those out in the New Haven area?

5    A.   I'm not going to incarcerate this man in an

6    assisted-living facility.  That's absurd.

7              THE COURT:  Hold on a second.  You just were

8    asked yes or no.

9              THE WITNESS:  I'm sorry, Your Honor.  I'll be

10   better at listening.

11             Say it again, please.

12   BY MR. FINEMAN:

13   Q.   Did you price out any apartment complexes in the

14   New Haven area, or assisted-living facilities, that are

15   already equipped with everything somebody would need to

16   live and have it be handicapped accessible?

17   A.   Absolutely not.

18   Q.   Okay.  Are you familiar with the Bella Vista

19   apartment complex?

20   A.   Please, it's not your fault.

21   Q.   Are you familiar with the Bella Vista apartment

22   complex?

23   A.   I've heard of it, yes.

24   Q.   And so you're aware that that's already outfitted to

25   be handicapped accessible?

1   A.   Yes, sir.

2   Q.   All right.

3   A.   Not to the degree that he needs it; but yes, sir.

4   Q.   Okay.  So the last thing I want to talk to you about

5   is, at the end of your report, on page 19, the services

6   that you include in here the services that Ms. Davis

7   requires that Mr. Colon used to provide to her before the

8   accident.

9        Is that what this page represents?

10  A.   Yes, sir.

11  Q.   So it's your understanding, then, that he did some of

12  the grocery shopping for the family?

13  A.   He did some, sure, with her.

14  Q.   He did some home repairs and household chores?

15  A.   Not in the apartment as much.  This is when they were

16  in a residence acquisition.  But he might have unstuck the

17  toilet, he might have hung a picture, he might have helped

18  with some other things that she said he did.  But he's not

19  constructing drywall or putting in electric system.

20  Q.   He's not, okay.

21       You said he likes to cook, so he was doing some of

22  the cooking for the family?

23  A.   Some, sure.

24  Q.   So he was helping Ms. Davis.  The whole point of that

25  part of your report is to compensate them for the services

1    that he used to provide her, because he used to provide

2    her with services?

3    A.    Yeah, some he provided, and I did some, but I did at

4    the low rate, the prevailing community rate.

5    Q.    Okay.  Thank you, Mr. Forman.

6    A.    Thank you.  Nice meeting you.

7              THE COURT:  Mr. Reed, anything?

8              MR. REED:  I have no questions, Your Honor.

9              THE COURT:  Mr. Rush, anything?

10             MR. RUSH:  No, Your Honor.

11             THE COURT:  Thank you, sir, for coming in.

12             THE WITNESS:  Thank you all.

13             Thank you, Your Honor.

14             THE COURT:  Next witness, please.

15             MR. RUSH:  Your Honor, I think we'll play the

16   video of Robert Doody, the corporate representative of

17   Metro-North.

18             THE COURT:  All right.

19             Ladies and gentlemen, what we'll hear is we'll

20   hear -- we've done this before, as you recall, with

21   Dr. Savetamal.  And you'll listen to the video.  There

22   will be reference to certain exhibits that I understand

23   have already been admitted into evidence.  I think there

24   was going to be -- there were two additional exhibits, as

25   I recall.

```
 1              Was it Exhibit 71 and 72 that you were going to
 2  offer as part of this deposition?
 3              MR. RUSH:  Yes, Your Honor.  We move to admit
 4  Exhibit 71 and 72.
 5              THE COURT:  And those are two photographs, and I
 6  understand that there's no objection except a request for
 7  explanation that these are photographs that were taken of
 8  the railroad right-of-way during a site inspection in
 9  April of 2014, so some point some years after the incident
10  at issue in this case.
11              That's Exhibit 71 and 72.  And understanding
12  there's no objection, those are full exhibits.
13              MR. HICKEY:  Thank you, Your Honor.
14              (Plaintiffs' Exhibits 71 and 72 marked in
15               evidence.)
16              THE COURT:  Please proceed.
17              (Video deposition of Robert Doody played.)
18              THE COURT:  Can you stop the deposition for just
19  a second.
20              So as you saw, there was a jump in the
21  deposition.  And so what's occurred is that the deposition
22  is longer than what you are seeing.  What you are seeing
23  is what parts of the deposition that the Court determined
24  were admissible.  And the weight to be given to any
25  testimony, of course, is up to your own determination.
```

1      Please proceed.

2      So you'll see periodic jumps in the deposition.

3      Please proceed.

4      (Deposition video of Robert Doody played.)

5      THE COURT:  Why don't we stop it there.  We'll

6  take our lunch break at this time.  It's 12:00.

7      Ladies and gentlemen, the usual lunch break, the

8  usual rules:  Please don't talk about the case, engage

9  anybody in any conversation, or do any kind of research.

10     We'll plan to start again at 1:00 p.m., thank

11  you.

12         (Whereupon the jury left the courtroom.)

13     THE COURT:  Please be seated.

14     I've just been looking over -- with respect to

15  the suggestion of the request for admission, I pulled up

16  the document that Mr. Rush had filed back on July 28, I

17  believe.

18     And what I'd like to do, it seems to me, in

19  terms of a way forward on this, in recognition that if in

20  fact there are admissions there that are relevant and

21  otherwise admissible in the case, they should be allowed.

22  My hope is to work with the parties to try to essentially

23  boil down those requests for admissions and the responses

24  to try to identify what would be appropriate.

25     So what I asked my law clerk to do was to start

1   with the July 28 document.  It looked like the July 28

2   document only included kind of, at some point, sometimes

3   only snippets or portions of the full request for

4   admission.  So what we're trying to do is trying to go

5   back and actually look at the full request for admission.

6   Because I don't think it would be appropriate to take like

7   a portion of a request for admission, and then have a

8   response to something that's not the complete request for

9   admission, unless the parties actually agree to that.

10          So what we're going to do, again, to try to

11  facilitate this in the absence of the parties' ability to

12  reach a stipulation about these, I'm going to shortly

13  forward to you all hard copies of what I understand to be

14  the full request for admissions at issue and then the full

15  responses.  And then we can try to sort out and talk

16  amongst ourselves about which of these would be properly

17  admissible, either in full or in some sort of redacted

18  form.

19          Does that make sense, to try to get past this

20  issue?

21          MR. RUSH:  Yes, Your Honor.  I also have the

22  hard copies if opposing counsel wants to look at them.

23          THE COURT:  Great.  So they'll be available,

24  those hard copies.

25          The hopes will be that we'll, at the end of the

1   day, have some number of these requests for admission, and

2   some number of the responses to them, that can be

3   introduced as a clean document to the jury, perhaps shown

4   on the screen, and then it's clear what the evidence is,

5   okay?

6            MR. RUSH:  Very good.

7            THE COURT:  We'll get that to you over the lunch

8   hour and then we can take that up at the appropriate time

9   later in the day.

10           Anything else to take up?

11           MR. REED:  No, Your Honor.

12           MR. HICKEY:  No.

13           THE COURT:  Thank you.  Stand in recess.

14               (Whereupon, a recess followed.)

15

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T E

3

4       RE:   COLON, ET AL. V. METRO-NORTH COMMUTER RAILROAD

5              COMPANY, ET AL., NO. 3:13CV325(JAM)

6

7             I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 1281 through 1385 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                          _____/s/_____

18                          DIANA HUNTINGTON, RDR, CRR
                              Official Court Reporter
19                          United States District Court
                                141 Church Street
20                          New Have, Connecticut 06510
                                 (860) 463-3180
21

22

23

24

25