1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3    - - - - - - - - - - - - - -  x
                                  :  Case No.
4    MILTON OMAR COLON, ET AL,    :  13cv325(JAM)
                                  :
5               Plaintiff,        :
         vs.                      :
6                                 :
     METRO-NORTH COMMUTER         :  141 Church Street
7    RAILROAD COMPANY, a public   :  New Haven, CT
     benefit corporation of the   :  August 15, 2017
8    State of New York, ET AL     :
                                  :
9               Defendant.        :
     - - - - - - - - - - - - - -  X

10
                    TRIAL TRANSCRIPT
11           VOLUME VII - P.M. SESSION

12   BEFORE: THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.,
                                      And jury
13

14   APPEARANCES:
     FOR THE PLAINTIFF:        BRIAN P RUSH, ESQ.
15                             Woodlief & Rush, P.A.
                               3411 W. Fletcher Ave.,
16                             Tampa, FL 33618

17

18   FOR THE DEFENDANT         ROBERT O. HICKEY, ESQ.
     METRO-NORTH:              BECK FINEMAN, ESQ.
19                             Ryan Ryan Deluca LLP
                               1000 Lafayette Boulevard,
20                             Bridgeport, CT 06604

21

22

23            Sharon Montini, RMR, FCRR
                  915 Lafayette Blvd
24              Bridgeport, CT 06604
               Official Court Reporter

25

```
1                    APPEARANCES CONTINUED

2

3    FOR THE DEFENDANT           CHARLES REED, ES
     UNITED ILLUMINATING:        JAMES RINGOLD, ESQ.
4                                Loughlin, Fitzgerald, P.C
                                 150 South Main Street
5                                Wallingford, CT 06492

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1                    THE COURT:  All right.  We set for the

 2     jury?

 3                    MR. HICKEY:  Yes.

 4                    THE COURT:  All right, please be seated.

 5     Please bring in the jury.

 6                    (Jury entered the courtroom.)

 7                    THE COURT:  All right.  We're back,

 8     ladies and gentlemen.  Please be seated.  We'll

 9     continue at this time with the rest of the

10     deposition of Mr. Robert Doody.

11                    R O B E R T   D O O D Y,

12            (Testified via videotaped deposition)

13                    (Recording played)

14                    THE COURT:  Okay.  And I understand

15     there may be a portion of that deposition that was

16     not included with the video.

17                    I think, Mr. Fineman, you had a certain

18     portion, short passage.  Would you just do a reading

19     out loud of the questions and answers.

20                    MR. FINEMAN:  Absolutely.

21                    THE COURT:  This is your own

22     questioning, right?

23                    MR. FINEMAN:  This is my questioning of

24     Mr. Doody, yes.

25                    (Deposition read-in by Mr. Fineman of

1  Robert Doody)

2          "Question:  I want to show you

3  Exhibit 9.  That is, if I understand it correctly, a

4  1971 Federal Highway Administration report to

5  Congress, and it's called Railroad Highway Safety,

6  Part One, Comprehensive Statement of the Problem.

7          Before today, had you ever seen this

8  document?

9          Answer:  No, I have not.

10          Question:  Have you ever looked at any

11  federal reports to Congress at all?

12          Answer:  No.

13          Question:  Anything dating back to 1971?

14          Answer:  No.

15          Question:  You were asked about some of

16  the conclusions that Mr. Rush directed your

17  attention to, and I believe he was talking mostly

18  about page 88, the catenaries.  Do you remember

19  being asked about that?

20          Answer:  Yes, I do.

21          Question:  Okay.  Do you have any idea

22  what the source or sources were for the Federal

23  Highway Administration in collecting their data?

24          Answer:  No, I don't.

25          Question:  Do you know anything about

```
 1   how their studies were conducted?

 2               Answer:  No, I do not.

 3               Question:  Do you know whether -- do you

 4   have any idea whether this report pertains to

 5   passenger railroads as opposed to freight railroads?

 6               Answer:  I do not.

 7               Question:  Metro-North is a passenger

 8   railroad, right?

 9               Answer:  Yes, they are."

10               THE COURT:  Thank you, Mr. Fineman.

11               So, ladies and gentlemen, we're coming

12   up on 2:30.  I think we'll take our break just a

13   little bit early before we start a new witness.  So

14   if we can come on back in about 15 minutes time,

15   we'll be ready to go.

16               (Jury exited the courtroom.)

17               THE COURT:  All right.  Please be

18   seated.  So I see Ms. Davis has joined us.  Welcome.

19               And the next witness you anticipate will

20   be Ms. Davis?

21               MR. RUSH:  Yes, your Honor.

22               THE COURT:  Okay, great.  And I take it

23   we're fine in terms of the accommodations and the

24   space in the witness chair?

25               MR. RUSH:  Yes, your Honor.  I'm going
```

1    to help her up.

2              THE COURT:  Great.  That sounds good.

3              MR. RUSH:  If you don't mind her sitting

4    up there before the jury comes in.

5              THE COURT:  Whatever you want to do is

6    fine with the Court.

7              And then I just passed out a copy of

8    what looked to me like full requests for admission,

9    full responses there based on our review.  I count

10   on you if there is an error with that.  So hopefully

11   that can be a topic of discussion perhaps at the end

12   of the trial day.  Okay?

13             And does anybody have -- I also want to

14   discuss a bit more about this MTA police report that

15   we discussed this morning.  Does everybody have a

16   copy, their own copy of that report?

17             MR. REED:  We don't have one with us

18   today.

19             THE COURT:  I'll have copies made.

20   We'll pass it out and you'll get copies of it.  I

21   want to discuss a little bit more about that at the

22   end of the trial day.

23             So we'll stand in recess.

24             (Recess.)

25             THE COURT:  All right.  Please be

```
1    seated.

2              Are we set for the jury?  Great, okay.

3              (Jury entered the courtroom.)

4              THE COURT:  All right.  Welcome back,

5    folks.  Please be seated.

6              Mr. Rush, if you would like to call your

7    next witness.

8              MR. RUSH:  Yes, your Honor.  We call

9    Arlene Davis to the stand.

10             THE COURT:  All right.

11         A R L E N E   D A V I S   C O L O N,

12   Having first been duly sworn, was examined and

13   testified as follows:

14             THE WITNESS:  Arlene Davis Colon.  Last

15   name spelled C-o-l-o-n.  New Haven, Connecticut.

