UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                 :
MILTON OMAR COLON and ARLENE     :   No. 3:13CV325(JAM)
DAVIS,                           :
                                 :
        Plaintiffs               :
                                 :
      vs.                        :
                                 :
METRO-NORTH COMMUTER RAILROAD    :
COMPANY, and METROPOLITAN        :
TRANSPORTATION AUTHORITY,        :
                                 :
        Defendants               :
                                 :
- - - - - - - - - - - - - - - - :
                                 :
METRO-NORTH COMMUTER RAILROAD    :
COMPANY, and METROPOLITAN        :
TRANSPORTATION AUTHORITY,        :
                                 :
        Third-Party Plaintiffs   :
                                 :
      vs.                        :
                                 :
UNITED ILLUMINATING COMPANY,     :
AUTHORITY,                       :
                                 :   New Haven, Connecticut
        Third-Party Defendant    :   August 16, 2017
                                 :
- - - - - - - - - - - - - - - - x
```

JURY TRIAL
VOLUME VIII - A.M. SESSION

B E F O R E:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.,

and a Jury

Diana Huntington, RDR, CRR
Official Court Reporter

1    A P P E A R A N C E S:

2

3        FOR THE PLAINTIFFS:

4            WOODLIEF & RUSH, P.A.
                 3411 W. Fletcher Ave., Suite B
                 Tampa, Florida 33618
5            BY:  BRIAN P. RUSH, ESQ.

6

7        FOR THE DEFENDANTS AND THIRD-PARTY PLAINTIFFS:

8            RYAN RYAN DELUCA, LLP
                 707 Summer Street
                 Stamford, Connecticut 06901
9            BY:  ROBERT O. HICKEY, ESQ.
                 BECK S. FINEMAN, ESQ.

10

11       FOR THE THIRD-PARTY DEFENDANT:

12           LOUGHLIN FITZGERALD, P.C.
                 150 South Main Street
13               Wallingford, Connecticut 06492
             BY:  CHARLES P. REED, ESQ.
14               JAMES E. RINGOLD, ESQ.

15

16

17

18

19

20

21

22

23

24

25

1

<u>TABLE OF CONTENTS</u>

2

PLAINTIFFS'                                                          VOIR

3    <u>WITNESS</u>           <u>DIRECT</u>   <u>CROSS</u>      <u>REDIRECT</u>      <u>RECROSS</u>   <u>DIRE</u>

4    STEPHEN BERRANG
        Read-in of Deposition – 1485

5
     GARY CRAKES
6       By Mr. Rush        1499
        By Mr. Reed              1520
7       By Mr. Rush                      1533

8    GARY CRAKES
        Video Deposition – 1535

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **8:35 A.M.** |
| 2 | THE COURT:  We're here for the eighth day of |
| 3 | trial evidence in the matter of Colon vs. Metro-North |
| 4 | Railroad.  Very echo-ey in here. |
| 5 | May I have the appearance of counsel and all |
| 6 | folks at counsel table? |
| 7 | MR. RUSH:  Good morning, Your Honor.  Brian Rush |
| 8 | for the plaintiffs; Margaret Murrell, Tiffany Rivas, and |
| 9 | James Chian -- Chianese? |
| 10 | Did I get that right?  Close enough. |
| 11 | THE COURT:  Okay. |
| 12 | MR. RUSH:  And maybe later, Zacarias Marroquil. |
| 13 | MR. HICKEY:  Robert Hickey from Ryan Ryan Deluca |
| 14 | for Metro-North and the MTA.  With me again today is |
| 15 | Beck Fineman. |
| 16 | MR. REED:  Good morning, Your Honor.  Charles |
| 17 | Reed of Loughlin Fitzgerald for the third-party defendant, |
| 18 | United Illuminating Company.  And with me is Mr. James |
| 19 | Ringold. |
| 20 | THE COURT:  Good morning. |
| 21 | Do we have matters to take up initially? |
| 22 | MR. RUSH:  Not for the plaintiffs, Your Honor. |
| 23 | THE COURT:  Okay. |
| 24 | MR. HICKEY:  Not at this time for Metro-North, |
| 25 | Your Honor. |

1    MR. REED:  None, Your Honor.

2    THE COURT:  Do we have a printout for those

3  requests for admission -- you'll send them on to me, and

4  I'll review them and send them to you all.

5    No changes in the projected lineup today?

6    MR. RUSH:  No, Your Honor.  We're going to go

7  back and finish the Robert -- I'm sorry -- the Stephen

8  Berrang deposition.  I think there's fewer than ten pages.

9    THE COURT:  Okay.

10    MR. RUSH:  And then we'll bring in our

11  economist, Gary Crakes.

12    THE COURT:  Great.  We'll stand in recess until

13  our jury is ready.  Thank you.

14    (Whereupon, a recess followed.)

15    THE COURT:  Please be seated.

16    Couple of things.  Here are the printouts for

17  the requests for admission, several copies there.  If

18  they're acceptable, then I propose you may introduce them

19  at any time.  You may want to, of course, review them and

20  make sure they're accurate.

21    MR. RUSH:  Your Honor, when I introduce them, do

22  you want me to read them, or what do you want me to do?

23    THE COURT:  I think probably put them on the

24  screen.  And you've marked them as a plaintiffs' exhibit,

25  and we'll make clear to the jury that they may consider

1    any admission by defendants to be true, as evidence.

2              So the second thing is on scheduling, my sense

3    at this point is, in light of all that's going on -- in

4    terms of especially legal issues here, and the complexity

5    of the jury instructions, that we should probably aim to

6    finish evidence this week but to start closing arguments

7    on Monday, to give us enough time to work through these

8    issues.

9              The concern I have -- and I've had this happen

10   in some jury cases -- is to have closing arguments on a

11   Friday -- and I would expect closing arguments here would

12   be some length.  We didn't have opening statements in the

13   case.

14             To be giving the jury the case in the middle of

15   the afternoon, essentially, on Friday is not very

16   productive to deliberations.  So my preference, I think,

17   is to finish up the arguments this week -- finish the

18   evidence, pardon me, this week.  If we're lucky, we

19   wouldn't have any evidence Friday at all.  We'll reserve

20   that for our charge conference.  We'll have to see how

21   things go today.

22             Does that sounds like a good plan?

23             MR. RUSH:  Yes, Your Honor.

24             THE COURT:  It gives everybody more time to

25   prepare and polish what their closing arguments will be.

1    That's to the jury's benefit, if closing arguments can be

2    tight and very organized.

3           MR. HICKEY:  Certainly no objection from us,

4    Your Honor.

5           MR. REED:  That's fine, Your Honor.

6           THE COURT:  Great.  We'll march on that.

7           What I'll do is, I'll tell the jurors when they

8    come in we are expecting currently that we'll probably, in

9    all likelihood, conclude evidence this week, and that

10   we're probably going to give them the case on Monday with

11   final arguments, saying that's a projection.

12          We haven't talked, Mr. Rush, about whether

13   plaintiffs anticipate presenting a rebuttal case, and I

14   know you want to consider that as well.

15          MR. RUSH:  Very good, Your Honor.

16          THE COURT:  Anything else before bringing in the

17   jury?

18          MR. RUSH:  Your Honor, I've shown an exhibit,

19   2011 MTA budget, to Mr. Fineman and Mr. Reed.  They don't

20   have any objection to it going into evidence, so I'll do

21   that before I finish the reading.

22          THE COURT:  Okay.

23          MR. HICKEY:  Your Honor, Mr. Fineman is making

24   sure something is on schedule for today.  If that doesn't

25   offend Your Honor, that he will come in --

1    THE COURT:  No, not at all.

2    MR. RUSH:  Probably I'll get -- just to get

3    these requests for admissions off my docket, whenever I'm

4    done with Berrang, I'll just --

5    THE COURT:  That's great.  Good.

6    MR. RUSH:  Do you want me to mark it as an

7    exhibit?

8    THE COURT:  Yes, you'll need to mark it.  It's

9    evidence, like anything else in the case.

10   (Whereupon, the jury entered the

11   courtroom.)

12   THE COURT:  Welcome back, ladies and gentlemen.

13   Please be seated.

14   We're going to continue with the evidence.  You

15   recall, Mr. Rush was reading into the record a deposition

16   of a witness.

17   I wanted to give you a little bit of an update

18   on at least what our projections or predictions are about

19   the schedule in this case.  I'm sure that's a concern to

20   everybody here.

21   I think this will be some welcome news to you,

22   in terms of we do expect, in all likelihood, that the

23   evidence will conclude this week, and we'll be done with

24   the evidence, witnesses and documents and all that, this

25   week; and in all likelihood, on Monday, we'd have you back

1    for closing arguments of counsel, which will be of some

2    length, and my closing legal instructions, which will also

3    be of some length.  I'll be reading very detailed legal

4    instructions to you.  At that point you'll be free to

5    begin your deliberations in the case.

6         So that's our prediction.  Predictions are never

7    perfect, but our prediction is you're going to get the

8    case and begin deliberating Monday afternoon.

9         Thank you.

10        Mr. Rush, if you'd like to proceed.

11        MR. RUSH:  Thank you, Your Honor.

12        Your Honor, as we discussed, we're going to move

13   into evidence Exhibit 105, the MTA 2011 budget.

14        THE COURT:  I understand there's no objection?

15        MR. REED:  No objection.

16        THE COURT:  Full exhibit.

17        (Plaintiffs' Exhibit 105 marked in evidence.)

18        MR. RUSH:  We left off on page 48, I believe,

19   correct me if I'm wrong, but beginning on line 25.

20             (Deposition read-in by Mr. Rush of Stephen

21             Berrang:)

22   Q.   "What is your role with the MTA in regard to planning

23   for the existing assets that are owned by Metro-North;

24   what is your role?

25   A.   As I stated earlier, we have a 20-year needs

1  assessment process.  That 20-year needs assessment process

2  reviews the condition of assets in -- that MTA owns, so

3  that would be assets within the state of New York, and it

4  develops an estimate of capital investment to maintain

5  those projects, those assets.  And then a program of

6  projects is developed out of that 20-year needs assessment

7  in 5-year chunks.

8       The first 5-year chunk of the 20-year needs

9  assessment becomes a program of projects which is then

10  proposed by the MTA as its subsequent 5 year-capital

11  plan."

12          MR. RUSH:  Page 51, line 18:

13  Q.   "What -- when you make this 20-year needs assessment,

14  to whom is this needs assessment sent?

15  A.   It is -- it is issued.  It is not sent to anyone.

16  Q.   To whom is it issued?

17  A.   The public."

18          MR. RUSH:  Page 54, line 1:

19  Q.   "Does the State of Connecticut pay money directly to

20  the MTA for Metro-North's operations?

21  A.   I believe that is so, yes.

22  Q.   And when the State of Connecticut pays these monies

23  to the MTA, where do these monies typically go?

24  A.   To MTA corporate accounts.  I don't know specifically

25  where they're located."

1    MR. RUSH:  Page 55, line 4:

2    Q.   "Isn't it true that the MTA pays for Metro-North's

3    operation, operational and maintenance activities on the

4    New Haven line?

5    A.   Yes.  It doesn't fund all of them, but it pays for

6    them.

7    Q.   When you say it doesn't fund them, you're saying that

8    MTA sometimes receives funds from some source which

9    actually funds the payment of an item?

10   A.   65 percent of the operating costs of New Haven line

11   is funded by Connecticut, 65 percent of the net operating

12   costs."

13   MR. RUSH:  There's a fragment of a question

14   without an answer, so I didn't read the next line on 15.

15   It's just one line of a question.

16   Page 60, line 18:

17   Q.   "What if -- what happens when Metro-North sells an

18   asset that is not funded by the federal government, and

19   that asset is located in the state of Connecticut?

20   A.   I don't believe we sell assets in the state of

21   Connecticut because we don't have assets in the state of

22   Connecticut."

23   MR. RUSH:  Page 66, line 21:

24   Q.   "I'm putting before you Plaintiffs' Exhibit A for

25   this deposition.  I think we've used numbers before, but

