1           UNITED STATES DISTRICT COURT

2              DISTRICT OF CONNECTICUT

3    - - - - - - - - - - - - - - x
                                 :  Case No.
4    MILTON OMAR COLON, ET AL,   :  13cv325(JAM)
                                 :
5              Plaintiff,        :
           vs.                   :
6                                :
     METRO-NORTH COMMUTER        :  141 Church Street
7    RAILROAD COMPANY, a public  :  New Haven, CT
     benefit corporation of the  :  August 16, 2017
8    State of New York, ET AL    :
                                 :
9              Defendant.        :
     - - - - - - - - - - - - - - X

10

              TRIAL TRANSCRIPT
11        VOLUME VIII - P.M. SESSION

12   BEFORE: THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.,
                                        And jury

13

14   APPEARANCES:
     FOR THE PLAINTIFF:        BRIAN P RUSH, ESQ.
15                             Woodlief & Rush, P.A.
                               3411 W. Fletcher Ave.,
16                             Tampa, FL 33618

17

18   FOR THE DEFENDANT         ROBERT O. HICKEY, ESQ.
     METRO-NORTH:              BECK FINEMAN, ESQ.
19                             Ryan Ryan Deluca LLP
                               1000 Lafayette Boulevard,
20                             Bridgeport, CT 06604

21

22

23           Sharon Montini, RMR, FCRR
                 915 Lafayette Blvd
24             Bridgeport, CT 06604
               Official Court Reporter

25

APPEARANCES CONTINUED

FOR THE DEFENDANT           CHARLES REED, ES
UNITED ILLUMINATING:        JAMES RINGOLD, ESQ.
                            Loughlin, Fitzgerald, P.C
                            150 South Main Street
                            Wallingford, CT 06492

1552

```
 1                    THE COURT:  All right, please be seated.
 2      We're waiting for Mr. Rush.
 3                    MR. RUSH:  Your Honor, I apologize.
 4                    THE COURT:  All right, so before we
 5      start, can I see the photograph here?
 6                    MR. RUSH:  Your Honor, we resolved it.
 7                    MR. HICKEY:  Your Honor, can I
 8      interrupt?
 9                    THE COURT:  Yes.  Okay, go ahead.
10                    MR. HICKEY:  For the record, Metro-North
11      withdraws that exhibit and will not use it today or
12      tomorrow.
13                    THE COURT:  Okay.
14                    MR. HICKEY:  It's withdrawn.
15                    THE COURT:  Okay.  Fair enough.  All
16      right.  And that was just, for the record, exhibit
17      number what?
18                    THE CLERK:  523.
19                    THE COURT:  523, okay.  Marked for ID
20      only.
21                    Next -- well, we won't call our witness
22      until we get our jury.  All ready for the jury?
23      Okay.
24                    (Jury entered the courtroom.)
25                    THE COURT:  Welcome back, ladies and
```

1  gentlemen.  Please be seated.  So we will continue

2  at this time.

3          If plaintiff would like to call the next

4  witness.

5          MR. RUSH:  Thank you, your Honor.  We'll

6  call Phil Wilhelmy.

7          THE COURT:  Great.

8          P H I L I P   W I L H E L M Y,

9  Having first been duly sworn, was examined and

10  testified as follows:

11          THE WITNESS:  Philip Wilhelmy, III.

12  W-i-l-h-e-l-m-y.  Seymour, Connecticut.

13  DIRECT EXAMINATION

14  BY MR. RUSH:

15      Q.   Good afternoon, sir.  How are you?

16      A.   Good.  Thank you.

17      Q.   Mr. Wilhelmy, can you tell us where you are

18  employed now?

19      A.   Metro-North Railroad.

20      Q.   And what do you do now?

21      A.   Right now I am chief rail traffic

22  controller.

23      Q.   In 2011, March of 2011, did you occupy

24  another position for Metro-North?

25      A.   I did.

1    Q.    What was that position?

2    A.    District superintendent of operations, New

3    Haven.

4    Q.    And as district superintendent of

5    operations for the New Haven division, what were

6    your responsibilities, your duties in that position?

7    A.    The New Haven line is divided into two

8    districts.  I was the district superintendent of the

9    New Haven district.  My duties included, but weren't

10   limited to, managing and supervising the day-to-day

11   operations of train operations, the crews, the yard

12   operations.  I also would respond in the field to

13   any situations that were in the field, any special

14   projects.  I worked directly with and coordinated

15   with all of the different departments, the

16   mechanical department, the power department, track

17   department, such as that.

18   Q.    When you say you would respond to problems

19   in the field, can you tell the jury whether that

20   would include injury situations where individuals

21   had been injured on railroad property?

22   A.    Yes, I'd respond to situations in the

23   field.  Some of them would be injuries, yes.

24   Q.    And what was your -- could you tell the

25   jury what your responsibility was in terms of

1    responding to severe electrical injuries in the

2    field?

3         A.   My responsibility upon any incident or

4    injury in the field, being superintendent of

5    operations, I would be the highest ranking

6    operations person on the field and would take charge

7    of the scene, its situation, and lend assistance in

8    any way I can.

9         Q.   Okay.  What areas are covered by the New

10   Haven district when you were head of that district

11   in March of 2011?

12        A.   Basically from the division post in New

13   Haven to Stamford.

14        Q.   Okay.  When you were the superintendent of

15   operations for the New Haven district, were you in

16   charge of safety?

17        A.   We're all in charge of safety.

18        Q.   Well, the custodian at the Union Station

19   may have a lesser role than you?

20        A.   I don't believe so.

21        Q.   Okay.  So does everybody have the same

22   responsibilities in terms of ensuring safety that

23   you had?

24        A.   I believe that the responsibility is equal

25   across the board.

1    Q.    Well, let me go about it this way.  What

2    did you understand your duties to be in regard to

3    safety on the metro line -- Metro-North Railroad

4    line?

5    A.    My duties would be to ensure that both

6    external customers and internal customers are

7    provided with a safe work environment, a safe

8    transportation, and do whatever I can to make sure

9    our safety standards are met and that our safety

10   objectives are being followed.

11   Q.    Okay.  As district superintendent of

12   operations for the New Haven division in March of

13   2011, can you tell the jury who at Metro-North was

14   responsible for protecting children and teenagers

15   who might come on the right-of-way in March of 2011?

16   A.    I'm sorry, who was in charge of protecting

17   children and teenagers?

18   Q.    Yes, who might come onto the right-of-way

19   in March of 2011.

20   A.    I have a problem with understanding the

21   difference between anyone entering the right-of-way

22   and children and teens.  So we take the same

23   responsibility for our devotion to safety whether

24   they're children or teens or anyone.  So I don't

25   really know how to give a specific on that.

1    Q.    What was the answer to my question?  My

2    question was a who, not what you think.

3    A.    Okay.

4    Q.    So let's try it again.

5    A.    Okay.

6    Q.    At Metro-North when you were superintendent

7    of operations in March of 2011, who was responsible

8    for protecting children and teenagers who might come

9    onto the right-of-way in March of 2011?

10   A.    Everyone that's in charge of protecting

11   anyone that comes onto the right-of-way would fit

12   that category.

13   Q.    Okay.  Again, if the answer to every

14   question is everyone, then it's no one.  So my

15   question to you -- well, does everyone include

16   everyone in this room?

17   A.    Everyone that works on Metro-North; the

18   state of Connecticut, who is a landlord of the

19   property; the MTA police.  In a broad brush, I would

20   count them as everyone.

21   Q.    Okay.  So let me ask you this:  Who was

22   most responsible for protecting children and

23   teenagers who might come onto the right-of-way in

24   March of 2011 when you were superintendent of

25   operations?

1     A.    Like I said, I don't have an answer for

2  that specific.   It would be everyone that would

3  enter -- it would be everybody's responsibility.   It

4  would be -- the state, the MTA police, would all

5  have a role in protecting people from -- or

6  preventing people from entering the right-of-way.

7     Q.    So in March of 2011 when you were

8  superintendent of operations for the New Haven line,

9  if someone came in to your boss, for instance, and

10  said who in our organization in your area is most

11  responsible for protecting children and teenagers,

12  you would have told your boss everyone, same level

13  of care, same obligations, everybody from the

14  custodian to the president?

15              THE COURT:   Hold a second.   Is there an

16  objection?

17              MR. FINEMAN:   Asked and answered.   And I

18  think there is a foundation issue at this point.

19              THE COURT:   There is a foundation issue.

20  The question is assuming there was somebody who was

21  specifically appointed to have responsibility.   So I

22  think that seems to be the point of confusion here.

23  So try to -- you can see if there in fact is a

24  specific responsibility or somebody who has those

25  specific responsibilities, but your question at this

1   point is assuming somebody had those assigned

2   specific responsibilities.

3        Q.    Was there a safety committee for the New

4   Haven district when you were the superintendent?

5        A.    Yes.

6        Q.    And were you on the safety committee?

7        A.    I was.

8        Q.    How many other people are on the safety

9   committee?

10       A.    The local safety committee, which I

11   chaired, was to have representation of as many

12   departments as we can at monthly meeting, and so

13   there would be anywhere from 4 to 12 people at a

14   time.

15       Q.    Can you name the departments that you can

16   recall being on that committee that you chaired in

17   March of 2011 as a superintendent of that division?

18       A.    All departments were invited and encouraged

19   to send a representative.  So there would be

20   representatives of the track department, power

21   department, mechanical department, maintenance of

22   way, station cleaners, custodians, ticket sellers.

23   The larger the pool the better we thought it was.

24       Q.    And which of those departments would be

25   primarily involved with activity on the railroad

1    right-of-way in March of 2011?

2         A.   The MTA police, and they were also invited

3    and often represented.

4         Q.   And who else besides the MTA police?

5         A.   Who besides the MTA police what?

6         Q.   Would be involved with activity, whether

7    it's repair or maintenance or patrol of the

8    right-of-way in your district in March of 2011?

9         A.   I'm sorry, was it who would be responsible

10   for the repair of the right-of-way?  Is that the

11   question?

12        Q.   No.  I was trying -- you had earlier said

13   everybody is responsible for safety, and you are the

14   head of the safety committee, and so I'm trying to

15   understand who is involved with safety on the

16   right-of-way.  And so to get to that, I am trying to

17   find out which departments are involved on the

18   right-of-way who are at your safety meetings.

19        A.   Basically all the departments that would

20   have access to the right-of-way would be involved

21   with the safety of the right-of-way.  At times there

22   is several departments that may be out there, the

23   track department, th power department, maintenance

24   of way people, conductors.  There is also

25   contractors, conduct the flags, train crews, the MTA

1    police.

2        Q.    Anyone else come to mind?

3        A.    No, not exactly.

4        Q.    Okay.  So I -- correct me if I'm wrong, I

5    heard track department, power department,

6    maintenance and weigh department?

7        A.    Maintenance of way.

8        Q.    Maintenance of way department.

9    Contractors.  By conductors, people on the train you

10   mean?

11       A.    No.  Well, sometimes a conductor flags,

12   have duties escorting non-railroad personnel onto

13   the right-of-way.

14       Q.    I also wrote down flag crew.  So flag crew

15   and conductors on the right-of-way would be the

16   same?

17       A.    Sometimes the train crews would be on the

18   right-of-way, whether they are changing hands on

19   trains or something to that effect.  So that would

20   include train crews as well.

21       Q.    So when we talk about conductors, train

22   crews and flag crews on the right-of-way, they are

23   all doing the same thing, basically?

24       A.    No.

25       Q.    On the right-of-way they are doing the same

1    thing?

2         A.    Not necessarily, no.

3         Q.    No. 1 we have the track department, No. 2

4    we have the power department, No. 3 we have the

5    maintenance of way department.

6         A.    Correct.

7         Q.    No. 4 we have conductors who would mostly

8    be operating flags on the right-of-way?

9         A.    Conductor flags, yes.

10        Q.    Anything else conductors do on a

11   right-of-way on a regular basis?

12        A.    I mean there is a lot of occasions where

13   there is different types of occasions where a train

14   crew may have to walk along the right-of-way to

15   change ends on a train, but basically that's a large

16   list right there.

17        Q.    Okay.  So track, power, maintenance of way,

18   conductors.  Now we're down to contractors.  Is

19   contractors a department of Metro-North?

20        A.    No.

21        Q.    Contractors is somebody else who is an

22   outside person?

23        A.    Contractors do work on the railroad, yes.

24        Q.    Do the outside contractors serve on your

25   safety committee?

```
1     A.    No.
2     Q.    So we can take contractors off of this.
3   Contractors aren't really responsible for
4   maintaining Metro-North safety, are they?
5     A.    If you are on the right-of-way you have a
6   responsibility to safety, absolutely.
7     Q.    So do outside contractors have a
8   responsibility for that, providing safety to
9   children and teenagers who find their way onto the
10  right-of-way of Metro-North?
11    A.    Their role would be basically in reporting
12  it.
13    Q.    Reporting?
14    A.    Correct.
15    Q.    Okay.  Well, we'll leave them on for now.
16  So we're going to leave the contractors on.  And
17  then you said train crews.  And the train crews
18  would also be reporting or operating flags?
19    A.    The train crews would be reporting any
20  observation, yeah.  Yes.
21    Q.    And then we have the MTA police?
22    A.    Correct.
23    Q.    Is there anybody else you want to add to
24  that universe of people who would have some
25  responsibility on your safety committee, or even off
```

1 your safety committee, for providing safety to

2 children and teenagers on the Metro-North

3 right-of-way?

4     A.    I have -- the safety committee isn't

5 responsible for that, for the action.  The safety

6 committee is a committee of people that get together

7 with safety ideas and goals in mind.  It's not

8 necessarily a committee for responsibility to

9 protect children and teens.

10    Q.    Yeah, that wasn't what I asked.  I asked

11 you was there anybody else you wanted to put on this

12 list of people that you felt were responsible for

13 providing safety to children or teenagers that came

14 onto the right-of-way?  Anybody else?

15    A.    No, I thought you said -- I thought you

16 said the committee.  No, that's a pretty good-sized

17 list.  Right.

18    Q.    Again, on the committee or off the

19 committee.  I'm trying to get to the universe.  Now,

20 you said these seven groups would have some

21 responsibility for providing safety to children and

22 teenagers who came onto the right-of-way?

23    A.    No, I didn't say that.

24    Q.    Okay.  So my question now is, is there

25 anybody who is responsible, anybody in particular,

1    who is responsible for providing safety to children

2    and teenagers who come on the right-of-way?

3         A.   Children and teenagers is a subgroup of

4    anybody that comes on the right-of-way that

5    shouldn't be there.  Right?  So then everybody would

6    have the same responsibility whether they were

7    children or teenagers or any other trespasser.

8         Q.   Okay.  Now, do you view all trespassers as

9    equal in terms of the need for protection?

10        A.   I don't want to see anybody get hurt, so if

11   you are not where you are supposed to be, then we

12   shouldn't have you there.

13        Q.   So was that a "yes" or a "no"?

14        A.   The need for protection?

15        Q.   No.  Maybe we're having trouble

16   communicating and I am probably not being clear,

17   although I will trying to be.

18        A.   I know you are not.

19        Q.   Do you -- strike that.  As superintendent

20   of the New Haven division in March of 2011, do you

21   view all trespassers, whether they be children or

22   adults, mentally disabled, as equal in need of

23   protection?

24             MR. FINEMAN:  Objection.  Relevance.

25             THE COURT:  I will sustain it.

1    Q.   Okay, let me ask you this question.   At

2  Metro-North were there any directives from your

3  office to take any steps, special steps, to protect

4  children or mentally disabled people who might find

5  their way onto the right-of-way?

6              MR. FINEMAN:   Same objection, your

7  Honor.

8              THE COURT:   I will allow that question,

9  As to whether there are any directives to take

10 special steps to protect children or the mentally

11 disabled who might find their way on the

12 right-of-way.   If you know.

13   A.   Not that I'm aware of, that specific.

14   Q.   Okay.  And as the superintendent for that

15 division, at that time did you have any view as to

16 whether there needed to be some sort of special

17 protection for children or mentally disabled people

18 who found their way onto the right-of-way, March of

19 2011?

20   A.   You are asking me if I felt that there

21 should be special protection for children and teens?

22   Q.   Yes, as opposed to adults.

23   A.   I can't say that I felt any different from

24 anyone being -- trespassing that needed to be

25 protected.  I don't see a difference.

1    Q.   Prior to 2014 or '15, can you ever recall

2    during your career at Metro-North reporting

3    teenagers or children on the right-of-way to the MTA

4    police or anyone else?

5              THE COURT:  Just a moment.  Is there an

6    objection?

7              MR. FINEMAN:  Yes.

8              THE COURT:  On time frame?

9              MR. FINEMAN:  Yes.

10             THE COURT:  I think from 2011 before is

11   fine, but we're not here to look at 2014 or later,

12   after the accident.

13   Q.   Let me correct that, Mr. Wilhelmy.  As you

14   sit here today, can you ever recall during your

15   career at Metro-North reporting teenagers or

16   children on the right-of-way to the MTA police or

17   anyone else before March 17, 2011?

18   A.   Yes.  And the reason why I say yes is, as

19   we get a description of the particular person that

20   seems to be a trespasser, the description is often

21   as specific as possible so that we can pass it on to

22   the MTA police.  So yes, some of them were described

23   as children or teens.

