UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - - x
                                  :
MILTON OMAR COLON and ARLENE      :  No. 3:13CV325(JAM)
DAVIS,                            :
                                  :
        Plaintiffs                :
                                  :
     vs.                          :
                                  :
METRO-NORTH COMMUTER RAILROAD     :
COMPANY, and METROPOLITAN         :
TRANSPORTATION AUTHORITY,         :
                                  :
        Defendants                :
                                  :
- - - - - - - - - - - - - - - - - :
                                  :
METRO-NORTH COMMUTER RAILROAD     :
COMPANY, and METROPOLITAN         :
TRANSPORTATION AUTHORITY,         :
                                  :
       Third-Party Plaintiffs     :
                                  :
     vs.                          :
                                  :
UNITED ILLUMINATING COMPANY,      :
AUTHORITY,                        :
                                  :  New Haven, Connecticut
       Third-Party Defendant      :  August 17, 2017
                                  :
- - - - - - - - - - - - - - - - - x
```

JURY TRIAL
VOLUME IX

B E F O R E:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.,

and a Jury

Diana Huntington, RDR, CRR
Official Court Reporter

1   A P P E A R A N C E S:

2

3           FOR THE PLAINTIFFS:

4               WOODLIEF & RUSH, P.A.
                    3411 W. Fletcher Ave., Suite B
                    Tampa, Florida 33618
5               BY:  BRIAN P. RUSH, ESQ.

6

7           FOR THE DEFENDANTS AND THIRD-PARTY PLAINTIFFS:

8               RYAN RYAN DELUCA, LLP
                    707 Summer Street
                    Stamford, Connecticut 06901
9               BY:  ROBERT O. HICKEY, ESQ.
                    BECK S. FINEMAN, ESQ.

10

11          FOR THE THIRD-PARTY DEFENDANT:

12              LOUGHLIN FITZGERALD, P.C.
                    150 South Main Street
13                  Wallingford, Connecticut 06492
                BY:  CHARLES P. REED, ESQ.
14                  JAMES E. RINGOLD, ESQ.

15

16

17

18

19

20

21

22

23

24

25

1                           TABLE OF CONTENTS

2
    DEFENSE                                                      VOIR
3   WITNESS              DIRECT   CROSS    REDIRECT   RECROSS   DIRE

4   JAMES PFEIFFER
      By Mr. Fineman    1702
5     By Mr. Rush                 1711
      By Mr. Reed                 1728
6     By Mr. Fineman                       1731
      By Mr. Rush                                      1732
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        8:34 A.M.

 2              THE COURT:  We are here for purposes of the

 3   ninth day of trial evidence in the matter of Colon vs.

 4   Metro-North Railroad.

 5              Maybe we can turn down the sound a little bit.

 6              MR. RUSH:  Your Honor, for the plaintiff, Brian

 7   Rush; and my assistant, Tiffany Rivas; and maybe Zacarias

 8   Marroquil is behind me.

 9              MR. HICKEY:  Good morning, Your Honor.  Once

10   again, Bob Hickey for Metro-North and the MTA, with

11   Attorney Beck Fineman.

12              MR. REED:  Good morning, Your Honor.  Charlie

13   Reed of Loughlin Fitzgerald for third-party defendant, the

14   United Illuminating Company.  And Mr. James Ringold.

15              THE COURT:  Are there matters to take up at this

16   point in terms of evidence?

17              Are you all expecting the evidence that you had

18   thought -- we'll have Mr. Wilhelmy back, and then

19   Mr. Pfeiffer?

20              MR. FINEMAN:  We're not going to call

21   Mr. Wilhelmy back.  We'll just be calling Mr. Pfeiffer

22   this morning.

23              THE COURT:  Mr. Rush.

24              MR. RUSH:  If he's done; yes, Your Honor.

25              I just wanted to make sure we're not going to
```

```
 1    have any new arrest reports or something coming out of
 2    left field.  Anything new that I haven't seen like that,
 3    I'd want to see it before we start.
 4              MR. FINEMAN:  I don't anticipate any surprises
 5    this morning.  Should be a low-drama sort of day,
 6    Your Honor.
 7              MR. RUSH:  Perfect.
 8              THE COURT:  Okay, good.
 9              Mr. Reed, are we going to hear from
10    Mr. DelMonte?
11              MR. REED:  We're not.  Our presentation will be
12    limited to a stipulation of facts that has been signed and
13    has marked and we'll introduce and publish to the jury.
14    And that will be it.
15              THE COURT:  Okay, all right.
16              Mr. Rush, are you anticipating --
17              MR. RUSH:  I'm not anticipating a live witness.
18    I have the deposition of Mr. Chacon.  He was adamant -- he
19    reminded me of Brian Rush.  He was adamant that he was not
20    coming today.
21              THE COURT:  Adamant -- who was?
22              MR. RUSH:  Mr. Chacon.
23              THE COURT:  Yes.  Okay, well, if you decided you
24    wanted him --
25              MR. RUSH:  We told him he was under subpoena and
```

1    that he had to be here, and he said he was not coming.  I

2    think he's financially up against it.  He's a truck driver

3    with a family.  We do have his deposition, so if we had

4    to, we could read his deposition or portions of it.  We

5    might want a half-hour break before we did that, if we

6    decide to do a rebuttal.  I don't have a way to easily

7    compel him.  I think he's on the road right now.

8               THE COURT:  The question I have in my mind is,

9    in what way would his testimony be a rebuttal to anything

10   in the defense case, given the very narrow defense case?

11              MR. RUSH:  Assuming there's a very narrow

12   presentation today, there would be no rebuttal and no

13   reason for rebuttal.

14              THE COURT:  So we'll take that up at that point.

15   So perhaps after we hear from the defense, we'll take a

16   break, and I'll consult with you one more time about

17   whether you want to go forward with a rebuttal.

18              MR. RUSH:  Very good.  If it's as they say, I

19   don't think we'll have a rebuttal.

20              THE COURT:  Okay.  So you're not going into

21   Mr. Chacon or anything like that?

22              MR. HICKEY:  No.  I attended Mr. Chacon's

23   deposition, and I've been involved with the theory of

24   Metro-North trying to prove why Mr. Colon was up there. I

25   would be shocked if anything -- that our very limited

```
 1   presentation this morning, I would be shocked if it

 2   implicated anything at all to do with Mr. Chacon.

 3           THE COURT:  So I gather, then, in terms of, if

 4   we're going to be done fairly early today, probably by

 5   close to the first break, makes sense, everybody still

 6   content with, we'll take tomorrow off, we'll do a charge

 7   conference tomorrow?

 8           I got your new submissions, still waiting for

 9   the submission --

10           Did you give me something on the UI or your

11   submission there?

12           MR. FINEMAN:  Included with the new proposed

13   verdict form, there was an interrogatory that dealt with

14   that.  We did not yet include any language in the charge

15   itself.  I'm not sure if Your Honor wanted to craft

16   something that would explain --

17           THE COURT:  All right.  I think maybe we'll stay

18   on the current course.  When we're done with evidence

19   today, we'll tell the jury that we're off tomorrow, and

20   then come back for opening arguments -- or closing

21   arguments and closing instructions on Monday morning.

22   Okay?  And then we'll have a charge conference tomorrow

23   morning.  Okay.

24           MR. RUSH:  I have an objection to the

25   stipulation of facts, because while it technically doesn't
```

1    apply to me, I think the intention -- I heard they're

2    going to read it to the jury, which I'm a little bit

3    concerned about.

4            Paragraphs 1 and 4 reference CDOT's ownership,

5    which is not, I don't think, an issue in the case.  And I

6    think it may be designed to tell the jury:  Hey, maybe

7    they have some liability here, maybe they're going to have

8    to pay money; you, as a taxpayer, may want to know about

9    that.

10           Paragraphs 1 and 3 --

11           THE COURT:  I don't have a copy of that

12   stipulation.

13           Does anybody have an extra copy?

14           Do you have an extra copy, Mr. Rush?

15           MR. RUSH:  I do now.  It's a front-and-back

16   stipulation, Your Honor.  Paragraph 1 says:  ConnDOT owns

17   the subject right-of-way.

18           THE COURT:  Hasn't there already been testimony

19   on that?

20           MR. REED:  Yes, there has been, Your Honor.

21           THE COURT:  Hard to say that that's prejudicial.

22   I think it came from one of your own witnesses.

23           MR. RUSH:  Well, it also is not necessary.  And

24   it's really part of their argument, that you don't find in

25   favor of the plaintiff because it may rebound to the

1    negative of the taxpayers.  If it's already in and not in

2    dispute, then restating it is only argumentative, we would

3    argue.

4              And number 3, for the same reason.  But again,

5    if it's not argumentative and it's not already in, then 3

6    would be relevant, I guess.

7              THE COURT:  So it's Paragraphs 1 and 3 that you

8    have a concern about?

9              MR. RUSH:  Yes, Your Honor.  Those paragraphs

10   don't relate in any way to the dispute between UI and

11   Metro-North.  They don't add or subtract anything to that.

12   So they're superfluous, so they could only be put there,

13   as the first and third paragraphs, to communicate

14   something to the jury that's not really important or

15   relevant between these two parties in their dispute.

16             THE COURT:  I see.

17             Mr. Reed.

18             MR. REED:  I don't see, Your Honor, why we can't

19   cleanly stipulate to facts, they are already in evidence

20   so they aren't in dispute, but in a unified way, for the

21   sake of efficiency, reach a stipulation that makes very

22   concise the presentation of the third-party case.

23             I just -- I don't quite see why it wouldn't be

24   an item to agree to, which has been done pursuant to

25   encouragement from the Court, and that would be for the

```
 1   benefit of the jury, and by agreement of the parties to

 2   the third-party action.

 3          And these are based on responses to requests for

 4   admission.  And frankly, in reliance on the agreement that

 5   was reached over the last couple of days, I did not

 6   question Mr. Wilhelmy on some of the stuff because it was

 7   going to be, you know, neatly, succinctly put into this

 8   package.

 9          It's not clear to me, because we haven't had a

10   deposition of Mr. Pfeiffer, as to whether he would be in a

11   position to answer these.  You know, the overarching

12   objection on behalf of Mr. Rush's position, I simply fail

13   to see why this can't be agreed to between parties to the

14   third-party action, which the plaintiff is not a party to.

15          Plaintiff didn't sue UI, it sued only

16   Metro-North, which in turn brought a third-party action.

17   And these are facts that illuminate the relationship

18   between Metro-North, as the third-party plaintiff, and UI,

19   as the third party defendant.  So I think it's an

20   appropriate document.

21          MR. RUSH:  Your Honor, I misspoke.  I meant 1

22   and 4.

23          THE COURT:  1 and 4 is the concern?

24          MR. RUSH:  Yes, Your Honor.  Both talk about

25   CDOT's ownership.  4 is CDOT owned Tower #1043.
```

1    THE COURT:  Okay.  To the extent it's based on

2    an objection of relevancy, it does strike me as being

3    relevant to the dispute between Metro-North and UI, in

4    terms of ownership issues.

5    And I also don't see any kind of a 403 issue.

6    If you're concerned about that, the concern about the

7    taxpayers being on the hook or them thinking about that,

8    it's something that I could possibly try to address in a

9    jury instruction --

10    MR. RUSH:  Very good, Your Honor.

11    THE COURT:  -- if you want to propose something

12    about that.  Obviously defendants have proposed a sympathy

13    instruction, so if you have a concern about my making

14    explicit something like that.  But I think especially in

15    light of the fact that the parties have already adduced

16    evidence that it's CDOT that owns that, I can't see that

17    there's a real prejudice issue from just those Paragraphs

18    1 and 4.

19    And I assume that -- Paragraph 7 states that

20    Mr. Colon does not claim to have made physical contact

21    with any portion of the UI transmission system.  That's

22    kind of different.

23    That's sort of like -- why is that relevant to

24    the dispute there?

25    I think it's probably true.  Maybe it's not

1    without objection.

2            MR. REED:  Well, Mr. Colon admitted that, when I

3    cross-examined him, and I believe that Dr. Stern agreed

4    with that concept.  The basis of the claim and how my

5    client's implicated in this case is that there is a theory

6    of electrical event --

7            THE COURT:  I get that.  But the oddity to me

8    was, you two are making a stipulation about what somebody

9    else doesn't claim.  So that's not the usual; but if it's

10   not objected to, I don't think it's --

11           MR. RUSH:  Well, the transmission system may

12   include the whole tower.  So I think if they're going to

13   say UI's power lines, I think that's true, they did not

14   come into physical contact with UI's power lines.  But the

15   transmission system is everything above the bonnet.  And

16   he was probably holding onto something above the bonnet or

17   was in very close proximity to something above and beyond

18   the bonnet.

19           So he probably did have physical contact with

20   the upper reaches of the tower.  And so if "transmission

21   system" means the whole thing, the structure, as opposed

22   to the line, then Paragraph 7 is inaccurate.

23           It just seems to me "the transmission system"

24   should be changed to "high voltage power line" or

25   something like that.  Because actually UI, the

1  transmission system does depend on what's below.  There

2  has to be something below that holds up the bonnet above.

3           MR. REED:  Your Honor, in the Plaintiffs'

4  Exhibit 46, which is the transmission line agreement,

5  Article II defines the transmission system, Subparagraph

6  A.  And, you know, it states -- I'll try to read slowly.

7           THE COURT:  Maybe put it on the screen, if you

8  can.

9           MR. REED:  Sure.

10              (Document displayed.)

11           THE COURT:  So it's just the wires that were

12  installed.