16   DIRECT EXAMINATION

17   BY MR. RUSH:

18       Q.   Good afternoon, Arlene.

19       A.   Good afternoon, Mr. Rush.

20       Q.   How are you doing?

21       A.   I'm okay.  How are you?

22       Q.   Good.  Have you ever testified before?

23       A.   No, sir.

24       Q.   When you talk make sure you are talking

25   into the microphone.  Sometimes it whorls and
```

```
1   whistles back at you, but just talk directly to the
2   jury.  Have your conversation with them rather than
3   me.  I'll ask you a question, talk to them.
4        A.   Okay.
5        Q.   What is your birthday?
6        A.   August 18, 1970.
7        Q.   And how old are you?
8        A.   I'm 46.
9        Q.   Are you married?
10       A.   Yes, I am.
11       Q.   To whom are you married?
12       A.   Omar Colon.
13       Q.   You are 47 years old?
14       A.   I'm 46 years old.
15       Q.   Okay.  Sorry about that.  You will be 47
16  shortly?
17       A.   Yes, sir.  This Friday.
18       Q.   This Friday?
19       A.   Yes, sir.
20       Q.   Happy birthday.  And you are married to
21  Omar Colon.  How old is he?
22       A.   Omar is 32.
23       Q.   You are about 15 years older?
24       A.   Yes, sir.
25       Q.   Can you -- well, let me ask.  How long have
```

1  you been married to Omar?

2      A.    Omar and I got married in 2008.   Almost ten

3  years -- nine years.

4      Q.    Are you -- where were you born?   What city?

5      A.    New Haven, Connecticut.

6      Q.    And did you go to high school here?

7      A.    Yes.

8      Q.    Where did you go to high school?

9      A.    Career Education Center at Conte.

10      Q.    Okay.   And what was your first job after

11  high school?

12      A.    My first job would have been Wendy's.

13      Q.    Okay.   And what did you do at Wendy's?

14      A.    Wendy's is a restaurant, so cashier, on the

15  grill.

16      Q.    Did you ultimately go to work in a retail

17  store?

18      A.    Yes, I did.

19      Q.    What was the name of that store?

20      A.    Yale Co-op, which is now the Yale

21  Bookstore.

22      Q.    How long did you work -- how many years

23  total did you work at the Yale Co-op or Yale

24  Bookstore?   About.   Not exactly, but about.

25      A.    Off and on about six years.

1395

1    Q.    Were you full-time or part-time?

2    A.    I was full-time.

3    Q.    What did you do at the Yale Co-op and

4  bookstore?

5    A.    I was a credit collections clerk.

6    Q.    What did you do as a credit collection

7  clerk?

8    A.    Open up and close credit accounts for the

9  co-op students and faculty.  That's basically it.

10    Q.    Okay.  How many hours a week,

11  approximately, did you work at the Yale Co-op and

12  bookstore?

13    A.    I was 40 hours a week.

14    Q.    Okay.  While you were working at the co-op

15  and bookstore, during your various stints there, did

16  you have occasion to work at a taxi company?

17    A.    Yes, I did.  I was at Metro Taxi for almost

18  a year and a half, two years.

19    Q.    What did you do at Metro Taxi?

20    A.    Answer calls, taking calls for customers to

21  send them taxis.

22    Q.    And how many hours a week did you work at

23  Metro Taxi?

24    A.    I was 40 hours a week there as well.

25    Q.    Did you subsequently work for a

1    construction company?

2        A.    Yes, I did.

3        Q.    What was the name of that construction

4    company?

5        A.    NER -- NER Construction Company.

6        Q.    Approximately how long did you work at NER

7    Construction?

8        A.    For about a year and a half.  Up until I

9    had my stroke.

10       Q.    And what did you do at NER?

11       A.    Office work.

12       Q.    Can you tell us about your stroke,

13   approximately when it happened?

14       A.    My first stroke occurred in 2001, at the

15   end of January, and I had a second stroke that

16   occurred in 2003.

17       Q.    Okay.  Were you treated for these strokes

18   in the hospital?

19       A.    Yes, I was.

20       Q.    Where did you go to receive your treatment

21   for the first 2001 stroke?

22       A.    I went to St. Raphael's Hospital.

23       Q.    Okay.  And did you have physical therapy

24   after that?

25       A.    Yes, I did.

1    Q.   Tell us about your -- how long after that

2  first 2001 stroke, when did you have a second

3  stroke?

4    A.   I had my second stroke in 2003.  It was

5  about almost two years -- maybe two years

6  afterwards.

7    Q.   As a result of those two strokes, have you

8  suffered any paralysis?

9    A.   Yes.

10   Q.   Can you tell the jury what your condition

11 is?

12   A.   I have right side paralysis from my left

13 hemisphere stroke on the left side of my brain.

14   Q.   Has the stroke affected your speech?

15   A.   A little.  Not much, thank God.

16   Q.   Okay.  How is your memory?

17   A.   My memory is okay.  It's been better.  I'm

18 getting older.

19   Q.   Okay.  Did you ever recover from that

20 second stroke in 2003?

21   A.   Not fully.

22   Q.   Okay.

23   A.   Obvious.

24   Q.   After that second stroke, were you weaker?

25   A.   Yes.

1    Q.    And after that second stroke, were you able

2  to return to work?

3    A.    No.

4    Q.    Have you worked since that 2003 stroke?

5    A.    No, sir.

6    Q.    From 2003 until 2006, where did you live?

7    A.    I lived with my mom.

8    Q.    And why were you living with your mom?

9    A.    Because she was diagnosed with having stage

10  four breast cancer.

11    Q.    How long did you care -- or did you provide

12  care to your mom during that time?

13    A.    Yes, I did.  Excuse me.

14    Q.    How long did you care for your mom?

15    A.    Excuse me.  Until she passed away.

16    Q.    Okay.

17    A.    2006, October.

18    Q.    Were you able to return to work after your

19  mother died?

20    A.    No, sir.

21    Q.    Can you tell the jury when you met Omar

22  Colon.

23    A.    I met Omar in February of 2006.

24    Q.    In what?  I heard the 2006.  What was the

25  first part?

1    A.    February.

2    Q.    Oh.

3    A.    I believe it was around the 21st, 22nd.

4    Q.    Okay, February of 2006?

5    A.    2006.

6    Q.    Okay.  How did you come to meet Omar?

7    A.    It was a social gathering through a mutual

8    friend of ours.

9    Q.    Did you have occasion to start dating Omar

10   Colon at that time?

11   A.    Yes, we started dating at that time.

12   Q.    And how long did you all date before you

13   married, approximately?

14   A.    Approximately almost two years.  Maybe two

15   years.  Yeah.

16   Q.    And you earlier testified you had gotten

17   married in 2008?

18   A.    Yes, sir, 2008 we married.

19   Q.    Can you tell the jury about the first two

20   years or two and a half years of your marriage

21   before the March 2011 injury incident?

22   A.    When Omar and I first got married, Omar --

23   he was my everything.  He did everything for me.  He

24   bathed me, he dressed me, he cooked, he cleaned.  He

25   did the laundry, did the shopping.  Omar was my

1400

1   legs.

2       Q.   How would you describe the happiness of

3   your marriage to Omar during that first two and a

4   half years in late 2008 to early 2011?

5       A.   Excuse me?  Could you repeat your question?

6   I didn't quite hear.

7       Q.   I'm sorry?

8       A.   I didn't quite hear you.  Could you repeat

9   your question, please.

10      Q.   I'm sorry, I'm trying to keep this thing

11  from whistling.  Can you tell the jury the level of

12  happiness you had with Omar during that first two

13  and a half years of marriage?

14      A.   Very high level of happiness.  We were

15  happy.  Just to be around each other made us happy.

16  Simple people.

17      Q.   Now, do you speak Spanish fluently?

18      A.   Not fluently.  I know a few words.

19      Q.   Does Omar speak English fluently?

20      A.   Spanish is his first language, English

21  isn't.

22      Q.   Can you explain how two people can be

23  married and can't speak the same language fluently?

24      A.   You would be surprised what love can do.

25      Q.   Maybe you can amplify.  Explain to the jury

1401

1  how you all did communicate.

2       A.   Omar, if he wanted something, if there were

3  pictures around, he would point to the pictures, and

4  I would say, "That's what you want sweetie?" "Yes."

5  And I would try to give it to him or get it for him.

6       Q.   Did Omar do household tasks for you, like

7  shopping and cleaning?

8       A.   Yes, he did.

9       Q.   And in addition to helping you bathe, did

10 he also help you with other personal items?

11      A.   Yes.  Omar did cooking, cleaning, laundry,

12 bathing me, dressing me.  Omar did everything for

13 me, basically.  I had no support besides Omar.

14      Q.   Can you tell the jury about -- well, strike

15 that.

16            Can you explain how it is that your

17 relationship was helped by Omar's physical strength

18 and ability before the accident?

19      A.   Well, what I couldn't do, Omar would do.

20 When I met Omar I was already disabled and he

21 wasn't, so anything you could imagine that somebody

22 would need, Omar would do it for me.

23      Q.   Can you explain how your intellectual

24 ability was of use to Omar with his intellectual

25 disability?

1    MR. HICKEY:  I'm going to object to that

2    question.

3         THE COURT:  Sustained.

4         MR. RUSH:  Very good.

5    Q.    Can you tell the jury your observations of

6    Omar's ability or inability to read when you first

7    got married?

8    A.    Omar couldn't read English very well when

9    we first got together.

10   Q.    Okay.  And was he ever, during that first

11   time you were married, ever able to read more than a

12   few words in English?

13   A.    No.

14   Q.    Okay.  Similarly, can you tell the jury

15   whether he had trouble reading at all, whether it be

16   in Spanish or English, more than a few words?

17   A.    Omar had difficulties, yes.

18   Q.    I'm sorry?

19   A.    Omar had difficulties, yes, reading before

20   we got married.

21   Q.    Okay.

22   A.    And after.

23   Q.    After you got married also?

24   A.    Yes, sir.

25   Q.    What can you tell the jury about whether

1  Omar had normal intelligence or below normal

2  intelligence?

3              MR. HICKEY:  Objection.

4              THE COURT:  Just a second.

5              MR. HICKEY:  Objection.

6              THE COURT:  The basis of -- in terms of

7  asking for an expert conclusion of sorts?

8              MR. HICKEY:  Of sorts, exactly.

9              THE COURT:  Okay.

10             MR. RUSH:  Lay opinion.

11             THE COURT:  I think I will allow it.

12             You understand the witness is not an

13 expert on this, but certainly can testify about what

14 she perceived of his apparent intelligence.

15             Go ahead.

16     A.   I would say Omar had below normal

17 intelligence.

18     Q.   And how did the two of you, you with your

19 physical disability and he with his below normal

20 intelligence, how did that relationship work or not

21 work?

22     A.   Well, I was the brain, he was the brawn.

23     Q.   Okay.  Can you describe his physical

24 appearance before the 2011 injury incident?

25     A.   Omar was very strong, healthy, about your

1 height, maybe a little bit taller.

2     Q.   Oh, sure, talk about how short I am.

3     A.   Oh, no.  But he was a very physically

4 strong person.  Young, strong.  So that's why he was

5 a very big help to me before the accident.

6     Q.   Were you -- can you tell the jury whether

7 you were happy to be married to Omar?

8     A.   Yes, I was.  I was very happy, and I still

9 am happy married to Omar.

10     Q.   Okay.

11     A.   I love my husband.

12     Q.   Can you tell the jury about your sexual

13 relationship briefly?  Not necessarily explicitly,

14 but the quality of that relationship before Omar was

15 injured.

16     A.   Awesome.

17     Q.   And can you tell -- can you tell the jury

18 about Omar's efforts to earn money by working after

19 the marriage?

20     A.   After the marriage?

21     Q.   After the marriage.

22     A.   Okay, I'm very sorry, I got confused.

23 Well, Omar did side jobs.  He did a lot of side

24 jobs.  He did work with his brother.  He worked at a

25 couple of temporary agencies doing assembly work.

1405

```
1    Q.    When he worked -- was he occasionally able
2  to work full-time?
3    A.    I believe when he was working doing
4  assembly work he was working full-time.
5    Q.    What did he do in terms of assembly line
6  work?
7    A.    Piece work.  Assembly work piecing things
8  together.  I believe that the job, ADP, he was
9  putting together -- I want to say -- I forget the
10 word.  Not scalpel.  Some type of surgical word that
11 is used in the hospital.  Schick is where he was
12 putting together razors that you use to shave.
13   Q.    After those assembly line work jobs, did
14 Omar have occasion to work for his brother Jose?
15   A.    Yes.
16   Q.    What was that work like for him?
17   A.    You mean what type of work was he doing?
18   Q.    Yes, what type of work was he doing?
19   A.    Construction work, I believe.  Doing
20 painting, laying down tile on the floor, maybe a
21 little carpentry.
22   Q.    Okay.
23   A.    I am assuming.
24   Q.    Okay.  You don't know exactly?
25   A.    Right, I'm not sure exactly.
```

1   Q.   Omar -- well, can you tell the jury what

2   you knew about Omar's struggles with addiction,

3   especially heroin, and his methadone treatment?

4   A.   Well, when I first met Omar he was very

5   honest about his addiction.  Excuse me.  He told me

6   that he was going to the methadone clinic because he

7   had a problem with heroin in his younger years and

8   he was getting help for it, and I thought that was

9   commendable.

10   Q.   During your marriage has he -- can you tell

11   the jury whether he has continued to attempt to seek

12   treatment from time to time for his heroin

13   addiction?

14   A.   Yes, he has continued to go to the clinic,

15   the methadone clinic.

16   Q.   Can you tell the jury whether he -- about

17   Omar's use of marijuana before the injury incident?

18   A.   He used marijuana to lessen the effects --

19   not lessen the effect of the methadone, but he told

20   me it would make him nauseous.  So he smoked

21   marijuana to get rid of nausea from the methadone.

22   Q.   Okay.  Did Omar -- well, could you tell the

23   jury what your understanding was of Omar's use of

24   cocaine from time to time before the incident?

25   A.   I wasn't aware of that.

1    Q.   Okay.  After the injury incident, did you

2  have occasion to see Omar in the hospital?

3    A.   Yes.

4    Q.   Okay.  What was that like, to see your

5  husband in the hospital with those injuries?

6    A.   It was very difficult to see him that way.

7    Q.   Did there come a time when he was able to

8  come home from the hospital?

9    A.   Yes.

10    Q.   Can you tell the jury about the process of

11  Omar coming home from the hospital?  Where did he

12  go?

13    A.   When Omar first was released from the

14  hospital he went to his brother's house.

15    Q.   Why did he go to his brother's house

16  instead of to your home?

17    A.   Because where we live at it's an

18  efficiency, very small, and it's difficult to take

19  care of him.  It was difficult to take care of Omar.

20  It would have been extremely difficult for me to try

21  to take care of Omar by myself when he first got out

22  of the hospital, so his mom actually moved from

23  Puerto Rico up here to take care of him.

24    Q.   What was Omar's state of mind early on

25  after coming home from the hospital?

1    MR. HICKEY:  Objection, your Honor.

2    THE COURT:  Yes.  Sustained.  More

3    specific, please.

4    Q.   Can you describe what you observed in

5    Omar's emotions and presentation in the months,

6    weeks after coming to his brother's house?

7    A.   Omar -- I'm not a doctor and this is

8    strictly my opinion -- suffered with depression.

9    Suffered a depression.  Very difficult.  It was very

10   difficult for him to have legs and then not to have

11   legs.  I think that would be for anyone.  So highs,

12   lows, mediums.  He went through it all.

13   THE COURT:  Maybe you can repeat that

14   for the court reporter.

15   A.   Highs, lows, mediums.  Omar went through it

16   all.

17   Q.   How long did he continue to live at his

18   brother's house?  Most of the time?  More than half

19   of the time?  How many months or years did he

20   continue to stay at his brother's house after the

21   March 2011 incident?

22   A.   At least two years.  Maybe three years.  It

23   was half at his brother's house and half in my

24   house.

25   Q.   How did that affect your marital

1  relationship?

2      A.    Well, it didn't really help it.  Kind of

3  broke it down.

4      Q.    Over the last six and a half years, can you

5  tell the jury how your marital relationship with

6  Omar has evolved?

7      A.    My marriage has actually deteriorated since

8  the accident.  Very difficult trying to deal with

9  Omar and my issues.  It's just extremely hard.

10     Q.    Can you tell the jury whether you have

11  noticed any change in Omar's thought process since

12  the accident six and a half years ago?

13     A.    Omar -- what's a good word?  Dull is a very

14  good word.  He's very -- he gets aggravated very

15  easily.  Angry, irritated, depressed.  As I said,

16  highs, lows, mediums.

17     Q.    Can you tell the jury whether you observed

18  him being in pain on a daily basis?

19     A.    Omar is in constant pain all the time.

20     Q.    How does that pain affect your marital

21  relationship with Omar?

22     A.    Well, by him being in constant pain, I

23  can't really give him a hug, try to console him,

24  because he's in pain.  I don't know where to touch

25  him that doesn't hurt him because it seems like he's

1    always in pain throughout his whole body.

2         Q.   Can you explain that issue of human touch

3    when you are touching Omar's body near his burn

4    sites?

5         A.   You can't.  You can't touch Omar there.

6         Q.   Can you tell the jury how Omar's pain and

7    injuries has affected your sexual relationship over

8    the last three years?

9         A.   We really don't have anymore sexual

10   relations.

11        Q.   Okay.  Can you tell the jury whether you

12   noticed any confusion in his thinking?

13        A.   Yes.  Omar, he's more confused now than he

14   was before.  It seems like his perception of reality

15   is a little misconstrued now.

16        Q.   Can you tell the jury whether you are

17   concerned about the future if Omar's confusion

18   increases over time as he ages?

19        A.   I know that I'm definitely going to need

20   help with Omar to try to care for Omar in the future

21   because he's already shown a sign of forgetfulness.

22   He misplaces things.  He can't remember things.

23   Simple things for you and I, he can't grasp it now.

24   So that's going to be a problem in the future.

25        Q.   What size apartment do you all have?  How

1  many bedrooms?

2      A.   It's an efficiency.   No bedroom, an

3  efficiency.   Just one room, basically.

4      Q.   How is it to have two people in a small

5  efficiency both of whom are in wheelchairs?

6      A.   You could -- if you could see the walls you

7  would know.   It's very difficult.   It's hard enough

8  to have one wheelchair, but to have two, almost

9  impossible.

10     Q.   If -- well, can you tell the jury your

11 thoughts as to whether Omar's brother and

12 sister-in-law can provide care to you and Omar in

13 the years to come if you are not able to take care

14 of Omar?

15     A.   His family is a God send, but it would be

16 extremely difficult for them to try to take care of

17 us being that they have newborn twins.   It would

18 basically ruin their family trying to take care of

19 Omar and I.

20     Q.   Can you tell the jury your view of the

21 coming next 10, 20, 30 years with Omar?

22     A.   Excuse me?

23          MR. HICKEY:   I'm sorry, your Honor, I

24 have to object.

25          THE COURT:   That's a bit broad.   Can you

1  be more particular, please.

2      Q.   Can you share with the jury your thoughts

3  about how the next several years with Omar will play

4  out in terms of your relationship and your ability

5  to take care of him?

6      A.   Well, I do know it's going to be difficult

7  because it's already difficult, but I do believe

8  with help that I will be able to manage it because

9  he is my husband and I love him and I'm not going

10  anywhere.

11      Q.   Okay.

12          MR. RUSH:  Your Honor, no further

13  questions.

14          THE COURT:  Okay.  Cross-examination.

15          MR. HICKEY:  Yes.  Thank you, your

16  Honor.

17  CROSS-EXAMINATION

18  BY MR. HICKEY:

19      Q.   Good afternoon, ma'am.

20      A.   Good afternoon.

21      Q.   I don't know if you remember me, but my

22  name is Bob Hickey.  I took your deposition a few

23  years ago.

24      A.   I remember you, Mr. Hickey.

25      Q.   I'm going to follow-up with some questions,

1413

1  and if I ask you anything that is confusing, you let

2  me know.  Okay?

3      A.   I will, sir.

4      Q.   I just want to retrace a little bit of the

5  chronology here to make sure the jury has it in

6  their head.  Okay?

7      A.   Okay.

8      Q.   As I understand it, you met Mr. Colon in

9  2006?

10      A.   Yes, sir.

11      Q.   And then you moved in together in 2007?

12      A.   Yes.

13      Q.   And you got married in 2008?

14      A.   Yes.

15      Q.   So if you moved in together in 2007, you

16  basically lived with him for approximately four

17  years before the accident?

18      A.   We were together, yes.

19      Q.   Okay.  So you had only been married since

20  2008, but you lived together from 2007.  So you were

21  very familiar with each other, I assume, because you

22  had lived together for four years?

23      A.   Yes.

24      Q.   Just so the jury knows, where did you live

25  for those first four years?  Was that a different

1414