1    today we're going to use letters.  So Exhibit A is titled,

2    'MTA 2011 Adopted Budget, February Financial Plan

3    2011-2014.'  Then it says, 'February 11, 2011,

4    Metropolitan Transportation Authority.'

5         Do you recognize Exhibit A, sir?

6    A.   I see what you placed in front of me.

7    Q.   If I were to tell you I printed that off of the MTA

8    internet web site, and I represent to you that that is an

9    accurate rendition of what was printed from our

10   computers -- we didn't add anything, didn't subtract

11   anything -- can you describe what Exhibit A appears to be?

12   A.   It appears to be the financial plan issued in

13   February 2011 for the MTA.

14   Q.   Okay.  Why don't you take a little while and look

15   through that Exhibit A.  I'd like to identify that as the

16   budget of MTA.

17        Assuming that nobody has taken any pages out and put

18   any pages in, to which a federal judge might look askance,

19   does that appear to be the MTA's 2011 adopted budget?

20   A.   It appears to" -- it's missing the word "be", but --

21   "it appears to be the MTA's February financial plan.

22   Q.   Okay.  How is that different from MTA 2011 adopted

23   budget?

24   A.   The MTA does updates to its adopted budget

25   periodically.  The February financial plan is one of those

1    updates.

2    Q.   Does Exhibit A appear to be, then, the February

3    update to the MTA 2011 adopted budget?

4    A.   Yes.  I don't know anything particularly about your

5    budget, but assuming that there's been printed up" --

6         MR. RUSH:  Let me start that again:

7    Q.   "I don't know anything particularly about your

8    budget, but assuming that that's been printed up from the

9    MTA, which I represent to you has happened, is that a

10   reasonably accurate picture of the MTA 2011 budget as of

11   February 2011?

12   A.   Yes."

13        MR. RUSH:  Page 77, line 2:

14   Q.   "Okay.  And isn't it true that this budget plan,

15   setting forth where the dollars go, is reasonably accurate

16   as of the date of the plan, February 2011?

17   A.   Yes.

18   Q.   Okay.  Looking at the first category by expense

19   category, how much is the total expense by category?

20   A.   Are you referring to payroll?

21   Q.   I was looking at the total of payroll, overtime,

22   health and welfare, pensions and other labor, nonlabor,

23   debt service.  What is the total operational budget by

24   expense category; how much is it?

25   A.   12,033,000,000.

1   Q.   And similarly, the expense by agency, by MTA agency,

2   is the same amount?

3   A.   Correct.

4   Q.   Does this budget accurately set forth the anticipated

5   expenses that the MTA will pay directly for payroll, for

6   overtime, for health and welfare, for pensions, for other

7   labor, for nonlabor and debt service totaling a little

8   over $12 billion?

9   A.   I believe so, yes.

10   Q.   Does this pie chart shown by MTA agency directly

11   state the estimated share of Metro-North's railroad as

12   8 percent of the total of the MTA's agencies?

13   A.   For as of February 2011, yes."

14            MR. RUSH:   Page 101, line 8:

15   Q.   "Do you know what the present value of Metro-North's

16   assets are, capital assets, approximately?

17   A.   I'm thinking for a second.  The MTA as a whole was

18   valued -- all the agencies was valued at $948 billion.

19   The lion's share of that was New York City Transit,

20   approaching 80 percent.  And then I'd say 5 percent of

21   that is approximately Metro-North.

22        So let's say 45 to 50 billion dollars include --

23   that's a New York state asset.  That's not assets outside

24   of the state of New York.

25   Q.   Those assets are generally owned by the State of

1    Connecticut?

2    A.   The --

3    Q.   The assets in -- oh, in Connecticut.

4    A.   The assets in Connecticut are owned by the State of

5    Connecticut."

6              MR. RUSH:  Page 116, line 19:

7    Q.   "Sir, I'm going to show you what I'm marking as

8    Exhibit B, which is titled, 'MTA 2014 Adopted Budget,

9    February Financial Plan 2014-2017,' dated February 2014,

10   for the Metro-North Transportation Authority.

11        What is that document?

12   A.   It is the adopted budget as updated, as of the

13   financial plan, as of February 2014."

14             MR. RUSH:  Page 117, line 1:

15   Q.   "Again, I'll represent to you that I asked my

16   assistant to print this off the MTA's web site, and she

17   dutifully told me she had done that.

18        Does this appear to be the 2014 adopted budget for

19   the MTA, without looking at each and every line of the

20   document, or each and every line of this very large piece

21   of paper?

22   A.   It appears to be the adopted budget as updated in a

23   February financial plan.

24   Q.   Without asserting that -- well, the numbers in the

25   2014 budget for the year 2014 are likely to be different

 1  in some way from the 2011 adopted budget?

 2  A.   They are not likely, they will be different."

 3         MR. RUSH:   Page 114, line 5:

 4  Q.   "I'm going to show you what was previously marked as

 5  Exhibit 2.   In a string of depositions exhibits that we

 6  used in the Metro-North and UI and Metro-North of the MTA

 7  police representative for MTA, and it's titled, 'Amended

 8  and Restated Service Agreement,' dated as of June 21,

 9  1985.

10         Have you seen that document before?

11  A.   Yes.

12  Q.   What is that document?

13  A.   It's a document that lays out the contractual

14  relationship for administrative and financial and

15  operational activities for Metro-North to operate commuter

16  rail service in Connecticut."

17         MR. RUSH:   Page 126, line 8:

18  Q.   "Can you read that sub-B paragraph?

19  A.   Parenthetically, Sub-B, quotations, MTA and CDOT

20  shall each have the right to propose amendments to the

21  service fares for the main line.   Any such proposed

22  amendment shall be implemented by Metro-North provided the

23  proposed amendment is approved by both MTA and CDOT.

24  Q.   In practice, does MTA and Connecticut DOT have to

25  approve any amendments to service fares for the main line?

 1  A.    MTA and CDOT approve service fares for all of

 2  Metro-North.

 3  Q.    Once MTA and CDOT have approved those fares --

 4  A.    I retract that.  MTA and CDOT approve service fares

 5  for Connecticut territory.  MTA approves fares for service

 6  in New York state.

 7  Q.    Okay.  Once the MTA and the Connecticut DOT have

 8  approved the service fares for the main line in

 9  Connecticut, Metro-North is obligated to carry out those

10  service fare charges, correct, in practice?

11  A.    Metro-North.  The fares are set by MTA and

12  implemented by Metro-North and other subsidiary agencies."

13            MR. RUSH:  Page 148, line 7:

14  Q.    "In practice, who pays for the claims, in respect to

15  third parties, arising under this agreement with respect

16  to the service?

17  A.    My understanding is that, in practice, there is an

18  agreement between CDOT and Metro-North; and by that, the

19  MTA pays a portion that it's agreed to be paid for by

20  Metro-North.  That is my understanding.

21  Q.    I'm sorry, I didn't hear the last -- it's to be paid

22  in proportion to be agreed upon?

23  A.    It's paid in a proportion to be agreed upon, but it's

24  an agreement between the parties to the contract.  MTA

25  pays for a portion of it, and CDOT pays for a portion of

1    it."

2            MR. RUSH:  Page 149, page [sic] 16:

3    Q.   "Okay.  Who employs the MTA police?"

4            MR. RUSH:  This is on page 149, line 16:

5    Q.   "Okay.  Who employs the MTA police?

6    A.   The MTA police are part of MTA headquarters.

7    Q.   And who pays the salaries of MTA police?

8    A.   The MTA does.

9    Q.   And similarly, does MTA administratively control the

10   MTA police?

11   A.   I'm not sure what you mean by that.

12   Q.   While the MTA police are employed and paid by the

13   MTA, my question is, are they similarly -- are their

14   operations essentially controlled by MTA also?

15   A.   I don't -- I don't know.  I'm not a police person.  I

16   don't know.

17   Q.   The pension -- the pensions of MTA police are paid

18   for by the MTA?

19   A.   Yes.

20   Q.   All their benefits are paid by the MTA?

21   A.   Yes.

22   Q.   Metro-North does not pay for any salaries or benefits

23   of MTA police?

24   A.   I do not believe so, no.

25   Q.   And Metro-North Railroad does not control MTA police,

1    correct?

2    A.    I believe that to be the case, yes."

3          MR. RUSH:  Page 153, line 8, cross-examination

4    by Mr. Reed:

5    Q.    "I just have a couple questions for you, sir.  My

6    name is Charlie Reed, and I represent the United

7    Illuminating Company, which is a party to this action.

8          You're here today as a designated witness on behalf

9    of the MTA, correct?

10   A.    Yes.

11   Q.    In that capacity, do you have any information or

12   facts that Omar Colon's injuries were caused by any act or

13   omission of the United Illuminating Company?

14   A.    Well, I'm generally familiar with the accident, I'm

15   not aware of any details that directly tie the accident to

16   United Illuminating.

17   Q.    So the answer would be no?

18   A.    Correct.

19   Q.    Again, in your capacity that brings you here today,

20   do you have any facts or information that Mr. Colon's

21   injuries were caused by the presence or use, installation

22   or maintenance, of UI's high-voltage transmission and

23   system atop Catenary 1043?

24   A.    I have no knowledge of that so --

25   Q.    Again, in your capacity that brings you here today,

1    do you have any facts or information that the United

2    Illuminating Company failed to make any additions

3    necessary to the Catenary 1043?

4    A.   I have no information or knowledge.

5    Q.   Lastly, do you have any facts or information that UI

6    failed to maintain its power transmission system and power

7    lines atop Catenary 1043 in a safe and prudent manner?

8    A.   I have no knowledge of that."

9              MR. RUSH:  Your Honor, that concludes the

10   reading of that deposition.

11             THE COURT:  Okay.  Sounds good.

12             Do you have one more exhibit you wanted to make?

13             MR. RUSH:  I think we put it in.

14             THE COURT:  The request for admission?

15             MR. RUSH:  Thank you, Your Honor.

16             I'd like to move Exhibit 258, which are

17   plaintiffs' requests for admissions.

18             MR. HICKEY:  No objection.

19             (Plaintiffs' Exhibit 258 marked in evidence.)

20             THE COURT:  Okay.

21             So, ladies and gentlemen, what these are is,

22   during the course of pretrial discovery in a case,

23   oftentimes one side will make what are called "requests

24   for admissions," essentially a request that the other side

25   admit something to be true or not true.

1      So what you have here is essentially the copy of

2  certain of these requests for admission that were made by

3  plaintiffs in this case, and certain of the responses by

4  the defendants, Metro-North and MTA.

5      And, Mr. Rush, you'll review those now.

6      MR. RUSH:  Thank you, Your Honor.

7      Your Honor, do you wish me to read them, or

8  what's your preference?

9      THE COURT:  Whatever makes clear to the jury so

10  the jury has an opportunity to review them.  You can read

11  them or simply give them to the jury, and the jury will

12  have a full opportunity to review them as part of the

13  evidence in the case.

14      MR. RUSH:  Very good, Your Honor.

15      I don't want to take up the time of reading all

16  of them, with the exception of Request Number 6, which

17  Request for Admission Number 6 says --

18      THE COURT:  Maybe zero in a little bit so we can

19  read.

20      MR. RUSH:  Request for Admission Number 6:

21  "Admit or deny that, on March 17, 2011, defendant,

22  Metro-North Commuter Railroad, had not installed any

23  no-trespassing signs on the right-of-way in the 100 feet

24  on either side of Tower #1043.

25      "Response:  The defendants admit that it had not