24   Q.   Okay.  And did you -- prior to March 17,

25   2011, did you ever have occasion to discuss with

1  anyone at Metro-North the need to take steps to

2  prevent children or teenagers from even coming onto

3  the right-of-way?

4      A.   I'm sure I've had discussions about keeping

5  everyone off, but specifically children and teens, I

6  don't think I was involved with gearing a program

7  that specific.

8      Q.   Similarly, the same question for

9  trespassers who are mentally disabled, as to what

10 steps you would have taken to protect them before

11 March of 2011?

12          MR. FINEMAN:  Objection.  Relevance.

13          THE COURT:  I will allow it.

14     A.   That answer would be the same as the

15 previous answer.  The same amount of effort would go

16 in, but nothing specifically targeting mentally

17 deficient, that I am aware of.

18     Q.   What issues did you discuss in the year

19 before March 2011 in your safety committees that you

20 chaired?

21     A.   There was -- the safety committee has to do

22 with -- the local safety committee that we're

23 talking about has to do with the people -- the

24 premises, the people that are actually doing the

25 work, bringing the thoughts and ideas of safety and

1  injury prevention and practices, better practices

2  and procedures to the table, and to be forwarded to

3  Metro-North safety department.

4      Q.   Okay.  In your time at Metro-North, did you

5  have occasion to become aware of instances where --

6  instances or an instant where a trespasser was

7  injured by high voltage electricity on a catenary in

8  Connecticut?

9            THE COURT:  Prior to March 17, 2011?

10      Q.   Prior to March 17, 2011?

11      A.   Once.

12      Q.   Okay.  Do you remember the date of that?

13      A.   No, not the specific date.

14      Q.   Do you recall in your deposition discussing

15  an event on July 1st, 2001, in Norwalk?

16      A.   2001, yes.

17      Q.   Okay.  And at that -- for that event, did

18  you actually go out to the site of the injury?

19      A.   I did.

20      Q.   Now, can you tell the jury whether that

21  particular event involved someone being electrocuted

22  who climbed up on the catenary?

23      A.   The person that --

24      Q.   Well, my question is very -- I want to

25  know, my question is about -- well, in that

1    instance, on July 1st, 2001, did that event involve

2    someone who was -- who suffered a high voltage shock

3    injury on the catenary while they were climbing on

4    the catenary at height?

5        A.   When I arrived they were bringing the

6    individual down with severe injuries and, for

7    argument sake, I can only assume from my position

8    when they were bringing the person down that he

9    received shock or burns from on top of the catenary.

10       Q.   Okay.

11       A.   This was not the regular catenary

12   structure.  This was a different type of structure.

13       Q.   Okay.  Can you tell the jury what type of

14   injuries this man had -- this person -- was it a man

15   or a woman?

16       A.   A man.

17       Q.   Can you tell the jury what types of

18   injuries you observed in this person who was shocked

19   on top of the catenary?

20       A.   The person was still conscious, but

21   unresponsive.  Seemed to be -- his clothes were

22   still on, so I didn't see any kind of real injury

23   per se.  And he was wrapped in a blanket coming down

24   on one of the steel stretchers off of the catenary

25   pole, so I don't know for sure.

1    Q.    Do you know whether that person survived

2    that electrical high voltage shock?

3    A.    I don't recall.

4    Q.    You were not present when they climbed the

5    catenary?

6    A.    No.

7    Q.    Okay.  How tall was that catenary, that

8    super catenary that you are talking about?

9    A.    It's called an anchor bridge.  It's the

10   same height on the cross member as all of the other

11   catenaries.  The structures look much larger, and it

12   holds other equipment besides just the catenary

13   wire.

14   Q.    So how tall is a super catenary as opposed

15   to a regular catenary like Tower No. 1043?

16   A.    This is an anchor bridge.  It's not a super

17   catenary.  It's larger in size as far as it's a

18   beefier structure.  The dimensions heightwise are

19   the same as the rest of the catenary system.

20   Q.    Well, when you say it's an anchor, what

21   does that mean?  It's an anchor to what?

22   A.    Anchor bridge it's called.

23   Q.    And what does that mean?

24   A.    This particular location in South Norwalk,

25   the anchor bridge is a location where power is fed

1    into the system at that location.  So on top -- it's

2    an ominous structure.  On top there is some other

3    components of the tower system, transformers.  It's

4    very old structure.  It used to hold the old signal

5    system and stuff like that.

6         Q.   Now, are you saying it was not a super

7    catenary?

8         A.   Well, I am saying it's called an anchor

9    bridge.  I don't know what your definition of super

10   is.  It's a pretty good catenary.

11        Q.   Is there a structure you would call a super

12   catenary?

13        A.   No.

14        Q.   Or super tower?

15        A.   There's a high tower, but in -- railroad

16   language is the same as any other industry, they

17   have their own language.  The tower that we're

18   talking about in South Norwalk is referred to as an

19   anchor bridge.  That's where the power comes in.  So

20   the lines from outside are anchored to it.  That

21   feeds the system.  There is other bridges, like over

22   there is other towers that are over bridges that are

23   high because the wire has to go up higher or over a

24   highway and stuff like that.  There are high towers,

25   but I don't recall -- we don't really refer them to

1    as super towers.

2        Q.    How high up on the catenary had they

3    gotten?

4        A.    I'm sorry?

5        Q.    How high up on the catenary had they

6    gotten?

7        A.    Had who gotten?

8        Q.    The person who fell.  I'm sorry, the person

9    who was shocked and burned up there.

10        A.    I don't know.  When I arrived at the scene

11    they were in absolutely dead center of the catenary

12    structure.  That's the catenary pole.  They were

13    lowering him down.  So he was about 15 to 18 feet in

14    the air when I got there and the fire department was

15    lowering him down.

16        Q.    Okay.  I guess I am a little confused.  Do

17    you recall giving your deposition in May of 2015?

18        A.    Yes.

19        Q.    And I asked you a question, I said:  "How

20    high up on the catenary had they gotten?"  And your

21    answer was:  "They were on the super tower."

22              So do you remember that question and

23    that answer?

24        A.    I do.  I used the word "super" because I

25    was a little nervous and wanted to be as descriptive

1  to you as I could and just to make a difference

2  between a regular catenary structure and this

3  particular catenary structure.  So I did use the

4  word "super," but it's called an anchor bridge.  And

5  there is a difference between that structure and the

6  regular catenary structures.

7      Q.   Okay.  So now can you tell the jury how

8  high is the top of this super catenary,

9  approximately?

10     A.   20 feet high.  At the base of where our

11 wires are, it's approximately 20 feet off the ground

12 or 30 feet off the ground.  So somewhere in there.

13     Q.   That's what you call a super tower?

14     A.   No.  I used the word "super" in that

15 deposition, but it's called an anchor bridge.  It's

16 a beefier structure, same dimensions as the regular

17 catenary or average catenary structure.

18     Q.   Well, if that's a super catenary, what is

19 Tower 1043?  If you were going to call it something

20 like super, what would you describe it as?

21     A.   1043 is an average catenary.  An average

22 catenary structure.

23     Q.   Okay.  So was this structure that this man

24 climbed in 2001 where you were out there, is it the

25 same or similar in structure size and shape as Tower

1575

1    1043?

2         A.    No.

3         Q.    Okay.  Is it relatively the same height?

4         A.    Yes.  The height dimension from where the

5    catenary wires hang are the same.  The structure

6    itself and the components above it are -- that

7    anchor bridge is a bigger structure.  It held a

8    catwalk type of area where the transformers were and

9    old signals and stuff like that.  It's larger per

10   scale, but heightwise, at the base of the catenary

11   is the same height.  The structure that was above it

12   and around it, there is others -- a lot of places

13   where these structures have different components.

14   They'll have a side tower off one side of the pole

15   holding other wires.

16        Q.    Okay.  Now, in terms of the high voltage

17   electricity that's present at the catenary on this

18   tower in Norwalk, is it different in kind from the

19   signal wires and the electrical system that is on

20   Tower 1043 in terms of voltage?

21        A.    No.

22        Q.    Okay.  Thank you, Mr. Wilhelmy.

23        A.    You're welcome.

24             THE COURT:  All right.

25   Cross-examination.

1576

1    CROSS-EXAMINATION

2    BY MR. FINEMAN:

3        Q.    Good afternoon, Mr. Wilhelmy.

4        A.    Good afternoon.

5        Q.    Let me back up for a moment.  You told us

6    about some of the positions that you've held at

7    Metro-North since 2011.  And I understand you are in

8    a different position today than you were back then?

9        A.    Correct.

10       Q.    So what is your job today?

11       A.    My title is chief rail traffic controller.

12   Right now we have what's called central control in

13   Grand Central.  There is 14 rail traffic

14   controllers.  Each rail traffic controller controls

15   a section of track, a portion of track that's their

16   territory.  And we have a set of assistant chiefs,

17   and then a chief rail traffic controller is in

18   charge of the operation.

19       Q.    So the folks that you oversee and work with

20   down in New York, they actually are responsible for

21   moving the trains from here to there?

22       A.    Yeah.  It's very -- for argument sake it's

23   the same realm as being an air traffic controller,

24   but they do it with the rails, yes.

25       Q.    And in 2011 you were the line

1    superintendent for New Haven?

2        A.    I was district superintendent.

3        Q.    District superintendent.  Okay.  How long

4    had you been in that position as of March of 2011?

5        A.    '05.  I believe I started in '05 as

6    district superintendent.

7        Q.    What year did you hire on with Metro-North?

8        A.    August 11, 1986.

9        Q.    Can you briefly describe for us the

10   positions that you held from --

11       A.    Sure.

12       Q.    -- 1986 until 2005 when you became district

13   superintendent?

14       A.    In '86 to around '93 I was a tower

15   operator.  '93 to '95 I was a rail traffic

16   controller.  They were called dispatchers at the

17   time.  And then from 2005 until 2012 I was district

18   -- I was train master in the field, and then I

19   became district superintendent.

20       Q.    So is it fair to say since the 1980s, since

21   you joined Metro-North, you have been intimately

22   involved with the operations of the trains, the

23   running of trains on Metro-North?

24       A.    Yes.

25       Q.    The safety committee that you had mentioned

1   before, that's separate from Metro-North's official

2   safety department, isn't it?

3        A.   Yes.

4        Q.   Is the safety committee -- is that a

5   voluntary thing?

6        A.   Yes.

7        Q.   And that's something where union employees

8   and management employees, they can all participate,

9   and they're all invited to participate?

10       A.   Yes.

11       Q.   In your position in 2011, March of 2011,

12  did you receive reports of trespassers in your

13  territory?

14       A.   Yes.

15       Q.   That would be part of your regular job,

16  would be to receive information about trespassers

17  that are called in?

18       A.   Yes.

19       Q.   And the trespassers would be called in by

20  the engineers who are in the trains who are passing

21  by and they happened to see somebody?

22       A.   I believe that a majority of the eyes that

23  see trespassers are from engineers, but there are

24  some from other sources, too.

25       Q.   Like what other sources?

1    A.    Workers.   Workers around the track,

2    maintenance people.   Station custodians cleaning

3    platforms have called in trespassers.   But I would

4    say the majority is the train crew.

5    Q.    And what would happen when a report of a

6    trespasser would come in to you?

7    A.    From start to finish?

8    Q.    Start to finish?

9    A.    Most of the time the report of a trespasser

10   would be from, say, an engineer.   The engineer would

11   radio to RTC, the rail traffic controller, a sight

12   of a trespasser, and that -- as much information is

13   asked right then and there.   The train is obviously

14   travelling sometimes at a high rate of speed.   We'll

15   get as much of a description, location, possible

16   direction of travel.

17             Immediately the dispatcher would call

18   the police and tell his assistant chief what's going

19   on.   While he's calling the police to give the

20   location, the assistant chief would be calling

21   people in the field.   We would network with whoever

22   we could find in the field.   Myself, as a

23   superintendent or train master, could get the

24   information.   We'd try to head out there.   We would

25   start networking with whoever is out in the area,

1   track department, anybody that's working to grab

2   another set of eyes if we can do it.

3           We have the -- we're fortunate that we

4   have several trains running -- are running at all

5   times.  We get the subsequent train, we give them

6   information about that we just got a call for a

7   trespasser sighting.  A lot of times they'll give us

8   a follow-up, they're heading -- you know, I have

9   seen that person and they're now some point east, so

10  we assume they're travelling east.  We get things as

11  detailed as the person is carrying a fishing pole,

12  which may sound simple, but the people in the area,

13  the engineers, they know where some of these spots

14  are.  There is a lot of water along the railroad.

15  They might be heading to a fishing spot.  That's

16  just an example.

17          But we try to get as much information to

18  the MTA police.  And they immediately canvass the

19  area.  We continue to canvass until either we have a

20  subsequent amount of information saying area clear

21  or we get an all clear from the police.

22      Q.   And the procedure then is to report all

23  trespassers, right?

24      A.   All trespassers.

25      Q.   It doesn't matter if they're children or

1581

1    adults?  It doesn't matter if they're children or

2    adults to you?

3        A.    It doesn't matter if they're children or

4    adults.  It doesn't matter if they have two legs or

5    four legs.  Everything that's on that track gets

6    reported.

7        Q.    You had mentioned to Mr. Rush that you had

8    before March of 2011 on occasion reported children

9    trespassing somewhere along the right-of-way.  Do

10   you recall that?

11       A.    Yes, I do.

12       Q.    Had you ever before March of 2011 reported

13   any child or adult climbing a catenary on the

14   right-of-way?

15       A.    No.

16       Q.    Had you ever observed that other than this

17   2001 incident that Mr. Rush had asked you about?

18       A.    No.

19       Q.    Was this a problem on Metro-North with

20   people climbing catenary towers on the right-of-way

21   before March of 2011?

22       A.    Not specifically, no.  I do not recall --

23   besides the 2001, I do not remember responding to,

24   reporting or sending my people to respond to another

25   catenary climb.

1    Q.   You had mentioned that there are areas

2  where -- I guess you had mentioned fishing spots a

3  moment ago.  Is that somewhere where you might more

4  frequently get reports of trespassers?

5    A.   Not on the New Haven line.  On the other

6  branches, the Harlem and Hudson side there is more

7  specific.  That runs along the Hudson River.  That

8  would be more specific.  There are some occasions we

9  see somebody.  We -- obviously the MTA police look

10 for trends, and there is trends.  We try to go

11 in-depth instead of just having the area clear.  Is

12 there anything else going on?  The railroads on both

13 sides of the railroad, there is a barrier, some type

14 of barrier the entire length of the railroad.  Was

15 that barrier breached in any way?  And we try to

16 send the MTA police there.  They would correlate --

17 we would get specific reports of trespassers and we

18 send all of that information to the MTA police.

19 They will correlate frequency and time and all of

20 that stuff, and description.  If they got any

21 trends, they act accordingly.

22    Q.   Okay.  Would they tell you if they were

23 notified of trends or they had identified trends?

24    A.   I'm sorry, what?

25    Q.   I'm sorry.  Would they tell you if they had

1    identified an area where there was a trend in

2    trespassing?

3        A.   If the MTA police were investigating a

4    frequency of trespassers I wouldn't specifically be

5    notified.  I may be for help if I know of anything

6    in the area, if I was involved in reporting it, do I

7    remember the description, that type of stuff.  But

8    usually they are going to deal with it how they're

9    going to deal with it.

10       Q.   Okay.  Before March of 2011, had you been

11   informed of any trends in trespassing in the area of

12   Catenary 1043?

13       A.   No, no.

14       Q.   I want to talk to you briefly about this

15   July 2001 incident that you responded to.  First of

16   all, which catenary?  Do you remember which catenary

17   number it was?

18       A.   I don't.  It was in the area of South

19   Norwalk.  I don't remember the exact location.  I

20   think it was west of the Washington Street bridge,

21   the big bridge in the area, downtown -- like right

22   in downtown South Norwalk.

23       Q.   How far away from Tower 1043 would you say

24   the tower was that you responded to in July of 2001?

25       A.   Oh, between South Norwalk and West Haven?

1  30 miles, somewhere in that neighborhood.

2      Q.   And you had mentioned that this was a

3  different type of structure which we heard a little

4  bit about, right?

5      A.   Yes.

6      Q.   So it doesn't look anything like Tower

7  1043?

8      A.   No.

9      Q.   And you just mentioned a moment ago that

10  this is located in South Norwalk, right?

11      A.   Yes.

12      Q.   What's around Tower 1043?  Or, I'm sorry,

13  not 1043.  What is around the right-of-way and the

14  tower that you responded to in July of 2001?

15      A.   It's a transition between like the downtown

16  area and some small factories and stuff like that.

17  It's above grade to pedestrian traffic.  A lot of --

18  there is like a main drag with restaurants and bars

19  and that type of stuff on one side.

20      Q.   So it's close to businesses?

21      A.   Yes.

22      Q.   Okay.  Other than July of 2001 and Mr.

23  Colon's incident, are you aware of any other

24  incidents involving trespassers climbing any

25  catenary towers in Connecticut during the decades of

1   your experience at Metro-North?

2       A.   I honestly don't remember any other than

3   those two.