13           MR. REED:  Yes, it's everything above the bonnet

14  of the State's catenary structure and shall not consist of

15  not more than two 3-phase 60-cycle circuits.  That's the

16  transmission system.

17           I don't think it's at all in dispute that he did

18  not touch or come in direct, immediate physical contact

19  with the transmission system as so defined.

20           In fact, I think the testimony -- well, the

21  testimony is in conflict because Mr. Colon, in court, said

22  he was scaling up the inside field side of the tower.  In

23  his deposition, and based on Dr. Stern's reconstruction,

24  they have him standing on the first crossarm holding onto

25  the second crossarm, which, pursuant to our stipulation,

```
 1   is still part of that property owned by the State, State's

 2   designee, Metro-North, not UI.

 3            That's a distinction that is important for us to

 4   make, and that's why we've put it in.

 5            THE COURT:  So, Mr. Rush, are you satisfied at

 6   this point?  It looks like the definition of transmission

 7   system just includes those wires.

 8            MR. RUSH:  The only thing I would suggest is

 9   that we say, "as designed in the parties' agreement."  If

10   we're relying on an external definition between those two,

11   that's fine.

12            We -- while we hold -- we claim Metro-North is

13   liable because they didn't take appropriate precautions

14   that they could have done at the lower reaches.  We do

15   believe that UI's --

16            THE COURT:  I'm satisfied where it is.  I think

17   it's -- we've already had testimony about that specific

18   paragraph in the agreement.  So you can say that in

19   closing arguments if you're concerned that there's going

20   to be some confusion there.

21            MR. RUSH:  Yes, Your Honor.

22            THE COURT:  That's the stipulation.

23            Anything else to take up then, at this point?

24            We'll take a ten-minute recess until our jury is

25   here, and then we'll get going.  Thank you.
```

```
 1                    (Whereupon, a recess followed.)

 2               THE COURT:  Please be seated.

 3               There's one additional issue to raise, is the

 4   role of our jurors, and specifically our alternate jurors.

 5   I gather -- I know our agreement previously has been that

 6   the last two jurors that were picked at our supplemental

 7   jury selection would be alternate jurors.

 8               Are the parties still satisfied with respect to

 9   that?

10               My usual preference is to have all of the jurors

11   serve who have listened to the case, if possible, but I

12   understand and I honor the request made by plaintiffs that

13   those two additional jurors be considered alternate jurors

14   who would not be able to deliberate.

15               And now that we've been through the trial, I

16   wanted to see if the parties had any different feelings

17   about whether those alternate jurors should be able to be

18   part of the deliberation pool.

19               Have you given that any thought?

20               MR. RUSH:  Your Honor, the plaintiff has not

21   thought about that further.  Right now I'd like to stay

22   where we are.  I'll think about it.

23               THE COURT:  Okay.  What I'd like to do is let

24   folks know, especially when they're coming back -- part of

25   the concern -- what I ordinarily to with alternate jurors
```

1    is I hold onto them in the courthouse.  I give them their

2    own room.  I let them know that they may be needed and

3    sometimes are needed.  It seems somewhat unlikely here

4    because we are -- we are at least one juror above the

5    six-juror threshold of regular jurors.

6              So maybe what I'll do is just tell the jurors

7    that two of them -- I won't say which ones, they might

8    intuit it -- will be serving as alternate jurors in the

9    case; and, in the event that they are serving as alternate

10   jurors, they would be given a separate room in the

11   courthouse while the regular jurors deliberated, and

12   they'd be called upon as necessary.

13             And the reason I tell them that is so they can

14   bring something to the courthouse to occupy themselves,

15   like a laptop computer or a book, or something like that,

16   so they're not just sitting there twiddling their thumbs

17   during that process that they may be waiting.

18             Are you okay with me telling them that two are

19   alternate jurors?

20             That leaves your options open in case there's a

21   reconsideration on the part of all the parties as to

22   whether those two additional jurors should serve as part

23   of the regular jury.

24             MR. RUSH:  That's okay with the plaintiffs.

25             THE COURT:  So I'll plan to tell them that at

1    the close of when we dismiss them for the day, which

2    sounds like it might be fairly soon.  Okay.

3              Anything else before we bring in the jury?

4              Let's get the jury in.

5              If our witness is here, our witness is welcome

6    to come on up.

7              Is that Mr. Pfeiffer?

8              Come on up and maybe just stand over here.

9                   (Whereupon, the jury entered the

10                  courtroom.)

11             THE COURT:  Welcome back, ladies and gentlemen.

12   Please be seated.

13             We're here at this point, as you recall from

14   yesterday, that the plaintiffs rested their case, which

15   means at this point in time the defendants have an

16   opportunity to present any evidence that they'd like.

17             The defendants Metro-North and MTA have chosen

18   to do so.  We have a witness here who is about to testify.

19             So if we could swear in the witness, and then

20   we'll proceed with the examination.

21             THE CLERK:  Please raise your right hand.

22

23                   JAMES PFEIFFER,

24       called as a witness, having been first duly

25       sworn, was examined and testified as follows:

```
 1                    THE CLERK:  Please be seated.

 2                    Please state your name.

 3                    THE WITNESS:  James Pfeiffer.

 4                    THE CLERK:  Please spell your last name.

 5                    THE WITNESS:  P-F-E-I-F-F-E-R.

 6                    THE COURT:  Please proceed -- sorry.

 7                    THE CLERK:  Please state your city and state

 8    only.

 9                    THE WITNESS:  Hamden, Connecticut.

10                    THE CLERK:  Thank you.

11                    MR. FINEMAN:  Thank you, Your Honor.

12

13                         DIRECT EXAMINATION

14    BY MR. FINEMAN:

15    Q.   Good morning, Mr. Pfeiffer.

16         Are you currently employed?

17    A.   Yes.

18    Q.   By whom?

19    A.   Metro-North Commuter Railroad.

20    Q.   How long have you been employed with Metro-North?

21    A.   Over 30 years.  Thirty-four years.

22    Q.   Thirty-four years.

23         And did you work for any railroad before Metro-North?

24    A.   Yes.

25    Q.   Which railroad was that?
```

1  A.   Conn. Rail and Penn Central.

2  Q.   Were those the predecessors to Metro-North?

3  A.   Yes.

4  Q.   They occupied the same territory that Metro-North

5  does now?

6  A.   Yes.

7  Q.   And so how long have you worked for a railroad?

8  A.   I have worked for the electrical department,

9  New Haven line, for 44 years.

10  Q.   Forty-four years.  Okay.

11       Have you been with the electrical department or the

12  power department the entire 40-plus years you've been

13  there?

14  A.   Yes.

15  Q.   Yes?

16  A.   (Nods head up and down.)

17  Q.   In March 2011, what was your position with

18  Metro-North?

19  A.   Design group.  I was at the electrical design office.

20  Q.   Is that in the catenary department?

21  A.   Yes.

22  Q.   In March of 2011, were you in a position to know

23  about trespassing on or around catenary towers along the

24  right-of-way?

25            MR. RUSH:  Objection, Your Honor, foundation.

1        There's a juror with his hand up.

2        JUROR:  I'm having difficulty hearing.

3        THE COURT:  Okay.

4        THE WITNESS:  I'll step up to the mike.

5        THE COURT:  Is that better, sir?

6        THE WITNESS:  Can you hear me now?

7        JUROR:  Yes.

8        THE COURT:  Thank you.

9        So you want more foundation?

10       MR. RUSH:  It's also leading.

11       THE COURT:  Okay, about whether he's in a

12   position to know about trespassing -- Can you do that, lay

13   a little more foundation, what the basis of the knowledge

14   would be.

15       MR. FINEMAN:  Sure.

16   BY MR. FINEMAN:

17   Q.  Can you tell us a little more about the position that

18   you held in March of 2011?

19   A.  Well, I was in charge of the review and the -- of the

20   new catenary system they were building, and they were

21   rebuilding the entire catenary system from New Haven to

22   Pelham, New York.

23       So we did the New York section 15 -- almost 20 years

24   ago, and we're doing the Connecticut section now.  We're

25   just finishing it.  And in '11, we were just finishing in

1    New Haven.

2    Q.   And why don't we go back to the 1970s when you joined

3    a railroad in the catenary department.  Tell us a little

4    bit about the other positions you've held in the catenary

5    department leading up to March of 2011.

6    A.   I was an electric lineman; been a foreman,

7    supervisor; and then I was put into the electrical design

8    office.

9    Q.   In those capacities were you familiar with the

10   catenary system and the catenary structures along the

11   right-of-way from New Haven to the New York line?

12              THE COURT:  Hold on.

13              MR. RUSH:  Objection.

14              THE COURT:  Pardon?

15              MR. RUSH:  It's leading, Your Honor.

16              THE COURT:  If he's asking just if he's familiar

17   with it, I'll overrule that objection.

18              Go ahead.

19              THE WITNESS:  Intimately.

20              THE COURT:  Are you going to ask him how, how it

21   is he becomes familiar with that on a day-to-day basis?

22              MR. FINEMAN:  Sure.

23   BY MR. FINEMAN:

24   Q.   Can you describe for the Court how it was you were

25   intimately familiar with the catenary system and the

 1   structures from the New Haven line to the -- I'm sorry --

 2   from New Haven to the New York line.

 3   A.   I repaired them, I inspected them, I built them, I've

 4   been on most of them.

 5   Q.   Okay.  Now I want to ask you, Mr. Pfeiffer, as of

 6   March of 2011, were you in a position to know about

 7   trespassing that may have occurred on or around catenary

 8   towers along the right-of-way from New Haven to the

 9   New York line?

10   A.   Yes.  If there's a fault, if there's an electrical

11   interruption, we all hear about it, anybody in the

12   department.  It's a serious thing.

13   Q.   Are you familiar with Catenary #1043?

14   A.   Yes.

15   Q.   And were you, in March of 2011, in a position to know

16   about trespassing that may have occurred on or around

17   Catenary 1043?

18           MR. RUSH:  Objection, foundation.

19           MR. FINEMAN:  I think I laid the foundation

20   already, Your Honor.

21           THE COURT:  I'll overrule the objection.

22           THE WITNESS:  Yes, I did.  I heard about it.

23   BY MR. FINEMAN:

24   Q.   Okay.

25           In March of 2011, as of that time, was there, to your

1    knowledge, trespassing up Tower 1043?

2    A.   I've never heard of it.

3    Q.   And what about -- I'm going to show you what's been

4    marked as Plaintiffs' Exhibit 55.  I believe this is the

5    one we've been using.

6    A.   Okay.

7              THE COURT:  Let's make sure it's on the screen.

8              Okay.

9    BY MR. FINEMAN:

10   Q.   Do you recognize what this aerial photograph shows,

11   Mr. Pfeiffer?

12   A.   Yes.  It's West River; and Ella Grasso Boulevard; the

13   main line up to the Kimberly Avenue bridge; and the I-95

14   overpass, First Avenue.

15   Q.   I'm sorry, I didn't mean to cut you off.

16        Did this stretch of the right-of-way fall within your

17   jurisdiction in March of 2011?

18   A.   It's part of the electrified zone, so yes.

19   Q.   So I asked you about 1043.  What about, let's say,

20   two catenary towers in either direction:  As of March of

21   2011, were you aware of anybody, other than an employee or

22   a contractor or somebody who was supposed to be there,

23   climbing to a height that put them in close proximity to

24   the electrical wires attached to that catenary tower?

25   A.   No.

```
 1   Q.   And what about if we were to look at from Ella Grasso
 2   Boulevard down to I-95 overpass:  As of March of 2011,
 3   were you aware of anybody, other than an employee or
 4   contractor or somebody who was authorized to be there,
 5   climbing to a height that put them in close proximity to
 6   the electrical wires?
 7   A.   No.
 8   Q.   What about, let's say, five years before March
 9   of 2011, so going back to March of 2006, during those
10   5 years leading up to March of 2011, were you aware of
11   anybody, other than an employee or a contractor or
12   somebody who was authorized to be there, climbing, let's
13   say, Tower 1043 to a height that put them in close
14   proximity to the electrical wires?
15   A.   No.
16   Q.   Again, if I were to expand that question out to the
17   area between Ella Grasso Boulevard and I-95 overpass
18   there, were you aware of anybody in those five years
19   leading up to March of 2011, anybody other than an
20   employee or a contractor or somebody authorized to be
21   there, climbing to a height that put them in close
22   proximity to the electrical wires?
23   A.   No.
24   Q.   I want to show you what's been marked as Plaintiffs'
25   Exhibit 82.
```

1     Do you recognize what's shown in Exhibit 82,

2  Mr. Pfeiffer?

3  A.   Yes.  It's a balance weight structure.

4  Q.   Are you familiar with that particular tower?

5  A.   I am.

6  Q.   Do you know where it is?

7  A.   Yes, I do.  It's just west of the I-95 overpass.

8  Q.   Are you able to show us on Exhibit 55?

9  A.   Yeah, it's -- how do you get --

10       MR. FINEMAN:  Does he not have the capability

11  of -- okay.

12  A.   The lower left-hand corner, up around in there, right

13  around in there.  I think it's that second one.

14  Q.   Second one?

15  A.   I think it's that one right there.

16  Q.   Do you recall when this tower was installed?

17  A.   It was installed during the Section D installation

18  project.  It was back in, I want to say, maybe early 2000,

19  in that area.  We built the -- between New Haven and

20  Devon, Connecticut.

21  Q.   Were you involved in the project, that Section E

22  project that you just mentioned?