```
 1    place than where you live now?

 2         A.    Yes.

 3         Q.    And just for the record, where was that?

 4         A.    That was on Orange Street in New Haven,

 5    Connecticut.

 6         Q.    And where do you live now?

 7         A.    Eastern Street.

 8         Q.    Is there a name for the property at which

 9    you live?

10         A.    Bella Vista.

11         Q.    And if I remember right, you were very

12    excited to move into Bella Vista; is that right?

13         A.    Yes.

14         Q.    When did you move into Bella Vista?

15         A.    In 2011.

16         Q.    About a week before the accident?

17         A.    Yes, sir.

18         Q.    If you could, just describe Bella Vista for

19    the jury.  What type of place is Bella Vista?

20         A.    It's an elderly/disabled complex.

21         Q.    Do you know how many buildings are there?

22         A.    Five buildings.  Yes, sir, five buildings.

23         Q.    And how many floors in your building?

24         A.    17 floors.

25         Q.    Is it all handicapped accessible?
```

1    A.   Yes, sir.

2    Q.   And is there some stores there?

3    A.   Yes, sir.  We have a convenience store.  We

4  had a bank.  We have a hair salon.  Yeah.

5    Q.   I think you described it as a little

6  community within the community; is that right?

7    A.   Basically a community within a community,

8  yes, sir.

9    Q.   And so I understand, you are in an

10 efficiency, which is pretty small for two people?

11   A.   Yes, it is, sir.

12   Q.   If you could get to a bigger apartment, is

13 there any reason that you -- inside that community,

14 is there any reason you would want to live -- leave?

15 I'm sorry.

16   A.   Only being it's Bella Vista, they have a

17 very long waiting list.  There is a lot of people

18 trying to get into Bella Vista.  There is people

19 already in Bella Vista that have more seniority than

20 me that would like to do a lateral move.  So --

21   Q.   Okay.

22   A.   -- it's a process.

23   Q.   Do you remember talking to Mr. Forman at

24 all in this case, one of the experts?

25   A.   Yes, sir.

1    Q.   Right.  Today, this morning, he testified

2    that he didn't even consider Bella Vista as a place

3    for Omar to live.  Would you be happy living there

4    with Omar?

5    A.   If we had more room.

6    Q.   If you had more room.  Yeah, obviously,

7    because it's a little bit small right now.  Okay.

8    But it's a good place to live?

9    A.   It's safe.

10   Q.   It's safe, okay.  And your apartment that

11   you have now, it's handicapped accessible; for

12   instance, the bathroom and things of that nature?

13   A.   It's handicapped accessible being that the

14   doors are wide enough for a wheelchair to get in,

15   but the cabinets are not made for a wheelchair to go

16   under.  So maybe that's why some people might not

17   consider it handicapped accessible.

18   Q.   Okay.  I am going to bounce around a little

19   bit just so I don't repeat a lot of questions.

20   Okay?  I just want to talk to you about Omar's

21   substance abuse issues before the accident.  He

22   definitely had some troubles along the way with

23   regard to substances?

24   A.   Okay, yes.

25   Q.   Did you tell Mr. Rush that you were not

1   aware of whether he used cocaine or not?

2        A.   No, I wasn't aware of cocaine usage.

3        Q.   Okay.

4        A.   I know about heroin usage.

5        Q.   Yesterday Dr. Myers told us that he learned

6   somewhere -- and I don't think it was in a direct

7   conversation with you, but he saw somewhere that you

8   had said Omar had used crack cocaine two days before

9   this accident.  Is that possible?  Did you know

10  anything about that?

11       A.   No, that didn't come from me, Mr. Hickey.

12       Q.   I didn't think so because you told me at

13  your deposition you had no idea about his use,

14  right?

15       A.   No.

16       Q.   So Dr. Myers must have been wrong?

17       A.   He must have been wrong because that did

18  not come from me.

19       Q.   Now, obviously before -- strike that.  I'm

20  sorry.  Mr. Forman gave an estimate today that Omar

21  helped you perhaps about 25 hours a week before the

22  accident.  Does that sound fair?

23       A.   Maybe more than that.

24       Q.   Maybe more.  Okay, because he did the

25  cooking, the cleaning, the laundry?

1    A.    He did everything.

2    Q.    And I'm trying to be respectful of your

3    privacy here, but obviously you had a relationship

4    that was husband and wife?

5    A.    Yes, sir.

6    Q.    You didn't treat Omar like a child, did

7    you?

8    A.    No, sir.

9    Q.    You had a sexual relationship with him; is

10   that right?

11   A.    Yes, sir.

12   Q.    You didn't check up on him on where he was

13   going every day and tell him where he could go or

14   where he couldn't go?

15   A.    No, sir.

16   Q.    All right.  You didn't think of him as a

17   teenager, did you?

18   A.    No, sir.

19   Q.    He was a man, right?

20   A.    My husband.

21   Q.    And, matter of fact, you were completely

22   shocked and surprised by this accident, weren't you?

23   A.    Yes, I was.

24   Q.    What's the first thing you thought when you

25   heard Omar had climbed a catenary tower?

1    A.    The first thing I thought is it had to have

2  something to do with nature.   My husband loves

3  animals.   Anyone who knows Omar knows he has a very

4  fond affection for animals.   So my thinking was he

5  had to be looking at some type of animal.

6    Q.    Before you thought of that, didn't you

7  think of something else as your first reaction?

8    A.    Okay, I'm not following you, Mr. Hickey.

9    Q.    When I took your deposition, do you

10  remember I asked you what your initial thought was

11  when you heard the news?  Do you remember I asked

12  you that?

13    A.    No, sir.   To be honest with you, I don't.

14    Q.    Okay.

15         MR. HICKEY:   Your Honor, I have the

16  original.

17         THE COURT:   Certainly.

18    A.    What am I looking for?

19    Q.    I'm going to tell you in one second.

20    A.    Okay.

21    Q.    If you could turn to page 38.   Can I help

22  you with that, Ms. Davis?

23    A.    38.   I'm there, sir.

24    Q.    Okay.   So if you go down -- I hope it has

25  line numbers on the side.

1    A.    Yes, sir.

2    Q.    And I will read the question at line 8,

3    okay?

4    A.    Okay, sir.

5    Q.    "Question:  What was -- what was your

6    reaction when you found out that Omar had been on a

7    railroad catenary or tower and had come into contact

8    with the electrical wires?"  Could you reading your

9    answer?

10   A.    "My first thought was what in the hell was

11   he doing on the tower.  Then, knowing Omar, I had

12   figured he was looking at some type of animal.  He

13   loves animals."

14   Q.    You read that kind of fast.  I don't know

15   if our court reporter got it.  Can you just read it

16   a little slower.

17   A.    Yes, sir.  "My first thought was what in

18   the hell was he doing on the tower.  Then, knowing

19   Omar, I had figured he was looking at some type of

20   animal.  He loves animals."

21   Q.    And this is something you never thought of

22   happening in the future, right?  You didn't have a

23   concern that this would ever happen?

24   A.    No.

25   Q.    I just want to talk to you about one last

```
 1   issue here.  You understand that your claim in this

 2   case is for the harm that's been done to you and

 3   your marriage, right?