```
 1   installed no-trespassing signs on the right-of-way in the
 2   100 feet east or west of Tower 1043, nor had Metro-North
 3   been requested or directed to do so, and nor were such
 4   signs necessary in the location where Omar Colon testified
 5   he accessed Tower #1043, particularly in that he accessed
 6   the tower by trespassing through private property not
 7   owned by the defendants."
 8                  THE COURT:  Thank you.
 9                  And the next witness, please?
10                  MR. RUSH:  Your Honor, we call Gary Crakes, the
11   economist.
12                  THE CLERK:  Please raise your right hand.
13
14                           GARY CRAKES,
15        called as a witness, having been first duly
16        sworn, was examined and testified as follows:
17
18                  THE CLERK:  Please be seated.
19                  Please state your name.
20                  THE WITNESS:  Gary Crakes.
21                  THE CLERK:  Please spell your last name.
22                  THE WITNESS:  C-R-A-K-E-S.
23                  THE CLERK:  Please state your address by city
24   and state only.
25                  THE WITNESS:  860 -- I'm sorry.  Cheshire,
```

1    Connecticut.

2

3                         DIRECT EXAMINATION

4    BY MR. RUSH:

5    Q.    Good morning, sir.

6    A.    Good morning.

7    Q.    Is it Dr. Crakes?

8    A.    I'll answer to just about anything.

9    Q.    Okay.  Dr. Crakes, can you tell the jury what you do

10   for a living?

11   A.    Yes.  I'm an economist.  I'm a professor emeritus of

12   economics at Southern Connecticut State University, where

13   I continue to teach on a part-time basis.

14   Q.    Can you tell the jury a little bit about your

15   educational background after high school?

16   A.    Yes.  I received a bachelor's degree in economics

17   from Central Connecticut State College in 1975; a master's

18   degree in economics from the University of Connecticut in

19   1976; and a Ph.D. in economics, also from the University

20   of Connecticut, which I completed in 1984.

21   Q.    Can you tell the jury what your employment experience

22   is in regard to economics and the study of economics since

23   you received your Ph.D. in 1984?

24   A.    Well, actually after receiving my master's degree in

25   1976, I became employed as a research assistant on a

 1    variety of health economics research projects at the

 2    University of Connecticut Health Center.

 3         I continued that employment until 1979, when I began

 4    teaching on a part-time basis at both Southern Connecticut

 5    and the Hartford branch of the University of Connecticut.

 6         And then, in the fall of 1980, I began a full-time

 7    position as assistant professor at that time at Southern

 8    Connecticut State University, and becoming a professor

 9    emeritus in 2011.

10    Q.   Can you tell the jury what your experience is, in

11    terms of calculating present value of damages over a

12    party's lifetime and life expectancy?

13    A.   I've been performing calculations of economic loss

14    for matters in litigation for approximately 36 years, in a

15    variety of different types of cases -- wrongful death,

16    personal injury, some employment litigation -- for a

17    variety of different circumstances in terms of

18    occupations, levels of education, and the future

19    discounted cost of care for individuals where lifecare

20    plans have been provided.

21    Q.   Okay.  When you give your -- state your conclusions

22    in this case, and opinions, will you do so within a

23    reasonable degree of probability?

24    A.   Yes.

25    Q.   And within a reasonable degree of economic

1    probability?

2    A.    Yes.

3    Q.    I've often wondered, I'm not really sure, is

4    economics a science or something else?

5    A.    Economics is considered to be a social science.  It

6    certainly has quantitative aspects associated with it, but

7    it's like the other social or behavioral sciences in that

8    it deals with aspects of human behavior.

9    Q.    Dr. Crakes, have you received any fellowships in your

10   studies for research?

11   A.    Yes.

12   Q.    Can you tell the jury about those?

13   A.    I received a University of Connecticut predoctoral

14   fellowship to provide financial support for my first year

15   of graduate studies; a University of Connecticut

16   dissertation fellowship to provide financial support for

17   my dissertation research; and in a national competition, a

18   Richard D. Erwin fellowship, also to provide support for

19   research.

20   Q.    Have you received any awards associated with your

21   teaching?

22   A.    Yes, I have.

23   Q.    Can you tell the jury about that?

24   A.    I received the University's -- Southern Connecticut

25   State University's Teacher of the Year Award in 1987, and

1    the School of Business Teaching Award in 1998.

2    Q.    Have you ever been honored for your services as an

3    economic expert?

4    A.    Yes, I have.

5    Q.    What was the nature of that honor?

6    A.    It was associated with pro bono or volunteer

7    appraisals of economic loss that I performed on behalf of

8    families of the victims of the terrorist attack on the

9    World Trade Center, was supervised through the U.S.

10   Department of Justice and the Victim Compensation Fund

11   established by Congress and administered by the Department

12   of Justice.

13   Q.    Dr. Crakes, are you a member of any professional

14   organizations?

15   A.    Yes.

16   Q.    Could you name a few of them?

17   A.    Yes.  I'm a member of the American Economic

18   Association; the Eastern Economic Association; the

19   National Association of Business Economics; the National

20   Association of Forensic Economics; the American Academy of

21   Economic and Financial Experts; and an international honor

22   society in economics, Omicron Delta Epsilon.

23   Q.    Dr. Crakes, have you published any articles in regard

24   to economics analysis?

25   A.    Yes.

1   Q.   Can you tell the jury about that?

2   A.   Yes.  I've published approximately 22 refereed

3   professional articles in the field of economics.

4   Q.   Doctor, as background for your conclusions in this

5   case, can I ask you to just generally tell the jury what

6   is meant by "life expectancy"?

7   A.   A life expectancy is something that -- the official

8   life expectancy tables are calculated by the U.S.

9   Department of Health and Human Services and the National

10  Center for Vital Statistics.  It's the average number of

11  years that individuals will have for remaining life

12  expectancy based upon their age, their gender, and their

13  race.

14  Q.   Can you tell the jury generally what is meant by a

15  present value analysis?

16  A.   Present value or discounted values are basically

17  values that we expect to receive in the future and what

18  their value is today.  It basically takes into

19  consideration the ability of money to earn interest or

20  what is sometimes called the time value of money.

21       If I could give a brief example, if we had a

22  4 percent interest rate and someone promised you the

23  payment of $104 one year from now, that promise of payment

24  of $104 in one year would have a present value today of

25  $100, because you would be able to earn that 4 percent

1    interest on that $100 over the course of the next year,

2    making it thereby equal to $104, in dollars, for a year

3    from now; so that the values that typically are calculated

4    in matters such as the present case are discounted or

5    reduced to present value.

6    Q.   Can you tell the jury whether, in your analysis, you

7    looked at past medical expenses?

8    A.   No.   It's based upon the prescription for care as

9    identified in the lifecare plan provided by Comprehensive

10   Rehabilitation Consultants.

11   Q.   Dr. Crakes, Lawrence Forman was here yesterday,

12   discussing his lifecare plan for Omar Colon.

13        Can you tell the jury whether you've had a chance to

14   review that lifecare plan prepared by Comprehensive

15   Rehabilitation Consultants and Mr. Forman?

16   A.   I did use that report in my calculation in what I

17   described earlier, the present value or discounted value

18   of that future cost of care necessary for Mr. Colon Ayala.

19   Q.   Can you tell the jury whether you're a medical

20   doctor?

21   A.   No, I am not.

22   Q.   Can you tell the jury whether you are a life planner

23   like Mr. Forman?

24   A.   No, I am not.

25   Q.   Can you tell the jury why it is, in your profession,

1  you would rely upon the lifecare plan prepared by

2  Mr. Forman and Comprehensive Rehabilitation Consultants?

3  A.   The reason I would rely on that lifecare plan is, I'm

4  not qualified to make an assessment of the care needs for

5  an individual.  That is something that is a different area

6  of expertise, and I would rely on a report by someone who

7  has that expertise.

8  Q.   In the past, have you relied on reports of Mr. Forman

9  and Comprehensive Rehabilitation Consultants to do your

10  economic analysis in other cases?

11  A.   Yes, I have.

12  Q.   Is that process by which you rely upon those lifecare

13  plans, is that process reasonable and customary in your

14  profession?

15  A.   Yes, it would be.  I believe that most economists are

16  not qualified to make an assessment of care needs;

17  therefore, they would need to rely on a lifecare plan, as

18  I have here.

19  Q.   In your profession and in your science as an

20  economist, are those lifecare plans viewed as typical and

21  reliable?

22  A.   Typically, yes.

23  Q.   Dr. Crakes, are you being paid to be here today?

24  A.   Yes.  There is a fee for my time associated with my

25  appearance today.