4              MR. FINEMAN:  Thank you.

5              THE COURT:  Okay.  Anything else?

6              MR. RUSH:  Briefly, your Honor.

7              THE COURT:  Just a moment, it's Mr.

8   Reed's turn.  Pardon us.

9              MR. REED:  I will be brief.

10  CROSS-EXAMINATION

11  BY MR. REED:

12      Q.   Good afternoon, sir.  How are you?  We met

13  before.  My name is Charlie Reed and I represent the

14  United Illuminating.  Just a question for you, sir.

15  Isn't it true that members of the public are

16  protected against the risk of high voltage

17  electricity by installation of the wires 45 feet up

18  on towers and higher than that?

19      A.   I would believe the fact of putting the

20  wires 45 feet in the air in itself is the fence per

21  se and the safety net for that.

22      Q.   And isn't it true that there are other sets

23  of wires that are even higher up on Tower 1043 than

24  45 feet?  50, 60 feet high?

25      A.   Yes.

1    MR. REED:  Okay, thank you.

2    THE COURT:  All right.

3    Mr. Rush.

4    REDIRECT EXAMINATION

5    BY MR. RUSH:

6    Q.    Do you know who Robert Doody is?

7    A.    I do.

8    Q.    And you realize that Robert Doody gave a

9    deposition in this case as a representative,

10    corporate representative of Metro-North?

11    A.    Yes.

12    Q.    Okay.  Have you read his deposition?

13    A.    No.

14    Q.    Okay.  Would you be surprised if you

15    learned that he had a different opinion or different

16    recollection of the number of incidents of people

17    injured climbing catenaries than you do?

18    A.    Yes.  Would I be surprised?  No.

19    Q.    He's been with the company -- he's actually

20    retired now?

21    A.    Right.

22    Q.    But he started with the company over

23    30 years ago, correct?

24    A.    I believe so.

25    Q.    So he would have a better understanding of

1   a longer period of time involving people who had

2   been injured on catenaries at height?

3        A.   I don't understand why he would say that.

4        Q.   I'm asking you.

5        A.   Because he has 30 years?

6        Q.   No.  I am asking -- you know Robert Doody,

7   correct?

8        A.   Yes.

9        Q.   And maybe I misunderstood.  You are not

10  surprised that he has a different view than you do

11  about injuries to trespassers climbing on catenaries

12  to height?

13       A.   He has a different view.  I am not

14  surprised.  I don't know really how to answer that,

15  so --

16       Q.   Isn't it true that you don't have a memory

17  of any other specific trespasser injuries on

18  catenaries at height one way or the other prior to

19  2001?

20       A.   The question is do I recall any other

21  people climbing the catenaries?

22       Q.   To height and being injured.  That's not my

23  question.  My question is, you earlier said you

24  didn't know of any -- or you didn't recall any.  My

25  question to you is, is it that you just don't know

1   about these things that Mr. Doody does know about?

2        A.   It's a possibility.  I just don't recall

3   any other incidents where they climbed the catenary.

4        Q.   You don't remember or recall them, correct?

5        A.   I don't recall them.

6        Q.   And would you be surprised that he

7   testified that he did recall them, that he talked

8   about these problems with other people at

9   Metro-North?

10               MR. FINEMAN:  Objection.

11               THE COURT:  Just a second.  So I'm not

12   going to have you doing a war between what this

13   witness remembers and what another witness has

14   previously testified to.  It's for the jury to

15   figure out any kind of -- if there is a

16   contradiction to figure out any contradiction, not

17   for you to get into an argument with this witness

18   about what another witness has testified on.  So the

19   objection is sustained.

20               MR. RUSH:  Thank you, your Honor.

21        Q.   Mr. Wilhelmy, can you explain to the jury

22   how high voltage lines are adequately isolated when

23   there is a ladder system that goes from the ground

24   to the high voltage wires on Tower No. 1043?

25        A.   What kind of system?

1   Q.   A lattice ladder system that is a -- by

2   climbing the lattice like a ladder, how -- I'll

3   start over.  Can you explain to the jury how it is

4   that the power lines are isolated when there is a

5   lattice ladder system all the way from the ground to

6   the wire that's easily climbable?

7   A.   You are going to have to describe the area

8   where there is a lattice ladder system because I'm

9   not aware of one.

10  Q.   Okay.  You are not aware that Tower No.

11  1043 has lattice steel pieces that are in an X

12  formation that is easily climbable?  You are not

13  aware of that?

14  A.   I'm not aware of that catenary pole being

15  easily climbable, no.

16  Q.   Is it your testimony -- are you telling --

17  please explain to the jury why you think that that

18  lattice, that X structure up the side of Tower No.

19  1043, is not easily climbable?

20  A.   Because it goes for 50 feet in the air.

21  That's not easily climbable at all.

22  Q.   Are you aware that Metro-North repair

23  workers routinely have climbed those in the past,

24  just like I have said, all the way up to the wires?

25  A.   No.

1    Q.    Were you ever in charge of the catenary

2  department?

3    A.    No.

4    Q.    Were you ever in charge of the power

5  department?

6    A.    No.

7    Q.    Have you ever performed any maintenance as

8  an electrician on a catenary pole?

9    A.    I'm not an electrician, no.

10    Q.    Have you ever installed safety signs or

11  warning signs on a catenary?

12    A.    No.

13         MR. FINEMAN:  I'll object.  It's beyond

14  the scope of cross.

15         THE COURT:  We're beyond the scope at

16  this point.

17         MR. RUSH:  Okay.  Thank you, your Honor.

18  No further questions.

19         THE COURT:  Okay, anything else?

20         MR. FINEMAN:  Very briefly, your Honor.

21  RECROSS-EXAMINATION

22  MR. FINEMAN:

23    Q.    Mr. Wilhelmy, you were asked if it's

24  possible -- I think you were asked if it was

25  possible that there had been incidents where people

1  had climbed catenaries and maybe you had forgotten

2  about it.  You just didn't remember those?

3      A.    I'm sure that's a possibility.

4      Q.    Okay.  Is that the type of incident that

5  you would forget, if you were made aware of somebody

6  climbing a catenary 45 feet in the air?

7      A.    My role as superintendent or train master

8  in both 2001 and 2011 is to respond to incidents and

9  to assist in any way possible and protect the people

10 that are there.  There are possibilities that other

11 departments may have seen somebody on or near

12 catenaries and reported it, but I recall responding

13 to the one in 2001 and the one in 2011.  I don't

14 recall my train masters ever going to another one or

15 an incident of another one where in fact they

16 climbed a catenary and that they were there.  Can

17 there be other witnesses, that they saw people on or

18 around a catenary?  I'm sure there were, but I don't

19 recall them.

20            MR. FINEMAN:  Thank you.

21            THE COURT:  All right.  Mr. Reed,

22 anything else?

23            MR. REED:  No, your Honor.

24            THE COURT:  Mr. Rush, anything else?

25 RE-REDIRECT EXAMINATION

1   BY MR. RUSH:

2       Q.   How long have you been the superintendent

3   of the New Haven division?  From what years to what

4   years?

5       A.   Let's see, 2008 to 2012 I was a district

6   superintendent.  Six years prior to that I was a

7   train master in the New Haven district.

8               MR. RUSH:  Thank you.

9               THE COURT:  Okay, thank you, sir.

10              All right, next witness.

11              MR. RUSH:  We call Marilyn Rodriguez

12  your Honor.

13    M A R I L Y N   R O D R I G U E Z   C O R R E A,

14  Having first been duly sworn, was examined and

15  testified as follows:

16              THE WITNESS:  Marilyn Rodriguez Correa,

17  C-o-r-r-e-a, New Haven, Connecticut.

18  DIRECT EXAMINATION

19  BY MR. RUSH:

20      Q.   Good afternoon.

21      A.   Good afternoon.

22      Q.   Have you ever testified in court?

23      A.   No.

24      Q.   Could you tell us what you do for a living?

25      A.   I work for the Housing Authority of the

```
 1    City of New Haven, and I do human resource
 2    generalist.
 3                MR. RUSH:  Can the jury hear her all
 4    right.
 5                JUROR:  I'm having difficulty.
 6         Q.   Could you maybe speak up a little bit.
 7         A.   Sure.  I work for the Housing Authority of
 8    the City of New Haven, and I work in the human
 9    resource department.
10         Q.   In what city were you born?
11         A.   New Haven, Connecticut.
12         Q.   And have you lived here your whole life?
13         A.   Yes, I have.
14         Q.   Where did you go to high school?
15         A.   I went to Wilbur Cross High School.
16         Q.   And have you had occasion to attend
17    university or college?
18         A.   Yes.  I actually went to Albertus Magnus
19    College, and I graduated with my MBA.
20         Q.   How long have you worked for the City of
21    New Haven?
22         A.   I've been there for 19 years.
23         Q.   And in what department do you work exactly?
24         A.   Human resources.
25         Q.   What do you do in human resources?
```

1     A.    I do rules, regulations, policies, job

2   descriptions, hiring and firing, and employee

3   benefits.

4     Q.    Are you married?

5     A.    Yes, I am.

6     Q.    To whom are you married?

7     A.    To Jose Correa.

8     Q.    And what is the relationship between Jose

9   Correa and Omar Colon?

10     A.    They're brothers.

11     Q.    That makes you a sister-in-law?

12     A.    Yes.

13     Q.    How many children do you have?

14     A.    I have four.

15     Q.    And how old are the youngest two?

16     A.    Six months.

17     Q.    And are they twins?

18     A.    Yes, they are.

19     Q.    When did you first meet Omar Colon?

20     A.    I met Omar back in around 2009.

21     Q.    Okay.  When did you get married to Omar's

22   brother Jose?

23     A.    April 2010.

24     Q.    In that time frame, 2009, 2010, before the

25   injury incident involving Omar Colon, can you tell

1    the jury what you observed in regard to Omar's

2    comprehension and intelligence?

3        A.    Well, Omar always been a young gentleman

4    with very low comprehension issues.  We would always

5    help him with anything pertaining to letters.  I

6    would do anything that was related to English

7    language and his brother would do anything that's

8    pertaining to the Spanish language.

9        Q.    Have you ever seen Omar having a driver's

10   license?

11       A.    No, not at all.  He has never droven, or he

12   only carried just a state ID.

13       Q.    Has Omar ever asked you to read to him or

14   for him?

15       A.    Yes.  Anything that came in the English

16   language I would do the reading and the translation

17   to him to Spanish.

18       Q.    Have you ever seen or heard Omar read out

19   loud in either English or Spanish?

20       A.    No.

21       Q.    Do you know who Arlene Davis?

22       A.    Yes.

23       Q.    Who is Arlene Davis?

24       A.    Arlene Davis is Omar Colon's wife.

25       Q.    Approximately when would you have first met

1  Arlene Davis?

2      A.    I think about a year before they got

3  married.

4      Q.    Okay.  And did you -- were you familiar

5  with Arlene Davis and Omar Colon as a couple before

6  they got married?

7      A.    Yes.

8      Q.    Can you tell the jury -- well, this may be

9  kind of dumb, but are you familiar with them after

10  they got married?

11      A.    Yes.

12      Q.    Can you please briefly explain to the jury

13  what you observed about their relationship as a

14  married couple?

15      A.    One thing that I noticed is that they're

16  both very different, but they like fill each other's

17  gaps.  Arlene was more of the understanding when it

18  came to -- she was more knowledgeable and he was

19  not.  She was more -- she needed always help, and he

20  was the one always helping her with all of her needs

21  on a daily basis.

22      Q.    How would you characterize their

23  relationship after they were married and then prior

24  to the 2011 injury incident?

25      A.    They were always together.  They would --

```
 1    like I said, they filled each other's gaps.  He was

 2    always the one helping with her -- with her daily

 3    acctivities, moving around, and everything that she

 4    needed to do, he was always there to help her.

 5         Q.   Would you -- how would you describe their

 6    married relationship as being either happy or not

 7    happy?

 8         A.   I think they were very happy.  They were

 9    different, but they filled each other's gap, and

10    they were always happy.

11         Q.   Can you tell the jury about Omar's

12    struggles with drug addiction and his methadone

13    treatment?

14              MR. HICKEY:  Objection, your Honor.

15    Objection.  I'm sorry.

16              THE COURT:  Foundation?

17              MR. HICKEY:  Foundation.  I'm not sure

18    what it's calling for, but it's certainly a ground

19    that has been adequately covered to this point.

20              THE COURT:  So you just need to lay some

21    foundation here.  Is it something she learned from

22    speaking to somebody, in which case it would be

23    hearsay, or is it something she personally observed

24    with respect to his drug addiction.

25              MR. RUSH:  Very good.  Thank you, your
```

1    Honor.

2        Q.    What have you observed -- well, prior to

3    the injury incident in March of 2011, have you ever

4    observed Omar to be intoxicated by methadone or any

5    other drug?

6        A.    Yes, I have, but he always seeked help and

7    I always saw him going to the methadone clinic.  I

8    would either give him a ride.  He would fall back

9    into the drugs, but he would always seek for help to

10   get out of it.

11       Q.    You did not attend his drug treatment with

12   him, though?

13       A.    No.

14       Q.    Okay.  Let me take you to the incident of

15   2011.  Can you explain to the jury how that incident

16   affected your family after Omar Colon came home from

17   the hospital?

18                MR. HICKEY:  Objection.

19                THE COURT:  Relevancy in terms of her

20   family as opposed to the family of Arlene or --

21                MR. HICKEY:  Exactly.

22                MR. RUSH:  I can address that, your

23   Honor, but I don't want to do it in front of the

24   jury unless you want me to.

25                THE COURT:  We're going to take a quick

1    break while I take this up with counsel.

2              (Jury exited the courtroom)

3              THE COURT:  We'll just wait for our

4    witness to step outside.

5              All right.  So maybe, Mr. Hickey, you

6    can tell me what the concern is and then we can hear

7    from Mr. Rush what he wants to do.

8              MR. HICKEY:  Yeah, your Honor, my

9    concern is that while it's very admirable for her

10   and her husband to have done what they've done, they

11   don't have a claim in this case.  The burden that is

12   upon them is -- this is just another plea for

13   sympathy.  It's a bad situation, I would never deny

14   that, but we don't need to retrace this ground in

15   front of the jury.

16             THE COURT:  Okay.

17             MR. RUSH:  Yes, your Honor.  It's not

18   designed to gain sympathy.  Ms. Rodriguez does not

19   want Mr. Colon to live with them.  She wants him --

20   she's not interested in providing his long-term

21   care.  She -- this isn't a claim for sympathy.

22   There should be no doubt that Omar does not have a

23   place to land, necessarily.  He has been a great

24   burden on her.  And she has two young children.  So

25   it's not a claim for sympathy, it's an understanding

1  that as he -- as his dementia becomes worse, she

2  doesn't want him around her children.  She does not

3  want him in the house.  So that's -- she does have a

4  view on that, and it is relevant.

5          THE COURT:  So it goes to the issue of

6  damages.

7          MR. RUSH:  It does, your Honor.

8          THE COURT:  In terms of what Omar's

9  future choices are.

10         MR. RUSH:  He has very limited choices.

11         THE COURT:  So your question, however,

12  was just, can you explain to the jury how that

13  incident affected your family after he came home

14  from the hospital.  So why not just ask her, going

15  forward what are your plans in terms of Omar living

16  with you and your family.

17         MR. RUSH:  That would be fine.  But,

18  again, there have been objections on foundation and

19  other things, so I don't --

20         THE COURT:  Is that question

21  objectionable, what are your plans with respect to

22  Omar's future living arrangements?  Is he welcome to

23  live with you?

24         MR. HICKEY:  I do object to it, what's

25  going to happen in the future.  Her husband was on

1    the stand.  You know, maybe he wants Omar to be

2    there.  I mean this is going to be a mini-trial

3    about what his -- they have already put into

4    evidence a life care plan and an economist to talk

5    about the cost.  The economist today said regardless

6    of whether a family member provides it or someone

7    else provides it, there is a value to it.  So it has

8    been quantified.  So I mean the idea that now this

9    witness is going to come in here and say we're going

10   to put Omar on the street in six months or a year or

11   maybe -- I don't know when, it just seems to me to

12   just be something that shouldn't be involved in this

13   case.

14            THE COURT:  Well, I can see that

15   argument in the abstract, but the concern -- I think

16   it was raised especially by Mr. Reed's

17   cross-examination of the economist, a suggestion,

18   well, it's probably going to just be family doing

19   this, and that's not really something -- so the jury

20   may be thinking about whether it should discount for

21   that.  So I will allow that question in that area,

22   but not general impact -- victim family impact

23   question.

24            All right, so we'll bring the witness

25   back and get the jury back.

1        (Jury entered the courtroom.)

2        THE COURT:  All right, we're back.  So

3   please be seated.  We'll continue at this time.

4        Q.   Marilyn, you understand your obligation to

5   tell the whole truth to the jury?

6        A.   Yes.

7        Q.   And you understand your obligation to tell

8   the truth as you see it?

9        A.   Yes.

10       Q.   Can you tell the jury your thoughts as to

11   whether or not Omar can live with you and Jose

12   indefinitely for years in the future?

13       A.   No.  There's a lot of responsibility that

14   he needs, and right now with the two little ones,

15   it's a lot of things to do.  You know, I work

16   full-time, and then my -- the time at home, it's

17   just dedicated to them, and then start all over the

18   next day.  So it turns out to be a lot of work on my

19   end to try to take care of him and two other little

20   kids in the house.

21       Q.   Are you and your husband working full-time?

22       A.   Yes.

23       Q.   Can you tell the jury whether you have any

24   concerns about Omar's mental condition in close

25   proximity to your children in the years to come?