23  A.   D.  Yes, I was.

24  Q.   Were you involved in part of the process that

25  involved getting materials out to the site and having

1    them --

2    A.   No.  I was more or less -- we would deal with the --

3    the contractor would go out and lay down -- they would lay

4    down their materials in the structures previous to their

5    night outage.  Because it's a big deal.  They have to lay

6    this stuff all out, all those stack weights, the pipes,

7    the towers.

8        They would go in and they would put the foundation in

9    first, and then you had -- they'd have an outage and come

10   in with a big truck and lay out these towers on the north

11   and south side.  And then they would come in either on the

12   weekend at night and erect them.

13   Q.   If I understand you correctly, are you saying that

14   the towers themselves were laid on the ground for some

15   period of time before they're placed upright?

16   A.   Yes.  They're laid in the clear, off the

17   right-of-way.

18   Q.   Is it possible that somebody came onto the property

19   and painted graffiti while that tower was on the ground?

20               THE COURT:  Hold on a second.  Okay.

21               MR. RUSH:  Your Honor, anything's possible.

22               THE COURT:  I'll sustain the objection to that,

23   asking about whether something's possible.

24   BY MR. FINEMAN:

25   Q.   In your experience in the catenary department and

1    your involvement in the projects of placing equipment out

2    on the right-of-way such as these structures, has it been

3    your experience that it's common for people to place

4    graffiti on the structures while they're laying on the

5    ground before they're placed upright?

6    A.    Anything that's left there; trucks, structures.

7    Q.    That's a yes?

8    A.    Yes.

9              MR. FINEMAN:  Nothing further, thank you.

10             THE COURT:  Cross-examination?

11             MR. RUSH:  Thank you, Your Honor.

12

13                      CROSS-EXAMINATION

14   BY MR. RUSH:

15   Q.    How are you, Mr. Pfeiffer?

16   A.    Good.

17   Q.    I'm a little bit unclear what your position was in

18   March of 2011.  Can you tell the jury what your actual job

19   title was then?

20   A.    Design technician.  I was the catenary design

21   supervisor.

22             THE COURT:  We're out of the microphone range.

23   A.    I was the catenary design supervisor for the

24   electrical department during these projects, during these

25   catenary replacement projects.

1  BY MR. RUSH:

2  Q.   Catenary design --

3  A.   Yes, sir.

4  Q.   What was the last part?

5  A.   Catenary design supervisor, yes.

6  Q.   And were you part of the catenary department?

7  A.   Yes.

8  Q.   And so that means you worked underneath Robert Doody?

9  A.   No.

10  Q.   Was he in the catenary power department also?

11  A.   He was -- he was -- okay.  He was in the operations,

12  and I was in the design side.

13  Q.   And are you an engineer by training?

14  A.   No.

15  Q.   What kind of training do you have to design catenary?

16  A.   Well, I've been building it for 40 years.

17  Q.   Okay.  But I'm just trying to understand a little bit

18  more about what you do.

19       You do the drawings and the specs, that sort of

20  stuff?

21  A.   Drawings; yes, I do.  I do the engineering.  Of

22  course it's not stamped by me, but...

23  Q.   Let me hit it from a different angle.

24       Where is it that you do your design work for

25  designing catenaries; where are you located?

```
 1   A.    When I was doing that, I was located out of
 2   New Haven.
 3   Q.    In an office?
 4   A.    Yes.
 5   Q.    Okay.  You said earlier, Mr. Doody was in operations;
 6   you were in design, he's in operations.
 7         What is operations -- how is operations different --
 8   A.    Day-to-day operations of the electrical system in
 9   conjunction with the revenue trains.
10   Q.    Okay.  Mr. Doody and his guys are actually out on the
11   site, doing work, examining the wires and the transmission
12   system.  They're operating it; is that right?
13   A.    Right.  But so was I.  I was there when they were
14   doing the interface between the operating system that was
15   in place and the new system we were putting in place.
16   Because at the time we couldn't change -- we couldn't stop
17   it.  We had to keep, you know, service.
18   Q.    But they're actually operating the system, and you're
19   designing the system; is that basically how it breaks
20   down?
21         I know you were there, but they're --
22   A.    Well, I'm a supervisor.  I don't actually go up and
23   work on the wires, if that's what you mean.
24   Q.    Well, you don't work on the wire, you don't walk the
25   line.
```

```
 1   A.   I walked the line.  I did at the time.

 2   Q.   Back in 2011 --

 3   A.   Yes.

 4   Q.   -- how far did you walk every day?

 5   A.   I walked, either walked it or we drove in hi-rail

 6   trucks from New Haven to Devon at the time that you're

 7   talking about.

 8   Q.   Every day you were walking it?

 9   A.   Not every day, no.

10   Q.   How often were you walking --

11   A.   Twice a day.

12            THE COURT:  Hold on a second.  The two of you

13   are talking over one another, so if the witness can just

14   make sure he's got his question out, and you can answer,

15   and likewise.

16   BY MR. RUSH:

17   Q.   Six years ago, you were -- maybe I misunderstood --

18   you were walking along the catenary pathways twice a day?

19   A.   No.  I said, we either get a track outage and we walk

20   along the railroad or we take a hi-rail truck and go along

21   the railway.  I said I was inspecting the line.

22   Q.   Okay.  How often were you doing that on a weekly

23   basis?

24   A.   I don't know, maybe once or twice.

25   Q.   Once or twice per week?
```

1    A.    That would be a good estimate, yeah.

2    Q.    So almost all of that was on a rail truck, as opposed

3    to walking the pathway next to the track?

4    A.    Like I said, we get track outages.  We take track

5    out.  We literally get ahold on a track and we walk down

6    the track.  There's not always paths to walk on.  I don't

7    know what paths you're talking about.

8         I said, we go out on the main line.  We go out on the

9    rail.  We go out on the tracks.

10   Q.    Well, I'm going to try to better understand this.

11   You said you walked, and you also said you went on the

12   rail line, and I was trying to figure --

13   A.    We walk on the tracks too.

14   Q.    And you walked on the tracks too.

15        You said something about there would be outages.  So

16   that's what caused you to go out, were these outages?

17   A.    If you want to occupy a track, you need to get a

18   clearance to be there so that you don't get hit by a

19   train.  So you literally get an outage on that track so

20   you can walk from Point A to Point B.

21   Q.    And when you say an outage, you mean they turn off

22   the electrical power?

23   A.    No.  I mean take ahold on the track from trains.  The

24   trains don't go on that track.  They reroute the trains

25   around you.  And you --

1    Q.   So an outage is not really a power outage.  It's a --

2    A.   No, it's a different thing.  An outage is an outage.

3              THE COURT:  You're talking over --

4              THE WITNESS:  Okay.  I'm sorry.

5              I'm sorry, buddy.

6    BY MR. RUSH:

7    Q.   I'm just trying to understand.

8    A.   I know, I know.  It's -- I understand.

9    Q.   The cause for you going out would be what reason?

10   A.   To inspect the line to look at -- I used to be there

11   when something didn't go according to what an engineer's

12   plan was, and we have to reenergize it.  I have to go out

13   and, okay, will this work?  No, it won't; do this.  Or

14   yes, that's fine.  And that be would it.  Then we would

15   put that piece of catenary into service.

16   Q.   Okay.  And so you were -- when these events occurred,

17   can you tell the jury whether you were going to a specific

18   location, or were you just going to inspect the whole

19   line?

20   A.   Well, you would inspect the wire run.  The wire run

21   was basically a mile long.  So you'd have -- they would

22   build a -- miles' worth of catenary on one of the four

23   tracks that are out there.

24        And we would inspect it.  We would say, okay, this is

25   done.  We would inspect it.  And then you would have

1    inspector up on the line, he would sit there and check

2    bolts.  And I would be there to make sure it went per

3    design, per spec.

4    Q.    Just so I understand, you were inspecting newly

5    installed catenaries to make sure they were installed

6    pursuant to the design plans?

7    A.    They would call me -- I wasn't the inspector.  They

8    would call me if there was a problem in the interface

9    between the old system and the new system that was being

10   installed.  I was like a trouble-shooter in that respect.

11   Q.    To be clear, your job was not to really inspect the

12   whole line, but rather to go act as a trouble-shooter for

13   a specific interface problem between the old catenaries

14   and the new catenaries that were being erected; is that

15   right?

16   A.    Any problem that the construction came into that had

17   to do with the new design or the new system was my -- was

18   in my territory, was on my watch.

19   Q.    Okay.  And I'm probably not being clear, so if I'm

20   not being clear, I'm sorry.  I'm just trying to understand

21   what your job entailed; and I'm trying to understand what

22   the genesis is, the origin of why you're going out to a

23   particular place.

24         And I think I -- I think I understand that you would

25   be called out to a specific place to troubleshoot -- that

1    was your word, "troubleshoot" -- a problem that was

2    arising between the interface -- again, your word -- the

3    interface between the old catenary system and the old

4    catenary towers and a newly designed and built catenary.

5         Did I misunderstand?

6    A.   Can I ask you a question?

7    Q.   Sure.

8    A.   When you say "catenary," are you talking about the

9    structure, or are you talking about the system, the wire

10   system?  The catenary is the wire system.

11   Q.   Okay.  Is the catenary also can be like --

12   Catenary 1043, can it also be a structure?

13   A.   If it's a portal, sure.

14   Q.   If it's a what?

15   A.   Is it brand new?  If it was a brand new one put in

16   that project then, yes, it was mine.  But if it was an

17   older one, I -- you know, it's the catenary.  It's not --

18   that's what I don't understand, if you're talking about

19   the structures or talking about the wire.

20   Q.   Okay.

21   A.   When you're talking about catenary, you're talking

22   about catenary is the catenary wire.

23   Q.   Now I'm going to try to get more understanding so

24   that I can understand, and hopefully the jury -- maybe

25   they already understand --

1    A.    It's confusing.  I understand.

2    Q.    Is it your testimony your job did not involve the old

3    catenary structures?

4    A.    No, it did.

5    Q.    It did.

6    A.    All of them.  But that's the structures.  When you

7    say "catenary system," it's the wire is the catenary

8    system.  It's the trolley wires that the trains run on,

9    the propulsion system.

10   Q.    Okay.  Where did you spend most of your time, in your

11   design office or out in the field dealing with these --

12   troubleshooting interface problems between the new and old

13   catenaries?

14   A.    Most of it was either in meetings or in conference

15   with engineering firms.  Like I said, it was maybe one day

16   a week, two days a week, in the field.

17   Q.    What percentage of your time was actually spent out

18   on the right-of-way in a normal week?

19   A.    Twenty-five percent of my time?

20   Q.    Okay.  And during that 25 percent of the time, please

21   tell the jury what you did during those times you were out

22   there.  Be as specific as you feel you need to be.

23   A.    I would be inspecting the newly designed -- or newly

24   installed catenary or how it interfaced with the system

25   that was in place already.  That's exactly what it is.

1    Q.   Okay.  And how often in -- how often in 2007 did you

2    go out and inspect specifically Tower #1043?

3    A.   I don't remember ten years ago how many times I

4    inspected that structure.  Went by it, I don't know how

5    many times.  I don't know if I visited that one

6    particular.  I don't know.

7    Q.   So as you sit here today, you do not know whether you

8    ever inspected Tower #1043 in 2007?

9    A.   I inspected wire that was attached to it.  I went by

10   it.  I have been in that area multiple times because

11   you're going from one point to another, you go by all of

12   them.  They're 300 feet apart.

13   Q.   Do you know how many signs are on Catenary 1043?

14   A.   No, I don't.

15   Q.   Do you know how many signs were on Catenary #1043 on

16   March 17, 2011?

17   A.   No, I don't.

18        MR. FINEMAN:  I object, Your Honor.  It's beyond

19   the scope of direct.

20        THE COURT:  No, I'll allow it.

21   A.   I don't know.

22   BY MR. RUSH:

23   Q.   Do you know the exact date when this epik owl

24   catenary was erected?

25   A.   No, I don't know the exact date; no, I don't.  It was

1    during that project.

2    Q.   Were you present when it was erected?

3    A.   No.

4    Q.   Do you know whether -- do you know for a fact whether

5    that epik owl graffiti was on Tower 1040 at the time it

6    was erected, whenever it was?

7    A.   No, I don't.

8    Q.   Is Metro-North in the habit of erecting catenaries

9    like this epik owl, 1040, that have already prearranged

10   graffiti on them?

11   A.   It's a galvanized structure.  What are we going to do

12   with it, have it sandblasted?  You can't do that.  Have it

13   retreated?  No.  We would put it up, yes.

14   Q.   You would put up a structure that has graffiti from

15   all the way from the ground to the high voltage wires, you

16   would do that?

17   A.   We wouldn't waste the money and not do it.  Not if we

18   had the outage set.

19   Q.   Let me ask you a question:  What happens when a

20   ten-year-old walks by and sees that, and sees somebody has

21   painted from the ground to the top --

22            MR. FINEMAN:  I object, Your Honor.  Speculation

23   and relevance.

24            THE COURT:  Reframe the question, if you can, in

25   a way that's factual.

1           MR. RUSH:  Okay.

2    BY MR. RUSH:

3    Q.   In this process, where you say you wouldn't spend the

4    money to repaint that or paint over that catenary

5    graffiti, do you consider that young people will then walk

6    by this graffiti, showing that graffiti can be done from

7    the ground up to the wire; do you consider that in your

8    analysis?

9    A.   No.  No, I don't.

10   Q.   Why not?

11   A.   It's beyond me, why would somebody climb up there in

12   the first place.