 4       A.   Yes, sir.

 5       Q.   And part of that is Omar -- I guess from

 6   what you told Mr. Rush, Omar not living with you and

 7   living with his brother?

 8       A.   It has presented a hardship to me by not

 9   having -- something happened.

10            THE COURT:  You may have hit the bottom

11   of the mic.

12            THE WITNESS:  Thank you, sir.

13       A.   It has been a hardship for me not having my

14   husband there to help me as he did before.

15       Q.   Okay.  And I want to give you an

16   opportunity to perhaps add to your answer there and

17   explain to the jury why it is that Omar is not

18   staying with you.  That's because of an incident in

19   December of 2014; isn't that right?

20       A.   Okay, I'm not following you, sir.

21       Q.   Okay.  Well, let me ask you this:  Is Omar

22   on your lease?

23       A.   Actually, no, because he was in the

24   hospital.

25       Q.   Right.  But he had moved in for about a
```

1    week before the accident?

2        A.    About a week.

3        Q.    Okay.  And there have been instances along

4    the way with security where he's been told not to be

5    there because he's not on the lease; isn't that

6    right?

7        A.    Well, Omar had -- someone from the facility

8    had gotten into it with Omar and they had like a

9    little verbal altercation.

10       Q.    Okay.  And then in December of 2014 there

11   was an incident where a complaint was lodged against

12   Omar for something that he did at the building;

13   isn't that right?

14       A.    A complaint about what?

15       Q.    That Omar had been caught on video stealing

16   copper out of the laundry rooms in the building.

17       A.    Okay.  No, I'm not -- you said December

18   of 2014?

19       Q.    Correct.  Do you know a William Johnson?

20       A.    William Johnson?

21       Q.    Is he the building manager where you are?

22       A.    No. That's not my building manager.

23       Q.    Okay.

24       A.    William Johnson?  No, sir.

25       Q.    Is there security at your building?

1       A.      There is security at Bella Vista, yes, sir.

2       Q.      Okay.   And you weren't aware that Omar had

3   been arrested for stealing copper out of the washing

4   areas and they had caught it on the video?

5                   THE COURT:   Just a moment.   Is there an

6   objection?

7                   MR. RUSH:   It's improper impeachment.

8   Character evidence.

9                   THE COURT:   Let me do this, ladies and

10  gentlemen.   We'll just give you a brief break so I

11  can pursue this with counsel.

12                  (Jury exited the courtroom.)

13                  THE COURT:   All right.   So tell me a

14  little bit about where this is going and what the

15  concerns are.

16                  MR. HICKEY:   Well, I'm almost done, your

17  Honor.   It's very simple.   I think the jury needs to

18  know at least part of the reason why Mr. Colon is

19  not living with Ms. Davis is that he's not supposed

20  to be there.   And I have in good faith an incident

21  investigation report from the New Haven Police

22  Department.   I don't know how this could apply to

23  anyone else, quite frankly.   It says -- it describes

24  Milton Omar Colon as a friend of Ms. Davis.   It

25  describes him as being in a wheelchair because he

1424

```
1    lost both legs.  It was on video.  So I think I have
2    a good faith basis to ask the questions.  Quite
3    frankly, I am surprised that the witness doesn't
4    know about this.  I thought that she would know
5    about it.
6              THE COURT:  Can I see the report,
7    please?
8              MR. HICKEY:  Absolutely.
9              THE COURT:  Mr. Rush, are you familiar
10   with this incident or have this report?
11             MR. RUSH:  I have not seen that report.
12   I'm aware that he's had an altercation.  He is, in
13   fact, living in the apartment.  That statement is
14   incorrect.  But he has had an altercation.  I'm
15   aware that he's had an incident.  Under Rule 404 I'm
16   not sure that this is proper impeachment for crime,
17   wrongs or other acts.  This is certainly hearsay.
18   That report is hearsay.
19             THE COURT:  So I'm going to read it and
20   then I want to hear more from you.  But you do not
21   or did not have a copy of this report?
22             MR. RUSH:  I don't think I have ever
23   seen that report.  I am aware he had a problem.
24             THE COURT:  Okay.  So I have reviewed
25   the report.  Here's the concern I have, is why -- if
```

```
1    this is being offered solely for purposes of showing
2    why he's not living -- or doesn't spend as much time
3    as they might like at the Bella Vista apartment, it
4    seems to me that could be established -- could have
5    been established simply by saying was there an
6    altercation at one point in which it was made clear
7    to him that he could no longer -- he couldn't be
8    there at the apartment.  It seems to get into this
9    fact of the reasons for the altercation being this
10   theft.  That doesn't seem to me to be -- I don't see
11   how that relates to her issues in terms of why she
12   can't spend time with him.
13           MR. HICKEY:  Well, your Honor, I gave
14   her an opportunity.  I said, do you know why, and
15   she said no, and then I think it's fair
16   cross-examination to then say to her, well, isn't it
17   true based on that report.  I mean she is the tenant
18   there.  I can't imagine she was not made aware of a
19   problem with someone they describe as her guest.  So
20   I think that's -- I mean I gave her an opportunity,
21   quite frankly, to say yes, that Omar was not on the
22   lease, that he had had problems with security.  And
23   I would have left it alone, quite frankly.  So
24   obviously I'm not perfect and -- you know, I mean if
25   we go back and read the transcript, but I thought I
```

1    tried to give her an opportunity to explain to this

2    jury that there is more going on here than just his

3    physical limitations with regard to their --

4              THE COURT:  Yes, I understand there is

5    more going on in the sense that, you know, he's been

6    told -- the report says he was not on the lease and

7    was told by security several times not to be on the

8    property.  That's one thing.

9              MR. HICKEY:  Right.

10             THE COURT:  But going into the

11   additional aspects that he stole copper and,

12   apparently, according to this report, admitting it,

13   and then fencing it elsewhere, that seems to me to

14   be the issue that is kind of fairly prejudicial.

15             MR. HICKEY:  Then I won't ask another

16   question, your Honor.  I won't ask another question.

17             MR. RUSH:  Well, your Honor, the problem

18   I have, it is hearsay.  If you will take argument

19   now, I will give you argument.

20             THE COURT:  No, go ahead.

21             MR. RUSH:  Rule 609 deals with

22   impeachment by evidence of a criminal conviction.

23   An arrest report is not a criminal conviction.  It's

24   not a finding of guilt.  All it is is a hearsay

25   statement of a police report.  They say they

1    arrested this guy name Omar Milton Colon.  Let's

2    assume it's my client.  But it's only -- it's all

3    hearsay, and the Court -- I would request the Court

4    instruct the jury that there is no admissible

5    evidence to support the accusation that he stole

6    copper because there is no admissible evidence.

7    It's prejudicial under Rule 403.  It's not relevant

8    under Rule 401.  It's not admissible.  Again, it's

9    not admissible as cross-examination of her.  What

10   counsel is trying to do is impeach her credibility

11   by an alleged hearsay criminal act by her husband.

12   That isn't allowed.  It's not a conviction under

13   Rule 609 which requires that there be a conviction

14   within the last ten years.  So it's not a criminal

15   conviction for stealing copper.  And obviously this

16   dovetails with their general theory which you

17   prohibited them from arguing, that he was stealing

18   copper when he went up onto the tower.

19              So the jury should be instructed that

20   there is no admissible evidence to support the

21   accusation made by Mr. Hickey.  Cross-examination

22   doesn't mean you get to bring in hearsay and

23   character evidence and all sorts of other stuff.

24   Character evidence against Mr. Colon to impeach his

25   wife, it doesn't seem that follows.

1    THE COURT:  Is there anything that is

2    probative to your case about his theft?

3    MR. HICKEY:  Your Honor, if I could.

4    THE COURT:  Right.

5    MR. HICKEY:  I'm not offering that

6    report.  Okay?  I'm not offering that report.

7    THE COURT:  Okay.

8    MR. HICKEY:  And I do want to make one

9    other thing clear.  I will represent to the Court

10   that I did not have that report when Mr. Colon was

11   on the stand.  We received that --

12   THE COURT:  Recently.

13   MR. HICKEY:  -- late last week or over

14   the weekend.  So I would have actually not done this

15   this way, but that is the vagaries of trial work,

16   your Honor.  And I don't think I did anything wrong.

17   I'm not offering that report, and I can actually

18   just cease my cross-examination.

19   THE COURT:  I think it's fair game to

20   cross-examine the witness about was there -- wasn't

21   there some kind of altercation that he had, wasn't

22   he told several times by security not to be on the

23   property.  You would have a fair basis to say that,

24   but not to go into --

25   MR. HICKEY:  And that's fine.

 1          THE COURT:  -- any allegation that he

 2    stole property.  And I would Rule on 403 grounds

 3    there.  I think it's more prejudicial because it

 4    could be misunderstood as a comment on the character

 5    of Mr. Colon than any possible probative value it

 6    has with respect to theft activity.

 7          So I think I'm going to bring the jury

 8    back and instruct them, as Mr. Rush suggested, that

 9    there is no admissible evidence that Mr. Colon

10    participated in the theft of copper and that they

11    should not draw any adverse inference concerning his

12    character from the cross-examination that's occurred

13    so far.

14          All right, is that okay with the

15    parties.

16          MR. HICKEY:  That's fine.

17          MR. RUSH:  Yes, your Honor.

18          MR. HICKEY:  So I'm just going to ask --

19          THE COURT:  You can go on, just don't

20    mention the theft of copper.

21          MR. HICKEY:  Just so we're clear, I'm

22    going to ask two more questions.  Isn't it true he

23    is not on the lease.  I think that was already

24    answered.

25          THE COURT:  Yes.

```
 1              MR. HICKEY:  Isn't it true he's not

 2    supposed to be there, and he had security tell him

 3    on numerous questions he shouldn't be there.

 4              THE COURT:  There's certainly good faith

 5    basis for all of that.

 6              MR. HICKEY:  I will leave it at that.

 7              THE COURT:  Just don't mention -- no

 8    more theft of copper mentioned.

 9              Mr. Rush, is that proposal acceptable to

10    you?

11              MR. RUSH:  Yes, sir.

12              THE COURT:  All right, so we'll bring

13    the jury back in.  Thank you.

14              (Jury entered the courtroom.)

15              THE COURT:  All right.  Welcome back,

16    ladies and gentlemen.  Please be seated.

17              So I think we have resolved this issue.

18    I'm just going to tell you this:  There is no

19    admissible evidence of Mr. Colon's participation in

20    any theft of copper, and any suggestion from the

21    cross-examination of a theft of copper should be

22    disregarded by you and should not be considered in

23    any event as to Mr. Colon's character in this case.