```
1    Q.    Have you also been paid for all the work you've done
2    on this case?
3    A.    Yes.  Again, there was a fee for my time associated
4    with performing the appraisal of economic loss in this
5    matter.
6    Q.    Have you ever worked for me or my law firm before
7    this case?
8    A.    No.
9    Q.    Do you anticipate rendering a bill at the end of your
10   testimony today?
11   A.    For my time, yes.
12   Q.    What is your hourly rate?
13   A.    The fee for my time associated with the appearance at
14   trial is $1400 per day.
15   Q.    And do experts in your field typically charge a fee
16   for doing their economic analysis for a case like this?
17   A.    Yes.
18   Q.    And do they typically charge to come to court and
19   testify?
20   A.    For their time in doing so, yes.
21   Q.    In your economic -- in your -- in your employment
22   history, what kinds of appraisals of loss have you done?
23   A.    I performed appraisals of economic loss of earning
24   capacity in cases where such a value is requested, based
25   upon, again, personal injury cases, wrongful death
```

1   matters, employment litigation, for a variety of different

2   occupations, a variety of different earnings levels,

3   variety of different educational attainment; and I have

4   also, in many cases, provided the present value of a

5   future cost of care, prescribed care, as I have here,

6   associated with a lifecare plan.

7   Q.   Okay.  Did I ask you to prepare an appraisal of

8   economic loss in a case involving Omar Colon and Arlene

9   Davis?

10  A.   Yes.

11  Q.   Can you -- do you have an opinion of the probable

12  economic loss for the plaintiff Omar Colon and his wife,

13  Arlene Davis, in this case?

14  A.   Yes.

15  Q.   Could you tell the jury about that?

16       And before that, have you prepared a summary of

17  appraisal of Milton Omar Colon Ayala's discounted economic

18  loss?

19  A.   Yes, I have.

20  Q.   Is that in your report?

21  A.   Yes.

22  Q.   Dr. Crakes, let me show you a demonstrative exhibit,

23  not evidence.

24       Can you tell the jury what this exhibit --

25       Is it Exhibit I or Exhibit 1?