1    MR. HICKEY:  Objection, your Honor.

2    THE COURT:  Yes, I will sustain that.

3    MR. RUSH:  Okay.

4    Q.    Right.  Now, can you tell the jury whether

5    you have any concerns about Omar living with you and

6    your husband and your two children full-time right

7    now and into the future?

8    MR. HICKEY:  Your Honor, it's the same

9    objection.  Asked and answered.

10   THE COURT:  Sustained.  The witness has

11   answered.

12   Q.    Can you tell the jury how having Omar live

13   in your house part-time is affecting your

14   relationship with your husband?

15   MR. HICKEY:  Objection.

16   THE COURT:  Sustained.

17   A.    Can you repeat it again?

18   Q.    No, no.

19   THE COURT:  The objection is sustained,

20   so he has to ask another question.

21   THE WITNESS:  Okay.

22   Q.    Earlier you had said that the burden falls

23   on you for taking care of Omar, in whole or in part.

24   Can you explain that to the jury?

25   A.    Well, because he requires a lot of need.

1    So my husband is the one that always giving him the

2    attention.  So anything else that he needs, when it

3    comes to basically his laundry, all that, it all

4    turns out on me.  So it is like I always have to be

5    always watching him, make sure he's -- always his

6    needs are met.  He always needs someone to be next

7    to him, talk to him.  He's basically like another

8    little kid having around the house.

9         Q.   Thank you.

10             MR. RUSH:  No further questions, your

11   Honor.

12             THE COURT:  Any cross-examination?

13             MR. HICKEY:  No questions, your Honor.

14             THE COURT:  Mr. Reed?

15             MR. REED:  No questions, your Honor.

16             THE COURT:  Thank you, ma'am.

17             All right, is there another witness?

18             MR. RUSH:  No, your Honor.  The

19   plaintiff will rest at this time.

20             THE COURT:  Okay.  So, ladies and

21   gentlemen, the plaintiff has rested their case.  The

22   plaintiffs have rested their case, so what that

23   means is we're going to suspend today for you.

24   We'll ask you to come back for tomorrow the same

25   usual time.  I will be taking up certain matters

1   with counsel, so we'll still be working, but we

2   don't need to use up your valuable time doing that.

3   So we'll just ask you to come back tomorrow.  And

4   again, as always, please don't talk about the case

5   or do any kind of research or have any discussion

6   with anybody here in the courtroom.  Thank you.

7              (Jury exited the courtroom.)

8              THE COURT:  Please be seated.  So I

9   gather there will be some motions at this point?

10             MR. FINEMAN:  Yes, your Honor.

11             THE COURT:  Okay.

12             MR. FINEMAN:  May I please proceed?

13             THE COURT:  Please proceed.

14             MR. FINEMAN:  Thank you, your Honor.

15  The defendants do move pursuant to Rule 50 for a

16  motion for a directed verdict in their favor.

17  Having heard and seen all of the plaintiff'S

18  evidence, the defendants submit that they cannot

19  prove their case as matter of law.

20             There is no question in this case that

21  Mr. Colon was a trespasser.  That has been found by

22  this Court.  The Connecticut law regarding liability

23  for injuries to trespassers is clear that the

24  starting point is that generally there is no duty

25  other than to refrain from hurting somebody

1    willfully.  This Court has already determined that

2    that is not the case here.  So what we are left with

3    are the very narrow exceptions that this Court has

4    allowed, at least to date, the case to proceed on.

5            The first being the child trespasser

6    exception.  And your Honor is very familiar at this

7    point with our position regarding the applicability

8    or lack of applicability of that exception.

9            At this point I would just submit to the

10   Court that based on everything that we've heard to

11   date, there can be no reasonable question that Mr.

12   Colon was an adult at the time of the accident.  He

13   was 26 years old.  He had adult responsibilities.

14   He carried on his life as any regular adult.  He

15   told us that he was living as a normal person

16   beforehand.  And every person with personal

17   knowledge of Mr. Colon vouched for that idea before

18   -- at least as of the time before the accident.

19           So I would submit that the child

20   trespasser exception, which by the way is not a

21   childlike trespasser exception, it's for children

22   only, should not apply in this case.  To extend it

23   to a childlike theory would be creating new law, and

24   I think under the facts as we've heard them to date,

25   I would submit that that's not an appropriate theory

```
1    -- or this is not the appropriate case upon which to

2    create that new law.

3            That would leave us then with the

4    constant trespasser exception, and I would just

5    start back where we -- go back to where we started,

6    I should say, with the Maffucci case, which is the

7    controlling law on trespasser liability in

8    Connecticut which makes it very clear that at least

9    -- and as your Honor knows, our position has been

10   that there has to be a demonstration of constant

11   trespassing on Tower 1043.

12           THE COURT:  Right.

13           MR. FINEMAN:  And not just on Tower

14   1043, but to a height that would put somebody in

15   close proximity to the danger at issue in this case,

16   which is the alleged -- I should say the alleged

17   danger which is the electrical equipment 45 feet up

18   the tower.

19           In Maffucci the Court cited -- not only

20   cited with approval, but actually adopted the

21   reasoning of a number of cases, some from the Ninth

22   Circuit, First Circuit, and other jurisdictions,

23   that dealt specifically with some electrical

24   injuries and some specifically with climbing cases.

25   I would refer to those cases, which are cited at
```

1    page 561 of *Maffucci*, as well as to the additional

2    cases that we cited in our motion for summary

3    judgment papers which do distinguish climbing from

4    other types of trespassing.

5            The *Maffucci* court made it clear that the

6    extent of trespassing that a plaintiff has to

7    demonstrate in order to qualify for this narrow

8    exception, it has to be so routine, in the words of

9    *Maffucci*, so regular, that it would actually equate

10   to -- and this is what the court said -- it has to

11   equate to actual knowledge.  So it's not the usual

12   constructive knowledge that we think of in other

13   premise liability cases where you have to show

14   perhaps that a reasonable inspection would have put

15   the defendant on notice that a certain condition

16   exists.  This is different.  It has to be -- it has

17   to be equivalent to actual notice, which means that

18   the plaintiffs here have to prove that Metro-North

19   or the MTA would have actually known -- maybe not

20   that Omar Colon was going to climb at noontime or

21   thereabouts March 17, 2011, but that they could bet

22   that somebody would be 45 feet up a catenary, we

23   think on Tower 1043, or at best, in a liberal

24   reading of *Maffucci*, somewhere very close to 1043 on

25   that date.  There has to be so much trespassing, it

1  has to be so routine, that the defendants would know

2  that somebody is going to be there around that time

3  in that exact place.

4           The evidence has been clear, as brought

5  out by the plaintiffs extensively, the only

6  trespassing we really have here with any frequency,

7  if that, at a liberal reading of their evidence, is

8  on the ground, or at best 6 to 8 feet up the tower

9  at sign level.

10          What they do have at height is Epik Owl.

11 It's their Exhibit 82.  And what we know about Epik

12 Owl is that it's two and a half football fields away

13 from Tower 1043, which I would submit is beyond the

14 limited area that *Maffucci* contemplates.  There has

15 also been testimony that that graffiti may have been

16 painted while that structure was on the ground

17 waiting to be put upright.

18          Even if we were to accept that a

19 reasonable jury could conclude that the Epik Owl

20 graffiti had been painted while that tower was

21 upright, we have graffiti 20 to 25 feet up a

22 different type of structure, which the plaintiff's

23 expert said is more climbable than Tower 1043; at a

24 height that's half as high as Mr. Colon went; again,

25 in an area two and a half football fields away; and

1    adjacent to a building which is very different than

2    what we have with Tower 1043.

3              It is important to note that there is

4    zero evidence in this case of when any of the

5    graffiti that the plaintiff's point so extensively

6    to, when that was placed anywhere along the

7    right-of-way.

8              So I don't see how the plaintiffs could

9    ever prove or that a jury could reasonably find that

10   there was such constant activity that we should have

11   been on notice that Mr. Colon, or somebody, was

12   going to climb a catenary 45 feet up in the air on

13   or about March 17, 2011.  There is no indication of

14   frequency.  There is no indication of timing.

15             The other evidence that has been

16   presented is of an incident that happened that we

17   know very little about in 2001, 30 miles away, which

18   is far beyond what a limited area would be.  Again,

19   to a height of 20 to 25 feet, circumstances we know

20   nothing about, and that's ten years before Mr. Colon

21   climbed.

22             So we have two incidents, a decade

23   apart, where trespassers have climbed a catenary

24   that would have been known to Metro-North, and I

25   would suggest to the Court that that is a far cry

1    from the type of routine, frequent trespassing that

2    has to be demonstrated under *Maffucci* before

3    defendant --

4              THE COURT:  What of Mr. Doody's

5    testimony which suggested some more frequency?

6              MR. FINEMAN:  I had a feeling you were

7    going to ask me about that, your Honor.  So what we

8    have with Mr. Doody, as your Honor is aware of our

9    position on this based on our objections to that

10   testimony coming in, we have Mr. Doody saying

11   sometime, somewhere along the entire right-of-way,

12   which cannot possibly be a limited area for *Maffucci*

13   purposes, during his lengthy career at Metro-North,

14   so someone, sometime in the 30 years he was with

15   Metro-North, somewhere in the hundreds of miles of

16   track, had been climbing catenaries, he believed.

17   That doesn't give us the type of routine, frequent

18   trespass that would put Metro-North or the MTA on

19   actual notice, the level of notice that would be

20   actual notice that Omar or somebody was going to

21   climb 1043, 45 feet up in the air, at that

22   particular time.  There is nothing about that

23   testimony that gives the jury something to really

24   ground themselves in.  It would only be by

25   speculation that they could say, well, Mr. Doody

1    said that there is -- that this is a constant

2    problem, that there is graffiti on the tower

3    somewhere along the way, at some unknown time, at

4    some unknown height, and, therefore, Metro-North

5    should have known that people were up and down Tower

6    1043 with such regularity.

7                THE COURT:  So suppose -- and I know

8    that this is contrary of the facts of this case, but

9    it would be helpful to me if you address this so

10   that I can understand where the legal doctrine lies

11   here.  Suppose you had a frequent -- people

12   frequently climbing up Tower 1042, but never on

13   1043, would your argument be, well, tough luck to

14   Mr. Colon because all that Metro-North knew is that

15   they were climbing up to the wires at 1042, not

16   1043, which is just down the railroad tracks?

17                I know that's not the facts here, but a

18   concern I have about your argument, which is

19   suggesting that everything has to happen on 1043 or

20   nowhere -- in fact I think you are saying it has to

21   happen not just at the base of 1043, but up at the

22   wires -- is that's a little bit contrary to I think

23   the purpose, in part, of the constant intrusion

24   doctrine, which is to -- the purpose of the constant

25   intrusion element of this particular negligence

1    theory is to focus on what would it be that

2    defendants had reasonable notice of.  In other

3    words, how culpable is it.  And I would think

4    focussing kind of only on 1043 and saying nothing

5    else matters is a problem.  It seems like it's

6    artificially restrictive.

7                MR. FINEMAN:  I can appreciate that

8    concern, your Honor.  I think that there is a

9    reading of *Maffucci* that would suggest it is, in

10   fact, that narrow.

11               In *Maffucci* you had switch gear cabinets

12   where one had been broken into at some time before

13   the plaintiff was injured, and there had been

14   evidence of trespass all over the place, but not in

15   that particular cabinet, and the court there said

16   that wasn't enough.

17               THE COURT:  But there was a break-in in

18   *Maffucci*.  I have it right in front of me here.  The

19   trespasser -- first sentence -- entered an

20   electrical switch gear cabinet in a bank of such

21   cabinets.  So it seems to me that it's not so clear

22   that it would have mattered.  Let's suppose that you

23   had ten cabinets in that bank, suppose it was some

24   big bank the width of this courtroom, it doesn't

25   seem to me that the Connecticut Supreme Court would

 1   have said, well, maybe there was constant intrusion

 2   into the one cabinet, Cabinet No. 1 in the bank, but

 3   it was Cabinet No. 8 or 9 that was the one that this

 4   person broke into, so, you know, tough luck, they

 5   didn't have notice, it wasn't a constant intrusion

 6   because it wasn't that specific.

 7            I didn't really read *Maffucci* to speak

 8   exactly to that issue, although obviously *Maffucci*

 9   is a very strong endorsement of the notion it has to

10   be a limited area.  So it can't just be general

11   trespass.  And, in fact, just general trespassers on

12   the railroad right-of-way is not by itself enough to

13   establish or to satisfy the constant intrusion

14   requirement.  It may be evidence that could be used,

15   an accumulation, to try to satisfy the constant

16   intrusion rule requirement.

17            But that's the concern I have about --

18   and this is in your proposed jury instructions as

19   well, it's all about 1043 and it isn't about any

20   intrusion anywhere else, even up to the wires on

21   nearby catenaries.

22            MR. FINEMAN:  I think *Maffucci* would

23   stand for the proposition, your Honor, that if you

24   had a switch gear cabinet in one area of the

25   property and a switch gear cabinet on another area

1    of the property and there was evidence that the

2    padlock had been snipped in one, that that would

3    not, in fact, suffice to show prior intrusion into

4    that particular switch gear -- or that cabinet.  But

5    I think the other point that *Maffucci* made -- and I

6    think, if I am reading -- if I am understanding your

7    Honor's questions correctly, I think what the Court

8    may be grappling with is how broad the scope is and

9    is what is a limited area and what is constant

10   intrusion.

11            The limited area is obviously what we

12   are dealing with here, but there is another element

13   that is the constancy of the intrusion.  That's also

14   what *Maffucci* talks about.  What we have in this

15   case is evidence of prior intrusion, perhaps,

16   somewhere else on the right-of-way at some other

17   level, nowhere near what the danger is alleged to be

18   in this case.  I don't think that *Maffucci* would say

19   that because -- even if you had people up and down

20   Tower 1042 all the time, if they weren't getting

21   anywhere near the wires, I don't think *Maffucci*

22   would say that's sufficient to get --

23            THE COURT:  No, my question was that

24   they are getting into the wires on 1042.  You'd say,

25   well, tough luck, it's 1042.  The guy was

1616

1   electrocuted.   Ten people have been electrocuted in

2   the last week on 1042, but this was on 1043, Mr.

3   Colon climbed the wrong tower, darn at.

4            MR. FINEMAN:  I think we would have a

5   tough time making that argument.  I'm not sure I

6   would make that argument.

7            THE COURT:  So that's my concern about

8   focussing everything on 1043.

9            MR. FINEMAN:  But we don't have anything

10  on 1042 here.  And the other issue is in your

11  hypothetical, your Honor, you have people up and

12  down 1042 near the wires all the time.

13           THE COURT:  I understand.

14           MR. FINEMAN:  But the constancy thing is

15  also something so utterly lacking in this case.  We

16  have zero evidence to establish real frequency, the

17  regularity.  We have potentially -- well, we

18  definitely have evidence of prior intrusion.  There

19  is graffiti along the right-of-way at lower levels.

20  We have potentially one instance of graffiti at a

21  height of 20 to 25 feet some distance down the

22  tracks.  What we don't have is anything to establish

23  that there was routine, that there was regular

24  intrusion on the tower -- on any tower anywhere near

25  the height that Colon climbed that day because this

1  had never happened.  It doesn't happen.  And the

2  plaintiffs have had adequate opportunity to adduce

3  all kinds of evidence of trespass along the

4  right-of-way, which they've done, but they have

5  never been able to put anybody at height, other than

6  perhaps Epik Owl and someone in 2001 down in South

7  Norwalk.  They've never been able to put anybody at

8  height with any frequency that would satisfy what

9  *Maffucci* stands for.

10            And I don't make this argument just in

11  the abstract, your Honor.  I think part of what the

12  Court may be grappling with is it sounds like a

13  policy argument as well, or concern.

14            THE COURT:  It's not a policy argument.

15  It's an understanding of why the rule is what the

16  rule is.  It's a common law rule.  So I think scope

17  has to be understood in terms of what the purpose of

18  the rule is.

19            MR. FINEMAN:  Perhaps I mislabelled

20  that.  So the purpose of the rule, your Honor, as I

21  read *Maffucci* and the cases that came after it, is

22  to establish, first of all, the starting point,

23  there is no duty that's owed to a trespasser because

24  landowners and possessors --

25            THE COURT:  I know that.

1        MR. FINEMAN:  -- have all of the rights.

2   Have superior rights.  If there is going to be an

3   exception to that, the only time Connecticut has

4   been willing to carve out an exception, at least

5   under circumstances anywhere near this, has been if

6   there is such regular trespassing in a particular

7   area that a landowner could not fairly turn the

8   other cheek or turn a blind eye and say I'm just

9   going to pretend that I don't see that.  But there

10  has to be enough evidence in the first place to

11  establish that the landowner would actually know

12  that there are going to be people in a particular

13  area at a particular time.  And we don't have that

14  here.  I think the purpose of *Maffucci* is to

15  preserve the landowner's right to do what it will on

16  its property unless a situation comes up where they

17  -- it would not be morally correct for a landowner

18  to be able to say, tough luck, you are on my

19  property, and even though I know you are going to be

20  there, I'm going to allow you to encounter a danger

21  you are not going to be aware of.  And that's the

22  other piece that we don't have here.