13   Q.   Well, okay.  Let's talk about that.

14       If you're saying -- are you saying it's's okay to put

15   up a catenary with graffiti all the way from the ground,

16   all the way to the top where the wire is?

17   A.   I'm not saying it's okay, but what do you do?  What

18   do you do if somebody has vandalized something that has to

19   go up tomorrow and it's in a schedule, and it's not

20   hurting it.  I mean, I'm not thinking of ten year-olds

21   now, I'm sorry, but we're talking about getting the

22   structure up.

23   Q.   Couldn't you just paint over it with black paint?

24   A.   That was the contractor.  I didn't build it myself.

25   We went in there and it was up.

1  Q.   I'm sorry, I don't mean to interrupt you.

2       Are you finished?

3  A.   Yes.

4  Q.   I'm not suggesting that you're culpable in any way.

5  I'm trying to understand the operational philosophy that

6  you're mentioning, that you think that Metro-North's

7  policy would be to put up that type of catenary, with

8  graffiti from the ground all the way to the high voltage

9  wires, when somebody like you or somebody else at

10  Metro-North could simply come by and say to the

11  contractor, "Paint over that with black paint.  Do not put

12  up a catenary that shows graffiti from the ground all the

13  way to the high voltage wire."

14  A.   I'm not sure that you would want to paint a

15  galvanized pole.  I don't know the properties and what

16  that would do to it, or whether it would have to be -- I

17  don't know what the treatment would be for something like

18  this; how would you, you know, mediate this problem.  I

19  don't think painting it is.

20  Q.   Okay.  Let me show you this photograph which is -- I

21  was just showing you Exhibit 82, I think Mr. Fineman was

22  showing you on direct.  Let me show you Exhibit

23  Number 136, which is in evidence.

24       Do you see this structure?

25  A.   Yes.

```
 1    Q.    Can you tell whether that catenary was erected with
 2    that graffiti on the base?
 3    A.    No.
 4    Q.    You can't tell?
 5    A.    I know it wasn't.
 6    Q.    And how do you know that?
 7    A.    Because it was put up in 1911.
 8    Q.    Right.  So that graffiti would have had to come
 9    sometime after 1911, right?
10    A.    Yes.
11    Q.    And you don't know whether -- you don't even know the
12    date that the epik owl went up?
13    A.    No, I don't.  I know it was during the project.
14    Q.    Let me show you Exhibit Number 203.
15          Do you see that sign on 1043?
16    A.    Yes, I do.
17    Q.    Can you tell by looking at that sign whether that
18    graffiti was on the sign before the sign was installed?
19    A.    I can tell you it wasn't.
20    Q.    How do you know that?
21    A.    Because the sign has paint.  It's not an original
22    sign.
23    Q.    Okay.  Are you assuming that this epik owl graffiti
24    was actually on Catenary Number 1040 before it was put up?
25    A.    Yeah, I'd say I'm assuming it.
```

1  Q.   You are assuming it?

2  A.   Yeah.  No report of somebody climbing up there and

3  putting it on there, no.

4  Q.   You don't know one way or the other, even though

5  you're assuming it's up there, it was up there before.

6  A.   It's there.  I don't know.  I would believe it would

7  be put on when it was laying on the ground, when they are

8  laid out.

9  Q.   Are you familiar with all the graffiti under Ella

10 Grasso Boulevard?

11 A.   I seen some of it; yes, I've seen it.

12 Q.   Exhibit 69 --

13 A.   Uh-huh.

14 Q.   -- do you know whether any of that graffiti was on

15 any of those structures before or at the time they were

16 installed?

17 A.   I don't know.  No, I don't.

18 Q.   There's no way to tell.

19 A.   No.

20 Q.   How many times were you out to the site around

21 Tower 1040 in 2008?

22 A.   I don't know.  I don't remember.

23 Q.   You don't know if you were ever out there in two

24 thousand --

25 A.   Oh, I was out there.

1    Q.   Do you know if you ever inspected Tower 1043 in 2008?

2    A.   I went by it.  Like I said, we go by them, we look at

3    them, we go through kind of a system.

4    Q.   How many catenaries are there in Connecticut?

5    A.   In Connecticut there's approximately 900 to a

6    thousand.

7    Q.   And they have two legs each?

8    A.   Yes.

9    Q.   And how many --

10   A.   There's an intermediate pole also on curves.

11        We could have more than -- we could have

12   probably 1500.

13   Q.   And have you inspected all 1500?

14   A.   I couldn't say that I did, no.

15   Q.   Do you remember which ones you've inspected?

16   A.   No.

17   Q.   Is it a fair statement to say that you really don't

18   know whether you have actually closely eyeballed

19   Tower 1043 in the five years before March 17, 2011?

20   A.   No.  I could say that I didn't eyeball.  I'm not sure

21   if I've -- how closely I looked at it, no.

22   Q.   Because you're going down the line.  How fast are you

23   going on these railcars when you go down those lines?

24   A.   Ten miles an hour, five miles an hour.  We're

25   inspecting.

```
 1   Q.   As you inspect them, do you know notice the graffiti
 2   on each pole and make a mind's eye kind of memory of it?
 3   A.   Like I said, when we're inspecting, we're looking at
 4   the catenary wire.  The structures are not the primary
 5   concern.
 6   Q.   Okay.  So is it a fair statement to say that, in
 7   these inspections, you're really focusing on the wire, not
 8   the graffiti or the structure or the signs at all?
 9   A.   We're not really checking the graffiti out, no.
10   Q.   Did you have occasion to review any of Mr. Doody's
11   deposition testimony?
12   A.   I heard a few things.
13   Q.   Are you in a position to dispute his testimony?
14           MR. FINEMAN:  Your Honor --
15           THE COURT:  I'm not going to allow one witness
16   to comment on the testimony of another witness.
17   BY MR. RUSH:
18   Q.   Mr. Pfeiffer, these cutouts in the splice plate near
19   the truss, do you see those?
20   A.   Uh-huh.
21   Q.   We're looking at the MTA photos, Exhibit Number 11.
22   It's a composite photo.
23        Can you tell the jury whether those cutouts can be
24   used as handholds or footholds to climb the tower?
25   A.   I guess they could be used for that, yes.
```

```
 1   Q.    Isn't it true that the tower, because of its

 2   latticework ladder system and those cutouts, is easily

 3   climbable?

 4   A.    I wouldn't call it easily, but it's climbable.

 5   Q.    In fact, isn't it true that Metro-North workers over

 6   the years, before they had rail cars and bucket trucks,

 7   they would do maintenance by climbing up the side using

 8   the latticework ladder system and those cutouts to get to

 9   the power lines?

10   A.    Yes.  I would say that.

11              MR. RUSH:  Thank you.  No further questions.

12              THE COURT:  Mr. Reed, anything?

13              MR. REED:  Couple questions, Your Honor.

14

15                     CROSS-EXAMINATION

16   BY MR. REED:

17   Q.    Good morning, sir.  How are you?

18   A.    Good.

19   Q.    My name is Charlie Reed, and I represent the United

20   Illuminating Company.  I just have a couple questions for

21   you.

22        I'm going to make reference to --

23              MR. REED:  Your Honor, this is Exhibit 21, full

24   exhibit, page 2.

25
```

1    BY MR. REED:

2    Q.   Sir, in reference to this -- excuse me.

3         Sir, do you see what I've put up on the projector?

4    A.   Yes.

5    Q.   Do you recognize that?

6    A.   Yes, I do.

7    Q.   And just describe for us what that is.

8    A.   That is a catenary portal structure with two tower

9    column extensions on it, with United Illuminating

10   overbuild on it.

11   Q.   So up and down the line from New Haven, down towards

12   Devon and Fairfield, the catenary structures look, up and

13   down the line, very similar to this, correct?

14   A.   Yes, they do.

15   Q.   So you've got a tower on either side of the tracks,

16   you've got a truss going across the tracks, and then

17   you've got, above the truss higher up on a vertical line,

18   various sets of wires, correct?

19   A.   Yes.

20   Q.   And you're familiar with these catenaries, in your

21   capacity as somebody who has designed them and inspected

22   them?

23   A.   Yes, I do.

24   Q.   You've done that over many years, correct?

25   A.   Yes.

1    Q.    Can you tell the ladies and gentlemen of the jury if

2    there's a safety purpose in placing the wires, all of

3    them, at the heights that are shown here on this

4    photograph?  There's an initial set of wires, and then

5    there's wires higher up.

6         Is there a safety purpose or benefit in the wires

7    being put that high up in the air?

8    A.    So they get over the highway.

9    Q.    I'm sorry?

10   A.    So they can get -- there's a highway bridge to the

11   west of this picture.

12   Q.    Is there a safety benefit for the sake of

13   individuals?

14   A.    Yes.

15   Q.    By putting them up in the air, they're way above the

16   ground, correct?

17   A.    Yes.

18   Q.    And that keeps them way away from anybody, correct?

19   A.    Yes.

20   Q.    Except those who may be up there for a proper

21   purpose, working on the system.

22   A.    Correct.

23              MR. REED:  Thank you.

24              THE COURT:  Hold on a second.

25              MR. FINEMAN:  I'm not sure of the order here.

1        THE COURT:  I think I'll let you go, and then

2   I'll give all counsel all an opportunity to finish up

3   questioning of this witness.

4        MR. FINEMAN:  Thank you, Your Honor.  I'll be

5   very brief.

6

7                    REDIRECT EXAMINATION

8   BY MR. FINEMAN:

9   Q.   Mr. Pfeiffer, when you were out on the tracks, either

10  walking along the right-of-way or in that hi-rail truck

11  that you talked about going five to ten miles an hour,

12  were you in a position to see graffiti on the catenary

13  structures along the right-of-way?

14  A.   Yes.

15  Q.   Did you ever see graffiti anywhere close to the high

16  voltage wires on any of those towers?

17  A.   No, I've never seen it.

18        MR. FINEMAN:  Thank you.

19        THE COURT:  Mr. Rush.

20        And I'll just remind Mr. Pfeiffer, one more

21  time, close to the microphone.

22        THE WITNESS:  I'm sorry.  I'm drifting here.

23

24

25

```
 1                       RECROSS-EXAMINATION

 2   BY MR. RUSH:

 3   Q.   Mr. Pfeiffer, before you were involved in this case,

 4   were you aware that Tower 1040 had that graffiti all the

 5   way from the ground to the top?

 6   A.   The owl?

 7   Q.   I'm sorry?

 8   A.   The owl structure?

 9   Q.   Yes.

10   A.   No, I wasn't.  I wasn't aware of that.

11   Q.   So in all of your travels in the last five or six

12   years and before that, you hadn't noticed the graffiti

13   from the ground to the wire?

14   A.   Not that I recall.

15   Q.   Okay.  So the last question by Mr. Fineman was, you

16   know, during all your inspections, had you ever noticed

17   any graffiti up by the wire.

18        You must have passed by the epik owl one from time to

19   time and not noticed it, correct?

20   A.   Well, no, I didn't notice it.  Not something that I

21   would recall.

22   Q.   Looking again at the strike plate and following up on

23   Mr. Reed's comments, elevating the wire so -- elevating

24   the wire is a safety precaution provided people can't

25   easily get to that elevated wire; would you agree with
```

 1   that?

 2   A.   If that's your purpose, yes.

 3   Q.   So the elevation only works as a safety protection if

 4   you can't easily get to that elevated wire, correct; isn't

 5   that true?

 6   A.   The main reason it's elevated?

 7   Q.   I'm saying, Mr. Reed was asking you whether it was a

 8   safety precaution to elevate the wire.

 9       I'm now saying to you:  Isn't it true that that

10   safety precaution only creates safety if you can't easily

11   climb up to that wire; isn't that true?

12   A.   True.

13   Q.   Now, looking at this, you see the -- I call them

14   strike plates, but that's not right.

15       I think they're called splice plates; is that right?

16   A.   It's called a gusset plate.

17   Q.   I'm sorry?

18   A.   It's called a gusset plate.  Everything is riveted to

19   that for the truss.

20   Q.   And its function is to splice those two pieces of

21   tower together?

22   A.   Yes.  And the truss.

23   Q.   So looking at that profile or side view of this

24   gusset -- is that what you said?