24              Okay, please proceed.

25              MR. HICKEY:  Thank you, your Honor.
```

1    Q.    Ms. Colon, just a couple of more questions.

2  So Mr. Colon was never on your lease?

3    A.    That is correct.

4    Q.    And you haven't added him at any time since

5  the accident to the lease?

6    A.    That is correct.

7    Q.    And security has told him on numerous

8  occasions that he's not supposed to be on the

9  property; isn't that fair?

10    A.    That's correct.

11    Q.    Okay.  Thank you, ma'am.

12            MR. HICKEY:  I have nothing further,

13  your Honor.

14            THE COURT:  Mr. Reed.

15            MR. REED:  No questions, your Honor.

16            THE COURT:  Okay, Mr. Rush.

17  REDIRECT EXAMINATION

18  BY MR. RUSH:

19    Q.    Ms. Davis, have you enjoyed living at Bella

20  Vista?

21    A.    Yes, I have.

22    Q.    And has Omar in fact been living with you

23  at least half of the time -- or approximately half

24  of the time over the last three years at Bella

25  Vista?

1    A.    Yes, he has.

2    Q.    And does he also spend about half his time

3 at his brother's house?

4    A.    Yes, he does.

5    Q.    Okay.  Is the apartment that you have now

6 suitable for you and Omar to live in full-time

7 together?

8    A.    No, it isn't.

9    Q.    Okay, thank you.

10    A.    You are welcome.

11              THE COURT:  Anything else?

12              MR. HICKEY:  No, your Honor.

13              THE COURT:  Thank you, Ms. Davis.  You

14 can step down.

15              THE WITNESS:  Thank you.

16              THE COURT:  Wait a minute, help you out.

17              All right, do we have another witness?

18              MR. RUSH:  Yes, your Honor.  I'm going

19 to read the excerpt of the deposition.  We have a

20 blueline, redline version that the parties have

21 designated.  I'm not aware of any pending objections

22 to it.

23              THE COURT:  Okay, is this Mr. --

24              MR. RUSH:  Stephen Berrang.  He's the

25 corporate financial representative.

```
 1                 THE COURT:  Okay.

 2                 MR. RUSH:  And that should take us

 3   pretty close to the end.

 4                 THE COURT:  Okay.  And do we have a

 5   video of that or just a reading?

 6                 MR. RUSH:  Just the paper, Judge.

 7                 THE COURT:  So you will just be going

 8   through and doing question and answer throughout.

 9                 MR. RUSH:  Yes, sir.

10                 THE COURT:  You may proceed.

11                 MR. RUSH:  Thank you, your Honor.

12             S T E P H E N    B E R R A N G,

13   Testified via deposition as follows:

14                 MR. RUSH:  "Stephen Berrang, having been

15   having first been duly sworn, was deposed and

16   testified as follows:

17   DIRECT EXAMINATION

18   BY MR. RUSH.

19       Q.   State your name, sir.

20       A.   Stephen Berrang.

21       Q.   Mr. Berrang, my name is Brian Rush.  I am

22   the attorney for the plaintiff.  I'm going to ask

23   you some questions today.  If they're unclear, would

24   you ask me to rephrase them?

25       A.   I will.
```

1    Q.    Okay.  And you're real good at projecting

2  your voice, so that's good."

3              THE COURT:  We're getting a lot of

4  feedback.  Can you adjust the mic a little bit.

5              MR. RUSH:  Maybe if I push it down.

6              THE COURT:  Volume down a little bit.

7  Try again.

8              MR. RUSH:  Is it working?  Testing 1, 2.

9              THE COURT:  Is that better?  Okay.  All

10  right.

11              MR. RUSH:  Sorry.

12    Q.    "Okay.  And you are real good at projecting

13  your voice, so that's good.  Can't take down head

14  shakes or head nods, so I think you will answer my

15  questions yes, no, and then explain or whatever

16  appropriate answer you determine.  Fair enough?

17    A.    Yeah.

18    Q.    In answering my questions you might leave

19  your attorney time to object in case I ask a

20  question that he finds objectionable.  Fair enough?

21    A.    Yes.

22    Q.    If I ask you a question and you answer it,

23  I'm going to assume that you understand the question

24  fully when you answer it.  Fair enough?

25    A.    Yes.

1    Q.    What do you do for a living, sir?

2    A.    I'm director of capital program management

3    for the MTA.

4    Q.    Okay.  And what do you do in that capacity

5    for the MTA?

6    A.    I am responsible for the development and

7    management of the MTA's five-year capital program.

8    Q.    What is your work address?

9    A.    2 Broadway, New York, New York.  We just

10   moved, so I am uncertain of the ZIP Code.

11   Q.    Where were you previously before you moved?

12   A.    345 Madison Avenue."

13          MR. RUSH:  Next page is page 9, line 14.

14   Q.    "How many years is that total since you

15   left the University of Texas?

16   A.    29 and a half years, approximately.

17   Q.    Okay.  On a day-to-day basis, what do you

18   do at MTA for the last four years?

19   A.    For the last four and a half years I have

20   -- at the MTA I have managed the five-year capital

21   program for the MTA.

22   Q.    What is the five-year capital program for

23   the MTA?

24   A.    The MTA every five years develops and

25   proposes a five-year capital program that outlines

1   its basic capital investments for the subsequent

2   five years for the MTA operating agencies.

3       Q.   And are you then responsible for generating

4   the budget?

5       A.   I am responsible, in concert with the

6   operating agencies, in generating the five-year

7   program.

8       Q.   Who are the operating agencies?

9       A.   New York City Transit, MTA Bus, Long Island

10  Railroad, Metro-North Railroad, Bridges and Tunnels

11  Authority, and the MTA Capital Construction."

12           MR. RUSH:   Next page is page 11, line

13  14.

14      Q.   "What are the railroad entities or railroad

15  agencies that interact with the MTA that MTA manages

16  through its overall process?

17      A.   The MTA has two corporate subsidiaries that

18  are -- provide commuter rail service.  One is Long

19  Island Railroad and the other is Metro-North

20  Railroad.

21      Q.   And using the concept of railway to include

22  anything involving trains and tracks or -- well,

23  trains and tracks, you also have a subway system in

24  New York?

25      A.   We also -- we have a subsidiary of New York

1   City Transit that operates the New York City Transit

2   subway system, and we have a subsidiary that

3   operates the Staten Island railway system called

4   Staten Island Railway.

5       Q.   Okay.  What is the MTA?

6       A.   The MTA is a public benefit corporation,

7   defined by public law, set up to serve as a

8   corporate parent to various subsidiaries.

9       Q.   What is the MTA's functions in regard to

10  commuter rail?

11      A.   The MTA, in regard to all of its corporate

12  subsidiaries, provides any funding rule or

13  passthrough for funding.  It also provides an

14  oversight rule and it also provides sort of

15  strategic goals and management functions."

16          MR. RUSH:  Line 23, page 12.

17      Q.   "Strategic goals is different from

18  management?

19      A.   Strategic goals, strategic management.  We

20  don't manage on a day-to-day operation, so

21  everything we do is strategic.

22      Q.   What else?

23      A.   That would be it, I believe.

24      Q.   You also acquire, negotiate, purchase and

25  acquire capital equipment on behalf of the --

1    A.    The agencies do.

2    Q.    The agencies do?

3    A.    The subsidiaries do."

4          MR. RUSH:   Line 21.

5    Q.    "Let's go back to that funding entity.

6  What do you mean by that phrase 'the MTA acts as the

7  funding entity'?

8    A.    The MTA provides the capital funds or the

9  access to the federal funds or PAYGO capital to

10  purchase capital assets for all of its corporate

11  subsidiaries.

12    Q.    How does the MTA provide access to those

13  funds to Metro-North?

14    A.    For MTA bonds, we issue bonds and provide

15  those funds to Metro-North.  For federal funds, we

16  are a conduit through federal funds flow and we

17  provide access to those funds to Metro-North.  And

18  for PAYGO capital we have the funds in hand and

19  provide access to our corporate subsidiaries."

20          MR. RUSH:   Next page is page 19, line 8,

21  by Mr. Rush.

22    Q.    "I am not speaking in these questions --

23  I'm not speaking about any particular bond.  I'm

24  trying to understand the process by which

25  Metro-North may or may not ever receive money which

1    arises from the sale of a MTA bond.  So that's sort

2    of the background.

3            Now, let me begin by asking you a

4    question.  Does Metro-North ever receive any money

5    that arises from the sale of MTA bonds?

6    A.   Metro-North receives the benefit of the

7    sale of MTA bonds.  The bills are actually made paid

8    by the MTA.

9    Q.   How does Metro-North receive the benefit of

10   that?

11   A.   It receives the asset.

12   Q.   So Metro-North does not receive the money

13   directly from the MTA?

14   A.   I do not believe so.

15   Q.   So now my question is, how does that" --

16           MR. RUSH:  That's a fragment, the last

17   question doesn't have an answer.  Okay.

18           The next question is on page 21,

19   beginning at line 6.

20   Q.   "Isn't it true that in 2010, 2011, MTA

21   would use MTA funds to purchase assets which would

22   then be owned by Metro-North Railroad?

23   A.   Yes.

24   Q.   Isn't it true that that continues to the

25   present date in 2014, that same process?

1   A.   That's true as it relates to assets, fixed

2   assets in the state of New York, correct.

3   Q.   But to be clear, these fixed assets in the

4   state of New York are owned by Metro-North Railroad,

5   but are paid for by MTA funds?

6   A.   Yes.

7   Q.   Now, similarly, are there trains that

8   operate in both New York and Connecticut which have

9   been purchased by MTA funds, but are owned by

10  Metro-North Railroad?

11  A.   There are.

12  Q.   Same dates 2010, 2011?

13  A.   There are rolling stock which is purchased

14  that operates in both Connecticut and New York that

15  is subject to the amended restated service

16  agreement.  65 percent of that rolling stock that

17  operates on the New Haven line, or in Connecticut,

18  is paid for by Connecticut and the other 35 percent

19  is paid for by New York.

20  Q.   When you say "paid for by New York," you

21  mean paid for by the MTA?

22  A.   Paid for by the MTA.

23  Q.   Even though it's owned by Metro-North

24  Railroad?

25  A.   Yes.

1  Q.   When you say 'rolling stock,' are you

2  speaking of trains and other large train-like

3  vehicles that move on rails?

4  A.   I am speaking of trains and coaches,

5  locomotives and electric-powered coaches.

6  Q.   Okay.  If the MTA did not purchase these

7  electric-powered rolling stock and trains,

8  Metro-North would not be able to buy those trains;

9  is that true?

10  A.   If we did not fund.  We don't purchase the

11  trains, we fund the purchase of the trains.

12  Q.   What's the difference in your mind between

13  funding it and purchasing it?

14  A.   One entity issues a procurement.  One

15  entity issues a procurement.  That would be

16  Metro-North.  The other entity, the corporate

17  parent, the MTA, funds the purchase."

18         MR. RUSH:  Page 25, lines 4, by Mr.

19  Rush.

20  Q.   "In these transactions we have been talking

21  about, MTA controls all of the money for this

22  purchase in the name of Metro-North, correct?

23  A.   You need to restate the question.

24  Q.   What's wrong with the question?

25  A.   Not everything that Metro-North purchases

1    is funded by the MTA.

2        Q.   Because state of Connecticut pays a

3    portion?

4        A.   Correct.

5        Q.   For rolling stock in Connecticut, what

6    percentage of Metro-North rolling stock does MTA pay

7    for?

8        A.   Excluding the branch lines, which are paid

9    for 100 percent by Connecticut, the MTA pays for

10   35 percent of the rolling stock that operates on the

11   New Haven line."

12              MR. RUSH:   Page 27, line 9.

13       Q.   "The New Haven line could not operate

14   without using those capital assets in New York which

15   are owned by Metro-North, but paid for by the MTA,

16   correct?

17       A.   No.

18       Q.   Okay.  Please explain.

19       A.   New Haven line could stop running at the

20   New York/Connecticut border.

21       Q.   Yes, but as defined by the amended restated

22   service agreement, the New Haven line does not stop

23   at the New York border, correct?

24       A.   Correct.

25       Q.   So in order for the MTA and Metro-North to

1  comply with its obligations under the amended and

2  restated service agreement of 1985, the New Haven

3  line must use fixed assets located in New York,

4  which are owned by Metro-North but have been paid

5  for by MTA, correct?

6      A.   Yes.

7      Q.   The MTA bonds and the money that flows from

8  those bonds is not used for any operating expenses?

9      A.   It is not.  MTA capital is not used for

10  operating expenses."

11          MR. RUSH:  Line 13, page 28.

12      Q.   "Okay.  Was the next item you mentioned

13  federal funds?

14      A.   Yes.

15      Q.   What is the role of federal funds in regard

16  to the MTA?

17      A.   The MTA is a recipient of federal funds

18  that it uses primarily to fund capital assets.

19      Q.   When you say primarily capital assets, what

20  else does the MTA use federal funding for?

21      A.   There are a variety of federal funding

22  sources, which are grants, that could be used for

23  operating activities, but the primary, overwhelming

24  percentage of federal funds received are for the

25  capital program."

1    MR. RUSH:  Page 30, line 6.

2    Q.    "Okay.  Now, you said some of the federal

3    funds are used for operational or operating

4    activities.  What did you mean by that?

5    A.    There are from time to time federal funds

6    that are received for specific grant purposes that

7    can be used for a specific operating expense and a

8    specific project.

9    Q.    In the last five years, from the period of

10   2010 to the present, has the MTA used some federal

11   funds to pay for the operating expenses or

12   activities of Metro-North?

13   A.    Yes.

14   Q.    What type of operational activities of

15   Metro-North has MTA used federal funds to pay for?

16   A.    In the aftermath of the Hurricane Sandy

17   there was a substantial provision of federal funds

18   to fund some operating expenses related to the

19   recovery of -- from that storm.

20   Q.    Can you explain how the MTA paid for these

21   Metro-North operational activities?

22   A.    It is paid for in the normal course of

23   business.

24   Q.    What does that mean?

25   A.    We have the business service center which

1    pays the bills for the MTA.

2         Q.   Are these bills of MTA or are they bills of

3    Metro-North that we're talking about now, these

4    operational activities related to Hurricane Sandy,

5    for example?

6         A.   They are bills of Metro-North that are paid

7    for by the MTA.

8         Q.   Earlier you said MTA doesn't pay for

9    operational expenses of Metro-North.  That's not

10   100 percent correct.

11        A.   That is not what I said.

12        Q.   What did you say then?

13        A.   I said --

14        Q.   Sometimes I can't remember.

15        A.   The MTA does not pay for operational

16   expenses in Connecticut, -does not fund operational

17   expenses in Connecticut."

18             MR. RUSH:  Page 34, line 1.

19        Q.   "We're talking about operational activities

20   now.  Okay?  So let's talk about operational

21   activities, just so I understand.  We're not talking

22   about capital now, we're talking about operational

23   activities of Metro-North.  Is that clear?

24        A.   In this particular instance, yes.

25        Q.   Okay.  So does the MTA use any federal

1  funds to pay for any operational activities of

2  Metro-North ever?

3      A.   Yes.

4      Q.   When was the last time they did that?

5      A.   As I said earlier, for the recovery of

6  Sandy, the aftermath of Sandy, there were federal

7  funds made available to reimburse the MTA for

8  certain operating expenses that were related to the

9  recovery of -- from that storm.

10             MR. RUSH:   Page 35, line 21.

11     Q.   "Okay.   It would not be out of the ordinary

12 for the MTA to use federal funds to pay for

13 Metro-North's operating activities if the federal

14 government had authorized that kind of expenditure

15 in 2010 or 2011?

16     A.   The MTA generally does not use federal

17 funds to fund operating and maintenance activities."

18             MR. RUSH:   Bottom of page 36, line 21.

19     Q.   "You only use those federal funds to

20 purchase capital assets?

21     A.   We generally use those federal funds to

22 purchase capital assets.

23     Q.   For Metro-North and your other agencies?

24     A.   For Metro-North and other subsidiaries,

25 yes."