```
1    A.    I would say Exhibit I, Roman Numeral I.

2    Q.    Can you tell the jury what that is?

3    A.    Yes.  That is a summary of the appraisal of economic

4    loss for Mr. Colon Ayala.  That is a summary of what is

5    provided in my report.

6    Q.    Okay.  Can you explain that summary appraisal to the

7    jury?

8    A.    Yes.

9              THE COURT:  So, Mr. Rush, did you want the jury

10   to be able to see this?

11             MR. RUSH:  Yes, Your Honor.

12             THE COURT:  Would you like to move it for

13   admission as a demonstrative exhibit?

14             MR. RUSH:  Yes, sir.

15             THE COURT:  Any objection to its use as a

16   demonstrative exhibit?

17             MR. REED:  No objection.

18             THE COURT:  Can we give this exhibit a number,

19   please?

20             MR. RUSH:  Yes, Your Honor.

21             Your Honor, this is Exhibit Number 259.

22             THE COURT:  259 is admitted a demonstrative

23   exhibit.

24             Ladies and gentlemen, as for all demonstrative

25   exhibits, it's not something that goes back to you in the
```

1  jury room.  It's presented to you for assistance.  You're

2  welcome to take notes or whatever, but you won't have this

3  exhibit document in the jury room with you at the close of

4  the case.

5  BY MR. RUSH:

6  Q.   Dr. Crakes, can you explain to the jury what is shown

7  in Exhibit 259?

8  A.   Yes.  The first element in my report is the value of

9  the continuing cost of care for 47.77 years of remaining

10  future life expectancy.  I calculated the life expectancy

11  of Mr. Colon Ayala at the time of his injury.  A number of

12  years have passed since that injury.  I subtracted those

13  years that have passed from his life expectancy, and 47.77

14  years remain for that future life expectancy.

15       The first value of $6,015,116 is based upon the

16  values presented in the lifecare plan of Comprehensive

17  Rehabilitation Consultants.  Each element in that lifecare

18  plan would identify a period of time over which the care

19  would be required, a cost per occurrence and a frequency

20  of occurrence.

21       Whenever there was a range provided in the report, I

22  would choose the midpoint of that range.  So if a cost was

23  between some value, say $50 and $60, I would use the

24  midpoint of $55.

25       I calculated the present value of that lifecare plan

1   with the assumption that, on average, the future rate of

2   growth of the cost of care will be equal to the discount

3   rate.  I'll elaborate on that.

4        I indicated before that one must choose an interest

5   rate or a discount rate for the purposes of reducing

6   future values to present value.  But at the same time, we

7   know that costs will increase over time.  I don't know

8   what the rate of growth in cost will be each year in the

9   future, nor do I know what interest rates will be each

10  year in the future.  But reviewing how the two have

11  compared to one another over time, I can make an

12  assumption as to that relative comparison.

13       Typically, we think of medical care costs as rising

14  more rapidly than interest rates, but the majority of the

15  costs of care in this lifecare plan are labor costs.  So I

16  assumed rather than that increase in growth would be

17  greater than the discount rate, I assumed instead that the

18  two would be equal.  So the values presented in my report

19  for $6,015,116, and the components of it, are all based on

20  that assumption.

21       The next element in the lifecare plan, also for

22  47.77 years of remaining future life expectancy, is the

23  value of the cost of prosthetics based on a plan provided

24  by Hanger Prosthetics.  And that was something that was

25  included in the lifecare plan as well.  I did list that as

```
1   a separate entry.  And that would be the present value or
2   discounted value of the cost of those prosthetic devices
3   over the remaining life expectancy of Mr. Colon Ayala.
4        The third element of the discounted economic loss is
5   the value of services provided by Mr. Colon Ayala to
6   Arlene Davis for 54.06 years of life expectancy from his
7   date of injury.
8        There was a separate entry in the lifecare plan for
9   the value of those services that Mr. Colon Ayala was
10  providing to Ms. Davis.  That value is something I have
11  included in my report, the present value of it, not just
12  for the future life expectancy but from the date of
13  injury.
14       Mr. Colon Ayala was providing those services to
15  Ms. Davis, so that the value is provided for both the past
16  time period and the remaining future life expectancy.
17  That value was $1,571,092.
18       When we add the costs together -- the future cost of
19  care, the future cost of prosthetic devices, and the past
20  and future value of services provided by Mr. Colon
21  Ayala -- the discounted economic loss is $10,380,733.
22       I made one additional calculation, and that is a
23  deduction for the potential of interest being paid more
24  frequently than costs will increase.  Typically, we think
25  of increases in costs occurring once or twice per year.
```

1    If interest were to be paid more frequently than that, say

2    quarterly, there would be an effect of compounding,

3    interest being earned on interest, that could leave a

4    balance, a remainder in this estimated economic loss at

5    the end of the statistical life expectancy of Mr. Colon

6    Ayala.

7        I've allowed for that possibility and made a

8    deduction accordingly; and with that deduction, the total

9    net discounted economic loss is $9,964,733.

10   Q.   Can you tell the jury whether that last adjustment,

11   where you reduced the present value amount from

12   10,380,733, you reduced it by an amount of $416,000, is

13   that a mandatory reduction that you've made?

14   A.   No, it is not.

15   Q.   That makes the number more conservative?

16   A.   I would say more reasonable, yes.

17   Q.   Okay.  Some economists would not have made that

18   deduction?

19   A.   That's correct.

20   Q.   And the jury might choose not to -- well, in making

21   that reduction, you have reduced the amount to just under

22   $10 million?

23   A.   That's correct.

24   Q.   $9.964 million?

25   A.   Yes.

1   Q.   If interest were paid on an annual basis, the number

2   would be 10,380,000?

3   A.   Yes.

4   Q.   Okay.  What is your conclusion in this case as to the

5   present value of the items that are shown in this

6   Exhibit 259?

7   A.   That the total net discounted economic loss

8   is $9,964,733.

9   Q.   Okay.  Now, going in reverse, Roman Numeral III is

10  the value of services provided by Omar Colon to his wife,

11  Arlene Davis?

12  A.   Yes.

13  Q.   That's for a period of time from the date of injury

14  to the date of anticipated death at approximately 80 years

15  of age?

16  A.   Yes.

17  Q.   If Mr. Colon were to live longer than 80 years, say

18  an additional 10 percent on top of 80 years, to 88,

19  approximately, how would that affect your calculations if

20  he lived 10 percent longer than your estimate of 80 years?

21  A.   Approximately -- the values would approximately be

22  10 percent greater.

23  Q.   Similarly, if he lived longer or shorter than that

24  10 percent, 5 percent longer or 15 percent longer, how

25  would that affect the calculation of your number?