23        I would submit to the Court, I

24  understand this Court's rulings in the summary

25  judgment papers that the hidden danger here is an

1    area that is immediately surrounding the high

2    voltage wires, but I just want to make the argument,

3    your Honor, and as deferentially as I possibly can,

4    that I think that that is a mistaken reading of what

5    the limited area is supposed to be or what the

6    hidden danger is supposed to be, because what it

7    would suggest here is it would okay for Mr. Colon --

8    we would not have to warn him if he climbed 45 feet

9    he might come in contact with a wire, but we have to

10   warn him that if he comes 42 feet up the tower he

11   may come into contact with -- or he may come within

12   a field that presents a danger to him that he

13   wouldn't otherwise know about.

14            If we look at it in a less microscopic

15   way and we look at the circumstances we have here,

16   with somebody coming onto the right-of-way, really

17   in the middle of nowhere, with power lines as far as

18   the eye can see in either direction, standing at the

19   base of a tower right next to live railroad tracks,

20   where there can be no real question that the height

21   alone would have been an obvious risk for him to

22   take, I don't think -- I think it would be a mistake

23   to say then that the hidden danger is something that

24   you only encounter once you get 45 feet up, and so

25   we should have to warn you even though there is no

1   expectation that somebody is going to be there in

2   the first place.

3            It would be akin to saying, I think,

4   because somebody doesn't understand the physics of

5   gravity we're not going to hold them accountable for

6   understanding the risks, the specific risks involved

7   in climbing, and I think it's pretty evident that

8   the risk of climbing is well-known to everybody, and

9   it was well known to Mr. Colon.  But that seems to

10  be the end result of this Court's identification of

11  the hidden danger as being this invisible electrical

12  field, which is really on sort of, in a physics --

13  through a physics lens that we're looking at this,

14  where the general public might not know the exact

15  physics of electricity, but I think if we back up

16  and say would the general public know there are

17  dangers associated with climbing 45 and coming near

18  electrical equipment, I think the only reasonable

19  answer to that is that that was an obvious risk and

20  not something Mr. Colon had to be warned of.  But,

21  in any event, we're not warning him until he gets up

22  to 41, 42 feet.  That would be -- at least my

23  understanding of the summary judgment ruling would

24  be that's when our duty to warn to kick in.

25            THE COURT:  No, the duty -- or the

```
1    summary judgment said where you had to post a sign,

2    exactly where you had to do that.  So I'm not really

3    prepared to reconsider my summary judgment ruling.

4    I have ruled.  I have considered those arguments

5    concerning hidden danger and its presence, and I

6    don't think Metro-North, MTA can essentially absolve

7    themselves by the fact that there were other dangers

8    that were apparent.  In fact, there was a hidden

9    danger, and that was a hidden danger that resulted

10   -- or led to the chain of events that led to Mr.

11   Colon's injury.  So I'm not going to be reconsider

12   that part of my summary judgment ruling.  There is

13   other fora for challenging my ruling on that basis.

14            MR. FINEMAN:  And, again, I make the

15   argument as deferentially as I can.

16            THE COURT:  I understand.

17            MR. FINEMAN:  The other argument that I

18   wanted to make before I sit down is -- and again

19   also being cognizant of this Court's rulings on our

20   prior attempts to get the MTA out of this case, but

21   I would be remiss if I didn't make one more effort

22   here, particularly in light of Officer Russell's

23   testimony today.  When he was asked about the scope

24   of the MTA's involvement in and along the

25   right-of-way in Connecticut, his response was that
```

1    they play a pure law enforcement function.  And I

2    think that because there is a statute in

3    Connecticut, which I don't have the citation to off

4    the top of my head, your Honor, but there is a

5    statute in Connecticut that defines the scope of the

6    MTA police, their responsibility, and in fact their

7    authority, as being -- fulfilling only a law

8    enforcement function.

9            And because this case has nothing to do,

10   at least as of now, with any claim that the law

11   enforcement was inadequate on behalf of the MTA, I

12   would submit that the claim is not proper as to

13   them, that that doesn't give them then some broader

14   control for all purposes.  I think it would be

15   different, perhaps, if the claim was that there was

16   inadequate patrol here and it fell within the realm

17   of the control or possession that the MTA police

18   could be said to have in this territory, but because

19   it's so far afield of that, I don't believe that

20   their mere presence or their participation in law

21   enforcement here should then leave them on the hook

22   for liability to Mr. Colon.

23            THE COURT:  Okay.  All right, thank you.

24            MR. FINEMAN:  Thank you.

25            MR. RINGOLD:  Your Honor, if I may just

1    be heard briefly.

2              THE COURT:  Yes, of course.  Why don't

3    you come on up.

4              MR. RINGOLD:  Thank you, your Honor.

5    Your Honor, UI would like to be heard briefly on

6    this issue as well.  Federal Rule 14(a)(2)(C)

7    provides that a third-party defendant may assert

8    against the plaintiff any defense that a third-party

9    plaintiff has in the plaintiff's case.  This

10   entitles UI to participate fully in the first-party

11   case.  The precedent establishes that a third-party

12   defendant may raise claims on appeal arising out of

13   a first-party case.  However, in the interest of

14   ensuring that there is a clear record, we just want

15   to state on the record that the UI fully joins in

16   Metro-North's and MTA's motion for a directed

17   verdict in all respects, on all arguments, on all

18   fronts.

19             THE COURT:  Okay, thank you.

20             Now, there is a third identified theory

21   of liability in the Court's summary judgment ruling.

22   It hasn't gotten much discussion, but is there --

23             MR. FINEMAN:  Is this Section 337 of the

24   Restatement, your Honor.

25             THE COURT:  Yes.

```
 1              MR. FINEMAN:  So in looking at these,
 2   this one is artificial conditions highly dangerous
 3   to known trespassers, and I think the distinction
 4   between 335, which is the constant trespassers, and
 5   337, would be basically the difference between
 6   constructive notice and actual notice.  337 may
 7   apply if there was any evidence whatsoever that
 8   Metro-North or the MTA or somebody --
 9              THE COURT:  Actually knew.
10              MR. FINEMAN:  -- actually knew that he
11   was there, but I don't think --
12              THE COURT:  So you are seeking a
13   judgment on that.
14              MR. FINEMAN:  Insofar as that claim is
15   being allowed to proceed, yes.
16              THE COURT:  It was.  I addressed it in
17   my summary judgment motion ruling.  And you are
18   joining?
19              MR. RINGOLD:  Yes.
20              THE COURT:  Mr. Rush.
21              MR. RUSH:  If you need argument, I will
22   give it to you.
23              THE COURT:  I'm going to just ask for
24   argument, if you can.  It's your case.  You are
25   facing a motion and so I'd like to hear it.
```

1    MR. RUSH:  Maybe my beginning point will

2    be with your instructions.  On page 7 of your

3    preliminary instructions, you said to the jury "You

4    will need to consider if plaintiffs have proved the

5    defendants were aware or should have been aware of

6    the specific kind of constant intrusion on their

7    property, i.e. climbing up catenary poles to be near

8    electric wires that led to Mr. Colon's injuries."  I

9    may be misinterpreting that, but as I understand it,

10   if the defendants -- if there is evidence showing

11   that the defendants either were aware of this type

12   of intrusion or should have been aware of this type

13   of intrusion on their catenary poles near electric

14   wires, that would be sufficient to create a jury

15   issue for the jury to go forward and not have

16   directed verdict.

17          On that basis, there is -- Mr. Doody's

18   testimony I think is important because he is the

19   corporate representative of Metro-North Railroad,

20   and he was the head of their catenary power

21   department.  Based on the testimony of Mr. Wilhelmy,

22   it seemed like Mr. Wilhelmy did not have a lot of

23   experience with dealing with catenaries and the

24   power department.  He was more of an administrator,

25   had not dealt with that type of intrusion, but on

1   page 174 of the deposition of Mr. Doody that was

2   read -- played by video today.

3            THE COURT:  Yesterday was it?

4            MR. RUSH:  Yesterday.  I'm sorry, your

5   Honor.  Line 25 on page 174 -- I'm sorry, beginning

6   above that, line 12, "Have you heard of anyone else

7   climbing the catenaries and getting electrocuted

8   other than Mr. Colon in the 29 years you've been at

9   Metro-North?"  That's in the context of a trespasser

10  like Mr. Colon.

11           Answer:  "Yes, I have, but I don't

12  recall the instances."

13           Question:  "But it's something that you

14  would have heard about from time to time."

15           Answer:  "Yes."  Implying multiple

16  events.

17           "It would be something that people would

18  talk about on the railroad, that another person got

19  electrocuted up there, right?"

20           Answer:  "Yes."

21           Question at 25:  "During your career,

22  have you been aware of from time to time -- maybe

23  not from the very beginning, but shortly after you

24  began working at Metro-North to the present, you

25  have been aware that people have been electrocuted

1   up on the catenaries?"

2                    Answer:  "Yes."

3                    Question:  "Trespassers as opposed to

4   employees?"

5                    Answer:  "Yes."

6                    Question:  "And employees have also been

7   electrocuted up there?"

8                    Answer:  "Yes."

9                    "It's a very dangerous place to be?"

10                   Answer:  "Yes."

11                   Last question:  "During all of this time

12  that you've been at Metro-North during the last

13  29 years, have you ever had occasion to have any

14  discussions with anyone about making it difficult or

15  impossible to climb the latticework up to the

16  catenaries:

17                   "No."

18                   And that's not directly related to the

19  issue, but the previous quotations are of

20  Metro-North's designated 30(b)(6) representative who

21  admits that he's aware of it, that Metro-North is

22  aware of it, some multiple periods of times.  We

23  don't know how many, but that admission by itself

24  would seem to meet the first requirement, that the

25  plaintiffs have proven that the defendants were

1    aware -- in this case they were aware or should have

2    been aware of the specific kind of intrusions on

3    their property, climbing up catenary poles, being

4    near electric wires.

5              THE COURT:  That assumes essentially

6    that I read the requirement, *Matsufuji's* requirement

7    of a limited area to be any catenary pole anywhere

8    up and down the Metro-North line, right?

9              MR. RUSH:  Well, yeah.  I think it's --

10   *Maffucci* does not specifically require proof of

11   intrusion near the wires in the switch box, but

12   *Maffucci* specifically requires evidence of intrusion

13   on or around or in the switch box.  The structure of

14   the switch box, not the wire.  And *Maffucci* is not

15   specific as to -- it -- the structure in *Maffucci* is

16   the switch box, which might reasonably be that whole

17   structure of switch boxes, as you said, or it might

18   be just the switch box.  But *Maffucci* doesn't say it

19   has to show intrusion near the high voltage wires in

20   the switch box.  And so --

21             THE COURT:  Well, presumably that whole

22   switch box is near --

23             MR. RUSH:  Is what?

24             THE COURT:  The whole switch box -- it's

25   an electrical switch box.  So once you open the

1    switch box you are near everything, right?

2              MR. RUSH:  Yes, but for instance it

3    wasn't clear from the opinion whether you had to

4    open the switch box.  You could have trespass on the

5    switch box, on the outside of the switch box,

6    through graffiti, or perhaps a broken lock or some

7    sort of wear and tear that was not related to

8    employees, damage, for instance, like someone had

9    tried to force their way in.

10             So *Maffucci* it's not clear that you have

11   to get near the wire.  You just have to have

12   intrusion on the switch box, I think.

13             Now, the court went into some detail

14   about that.  They talked about the limited area of

15   the structure.  And they didn't say you had to show

16   intrusion near the wire.  I don't think they ever

17   used the word near the wire, in the box, anything

18   like that.  Just the structure is the box.

19             So I think that *Maffucci* -- I think

20   *Maffucci*, properly read, is if there is evidence of

21   intrusion on the structure, the relevant structure,

22   that's the limited area.

23             In this particular case there is plenty

24   of intrusion on Catenary Tower No. 1043.  I will

25   probably forget some of them, but of course the sign

1    shows intrusion at approximately 9 feet.  Someone

2    had to climb up there, according to Mr. Doody and

3    Dr. Stern, to paint that graffiti on that sign,

4    which sits at somewhere between about 8 and 9 feet.

5    So that's intrusion on the structure.  Another sign

6    was ripped off or removed, according to Deputy

7    Russell today.  There is supposed to be a sign on

8    each side.  That's intrusion, or arguably it's

9    intrusion.

10              There is wear and tear at the base where

11   somebody or something has been climbing up on the

12   concrete base.  It's worn.  It's shown in that photo

13   with the telephone.  The photo is taking picture of

14   the telephone, but it catches the corner of that

15   concrete base.  It is broken and worn.  There is

16   also intrusion at the base where everything is

17   knocked down around the base.  The subterranean part

18   of the base actually bells out slightly, according

19   to the plans and specs.  So if you are standing

20   close to the base you aren't on the base.  Not to

21   make too much of it, it is just another instance of

22   intrusion on the structure.

23              The far leg has graffiti on the sign, it

24   has a missing sign, and it has intrusion on the

25   base.  That's the far leg.  If you go back to the

1631

```
 1   leg he climbed, which we were previously on, there

 2   are two or three instances of graffiti on the base.

 3   There is substantial intrusion on this particular

 4   structure, which that's the phrase I thought

 5   Maffucci used.

 6                THE COURT:  There is intrusion on --

 7   I've got wear and tear on the base, another sign

 8   being ripped off, and on the JAS 7 sign, we'll call

 9   it.

10                MR. RUSH:  Yes.

11                THE COURT:  Other evidence of intrusion

12   on this particular tower?

13                MR. RUSH:  I just love my pictures, as

14   everybody can probably tell.

15                THE COURT:  Well, just tell me and it

16   will come back to me.

17                MR. RUSH:  Very good, your Honor.  You

18   can see it on this photograph of -- there are

19   blowups of it.  Shall I just approach and give it to

20   you?

21                THE COURT:  Just hold it up.  I will

22   recognize it.

23                MR. RUSH:  Well, you can see the base,

24   it says RA on the base, and there's --

25                Is that working for you, Judge?
```

```
 1                    THE COURT:  It's not on the screen as

 2      yet.

 3                    Okay, I've got it now.

 4                    MR. RUSH:  There's graffiti on the base.

 5      That says RA.  You can see it.

 6                    THE COURT:  And that exhibit number?

 7                    MR. RUSH:  That's exhibit.  It's two

 8      pages, Exhibit 133.  And we have another exhibit

 9      that blows that up.  And then on the inside of this

10      there's that RA, or something similar is also

11      repeated on the inside.  You can see -- this is not

12      the best picture, but the picture shows that there

13      is intrusion all the way around the base.  The grass

14      is knocked down.  It's actually -- it's all eroded

15      or diluted down to the dirt.  You have a lot of

16      activity -- not there, but back at I-95, which is

17      only about 200 feet away -- maybe it's 150 feet --

18      150 yards away, 300 feet, 400 feet maybe.  I don't

19      think it's that far, but maybe it is.  This is the

20      area that Detective Russell talked about all of the

21      parties where people would drink and consume drugs

22      and have sexual relationships.  He said there's a

23      lot of debris under that.

24                    This area around this particular tower

25      is intruded upon more so than most of the other
```

towers.  It's all worn around.  I will probably

forget about some of the other intrusion, but if you

think about some of the other witnesses who have

talked about motorcycle activity and people walking

up and down this pathway.  And the reason I talk

about these pathways is I didn't -- I'm not smart

enough to come up with them on my own, but Prosser

talks about that the most reported evidence of

constant intrusion are well-worn paths on railroad

rights of way in all case law.  He says that's where

this doctrine comes from.

And if you look at the case of *Lin v.*

*Metro-North*, which is a 2006 or '7 Connecticut

Supreme Court case, that case dealt with a trestle,

and Ms. Lin, she was fishing or digging clams or

something where she was going back and forth on this

trestle, and in that case they mentioned that there

were paths -- there was evidence of paths leading to

the trestle.  And it's that kind of path that gives

you evidence of intrusion.  Because if you think of

a piece of steel, how would you ever prove that

there is intrusion if somebody climbs up 40 feet and

then climbs down.

THE COURT:  So when *Maffucci* talks about

-- and it's at page 22 of the Connecticut Supreme

1    Court's decision, it defines -- it says, "The

2    limited area to which the court must look is the

3    structure creating the condition."  And then it

4    says, "In the present case that limited area of the

5    land is the switch gear cabinets themselves."

6              MR. RUSH:  Yes, your Honor.

7              THE COURT:  I am quoting from the

8    Supreme Court's decision there.  So what is your

9    definition of the limited area?

10             MR. RUSH:  Well, I have two different

11   ones, and I don't mean -- because I think there is

12   an alternative argument here.  But I would argue

13   that the limited area is the area -- is the area in,

14   around and on Tower No. 1043 that has -- that the

15   catenary tower has two legs.  And that whole

16   structure, it's one individual structure.  Now you

17   can say no, we're not going to count this stuff

18   across the road, although they can't stand without

19   two structures.  But I would argue initially that

20   the structure is any evidence of intrusion --

21             THE COURT:  The structure.  When it says

22   -- what's the limited area?  It says it's the

23   structure.  Is it Tower 1043?