25   A.   Yes.

```
 1    Q.   -- gusset or splice plate that I'm sort of circling

 2    here, the truss sort of ends in it, right?

 3    A.   Uh-huh.

 4    Q.   That's a flat, smooth piece essentially, correct?

 5    A.   Yes, it is.

 6    Q.   Not really climbable, correct?

 7    A.   No, it's not.

 8    Q.   If there were no -- I'm -- we're looking at

 9    Photograph 1 in that Composite 21.

10         If these cutouts weren't there and that was a flat

11    plate too, it would be much harder to climb, wouldn't it?

12    A.   Uh-huh.

13    Q.   It would effectively --

14              THE COURT:  Is that yes?

15              THE WITNESS:  Yes.

16    BY MR. RUSH:

17    Q.   It would effectively be an anti-climbing device?

18    A.   No.  The reason those cutouts are there is so you

19    could climb it.  That's the point.  That would be your way

20    up.

21    Q.   If those cutouts weren't there, it would be a

22    relatively effective anti-climbing device?

23    A.   There's some structures that don't have it, and we

24    put a ladder on it.

25    Q.   Yes.  But I'm asking about this structure.
```

```
 1   A.    Yeah, that would be your way up.
 2   Q.    And similarly, down at the base of this tower, you're
 3   familiar with the base of these catenary -- what I call a
 4   tower, but maybe I'm the only person that calls them
 5   those.
 6        But down here by the concrete base, you could wrap
 7   this in some sort of flat splice plate or gusset plate
 8   that was 6 or 8 feet long and maybe up something like 8 to
 9   10 feet --
10             THE COURT:  Hold on a second.
11             MR. FINEMAN:  Objection, relevance.
12             MR. RUSH:  He was asking about the safety
13   procedures at elevation.
14             MR. REED:  I think he's outside the scope.
15             THE COURT:  I'll allow it.
16   BY MR. RUSH:
17   Q.    This elevating of the wire could be made almost
18   completely safe if you simply wrapped the lower portion of
19   space about six or eight feet with a flat gusset plate or
20   splice plate, correct?
21   A.    If you wanted to go there, yes.
22   Q.    Okay.  And then for repairs you could easily bring in
23   sort of a high-tech kind of piece of equipment called a
24   ladder, and put the ladder up against the tower, and then
25   just climb over the splice plate, correct?
```

```
 1   A.   Yeah, anything is possible.

 2   Q.   But that would work, wouldn't it?

 3        I know it's possible, but that would in fact work?

 4   A.   Yeah, okay.  Yes, I'll agree with you on that.

 5             MR. RUSH:  Thank you, sir.

 6             THE COURT:  Anything else?

 7             MR. FINEMAN:  Nothing further, Your Honor.

 8             MR. REED:  Nothing further, Your Honor.

 9             THE COURT:  Thank you, Mr. Pfeiffer.

10             THE WITNESS:  You're welcome.

11             THE COURT:  All right.  Do defendants have any

12   more witnesses?

13             MR. FINEMAN:  No, Your Honor.  The defense

14   rests.

15             THE COURT:  So defendants Metro-North and MTA

16   have rested at this point.  Now we're going to turn to

17   United Illuminating and see if there's evidence they wish

18   to present.

19             MR. REED:  We have a motion, Your Honor.

20             THE COURT:  A motion?

21        Okay.  Ladies and gentlemen, I'm going to hear

22   counsel with respect to this motion outside your presence

23   at this point in time.  Maybe what we'll do is just count

24   on at least 20 minutes before we would resume.

25                  (Whereupon the jury left the courtroom.)
```

1           THE COURT:  Please be seated.

2           If you have any motion to present, if you can

3   come up to the lectern, that would be great.

4           MR. RINGOLD:  Thank you, Your Honor.

5           Your Honor, defendants and third-party

6   plaintiffs Metro-North and MTA having been fully heard,

7   United Illuminating, pursuant to Rule 50(a), moves for a

8   judgment as a matter of law in its favor on their

9   third-party claim against it.

10          Based on the evidence presented, UI submits that

11  no reasonable jury could find in the favor of the

12  third-party plaintiffs on this claim.  Our motion rests on

13  three or four, as one of them has two sub-part theories.

14          First, the only legal causes of Mr. Colon's

15  injuries that are alleged in the first-party case are

16  inadequate warning signs and failures to install

17  anti-climbing or anti-trespasser measures, all at ground

18  level or the immediate ground-level portion of Tower 1043.

19          It is undisputed in this case that that has

20  nothing to do with United Illuminating's transmission

21  system.  Indeed, the transmission line agreement itself

22  has been introduced.  That area is not included in what

23  constitutes UI's transmission system.

24          Therefore, pursuant to the indemnity provision,

25  there is no claim from the first-party case that can

1    possibly qualify for indemnity in the third-party case.

2            The indemnity claim is drawn from and based upon

3    the first-party claim, and the only possible results are a

4    defendants' verdict, where there will be no indemnity, or

5    plaintiffs' verdict based on legal grounds that will not

6    qualify --

7            THE COURT:  Those legal grounds are the -- what

8    again?

9            MR. RINGOLD:  They're contained, I believe, in

10   Paragraph 78 or 79 of the first-party complaint,

11   Your Honor, but they're a series of specifications of

12   negligence, all based upon inadequate warning signs and,

13   depending on what theories Your Honor allows to proceed to

14   the jury, potentially inadequate anti-climbing measures or

15   anti-trespassing measures.

16           Those are repeated, then, as the bases of the

17   third-party claim in the third-party complaint as the

18   claims that are being made by the first-party plaintiffs

19   and the claim upon which they are seeking indemnity.  But

20   none of those have anything to do with the transmission

21   system and, therefore, would not qualify under an

22   indemnity agreement that provides for indemnity for claims

23   that arise directly or indirectly out of the transmission

24   system.

25           THE COURT:  Okay.

1      MR. RINGOLD:  The second argument, Your Honor,

2  sort of related, gets to the other section of the

3  indemnity agreement which provides that United

4  Illuminating is not obligated to provide indemnity where

5  the claim is the result of the sole negligence of the

6  State or the State's designee.

7      This is near, Your Honor, where we would say

8  there are sort of two subparts to this argument.  That's

9  why I said three or four theories, depending on how you

10  want to say it.

11      First, we would submit, there's sort of an

12  anticipated argument, we understand, from Metro-North,

13  that Mr. Colon may be found to have some contributory

14  negligence in this accident; and, therefore, if there is a

15  plaintiffs' verdict, it would not be solely the result of

16  their own negligence.

17      We would submit two separate arguments,

18  Your Honor.

19      First of all, Mr. Colon's negligence is not a

20  question under that provision.  The only negligence that

21  would have been found to have caused his accident,

22  pursuant to the contract, would be Metro-North or MTA's.

23  His negligence, if it is found by the jury, should not be

24  considered as a part of that contractual provision in its

25  interpretation.

1     THE COURT:  It should only be balanced between

2  MTA's -- or Metro-North/MTA's negligence versus UI's.

3     MR. RINGOLD:  Absolutely, Your Honor.

4     And a sort of related but secondary argument

5  would be, even if Your Honor were to consider Mr. Colon's

6  contributory negligence, you should look to the

7  Connecticut negligence statute which would govern what

8  that contributory negligence would mean.

9     And 52-572h, if I'm remembering correctly,

10  defines that contributory negligence reduces the

11  recoverable economic and noneconomic damages, and then the

12  share, the proportionate share to their negligence that

13  Metro-North and the MTA would paid pay would be due

14  entirely to their own negligence.  The recoverable damages

15  are reduced by contributory negligence, and then they are

16  only responsible to pay for their comparative share.

17     So as a result, if a million dollars are awarded

18  in damages and there is 50/50 share of negligence, they

19  would be found on the first-party case to owe $500,000,

20  and that would be solely the result of their own

21  negligence and therefore would not qualify for

22  indemnification under the agreement.

23     And the final, and I think probably the biggest

24  thrust of our argument, Your Honor, would be that

25  Metro-North and the MTA have failed to carry their burden

1       of proof on the third-party claim.

2                    They have brought this case.  They have the

3       burden.  It may be a civil burden, but they still bear

4       that burden.  Even if Your Honor moves beyond the first

5       two arguments that we've discussed and gets into this

6       theory that has been discussed at times, I believe

7       Attorney Reed has described it as electrical causation as

8       to whose electricity may or may not have affected

9       Mr. Colon once he was at height.

10                   We would submit that plaintiffs have not been

11      able to prove, as we moved in our directed verdict, even

12      that Mr. Colon was affected by such a sensation once he

13      was at height.

14                   But even if Your Honor proceeds on the theory

15      that it is possible that a jury considers that he has been

16      affected by such a sensation, Metro-North and the MTA --

17                   THE COURT:  Wait a second.

18                   You don't think there's enough evidence of

19      record that he was affected by a sensation?

20                   MR. RINGOLD:  It is possible that the jury could

21      consider that; absolutely, Your Honor.  The argument I'm

22      about to make is on the question of whether or not they

23      can prove whose electricity caused that sensation, if the

24      jury were to consider that.

25                   THE COURT:  You don't think there's enough

1   evidence of record right now for the jury to conclude that

2   it was a sensation created, in large part, by UI wire?

3            MR. RINGOLD:  No, Your Honor.

4            THE COURT:  Despite the fact that UI wires carry

5   something close to ten times the voltage, and that he was

6   only affected -- allegedly affected by static electricity

7   at the point when he passed the Metro-North wires and was

8   near, or equidistant at the least, to the much higher

9   voltage wires, you're saying there's not even a jury issue

10  on that?

11           MR. RINGOLD:  Correct, Your Honor.

12           The issue is that a reasonable jury cannot rely

13  on speculation.  A reasonable jury may only rely on

14  verifiable usable data and record evidence.

15           The issue here is, we have representatives of

16  the Connecticut DOT, of the MTA, and of Metro-North -- so

17  of the record owner of the tower and of both third-party

18  plaintiffs, Mr. Doody, Mr. Bordiere, and Mr. Berrang, I

19  believe -- who all testified they have no information

20  whatsoever that UI's wires played any role whatsoever in

21  Mr. Colon's injuries.

22           THE COURT:  That just means they don't have

23  information.

24           MR. RINGOLD:  Absolutely.

25           THE COURT:  That's not a kind of proof that UI's

1    wires didn't do that.  What you have is you have the

2    testimony of Elliot Stern, Dr. Elliot Stern, about the

3    physics of this.

4         And I know you have other objections to that

5    testimony, but it seems like a real stretch to say that a

6    reasonable jury couldn't conclude, on the basis of the

7    record evidence in this case, that UI's exceptionally high

8    voltage wires didn't play a role.

9         MR. RINGOLD:  I'm glad you brought up Dr. Stern,

10   Your Honor.  I'm not surprised that you did.

11        Dr. Stern's evidence is obviously really the

12   crux of this issue.  Metro-North and the MTA have none of

13   their own experts.  They're relying simply on plaintiffs'

14   own expert, Dr. Stern.

15        And as was drawn out at times on direct, at

16   times on Metro-North and the MTA's own examination, and

17   extensively by Attorney's Reed's cross-examination of

18   Dr. Stern, any reliance on his opinion and his opinion

19   itself would be mere speculation.

20        He testified that he was not aware of the

21   condition of the line.  He testified that a single broken

22   strand to that line would largely alter the geometry of

23   calculating the electricity, that he did not know the

24   precise humidity, the precise wind condition, the presence

25   of dirt on the line, the presence of water on the line,

1   all of which he said were necessary to perform a

2   calculation.

3        He admitted on direct, repeatedly, that he had

4   not done a calculation of the coronal distance from UI's

5   wires or the static electricity range from UI's wires.

6        He, in fact, testified on direct at one point,

7   describing the scientific method itself, Your Honor, which

8   I think is a helpful piece of testimony to review.

9        On page 639 he said:  You establish a hypothesis

10  that explains the behavior or conditions, and then you

11  form some sort of test in order to verify those

12  characteristics, and then you iteratively perform that

13  operation until you can explain within a reasonable

14  certainty the characteristics that occur.

15       Dr. Stern's undisputed and self-admitted

16  testimony is that he performed absolutely no such

17  examination.  He had never been to the site before he

18  performed his -- or reached his opinions, and even after

19  visiting the site did not change his opinions.  He never

20  observed the lines.  He never observed the line

21  conditions.  He didn't know any of the variables relevant

22  to calculating as to this particular situation.

23       His only testimony is as to general

24  characteristics of physics, that higher voltage lines

25  supposedly, in general on average, have these larger field

 1   effects.  But those general characteristics of physics, by

 2   his own testimony, are defined by a myriad of variables

 3   that he did not know and did not have.

 4         He did not perform any calculation as a result

 5   of that and, indeed, testified repeatedly he did not even

 6   perform a theoretical calculation based on those limited

 7   basic facts of physics that he had.

 8         He also, to the degree that he did testify, his

 9   own testimony was not based on accurate evidence that was

10   provided in the record.

11         Mr. Colon testified first, on the first day of

12   trial, he drew a green X, I believe it was that day,

13   between the first and second crossarm as his position.

14   And then on the second day of trial, clarified that

15   actually he believed his head was sticking slightly above

16   the second crossarm.  But in either case, his testimony

17   was that he was positioned there.

18         And Mr. Colon's testimony universally,

19   throughout the entire course of this litigation, has been

20   that he was climbing the tower with his arms attached to

21   the tower.  And he gave, I believe, a demonstration by --

22   I was a little nervous for him for a moment -- sitting on

23   the jury box, displaying how he leaned out from the tower;

24   and, in doing so, he remained with one hand attached to

25   the tower, leaning out.

1        And it was at that moment that Mr. Colon

2   testified he felt this heat or this impact, or this

3   hot-and-cold sensation, the chicken skin, however it wants

4   to be described.

5        All of Dr. Stern's projections, all of

6   Dr. Stern's conclusions were based on a diagram --

7        THE COURT:  I remember the diagram.

8        MR. RINGOLD:  -- that had Mr. Colon several feet

9   out on the crossarm, straddling Metro-North's insulators,

10  with one hand leaning on the second crossarm.  His entire

11  analysis was based on a falsehood that exists nowhere in

12  the record evidence of the sole witness to what actually

13  happened on the day.

14       In fact, similarly, he testified that one of the

15  key factors in considering whether or not what Mr. Colon

16  described was consistent with an electrical effect was

17  sound, was he recalled Mr. Colon's saying something about

18  hissing or crackling sound.

19       I can represent, he made no such testimony at

20  his deposition, and he certainly made no testimony of

21  hearing any form of sound prior to the incident.  All he

22  remembers is heat, or a hot-and-cold sensation, and

23  chicken skin.

24       Dr. Stern's testimony is at odds with the sole

25  description of the accident from the witness and is based

1       upon no record evidence to justify any of the conclusions

2       he's drawing from physics.