```
1           MR. RUSH:  Page 40, line 8.

2      Q.    "Isn't it true that MTA is a local

3  recipient of the funds, as you have talked about

4  today?

5      A.    The funds, federal funds, actually flow

6  through local regional entities set up under federal

7  law, but the MTA is the recipient of those funds.

8      Q.    Isn't it true that, in short -- just

9  keeping it short, isn't it true that the MTA is a

10 recipient of those federal funds?  Yes or no?

11     A.    The MTA is a recipient of federal funds.

12 They flow through this local develop -- this local

13 organization set up by -- under federal law for the

14 purpose of allocating these funds, but the MTA is

15 the recipient of those funds, yes.

16     Q.    And in New York and Connecticut, what is

17 this local group that stands between the federal

18 funds and the MTA?

19     A.    There are various of these groups.  There

20 is one for New York City, there is one for northern

21 Westchester, one for Orange County.  There are

22 probably several in Connecticut that I am not

23 familiar with since federal funds used for

24 Connecticut projects do not come through the MTA.

25     Q.    Okay.  So for a Metro-North purchase, isn't
```

1    it true that MTA first has to pay for that purchase

2    from capital funds and then the MTA obtains

3    reimbursement from federal funds either directly

4    from the United States government or through this

5    local group that you spoke of?

6        A.   Yes.

7        Q.   If we're talking about operating activities

8    and they are qualified under federal law, isn't it

9    true that the MTA would first pay for those

10   operating activities, whatever they are, and then

11   seek reimbursement from the federal government

12   either directly or through this local organization

13   you mentioned?

14       A.   Yes.

15       Q.   Isn't that true?

16       A.   Yes."

17            MR. RUSH:   Line 10, page 42.

18       Q.   "Was the next thing you mentioned state

19   funding?

20       A.   I think I mentioned PAYGO capital."

21            MR. RUSH:   Line 16.

22       Q.   "Okay.  What is PAYGO capital?

23       A.   PAYGO capital is cash.

24       Q.   What is the source of this PAYGO capital

25   cash?

1    A.    MTA revenues.

2    Q.    What is the source of those revenues?

3    A.    It's a wide range of sources, including

4  taxes, fares, grants, et cetera."

5            MR. RUSH:   Page 44, line 13.

6    Q.    "Okay.  The next item you describe is

7  fares.  What do you mean by fares?

8    A.    Fares that are charged in the MTA service

9  districts.

10    Q.    What are the MTA service districts?

11    A.    Metro-North territory, Long Island

12  territory, City of New York territory, Staten Island

13  Railway territory.

14    Q.    Does it include anything from Metro-North?

15    A.    Yes.  As I have said earlier, Metro-North

16  territory.  Yes, service district.

17    Q.    The MTA receives funds from the fares that

18  MTA collects from passengers to ride on the

19  Metro-North Railroad?

20    A.    Yes."

21            MR. RUSH:   Line 16, page 45 -- or line

22  13 for the question.

23    Q.    "Isn't it true that in regard to

24  Metro-North fares, all these fares are collected for

25  passenger services rendered by Metro-North to its

1    passengers?

2        A.    I'm not sure I understand the question.

3        Q.    Okay.  Well, isn't it true that the phrase

4    'fares' covers the amount of money that passengers

5    pay to Metro-North in order to ride on their train,

6    the Metro-North trains?

7        A.    For Metro-North fares, yes.

8        Q.    Okay.  And those Metro-North fares

9    ultimately are transferred into MTA and become part

10   of MTA funds; is that true?

11       A.    Yes, that is true."

12            MR. RUSH:  Page 46, line 14.

13       Q.    "Are there direct state funds paid to the

14   MTA?

15       A.    Yes.

16       Q.    In the form of some sort of legislative

17   appropriation?

18       A.    They can be legislative appropriation, yes.

19       Q.    What else can they be if they're state

20   funds?

21       A.    They also could be a bond resolution."

22            MR. RUSH:  Page 47, line 5.

23       Q.    "Does Metro-North receive state of New York

24   funds that go to the MTA and then are transferred to

25   Metro-North?

1        A.    The MTA pays the bills of Metro-North, so I

2   believe the funds come to MTA.

3        Q.    Okay.   When you say "pays the bills," do

4   they pay all of the bills of Metro-North?

5        A.    I believe that is the case, yes.

6        Q.    And so that -- isn't it true then that the

7   MTA pays to Metro-North the costs of the salaries of

8   its people who work for Metro-North?

9        A.    I don't believe we pay money to

10  Metro-North.   I believe we pay the obligations.

11       Q.    Okay.   Isn't it true then that a

12  Metro-North employee working on the Metro-North New

13  Haven line receives a paycheck from the MTA?

14       A.    Yes.

15       Q.    Similarly, the Metro-North employees who

16  work on the New Haven line receive various infringe

17  benefits, such as retirement, that is paid for by

18  MTA?

19       A.    I believe that to be the case, yes."

20            MR. RUSH:   Page 48, line 25.

21            THE COURT:   So it may be we need to

22  probably -- unless we are right at the very end --

23  you've got a little bit more to go, so we may have

24  to pick up tomorrow on this.   So we're at the 4:00

25  hour.   You may have places you need to be.   So,

```
1   ladies and gentlemen, we're going to excuse you for
2   the day with the same old warnings not to talk about
3   the case or do any kind of research or engage in any
4   kind of conversation with anyone you might see here
5   in the courtroom, and we thank you.  We'll see you
6   tomorrow morning.
7                    (Jury exited the courtroom).
8                    THE COURT:  Please be seated.  Okay.  So
9   it looks like there's a couple of items we want to
10  talk about.
11                   The MTA police report, do we have
12  copies?  So before we have a broader discussion
13  about this, I wanted to at least clarify one point
14  in terms of the similarity of circumstances, which I
15  know is a key issue here in terms of the potential
16  admissibility.  As the Court has ruled, keeping in
17  mind, as I noted before, that I did not have this
18  report in previously ruling on the FRA casualty
19  reports, and also in concluding that plaintiff would
20  -- in that order that I issued, I believe it's No.
21  439, that plaintiff would need to seek leave of the
22  Court if it intended to go into other prior
23  incidents to make sure they were indeed similar
24  circumstances, on the question of whether this is a
25  similar circumstance, it looks to me from page 3 of
```

the report that essentially what occurred is in the

very early morning hours of July 1st of 2001, a

trespasser climbed up onto catenary No. 524, which

is somewhere in Fairfield County, in the Norwalk

area it looks like, and then that person crossed on

top of that catenary pole across the tracks to I

think the south side of -- if I have that right.

MR. RUSH:  I think it's the reverse,

your Honor.

THE COURT:  Okay, started on the north

and crossed over to the south side of the tracks,

and at some point in time when he was closer to that

side -- well, actually it looks like he was

recovered from the north side of the tracks, and the

witness says they were walking along the south side.

So it looks like a south to north progression here.

And it appears that he was subjected to a severe

electric burn injury, 75 percent of his body, and

that on the side that he was headed towards there

appeared to be a fenced compound that was checked

and found to be secure.

It did not appear to me from this

report, so far as I can tell, that he entered and

gained access to it by having to -- so far as this

report reflects, to enter a fenced compound, but

1    maybe I am misreading the report, and I know you all

2    have probably studied this a bit more than I have.

3           The bottom of page 3 says the pole on

4    the Track 3 side is within the fenced compound.  And

5    at the top of page 3 it says on the north side of

6    the track adjacent to Track No. 3.  That supports my

7    conclusion that it appears to me from this report

8    that he was headed towards the fenced compound, but

9    didn't have to go through the fenced compound to

10   gain access to the catenary tower on the south side

11   of the tracks.

12          So, anyway, just correct me if I am

13   wrong about those circumstances there.  And if I am

14   correct about those circumstances, this seems to me

15   to be at least arguably within the range of similar

16   circumstances, this particular incident.

17          So then that raises the issue of, well,

18   what is to be done about this particular incident.

19   This report, although it's an -- I guess a statement

20   of a party opponent, an MTA police report, or the

21   argument could be made that way, it was never

22   noticed as being one of plaintiff's trial exhibits

23   in the case, and, indeed, it appears clear that it

24   was never part of this court record previously.  It

25   was part of the discovery production I understand

```
1    many months -- or many years ago, it looks like.  It

2    looks like this report was printed in August

3    of 2014, presumably for purposes of litigation, but

4    that it was never noticed as a trial exhibit in the

5    case.