```
 1    A.    It would be approximately proportional as well.
 2    Q.    So if he lives 10 percent longer, then this
 3    bottom-line number of $9.964 million would be increased by
 4    10 percent?
 5    A.    Yes.
 6    Q.    Would that be a reasonable calculation?
 7    A.    Yes.
 8    Q.    Okay.  It would be consistent with economic
 9    principles?
10    A.    Yes.
11    Q.    And it would be within a reasonable degree of
12    economic probability?
13    A.    Yes.
14    Q.    Going to Roman Numeral II, it says:  Plus value of
15    prosthetics for 47.77 years of remaining future life
16    expectancy.
17          That's again the estimated life expectancy to age 80?
18    A.    Approximately, yes.
19    Q.    Can you explain to the jury why prosthetics are so
20    expensive, $2.794 million?
21    A.    I'm not an expert on prosthetics, but I do know that,
22    according to the plan that was provided, these are the
23    prosthetic devices that would be necessary for Mr. Colon
24    Ayala, and it's based upon, let's say, the prescription
25    for prosthetics that was provided by Hanger Prosthetics.
```

```
1    Q.   Okay.  I assume you don't have a crystal ball to
2    predict the future growth of medical-cost inflation.
3    A.   No, I do not, which is why I rely on the approach I
4    do, comparing past cost increases to past interest rates.
5    Q.   Can you tell the jury what the approximate increase
6    in medical cost inflation has been over the last period of
7    years, either 5, 10, 15, whatever period you feel is
8    appropriate?
9    A.   Well, if we go back to the late 1940s, early 1950s,
10   the average annual rate of increase has been in the
11   neighborhood of 5.9 percent.  That certainly has been
12   somewhat less in recent years.  But interest rates have
13   been lower, as we all know, in recent years as well.  That
14   is why I looked at the changes in the two on a comparative
15   basis, also keeping in mind that, even though medical care
16   costs have been increasing by amounts, percentages greater
17   than interest rates for discounting, so much of the
18   lifecare plan was labor costs that I felt it was
19   reasonable to assume that the rate of growth would be
20   equal to the discount rate.
21   Q.   In the years preceding, say, the year 2000, can you
22   tell the jury what medical cost inflation was,
23   approximately?
24   A.   I would say, if we're going before 2000 and looking
25   at that time period, it would be in excess of 4 percent
```

1    per year.

2    Q.   Would that exceed the rate of normal inflation during

3    that same period?

4    A.   Yes.

5    Q.   Can you tell the jury what the effect of new

6    treatments, new prosthetics, new types of care, has

7    typically on the cost of medical expenses and medical-cost

8    inflation?

9              MR. REED:  Your Honor, I'll object.  It's

10   outside the scope of the disclosure of the expert's

11   opinions.

12             MR. RUSH:  Your Honor, I think it's background

13   to his opinions as to why they're reliable.

14             THE COURT:  How is it outside the scope?

15             MR. REED:  He's claiming to be an expert on the

16   rate of medical costs inflation associated with innovative

17   devices and so forth.  I think that's not what he's been

18   disclosed to testify to today.

19             MR. RUSH:  I'll rephrase it, Your Honor.

20             THE COURT:  Try again.

21   BY MR. RUSH:

22   Q.   In regard to your study of economics, are you able to

23   tell the jury what the effect of innovations are, in terms

24   of prosthetics and other medical treatment, whether it's

25   diagnostic or prescription medicines; what effect did

1    those innovations have on increasing the cost and

2    increasing medical-cost inflation?

3    A.    Typically, as new procedures are developed, as new

4    technology occurs that is more advanced, it typically does

5    contribute to higher costs.

6         As we also move forward, the existing items may

7    become somewhat less of an increase in cost.  But as the

8    technology improves and the equipment becomes more

9    sophisticated, it typically is associated with higher

10   increases in costs when those new technologies occur.

11   Q.    Okay.  Looking at the Roman Numeral I at the top of

12   this section where my pen is pointed right now, it says:

13   Value of continuing cost of care for 47.77 years,

14   et cetera.

15        Can you explain to the jury why that number is so

16   large, $6 million?

17   A.    Well, that is the largest part of the lifecare plan.

18   That is separate from the prosthetics and the services

19   provided by Mr. Colon Ayala.  That's the basic lifecare

20   plan, much of which is attendant care that would be

21   necessary for Mr. Colon Ayala over the remainder of his

22   lifetime.

23   Q.    And what part of that Roman Numeral I, the cost of

24   care and attendant care, is related to labor costs, hourly

25   labor costs?

```
 1   A.   Approximately 70 percent.
 2   Q.   Okay.  What is the average hourly wage in Connecticut
 3   today?
 4   A.   The average hourly wage in Connecticut for workers
 5   would be in the neighborhood of $20 per hour, 20 to $25
 6   per hour.
 7   Q.   Let me show you a demonstrative exhibit marked as
 8   Exhibit Number 260.
 9             THE COURT:  Any objection?
10             MR. HICKEY:  No, Your Honor.
11             MR. REED:  No objection.
12             THE COURT:  Full demonstrative exhibit.
13   BY MR. RUSH:
14   Q.   First of all, Dr. Crakes, can you tell the jury what
15   this Exhibit Number 260 is?
16   A.   Yes.  It provides the date of birth and date of
17   injury of Mr. Colon Ayala, and the decimal equivalent.  In
18   other words, March 4 of 1985, March 4 would be .17 of a
19   full year, so that his date of birth in decimal equivalent
20   would be 1985.17.  The date of injury, 2011.21.  His age
21   at that time was 26.04 years.  And his life expectancy,
22   based on the source listed at the bottom of the page, is
23   54.06 years.
24   Q.   And the total of those is 80.1 years?
25   A.   80.10, yes.
```

1  Q.   Again, if Mr. Colon were to live as long as some of

2  the people in his family, if he were to live 20 percent

3  more than that, how would that affect your calculations?

4  A.   Approximately proportional.

5  Q.   Would you tell the jury what the source of this

6  average life expectancy is?

7  A.   Yes.  It's the National Vital Statistics Reports for

8  2011, the year of Mr. Colon Ayala's injury.  It's

9  published by the U.S. Department of Health and Human

10 Services and the National Center for Health Statistics.

11 Q.   This average life expectancy, can you explain to the

12 jury whether some people live longer or shorter lives?

13 A.   Yes.  It's a statistical average.  Some will live

14 longer, some will live shorter.

15 Q.   Is there any economic analysis that allows you to

16 determine whether somebody is going to live longer or

17 shorter than the life expectancy as estimated, the average

18 life expectancy computed by the National Vital Statistics?

19 A.   Not that I'm familiar with, no.

20 Q.   Okay.  In regard to your opinion, are there any other

21 sources of data that you've not shared with the jury?

22 A.   No.

23 Q.   And again, does your opinion render it within a

24 reasonable degree of economics probability?

25 A.   Yes.