24             MR. RUSH:  Yes.

25             THE COURT:  That's the limited area.

```
 1              MR. RUSH:  Yes, that's the first
 2   argument, is that it is Tower 1043 and the environs
 3   around it, its base.  Basically in, around, at or on
 4   Tower 1043.
 5              THE COURT:  What if the evidence were
 6   incontrovertible that all that ever happened is
 7   anybody -- people walked around Tower 1043, but
 8   never climbed in any manner 1043?
 9              MR. RUSH:  Did they touch it?
10              THE COURT:  Would you still be saying
11   that?
12              MR. RUSH:  I would say under Prosser and
13   under Lin and the progeny cases under Prosser, the
14   presence of the well-worn path would be evidence of
15   constant intrusion wherever that path went.
16              THE COURT:  I mean I understand why you
17   would argue that, the fact that you have a path or
18   well-worn path, however you want to characterize
19   them, is circumstantial evidence that people were
20   then accessing the structure and then perhaps going
21   up the structures, but it strikes me that to say
22   that the limited area for Maffucci purposes is
23   simply the path itself ignores the context of this
24   case.  And if I went back and relooked at the
25   Prosser case, what the Prosser case is talking
```

1    about, I suspect they're not about railroad catenary

2    structures and they may be injuries that occurred on

3    the land.

4              MR. RUSH:  Yes, sir.

5              THE COURT:  As opposed to this injury

6    occurred 45 feet up or so next to the wires.  So I

7    am trying to get a clearer understanding.  I have

8    the Metro-North take.  The Metro-North take is it

9    has to be -- the limited area is solely Tower 1043,

10   and it sounds like you are agreeing with that.  You

11   are saying it's the land around 1043 or anywhere

12   near 1043.

13             MR. RUSH:  I think what they are saying

14   is that the structure is up by the wires.  What

15   they've done is they've said they're going to ignore

16   the structure itself and they're going to lift their

17   vision to 45 feet, and they're saying that's what

18   *Maffucci* is talking about, it's that little

19   structure between 45 and 50 feet.  That's what it

20   is.  I am merely saying that if I follow the

21   language of *Maffucci*, that the court in *Maffucci* and

22   in *Lin*, which was talking about paths, well-worn

23   paths leading to the trestle as being relevant in

24   this overall analysis, if I put those two cases

25   together and I say what is the structure, in

1637

1 *Maffucci* it's the cabinet itself.  It's four corners

2 and everything inside it.  In *Lin* it's the trestle.

3 But in trying to determine whether there is constant

4 intrusion, in *Maffucci* they mention that there

5 weren't any paths leading to -- I thought they had

6 mentioned there wasn't any evidence of paths leading

7 to the structure, and in *Lin* they said -- they made

8 a point of saying there were evidence of these

9 paths.

10          And so as I look at this case -- and I

11 looked at Prosser, and, you know, I'm just a lawyer,

12 so I am sort of trying to put it together.  *Maffucci*

13 says it's the structure.  The structure must be in

14 this case the entirety of Catenary No. 1043.  It's

15 not the base, it's not way up at the top, it's not

16 just the middle.  It's the structure.  It's called a

17 catenary, and it has two legs.  And there is

18 evidence of substantial intrusion on the tower,

19 climbing up on the tower to paint it.  There is

20 substantial intrusion at the base.  There are paths

21 that lead to it and surround it.

22          THE COURT:  I'm unclear.  It seems like

23 you might be agreeing with Metro-North in terms of

24 what that is because Metro-North's request No. 7 of

25 its jury instructions asks -- it's entitled Trespass

1638

1     on Tower 1043, there is nothing there about the

2     trespass having to go up to a certain height, at

3     least in this one request.  It says "limited area

4     must consider the structure itself," and then says

5     "if the plaintiffs prove to you there is constant

6     intrusion on the ground around Tower 1043 that's not

7     enough."

8              It seems to me that Metro-North is

9     saying the relevant limited area is just the

10    structure itself.  I am asking you what does

11    *Maffucci* means by the structure, and you are telling

12    me -- I think you are telling me it's the structure

13    and the land around it.

14              MR. RUSH:  Yes.

15              THE COURT:  Right.

16              MR. RUSH:  Because the land deals with

17    the issue of paths, which both *Lin* and *Maffucci*

18    mentioned as being evidence of constant intrusion.

19    And so steel, unless you paint it, doesn't reflect a

20    lot of evidence.  And the common law doctrine can't

21    be a rule that can't be proven in practice, and the

22    best way to prove constant intrusion is in fact

23    well-worn paths leading to something because that

24    means people -- based on the evidence in this

25    case -- a jury could find differently, but based on

1  the evidence in this case it seems like there is a

2  whole lot of people down there.  Everybody knows

3  there is a lot of people down there.  Detective

4  Russell is talking about -- he doesn't call them

5  parties, but people are not very far away drinking,

6  smoking, having sex.  There is a lot going on there,

7  children, motorbikes, graffiti artists, all sorts of

8  activity.  So I think the activity, the activity

9  around it is relevant to determining whether there

10  is constant intrusion.  There is a whole lot of

11  constant intrusion along that stretch.

12           THE COURT:  I understand that argument,

13  that the activity around it is relevant, but that

14  doesn't answer the question of what is the

15  structure.  Because I can see why you would make

16  argument from circumstantial evidence, well, there

17  is so many people down there, whether they are

18  fishing, crossing through, kids on motorbikes,

19  whatever, that some portion of those people are in

20  fact intruding on the structure itself in a constant

21  kind of way, is your argument.

22           MR. RUSH:  I think the structure is in

23  fact 1043, both legs.  I think that is the

24  structure.  I think that the evidence of climbing to

25  height at the Epik Owl location is constructive

1   notice to -- under *Maffucci* there is the actual

2   notice and then there is constructive notice of

3   intrusion.  That kind of intensive use not very far

4   away up to the wires is constructive notice to

5   Metro-North that they have a serious problem.  And

6   it just happened to, you know, flower at Tower No.

7   1043.  It will be another tower at some other time

8   that also probably peculiarly has evidence of

9   intrusion.

10              THE COURT:  I see, okay.  So --

11              MR. RUSH:  I have an alternate theory,

12  though, of course.

13              THE COURT:  Go ahead.

14              MR. RUSH:  Which is essentially the

15  Court's theory, which is -- and it's more along

16  constructive notice.  The plaintiffs have proven

17  that the defendants knew or should have known of the

18  specific kind of constant intrusion on their

19  property which involves climbing to height.  There

20  is climbing on Tower No. 1043.  There is obvious

21  climbing at 1040 where it says Epik Owl.  Mr.

22  Doody's testimony by itself is an admission that

23  Metro-North was aware that this was a serious

24  problem.

25              That being the case, that evidence

```
 1    should have put them on constructive notice of the

 2    problem that they had at Tower 1043 because they

 3    were already aware that Tower 1043 -- that people

 4    had more than likely -- not certain, but more than

 5    likely climbed up to spray on that JAS sign at 9

 6    feet.  So the combination of that climbing activity

 7    on Tower No. 1043, along with their notice that

 8    trespassers were climbing their catenaries

 9    generally, combined should be enough.

10              THE COURT:  I see, okay.  I understand

11    the argument.

12              MR. RUSH:  Thank you, your Honor.  339,

13    briefly.  There is no good reason not to apply 339

14    to somebody who is mentally disabled.  The origin of

15    the doctrine is from the 1880s, I think, and there

16    is a U.S. Supreme Court case that I think was the

17    first big case that dealt with it, but a lot has

18    happened in the intervening 140 years regarding

19    mental health and mental disability and

20    understanding of intelligence.  And in this

21    particular case you couldn't go out and create

22    having Omar Colon tested by Dr. Angel Hernandez

23    Colon and Elba Colon when he is eight.  You can't

24    fashion that.  You are not thinking ahead 20 years

25    to a lawsuit.  He was diagnosed with an extremely
```

1   low IQ for nonverbal understanding.  57 is below the

2   area -- I always get mixed up.  It used to be idiocy

3   and other things, but I think 60 is the limit for

4   idiocy.  So his ability to look at structures and

5   understand them, analyze something that is nonverbal

6   is below the level for idiocy.  The U.S. Supreme

7   Court will not allow the death penalty in any state

8   in this country if somebody tests at 70 or below.

9   The very skill set that he should have to understand

10  this danger, the hidden danger especially, maybe a

11  lot of the other dangers, he doesn't have the

12  requisite IQ.

13          And IQ doesn't change very much.  You

14  get older, you have better understanding.  Maybe

15  when you are eight you can't understand a warning

16  sign, but by the time you are 13 or 14 you can in

17  terms of mental age.  But IQ doesn't change very

18  much.  He is not going to become a whole lot

19  smarter.  He may become more experienced, but his IQ

20  is going to remain relatively stable, according to

21  Dr. Myers.

22          You also have on top of this a long

23  history of special education classes for a very bad

24  academic student.  On top of that you have another

25  medical doctor named Oscar Osorio who at age

1 19 years and 11 months, I think it was, says he's

2 generally -- he suffers from general mental

3 retardation.  That's again an independent analysis.

4 You have the affidavit of Dr. Angel Hernandez Colon

5 confirming all of that also.  That's a reasonable

6 thing for a skilled professional psychiatrist to say

7 that based on that I think that his IQ was about 71,

8 72, and his nonverbal IQ is 57.

9           Now, is he a child?  Well, not

10 chronologically, of course he's not, but Dr. Myers

11 said he had a childlike aspect to him, a childlike

12 naiveté, and then he went down a list of things that

13 he said are all consistent that indicate that he had

14 mental disability.  The original term was mental

15 retardation.  It's not used a whole lot today, but

16 intellectual disability is, intellectually

17 challenged is.  Dr. Myers was pretty clear that he

18 fit in that category.

19           So the question is, is there a good

20 reason why courts would not say we have a person who

21 happens to be an adult, but they have a mind of a

22 child.  Why wouldn't you apply that doctrine?  Now,

23 there may be a good reason I haven't thought of,

24 maybe the defense will have one, just analytically

25 it doesn't occur to me why you would do that

1    differently.

2              THE COURT:  No court ever has, right?

3              MR. RUSH:  I don't think any court ever

4    has.  What I would say is the *Zimmerman* case out of

5    Pennsylvania alluded to this and they said -- I

6    think it was 21 or 22 and allegedly had anxiety and

7    some other things.  Now, these were mental disorders

8    as opposed to low IQ.  They said there wasn't any

9    evidence to support the claim that he was disabled

10   or mentally --

11             THE COURT:  Under your theory, right,

12   that wouldn't make a difference?  Anybody who is

13   mentally ill -- anybody who is having some sort of

14   diminished capacity would now qualify for this.

15             MR. RUSH:  Not under my theory.  No,

16   sir.

17             THE COURT:  Why would you distinguish

18   between a psychotic person who is out there in loony

19   land wandering the tracks and the person who simply

20   has a low IQ?

21             MR. RUSH:  Well, I would focus on the

22   issue of mental age.  If the person happened to be

23   psychotic and had a low mental age, then he would

24   fall into that.  If he were psychotic and was very

25   intelligent so he could understand the dangers and

1    the risks --

2            THE COURT:  So in a way then what you

3    are saying is, well, what you really have to do is

4    look at what their mental age is.  So you are saying

5    age is relevant.

6            MR. RUSH:  Mental age is.

7            THE COURT:  Okay.  Mental age is

8    relevant, but that raises the question of -- part of

9    that is age.  And then you are really saying age is

10   not relevant because you can be 26.

11           MR. RUSH:  Well, chronological age is

12   not relevant, mental age is.  And mental age is

13   really just an extension of what is their

14   intelligence quotient and how does that line up with

15   their ability to understand danger and risk, et

16   cetera.  So --

17           THE COURT:  Is there a difference

18   between the psychotic person who's in the middle of

19   some kind of out of world experience in terms of

20   their mental functioning that makes a difference?

21           MR. RUSH:  Only in this sense.  The

22   person who has a psychotic episode, when he comes

23   out of that psychotic episode, will have a mental

24   age of an adult.  He can be a mental aged adult.  In

25   fact, he's a mental aged adult having a bad time it.

1    THE COURT:  Why should that matter,

2    though, right, in some ways for what the tort rule

3    should be?

4    MR. RUSH:  Well, because they're

5    different.  And I --

6    THE COURT:  I know they're factually

7    different.  I'm just trying to figure out why that

8    difference should matter for -- should make a

9    difference for what the rule should be here.

10   Because you are making essentially I think very

11   adventurous -- I don't fault you for making an

12   adventurous argument, but you are essentially asking

13   me to go where no court has gone before, right?

14   MR. RUSH:  Sure.

15   THE COURT:  To the extent this child

16   trespasser exception, and my concern is, well, gosh,

17   you are asking me now to do it for the diminished

18   mental age, but it seems like it would equally apply

19   to almost anybody else who has a mental capacity

20   problem of any kind.

21   MR. RUSH:  Well --

22   THE COURT:  Under your reasoning.

23   MR. RUSH:  Yeah.  I'm not really because

24   I want to go back to the Rule 339.  339 talks about

25   children of tender years who -- now that tender

1   years has now been extended all the way to 18, as

2   far as I can tell, but it's focussing on their

3   ability, their developmental ability to understand

4   danger or risk.  Maybe I am misquoting that.  I

5   never really understand legal rules, your Honor, I

6   don't have that quick of a mind, I really don't, but

7   339 seems to be children of a certain age -- or

8   children because of the reduced -- not reduced, but

9   the development of their mind has not reached a

10  point where they have the same mental capacity as an

11  adult.

12          That's really where Mr. Colon fits right

13  in, because he'll never get there.  He's like the

14  child who's 14 or 15 years old and is electrocuted

15  on a catenary while of normal intelligence.  That

16  child will never achieve, because he's dead now, but

17  where he stopped was -- this theoretical child, he

18  stopped with the mind of a 14- or 15-year-old.

19  That's where Mr. Colon was.  He'll never get there

20  now either because he's going the other way.  So

21  it's really not -- developmentally Omar Colon can

22  never achieve the intelligence of an adult.  He can

23  never get there.  A psychotic person can.  In fact,

24  a psychotic person can be highly intelligent

25  simultaneously and still be very dangerous, quite

1   frankly.  But --

2             THE COURT:  Okay.

3             MR. RUSH:  I'm not pushing it hard,

4   Judge.  I will say I don't see a reason not to do

5   that.  But I really like Section 337, and that's

6   probably because I don't understand it maybe, but I

7   think 337 -- if this case were presented to the

8   Connecticut Supreme Court they would probably say

9   that this is a highly dangerous artificial structure

10  or artificial condition manufactured by the

11  controller, possessor of land, that it has hidden

12  dangers, and it also has obvious dangers that people

13  might ignore.  And, in fact, the evidence that they

14  might ignore them is the fact that people are

15  climbing these catenaries and painting stuff way up

16  there.

17            THE COURT:  So if he would look at 337

18  -- I have the text in front of me here.

19            MR. RUSH:  Yes, sir.

20            THE COURT:  It seems to be different

21  from the constant intrusion doctrine under 335 in

22  large part because it requires knowledge or

23  constructive knowledge, it seems, of the presence of

24  the actual trespasser.

25            MR. RUSH:  Yes, but --

```
 1              THE COURT:  So sort of prior trespassing

 2     activity.

 3              MR. RUSH:  Not an individual.  Not

 4     knowing that Harry Jones will be there.  I don't

 5     think it means that Harry Jones will be there.  But

 6     knowing that trespassers will be there.  And the

 7     case I'm referring to in Connecticut is Carlson v.

 8     Connecticut.  And Carlson v. Connecticut is the

 9     Connecticut Supreme Court back in 1920, that without

10     ever knowing that that doctrine would be codified in

11     Section 337, they decided that where the railroad

12     was on notice that partiers, revelers, would go to

13     the bars nearby and then they would walk down this

14     well-worn path and then they might go to sleep on

15     the tracks, so they had been notified of that, and

16     the sheriff notified the railroad of that, and the

17     railroad was even beginning to look out for people

18     like that, but they didn't really have a very good

19     lookout system, so they ran over Mr. Carlson and cut

20     off his legs.  And the Connecticut Supreme Court --

21     I don't want to misquote them, but I always thought

22     Carlson was really talking about 337.

23              THE COURT:  Well, 337 didn't exist in

24     1920, right?  It's a creature of the American Law

25     Institute Restatement (Second), I assume.
```

1    MR. RUSH:  It did not exist as Section

2   337.  It did exist in *Carlson*.  *Carlson* dealt with

3   an artificial dangerous condition, the railroad.  It

4   dealt with a circumstance where the railroad knew or

5   should have known that people were going to be in

6   close proximity to the railway, and then as a result

7   of that they didn't take any precautions.  They were

8   notified of it, they should have taken precautions.

9   I don't know if it's an actual hand in glove kind of

10  fit.

11    THE COURT:  That's the concern.  It's

12  titled -- 337 is titled Artifical Conditions Highly

13  Dangerous to Known Trespassers.  I think it's

14  anticipating a situation in which the railroad knows

15  that somebody is on the land.  So if they knew that

16  Colon -- and there has been no evidence they had any

17  knowledge of Mr. Colon's actual presence on the

18  land, and that's why it strikes me that 337 is

19  framed differently than 335.  Otherwise, 337 would

20  just be kind of an endless loop hole, there would be

21  no need for 335.

22    MR. RUSH:  Well, it's a different

23  situation, it doesn't require constant intrusion.