3               All Dr. Stern has testified to is higher voltage

4       wires tend to cause larger field effects; and, therefore,

5       I think that UI's wires played a role.  But he can, in no

6       scientific method, by his own description of the

7       scientific method, tie UI's wires to this system.

8               THE COURT:  You're not, I take it, disputing

9       that a jury could credit Stern's testimony insofar as he

10      testified about the effect of static electricity, are you?

11              MR. RINGOLD:  The --

12              THE COURT:  You're not saying that's junk

13      science, there's no such thing as static electricity, and

14      nobody can be harmed by static electricity by getting

15      somewhere near wires.

16              MR. RINGOLD:  As a general matter of physics?

17              THE COURT:  Right.  You're not disputing that

18      aspect of this testimony, are you?

19              MR. RINGOLD:  Dr. Stern is a smarter man than I

20      am.  I wouldn't dispute that, no, Your Honor.

21              THE COURT:  Isn't it conceivable, then, that the

22      jury could conclude that, even if Dr. Stern relied in some

23      manner on predicate facts that were at variance, as you've

24      suggested, with the actual trial testimony of Mr. Colon,

25      couldn't a reasonable jury still look at the facts here

1    and say:  He's already crossed past the Metro-North wires;

2    he's getting close to the UI wires; Dr. Stern has

3    testified about the existence of static electricity that

4    can affect somebody when they're some distance from those

5    wires; ergo conclude that there was, in fact, this impact

6    on him.

7            A reasonable jury couldn't do that?

8            MR. RINGOLD:  We would submit, no, Your Honor.

9    That set of conclusions would be based on speculation.

10   The testimony as to passing by Metro-North's wires and not

11   feeling an effect is of no moment, Your Honor.

12           Dr. Stern's own description of the difference

13   between a coronal discharge and a static discharge is that

14   a static discharge is momentary.  It's not a continual

15   streams of electrons.

16           So the fact that he did not feel it in one

17   moment in one position, in one form of geometry to the

18   wires, doesn't tell you anything about whether he was

19   necessarily affected by Metro-North's wires at some other

20   angle, at some other moment, under some other weather

21   conditions, under some other humidity, et cetera,

22   et cetera.

23           Metro-North bears the burden.  And the fact that

24   at one moment he felt -- he did not describe a sensation

25   does not necessarily mean that he didn't feel it at

```
 1    another moment as a result of Metro-North's wires.

 2              And as to the question of whether they could

 3    rely on his general testimony about --

 4              THE COURT:  Did you ask him that, by the way?

 5              Did UI ask the plaintiff:  By the way, as you

 6    were getting near those Metro-North wires, before you had

 7    gone above the Metro-North wires, did you feel the chicken

 8    skin or the goosebumps?

 9              I don't remember that being asked.

10              MR. RINGOLD:  I don't want to make a false

11    representation, but I think Attorney Fineman, at one

12    point, asked that.  And I believe his testimony was --

13              THE COURT:  -- he did not.

14              MR. RINGOLD:  I believe that's correct.

15              THE COURT:  I think the testimony is, he felt it

16    as he was above the Metro-North wires and approaching --

17    no matter where we put him, whether it's on the crossbar

18    or still on the pole, and I think his testimony was he was

19    still on the pole.

20              That's why I have trouble with the argument that

21    it would be pure speculation for the jury to conclude that

22    it's coming -- that the problem for him was coming from

23    the UI wires.

24              MR. RINGOLD:  Just to bring it back around,

25    Your Honor, again, not feeling it at one moment doesn't
```

1    mean he didn't -- doesn't really support the argument that

2    he couldn't have felt it at another moment.  And as to

3    whether or not, once he did feel this effect, whether it

4    was the result of UI's wires, there's no connective tissue

5    between essentially a sentence from a physics textbook

6    that higher voltage wires tend to cause larger field

7    effects, which is the only valid scientific, tied-to-data

8    opinion that Dr. Stern was able to give, and then taking

9    that reality and applying it to the specific factual

10   situation here where -- I would note, Your Honor, there

11   actually hasn't been a single piece of record testimony

12   that those wires were carrying 115 kV.

13          There's testimony that that is how they were

14   designed and that that is what the transmission line

15   agreement provides that they could carry.  No one has

16   tested those wires.  No one can say -- the jury has not

17   heard one iota of evidence that those wires even carried

18   115 kV.

19          In fact, Dr. Stern testified at one point that

20   lines can suffer -- that static and corona effects lead to

21   a charge loss, and that systems are designed to prevent

22   that.  And he had no evidence to dispute that UI's wires

23   were designed that way.  But if anything, that testimony

24   would support the conclusion that there is some voltage

25   loss, and that those lines may in fact not be running at

1    115 kV.  We have no information --

2              THE COURT:  Could a reasonable jury conclude

3    that they were?  Or would it be irrational, the height of

4    speculation, for the jury to conclude that these wires

5    that are designed to carry 115 kV were, in fact, carrying

6    115 kV or something close to it?

7              MR. RINGOLD:  Individually, Your Honor, I could

8    perhaps see the argument that the wires are designed that

9    way and, therefore, that is what the wires were carrying.

10             The issue we have here is we have speculation

11   upon speculation.  And while individual pieces of

12   evidence, perhaps a reasonable jury could find its way to

13   get from Point A to Point B, every single step along the

14   journey is missing any real meat to the opinion.

15             We don't actually know that those wires are

16   carrying that voltage, although maybe you could sort of

17   infer it from the fact that that's how they're designed.

18             We don't actually know -- Dr. Stern's opinion

19   was not based on where Mr. Colon testified he was actually

20   positioned, but maybe actually --

21             THE COURT:  I get the argument.

22             MR. RINGOLD:  Not to waste Your Honor's time.

23             THE COURT:  Anything else?

24             MR. RINGOLD:  Let me just review my notes,

25   Your Honor.

1               (Pause.)

2               MR. RINGOLD:  Your Honor, one case that I

3    just -- just to give Your Honor at least one piece of

4    legal citation.  There's a case from Pennsylvania -- and

5    Your Honor cited the Eastern District of Pennsylvania, the

6    *Klein* case, in your summary judgment ruling, but there's a

7    Pennsylvania case, *Rapp v. Singh*, 152 F.Supp.2d 694, that

8    I feel is -- we feel is of some relevance and some help to

9    understanding our argument here, Your Honor.

10              That was a case where a plaintiff -- the

11   executrix, I believe, of an estate of a woman who had died

12   when her car rear-ended a tractor-trailer, and she

13   unfortunately died because of what's called "underdrive,"

14   I believe, where the car goes underneath the back of the

15   tractor-trailer and the person is decapitated,

16   unfortunately.

17              And they sued the tractor-trailer company over

18   the design of the rear guard of that tractor-trailer,

19   saying that it was inadequately designed, and that she

20   died because if they had had a better designed guard, then

21   she wouldn't have died.

22              They presented multiple experts who all

23   testified to general principles of physics, who all

24   testified that:  Oh, well, if this guard had been designed

25   this way, then the energy would have been distributed

1   more.

2           But repeatedly, over and over and over again,

3   these experts were asked:  Have you analyzed whether, in

4   this accident, under these conditions, this car traveling

5   in this direction, striking this vehicle in this way, can

6   you testify that this guard that you claim it should have

7   been designed, can you show that this would have prevented

8   the accident.

9           All of them said no.  They all testified only to

10  the general concept that if you distribute the energy

11  better, then you can prevent the accident.  But they had

12  no proof that the design they were offering as an

13  alternative would actually accomplish that goal.

14          We would submit it's roughly the same problem

15  here.  An expert can't simply testify to general

16  principles of physics and then leave it to the jury to

17  speculate as to whether those effects are of any moment or

18  have any application in this particular case.

19              THE COURT:  Okay.  Thank you.

20              MR. RINGOLD:  Thank you, Your Honor.

21              THE COURT:  Metro-North?

22              MR. HICKEY:  Yes, thank you.

23              Good morning, your Honor.

24          As you know, the claim for indemnity here, by

25  Metro-North against the United Illuminating Company, is

1   contained -- or the origin of it is contained within

2   Exhibit 46, which is the transmission line agreement.

3           And starting on page 21 is the waiver and

4   indemnity provision that I think the Court will, at some

5   point in time, have to apply in this case in one form or

6   another.

7           But the import of that contractual provision is

8   most important here, because it alters what would --

9   perhaps what I would perhaps mostly be familiar with, as

10  well as the attorneys for UI, in that the quantum of

11  evidence and proof that's needed here on whether the

12  UI transmission system contributed to this accident.

13          And what I mean is that, in the traditional tort

14  case, a plaintiff would have the burden of proving more

15  likely than not that something happened, and I think here,

16  because of the language which Your Honor is probably

17  already familiar with, which is contained on page 22, that

18  states that the UI company will defend and indemnify

19  Metro-North from any and all claims, demands, or actions

20  related to injury or damage directly or indirectly caused

21  by the presence or use of the wires.  So Your Honor will

22  have to interpret that at some point in time in this case.

23          So as an initial matter, I would say that to

24  rule on the UI's motion now would be premature, at best.

25          And then to echo Your Honor's comments about

1  whether the jury could conclude that that burden of proof,

2  which I submit is only to show that the UI system

3  contributed directly or indirectly, we do have Dr. Stern's

4  testimony where he has already said he believes that it's

5  more likely than not that it was the UI static that caused

6  the initial shock to Mr. Colon.

7          And the way I look at this is, there's really

8  three possibilities:  It was either the UI shock that

9  caused Mr. Colon to fall; it was Metro-North static which

10 caused him to be shocked; or a combination of both.

11         Well, there's absolutely no evidence, there's no

12 suggestion by any witness that it was solely, solely, the

13 Metro-North static that caused him.

14         And so under either of the other two scenarios

15 which are definitely possible here, either the combination

16 of Metro-North and UI or the UI static, we prevail on the

17 indemnity because it's either caused by directly or

18 indirectly.

19         And so to take that decision away now, based on

20 the evidence we have, again I think would be wrong.  I

21 think it would be premature.  I think we're going to

22 submit -- I suspect we're going to submit an interrogatory

23 to the jury which asks them whether the UI static

24 contributed either directly or indirectly.  And I think

25 that would be much more informative, and I think it would

1   be better to at least defer your ruling.

2          And I think Your Honor also needs the benefit of

3   some briefing on this.  It's going to be a matter of

4   interpretation of the contract.  As we interpret the

5   contract for Metro-North, now that it has been established

6   that there is a claim, not even that it was caused

7   directly or indirectly, but that -- if you read this

8   paragraph the way we read it, if there is a claim that

9   there was a loss related to their transmission system, the

10  duty then kicks in for them to indemnify.

11          So I would just at best ask --

12          THE COURT:  No matter how frivolous?

13          MR. HICKEY:  Sure.

14          THE COURT:  Just simply a claim on that basis,

15  and if the trial evidence and later evidence were to show

16  that it had zilch to do with UI's wires, just the fact

17  that the exorbitant claim had been made by a plaintiff,

18  that would put UI on the hook?

19          MR. HICKEY:  My insurance company clients are

20  faced with that every day, Your Honor.  You write a

21  policy, you enter a deal, and now you're stuck with it

22  later.

23          So, yeah, I mean there are agreements that say

24  that:  If a claim is made, we're going to back you up.

25  But that's an interpretation.

1    I take Your Honor's comments to heart, and I

2    think that what Your Honor's comments suggest is that, at

3    best, it would be premature at this time to decide the

4    UI's motion based on the interpretation of the contract,

5    what this jury is going to decide with regard to the facts

6    of this case.

7         That's really all I have to say.

8         THE COURT:  Thank you.

9         Mr. Ringold?

10        MR. RINGOLD:  Briefly.

11        THE COURT:  Come on up to the lectern.

12        MR. RINGOLD:  Two very small points, Your Honor.

13        The first, the statement was made that no

14   evidence was introduced that it was Metro-North's wires

15   alone.  I would just reiterate, Your Honor is obviously

16   well aware, but Metro-North bears the burden of proof.  We

17   are not obligated to produce any evidence.  They have the

18   obligation to prove the condition predicate for indemnity.

19   We would submit they have not done so.

20        Just briefly, as to the argument of about a

21   claim, the full language of the contract is a claim demand

22   or action for such loss, injury or damage directly or

23   indirectly caused by the presence.

24        Again, the claim made by Milton Omar Colon is

25   Document Number 69 on the docket.  It's his first amended

1    complaint.  Nowhere -- once Your Honor removes the

2    references to 16-11-102, which Your Honor has already

3    ruled are not relevant in this case, there is no claim in

4    this complaint that he was -- that his injury was legally

5    caused by our transmission system.  The only allegations

6    of legal cause of his injuries are a lack of warnings, and

7    a lack of anti-trespassing, and a lack of anti-climbing

8    measures.  So we would submit there is no such claim.

9              Thank you, Your Honor.

10             THE COURT:  I appreciate the arguments.  I'm not

11   going to rule on the motion at this time.  I'm going to

12   defer consideration of that, pending the parties'

13   submission of briefing to the extent it's necessary on

14   that.  And I'm looking forward to parties' further

15   guidance on the form of the interrogatory that should be

16   submitted to the jury on the factual causation issue,

17   again, with the understanding that that's all that the

18   parties -- the defendants and the third-party defendant

19   need resolved by the jury.

20             So with that, does UI -- Mr. Fineman, did you

21   have something else?