6              And I didn't understand Mr. Rush to be

7    suggesting that it was going to be now offered as a

8    trial exhibit, but that he wished to simply use the

9    report as a basis for cross-examination of Mr.

10   Wilhelmy in light of Mr. Wilhelmy's testimony during

11   his deposition in which he referred to his own

12   personal knowledge, and that's at page 51 of the

13   Wilhelmy deposition.  And I gather Mr. Wilhelmy is

14   being called as a live witness in the case.

15             MR. RUSH:  Yes, your Honor.  He's

16   supposed to testify tomorrow morning.

17             THE COURT:  So -- and at 51, he's asked:

18   "Has anyone ever told you of any incident where

19   someone has been shocked or burned while climbing on

20   a catenary tower?

21             He answered:  "Yes."

22             And Mr. Rush said:  "How many times?"

23             Answer:  "I responded to one other."

24             Question:  "When was that?"

25             "2001."
```

1    And it appears that he doesn't localize

2    it specifically to Norwalk, but there is reference

3    in the questioning to July 1, 2001, so it seems to

4    me it would be the same incident.  And he says it's

5    in Fairfield County, but not the town of Fairfield.

6    There is not much more questioning there

7    that precedes, except about whether the person who

8    was burned had survived.

9    So my sense -- my inclination is to say

10   that since this was -- that this incident was the

11   subject of prior examination of Mr. Wilhelmy, that

12   it's appropriate to inquire into on the

13   cross-examination of Mr. Wilhelmy, but that the

14   police report itself and the contents of the police

15   report are not themselves admissible evidence in the

16   case for lack of having identified the police report

17   as an exhibit in the case.

18   And the concern I would have if I were

19   to let the police report in now would be the

20   prejudice to defendants in terms of defending

21   against an exhibit with very specific details there

22   about precisely what happened that defendants were

23   not anticipating having to respond to in the case.

24   So those are my thoughts about it.  My

25   bottom line thought, at least subject to arguments

1    of counsel -- I guess I will say not my bottom line,

2    my initial inclination is not to allow the

3    introduction of the police report because it wasn't

4    noticed as an exhibit, but not to foreclose Mr. Rush

5    from asking and inquiring about an incident of

6    July 1, 2001, during the examination of Mr.

7    Wilhelmy.

8              Any thoughts?

9              MR. RUSH:  I'm checking to see if we had

10   listed it somewhere else.  I don't know if we have.

11   I'll try to determine that promptly, your Honor.

12   I'm halfway through my exhibit list.  But we did

13   specifically list as Exhibits 27 and 28, the summary

14   of Federal Railroad Administration casualty reports,

15   and 28 is the shock/burn reports.  This was when --

16   until Wednesday or Thursday before trial both of

17   those summaries were still in play and before the

18   Court and had not been stricken.  When I arrived at

19   the pretrial, the third pretrial on Thursday

20   morning, the Court announced it had stricken the FRA

21   summary I think the day before, but I was in transit

22   the day before.  Obviously at that point the joint

23   trial memorandum deadline had passed two months

24   before.  But this particular incident report was

25   part of Exhibit 28 in the sense that we had made a

1  summary of at least Metro-North's report to the FRA

2  of the same event, and the Court struck that on the

3  assumption that there was no verifying evidence.

4        When I got a chance over the weekend --

5  I think it was the weekend just passed -- I went in

6  the Wilhelmy file to get ready for his testimony and

7  I located this.

8        So the Exhibit 28 incorporated

9  specifically this event, the July 1st, 2001,

10  shock/burn incident, and you struck that based on

11  Metro-North's assertion that that event was not

12  substantially similar.  Their assertion was

13  incorrect, if your interpretation is correct under

14  this incident report.

15        And for that reason I would ask the

16  Court to reconsider its striking of that portion of

17  the summary so that at least we can put in that

18  portion of the FRA summaries that corresponds

19  exactly with this report on July 1st, 2001, because

20  there is no reason to strike a substantially similar

21  event on that day.

22        And as a practical matter, as long as

23  the summaries were in evidence, and they were in

24  evidence from May and June and July, up until

25  August 2nd or 3rd, there would have been no need to

1459

```
1   necessarily refer to this particular document, only

2   after the Court had struck that portion of our --

3   the entire FRA summary.

4              THE COURT:  I have 28 in front of me

5   now.  I am paging through it.  I don't find -- first

6   of all, it certainly does not include this MTA

7   police report.

8              MR. RUSH:  No, it does not.

9              THE COURT:  And it doesn't include any

10  of the additional information -- or very little of

11  the additional information that would be in the

12  police report.  It's a single line.  The summary is

13  many different instances tracing back to 1985, and

14  there is a single line that includes all reported

15  trespass injuries.  Another one for all reported

16  shock/electric burn injuries.

17             MR. RUSH:  I'm sorry, there are two

18  summaries.  One is 27.  27 is the shock/burn.

19             THE COURT:  Okay, you have been talking

20  to me about 28.  I can look at 27 as well.

21             MR. RUSH:  Yes, your Honor.  You struck

22  both of those on the 2nd.

23             THE COURT:  Okay.  I see.  Okay, so

24  looking at 27, there is -- for 27, is there an

25  incident report from the 2001 -- an FRA report
```

1   there?  I don't seem to have it in my --

2           MR. RUSH:  I'll get it.

3           THE COURT:  At least in my reproduction

4   I don't have the FRA one page casualty report for

5   that incident of July 1, 2001.  I have many of the

6   other dates.  It might have been a copier error.

7           MR. RUSH:  I don't know, your Honor.  It

8   seems to be not included in this version either.

9           MR. RUSH:  And also attached -- well,

10  there is an expert of the Wilhelmy deposition also

11  attached, but I don't see the actual report yet.

12          THE COURT:  So in terms of what it is

13  you propose as exhibits in the case, I don't have a

14  casualty -- FRA casualty report for the 2001 --

15  July 1, 2001, incident.

16          MR. RUSH:  Yes.  It is included

17  specifically in the summary, in the summary page

18  before the reports.

19          THE COURT:  There might be a summary

20  page, but the primary record is not what's -- a

21  summary has to be based on primary records.

22          MR. RUSH:  Very good, your Honor.

23          THE COURT:  So that's the concern I've

24  got, is we don't have anything in 27 and 28 that

25  sheds light on -- that is the FRA casualty report

1    itself for this incident, and there isn't anything

2    else but the summary based on a report that isn't

3    there.

4              Defense counsel?

5              MR. HICKEY:  Well, your Honor, clearly I

6    think the report wouldn't come in in any event ever.

7    I mean, this is chockful of hearsay.  You know, my

8    understanding of even prior similar incidents, the

9    evidence of them might come in, but I don't think

10   the report would ever become --

11             THE COURT:  Which report?  The police

12   report?

13             MR. HICKEY:  The police report itself.

14             THE COURT:  It's a report of a statement

15   of a party.

16             MR. HICKEY:  I don't think it is.

17             THE COURT:  It's not?

18             MR. HICKEY:  Respectfully, I don't think

19   it is.  This is a recording by an officer of hearsay

20   from other people.  I mean I don't think that this

21   officer recording this would think one day it's

22   going to be used against the MTA because somebody

23   trespassed on their property.  So I mean he's got --

24   so it's chockful of hearsay.  But we would have

25   briefed this, your Honor, is my suspicion.  I mean

1  this would have been a part of the FRA motion, and I

2  think what it does is open up the door to the trial

3  within the trial that we spoke about earlier.  Was

4  the catenary pole that he climbed equipped with a

5  ladder, as many of them are?  I mean, was he at

6  ground level?  Was it above?  I know this area well.

7  I grew up in Norwalk.  It's right near all of the

8  bars.  It's a happening spot down there.  It opens

9  up all kinds of other issues here.  And I don't know

10 how helpful it would be to the jury to find out that

11 a decade earlier, 40 miles away, somebody at

12 4:00 o'clock in the morning did something

13 ill-advised.  It seems to be a stretch when the

14 burden of proof here is constant intrusion at

15 height.  So I just think it's very prejudicial,

16 probative of very little, and we should just stay

17 away from it.

18            THE COURT:  Okay.  Did you want to say

19 anything else on this issue?

20            MR. RUSH:  Not particularly, but as I

21 understand, we have to provide evidence --

22            THE COURT:  If you could just stand,

23 please.

24            MR. RUSH:  I'm sorry.

25            THE COURT:  Thank you.

```
 1              MR. RUSH:  I may be hazy, I haven't seen
 2    the final instructions of the Court, but as I
 3    understand it, the plaintiff has to show evidence
 4    that would have put Metro-North on notice that
 5    trespassers were likely to climb to height.  So I
 6    think this is evidence, as is Wilhelmy's admission
 7    that he was there, that they knew that people were
 8    climbing to height.  So this, along with other
 9    evidence, could combine -- equal the evidence that
10    put them on notice that people were likely to climb.
11              THE COURT:  Okay.  Now, I understand
12    that.  So basically what you are really saying is
13    there is a nonhearsay purpose, a notice purpose --
14              MR. RUSH:  Yes.
15              THE COURT:  -- for the report even if
16    there were a hearsay concern.  But still I am in the
17    position where I have a particular exhibit here that
18    was disclosed by defense and non-notice by plaintiff
19    as an exhibit in the case and, therefore, I'm not
20    going to allow it in for the reasons that we have
21    talked about.  I do think it would be not
22    appropriate to the defense in light of their ability
23    to defend against the particulars of this particular
24    incident here not knowing -- or not believing, until
25    I guess this morning, that there might be an effort
```

1  to introduce the police report into evidence.  But I

2  do think it's appropriate -- this incident of

3  July 1st, 2001, is appropriate for the examination

4  of Wilhelmy, that there has been fair notice there,

5  and it does go to the issue of the notice issue,

6  which is a significant issue in the case.

7         Okay, so I want to turn to another issue

8  then now, the request for admissions.  I think you

9  all have a handout here, courtesy of my law clerk,

10  that essentially includes the verbatim request for

11  admissions that were identified as such in Mr.

12  Rush's July 28th filing.  You will see there is a

13  bunch of boldface and a bunch of underlining.  The

14  boldface text was an effort to reproduce those parts

15  of the actual requests for admission that were not

16  included in the July 28th filing.  And those parts

17  that are underlined, not in boldface, are those

18  parts that were actually included in the July 28th

19  filing by Mr. Rush.

20         So basically for the reasons I said

21  before, it seems to me FRA comes in as a whole or it

22  doesn't, or at least it shouldn't be sliced and

23  diced within particular sentences to leave out

24  words, because that changes the content of what the

25  admission is.

```
 1              So we can look one-by-one at these

 2     particular FRAs.  In the absence of the parties

 3     stipulating, is there an objection to admission of

 4     FRA No. 1?  In other words, the jury would get a

 5     printout of the words of the FRA, there wouldn't be

 6     any kind of boldface or underlining here.  The only

 7     thing I can think of is that the first words of

 8     "this Court has jurisdiction" is kind of irrelevant

 9     to what the jury is looking at, but the rest is in

10     the nature of factual assertions.