```
 1   Q.   Can you tell the jury whether your opinion and
 2   conclusion in this case, as to both life expectancy and as
 3   to the discounted values, is reasonable and reliable?
 4   A.   I believe it is, yes.
 5             MR. RUSH:  Okay.  Thank you.
 6             No more questions, Your Honor.
 7             THE COURT:  Okay.  Cross-examination?
 8             MR. HICKEY:  We're going to defer to
 9   Attorney Reed, Your Honor.
10
11                     CROSS-EXAMINATION
12   BY MR. REED:
13   Q.   Good morning, Doctor.  How are you today?
14   A.   Good morning.  I'm fine, how are you?
15   Q.   We met a couple years ago when you had your
16   deposition at my office in Wallingford.  Do you remember
17   that in June of 2015?
18   A.   Yes.
19   Q.   I just have a few follow-up questions for you.
20        Your work in this case has been based on Mr. Forman's
21   lifecare plan; is that right?
22   A.   Yes.
23   Q.   Okay.  So you've worked with his business, his
24   organization before?
25   A.   Yes, I've worked in cases where a report has been
```

1    provided by Comprehensive Rehabilitation Consultants, yes.

2    Q.   And you've done that about 140 or 150 times?

3    A.   I would say, over the last 36 years, that would be

4    approximately right, yes.

5    Q.   And in each of those instances, that's been on behalf

6    of an injured party who needs a lifecare plan?

7    A.   Yes.

8    Q.   Okay.  And you've therefore come into the case to

9    essentially, for lack of a better expression, run the

10   numbers, what is it going to cost for that lifecare plan.

11   A.   It provides the present value of that prescribed care

12   plan, yes.

13   Q.   How long have you been doing this litigation support

14   work?

15   A.   Around 36 years.

16   Q.   And in the course of your work in that capacity, how

17   many hours a week are you working on it?

18   A.   I'm sorry?

19   Q.   How many hours a week are you dedicating to

20   litigation support services?

21   A.   At this point I would say it's my full-time

22   occupation.

23   Q.   40, 45 hours a week?

24   A.   In that range, yes.

25   Q.   How many times before today have you appeared in

1    court to testify?

2    A.   Over that 36 years?

3    Q.   Correct.

4    A.   I'd approximate 500 times.

5    Q.   When you testify in a matter, what's the breakdown of

6    your work or testimony on behalf of plaintiffs versus

7    defendants?

8    A.   I would say that 75 to 80 percent of the analyses I

9    perform are for attorneys representing plaintiffs; 20 to

10   25 percent for those representing defendants.  Most of my

11   appearances in court are for those who are representing

12   plaintiffs.

13   Q.   How many times have you given a deposition as an

14   expert economist in a case?

15   A.   Again, over 36 years, probably over 700 times.

16   Q.   And do you charge for your services?

17   A.   There's a fee for my time, yes.

18   Q.   Currently, how many reports are you doing annually?

19   A.   Again, an approximation, I would say 120 times per

20   year.

21   Q.   And what do you charge for your report, such as the

22   one you've done in this case?

23   A.   The fee for my time associated with performing an

24   appraisal of economic loss currently is $3400.

25   Q.   $3400.

1       So on an annual basis, would that be a little bit

2   more than $400,000 of income a year?

3   A.   Approximately, yes.

4   Q.   And you indicated you're still teaching on a

5   part-time basis?

6   A.   Yes, I do.

7   Q.   So if you were to look at your total workload, how

8   much time do you spend teaching?

9   A.   I would say, in addition to the time I spend

10  performing appraisals of economic loss during the academic

11  year, another 15 hours per week, perhaps, associated with

12  my academic activities.

13  Q.   But you're primarily working on these economic loss

14  appraisals for litigated cases, correct?

15  A.   Since I became a professor emeritus in 2011, that's

16  correct.

17  Q.   So it's been for approximately the last six years?

18  A.   Yes.

19  Q.   Now, your economic loss numbers are just an estimate,

20  correct; in other words, it's not a number calculated down

21  to the exact penny?

22  A.   No.  It is an estimate based upon the lifecare plan

23  and other inputs that were provided to me.

24  Q.   And you're relying on the data and the analysis

25  provided by Mr. Forman, correct?

 1  A.   Yes, I am.

 2  Q.   So you're not making your own judgment about the need

 3  of one item or another item, or some test or some other

 4  piece of equipment, in Mr. Colon's case, correct?

 5  A.   No.  That's not my area of expertise.

 6  Q.   You rely on all of his assumptions for the

 7  calculation of the figure that represents the present

 8  value of the cost of his future care.

 9  A.   To clarify, Mr. Forman did not provide the present

10  value.  He provided the outline of the prescription for

11  care.  I did not provide any type of assessment of that --

12  of his care needs.

13  Q.   Correct.  That's not your area of expertise.

14  A.   As I have indicated, yes.

15  Q.   So you're just taking what he's recommending; and,

16  where there's a range, you're looking at the midpoint, and

17  then you're doing the math?

18  A.   Yes.

19  Q.   Okay.  And one of the factors that you're using in

20  your analysis is the life expectancy factor, correct?

21  A.   Yes.

22  Q.   That's predicated on national statistics?

23  A.   Yes.

24  Q.   And explain to the ladies and gentlemen of the jury

25  whether those are statistics unique to an individual, or

 1    whether they are for all representatives of the particular

 2    person, if it's a male, Hispanic male, female, or whatever

 3    demographic description they may --

 4    A.    As you describe, the life expectancy tables are

 5    differentiated on the basis of race, gender, and age.  So

 6    it would be a statistical average for Mr. Colon Ayala,

 7    based upon those defining characteristics.

 8         The values are average life expectancies.  It's not

 9    people all who are in perfect health.  It's people --

10    everyone, people with a variety of different maladies,

11    different characteristics.  It's a statistical average.

12    Q.    And you need this information because you have to

13    figure out how long it's likely the person is going to

14    live, in order to calculate the cost of care over their

15    remaining expected lifetime?

16    A.    The calculation of the present value does require a

17    specified period of time over which those care needs will

18    be required.

19    Q.    Okay.  And this is average data, correct?

20    A.    As I just indicated, yes.

21    Q.    So you're not taking into account in the use of that

22    information any features about Mr. Colon himself, for

23    example?

24    A.    Well, other than age, gender and race; and again,

25    keeping in mind that the life expectancy tables are not

1    for people in person health.  They're a statistical

2    average for people overall.

3    Q.   But it's not taking into his account prior medical

4    history, his prior drug-use history or any other features

5    concerning him, correct?

6    A.   Only to the extent that that's reflected in an

7    average.

8    Q.   And so to the extent that his life expectancy may be

9    affected adversely by unique features in his medical

10   background, that's not being reflected in your analysis;

11   you're using national figures, correct?

12   A.   I'm using national data based on the defining

13   characteristics I mentioned earlier.  And again, it is a

14   statistical average.

15   Q.   So just on this calculation of the value of the loss,

16   you're essentially, if I understand correctly, essentially

17   saying that there's a wash between the expected rate of

18   growth of capital and inflation, correct?

19   A.   It's assuming that, on average, the rate of growth

20   and the cost of care will be equal to the discount rate.

21   In some years one may exceed the other; but on average,

22   the two will be equal.  That's based on a review of

23   historical data over the last 60 years.

24   Q.   So as applied to this case, the net result is that

25   the figures are essentially the same.  You're indicating

1    that, based on Mr. Forman's, report the value is

2    10.9 million, and the discounted present value is about

3    10.4 million, correct?

4    A.   Well, the values, I believe -- I believe the

5    estimated economic loss is 9.96 million.

6    Q.   Those are actually slightly different figures than

7    the ones that you had in your initial report, correct?

8    A.   Yes, they're lower than what was in the initial

9    report.

10   Q.   But you posit, for the sake of this analysis,

11   basically a wash.  It's going to wind up being about the

12   same?

13   A.   That on average the two will be equal.

14   Q.   Aren't there some economists who disagree with that

15   approach?

16   A.   Some economists will specify a particular growth rate

17   and a particular interest rate.  My personal opinion is, I

18   don't believe that either of those is knowable, which is

19   why I review the historical record and how the two values

20   compare to one another.

21   Q.   So the way in which you approach it is something

22   that's not universally accepted in the field of economics,

23   correct?

24   A.   Well, in the field of economics, one would have to

25   have the same process involved in terms of identifying a

1    present value.  It's the way in which one would make

2    assumptions in that regard.  And I rely on the methodology

3    that I've just discussed for the reasons I've discussed.

4    Q.   Very well.  And I appreciate that, but that's not met

5    with universal agreement in your profession, correct?

6    A.   No.  As I've indicated, some will specify a specific

7    growth rate and a specific interest rate.  I do not do so.

8    Q.   Okay.  And isn't it true that those economists who

9    disagree with you would indicate that the approach that

10   you take may actually produce an overstatement of the

11   value, correct?

12   A.   Actually, no.  There are articles that have appeared

13   in the Journal of Forensic Economics that have suggested

14   that the approach of assuming that, on average, the two

15   will be equal provides the most reliable estimates.

16   Q.   So you're not familiar with people who would indicate

17   that there's an overstatement effect to the way you do

18   this?

19   A.   If someone were to suggest that, that would be up to

20   them.  I've indicated the analysis that I perform and the

21   reasons that I made the assumption I have.

22   Q.   And you're not familiar with that critique?

23   A.   I'm familiar with it.  I just indicated, however, an

24   article in the Journal of Forensic Economics suggesting

25   the opposite.

1   Q.   Now, as far as this case is concerned, you haven't

2   interviewed or met with the plaintiff, Mr. Colon, or his

3   wife, Arlene Davis?

4   A.   Not to my knowledge; no, I have not.

5   Q.   You haven't studied their needs in terms of medical

6   needs or home care needs?

7   A.   As I've indicated, that's not my area of expertise.

8   Q.   So if it turns out in this case that some facet of

9   Mr. Forman's recommendations should not apply or don't

10   apply, or aren't accepted by the ladies and gentlemen of

11   the jury, wouldn't then the cost of those assumptions have

12   to fall out of your figure?

13   A.   If there were alternative assumptions regarding the

14   needs and the care needs of Mr. Colon Ayala, that would

15   produce alternative results, yes.

16   Q.   In other words, if for some reason he were to have

17   some assistance through a family member who would agree to

18   help out in lieu of the hired attendant that's been

19   recommended, that would not then be a cost, and it would

20   fall out of your figure, correct?

21   A.   Well, it would be a cost to that family member.  The

22   family member would be devoting their time to Mr. Colon

23   Ayala's care needs, which would not be without a value.

24   So no, I don't agree with you.

25   Q.   But if they agreed to do so on a voluntary basis,

1  there wouldn't be a cost associated with that, correct?

2  A.   Well, if someone is providing their time on a

3  voluntary basis, it doesn't mean that that time doesn't

4  have value.

5  Q.   And if it turned out that his residential needs may

6  turn out to be different from what Mr. Forman recommended,

7  who I think has talked about a three-bedroom,

8  two-and-a-half-bath house, and, for whatever reason that

9  may come into play, that weren't needed, the cost of that

10  then would fall out of your report, correct?

11  A.   No, not at all.  I did not include the cost of

12  purchasing a home in my report.

13  Q.   And the associated cost of lawn care and maintenance

14  of that structure, that's also not in your calculations?

15  A.   No, I did include those values.  I did not include

16  the value of purchasing a home.

17  Q.   If they turn out not to apply, they shouldn't be

18  included in the figure; isn't that right?

19  A.   Again, alternative assumptions in that regard would

20  generate alternative results, that's correct.

21  Q.   So it's the old, it's only as good as the data

22  opposite that comes in; garbage in, garbage out?

23  A.   It's based on the assessment of the care needs for

24  Mr. Colon Ayala provided by Mr. Forman.

25  Q.   The point I'm trying to make is that if some of what

1    Mr. Forman is proposing is not deemed to be necessary,

2    that, by definition, has to come out of the analysis?

3    A.   If that were the case, yes.

4    Q.   Now, as far as the part of your report that deals

5    with the loss of value of services that Mr. Colon had been

6    providing to his wife, Arlene, before the accident, again,

7    you're relying on input from CRC, correct --

8    A.   Yes.

9    Q.   -- Mr. Forman?

10   A.   Yes.

11   Q.   And I think you indicated at the time of your

12   deposition that there is something that's known as the

13   American Time Use Survey?

14   A.   Yes, there is.

15   Q.   Explain to the ladies and gentlemen of the jury what

16   that American Time Use Survey is.

17   A.   The American Time Use Survey is conducted by the

18   Bureau of Labor Statistics of the U.S. Department of

19   Labor.  It's a survey of approximately 20- to 25,000

20   households in the United States where diaries are

21   maintained and people identify the amount of time they

22   spend, men and women, in different types of household

23   production activities.

24        And the American Time Use Survey is conducted

25   periodically to assist in providing an indication of what

1    amounts of time Americans are spending in household

2    production, and the opportunity to perhaps value that time

3    as well.

4    Q.   Okay.  And did you use that national average in

5    computing the loss of the value of services that Mr. Colon

6    had been providing?

7    A.   No.  I relied on the assessment of Mr. Forman and

8    Comprehensive Rehabilitation Consultants in terms of the

9    amount of time.

10   Q.   And so when it came to the assessment of Mr. Colon's

11   life expectancy, you used national figure as a national

12   average, correct?

13   A.   Yes, I did.

14   Q.   But when it comes to the issue of this loss to

15   Ms. Davis of the services that have been provided by her

16   husband, you chose not to use a national average?

17   A.   No.  Because it was indicated that Mr. Colon Ayala

18   was providing more than that average in terms of the

19   services that he was providing on behalf of his wife.

20   Q.   You didn't do that analysis, you didn't meet with the

21   two individuals involved --

22   A.   No --

23   Q.   -- in their house?

24   A.   -- not at all.  I'm sorry.  Not at all.

25        As I indicated, I relied on the valuation of

1    Comprehensive Rehabilitation Consultants.

2    Q.   Isn't it true that the value associated with what

3    CRC, Mr. Forman's firm, comes up with produces a higher

4    cost figure than would have been obtained using the

5    national average?

6    A.   Yes.  Because of the number of hours that Mr. Colon

7    Ayala was involved in performing those services.

8    Q.   So as far as life expectancy, you rely on national

9    averages; but for this other item, you're using specific

10   unique information?

11   A.   Yes.  I'm not aware of any specific tables for life

12   expectancy as you're describing; so yes, that's why I

13   relied on the national averages.

14              MR. REED:  Very good.  Thank you, Doctor.

15              THE WITNESS:  Thank you.

16              THE COURT:  Anything else?

17

18                    REDIRECT EXAMINATION

19   BY MR. RUSH:

20   Q.   In your economic analysis, this Exhibit 259, you just

21   said something about new housing not being included in

22   your analysis.

23        What did you mean by that?

24   A.   There was a value in the lifecare plan for the

25   purchase of a home for Mr. Colon Ayala.  I did not include

 1   that.

 2   Q.   Okay.   In Connecticut, is Connecticut generally above

 3   the cost of living for the average in the United States?

 4   A.   On average; yes, it is.

 5   Q.   It costs more to live here than other places in

 6   the U.S., on average?

 7   A.   On average, yes.

 8   Q.   And do you recall the number of hours that were

 9   estimated as being provided on a weekly basis,

10   approximately, by Mr. Colon for your analysis?

11   A.   For the services that he was providing on behalf of

12   his wife, approximately 25 hours per week, as I recall.

13   Q.   And that computes to a little less than three and a

14   half hours -- or approximately three and a half hours or

15   less per week?

16   A.   Well, 25 hours per week.

17   Q.   Yes, I'm sorry, 25 hours per week would be 3 and a