24  So it's different.  But I think in the commentary to

25  337 it identifies what "known" means, and it does

```
 1    not mean an individual.  It means that trespassers

 2    generally are known to be are known to be present.

 3    So I would ask the Court to look at the commentary

 4    under 337.

 5              THE COURT:  I have looked at Comment A,

 6    and Comment A says, "The rule stated in this section

 7    relates only to conditions under which the possessor

 8    of land is subject to liability to a trespasser who

 9    he knows to be about to come in contact with a

10    highly dangerous" --

11              I understand your argument, but I'm just

12    not sure that if I adopt your understanding of 337,

13    which would read out the requirement that I think is

14    there that they have to know that the person is on

15    the land.  That would mean that every case like this

16    would be packaged in 337 and never a 335, because

17    335 is harder to get because you have to prove prior

18    constant intrusion.

19              MR. RUSH:  Then I would ask you to look

20    at Carlson.

21              THE COURT:  Okay, I will look at

22    Carlson.

23              MR. RUSH:  Because Carlson is not a

24    constant intrusion case, it's a case where the

25    defendant has been notified that they should keep a
```

1  lookout that there are going to be trespassers

2  coming onto their property and they should do

3  something.  And I don't know -- I'm not sure if it's

4  -- I just thought that -- *Carlson* is not a constant

5  intrusion case, I don't think.  But maybe it is.

6            THE COURT:  Do you have that here?  Do

7  you have --

8            MR. RUSH:  It's cited in both your --

9            THE COURT:  Do you have the evidence

10  here that Metro-North, MTA was notified that Colon

11  would be coming onto the land?

12            MR. RUSH:  No, not that Colon, because

13  he had never been to that site before.  But they

14  were notified that trespassers were coming onto that

15  site near Tower No. 1043, and even on Tower No.

16  1043.  And if *Carlson* doesn't stand for some

17  variation of Section 337, then it has to be a

18  constant intrusion case.  And again, it's cited in

19  your ruling.  It's cited in my memorandum.  I think

20  maybe it's cited in their memorandum.  It deals with

21  liability to trespassers where the defendant knows

22  that trespassers are going to be nearby close to

23  their dangerous artificial, that is a track.  They

24  didn't use the phrase "artificial dangerous."  It

25  just seemed to me because *Carlson* doesn't fit in

1653

1    constant intrusion and doesn't fit in the child

2    trespass theory, it must be either a different

3    Connecticut rule, just common law, or it's 337.  It

4    has to be one or the other.

5              THE COURT:  Okay.

6              MR. RUSH:  I don't want to go on and on,

7    Judge.  I have a list of all of the intrusion and,

8    you know, all of my photographs, but do you want me

9    to go on?

10             THE COURT:  All right, that's fine.

11             Okay, anybody else?  Anything else to

12   say on this motion?

13             MR. FINEMAN:  Nothing further from us,

14   your Honor.

15             MR. RINGOLD:  Just a small point.  Not

16   to belabor the point.

17             THE COURT:  Why don't you come on up,

18   Mr. Ringold.  You don't get enough time in the

19   spotlight.  Mr. Reed has been taking all of your

20   time.

21             MR. RUSH:  I'm sorry to interrupt.  I

22   wanted to be clear.  I have an alternative theory on

23   constant intrusion.  It's either the structure is

24   Tower 1043 or it's more in line with the Court's

25   instruction to the jury that if they know or should

1    have known of this type of intrusion generally.  So

2    I am lining it up as an alternative.

3              THE COURT:  One more time.  So first

4    theory, theory No. 1, is what?

5              MR. RUSH:  Theory No. 1 is under

6    *Maffucci is* the structure is the tower itself, the

7    catenary -- the whole catenary structure and its

8    close environs, including the well-worn path that

9    leads to its base.

10             THE COURT:  Okay.

11             MR. RUSH:  The other theory is the

12   theory set forth in your instructions to the jury

13   that where the plaintiff proves that the defendants

14   were aware or should have been aware of the specific

15   kind of intrusion, such as climbing up a catenary

16   pole to be near electric wires, then that would

17   trigger liability.  And I think Mr. Doody's

18   testimony and the Epik Owl and the climbing evidence

19   on Tower No. 1043 combined, the totality of the

20   evidence put them on notice.

21             THE COURT:  Okay.  Thanks.

22             MR. RINGOLD:  Thank you, your Honor.

23   Just very briefly on the issue of the child

24   trespasser exception.  Your Honor had asked the

25   question as to whether there was any reason to

1    change the rules of tort law in this situation, that

2    you took an issue with that.  To that point, your

3    Honor, I would just like to -- through my own

4    research that I don't think it has come up in this

5    case yet, but just as an additional point why the

6    child trespasser exception doesn't apply in this

7    situation, and in fact why it would be changing the

8    rule of tort law, would be another section of the

9    Restatement -- or rather, two sections of the

10    Restatement of Torts.  It would be Sections 283(a)

11    and 283(b), which are the sections of the

12    Restatement defining the reasonable person standard

13    generally -- or 283 is the section defining the

14    reasonable person standard generally, and 283(a) and

15    283(b) are the sections defining variations on that

16    reasonable person standard.

17           283(a) states that for children, again

18    using the same word as the child trespasser section

19    for children, one considers their age, intelligence

20    and experience in considering the standard that they

21    are held to.  So a 13-year-old of particular

22    intelligence with particular experience is held to

23    that standard.  But for 283(b), which is entitled

24    Mental Deficiency, reads, and I quote "Unless the

25    actor is a child, the insanity or other mental

1    deficiency does not relieve the actor from liability

2    for conduct which does not conform to the standard

3    of a reasonable man under like circumstances."

4              So I think the Restatement's own text,

5    and as your Honor I am sure is aware, in a legal

6    document we generally interpret the use of a word in

7    one context similar to the use of a word in another

8    context unless there is some indication it should be

9    used differently.  Here, the Restatement is telling

10   you adults are adults, children are children.  We do

11   not consider the mental deficiency of adults in

12   treating them as children.  And I think 283(a) and

13   283(b) read together tell us exactly that.

14             And additionally, just briefly, your

15   Honor had mentioned you would be the first court in

16   the land to apply this to a child.  And I would just

17   note, the Connecticut Supreme Court has in in fact

18   in *Maffucci*, a case we have been discussing,

19   answered exactly this question rather briefly and

20   tersely in footnote 5 stating, "The plaintiff in

21   this case was an adult at the time of the injury.

22   Consequently, the substantial precedent in this

23   state governing a landowner's duty to a child

24   trespasser is inapposite to this case."  There was

25   no analysis of Mr. Maffucci's mental condition, of

1    his mental age, of his IQ.  He was an adult.

2    Therefore, the law of child trespasser is-

3         THE COURT:  It may not have been raised,

4    right?  But I understand.

5         MR. RINGOLD:  I'm not aware of a

6    malpractice action brought against his attorneys.

7         THE COURT:  Okay.

8         MR. RINGOLD:  Thank you, your Honor.

9         THE COURT:  Great.  Thank you.

10        Anything else?

11        MR. RUSH:  Your Honor, just as an aside,

12   really the United States Supreme Court has made it

13   very clear that mental age does affect the

14   application of law.  And what was cited there is

15   283(a) and (b) as insanity, which does apply for

16   mental illness.  My client doesn't have mental

17   illness in the way that phrase is used.  He has low

18   intelligence.  So it's not mental illness, it's not

19   insanity.  And the U.S. Supreme Court has routinely

20   prohibited individuals who have -- adults with IQs

21   below 70 being treated the same as adults with

22   higher IQs.

23        THE COURT:  For that capital punishment

24   purposes.

25        MR. RUSH:  For that capital punishment

```
 1   purposes.

 2              THE COURT:  But I think probably also

 3   for holding the same with respect to people who are

 4   generally not competent for any mental reasons.

 5              MR. RUSH:  Yes.

 6              THE COURT:  Right.

 7              MR. RUSH:  That's also true.

 8              THE COURT:  So that might cut against

 9   your argument here because I'm not sure the Supreme

10   makes that distinction.

11              MR. FINEMAN:  Very briefly, your Honor,

12   on the child trespass exception.  And perhaps this

13   was my fault this hasn't come up yet because I

14   didn't raise it when I first made the argument, but

15   it may not even be necessary for the Court to

16   determine whether the childlike trespasser, the

17   child trespasser exception should ever apply to an

18   adult and get into this analysis because there is of

19   course also the predicate showing that has to be

20   made that the place where the dangerous --

21              THE COURT:  Can you come on up to the

22   lectern.

23              MR. FINEMAN:  I'm sorry.  It was my

24   signal that I promised to be brief.

25              THE COURT:  Very good.
```

1    MR. FINEMAN:  What I was saying, your

2  Honor, is it may not be necessary to actually answer

3  this question in this case, although it's an

4  interesting one, because the additional predicate --

5  or the first predicate that has to be shown is that

6  the place where the dangerous condition exists has

7  to be somewhere that children -- it's been shown

8  that children are likely to trespass.  So what we

9  have here is, again, 45 feet up a lattice tower.

10  And the plaintiff's elicited evidence that Mr. Colon

11  was tall and strong, he was 6'1 and somewhat

12  athletic, or physically capable at the time of his

13  accident, and I think that should be noted here.  I

14  don't think it would be reasonable to expect that

15  anybody would ever anticipate that a child would be

16  likely to climb that tower, and, if ever, that they

17  would climb to nearly that height.  It's a

18  terrifying height to be, and it's close to an

19  apparatus that I don't think any child would venture

20  near.

21    THE COURT:  And there is no evidence --

22  there may be evidence of intrusion, however we're

23  going to define the relevant structure here, but I

24  don't know that we have evidence that it was a child

25  who intruded on Tower 1043 as opposed to maybe

1660

1   possibly children being in other areas on the

2   ground.

3               MR. FINEMAN:  I would agree with that.

4   I also think that 339 doesn't even require an answer

5   to that question because I think it has to be -- and

6   it says, 339(a), "The place where the condition

7   exists is one upon which the possessor knows or has

8   reason to know that children are likely to

9   trespass."  So the real question for the Court is

10  are children likely to trespass 45 feet up a lattice

11  tower next to live railroad tracks where there is

12  nothing to be seen in either direction but

13  electrical equipment and towers and tracks.  And I

14  think the answer to that is no, and it may allow us

15  to avoid answering the question, to the extent it's

16  open at all in this state, as to whether the

17  exception could ever apply to an adult.

18              THE COURT:  Okay, great.

19              Mr. Rush.

20              MR. RUSH:  Your Honor, I must have had a

21  different experience growing up.

22              THE COURT:  Can you just come on up to

23  the lectern.

24              MR. RUSH:  Your Honor, I'm the fifth of

25  12 children and I played on railroad right-of-ways

1    and I always wanted to climb one of those towers.

2    When I was 15, I was 5'10 and 155 pounds.  I was

3    physically as strong as -- not as big and strong,

4    but I was able to climb a 45-foot tower.  We climbed

5    trees to 45 feet all the time.  My brothers

6    harvested holly in Florida -- not holly, but the

7    mistletoe, 50, 60 feet in the air.  People climb.

8    In fact, children climb everything.  I took my son

9    to the hospital when he fell out of an oak tree.  He

10   was 15 feet up and fractured his wrist in about ten

11   different places.  We had a cedar tree in our front

12   yard, my brothers and sisters and I climbed 40,

13   50 feet in the air.  My nephew fell out of a Norfolk

14   Island pine that was 60 feet tall and he hit every

15   limb on the way down, otherwise he would he dead.

16           Children climb.  They climb rocks, they

17   climb tress.  They climb up on cars.  They do all

18   sorts of crazy things.  And physically it takes no

19   great physical capability to climb up a ladder or a

20   tree or up a mountain.  I mean that's what people

21   do.  The Sound of Music they're walking across the

22   Alps.  People climb.  It's a natural human behavior.

23           And to say I don't think any child would

24   ever climb 45 feet in the air, it's inconsistent

25   with human experience.  That's what they do.  Some

1    of them fall and get killed, some of them don't.

2    Some of them never get the chance to climb the

3    electric tower, so they never do it and they become

4    lawyers.  It doesn't mean they don't do it.  People

5    climb these -- not telegraph.  These tall towers.

6    They now surround them with 10 foot barbed wire

7    fences to keep people from going up the cell towers

8    because people climb.  People used to climb up, you

9    know, these big water towers.  There used to be

10   water that was stored in these huge vertical things

11   and they had railings.  People would climb up on the

12   water tower.  That's what people do.

13           So I think that the child trespass thing

14   is -- you're on the edge and you may not want to go

15   over on that edge.  You may not be the first one who

16   says, hey, I want to do that.  This is an issue that

17   if it goes up on appeal the Second Circuit will deal

18   with and say, look, by the way, the plaintiff did

19   prove this.  So I think that ought to be part of the

20   process.  Maybe the development of the law will go

21   someplace else.

22           But as far as Mr. Colon's ability to

23   understand danger and risk, his intelligence is

24   relevant, it seems to me, to either contributory or

25   comparative negligence.  It is relevant.  I don't

1    know how far that goes, but I do make that point.

2              THE COURT:  Okay.  All right.  That's

3    why I permitted evidence essentially on mental

4    status condition because it's -- I think, as far as

5    I can tell, all that evidence that would bear on the

6    child trespasser exception would also bear on other

7    issues in the case.

8              So I'm not going to issue a formal

9    ruling at this point on the motion for judgment of

10   acquittal.  I will tell you -- just in terms of your

11   cases tomorrow, what are you looking at in terms of

12   witnesses at this point?  For Metro-North?

13             MR. FINEMAN:  Well, we will recall Mr.

14   Wilhelmy, who should be very brief since he already

15   testified, and then we're going to be calling Jim

16   Pfeiffer, who are is in the chain of command with

17   Mr. Doody.  He should also be very brief.  So I

18   don't anticipate going more than a couple of hours

19   with our case total.

20             THE COURT:  OH, okay.  All right.

21             And what about UI?

22             MR. REED:  Your Honor, we have a

23   stipulation that we've agreed to with the

24   third-party plaintiff that we'll certainly

25   introduce.  And I haven't yet made a determination

1  as to whether Mr. DelMonte may come and testify.  He

2  may or may not.  And, in any event, I would think he

3  would not be a lengthy witness.  So it would seem to

4  me quite likely that the entirety of the remaining

5  case could be put on tomorrow.

6          THE COURT:  Okay.

7          MR. REED:  I think we'll have a motion

8  when Metro-North rests.

9          THE COURT:  And you'll have a motion as

10  well.

11          MR. REED:  I can also raise, with Mr.

12  Hickey's assent, that we've reached an agreement

13  that the interpretation of that indemnification

14  provision is really a matter for the Court.  So that

15  the issues for the jury to decide is whether there

16  is evidence that the UI transmission system either

17  directly or indirectly caused the injury Mr. Colon

18  suffered.  I think that has to be determined by the

19  jury, but the application of any resulting

20  determination by the jury in that regard, including

21  what I understand to be a claim for attorney's fees

22  in the defense of this case, even in the event of a

23  defense verdict, still has to be adjudicated, and it

24  seems to us that is a matter for the Court.

25          THE COURT:  For the Court.

1665

```
 1              MR. REED:  So that's not something we'd

 2   have the jury even hear the evidence of, let alone

 3   decide.

 4              THE COURT:  Well, I will be getting to

 5   that portion of the jury instructions and we'll be

 6   looking for more of your guidance in terms of

 7   exactly what issue needs to be framed for the jury

 8   on that issue.

 9              Anything else on that?

10              MR. HICKEY:  No.  I think I'm in

11   agreement with Mr. Reed.  So if the Court was trying

12   to work out an extensive jury charge on indemnity or

13   indemnity contracts, perhaps that energy could be

14   directed elsewhere.

15              THE COURT:  Okay.  So what is it --

16   essentially you are looking -- you will be looking

17   then in the instructions, in the verdict form in

18   particular, for a jury determination of the issue of

19   whether UI's wires --

20              MR. REED:  It's what I have called

21   electrical causation in this case.

22              THE COURT:  Cause.

23              MR. REED:  That's really the single

24   issue that I think the jury has to decide to trigger

25   the indemnity provision.
```

1    THE COURT:  And then the Court will

2    determine the additional issues of what?

3    MR. REED:  Attorney's fees.  If they

4    should even in the case of a defense verdict,

5    whether they would be owed under the indemnity

6    provision.

7    THE COURT:  I'm sorry?

8    MR. REED:  Even in the case of a defense

9    verdict, whether Metro-North would still have a

10   valid claim to be reimbursed its attorney's fees and

11   defense costs.

12   THE COURT:  I see.

13   MR. REED:  Which is something that is in

14   the complaint.  We hadn't focused on it during the

15   course of the case, but counsel has raised that as a

16   claim that Metro-North intends to make even in the

17   case the jury returns a defense verdict.

18   THE COURT:  Could I ask you then,

19   counsel, to maybe -- if this has not been

20   specifically covered in terms of what you would

21   suggest I instruct the jury with respect to the

22   indemnification claim -- has it been?  I have your

23   instructions here.

24   MR. REED:  I believe --

25   THE COURT:  Is there some modification

1   you would be --

2           MR. REED:  I think it would be worthy,

3   your Honor, of our taking maybe another crack at it

4   to refine the charge, because it really -- as I

5   conceived it, it is limited to this issue of

6   electrical causation.  So it's that language in the

7   indemnity agreement that has to do with whether the

8   UI system directly or indirectly caused the injury.

9           MR. HICKEY:  Your Honor, our initial

10  thought, "our" meaning for Metro-North, would be by

11  way of maybe even one or two interrogatories to the

12  jury.