22             MR. FINEMAN:  Yes, Your Honor.  I want to make

23   sure that we have an opportunity to renew our Rule 50

24   motion, now that we have rested our case and put on some

25   additional evidence.  If I may be heard briefly on that.

1          THE COURT:  Okay.

2          MR. FINEMAN:  I believe, based on the arguments

3   yesterday that one of the concerns the Court has is that

4   there was this testimony from Mr. Doody hanging out out

5   there that suggested that this is a constant issue of

6   trespass on -- on the catenaries somewhere along the

7   right-of-way, which could include the area around 1043 and

8   however broadly the Court may read *Maffucci* to define the

9   limited area.

10          I think, now that we've heard from Mr. Pfeiffer,

11   we can say that the unrefuted evidence is that, at least

12   as to the five years leading up to March 2011, from the

13   area between Ella Grasso Boulevard and the I-95 overpass,

14   which contains 1043 and several catenaries around it,

15   there has been no knowledge on behalf of Metro-North,

16   somebody who worked in the catenary department for longer

17   than Metro-North has actually been in existence, who is

18   out on the track or the right-of-way once or twice a week

19   for decades and has an opportunity to observe the

20   situation out there, he's not aware of any trespassing,

21   he's not aware of any trespassing at height, he's not

22   aware of any graffiti at height.

23          And I think that that being unrefuted entitles

24   us to a judgment as a matter of law, as there's been no

25   evidence to suggest now that, specifically with respect to

1    specific time-frame geographic scope, anywhere near the

2    proximity or in proximity to the dangerous condition here,

3    there's just simply no evidence of trespass, let alone

4    constant trespass to the extent that it has to be so

5    routine and so regular that Metro-North should have had

6    any duty to warn people about it.

7            THE COURT:  Thank you.

8            Mr. Rush, anything?

9            MR. RUSH:  Briefly, Your Honor.

10           MR. RINGOLD:  I apologize, Your Honor.  Again,

11   for the record, Your Honor, UI would again join, in full,

12   the motion made by Attorney Fineman.

13           THE COURT:  Great.

14           MR. RUSH:  I stayed up past my bedtime reading

15   these cases, Judge, so I'm going to do the best I can with

16   them.

17           One of the things I wanted to begin with, in

18   response to that renewed motion, is to again go back to

19   *Maffucci*.

20           Connecticut law has -- Connecticut Supreme Court

21   has already spoken on this on two occasions:  One in

22   *Maffucci*, and also in the Lin vs. Metro-North case, which

23   I think is styled *Lin v. Amtrak*, but Amtrak was dropped

24   out.

25           On page 3 of the *Maffucci* case, the Supreme

1    Court of Connecticut very specifically adopted the *Carlson*

2    expected trespasser rule.  And they said on page 3, on the

3    second column, they're talking about the exceptions:

4    There's an equally well-established exception to the

5    general rule that a landowner doesn't owe a duty to a

6    trespasser.

7              And then in quotes:  If the owner knows that the

8    presence of trespassers is to be expected, then the common

9    obligation of exercising reasonable care gives rise to the

10   correlative duty of taking such precautions against

11   injuring trespassers as a reasonable foresight of harm

12   ought to suggest.

13             Now, that's a very close quote, very similar to

14   a quote in *Prosser*, but it's important from this

15   standpoint, that they then cite *Carlson v. Connecticut*,

16   the 1921 case.  There was no evidence of constant

17   intrusion, no physical evidence of constant intrusion at

18   the site of the injury of Mr. Carlson.  He just laid down

19   on the tracks.

20             And so the *Carlson* exception is either a

21   corollary to Section 335 of the restatement or it's

22   something altogether different.  There's some suggestion

23   that it actually applies to Section 334, not 335, but

24   those are two mirror-image concepts.

25             But there's two things that are really important

1   about this quote in *Maffucci*.  One is that this expected

2   trespasser doctrine could apply in this case; that is,

3   there may be enough evidence -- and the evidence is a

4   broader application than just the place, just the limited

5   area.

6           If you read this, if the owner knows that the

7   presence of trespassers is to be expected -- and he could

8   know that from a lot of different things.  He could know

9   it because of so much activity in the area, so many

10  parties under I-95, so much graffiti on Tower 1040.  And

11  that's a jury question, I think.

12          But if the owner knows that the presence of

13  trespassers is to be expected, then a common obligation of

14  exercising reasonable care gives rise to this duty of

15  taking such precautions -- not just a warning -- this is

16  the important part -- not just a warning but additional

17  precautions if they're necessary if the owner of land or

18  possessor of land expects trespassers to be around.

19          And so the *Carlson* exception is part of

20  *Maffucci*, I guess it's part of 335, but it is -- it

21  creates a duty that's not just about warnings but these

22  other precautions indeterminate.

23          So that's the first thing I want to say.

24          The second thing is, in *Maffucci* is this

25  distinction between actual knowledge and constructive

1    knowledge.  And on page 5 of my opinion, I guess it's

2    page 22 of the real opinion -- and I was quoting from

3    page 20, I guess, from the *Maffucci* case, so this is now

4    page 22 --

5            THE COURT:  Can I just ask you -- and I do want

6    to hear more about this --

7            MR. RUSH:  Sure.

8            THE COURT:  -- it doesn't seem to me that this

9    is responding -- or maybe you can tell me how this

10   responds to the immediate motion that's pending.  Because

11   if you want to let me know of further information that I

12   should be thinking about with respect to crafting jury

13   instructions, I'm very interested in that.  But I'm -- not

14   clear to me, since we have a jury waiting next door --

15           MR. RUSH:  Yes, sir.

16           THE COURT:  -- that these points pertain

17   directly to Mr. Fineman's argument that somehow I should

18   grant a judgment here, in light of Mr. Pfeiffer's

19   testimony.

20           MR. RUSH:  Very good, Your Honor.

21           Neither Mr. Pfeiffer's testimony nor any of the

22   other testimony against the plaintiff resolves this

23   expected trespasser issue.  There's enough evidence -- I

24   assume they're renewing their motion for summary judgment,

25   as well as a motion for directed verdict.  Nothing

 1    Mr. Pfeiffer said eliminates the jury issue dealing with

 2    this expected trespasser issue.  So that's my only

 3    response really.

 4            THE COURT:  I assume you're relying on the

 5    notion that Mr. Pfeiffer's testimony and the weight should

 6    go to the jury.

 7            MR. RUSH:  I think he's -- I think he was --

 8            THE COURT:  In terms of the lack -- he himself,

 9    he said that he didn't know the particulars concerning

10    epik owl and had not even noticed the epik owl graffiti

11    prior to this case.

12            MR. RUSH:  Or Tower 1043, apparently.

13            THE COURT:  Or done a particular inspection --

14            MR. RUSH:  Yes, sir.

15            THE COURT:  -- on-the-spot inspection.

16            I'm going to allow this case to proceed on the

17    constant intrusion, the 335 exception -- or theory of

18    liability to the jury, notwithstanding the arguments that

19    you made in good faith on that.

20            Okay.  So I think -- can we bring the jury back?

21    I understand UI wants to do its stipulation.

22            MR. REED:  Yes, Your Honor.

23            THE COURT:  And then UI will rest, and then --

24            Mr. Rush, UI is about to rest after it puts on

25    its stipulation.  You were going to then decline to

```
 1    present a rebuttal case; is that correct?

 2             MR. RUSH:  Yes, Your Honor.

 3             THE COURT:  So we'll do that, and then we can

 4    dismiss the jury for the day.  And then we'll take a short

 5    break for our court reporter, and then we'll hear any

 6    additional arguments or concerns you want to make.  Okay?

 7             MR. FINEMAN:  Your Honor, just as a housekeeping

 8    matter, I've never been entirely clear on how many times I

 9    have to renew the motion to be fully preserved, but since

10    we know the stipulations that are coming in, if we could

11    consider UI to have been fully heard, to the extent I am

12    required to do so, I want to renew the Rule 50 motion, now

13    that everybody will have rested, and I didn't think it was

14    worth dismissing the jury to do again.

15             THE COURT:  You want to renew the Rule 50 motion

16    after UI rests?

17             MR. FINEMAN:  Right.

18             THE COURT:  Absent objection, consider it so

19    renewed.

20             MR. FINEMAN:  Thank you.

21             THE COURT:  Let's get the jury.

22                 (Whereupon, the jury entered the

23                  courtroom.)

24             THE COURT:  Welcome back, ladies and gentlemen.

25    Please be seated.
```

 1          Sorry, that was a bit more than 20 minutes, but
 2  we're now ready to proceed at this time.  As you see that
 3  Metro-North and MTA have rested the case, and now the time
 4  comes for United Illuminating Company to present any
 5  evidence it might wish to present.
 6          Mr. Ringold.
 7          MR. RINGOLD:  Ladies and gentlemen of the jury,
 8  I'm sure you've been wondering who I am.  My name is Jim
 9  Ringold.  I also represent United Illuminating Company.
10          Your Honor, at this time UI would like to move
11  into evidence Defendants' Exhibit 607, the stipulation
12  we've discussed.
13          THE COURT:  Absent objection, full exhibit.
14          (Defense Exhibit 607 marked in evidence.)
15          MR. RINGOLD:  Ladies and gentlemen of the jury,
16  this is a stipulation of facts entered into between
17  Metro-North, the MTA, and The United Illuminating.
18          As you can see on page 2, it's been signed by
19  counsel for both sides.  I'd like to read it into the
20  record:
21          On or before March 17th, 2011, the Connecticut
22  Department of Transportation (CDOT) owned the Subject
23  Right-Of-Way.
24          On and before March 17, 2011, Metro-North
25  possessed and controlled the Right-Of-Way pursuant to its

1    agreement with the State and/or the Connecticut Department

2    of Transportation.

3              On and before March 17, 2011, UI did not own,

4    possess, or control the Right-Of-Way.

5              On and before March 17, 2011, the Connecticut

6    Department of Transportation owned Tower 1043.

7              On and before March 17, 2011, Metro-North

8    controlled, maintained, and made use of Tower 1043,

9    pursuant to an agreement with the Connecticut Department

10   of Transportation and the State of Connecticut.

11             On page 2:

12             On and before March 17, 2011, UI had leased the

13   top portion of Tower 1043, where its three-phase

14   transmission system was installed, and UI did not possess

15   or control the lower portion of Tower 1043, up to and

16   including the first two crossarms which carried

17   Metro-North transmission lines.

18             And finally, Mr. Colon does not claim to have

19   made physical contact with any portion of the

20   UI Transmission System on Tower 1043 on March 17, 2011.

21             THE COURT:  Okay.  Thank you, Mr. Ringold.

22             MR. RINGOLD:  Thank you.

23             THE COURT:  Does UI have any other witnesses or

24   evidence to present?

25             MR. REED:  No witnesses, Your Honor.  UI will

1    rest at this time.

2              THE COURT:  So UI rests at this time.

3              Ladies and gentlemen, the last inquiry is to

4    plaintiffs, whether plaintiffs have a rebuttal case to

5    present.

6              Do you have a rebuttal case to present?

7              MR. RUSH:  No, Your Honor.  Plaintiffs rest.

8              THE COURT:  Ladies and gentlemen, that's going

9    to conclude all the evidence that you're going to hear in

10   terms of documents and witnesses in the case.  What that

11   means is we go into the final phase of the case.

12             As I indicated to you yesterday, we're going to

13   continue the case and begin with our closing legal

14   instructions and the closing arguments of counsel, which

15   expect to be extensive, on Monday.

16             So at this point in time we're going to excuse

17   you for the day.  We're also going to excuse you for

18   tomorrow.  And we'll ask you to get lots of rest and not,

19   of course, to not talk about the case or do any kind of

20   research about the case or the like, all in anticipation

21   of getting back with you on Monday to have everything

22   presented to you, and the closing detailed legal

23   instructions.

24             You'll have a copy, a written copy of my legal

25   instructions.  You'll hear extensively from the lawyers

1    reviewing the evidence and making the arguments about what

2    they think the evidence shows in the case.  That will take

3    the better part of Monday to do that.  And then the case

4    will go back to you, and finally you'll be able to do your

5    deliberations in the case.

6         So that's essentially what we expect.  And

7    hopefully this comes as welcome news in the sense that we

8    had initially talked about the case going all the way

9    until the end of next week.  The good news is that it has

10   not done that, so you will have as much time as you need

11   or want to do your deliberations in the case.  There's no

12   limit on the time you take in your deliberations in the

13   case.  That's good news in terms of the schedule.

14        The other thing I want to tell you is that there

15   may be up to two of you who will be serving as alternate

16   jurors in the case.  And what that means is, for those

17   alternate jurors -- and we'll identify and tell you who

18   those will be -- is those alternate jurors would not

19   ordinarily deliberate with the other jurors in the case.

20        What they would do is, they would be on standby

21   in the event there was a problem, it could be health or

22   any other issue that affected the ability of a regular

23   juror to serve on a case.

24        What we do in this courthouse, for those people

25   selected to serve as alternate jurors, we give them their

1    own room, a meeting room, and we ask them to stay on hand,

2    essentially, in the courthouse while the other jurors,

3    members of the jury are deliberating.

4         And so the reason I'm telling you all that right

5    now is that I'm going to ask, when you come on Monday, and

6    in the event that one of you is -- or two of you are

7    designated as alternate jurors in the case and you are

8    asked to sit in a room, I want you to have something to

9    do.