11              MR. FINEMAN:  That's fine.

12              THE COURT:  Probably harmless.

13              Mr. Fineman, you okay with that then?

14              MR. FINEMAN:  Your Honor, I would

15     suggest it's harmless, but also redundant of

16     evidence that has already come in.  I don't know why

17     we need a stipulation when the evidence has come in

18     and has not been disputed.

19              THE COURT:  The response is "Defense

20     admit they have entered into certain agreements

21     regarding the operation of the commuter rail line

22     within the state of Connecticut."  Okay.

23              MR. FINEMAN:  That's fine, your Honor.

24              THE COURT:  The next is FRA No. 2, "On

25     or about June 21, 1985, Metro-North and the MTA
```

1  entered into an amended and restated service

2  agreement with the state of Connecticut and the

3  Connecticut Department of Transportation.  A copy of

4  this agreement is attached as Exhibit A."  And

5  that's admitted.

6          MR. RUSH:  That's fine with us, your

7  Honor.  We don't need FRA No. 3 coming up, though.

8  I jumped ahead to let you know.

9          THE COURT:  You don't need that.

10          MR. RUSH:  No, sir.

11          THE COURT:  The next is "Admit or deny

12  that in" -- this is FRA No. 4.  "Admit or deny that

13  in the three years before March 17, 2011" -- it goes

14  on and you all can read it yourselves.  Is there

15  objection?

16          MR. RUSH:  No objection, your Honor.

17          THE COURT:  Are you okay with that,

18  Metro-North?

19          MR. FINEMAN:  Yes, your Honor.

20          THE COURT:  And No. 5, same?  Any

21  concerns?

22          MR. RUSH:  No objection, your Honor.

23          THE COURT:  Okay.  All right, No. 6.

24          MR. RUSH:  No objection, your Honor.

25          The plaintiff doesn't need No. 7 whenever

1  you get to that one.

2          MR. FINEMAN:  I'm sorry, your Honor, we

3  started jumping ahead, too.  We're fine with No. 6.

4          THE COURT:  All right.  No. 7 is out.

5  No. 8?

6          MR. RUSH:  That's okay with us, your

7  Honor.  Okay, with the plaintiff.

8          MR. FINEMAN:  It's fine with

9  Metro-North, your Honor.

10          THE COURT:  Okay, the whole response can

11  come in then.

12          And the last one might be UI.  So Mr.

13  Reed on the hot seat here.

14          MR. RUSH:  Plaintiff has no really

15  interest in that one way or the other.

16          THE COURT:  So we can drop No. 9, can't

17  we, since it's not in plaintiff's interest and I

18  don't think the defendant or the third-party

19  defendant cares about it?

20          MR. FINEMAN:  I think it was our request

21  for admission and we don't need it.

22          THE COURT:  So No. 9 is out.  All right,

23  so we'll have -- we'll prepare a document for No. 1,

24  2, 4, 5, 6 and 8.

25          MR. RINGOLD:  Your Honor, just a

1    technical question.  We've been working with counsel

2    for Metro-North and the MTA on a couple of

3    stipulations as well, and I think we're pretty

4    close.

5              THE COURT:  Great.

6              MR. RINGOLD:  Just again from a

7    technical standpoint, I don't know when your Honor

8    plans on delivering the stipulations, so when should

9    we endeavor to have our stipulations?

10             THE COURT:  Well, when plaintiffs rest

11   the case, and during the defense case you could at

12   any time present a stipulation.  Just as you would

13   call a witness, you could say, we'd like to read a

14   stipulation into the record, and mark it as an

15   exhibit.

16             MR. RINGOLD:  Thank you, your Honor.

17             THE COURT:  Great.  So we'll give you a

18   copy of these FRAs and you can check them over, and

19   then if they're okay, then you can mark them as

20   trial exhibits.  Okay, Mr. Rush?

21             MR. RUSH:  Yes, sir.  Thank you, sir.

22             THE COURT:  Great.  Tomorrow's

23   activities, we've got, it looks like, at least four

24   more witnesses, DelMonte, Crakes, the Russell

25   deposition, and Wilhelmy.  Is that right?

1    MR. RUSH:  We're down to about two and a

2  quarter.  I think there is only about ten pages left

3  on the Berrang deposition, and then we'll do Mr.

4  Crakes, and I imagine he will be less than an hour,

5  and then we'll close out our case with Ms.

6  Rodriguez.

7    THE COURT:  I'm sorry, with whom?

8    MR. RUSH:  Marilyn Rodriguez, the

9  sister-in-law.  And I do not anticipate calling Mr.

10  DelMonte.

11    THE COURT:  So -- all right.  DelMonte

12  is out.  But the Russell deposition and Wilhelmy are

13  out, too?

14    MR. RUSH:  No, Russell is in.  Russell

15  deposition is in.  I'm sorry, I left that off.  I

16  don't have my list in front of me.  So Berrang to

17  finish, Crakes, Russell deposition, and then Marilyn

18  Rodriguez.  By memory, I'm doing it --

19    THE COURT:  Wilhelmy is out.

20    MR. RUSH:  Wilhelmy also.

21    THE COURT:  Wilhelmy is in.  Wilhelmy is

22  a live witness and knows to come?

23    MR. RUSH:  We'll take him sometime in

24  the morning.

25    Was that when you were going to have

1    him?

2              MR. HICKEY:  I think we can get Mr.

3    Wilhelmy here any time.  We'll just tell him he

4    needs -- he can be here tomorrow, and not worry

5    about timing.  There was a thought of calling a Mr.

6    Bernick from the Department of Transportation.  Is

7    that not going to happen?

8              MR. RUSH:  We're not going to call Mr.

9    Bernick.

10             THE COURT:  So that will conclude the

11   plaintiff's case then.

12             MR. RUSH:  Yes.  I don't have my

13   schedule in front of me, but -- I'm always better

14   looking at something, but Berrang to finish, Crakes,

15   Russell depo, Wilhelmy.

16             THE COURT:  And Marilyn Rodriguez.

17             MR. RUSH:  Yes.

18             THE COURT:  Okay.

19             MR. RUSH:  I think she is less than an

20   hour.  I assume Mr. Wilhelmy is less than an hour.

21   Russell deposition is about an hour.  And Crakes and

22   Berrang together I'm hoping no more than an hour.

23             THE COURT:  I see.  Okay.  And then I

24   assume there may be motions at that point.

25             MR. FINEMAN:  Yep.

1    THE COURT:  All right.  Okay, so I will

2    want to hear -- probably hear motions at that point,

3    and then if -- we're still working on the jury

4    charge.  I won't have it for you today, but the jury

5    charge will be ready I think the next day.

6         Assuming we do go forward with the

7    defense case, does the defense have a case at this

8    point?  I know you said you anticipate it being a

9    fairly short case, but can you give anymore details,

10   especially in the event that Mr. Rush is in a

11   position of having to prepare for cross-examination

12   for tomorrow.

13        MR. HICKEY:  Sure, your Honor.  Can we

14   inquire as to the examination of Mr. Wilhelmy?

15   Would that be in the same -- should we do a direct

16   of him while he's on the stand?  Or we can call him

17   again later.  It's at your Honor's pleasure.

18        THE COURT:  Is he somebody who is very

19   local?

20        MR. HICKEY:  He's not.  He actually

21   works down at the Grand Central terminal.  He's like

22   the main guy.  Believe it or not, he's the guy that

23   looks at the big screen and sees where every train

24   is.

25        THE COURT:  That's right?

```
 1              MR. HICKEY:  He can be here.  That's not

 2   the problem.  I think he lives local, but works

 3   distant.  We'll do whatever your Honor wants.

 4              THE COURT:  Mr. Rush, are you okay if

 5   they structure it --

 6              MR. RUSH:  It's not my preference, your

 7   Honor, but I understand he may --

 8              THE COURT:  Then we'll bring him back

 9   then if he can be back.

10              MR. HICKEY:  So if we bring him back,

11   we'll have Mr. Wilhelmy.  Then we may have --

12   honestly, your Honor, we may have one or two other

13   witnesses.  Because Officer Russell is retired, we

14   have access to him.  I will be up front with your

15   Honor, if we play the video, I'm not looking to

16   repeat things for the jury they have heard a lot,

17   and so I don't know that our case will be more --

18   I'm confident in saying our case literally could be

19   as short as half a day, perhaps as long as a day.

20              THE COURT:  Okay.  Half a day to a day

21   is the Metro-North-MTA case.

22              What about UI?

23              MR. REED:  Well, your Honor, I just

24   wanted to go into that just a bit.  Mr. DelMonte has

25   a work commitment, an important meeting in New York
```

1   tomorrow and Thursday.  So on the basis of Mr.

2   Rush's representation that he won't be called as

3   part of the plaintiff's case, it sounds like I will

4   be free to allow him to go at least Wednesday for

5   his meeting in New York.  I'm just trying to get a

6   little sense of what may happen in the amount of

7   time it may take to accomplish the completion of the

8   plaintiff's case and then the motions and argument

9   thereon, which obviously precedes the defense

10  presentation, whether that might just take up

11  Thursday so Mr. DelMonte could feel free to be in

12  New York Wednesday and Thursday, or not, in which

13  case I would say go and have to potentially be back

14  here to testify on the defense case on Thursday.

15  I'm just trying to get a sense.  It sounds like a

16  full day tomorrow.

17              THE COURT:  So Mr. DelMonte will be one

18  of your witnesses?

19              MR. REED:  He would be if we decide to

20  call him, and that may be subject to some further

21  consideration.  But on the assumption we may still

22  choose to call him, I would like to be able to give

23  him some guidance whether he would potentially be

24  going on Friday.

25              THE COURT:  I think you should tell him

```
1   -- I'm sorry to interrupt his work plans, but he had

2   better be available on Thursday.  Just tell him --

3              MR. REED:  Can I tell him for purposes

4   of tomorrow he's free to attend his meeting?

5              THE COURT:  I think so, yes.  It sounds

6   like it.  It sounds like any -- if he's your

7   witness, the very earliest -- you already heard the

8   estimates from the other parties.  So he's free

9   tomorrow, but on Thursday he's going to need to be

10  on standby, and if we can give him assistance, that

11  will be helpful to do.

12             MR. REED:  Very well.  Thank you.  It

13  may become moot because we may not call him.

14             THE COURT:  Are you anticipating other

15  -- it's too early to say?

16             MR. REED:  I don't anticipate any other

17  witnesses.

18             THE COURT:  Okay.

19             Anything else to take up at this time?

20             MR. HICKEY:  Not from us, your Honor.

21             MR. RUSH:  No, your Honor.

22             THE COURT:  Okay, great.  We'll stand in

23  recess.  See you tomorrow morning.

24             (Proceeding concluded 4:35)

25
```

1             I N D E X

2  WITNESSES                                        PAGE

3  ROBERT DOODY

4  Via videotaped deposition                        1388

5  ARLENE DAVIS COLON

6  Direct Examination by Mr. Rush                   1392

7  Cross-Examination by Mr. Hickey                  1412

8  Redirect Examination by Mr. Rush                 1431

9  STEPHEN BERRANG

10 Via videotaped deposition                        1433

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3          I certify that the foregoing is a correct

4     transcript from the record of proceedings in the

5     above-entitled matter.

6

7                              8/16/17

8                               Date

9

10                    /S/   Sharon Montini

11                      Official Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25