18   half hours a day, on average?

19   A.   Yes.

20            MR. RUSH:  Thank you very much, sir.

21            THE WITNESS:  Thank you.

22            THE COURT:  Anything else?

23            MR. HICKEY:  No questions.

24            THE COURT:  Thank you.  You're excused.  Thank

25   you for coming.

1        Next witness, please.

2        MR. RUSH:  Your Honor, we're going to play the

3   video of the MTA corporate representative, Raymond

4   Russell.  It lasts about an hour and a half.

5        THE COURT:  I guess we'll maybe start the first

6   15 minutes and take our break, ladies and gentlemen,

7   at 10:30.

8        Okay.

9        (Raymond Russell video deposition played.)

10        THE COURT:  We'll suspend at this point, ladies

11   and gentlemen, for our morning break, and ask you to come

12   back in 15 minutes' time, and usual advisories.

13        (Whereupon the jury left the courtroom.)

14        THE COURT:  Please be seated.

15        It just occurred to me, I want to make sure,

16   Mr. Rush, are you marking -- we're playing the deposition,

17   but do you have a marked exhibit?

18        MR. RUSH:  I think we do have a marked -- we

19   have a video disk that's marked.

20        We have a video, doesn't have a number yet.  He

21   did a video.

22        THE COURT:  I'll ask you, during the break, to

23   make sure you mark all of your video depos.

24        MR. RUSH:  Paper and disk?

25        THE COURT:  And the paper.  In the event that

1    there's further review in the case, we want to make sure

2    that any other court, or this Court, for that matter, on

3    any kind of post-trial motions, might have the opportunity

4    to review those and be part of the record.

5            MR. RUSH:  Thank you, Your Honor.  We've already

6    filed in the court file the entire deposition of Mister --

7    of Deputy Russell, and also Mr. Doody --

8            THE COURT:  Sounds good.

9            MR. RUSH:  -- as well as Berrang.

10           THE COURT:  Along with the markings, the depo.

11   Okay, great.

12           Anything else to take up at this point?

13           See you in about fifteen.

14               (Whereupon, a recess followed.)

15           THE COURT:  Let's get the jury.

16               (Whereupon, the jury entered the

17               courtroom.)

18           THE COURT:  Welcome back, ladies and gentlemen.

19   Please be seated.

20           We'll continue at this time with the deposition

21   testimony of Mr. Russell of the MTA.

22           (Video deposition of Raymond Russell played.)

23           THE COURT:  Is that it?

24           MR. RUSH:  Yes, sir.

25           THE COURT:  Ladies and gentlemen that completes,

1   that deposition, and so great time for a lunch break.

2   We'll take a lunch break for -- let's try to get going at

3   1:00, if we can, to make sure we've got enough time today.

4           And my usual advisories:  Don't talk about the

5   case any research, or talk to anybody here in the

6   courtroom.  Enjoy your lunch.  Thank you.

7               (Whereupon the jury left the courtroom.)

8           THE COURT:  Please be seated.

9           Okay.  So we've just got -- is it Ms. Rodriguez

10  coming?

11          MR. RUSH:  Yes, Your Honor.

12          THE COURT:  And then Mr. Wilhelmy?

13          MR. RUSH:  In reverse order, I think.

14          THE COURT:  Okay.  And then that will be it for

15  the plaintiffs' case?

16          MR. RUSH:  Yes, Your Honor.  When we come back

17  at 1:00, we have some evidentiary issues preliminary to

18  Mr. Wilhelmy, unless you want to do them now.

19          THE COURT:  We should handle this now.

20          MR. RUSH:  Your Honor, Mr. Fineman gave us what

21  we think is a new exhibit.  We have the photographs that

22  we took early on, out at the site, and we have another

23  photograph given to us by Joe Jordano from the Department

24  of -- Connecticut Department of Transportation.

25          But this is a new photo, it's we think an

1    enhanced photo.  We have not seen it before.  It's not an

2    exhibit in either our book or theirs, I think.  I know

3    it's not a listed exhibit of theirs.  So it is a -- what

4    we think is an enhanced picture.  It looks like the sign

5    has been cleaned and some other things.  So we object to

6    this.  It's not listed.

7              THE COURT:  I see.

8              Mr. Fineman?

9              MR. FINEMAN:  Thank you, Your Honor.

10             I take particular exception to the suggestion

11   that we doctored anything that we would offer as evidence.

12             The photograph that I showed Mr. Rush this

13   morning, and I'm happy to show Your Honor --

14             THE COURT:  Sure.

15             Are you proposing to use this in the

16   cross-examination of Mr. Wilhelmy?

17             MR. FINEMAN:  Yes, Your Honor.

18             THE COURT:  And just for our record, say what

19   the photograph purports to depict.

20             MR. FINEMAN:  This a photograph of the sign

21   while it was still attached to the Tower 1043.  There have

22   been other photographs that have been offered of that same

23   sign while attached to the tower.

24             We know that the sign was removed sometime

25   shortly after the accident.  So Mr. Wilhelmy was on site

1  at the time of the accident, you heard that from

2  Officer Russell today, and he will be able to testify that

3  that sign accurately and fairly depicts the condition of

4  the sign as he observed it on the day of the accident.

5          Mr. Rush has shown photographs to various

6  witnesses and said:  Sitting across the table from me or

7  standing here in court, can you read this photograph of

8  the sign?

9          And witnesses have said:  Not easily; or no.

10          Mr. Wilhelmy will be able to, again, vouch for

11  the accuracy of that photograph.

12          And I think it's fair to show the jury another

13  photograph of the same sign, which makes it clear that it

14  is fairly legible if one were to make an attempt.  And

15  that's also consistent with Officer Russell's take on

16  things.

17          Again, Your Honor, I don't know -- I tried to

18  retrace the steps from where the photograph came from.  I

19  know that every single photograph that has ever been taken

20  of the accident site or anything having to do with the

21  accident has been exchanged in discovery.  There's been

22  hundreds of photographs that have been exchanged between

23  the parties.  We didn't hold anything back.

24          And I can't say it was under cover of X date

25  that we sent this to Mr. Rush -- or we received it from

 1    Mr. Rush, I'm not sure -- but I'm quite confident that

 2    this is not a new photograph that's been received by us.

 3    We received everything during the course of the

 4    litigation.

 5              THE COURT:  This is the photograph, for the

 6    record, that seems to show, somewhat legibly now, that

 7    there is a sign and some writing underneath the JAS 7 sign

 8    that's been already the topic of much discussion to date

 9    in the case.  And it appears to be a danger and peligro

10    high-voltage sign that is not in any kind of color.

11              Is that a fair statement of essentially what

12    this photograph appears to show?

13              MR. FINEMAN:  I believe that's accurate.

14              THE COURT:  Help me understand why this wouldn't

15    have been produced or noticed as an exhibit a long time

16    ago.

17              MR. FINEMAN:  I would offer it as a rebuttal

18    exhibit, Your Honor, because witnesses have been called

19    upon here, in court, to describe whether they could read

20    what's on the sign.

21              And again, with the numerous photographs that

22    have been floating around, I was under the mistaken

23    impression that that had been included somewhere in the

24    plaintiffs' binder.  I went through it this morning when I

25    got up to court, and I realized it was not included in

 1   their exhibits.  I think it's fair to offer that as a

 2   rebuttal because of the testimony that Mr. Rush has

 3   elicited.

 4              THE COURT:  Mr. Wilhelmy, did he take this

 5   photograph?

 6              MR. FINEMAN:  I do not believe he took the

 7   photograph.

 8              THE COURT:  So is he -- do you understand -- has

 9   he looked at this photograph?

10              MR. FINEMAN:  He has, yes.  I showed it to him.

11              THE COURT:  And you understand that he's

12   prepared and will testify that this is -- that one could

13   see this -- that this photograph is accurate in the sense

14   of -- was he going to say that he was personally on the

15   site, and he remembers coming up to this particular sign

16   and looking and seeing, in fact, that it looked like what

17   this photograph purports to show, that he could actually

18   see the "danger" and the "live wire" inscriptions on the

19   sign; is that what he's going to say?

20              MR. FINEMAN:  Yes, Your Honor, that's exactly

21   what he's going to say.

22              THE COURT:  When did he do that?

23              MR. FINEMAN:  When did he see the sign?

24              THE COURT:  Yes.

25              MR. FINEMAN:  On the day of the accident.  He

1    was one of the first people on site.  You may recall,

2    Officer Russell named him as somebody that was there by

3    the time Officer Russell got there.

4            He was sort of running the show for the

5    Metro-North portion of the rescue, and he was one of the

6    first people on site.  He looked at the accident site.  He

7    looked at the sign.  And he told me that looking at that

8    photograph, that does accurately represent the sign as he

9    observed it on that day, shortly after the accident.

10           THE COURT:  Okay.

11           All right.  Mr. Rush, are you denying that you

12   received a copy of this?

13           MR. RUSH:  Yes, sir, I am.  I don't think they

14   can show that they've ever given us this document, ever.

15   And the photographs, if they had, we would have used this

16   in the deposition of Mr. Russell.  We would have used this

17   photograph in the deposition of Mr. Doody.

18           As it were, we used the photographs that we had.

19   We weren't even sure whether they were going to have

20   these.  The MTA photographs that they sent us did not

21   include this one.

22           We got a photograph from Mr. Jordano, at

23   ConnDOT, attached to some other documents that he produced

24   to us.  We have not received this.  It's not listed as

25   their exhibit.  It's not rebuttal exhibit.  And what it

1    does is it puts us in a situation now where we're going to

2    have to ask Mr. Wilhelmy about this question.

3              And we took Mr. Wilhelmy's deposition.  This

4    wasn't produce at Mr. Wilhelmy's deposition.  I'm looking

5    through his exhibits right now.  I don't remember if we

6    showed him the -- that's, you know, the picture we had or

7    not.

8              We do deny we got it.  It's not in our list.

9    It's not in their list.  It's a surprise.  We weren't

10   allowed to use the accident report or the incident report

11   from 2001 because we didn't list it.

12             What this forces us to do is, on the eighth day

13   of trial, change a significant fact of the case.  And

14   we've had no notice of this.  It just popped up this

15   morning.  Opposing counsel can't point to how they got it

16   to us.

17             Of course he's going to say he saw it out there.

18   I'm not even saying it may not be an accurate picture.  It

19   looks like it's enhanced.  It looks like it's cleaned up

20   in some way.  But I'm not even on that.  I'm on the issue

21   that this is the photograph we would have used in the

22   depositions.

23             If this photo existed, why wasn't it given to us

24   in 2014, so we could use it in the depositions, which

25   we've now played, of Doody and Russell.  We would have

1    showed this to them.

2              And now it's the eighth day of trial, and the

3    jury is going to see this, and they're going to say, oh,

4    the plaintiff is hiding stuff from us.

5              The defense is hiding stuff.  It isn't fair.

6    And it isn't listed on their exhibit list.  If they had

7    this, one would think that they would have listed it.

8    They've had these depositions for three years.

9              THE COURT:  Okay.

10             I'm going to reserve on this and think about

11   this over the lunch break.

12             Are there other evidentiary issues?

13             MR. RUSH:  Just briefly, Your Honor.

14             The Chacon -- Mr. Chacon is under subpoena.  I

15   don't know if he'll show up or not.  He's pretty hot about

16   being subpoenaed to testify because he gave a deposition.

17   I don't really want to read his deposition if I have to

18   call him as a rebuttal witness.

19             I guess I'd like to know is -- anything that

20   Mr. Wilhelmy would have talked to Mr. Chacon about would

21   be hearsay.  So I'm assuming that we're not going to get

22   any questions about that.  If we are, I'd like to know in

23   advance.

24             Yesterday we had a situation where we had a

25   hearsay arrest report, not even a conviction, not even

1    misdemeanor or whatever, it just came up, they talked

2    about it for a while, and then you had to do an

3    instruction.

4             I don't want to be surprised by Mr. Wilhelmy

5    saying, oh, yeah, I talked to Chacon, and he told me A, B,

6    C.  That would be hearsay.  I don't want to have that

7    happen.

8             I assume we're not going to have any more arrest

9    information.  I assume we're not going to have

10   Mr. Wilhelmy get up and say, "I think he was stealing

11   copper," because that's been excluded by the Court.

12            THE COURT:  You know, I excluded that at the

13   time, before you decided to introduce evidence of this.  I

14   was surprised when I saw your inclusion of all that

15   information, suggesting for the first time in the case

16   that he was stealing copper.

17            MR. RUSH:  Not the first time, because yesterday

18   stealing copper was made part of the --

19            THE COURT:  That was stricken.

20            But you've designated these sections of this

21   Russell deposition a long time ago.

22            MR. RUSH:  I did it before you struck it.  And

23   the point of all -- to get to the point was, there is no

24   evidence that he was a thief.

25            THE COURT:  I see.

1    MR. RUSH:  That was designated back in May, you

2  eliminated that issue in June.  And for whatever reason,

3  it's still there.  There's no discussion about -- it's all

4  negative evidence.

5    THE COURT:  Okay.  So you're concerned that

6  Wilhelmy --

7    Are you asking Wilhelmy anything about Luis

8  Chacon?

9    MR. HICKEY:  Your Honor, Mr. Wilhelmy is going

10  to be Mr. Fineman's witness, but since I have told

11  Your Honor on perhaps a dozen prior occasions that the

12  defense to this case never has been, and is not going to

13  be today, on the eighth day of trial, that he was stealing

14  copper, I don't believe that's going to come up.

15    Mr. Wilhelmy was deposed, so Mr. Rush had ample

16  opportunity to talk with him about any information told to

17  him by Mr. Chacon.  My understanding is that our

18  examination is not going to touch on that.

19    THE COURT:  Unless he opens the door.  Now

20  copper is in the case because Mr. Rush has put it in the

21  case.

22    But I guess, then, you have your answer, there's

23  not going to be an examination of Mr. Wilhelmy about Luis

24  Chacon unless you decide to go into that area.

25    MR. RUSH:  Very good, Your Honor.

1    THE COURT:  All right.

2    Or about the copper issue unless it's opened.

3    MR. HICKEY:  Again, not on direct.

4    THE COURT:  So you're proposing, in part, on

5    your Wilhelmy to do partial direct?

6    How did we leave this?

7    MR. RUSH:  I don't know how we left it,

8    Your Honor.

9    MR. FINEMAN:  I believe we had suggested it

10    yesterday, and Mr. Rush was not --

11    THE COURT:  He objected to that.  So you'll

12    bring him back in your direct case.  Okay, so you'll stay

13    within scope.

14    And that would presumably be tomorrow.

15    MR. FINEMAN:  Yes, Your Honor.

16    THE COURT:  Right, when the defense case goes

17    forward.

18    Okay, so sounds fine.  We'll reconvene at 1:00,

19    and we'll discuss this issue.

20    I'm going to ask you, Defense, to please make --

21    mark this new photograph of the JAS 7 sign as just

22    identification in the event that, whatever my ruling might

23    be, there might be a need for a reference to what that

24    photograph is.

25    MR. FINEMAN:  Yes, Your Honor.

1    THE COURT:  So if you can do that.  Thank you.

2    Stand in recess.

3         (Whereupon, a recess followed.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         C E R T I F I C A T E

3

4      RE:  COLON, ET AL. V. METRO-NORTH COMMUTER RAILROAD

5              COMPANY, ET AL., NO. 3:13CV325(JAM)

6

7              I, Diana Huntington, RDR, CRR, Official Court

8      Reporter for the United States District Court for the

9      District of Connecticut, do hereby certify that the

10     foregoing pages 1477 through 1549 are a true and accurate

11     transcription of my shorthand notes taken in the

12     aforementioned matter to the best of my skill and ability.

13

14

15

16

17                        _____/s/_____

18                        DIANA HUNTINGTON, RDR, CRR
                               Official Court Reporter
19                        United States District Court
                               141 Church Street
20                        New Have, Connecticut 06510
                               (860) 463-3180
21

22

23

24

25