13          THE COURT:  Yes.

14          MR. HICKEY:  That they would answer the

15  factual question, and then the application of the

16  contract could then be, if disputed, briefed to your

17  Honor, and if not disputed, applied as agreed.

18          THE COURT:  So all I would like to get

19  from you parties, the defendants and the third-party

20  defendant, is proposed language that you want me to

21  submit to the jury that meets your need for the

22  findings to be resolved.

23          MR. HICKEY:  I think that would be

24  perfect.

25          MR. REED:  I think that's fine, your

 1   Honor.

 2              THE COURT:  I would think that the

 3   instructions -- this is something that will be kind

 4   of buried in the instructions because most of the

 5   instructions will be talking about the major claim,

 6   claim or claims, against Metro-North and the MTA,

 7   but it would basically say, as we have already

 8   acknowledged, there is this third-party

 9   indemnification, and for that, ladies and gentlemen,

10   all you need to resolve is blank.  Right?  And then

11   have that be part of their verdict form.  And they

12   don't need to assess some sort of damages or

13   anything else like that.

14              MR. HICKEY:  Exactly.

15              THE COURT:  So at that point they're

16   just going to give us a factual answer.  So will you

17   give me something tomorrow?

18              MR. REED:  Yes.

19              MR. HICKEY:  Yes.

20              THE COURT:  Okay, great.  All right, so

21   I will take the motions under advisement.

22              I will be candid and say it's pretty

23   doubtful in my mind that I'm going to allow the case

24   to proceed on child trespasser, with all due respect

25   to the spirited arguments that have been made.  And

1    I have the same concerns about the 337, in light of

2    what I have said, although I want to go back and

3    take a second look at the *Carlson* case as Mr. Rush

4    has suggested.  So I'm going to take into account

5    all of these -- what I heard today, and especially

6    the reference to new authorities, Restatement 283,

7    283(b) as well, and try to give you more definitive

8    guidance.  But just in terms of how you are

9    presenting your case, I want you to know the

10   direction the Court is leaning, especially insofar

11   as it goes towards the likely content of the jury

12   instructions.

13           And we expect to get you a draft of

14   those jury instructions by tomorrow morning so that

15   you'll have enough time to do a review, an initial

16   draft, and maybe discuss that more following the

17   close -- it sounds like in all likelihood we'll have

18   close of evidence tomorrow from the defense,

19   third-party defendant, and will be --Mr. Rush,

20   you'll need to decide if you are going to do a

21   rebuttal case.  Do you have a thought on that yet?

22           MR. RUSH:  I do in this sense, your

23   Honor.  I am assuming they're not going to pursue

24   the man on the grassy knoll issue.  If they do, then

25   I would have to bring in the evidence of Mr. Chacon.

1  And by way of explanation, his testimony was he saw

2  him up on the ridge, 3-, 4-, 500 feet away running

3  laterally.  He wasn't next to Mr. Colon, and with

4  that in mind --

5            THE COURT:  All right.  So is Mr. Chacon

6  or mention of this mystery person coming in in your

7  testimony tomorrow?

8            MR. FINEMAN:  And as previously

9  mentioned, no.

10            THE COURT:  That's not changed as of two

11  hours ago.

12            So they're not going into the Chacon

13  issue in their witnesses tomorrow.  Other than that,

14  do you anticipate a rebuttal case?  Do you need more

15  time to think about this?

16            MR. RUSH:  I don't think so.  I'll think

17  about it and I'll listen to what they have to say

18  tomorrow.  I don't anticipate that.  I don't know

19  who all of these witnesses are.  Generally it's my

20  understanding -- well, generally the defendants

21  can't bring in witnesses to contradict their

22  30(b)(6) representative.  So I don't know what Mr.

23  Pfeiffer is going to talk about, but I would be

24  concerned if he got up there and said, oh, no, no,

25  no, that never happened.  He won't say Mr. Doody is

1    crazy, but if he gets up there and says there is no

2    evidence of that, of constant intrusion or people

3    climbing or it never happened, it only happened

4    once, I don't think that -- I don't think

5    Metro-North can do that.  I don't think they can

6    bring somebody in and say, the 30(b)(6), just ignore

7    him, we've got a new witness, he's going to come and

8    tell you the real story.

9              THE COURT:  My initial reaction to that

10   is the 30(b)(6) witnesses are generally --

11   oftentimes they're specific to particular subject

12   matter areas, such that their testimony may be based

13   on personal knowledge or it may be based on -- in

14   their deposition knowledge for which they have

15   essentially tried to learn in connection with those

16   responsibilities.  So even as a first step to kind

17   of proving this 30(b)(6) preclusion suggestion that

18   you are making, I think it would have to be very

19   clear to me that the specific area of contradiction

20   that was elicited from a Metro-North witness was on

21   that specific subject matter area reasonably defined

22   in a 30(b)(6) deposition, because, you know, you

23   have very wide ranging depositions.  You covered a

24   lot of different areas in the many depositions that

25   I have seen.  And so my question would be -- I don't

```
1   know that every single question that's been asked of
2   every single 30(b)(6) witness qualifies as
3   essentially a statement of the company in that way.
4   That would be the initial question I'd have.
5               MR. RUSH:  Okay.
6               THE COURT:  But it goes to essentially
7   what's going to be elicited from these witnesses.
8               Do you have a sense of what's the
9   purpose of calling these witnesses back?  Wilhelmy?
10              MR. HICKEY:  Well, Wilhelmy, your Honor,
11  because he was at the scene, and that would have
12  been beyond the direct examination.
13              THE COURT:  So fact witness testimony
14  about what he saw at the scene.
15              MR. HICKEY:  Fact witness.  Now I will
16  represent that Mr. Pfeiffer is in the power
17  department and is going to offer some evidence on
18  the knowledge of trespassing near the catenary
19  wires, but I think now this actually highlights
20  infirmity of the duty question because they weren't
21  very specific, they were not very detailed, and so
22  should we now be precluded -- for instance given the
23  colloquy this afternoon, why should we not be able
24  to call a current representative to talk
25  specifically about the lack of any information on
```

1   the intrusion onto Tower 1043.  As I understand it,

2   Mr. Rush has now conceded that's what he has to

3   prove in the case, and those questions to Mr. Doody

4   were rather broad, certainly they were not narrowed

5   down to 1043.

6            MR. RUSH:  This is what I was worried

7   about, Judge.  The structure, my position on the

8   structure issue under *Maffucci* is there does not

9   have to be intrusion at height.  This whole

10  intrusion at height issue is Metro-North's argument,

11  to take *Maffucci* and add another provision to it,

12  and say -- *Maffucci,* when they said the focus on the

13  structure, what they left off was it's a structure

14  but it's near the wire.  They never said near the

15  wire.  And this intrusion, at height issue is not

16  something I am conceding.  Just because I am saying

17  that intrusion on the structure and the structure

18  being the catenary is one of the two arguments to be

19  made here, but intrusion at height I don't think is

20  ever -- I haven't bought that from the beginning.

21  It's not in *Maffucci*, it's not in *Lin*.  It's a

22  narrowing of the constant intrusion doctrine that

23  says -- it's not just constant intrusion on the

24  structure, it's constant intrusion on this little

25  piece of the structure.

1674

```
 1              THE COURT:  I think I understood Mr.

 2    Hickey to be saying something a bit different than

 3    what you may have understood.

 4              Mr. Doody -- I'm looking at page 174 and

 5    175 of his depo.  He says in response to your

 6    questions -- he says basically that he's heard, that

 7    it's something people would talk about on the

 8    railroad, that another person got up there.  Right?

 9    And people have gotten electrocuted on catenaries,

10    including trespassers.  But there is nothing

11    specific there as to the Doody questioning about

12    Tower 1043.  And as I think I understood Mr. Hickey

13    to be saying, well, we're entitled to call a

14    supervisor, well-qualified supervisor from

15    Metro-North to talk about what is it that he knew

16    concerning Tower 1043.

17              Is that what you were suggesting?

18              MR. HICKEY:  Exactly, your Honor.  It's

19    perhaps 1042 and 1044, given your Honor's concerns

20    if we shrink the scope down so narrow.  But I think

21    that's exactly.

22              THE COURT:  So I don't see it really as

23    a conflict with what Doody is saying.  Doody's

24    testimony could be read to be saying -- he's just

25    not specific.  Doody's testimony wasn't specific as
```

1    to which catenary was at issue.  And I hear you say

2    at least one of your theories is the focus has to be

3    on at the very least the area around Tower 1043,

4    including the tower itself.

5              MR. RUSH:  That's part of it, but in the

6    Prosser well-worn path issue, the paths go from

7    nearby recreation areas all the way down to Tower

8    No. 1043.  These paths go from Mix Avenue,

9    approximately past the Epik Owl place, the Epik Owl

10   intrusion, all the way to the wire, all the way to

11   Tower 1043.  And as they do that, they go underneath

12   I-95 past the partying place.  It's -- the paths

13   extend outward from Tower No. 1043.  That's what

14   tells you how much intrusion is occurring.  And it

15   goes in a different direction.  According to Mr.

16   Thompson and others, this path continues down to

17   Ella Grasso.

18             Yes, you have to show intrusion in and

19   around Tower No. 1043, but you look sideways and say

20   what is occurring sideways.  There is all these

21   Roman roads that are coming to Tower 1043.  Not just

22   Tower 1043.  And so what's happening up in the

23   wildlife or motocross area with all the paths down

24   to the sandpit and connect to Tower 1043, that's

25   part and parcel showing intrusion into Tower 1043.

1          THE COURT:  So it's evidence of

2     intrusion.

3          MR. RUSH:  It's evidence of intrusion.

4          THE COURT:  But ultimately what the jury

5     needs to conclude was there was actual intrusion on

6     the tower, right?

7          MR. RUSH:  At, around or on the tower.

8          THE COURT:  Okay.  All right.

9          MR. HICKEY:  And just so we're clear, we

10    think it's even more than that.  It's at height.

11    The First Circuit, the Ninth Circuit, Third Circuit

12    have all authored cases in which there was evidence

13    perhaps of people, not even trespassers, people who

14    were allowed to be at the base of certain structures

15    and exonerated the defendants because there was no

16    past history of actually coming within the dangerous

17    condition.  The *Henderson* case, the *Eichelberg* case.

18          So your Honor's preliminary instruction

19    -- I know Mr. Rush loves page 7, but page 8 gave

20    them the preview of the case, that it was going to

21    involve trespassing at height.  Mr. Rush said I

22    don't understand why there needs to be a warning if

23    people weren't up at the dangerous condition.

24          So this is just a prelude to what we

25    need to work out in the charge, but the defendants

1   are clearly taking a position that an element of

2   proof for the plaintiffs here is to not just prove

3   at the base of the tower, but constant intrusion at

4   close proximity to the dangerous condition.

5           MR. RUSH:  And that would be fine,

6   Judge, if there wasn't a *Maffucci* case.  If the

7   state of Connecticut had adopted the very narrow

8   application of the constant intrusion doctrine that

9   -- I think it's really the Ninth Circuit has, that

10  might be appropriate, but in *Maffucci* they didn't

11  say near the wire.  They didn't add that on.  And it

12  was a pretty narrow ruling in any way.  They said

13  the limited area in this case was the structure.

14          THE COURT:  Okay.  I understand that,

15  and I will just ask you, Metro-North, to look at

16  your own request No. 7.

17          MR. HICKEY:  Understood.

18          THE COURT:  It doesn't have anything

19  there about height.

20          MR. HICKEY:  I understand.

21          THE COURT:  So if you have a revised

22  instruction on this, it would be helpful for the

23  Court to at least have that to consider because as

24  it is now it looks to me like it's just about the

25  structure.

```
 1          MR. HICKEY:  I understand.

 2          THE COURT:  Okay.  Mr. Ringold.

 3          MR. RINGOLD:  Just a brief response to

 4    Attorney Rush's point, that the Connecticut Supreme

 5    Court did adopt the position of those cases in the

 6    paragraph --

 7          THE COURT:  I know.  It cites Henderson

 8    from the Ninth Circuit and other cases.  I'm aware

 9    of that.  We'll all need to look and study Maffucci

10    closely.

11          MR. RINGOLD:  Just one other

12    clarification, your Honor.  Not to waste your

13    Honor's time, but the sentence is not actually that

14    the limited area is the structure.  The limited area

15    is the structure creating the condition.  And by

16    your Honor's own summary judgment ruling, the

17    condition at issue was any condition.  Is the pool

18    filled with hydrochloric acid?  It's the invisible

19    electric field at height.  The invisible electric

20    field is not created by the concrete base of Tower

21    1043.  The electric field is not created by the

22    lower metal steel portion of Tower 1043.  The

23    electric field that is the condition at issue in

24    this case is the field that is allegedly created by

25    the wires at height that allegedly affected Mr.
```

1    Colon.  There is no evidence that he would have been

2    affected by the condition standing on the ground or

3    a person standing on the concrete base spray

4    painting JAS 7 on the sign.  There is no evidence of

5    that whatsoever.

6              THE COURT:  How is it then that you

7    distinguish -- Mr. Rush has argued saying the

8    condition of -- the relevant structure there was the

9    cabinet, the switch gear cabinet, not the electric

10   circuit that actually hurt the trespasser.

11             MR. RINGOLD:  It would be I believe the

12   point your Honor made earlier, which is that they're

13   different structures.  A switch gear cabinet by its

14   nature is about this big.  If you are in proximity

15   to any portion of the switch gear cabinet, you are

16   in proximity to any of the dangers that it contains.

17   A 45 foot tall tower takes an great deal of effort

18   before you are in this range of this supposed static

19   or any other danger.

20             This is my own description, but I have

21   repeated said this case is *Maffucci* turned on its

22   side, essentially.  *Maffucci* with the cabinet raised

23   up to the height because the actual danger is up

24   here, it's not down here at ground level.

25             THE COURT:  All right.  Anything else to

```
1    take up?

2             MR. RUSH:  Only that -- I hate to beat a

3    dead horse, Judge, you are right on with looking at

4    Maffucci, but a switch gear cabinet is typically

5    locked and you can touch a switch gear cabinet and

6    not get shocked.  You have to open it up.  You have

7    to access it in order to be electrocuted.  The

8    catenary tower also you have to do something to get

9    to electricity.  A switch gear is not something that

10   you simply -- usually they're locked in a way that

11   requires you to break the lock.  And I forget what

12   happened in Maffucci, whether they broke the lock or

13   what.

14             THE COURT:  Shouldn't the relevant

15   structure be defined by reference to the danger?  I

16   should say the hidden danger.

17             MR. RUSH:  I guess I don't think --

18   that's a kind of a policy question, because in

19   Maffucci they didn't do that.  They said the cabinet

20   was a structure.  The cabinet by itself is not

21   dangerous.  It's what is inside the cabinet.  When

22   you try to steal the copper out of it, that's when

23   you get electrocuted.

24             Maffucci I think was interesting because

25   there weren't any paths, there wasn't any graffiti.
```

1    Usually these switch boxes are on concrete.  They're

2    on concrete floors and they're bolted in, and

3    they're anywhere from 4, 5, 6 feet tall, maybe 2, 3

4    wide.  I don't know how wide exactly, but they are a

5    big structure.  But in order to be hurt by them,

6    you've got to open them up.  And they're usually

7    locked or they're behind locked gates, which I think

8    was the case here.

9              Similarly, Tower No. 1043 is a

10   structure.  It's clearly the structure.  If you are

11   talking about a structure and you have to do

12   something to get up to it -- and 45 feet doesn't

13   take that long.  It probably takes 30 seconds.

14   There is probably a lot of people in this room who

15   could climb that tower in 30 seconds.  It's not that

16   high.  45 feet -- if it was a ladder 45 feet, which

17   it essentially is, and we are 25 years old, we can

18   probably get up it real fast.  Deputy Russell can

19   get it up at 51 who weighs well over 200 pounds.

20             THE COURT:  Okay, great.  So I have got

21   more to think about.  So we'll look forward to

22   starting tomorrow, and if anything changes with

23   respect to a possible rebuttal case, you just need

24   to make sure to let your witnesses know that they

25   need to be here tomorrow.

1    MR. RUSH:  Very good, your Honor.

2    THE COURT:  If you do have any rebuttal

3 witnesses, just so that we don't have to extend into

4 Friday with evidence and we can give the jury the

5 day off on Friday, if we can.

6    MR. RUSH:  Based on what I have been

7 told, we're not going to be doing the man on the

8 grassy knoll.  That is not going to be coming.

9    THE COURT:  Okay.  Thank you.

10    Stand in recess.

11    (Proceeding concluded 3:55)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2    WITNESSES                                    PAGE

3    PHILIP WILHELMY

4    Direct Examination By Mr. Rush               1553

5    Cross-Examination By Mr. Fineman             1576

6    Cross-Examination By Mr. Reed                1585

7    Redirect Examination By Mr. Rush             1586

8    Recross-Examination Mr. Fineman              1590

9    Re-Redirect Examination By Mr. Rush          1591

10   MARILYN RODRIGUEZ CORREA

11   Direct Examination By Mr. Rush               1592

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          I certify that the foregoing is a correct

3   transcript from the record of proceedings in the

4   above-entitled matter.

5

6                                   8/17/17

7                                   Date

8

9                        /S/   Sharon Montini

10                        Official Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25