10        So basically I am saying, if you've got that

11   summer reading list, if you've got a laptop computer or

12   something to work on, we'll work with you to make sure

13   that that time that you're spent waiting is used as

14   productively as possible while the other members of the

15   jury are doing that.  So we'll arrange Wi-Fi access or

16   anything like that that would help make that time

17   productive.  I wish it could be said that there were no

18   alternate jurors and we didn't have to impose on your

19   time.

20        The alternate jurors are really important to our

21   system because it does happen on occasion that a regular

22   juror -- one or more of the regular jurors is not able to

23   continue to serve.  And without those alternate jurors,

24   basically we lose the whole trial, and everybody's time

25   would have been thrown away, although we realize it

1    imposes this kind of cost on the alternate jurors.

2              So I just wanted to let you know about that, in

3    terms of bringing things to occupy yourselves for Monday,

4    in the event that you are selected to serve as an

5    alternate juror.

6              Okay.  With that, ladies and gentlemen, my usual

7    advisories.  We wish you a great long weekend, as it were,

8    and look forward to seeing you on Monday at the usual

9    report time.  Thank you.

10             (Whereupon the jury left the courtroom.)

11             THE COURT:  Please be seated.

12             I think we'll take a 20-minute recess, or maybe

13   we'll convene again at 11:00 a.m. for purposes of Mr. Rush

14   continuing his observations on what you were talking

15   about, in terms of *Maffucci* and anything else that I

16   should be keeping in mind.

17             And I will also have, by that time, an

18   opportunity to review more closely the respective parties'

19   filings that I think came in last night that I have not

20   had an opportunity to look at, but I will look at during

21   the recess.

22             So we'll reconvene at 11:00 a.m.  Thank you.

23             (Whereupon, a recess followed.)

24             THE COURT:  Please be seated.

25             At this point Mr. Rush, did you have more that

1     you want to talk about?

2              MR. RUSH:  Well, just a little.  I don't want to

3     beat a dead horse, Your Honor.  You can read *Maffucci* as

4     well or better than I can.

5              I wanted to bring your attention to really pages

6     2, 4, and 5, I guess.  Maybe it was 3, 4, and 5.

7              THE COURT:  Just so you know, I've looked at

8     that portion that you were recording extensively before

9     leading up to the *Carlson* cite, Footnote 8.

10             It seems to me, though, that the Court in

11    *Maffucci* then goes on, only after that kind of preambulary

12    language based upon *Carlson*, then goes on to say

13    essentially the standard is Section 335.  Which is a bit

14    more focused on this concept of it being a limited area of

15    land, which is not in the language that you were quoting

16    from prior to that really focused within that language.

17             So I understand why you're relying on that

18    portion.  I'm just saying it seems like the court goes on

19    and cites 335 and adopts 335 restatement.

20             MR. RUSH:  Very good, Your Honor.

21             There's some other interesting things going on

22    in *Maffucci*.  They cite to a number of cases, one of which

23    is the *Henderson* case which applied California law.  Of

24    course, under *Maffucci* we now have Connecticut law of

25    defining this.  The appellate court on page 1235

1    criticized the district court for making a distinction

2    between a near area and a far area.  And at the bottom of

3    that --

4              THE COURT:  The appellate court in *Henderson*?

5              MR. RUSH:  Yes.

6              So the short conclusion is the appellate court

7    said, yeah, you can look beyond the immediate area of the

8    pole to see if there's facts or evidence that would show

9    that there's constant intrusion.

10             And the Court on 1235 said, "The district

11   court's distinction between two areas of the missile test

12   facility, the missile test site and the water tank area,

13   is artificial and unsupported by the evidence.  No

14   physical barrier, such as a fence, separates the test site

15   from the water tank area.  The water tank area is part of

16   the facility and the subject of some public curiosity.  In

17   fact, Harmon" -- who I think is the plaintiff -- "Harmon

18   and his family drove through the facility, including the

19   water tank area, one month before the accident.  Given the

20   rampant trespassing at the missile test site, a reasonable

21   landowner would have been placed on notice that the water

22   tank area, 1000 feet away and accessible by road, was also

23   subject to unauthorized visitation.  The district court's

24   finding to the contrary is clearly erroneous."

25             That's the Ninth Circuit, 1988.

1    THE COURT:  Okay.

2    MR. RUSH:  It appears that under *Maffucci*, the

3    structure is when you're looking for -- to try to

4    determine whether there's evidence of constant intrusion,

5    I think you do look to Tower 1043 and its immediate

6    environs, but then when you're trying to determine this

7    actual and/or -- actual or constructive notice, you can

8    look way beyond.  So that's the first argument.

9    And then looking at page 4 when you look at the

10   structure, the bottom of page 4 -- well, page 4 of my

11   opinion, page 22 of Maffucci, it says, "When a trespasser

12   is harmed as a result of his or her entrance into or upon

13   a structure constituting an 'artificial condition on the

14   land,' the limited area to which the court must look is a

15   structure creating the condition.  In the present case,

16   that limited area of the land is the switchgear cabinets

17   themselves."

18   Then it goes into the discussion of this actual

19   knowledge versus constructive knowledge.

20   So just thinking about the structure, in

21   *Maffucci* it wasn't just the single switchgear cabinet.  It

22   was a bank of cabinets.  Early on in the opinion they talk

23   about a bank of cabinets.  Even in *Maffucci*, they're

24   saying it's not just the cabinet he was injured on, but

25   it's the cabinets themselves.  I'm not saying I'm sure

1   what they meant by that.  But they chose to say -- they

2   could have said "the cabinet itself"; instead, they said

3   "cabinets themselves."

4          And so it's either Tower 1043 or something

5   perhaps slightly larger than Tower 1043.

6          And then, lastly, that distinction between

7   actual knowledge of trespassers versus constructive is it

8   looks like it's at page 22, bottom of 22, "Actual

9   knowledge of trespasses on a limited area of the land is

10  not necessary if the possessor has constructive knowledge

11  of their presence."

12         And I'm not sure it's clear how far you're

13  supposed to look, but I think that's an all-facts

14  analysis, that the jury can consider all reasonable facts

15  to determine whether Metro-North had clear constructive

16  knowledge that people were likely to intrude on Tower

17  #1043.  And then all of the intrusion on Tower #1043, all

18  of the nearby pathways leading to Tower 1043, any other

19  facts regarding intrusion in that area would then be

20  relevant, I think.

21         Having made that argument, Your Honor, I wanted

22  to go back to Section 337, at least the provision I have

23  in the title it uses the words "known."  But in the body

24  of the Section 337, it uses the words "knows or has reason

25  to know" of their presence.  In the body of that

1  provision, it does not indicate that the landowner has to

2  know the exact identity of person.

3  And this issue arose in the Lin v. Metro-North

4  case in the context of Section 335.  And in that case the

5  defense argued that -- they presented a jury instruction

6  that said the plaintiff couldn't win unless the plaintiff

7  could prove that that plaintiff had trespassed constantly

8  before.  And the Connecticut Supreme Court affirmed the

9  decision but they implied that that was not the right

10  ruling but that the plaintiff's lawyer had not preserved

11  that objection to that instruction.

12  So, you know, if you just look at the body of

13  Section 337, it doesn't imply that you would know who the

14  persons are.  And it uses "persons," plural.  It says, "A

15  possessor of land who maintains on the land an artificial

16  condition which involves a risk of death or serious bodily

17  harm to persons" -- it doesn't say persons specifically

18  known, it just says to persons -- "coming in contact with

19  it is subject to liability for bodily harm caused to

20  trespassers" -- again not to known trespassers, but to

21  trespassers -- "by his failure to exercise reasonable care

22  to warn of the condition if the possessor knows" -- and

23  this ask what the "knows" attaches to -- "the possessor

24  knows or has reason to know of their presence in dangerous

25  proximity to the condition."

1          Now, I would agree that the landowner in this

2   subparagraph A would have to know that trespassers were

3   coming in dangerous proximity to the condition.  But

4   Mr. Doody testified that the entire Tower 1043 can become

5   electrified.  So the dangerous condition on that tower is

6   not just at height, it's also to the ground, if you get a

7   circumstance where the entire tower becomes electrified.

8          Subparagraph B says, "the condition is of such

9   nature that he has reason to believe that the trespasser

10  will not discover it or realize the risk involved."

11         Maybe I'm wrong, but looks like in subparagraph

12  A, "knows or has reasons to know" is attaching to the

13  trespasser's presence in dangerous proximity.  That's what

14  the known is.  It's not I know that Tommy Jones is out

15  there.  He just knows that trespassers are likely to be in

16  proximity to that.

17         That's my argument, anyway, Your Honor.

18         THE COURT:  All right.

19         MR. RUSH:  There are almost no cases

20  interpreting that.

21         THE COURT:  That provision, all right.  Thank

22  you.

23         Anything any other counsel want to direct my

24  attention to?

25         MR. FINEMAN:  I don't want to retread old

1    ground, Your Honor, because we've been over this, but I

2    did want to point out a couple of things.

3            I'm not sure why the *Lin* case keeps coming up.

4    That case really dealt with the misled invitee doctrine.

5    So I just want to make the point that I'm not even sure

6    that has anything to contribute here.

7            With respect to *Maffucci* and the cases that it

8    cites in support and actually adopts the reasoning of the

9    Ninth Circuit and the First Circuit, I think that those

10   cases really do make it clear that the limited area has to

11   be defined in connection with or in relation to the

12   dangerous condition.  And there's really no other way to

13   make sense of the *Maffucci* holding, the cases that set the

14   predicate for that holding or the cases that have come

15   after it.

16           And again, just to point Your Honor to the

17   language that we were referring to yesterday, but I don't

18   know that I gave the Court a cite, on page 563 of the

19   opinion, right after the court cites *Carlson* and says,

20   okay, you can have actual notice or you can have

21   constructive notice, it says very specifically "to prove

22   constructive knowledge, the plaintiff must prove a level

23   of knowledge equivalent to actual knowledge."  And then it

24   goes into the description of how routine and how regular

25   this must be.

1    Just to build on what I was saying yesterday, I
2  think that the instruction has to be clear to the jury
3  that when we're talking about constant intrusion, it has
4  to have been not prior intrusion, not evidence of even
5  occasional intrusion; it has to have been so frequent that
6  we would have actually known somebody -- maybe not Omar --
7  but somebody would have been on Tower 1043 or somewhere
8  very close to that at a height very close to the dangerous
9  condition at some time very close to March 2011.

10    THE COURT:  All right.  Thank you.

11    Anything else from UI at this point?

12    MR. RINGOLD:  No, Your Honor.

13    THE COURT:  Have you filed something yet with
14  respect to what you want me to instruct on the causation
15  issue between defendants and third-party defendants?

16    MR. RINGOLD:  Your Honor, as part of the initial
17  JTM, UI did submit some proposed charge and jury
18  interrogatories.  I believe one of our proposed charges
19  spoke to the element of causation for the third-party
20  claim.

21    MR. FINEMAN:  We included in our initial
22  proposed verdict form, Your Honor, and in our supplemental
23  one that we submitted last night an interrogatory that
24  deals with the claim by Metro-North against the United
25  Illuminating Company.

1    THE COURT:  Okay.  So I have what I need.

2    MR. FINEMAN:  I believe so, unless Your Honor

3    wants input from the parties in terms of a charge that

4    would be included with the rest of the substantive charge

5    dealing with where UI falls.

6    THE COURT:  I'll give it a shot and that's part

7    of what we'll have our charge conference deal with.

8    MR. RINGOLD:  Your Honor, we are working on and

9    planning on filing in the near future one additional

10   proposed interrogatory.  As Your Honor recognized in

11   ruling on the Stern motion in limine, all of this is sort

12   of predicated on the concept that Mr. Colon fell due to an

13   electrical event at all.  So we're drafting a jury

14   interrogatory to ask whether they find that at all.

15   THE COURT:  Whether he fell?

16   MR. RINGOLD:  Whether he fell as a result of an

17   electrical event as opposed to slipping or jumping or

18   anything like that.

19   THE COURT:  Anything else to take up at this

20   point?

21   MR. RUSH:  Your Honor, I assume you have

22   plaintiffs' proposed instructions filed with the JTM and

23   filed separately?

24   THE COURT:  Yes, I do.  I have your supplemental

25   one that you proposed yesterday.  But I also have

1    Document 314, which is your proposed instructions.

2              MR. RUSH:  About forty of them?

3              THE COURT:  They're lengthy, yes.  I'm

4    considering all of those in terms of the instructions I'm

5    putting together.  Okay.  And hopefully when you have a

6    copy of those later this afternoon, will be in a better

7    position to talk about that, if I've overlooked anything

8    you think I should have included in the proposed charge.

9              So let's try this.  We'll send this on to you

10   later this afternoon.  Why don't we do a charge conference

11   tomorrow at 10:30.  Is that okay?  Gives you all plenty of

12   time, I hope, to review whatever I'm going to send.

13             You're particularly smiling.

14             MR. HICKEY:  Mr. Black appears to be the

15   happiest person in the courtroom.

16             THE COURT:  Yes, Mr. Black is happy about that

17   time.

18             So we'll go at 10:30 then.  Otherwise, stand in

19   recess.  Thank you.

20                  (Proceedings adjourned at 11:14 a.m.)

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4    RE:  COLON, ET AL. V. METRO-NORTH COMMUTER RAILROAD

5              COMPANY, ET AL., NO. 3:13CV325(JAM)

6

7         I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 1685 through 1782 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                    _____/s/_____

18              DIANA HUNTINGTON, RDR, CRR
                  Official Court Reporter
19            United States District Court
                  141 Church Street
20            New Have, Connecticut 06510
                  (860) 463-3180
21

22

23

24

25