UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                 :
MILTON OMAR COLON and ARLENE     :   No. 3:13CV325(JAM)
DAVIS,                           :
                                 :
        Plaintiffs               :
                                 :
      vs.                        :
                                 :
METRO-NORTH COMMUTER RAILROAD    :
COMPANY, and METROPOLITAN        :
TRANSPORTATION AUTHORITY,        :
                                 :
        Defendants               :
                                 :
- - - - - - - - - - - - - - - - :
                                 :
METRO-NORTH COMMUTER RAILROAD    :
COMPANY, and METROPOLITAN        :
TRANSPORTATION AUTHORITY,        :
                                 :
       Third-Party Plaintiffs    :
                                 :
      vs.                        :
                                 :
UNITED ILLUMINATING COMPANY,     :
AUTHORITY,                       :
                                 :   New Haven, Connecticut
       Third-Party Defendant     :   August 18, 2017
                                 :
- - - - - - - - - - - - - - - - x
```

<u>JURY TRIAL</u>
<u>VOLUME X</u>

B E F O R E:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.,

and a Jury

Diana Huntington, RDR, CRR
Official Court Reporter

1784

1   A P P E A R A N C E S:

2

3       FOR THE PLAINTIFFS:

4           WOODLIEF & RUSH, P.A.
                3411 W. Fletcher Ave., Suite B
5               Tampa, Florida 33618
            BY:  BRIAN P. RUSH, ESQ.

6

7       FOR THE DEFENDANTS AND THIRD-PARTY PLAINTIFFS:

8           RYAN RYAN DELUCA, LLP
                707 Summer Street
9               Stamford, Connecticut 06901
            BY:  ROBERT O. HICKEY, ESQ.
                BECK S. FINEMAN, ESQ.

10

11      FOR THE THIRD-PARTY DEFENDANT:

12          LOUGHLIN FITZGERALD, P.C.
                150 South Main Street
13              Wallingford, Connecticut 06492
            BY:  CHARLES P. REED, ESQ.
14              JAMES E. RINGOLD, ESQ.

15

16

17

18

19

20

21

22

23

24

25

1                         <u>TABLE OF CONTENTS</u>

2

3                                                                  <u>PAGE</u>

4     CHARGE CONFERENCE ......................... 1786

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         **10:34 A.M.**

2              THE COURT:  Please be seated.

3              Maybe we can turn the volume down on the sound

4    system.  We're getting a lot of feedback.

5              So we're here for a charge conference in the

6    matter of Colon vs. Metro-North, et al.

7              Appearance of counsel, please, for plaintiffs?

8              MR. RUSH:  Good morning, Your Honor.  Brian Rush

9    for the plaintiffs.

10             THE COURT:  Good morning.

11             MR. HICKEY:  Good morning, Your Honor.

12   Bob Hickey from Ryan Ryan Deluca for the defendants

13   Metro-North and the MTA.  With me today again is Attorney

14   Beck Fineman.

15             THE COURT:  Good morning.

16             MR. REED:  Charles Reed of Loughlin Fitzgerald

17   for the third-party defendant The United Illuminating

18   Company.  And Mr. James Ringold with me to my right.

19             THE COURT:  Just initially, you may have heard

20   from our court reporter that there's some difficulties

21   with the sound system here.

22             So especially for Mr. Ringold and Mr. Reed, you

23   don't seem to come out very well on the sound system.  If

24   you could be very attentive to being loud so our court

25   reporter can hear, that would be great.

1          So I have circulated copies of the proposed

2     initial draft of the jury verdict form, as well as initial

3     jury instructions.  I'm sure there will be lots of

4     comments from both sides, perhaps on both of those -- or

5     all sides, I should say.

6          I wanted just to initially ask about your

7     thoughts about closing arguments.  As you know, the way

8     this is structured, I'm sure you could tell from looking

9     at the instructions, the closing argument will come after

10    I've delivered the bulk of the legal instructions in the

11    case.  That will take me a good -- take a good hour

12    probably to do that.

13         Have you all thought about how much time you'd

14    like in terms of closing arguments?

15         Maybe I'll start with you.  Mr. Rush, what do

16    you think you need in terms of a total amount of time,

17    keeping in mind that whatever time you have, the way I

18    usually do it is, I ask counsel to agree or impose a

19    particular time.  You'll obviously have a rebuttal

20    argument to make, so this would be the total amount of

21    time that you have, as divvied up between your opening and

22    closing argument and any rebuttal you'd like to make.

23         MR. RUSH:  Your Honor, I'd like to keep my

24    opening salvo of closing argument to around an hour, and

25    then about 20 to 30 minutes for the rebuttal.  I'd kind of

1    like the total of about an hour and a half.

2              THE COURT:  That sounds about right to me, in

3    terms of what would be appropriate here for plaintiffs'

4    case.

5              And, Mr. Hickey, thoughts?

6              MR. HICKEY:  Our meeting with Mr. Fineman and

7    our collective estimate is, we should probably be in the

8    range of 45 minutes to an hour.  I would maybe ask

9    Your Honor for an hour.  No harm done if it's shorter than

10   that.

11             THE COURT:  I think that's fine.

12             And, Mr. Reed?

13             MR. REED:  I would say, Your Honor, half an hour

14   to 45 minutes from our standpoint.  So less, probably,

15   than the third-party plaintiffs.

16             THE COURT:  Okay.

17             MR. RUSH:  And I have -- our lawsuit is against

18   Metro-North and MTA --

19             THE COURT:  Right.

20             MR. RUSH:  -- but the defendants appear to have

21   a unified defense.  So if -- I don't know how we're going

22   to handle this, but if Mr. Reed's going to have an

23   extensive attack on the plaintiff, which I'm afraid he

24   might have, then I might have to respond to that also.  I

25   don't know how we're going to do that exactly because my

```
 1    focus is over here, but on my flank I'm getting shot at.
 2              THE COURT:  I imagine, Mr. Reed, you're going to
 3    try to show there should be no liability at all?
 4              MR. REED:  Yes, I will.
 5              THE COURT:  That's within the realm of
 6    essentially trying to defeat the claim, the
 7    indemnification claim.
 8              MR. REED:  Yes.
 9              THE COURT:  So it strikes me that if you want up
10    to 45 minutes to make your case, and Mr. Hickey wants up
11    to an hour, then I would allow plaintiffs a total of
12    one hour 45 minutes --
13              MR. RUSH:  Very good, Your Honor.
14              THE COURT:  -- in terms of overall parody.
15              MR. REED:  That seems fine.
16              THE COURT:  I know it might be less than that,
17    but I'll do that.  Okay.
18              All right.  And so I will ordinarily, unless for
19    some reason something odd happens, usually will advise
20    counsel when they're getting close to those time limits.
21    I do expect counsel to adhere to those time limits.
22              Okay.  All right.  So on the jury instructions,
23    I'm sure that parties noticed there's at least one
24    disconnect there between the instructions and the jury
25    verdict form.
```

1        As I was drafting the instructions, I had

2   thought the defendant's theory as to MTA was that MTA,

3   that the evidence would satisfy -- the evidence as to all,

4   essentially, five elements of the negligence constant

5   intrusion claim, not only as to Metro-North but also as to

6   MTA.

7        And I saw that when I looked at the plaintiffs'

8   proposed jury verdict form that essentially plaintiffs

9   have proposed a jury verdict form that contemplates the

10  negligence claim elements being considered first against

11  Metro-North, and then a secondary consideration of whether

12  MTA should be liable on a joint-venture theory.  So if

13  that's the case, it seems to me it's a much cleaner way

14  for the jury to consider the issues in the case.

15       Then I would plan to modify what is in the

16  proposed jury instructions now, to make clear that, as to

17  those five elements for the constant intrusion claim, that

18  the jury's just looking at Metro-North there, and then

19  they're considering secondarily whether MTA was in a joint

20  venture.

21       And I've obviously provided instructions on

22  that.  So that's kind of the one, I think, real

23  discrepancy between -- maybe you found others -- between

24  the jury instructions and the jury verdict form.  Unless

25  there's going to be concern about that, I would basically

1    clean that up in the jury instructions to make clear that

2    they're just looking as to the five elements for the

3    constant intrusion claim as to Metro-North and, secondly,

4    looking as to MTA under a joint-venture theory, okay?

5           Any concerns there?

6           MR. RUSH:  No, Your Honor.

7           THE COURT:  Great.  All right.

8           So what I usually do with the jury instructions

9    is, I go pretty much page by page, understanding that most

10   of the concerns will be with respect to the liability, the

11   specific liability provisions, but perhaps there will be

12   concerns as to damages instructions as well.

13          The very first page on page -- it starts on page

14   3, are there any concerns there; it's boilerplate

15   introducing the case?

16          MR. RUSH:  No, Your Honor.

17          MR. REED:  No, Your Honor.

18          MR. HICKEY:  No.

19          THE COURT:  And then page 4 -- and just because

20   this is a conference, I don't expect counsel to stand

21   every time they address the Court.  Consider it more

22   informal.

23          Page 4, are there other issues as far as burden

24   of proof?  I tried to make clear what the burden is, and

25   there's an exception insofar as the defendants will have

1    the burden of proof on contributory negligence.

2              MR. REED:  Your Honor, I would suggest that it

3    would be appropriate to add at the end of the paragraph

4    words to the effect of, "Likewise, third-party plaintiffs

5    MTA and Metro-North will also carry the burden of proof to

6    establish by preponderance of the evidence the elements of

7    their claims against UI."

8              I think what we found missing was a clear

9    statement that there is a burden of proof that must be met

10   in the context of the third-party claim.

11             THE COURT:  Sure.

12             MR. REED:  That's one place to put it.  It

13   seems, since it's under the overall heading of burden of

14   proof, that would be a good place.

15             Later the charge -- and I don't mean to get

16   ahead of us --

17             THE COURT:  Let's not go later yet.

18             MR. REED:  Okay.

19             My suggestion would be that an appropriate place

20   to make a one-sentence mention of the burden of proof that

21   applies in the third-party case would be at the end of the

22   first paragraph under burden of proof, just to make sure

23   the jury has the understanding that the burden of proof

24   applies in that context as well.

25             THE COURT:  Right, right.

1        And I also think I need to make clear that we're

2   not asking the jury here -- I don't think you're asking me

3   to ask the jury to render a verdict in the claims that you

4   have, the third-party claim.

5        You're asking the jury just to answer one

6   special interrogatory, aren't you?

7        MR. REED:  That's right.  I can get to that

8   issue now or later, as it relates to the structure of the

9   jury verdict form, but I would agree with Your Honor's

10  statement that it's going to ultimately be submitted to

11  the Court for adjudication, the interpretation of an

12  application of the indemnity provision under any number of

13  different scenarios that might flow from the outcome of

14  the main case.

15       THE COURT:  I think I just need to build in

16  something that's going to be making clear to them that, as

17  to the cross -- or the third-party claim, all they're

18  being asked to do is answer one question and not otherwise

19  render a verdict because there will be additional issues

20  that I would separately address.

21       MR. REED:  Yes.

22       THE COURT:  So we'll figure out a way to put

23  that in.

24       And insofar as I'm talking about making

25  amendments and things like that, what you should know is,

1    following this conference, the first thing we'll do is go

2    back to chambers and incorporate those, and send those out

3    to counsel one more time, and for any further comment or

4    thoughts that you might have, with the view that if

5    there's reason why it needs to be amended yet again, the

6    Court will do that.  You'll know, obviously before I give

7    instructions, exactly what it is that I will be

8    instructing the jury.

9             Okay.  Other than that comment, anything else on

10   page 4?

11            MR. RUSH:  No, your Honor.

12            MR. HICKEY:  No, Your Honor.

13            MR. REED:  No, Your Honor.

14            THE COURT:  Page 5?

15            MR. RUSH:  Your Honor, the only change I would

16   request is, at the bottom of page 5, you use the phrase

17   "very limited."  I would ask you to take out "very

18   limited" and put in "certain."  I understand you may not

19   want to do that.

20            MR. REED:  I'm sorry, where is that?

21            MR. RUSH:  Three lines from the bottom, "very

22   limited circumstances."  The limitation of the rule is

23   what it is, as opposed to just drawing their attention to

24   how -- sort of that it's very limited.

25            Of course, it's intrusion within a limited area,

1   so maybe that's why the Court has that.

2         THE COURT:  Okay, I'm going to do that.  I think

3   it's clear.  I'll substitute "certain" for "very limited."

4         Okay.  Then page 6, anything?

5         MR. HICKEY:  In the fourth line down, in the

6   first paragraph about plaintiff Omar Colon, it's just

7   nitpicky that I think it should be "controlled" instead

8   of --

9         THE COURT:  Great.  Nitpicky is welcome.  That's

10   fine.

11         Anything else, page 6?

12         MR. HICKEY:  Your Honor, actually, that -- I

13   think that's the first time we might be presented with the

14   issue of whether the property was owned, managed, or

15   controlled by the MTA.  Because if the plaintiff is just

16   going to proceed on the theory that the MTA is responsible

17   as a co-party to a joint venture, we, meaning Metro-North,

18   has admitted through the course of this trial that

19   Metro-North possessed, controlled, managed, the

20   right-of-way, and the MTA did not.

21         So I wonder if that's the beginning of where we

22   should alter the charge to be clear that it is just based

23   on Metro-North's possession and control, not the MTA's

24   joint possession and control.

25         Because I don't think that's the issue.  If the

1   plaintiffs are only pursuing the joint venture, I don't

2   think they would be harmed by that clarification.

3         MR. RUSH:  Your Honor, I still think that the

4   jury could rule that the MTA has exerted management or

5   control over the right-of-way by virtue of their police

6   presence.  So to that extent, we would argue that the MTA

7   could be liable because they've exerted control.

8         THE COURT:  Well, it might be --

9         MR. RUSH:  Of course, that might be evidence of

10   the joint venture also.

11         THE COURT:  It seems like -- you're kind of

12   either in on this -- you have to kind of decide.  Are you

13   trying to prove every single one of these five elements as

14   to the MTA and Metro-North, or to go the joint venture

15   route?  Otherwise, if you do that, you're complexifying.

16         MR. RUSH:  Yes, it's really the latter, just as

17   long as we can argue that their police patrols are

18   evidence of their joint venture --

19         THE COURT:  Sure you could.

20         MR. RUSH:  Part of that joint venture is to

21   control or manage the --

22         THE COURT:  I assume you'll go through the

23   finances and all that sort of thing.

24         MR. RUSH:  That's okay.

25         THE COURT:  So we'll modify the language

1  essentially, again, as to all five elements to make clear

2  that the jury is looking just at Metro-North, okay, and

3  not at the MTA, okay?

4          We'll kind of go through and make that clear.  I

5  think the instructions will be a lot easier and clearer

6  for the jury to understand if they can focus on that.

7          Are there other suggestions on page 6, other

8  than making clear it's referencing just Metro-North as the

9  potential possessor of the land or the property?

10          MR. RINGOLD:  Your Honor, I just -- I wonder

11  whether in the second full paragraph on page 6, where it

12  begins, "The second thing," is that there's no dispute

13  that Mr. Colon was trespassing on the railroad

14  right-of-way at the time that he was injured, I wonder if

15  it would make sense to clarify that there's no dispute

16  that he was trespassing on the right-of-way or on the

17  tower when he was injured.  I don't think -- it's

18  certainly not disputed, but whether that --

19          THE COURT:  Maybe it could say on Metro-North's

20  property.  Would you be okay with that?

21          So we'll change it to say, "On Metro-North's

22  property."

23          MR. HICKEY:  It's technically owned by the State

24  of Connecticut.

25          THE COURT:  That's right.

 1          MR. FINEMAN:  What if we just said Mr. Colon was

 2    trespassing at the time?  What if we just took out that

 3    phrase altogether?

 4          THE COURT:  I'm sorry?

 5          MR. FINEMAN:  What if we just kept out the

 6    phrase altogether in terms of location and just said

 7    there's no dispute that Mr. Colon was trespassing at the

 8    time he was injured?

 9          MR. RUSH:  You could say "upon the property that

10    Metro-North admits that it controlled."  Leave it the way

11    it is, put a comma after "property" -- well, there is a

12    comma after "property" on page 6, and just say "which

13    Metro-North admits it controls."

14          THE COURT:  Or it could be "on property

15    controlled by Metro-North at the time he was injured."

16          MR. RUSH:  Yes, Your Honor.

17          THE COURT:  Would that be okay?

18          MR. RINGOLD:  This is in the second full

19    paragraph that begins, "The second thing"?

20          THE COURT:  Yes.  So take out the words "the

21    railroad right-of-way," and say "property controlled by

22    Metro-North."

23          MR. RINGOLD:  Thank you.

24          THE COURT:  Anything else on page 6?

25          That gets us to page 7.  As you can see,

1   obviously I've tried to lay out what I consider to be the

2   five elements of the constant intrusion claim there.  And

3   these elements here that are stated in kind of a summary

4   fashion there would be essentially what the jury would be

5   referencing at the time when they're doing their verdict

6   form and making specific findings.

7           As you know from the verdict form, essentially I

8   framed special interrogatories as to each of the elements,

9   whether they've found that they've been satisfied or not.

10  So I tried the best I can, essentially, to explain what

11  these elements are in light of either the undisputed

12  evidence or what the parties' contentions seem to be in

13  the case.

14          So are there any issues on page 7?

15          MR. REED:  Your Honor, at the top, last line of

16  the carryover paragraph from the preceding page, the

17  sentence is, "particular part of the property near where

18  the hidden danger exists."  Later on, that same concept is

19  expressed as "dangerous proximity to" -- and actually on

20  the same page under Subparagraph 3, "Knowledge of Prior

21  Constant Intrusion," "dangerous proximity."

22          THE COURT:  And I used that phrase.  I'm happy

23  to make that change to be consistent and not create an

24  apparent inconsistency, subject to any objections to the

25  use of the word "generally" and "in dangerous proximity,"

1    and we may get to that.

2         MR. RUSH:  Yes, Your Honor.  It seems like all

3    of these pages have to be sort of read together.  And

4    later on, you talk about circumstantial evidence regarding

5    property that's near.  So we should be able to use both of

6    those phrases as we go through this process, otherwise

7    it's going to tilt.

8         THE COURT:  Well, I guess the question is here,

9    on this page 7, are there specific language text

10   suggestions or concerns or objections that you want to

11   raise?

12        MR. RUSH:  Well, I guess we would argue to leave

13   it the way it is or make it "near or in dangerous

14   proximity," if you want to use both of the phrases.  With

15   the later direction to the jury that they can consider

16   circumstantial evidence, it's sort of -- those issues are

17   somewhat merged in terms of them doing their job.

18        THE COURT:  I do think that replacing, at the

19   top of page 7 on the second line, the word "near" with the

20   term, "in dangerous proximity" is consistent with the

21   standard that the instructions set forth.

22        And that's separate from the circumstantial

23   evidence point which I'm sure we'll get to when we talk

24   about Element Number 3.

25        Any other suggestions, concerns, objections, to

1   page 7?

2            MR. HICKEY:  It's just a matter of, I guess, the

3   order that the jury's going to be instructed.  We had

4   thought that the elements of proof first required the

5   constant intrusion, the trespassing, and then an analysis

6   of what is triggered after that.  I think that's the way

7   the restatement is laid out, is that once the constant

8   intrusion is proved, then you drop down.

9            So it's perhaps a nitpicky reversing of Items 2

10  and 3, but if Your Honor's comfortable with the order,

11  then that's fine.  I think everything is here.

12           THE COURT:  I am very comfortable with the

13  order.  I thought hard about that.  You're right, the

14  restatement says that, puts them in that order.  The

15  Connecticut model instructions also put them in that

16  order.

17           The concern I have is that when you look at the

18  standard that is put forth for the limited area of land, I

19  think their understanding of what that limited area -- of

20  the property, I should say, limited area of the property

21  is informed by having thought about what it is, the nature

22  of the hidden danger that's present here.  Because limited

23  area of the property is defined essentially as that area

24  that's in dangerous proximity to where the hidden danger

25  existed.

1          So if we're asking the jury to assess where the

2   hidden danger is, I'd rather them make a finding first

3   that there was a hidden danger, if they're going to make

4   that finding.  We don't know.

5          And then if they've done that and found that

6   necessary under Element 2, then they will, I think, better

7   understand and be able to apply Element 3.

8          So I understand the concern, but I did

9   intentionally flip those.

10         Okay.  Anything else page 7?

11         Ready for page 8?

12         Okay, page 8?

13         MR. HICKEY:  So again, in the very first

14   sentence, is that where we will alter it to not say the

15   MTA individually?

16         THE COURT:  There won't be anything about MTA in

17   the first five elements.

18         MR. HICKEY:  Okay.

19         THE COURT:  We'll only get to the MTA when we

20   get to the joint venture instruction.

21         Now, the first element, if it's not going to be

22   disputed by MTA that it is the possessor -- I'm sorry,

23   Metro-North, I keep misspeaking -- Metro-North, that it's

24   the possessor, that element can probably be simplified.

25         MR. HICKEY:  We would have no objection to that,

```
 1     Your Honor.  We clearly admitted it during the trial, and
 2     we're not going to argue that we did not possess and
 3     control Tower 1043.
 4               THE COURT:  I'll rewrite that to say that that
 5     is not in dispute in this case.
 6               MR. HICKEY:  We have no objection to that.
 7               THE COURT:  The second element description runs
 8     from page 8 to the first half of page 9.
 9               MR. REED:  Your Honor, do you wish us to address
10     comments with regard to the first paragraph of page 9?
11               THE COURT:  Yes, anything you have to say about
12     the second element would be helpful.
13               MR. REED:  Fair enough.
14               I have a comment on line 5 of the first
15     paragraph on page 9 where it's stated, "Mr. Colon,
16     however" -- line 4 -- "contends that there was a hidden
17     danger in the form of unseen static electricity in the air
18     around the high-voltage wires" -- and this is where I have
19     an issue -- "that surprised him and caused him to fall."
20               He did not say he was surprised.  I think it's
21     an inference that he was taken by surprise by whatever
22     sensation he felt.  And he could not say -- and it's an
23     issue in the case -- that whatever he felt caused him to
24     fall.
25               That's also an inference that can be made from
```

1    the facts that have been presented in the case subject to

2    the dispute that has been brought forth in the examination

3    of witnesses.

4            So I would object or express a concern of the

5    portion of that sentence that begins after high voltage

6    wires "that surprised him and caused him to fall."  I

7    think a way of making it more neutral, if we pardon the

8    use of the passive voice, we could say, "the air around

9    the high voltage wires which is claimed to have caused him

10   to fall and contact the high voltage wires that were below

11   him."

12           THE COURT:  There's a difference between what

13   his contention is in the litigation versus what his

14   testimony is, right?

15           I think I was referring to what the contention

16   of the claim is in the case.  I understand that he -- I

17   guess he didn't say it surprised him, didn't use the word

18   "surprise," at least as I recall.  Maybe he did.

19           Mr. Rush, do you have thoughts on this?

20           MR. RUSH:  Not directly.  I think Dr. Stern

21   talked about contracture of muscles and letting go and

22   things like that; that one suffers either a static shock

23   or micro arc, the effect could be to startle you.

24           So I do think there's evidence that the natural

25   muscular reflex would be to be startled and to release.

1    We could be even more specific than "surprised."  We could

2    say, "startled and caused him to release his hold,"

3    something like that.  I'm not suggesting we do that.

4            I also wanted to mention that it is quite true

5    that Dr. Stern, I think, does not believe that he was

6    struck by an arc from the UI line.  He could have been

7    struck by both static electricity or a micro arc from the

8    sort of combination of the Metro-North lines, et cetera.

9            Again, I'm not directly involved in their fight.

10   I'm just saying that it was more likely than not,

11   according to the expert, static shock.  It could also have

12   been a micro arc originating from Metro-North, or

13   potentially a combination.

14           But it was clearly not a full-scale arc from UI.

15   He would have been probably knocked clear of the tower if

16   he received a full blast from 115,000 volts.  He does have

17   wounds all over his body from electricity, some of which

18   are quite severe.  So he could have been hit by a micro

19   arc.

20           I mention that because it's not just static

21   electricity potentially, although that's what the expert

22   said.  Of course, the jury could say, "No, we think it's a

23   micro arc."  Clearly it was not a full arc.

24           THE COURT:  I guess it's important.

25           Are you going to be arguing something other than

```
 1   static electricity?

 2            It's what your expert said.  Why would you be up

 3   there saying, "You don't have to listen to my expert, it

 4   could be something else."

 5            MR. RUSH:  It's Friday, so I don't expect to do

 6   that.  Sometimes I have these brilliant ideas, sometimes

 7   they're not very brilliant, on Sunday.

 8            THE COURT:  I just -- I mean....

 9            MR. RUSH:  I'm going to leave it at static

10   energy, Judge.  That makes it cleaner and easier.

11            THE COURT:  It now says "unseen static

12   electricity" in the air.

13            MR. RUSH:  Yes.

14            THE COURT:  You're all right with that term?

15            MR. RUSH:  Yes, I am.

16            THE COURT:  I'll take out the word "surprised

17   him" -- I'll take out the words, "surprised him and."  But

18   it's clear he has to say it caused him to fall.  That's

19   clearly his contention in the case, this static

20   electricity somehow caused him to fall and contact the

21   high voltage wire below him.

22            MR. REED:  I have no objection to that.  The

23   word "surprise" seemed to me to be --

24            THE COURT:  I understand.  But the cause part is

25   very important here because that's a core part of this
```

 1   element.

 2          MR. HICKEY:  For the record, Metro-North has no

 3   objection to the removal of the three words "surprise him

 4   and."

 5          THE COURT:  Anything else on the second element?

 6          That gets us to the third element, page 9, and

 7   goes on and on, right up to the middle of page 11.

 8          MR. RINGOLD:  Yes, Your Honor.

 9          Under the first paragraph at the very end of the

10   third element, Your Honor describes the standard as

11   "experience does not reasonably put a defendant on notice

12   of a likelihood that trespassers would intrude in

13   dangerous proximity to the hazard that injured the

14   plaintiff."

15          I would say, under *Maffucci*, that's not quite

16   what I would understand the standard or from the rest of

17   Your Honor's charge to be.  We would suggest something

18   along the lines of, "on notice that the presence of

19   trespassers is to be expected."

20          It's not simply a likelihood or a possibility of

21   trespassers, but it's a relatively high standard that

22   their presence is to be expected.

23          MR. RUSH:  Does that follow the more likely than

24   not, the likelihood issue, or not?

25          THE COURT:  So we're looking -- make sure we're

```
 1    looking at the last sentence on the last full paragraph of

 2    page 9.

 3             MR. RINGOLD:  Yes, Your Honor.

 4             THE COURT:  What's the request for wording

 5    change?

 6             MR. RINGOLD:  To replace the words "a likelihood

 7    that trespassers" with something along the lines of "that

 8    the presence of trespassers is to be expected," then

 9    continuing on, "in dangerous proximity to the hazard that

10    injured the plaintiff."

11             So "would intrude in" also would be getting

12    removed.  Just to clarify that the notice is not simply of

13    a likelihood of trespassers are a possibility, but that

14    they are expected as a result of the constant intrusion.

15             THE COURT:  So could it simply say "does not

16    reasonably put a defendant on notice that trespassers

17    would be expected to intrude in dangerous proximity"?

18             MR. RINGOLD:  Exactly.  That gets rid of some

19    passive voice.

20             THE COURT:  Mr. Rush, are you okay with that?

21             MR. RUSH:  I don't have a strong feeling,

22    Your Honor.

23             THE COURT:  Okay.  So we'll take out the words

24    "a likelihood," and substitute the words "be expected to"

25    in between the words "would" and "intrude."
```

```
 1          MR. RUSH:  The only thing I would say,
 2   Your Honor, the burden of proof is always more likely than
 3   not.  So you could remove "a likelihood," and say "more
 4   likely than not that the trespassers would be expected to
 5   intrude," and that would carry both concepts.
 6          MR. HICKEY:  Your Honor, I think that's not
 7   correct.  Under Maffucci, the constructive knowledge has
 8   to be equivalent to actual knowledge.
 9          THE COURT:  I'm not sure -- this isn't about
10   burden of proof so much as what the actual proof is.  So,
11   okay, I'll make that change there.
12          And then spilling over onto page 10, as you can
13   see, I tried to frame this --
14          MR. HICKEY:  I'm sorry, Your Honor, before you
15   went to 10, the very last line on 9 says, "constant
16   intrusion near where" -- and is that where we would stay
17   consistent and say "in close proximity to the hidden
18   danger," going back to the very --
19          THE COURT:  Right, "in dangerous proximity to."
20   Okay.
21          And corresponding change at the top of page 10
22   for the word "near."
23          Then you can see on page 10 and 11, I tried to
24   flesh out just what the standard is for both the actual
25   constant intrusion and the knowledge, either actual or
```

1   constructive, of the constant intrusion, defining what

2   that limited area is with as much specificity as I thought

3   I could, in relying on the language from *Maffucci*, and

4   especially the language that *Maffucci* approves of from the

5   *Bennett* case in the First Circuit, which uses the

6   terminology of "a dangerous proximity."  All right.

7           So, Mr. Rush?

8           MR. RUSH:  Your Honor, I wonder if you might

9   change the word, it's in the first full paragraph, the

10  very last sentence, where it says "someone could have been

11  impacted," and change that to either "affected" or

12  "shocked" by static electricity.  Impact is closer to arc.

13          THE COURT:  Affected or shocked?

14          MR. REED:  I would object to shocked.  I think

15  that that's not in evidence.  The interpreter was very

16  precise when Mr. Colon was testifying that the correct

17  interpretation of his initial description was he was

18  impacted.  I think "impacted" is the correct word.  I

19  wouldn't object to "affected by," but "shocked" I would

20  object to.

21          MR. RUSH:  And just to be clear, Your Honor, I

22  don't think Mr. Colon's testimony controls the legal

23  instruction.  And static electricity does shock.  That's

24  what it does.  Everybody sort of knows that that's what

25  happens when you get a jolt of static electricity.

1            THE COURT:  So I'm going to take that change, I

2   agree.  It could be affected or shocked.

3            Okay, any other suggestions, objections or

4   comments on page 10?

5            That gets us to page 11.

6            MR. HICKEY:  Your Honor, on page 11, the last

7   sentence of the first full paragraph that starts with,

8   "But you may consider"?

9            THE COURT:  Yes.

10            MR. HICKEY:  Respectfully, it's just a little

11   confusing to us exactly -- I think I understand what the

12   charge is trying to do there, which is to say that the

13   jury does not have to forget about the activity on the

14   ground if they choose to believe that it's been proven,

15   but I'm not sure that they understand how to use that.

16            This almost suggests that they could use that to

17   infer that there would be trespassing up near the wires.

18   I just think it needs to be fleshed out a little bit more,

19   or perhaps I'm not understanding it exactly.

20            THE COURT:  I think you're understanding.  That

21   is exactly what I'm trying to do, is to make clear that

22   trespass on other areas outside of the so-called limited

23   area, that is the dangerous proximate zone, is not

24   irrelevant to the case, it's actually relevant.  It's

25   circumstantial evidence that there may have been, as I've

1    framed it here, further intrusions that occurred.

2              And I think that the jury could possibly look at

3    that evidence of trespass in other areas, combined with

4    the Doody testimony that we've talked much about, and

5    circumstantially try to draw an inference there about

6    knowledge and actual constant intrusion.

7              So that's what I'm trying to say.  If you have

8    better wording that makes that point, happy to do that.

9    But that's the aim here, is to make clear to the jury that

10   that other evidence is at least relevant, but certainly

11   not -- and I do say this quite clearly, it does not by

12   itself directly establish that there were intrusions.

13             MR. HICKEY:  That's fine.  Perhaps it's

14   somewhere else.  In other cases I've done, there's been a

15   brief definition of an inference in the legal context,

16   which means an inference must be reasonably probable, not

17   just likely.  So if that's --

18             THE COURT:  Okay.  And so I think I probably did

19   that in our opening instructions, but maybe because of the

20   importance of that issue here, I could add an inference

21   instruction at another point in the charge.

22             MR. HICKEY:  I think that would help.

23             THE COURT:  So for instance, at the top of

24   page 20, I talk about there, the law making no distinction

25   between direct and circumstantial evidence.  I could

 1  probably add something there about inferences and how they

 2  must be based upon --

 3            MR. HICKEY:  Yes.

 4            THE COURT:  -- reason and not speculation.

 5            Anything else for the third element?

 6            MR. REED:  Yes, Your Honor.

 7            First full paragraph on page 11, 8 lines down,

 8  "proximity to any zone of static electricity."  I don't

 9  think we need necessarily the word "zone."  I think it's a

10  conclusion to be reached based on the evidence --

11            THE COURT:  Okay.

12            MR. REED:  -- that there was a zone.  So perhaps

13  we can say "proximity to any static electricity."

14            THE COURT:  Okay.  That's consistent with the

15  usage elsewhere.  I'll take that change.

16            MR. REED:  Thank you.

17            THE COURT:  Anything else on the third element?

18            MR. RUSH:  You're deleting the word "zone of"?

19            THE COURT:  Taking out "any zone of," yes.

20            MR. RUSH:  Thank you.

21            THE COURT:  Just "zone of," pardon me.  I'll

22  leave the word "any."  So it's "proximity to any static

23  electricity."  I don't want to suggest there was static

24  electricity.  It's a matter of dispute.

25            Okay, fourth element, which is page 11 to top of

 1    page 12?

 2            MR. RINGOLD:  Your Honor, I'm sorry to double

 3    back.  Could I make a point to Your Honor in the third

 4    element?  Just sort of the entire discussion of the

 5    circumstantial evidence and what can be inferred and

 6    everything like that.

 7            Your Honor had previously relied on language

 8    from *Bennett*, one of the cases that the *Maffucci* court

 9    relied on.  I would just note that they also quote the

10    *Foster* court, the Alabama decision.  The language that the

11    court found compelling there was:  "Evidence that the

12    defendant might have had reason to know that people were

13    in the area and near the tower, there was no evidence from

14    which a fact finder could infer that the defendant had any

15    reason to know that people might be climbing the tower."

16            I question whether *Maffucci* recognizes that even

17    that inference can be drawn at all.  I recognize this case

18    isn't *Foster* but --

19            THE COURT:  Different facts here.  I still think

20    it's relevant that there were intrusions elsewhere on the

21    property.  And I'm making very clear that that alone will

22    not satisfy the burden of proof, those other

23    out-of-the-limited-area intrusions do not, alone, satisfy

24    the burden of proof, but they're relevant.

25            MR. RINGOLD:  Thank you, Your Honor.

1    MR. HICKEY:  Your Honor, on the top of page 12,

2    the first paragraph, we're fine with what is there, but

3    we're asking, given the evidence in the case, for an

4    addition to that paragraph, you know, in which Your Honor

5    would affirmatively charge the jury that:  You have heard

6    evidence in this case of fencing, anti-climbing devices,

7    failure to post no trespassing signs.

8    And under the facts of this case, those are all

9    irrelevant.  The railroad had -- they're irrelevant.  The

10   railroad -- the only duty here is the duty to warn.  There

11   is no duty to fence or install anti-climbing devices.

12   THE COURT:  I say that, I think.

13   MR. HICKEY:  What's that?

14   THE COURT:  I think I said that "a possessor of

15   the property does not have a further duty to prevent

16   trespassers from encountering danger by maintaining

17   constant police patrols, by building fences, or by

18   constructing other physical barriers."

19   So they know that they've heard evidence on

20   that.  It's a matter for argument.  You have something

21   there, in light of the fact that the case is just

22   proceeding on the constant intrusion theory.  I think you

23   have a very clear way to say --

24   MR. HICKEY:  Okay.

25   THE COURT:  -- in your own arguments that:  You

 1   may have seen evidence in this case, but the Court's

 2   instructions will have made very clear to you that the

 3   issue is the reasonable duty to warn and not to fence off

 4   or the like.  And I think the evidence was properly

 5   admitted at the time as long as the case was proceeding on

 6   a wider theory, but that that theory is no longer in the

 7   case.

 8             MR. REED:  Just for the record, as to that, I

 9   understand Your Honor's ruling there, but I would join,

10   for the sake of the record, Metro-North and the MTA on

11   what they said with regard to the fencing issues.

12             THE COURT:  Well, I'm not sure what the

13   suggestion was, other than to say, "You've heard evidence

14   of this."  Why the need to remind them that they've heard

15   evidence?

16             MR. HICKEY:  Well, because they heard so much

17   evidence that, arguably, had the case been trimmed down

18   before, never would have been admitted.  I just think,

19   because it was a constant theme of the plaintiffs in the

20   case, that it warrants an affirmative charge:  You did

21   hear this evidence, and I'm instructing you that it is

22   irrelevant to the case because the only duty here is to

23   warn.  That's all.

24             THE COURT:  Okay.  I'm satisfied with the

25   language here that makes that clear enough.

1           Okay.  Fifth element, anything on the fifth

2   element?  That's the middle of page 12.

3           Hearing nothing, that gets us to the bottom of

4   page 12, which starts off with the Corporations as Party

5   Defendant instruction, running over onto 13.

6           Anything there?

7           MR. REED:  Your Honor, I would suggest that the

8   word "artificial" might be able to be deleted, and so that

9   that sentence would read, "with respect to a defendant

10   that is a legal entity such as corporation rather than a

11   natural person."

12           THE COURT:  I'm fine with that.

13           Anything else on the corporations instruction at

14   the top of page 12 -- or bottom of 12, top of 13?

15           Then on the joint venture instruction, I think,

16   in light of our discussion, the first paragraph of that

17   would come out altogether.

18           MR. HICKEY:  Yes, Your Honor.  In the paragraph

19   that begins "If, therefore," it ends with "and vice

20   versa."

21           THE COURT:  Absolutely.  So it should not be

22   vice versa anymore, because the theory is clearer now.

23           MR. HICKEY:  Yes.

24           THE COURT:  So take out the words "and vice

25   versa."

1           MR. HICKEY:  So the MTA could be responsible for

2     Metro-North's purported failures but not the other way

3     around, we hope, right?

4           THE COURT:  Yes, I think that's the theory.  The

5     MTA is not being charged with the five elements, initial

6     elements.

7           Anything else on page 13?

8           Anything on the rest of the joint venture

9     instruction running over to the top of page 14?

10          Okay.  That gets us to the Affirmative Defense –

11    Contributory Negligence, which is subject of pages 14

12    and 15.

13          MR. HICKEY:  Your Honor, this is one of the

14    major items that we'd like to speak with you about today.

15    At the bottom of page 14, you reference the reasonably

16    prudent person.  And as Your Honor knows, this case was

17    substantially longer and substantially filled with efforts

18    to convince the jury that Mr. Colon suffers from some

19    peculiar deficiencies peculiar to him as opposed to the

20    reasonable person standard.

21          While this charge does say that that's the

22    standard against which he should be measured, I think just

23    by the sheer volume and efforts by the plaintiffs in this

24    case to establish a diminished mental capacity or ability,

25    I think in a vacuum it's insufficient to let this jury

1    know that -- and I don't know if Your Honor wants to let

2    them know that that evidence was admitted in reference to

3    claims that are now not before them, or how Your Honor

4    wants to do it, but that would probably be the single

5    greatest thing that we would ask you for today, is a

6    specific charge talking about how that evidence came in,

7    at the time it was appropriate, but now it would be

8    inappropriate for them to consider that, and it must be

9    measured against a reasonable person standard.

10           THE COURT:  I certainly don't agree that the

11   evidence was not otherwise admissible in the case,

12   concerning his mental condition.  I would have admitted

13   the mental condition evidence for other purposes in terms

14   of what he perceived and his ability to perceive, his own

15   account of what happened on the tower itself.

16           So I don't want to suggest here that somehow the

17   jury should altogether be ignoring evidence that's come

18   in.  But I do understand the other concern, which is that

19   the jury might think that they should just look at whether

20   his own personal capacities, rather than looking at, as

21   the instruction says, whether a reasonably prudent person,

22   what a reasonably prudent person -- it's an objective

23   standard.

24           Mr. Rush, do you have views on this?

25           I know that you have, and defendants have

1   requested for the Request Number 10, I think, in their

2   supplemental proposed charges filed on August 16, I see

3   the language you proposed there on that.

4          MR. RUSH:  Defendants' Request 10?

5          THE COURT:  It's defendants' Request Number 10.

6   It's their second --

7          MR. RUSH:  I don't have a copy of that right

8   now, Judge.

9          MR. HICKEY:  We're looking right now.  We'll

10  provide Mr. Rush a copy.

11         THE COURT:  I don't know if you have an extra

12  copy there.

13         MR. RUSH:  Standard of care applicable to

14  plaintiff?

15         THE COURT:  That's right.

16         I'm quite sure that I would not adopt the

17  language in that second paragraph there, of the second

18  sentence which states that evidence pertained to a claim

19  that is no longer in this case.

20         But overall, Mr. Rush, I'd like to know your

21  views on whether the contributory negligence standard is

22  an objective one that looks at what the reasonably prudent

23  person would do; and if it is so, why the Court doesn't

24  say that, notwithstanding evidence in the record

25  concerning Mr. Colon's limited mental abilities, for

1    purposes of contributory negligence is what a reasonably

2    prudent person would have done.

3            MR. RUSH:  The first thing I think, Your Honor,

4    is, I'm not sure that in the context of contributory

5    negligence it's the same standard.  That is, at least I

6    would make the argument that, in this case, we're not

7    talking about -- a negligence claim is always going to be

8    a reasonable man standard.  Maybe it's appropriate to do

9    that for contributory negligence also, I don't know.

10           THE COURT:  That's the point I think Mr. Hickey

11   is suggesting.

12           MR. RUSH:  I have not --

13           THE COURT:  And it's there already.  The concern

14   is whether there needs to be something further so the jury

15   is not confused on this point.

16           MR. RUSH:  The first paragraph would do that,

17   Your Honor, of Number 10, if that's your goal.  The first

18   paragraph of defendants' Request Number 10 would underline

19   that fact without including the second paragraph.

20           THE COURT:  Okay.  I think I understand the

21   concerns, so I'm going to take a further look at some of

22   the law on this.  I do think the law is it's an objective

23   standard for this purposes.  I'm not recalling -- you

24   cited, Mr. Hickey, Mr. Fineman, the *Coleman* case.  I'm not

25   sure if that dealt specifically with facts like that.

 1          MR. HICKEY:  It is somewhat distinguishable, but

 2   I think the -- I don't think it's a stretch to turn it.

 3          THE COURT:  I want to look at that again, as

 4   well.

 5          MR. RUSH:  Yes, Your Honor.

 6          Long ago, as I was researching a number of

 7   different things, I did come across a case, I thought it

 8   was a Ninth Circuit district court case, saying that in a

 9   contributory negligence claim you could consider mental

10   deficiency as part of that process of the --

11          THE COURT:  I need to get that case if you have

12   got a case like that.

13          MR. RUSH:  I'm going to go to the library and

14   look at it, if I can find it.  I haven't seen it recently,

15   but I believe it was out of the state of Washington.

16          THE COURT:  All right.  Other than that on the

17   contributory negligence?

18          MR. REED:  For the sake of the record, since

19   this has been brought up, I do want to join in

20   Mr. Hickey's comment about this issue of the reasonably

21   prudent person standard in the context of evidence that's

22   been received concerning Mr. Colon for the benefit of the

23   record.

24          It also seems to me that, on the issue of the

25   affirmative defense of contributory negligence, there is

1    evidence in the case of Mr. Colon's intoxication by his

2    own admission at the time of the incident.  And it seems

3    to me that it would be worthy of adding something about

4    that status of intoxication, something along the lines of,

5    that I have come up with, and it has to do with the

6    defendants' affirmative defense of contributory

7    negligence, something that would read along the lines of:

8    If you find that defendants have proven that Omar Colon

9    was intoxicated at the time of his accident, the fact that

10   Omar Colon was intoxicated does not exempt him from the

11   consequences of his actions while intoxicated, or prohibit

12   you from considering Omar Colon's relative negligence.

13          Something that would, you know, make the point

14   that he's not somehow exempted from behavior under the

15   circumstance because he was intoxicated.

16          THE COURT:  Okay.  And I'm going to hear you in

17   a moment, Mr. Rush.

18          I think I'm anticipating Mr. Rush will say he

19   does not believe he was intoxicated by any substances.

20   But there is no dispute here, and there certainly was

21   evidence, that he had used drugs, had drugs in his system.

22          And I guess what you're really asking is for

23   some acknowledgment and some guidance to the jury about

24   suggesting that the fact that he may have been influenced

25   by illicit substances would not change the standard of

1    care --

2              MR. REED:  Correct.

3              THE COURT:  -- is that right?

4              MR. REED:  Yes.

5              THE COURT:  Mr. Rush?

6              MR. RUSH:  I don't think there's any evidence

7    that he was impaired or intoxicated in this case.  The

8    defendants, for whatever reason, did not put on any

9    evidence of impairment or intoxication.

10             They're asking the jury to speculate that the

11   methadone that he receives every day intoxicates him or

12   impairs him without any evidence that that's the case.

13             I don't think if somebody -- somebody has a

14   single beer an hour before an event, there's not

15   affirmative evidence that that person is either

16   intoxicated or impaired.  It's an affirmative defense of

17   contributory negligence.

18             The only evidence on that issue was the expert's

19   statement that it would not.  And the effects of those two

20   drugs were to cause depression of the central nervous

21   system so that you would become less likely to do

22   something.  And so there's just no evidence other than a

23   tox screen that was not admitted into evidence.

24             THE COURT:  Well, there was a lot of testimony

25   about what was in his blood.  And it included opioids, as

1    I recall, or opiates, if I'm confusing those two, the

2    marijuana and the cocaine.  Right?

3              MR. RUSH:  He didn't have any opiates, and he

4    didn't have heroin.  He had methadone, benzodiazepines,

5    marijuana or cannabis, and --

6              THE COURT:  Okay.  But there was a lot of

7    evidence that there were potentially illicit drugs,

8    including both marijuana and cocaine.

9              MR. RUSH:  Yes, Your Honor, but in his system,

10   which is not evidence of intoxication or impairment.  So

11   there's no evidence of intoxication or impairment.

12             There's evidence that it was in his system, but

13   it's pure speculation that those -- that just because you

14   have trace elements, that that means you're impaired or

15   intoxicated.  There's no affirmative evidence that that is

16   so.  And you can't assume that -- if you have a glass of

17   wine tonight --

18             THE COURT:  I know your -- I get your point.  I

19   think this is well within what a jury could conclude, in

20   terms of circumstantial evidence, that he was impaired.

21             MR. HICKEY:  For the record, Your Honor, I asked

22   him the specific question, "And you got high," and he said

23   yes.

24             THE COURT:  And he talked about the recreational

25   use of marijuana.  I think the jury could easily conclude

 1    from this evidence that he had more than just one joint or

 2    one cigarette that day.

 3            I know it's the plaintiffs' contention it was

 4    only one, but I think it's fair game to argue that there

 5    was quite a bit more than that, when you have him getting

 6    in some car with some guy, heading off and buying drugs

 7    from some guy with a mask, and then engaging in very

 8    unusual behavior the way he did.

 9            I know the plaintiffs have their own explanation

10    for that behavior, but it seems to me it's well within the

11    range of debatability why he did what he did, in terms of

12    the choices he made going into that nature area and

13    ultimately climbing the tower.

14            So I want to look a little bit more.  If any

15    party has any further authority on this point that --

16    Mr. Reed, that you're suggesting that I should say

17    something in the contributory negligence instruction about

18    the effect of any elicit substances, that would be

19    helpful.

20            MR. REED:  I have proposed language in a couple

21    of Connecticut cases.

22            THE COURT:  Send them along, with copies to all.

23            MR. REED:  On this last point, not to belabor

24    the issue, but I'm pretty sure that Dr. Myers said, when I

25    cross-examined him, that based on Mr. Colon having said

```
 1    that he was high, he built up a tolerance because he was a
 2    daily user of marijuana, but I'm pretty sure that he
 3    acknowledged the fact that for somebody, by their own
 4    description, to have reached a high or to be high, they'd
 5    have had to have consumed more of that intoxicating
 6    substance, which would go against the notion that it was
 7    just one joint.
 8                THE COURT:  Again, room for debate here.
 9                All right.  That's page 15.
10                That gets us to Ms. Davis's loss of consortium
11    claim --
12                MR. REED:  Are we -- I'm sorry, I don't mean to
13    mumble.
14                THE COURT:  Anything on that point?
15                MR. REED:  You just got a little bit ahead of
16    me or --
17                THE COURT:  I'm sorry, did you have more to say
18    on the contributory negligence?
19                MR. REED:  No.  Just on page 15, on the sort of
20    characterization of the standard more negligent than the
21    defendant, when I've done these cases, admittedly
22    primarily in the state court, it's usually expressed as,
23    you know, greater than 50 percent.  Greater than
24    50 percent or up to 50 percent.  You know, the actual
25    percentages is stated, as opposed to more or equally or
```

 1    less negligent.  Just a question of, is it going to be

 2    clear.

 3              THE COURT:  Well, later on, of course, we get

 4    into the form.

 5              MR. REED:  Corresponds to the form, I agree.

 6              THE COURT:  I'm not sure in the damages

 7    section --

 8              MR. REED:  On page 19.

 9              THE COURT:  Page 19, I go into percentages

10    there.

11              MR. REED:  I'll retract the comment.  I think

12    that's fine.

13              THE COURT:  Anything else on page 15?

14              MR. REED:  No, Your Honor.

15              THE COURT:  That gets us to Arlene Davis's loss

16    of consortium instruction.

17              MR. HICKEY:  Yes, Your Honor.

18              In the second full paragraph for Ms. Davis, it

19    states if the defendants are liable to Mr. Colon, then you

20    must find that they are also liable to Ms. Davis for any

21    damages to her marital relationship.

22              I'm not sure that that -- I understand what

23    you're saying, but I think it needs to be drawn out a

24    little bit more.  Because we could be -- we could be

25    liable to Mr. Colon, but not liable to her.

1    MR. RUSH:  How's that?

2    MR. HICKEY:  Because they may say that she

3  didn't suffer any damage to her marital relationship.

4    THE COURT:  And I very much understand that

5  distinction.  It says "then you must find that they are

6  also liable to Ms. Davis," but then it goes on to say "for

7  any damages to her marital relationship caused by the

8  injury to Mr. Colon."

9    MR. HICKEY:  I'd be more comfortable with "may

10  have caused."

11    THE COURT:  "That may have been caused," we

12  could say?

13    MR. HICKEY:  "You may find that they are also

14  liable."  That suggests that they have to find.

15    MR. RUSH:  Your Honor, if she suffers damages,

16  they do have to award at least nominal damages.  They

17  can't just say, yeah, she's been injured, but we don't --

18  we're not going to follow the law.

19    If she suffered damages to her marital

20  relationship, they must award at least a dollar.

21    THE COURT:  How about if we say:  Then you

22  should find that they are also liable to Ms. Davis for any

23  damages to her marital relationship that may have been

24  caused by the injury to Mr. Colon?

25    MR. RUSH:  That is okay, Your Honor.

1            THE COURT:  Is that okay?

2            Anything more on that point?  Okay.

3            The indemnification claim.  I'm trying it make

4    clear that we're asking them only to decide one question

5    there.  But we're not giving them any more guidance about

6    what it means to directly or indirectly cause Mr. Colon's

7    injuries, and I don't think I ever got a substantive

8    instruction request on that.  Got the question, but

9    nothing about -- well, anything more on that.

10            I think I'm okay with that, but I want to make

11   sure there wasn't going to be a request from the

12   defendants or third-party defendant to say something more

13   about what the applicable legal standard is.

14            MR. HICKEY:  Your Honor, just a point of

15   clarification for the jury, I believe.  In that paragraph

16   it says, "You need consider this third-party claim against

17   UI only in the event that you find that Metro-North or the

18   MTA should be liable," but yet we have asked --

19            THE COURT:  You're asking -- right, I

20   understand.  I need to take that out too.

21            MR. HICKEY:  Yeah.

22            THE COURT:  In fact, I'll take out the middle

23   two sentences altogether, I think, right, and just

24   basically say that there's a third-party claim against UI,

25   and then skip right down to "For purposes of a third-party

1    claim, you need only consider and decide one question"; is

2    that okay?

3              MR. HICKEY:  Yes.

4              MR. RUSH:  So you deleted those two middle

5    sentences beginning with, "This means," down to, "Davis"?

6              THE COURT:  Yes.

7              And then actually the first clause of that third

8    sentence, which is --

9              MR. RUSH:  You've taken out "for purposes of

10   third-party claim" --

11             THE COURT:  No, just saying, "For purposes of

12   this third-party claim" -- we don't need to repeat the

13   parties again -- "you need only consider and decide one

14   question."

15             MR. RUSH:  Just so I can understand, Your Honor,

16   and I'm not an expert on their indemnification claim, but

17   I thought I read that the indemnity clause only is between

18   Metro-North and UI, and not MTA.  MTA does not have an

19   indemnity claim under the contract.

20             THE COURT:  I don't recall.

21             Is that right; do you all know?

22             MR. RUSH:  It says the State's designee, which

23   is defined as Metro-North, is indemnified.

24             MR. REED:  I believe that's correct.  It's just

25   a function of the transmission line agreement, Exhibit 46.

1    THE COURT:  Did MTA bring the third-party claim

2    then without standing?

3    MR. HICKEY:  Well, there was more to the

4    indemnity claim.  At one point in time there was

5    apportionment and common-law indemnity that --

6    THE COURT:  Okay.  I'm not sure I need to

7    clarify this now.

8    MR. HICKEY:  Okay.

9    THE COURT:  Does it make any difference?

10    We're just asking them to consider one question

11    there.

12    And then I think I'll add language at the end of

13    there, saying that the Court will independently resolve

14    additional issues concerning this third-party claim once

15    it has the jury's answer to this question.

16    MR. REED:  That's fine, Your Honor.

17    At some point I'd like to -- I don't mean to

18    preempt the discussion of the verdict form, but relating

19    to this third-party claim and the finding that the jury is

20    going to be asked to be making, I think there is an issue

21    on the form.

22    THE COURT:  We'll get to that.  That's great.

23    MR. REED:  Mr. Ringold may have one other

24    comment.

25    MR. RINGOLD:  Just, Your Honor, so you're

1    deleting not only the sentence "You need consider," but

2    the sentence prior to that, "This means that Defendants

3    Metro-North and the MTA claim," that's what Your Honor's

4    proposing?

5              THE COURT:  Yes.  That's gone.

6              MR. RINGOLD:  My only concern with that,

7    Your Honor, is I understand Your Honor's interest in

8    having the jury answer this one question, and then we'll

9    resolve it later, but my only concern is that if the jury

10   is given that neutral of a presentation, that they won't

11   really understand the import of their decision.

12              They've been presented with what the

13   transmission line agreement says, but they don't know what

14   the word "indemnity" means.  They might not understand

15   what answering that question in the affirmative would mean

16   for the parties.

17              I think there should be some explanation to them

18   that if they say yes, that means UI pays, not Metro-North,

19   if there is a verdict, which is why I think that second

20   sentence, "This means that the defendants Metro-North and

21   the MTA claim that UI is liable," that that sentence, it

22   would make sense to leave it in, since that is what the

23   claim is.

24              THE COURT:  I see.  Why not just add to that

25   first sentence "seeking to hold UI liable."

1    MR. HICKEY:  For the record, we don't think any

2    of that is necessary.  The implications of it, even if

3    they answer in the affirmative, are not clear right now,

4    because Your Honor's going to determine that at some later

5    date.  So we don't really see that as being necessary.

6    MR. RINGOLD:  The final result may be unclear,

7    depending on Your Honor's ruling, but that second sentence

8    is accurate as stated; that is, the claim that's being

9    made.  That's what they claim.  Whether that claim will be

10   fully proven in the eyes of the law is a different

11   question, but that is the claim that is being made.

12   THE COURT:  Maybe I'll just call it the

13   third-party indemnification claim.  That makes clear the

14   nature of the claim.

15   That's enough, isn't it, indemnification or

16   reimbursement?  I've said that before.  When we picked the

17   jury, we said that.  When I gave opening instructions, I

18   said that.  I think they know.

19   MR. RINGOLD:  I think the use of the word

20   "reimbursement" would help.  I know, before I went to law

21   school, I didn't know what indemnification was,

22   Your Honor.

23   THE COURT:  I'll say "indemnification or

24   reimbursement claim against United Illuminating," and

25   leave it at that.  And then add language about the fact

1   that I'll be deciding additional issues.

2              Okay.  That gets us to the damages section on

3   page 17.

4              Are there any concerns on page 17?

5              MR. REED:  No, Your Honor.

6              MR. RUSH:  And maybe this is not helpful, but

7   you previously delineated the elements they have to prove.

8   And I would ask that you change it to have proven either

9   the elements of their claim or have proven their claims

10  against Metro-North.

11             THE COURT:  Where do you want --

12             MR. RUSH:  I'm on page 17, under damages,

13  line 2.  It says:  "If - and only if - you conclude that

14  plaintiffs Omar Colon and Arlene Davis have proven each

15  element of their claims," it just seems, you know, the "if

16  and only if" is an affirmation and a focus, which I

17  understand you're going to leave in.  I'm suggesting that

18  that be shortened, that each element be taken out, so it's

19  just, "have proven their claims" -- "if and only if you

20  conclude that plaintiffs Omar Colon and Arlene Davis have

21  proven their claims against either Metro-North and/or

22  MTA," et cetera, essentially deleting each element.

23             THE COURT:  I want to focus them on elements.

24  That's important to me, so I'm going to leave that in.

25             Anything else on page 17?

1           Okay.  If there's not, I'll move to page 18.

2           And I take it, Mr. Rush, when you're doing your

3    closing, you're going to be essentially trying to do

4    something as an itemization of what you believe that the

5    past and future expenses may be, right?

6           MR. RUSH:  Yes, Your Honor.

7           THE COURT:  I know, in your proposed

8    instruction, you essentially proposed that I essentially

9    review each of these categories.  I don't usually do that,

10   but I do leave it to you, during your closing arguments,

11   to say what are the damages in this case that have been

12   proven, then you can review that.

13          MR. RUSH:  I assume we'll have an Elmo available

14   for that?

15          THE COURT:  Certainly.

16          MR. RUSH:  The only other thing, if you can go

17   back to 17, there's no reference to the -- what I call

18   generally the loss of household services.  I think the

19   economist describes it as the loss of the value of the

20   services provided by Mr. Colon to Arlene Dave.  Those also

21   are economic damages.

22          I'm looking at the middle of page 17 where it

23   says "including medical and lifecare expenses," it would

24   also be appropriate to say "and loss of household

25   services," recognizing that's shorthand for the loss of

1   the value of the services provided by Mr. Colon.

2           THE COURT:  That's Arlene's damages, right?

3           And I think I have that -- I have a separate

4   damages portion for Arlene Davis at page 18 which

5   specifically references household services.

6           MR. RUSH:  Very good, Your Honor, thank you.

7   Then I'm taken care of.

8           THE COURT:  Okay.

9           Anything else, page 17, for damages

10  instructions?

11          Page 18?

12          MR. HICKEY:  Page 18; yes, Your Honor.

13          The very last paragraph on page 18 I believe is

14  the first time the Court gets into issues of sympathy and

15  things of that nature.

16          THE COURT:  On page 18 I don't say "sympathy,"

17  do I?

18          MR. HICKEY:  I'm sorry?

19          THE COURT:  Do I say "sympathy" at the bottom of

20  page 18?

21          Oh, spilling over, I see "sympathy" at the top

22  of 19.

23          MR. HICKEY:  The point that we would like to

24  make, in a separate charge not within the damages section

25  of the charge, would be that sympathy should play no role

 1    in the totality of the decision-making process.

 2            I wouldn't expect Your Honor to say to the jury,

 3    "You can't have sympathy for Mr. Colon because of his

 4    present physical condition," but just separate and apart

 5    from within the damages, that all aspects of the case,

 6    liability, every decision they make should not be

 7    influenced by sympathy or prejudice, or feelings for or

 8    against corporations or people of color or -- you know.

 9            THE COURT:  I have a lot of that at the bottom

10    of page 21, top of 22.  Take a look at that and tell me

11    what you think is a concern there.

12            MR. HICKEY:  Oh, okay.

13            MR. RUSH:  Your Honor, my client -- defense

14    lawyers always, I think, think the plaintiffs are trying

15    to get sympathy.  My client's entitled not to sympathy but

16    to just compensation for the harm caused.

17            We agree he's not entitled to sympathy.  But

18    we'd like it to affirmatively state that, under

19    Connecticut law, the plaintiff is entitled to just

20    compensation for the harm caused by the defendants if any.

21    That's the other side of that.  We're not after the

22    sympathy, and we're going to tell the jury that.

23            THE COURT:  Sure.

24            We say that at page 18, right?  It says, "It is

25    for you, in the exercise of your best judgment, to say

```
 1    what is just and fair compensation," right?

 2              MR. RUSH:  Very good, Your Honor.

 3              THE COURT:  Okay.  That gets us on to page 19,

 4    unless there's further issues on 18.

 5              MR. FINEMAN:  I think a typo in the first full

 6    paragraph, midway down after the parentheses, "then

 7    Mr. Colon then you may award Mr. Colon money damages."

 8              THE COURT:  Okay.  So get rid of those first

 9    three words in that line.

10              If there's nothing else on 19, we'll go over

11    to 20.  As I noted before, I tend to add standard language

12    about inferences and reasonable inferences that may be

13    drawn.

14              And, if there's nothing on 20, 21?

15              Nothing on 21, then 22?

16              MR. REED:  Your Honor, there was mention about

17    the issue of sympathy.  Quite typically, you know, we use

18    language that says something like, "Sympathy must play no

19    role in your deliberations."  I think that was the point

20    that Mr. Hickey was making.  I know it's addressed in this

21    paragraph, but that would be one suggestion.

22              THE COURT:  Well, it says now, "it would be

23    wrong for you to allow sympathy to influence you," so it's

24    sort of the same thing.

25              MR. REED:  It is.
```

1     All right.  Anything else on page 21, 22?

2          And that gets us to the -- after I've gotten to

3  that 22 pages, we'll then have your arguments.  And then I

4  have pretty much boilerplate concluding instructions from

5  pages 23 through 25.

6          All right.  Not hearing anything else, I'll just

7  ask if there's any more epiphanies this afternoon, I would

8  like to ask if you have those epiphanies today, not over

9  the weekend.

10          So I'm going to ask that you make sure to get

11  any additional concerns or issues you have about these --

12  initial draft by 4:00 p.m. today, if you can.

13          Mr. Rush.

14          MR. RUSH:  Whenever it would be appropriate for

15  me to ask you to -- I know your rulings on Section 339 of

16  the restatement, and I think I understand your ruling on

17  Section 337 of the restatement --

18          THE COURT:  Yes.

19          MR. RUSH:  -- but whenever it's appropriate, I'd

20  like to renew my request that you give specific

21  instructions to those, tracking the language of

22  Section 337 and 339, which I can give to the court

23  reporter at a later time.

24          THE COURT:  I don't -- I don't intend to allow

25  the case to proceed on those theories.  So your objection

1  on that is certainly preserved, that I should have

2  instructed on that.

3          I'm not sure that you need to -- in view of the

4  Court's decision not to instruct on 337 or 339, I'm not

5  sure you need to concern yourself with submitting

6  instructions on that, or that we need to go back and forth

7  about what those instructions exactly would say.

8          MR. RUSH:  After you have concluded this event

9  or hearing, could I just dictate into the record the

10  language I want for 337, or not?

11          THE COURT:  Well, if I'm not here, then there's

12  not a way to dictate that in.

13          Did you have something you wanted to --

14          MR. RUSH:  I don't want to bore the Court with

15  me reading in these four sentences, but 337 is relatively

16  short.  I want to make sure that my record is complete.

17          THE COURT:  So this would be a proposed

18  instruction on 337?

19          MR. RUSH:  Yes, Your Honor.

20          THE COURT:  Go ahead and read it slowly.

21          MR. RUSH:  I would simply say that:  The jury is

22  hereby instructed that, quote, a possessor of land who

23  maintains on the land an artificial condition which

24  involves a risk of death or serious bodily harm to persons

25  coming in contact with it, it is subject to liability for

1    bodily harm caused to trespassers by his failure to

2    exercise reasonable care to warn them of a condition if:

3    (a), the possessor knows or has reason to know of their

4    presence in dangerous proximity to the condition;

5    and, (b), the condition is of such nature that he has

6    reason to believe that the trespasser will not discover it

7    or realize the risk involved.

8              Thank you, Your Honor.

9              THE COURT:  All right.  That was a Section 337

10   instruction?

11             MR. RUSH:  Yes, sir, under the Restatement of

12   Torts 2d.

13             THE COURT:  Thank you.

14             Okay.  I guess that gets us to jury verdict

15   form, which I'm sure there will be some comment on, as

16   well.

17             Before I gather specifics on it, what I tried to

18   do with the form was to roadmap as much as I could in

19   terms of how the jury should consider the many sort of

20   forks in the road, decisional forks in the road that they

21   may have.

22             As you can see, I have the special

23   interrogatories for each of the five elements in hopes

24   that if there does end up being further review in this

25   matter by myself or by an appeals court, that that might

1    be helpful that the jury is actually making a finding on

2    each one of those five elements.

3            I'll be very clear to the jury that, no matter

4    how they rule, yes or no, they're going to need immediate

5    answers on whether plaintiff has proven each and every one

6    of those five elements.  Okay?

7            I didn't want to -- and I know some of you

8    suggested very specific questions there, but my concern

9    is, if I have a specific question there, rather than

10   simply incorporating the element, the question might be

11   under-inclusive or thought to depart in some manner from

12   what the actual element is.

13           So are there anything you want to call my

14   attention to with respect to the verdict form, points you

15   want to make?

16           MR. REED:  Your Honor, with respect to

17   Question 1, there's a preamble to the special

18   interrogatories section that directs the jurors to,

19   notwithstanding how they may have answered, to go on and

20   answer Number 8, at the end.  And it seems to me that if

21   they've answered the second element, Injury Caused by a

22   Serious Hidden Danger in the negative, then they will have

23   already answered Question Number 8, which has to do with

24   whether UI's wires directly or indirectly caused the

25   injuries to plaintiff Omar Colon, because the second

1    element is that -- what I've called the electrical

2    causation issue.

3              THE COURT:  Sure, sure.

4              MR. REED:  So it seems to me that we could end

5    the sentence, then answer each of the special

6    interrogatories below with a period, and then say

7    something like, "If you answer no to the second element,

8    stop; if you answer yes, then go to Number 8."

9              Because it seems to me that if they've answered

10   no to the second element, then that takes care of Question

11   Number 8.

12             THE COURT:  What do the parties think about

13   that?

14             I suppose that, in theory, couldn't the jury

15   find no on the second element on grounds that his injury

16   was caused solely by a non-hidden danger?

17             MR. REED:  A non-hidden danger would, by

18   definition, then not have anything to do with the UI

19   system, unless he touched the wire.

20             THE COURT:  Because there's no evidence that he

21   touched.

22             MR. REED:  Correct.  He has denied that.  The

23   expert, Dr. Stern, has indicated that.  It's been

24   stipulated to.

25             THE COURT:  Hold on a second.

1        (Pause.)

2        THE COURT:  Do other parties have objection to

3    that issue in terms of basically telling them if they

4    answer no to the special interrogatory for the second

5    element, then it is unnecessary for them to, well,

6    consider any further issues in the case?

7        MR. HICKEY:  Mr. Fineman and I are trying to

8    think it through right now.  I guess the fear here is the

9    potential for an inconsistent answer on the

10   interrogatories.  In other words, a no to the second

11   element under Question Number 1, and then a yes under

12   Number 8; that's the real fear here, I guess.

13       MR. REED:  That's our concern.

14       THE COURT:  That's the concern I'm trying to

15   meet as well.  We're trying to think about how it could be

16   that there could be a permissible inconsistency.  I

17   suppose if they found that static electricity is not a

18   hidden danger, that it is known in some manner.  But there

19   wasn't testimony suggesting that.

20       MR. HICKEY:  I think the potential for an

21   inconsistent is very remote.  I think we would object and

22   just leave it as it is, would be our position.

23       THE COURT:  Or alternatively I could say after

24   Question Number 8:  Please note that you do not have to

25   answer this question if you answered no to Special

1   Interrogatory Number 2.

2           MR. REED:  That would be fine.

3           MR. RUSH:  Your Honor, we're adding more

4   complexity.  The plaintiff would love to do away with

5   those five interrogatories and just have a much simpler

6   verdict form.  That would eliminate the potential for

7   inconsistency, but it would also eliminate the potential

8   for an interrogatory.

9           You have selected a relatively clear and simple

10  way, and adding more below or inside 1 or 1B, where the

11  five elements are, doesn't really make it clear and it

12  creates more confusion.

13          And so -- I mean, the plaintiff would like to

14  get rid of all those interrogatories, but I think the

15  Court has decided --

16          THE COURT:  I think that could be important

17  to --

18          MR. RUSH:  I'm not arguing for that.

19          THE COURT:  -- further guidance.

20          In a way, it probably makes it less -- I think

21  that both defendants and third-party defendant agree that

22  the Court could say, at the end of Question Number 8, that

23  they need not consider Question Number 8 if they answered

24  no to the second element of special interrogatories for

25  Question Number 1.  And then that would simplify things.

1            That doesn't shorten -- they will have -- that

2    doesn't complexify anything that the jury would be doing

3    on your behalf, Mr. Rush, because they'll be done with all

4    their work --

5            MR. RUSH:  That's true.

6            THE COURT:  -- by that point in time as to your

7    case.

8            MR. HICKEY:  What if under the Special

9    Interrogatory Number 8, what if it said something like:

10   If your answer to the second element in Number 1 is no,

11   your answer to this question must be no.

12           THE COURT:  As opposed to telling them not to

13   address it?

14           MR. HICKEY:  Because we've told them:  You have

15   to answer this no matter what.

16           THE COURT:  Are you okay with that?

17           MR. REED:  I am, Your Honor, that's fine.

18           THE COURT:  Okay.

19           All right.  More issues concerning the verdict

20   form?

21           Okay.  I'll just ask you, again, reexamine all

22   the materials.  If you have any additional insights you

23   want to share, let the Court know by 4:00 p.m. today.

24           I think I'll take this initial draft and post it

25   to the docket so there's a record of what document we

1  discussed today for purposes of any further review that

2  might be necessary in the case.

3          Anything else?

4          One last thing, I know I raised this yesterday,

5  we have our Jurors Number 8 and 9 who would ostensibly the

6  alternate jurors in the case.  I did ask the parties to

7  consider whether you might wish to have Jurors Number 8

8  and 9 serve as regular jurors in this case.

9          There's no bar to that.  We often have that many

10  jurors.  But I did pick them on the understanding and the

11  commitment to the Court, I think in response to Mr. Rush's

12  request, that they would only be alternate jurors and not

13  actually join the regular jury pool.

14          So I just wanted to see if the parties had

15  possibly reconsidered that issue, if you want to stick

16  with what we had, or possibly let them know that they can

17  serve as regular jurors.

18          MR. RUSH:  Your Honor, I'd like to stick with it

19  now.  I might change my mind over the weekend as I get

20  deeper into my presentation.  I understand why you might

21  want to have them involved.  I'm happy with the first

22  seven.

23          THE COURT:  Let the Court know, if you can.  I'm

24  also not going to change that, if one of the defendants --

25  if the defendants have concerns, because they may have

```
 1    relied in some sense on having Jurors 8 and 9 not be part
 2    of the regular jury pool in the case.
 3              So you'll think about that more, and let me know
 4    Monday morning, if you can.
 5              MR. RUSH:  Thank you, Your Honor.
 6              THE COURT:  Is there anything else to take up?
 7              MR. REED:  Yes, Your Honor, one point of -- a
 8    request for guidance or preference of the Court.
 9              When arguing to the jury, does Your Honor have
10    any rules about, you know, trying to explain to the jury
11    the jury verdict form, going through the form?  We'll have
12    it, they won't yet have it.
13              THE COURT:  They will have it.  They'll have a
14    copy of the jury verdict form and my instructions.
15              MR. REED:  As they're being delivered?
16              THE COURT:  Exactly.  They'll all be reading
17    along.
18              MR. REED:  So if counsel wish to acquaint jurors
19    with one or more facets of the form or the instructions --
20              THE COURT:  It's fine.  It's fine to refer to
21    that.  But I think you'll find that I make pretty clear
22    because I will stop periodically and essentially do a
23    cross-correlation between particular parts of the
24    instructions and say:  Take a look at your verdict form
25    for a moment, and you're going to see a part of the
```

1     verdict form that matches to this part of the jury

2     instruction.

3              MR. REED:  Thank you.

4              THE COURT:  But if you think it's been unclear,

5     you're welcome to do that as part of your presentation.

6              I'd encourage the parties, to the extent that

7     you're going to want to use visuals, and I'm sure you

8     will, be really ready with those.

9              If you're going to have -- are any parties

10    thinking about having PowerPoints or demonstratives that

11    have not previously been shown to the jury?

12             MR. HICKEY:  That's a possibility, from one of

13    the technologically challenged people in the courtroom.

14    We may have something on Monday.  I don't know for sure.

15             THE COURT:  So all I ask is, if there's any

16    demonstratives you're going to use, or any kind of prop

17    that's not evidence or wasn't used during trial, that you

18    make that known to all counsel.

19             And if there's going to be an objection to that

20    demonstrative, then I can entertain that and rule upon

21    that before we get into, you know, you starting to use

22    some sort of demonstrative or a prop and then finding an

23    objection midstream.

24             MR. HICKEY:  I'd like to let Your Honor know

25    that I certainly have no props or anything like that.  We

```
 1    have been ordering transcripts, and I anticipate using
 2    portions of certified transcripts.  I just want to let
 3    everybody know.
 4              THE COURT:  That's fair game.
 5              MR. HICKEY:  That would be about the extent
 6    of --
 7              THE COURT:  And those have been made equally
 8    available to all parties, so that's fine to use the
 9    transcripts.
10              MR. RUSH:  I'd just like to see whatever they're
11    going to do at some point before they do that.
12              Is that possible or not?
13              THE COURT:  I don't know I'm going to require
14    disclosure of transcript parts.  You'll have opportunity
15    of course in your rebuttal case to address anything they
16    rely on in terms of transcripts.  So, okay.
17              And in terms of just general presentation,
18    obviously the hope is that no party has to object to
19    another party's presentation.  I understand that, in some
20    instances, it's urgent and necessary.  Hopefully we keep
21    any such objections to a minimum though.
22              Do the parties anticipate any concerns in that
23    respect?
24              MR. REED:  Your Honor, I just want to highlight
25    one issue.  There was the issue that we confronted last
```

1    week, about the testimony of Dr. Stern, about the highly

2    likely impact or effect of the UI system on the plaintiff.

3            It's my understanding -- I didn't have the

4    conversation myself, but that Mr. Ringold and Mr. Rush had

5    a conversation in which Mr. Rush indicated that he thought

6    it was 100 percent certain that it was UI system.  It's

7    obviously not in evidence.  I just want to make sure

8    something along the lines of the highly likely are not

9    going to be --

10           THE COURT:  I understand, Mr. Rush, you wouldn't

11   use the words "highly unlikely" or "a hundred percent

12   likely"; you would just say that the testimony of

13   Dr. Stern was it was more likely --

14           MR. RUSH:  I would not mischaracterize his

15   testimony, which is more likely than not.  I think it's

16   fair game to argue that, based on all the evidence they

17   have, they could conclude that it was, in fact, UI's

18   lines.

19           I don't think it's a question -- I'm not telling

20   them it's my opinion.  I'm telling them --

21           THE COURT:  As long as you're clear that you're

22   not suggesting that Dr. Stern's testimony -- or reminding

23   them of parts of Dr. Stern's testimony that I struck, I

24   believe I struck, in terms of his agreement with your

25   characterization at the time that it was highly likely.

1    But you're free to make any argument you want

2  about what you believe the cause was, including that it

3  was the higher voltage wires, but just refrain from saying

4  Dr. Stern said anything more than more likely than not.

5    MR. RUSH:  If I remember on Sunday, I may try to

6  say to them:  Dr. Stern said it would be more likely than

7  not, but I would argue, based on all the evidence, that it

8  is indeed highly likely.

9    THE COURT:  You might, but just be careful.  You

10  know the concerns, okay, if it looks like you're saying

11  that that was Dr. Stern's testimony.

12    MR. RUSH:  I won't do that.

13    THE COURT:  Okay.  All right.

14    And do you intend, Mr. Rush, basically to have

15  some prepared remarks that you'll be delivering from the

16  lectern?

17    MR. RUSH:  When I say "prepared," I --

18    THE COURT:  I don't know what your style of

19  closing is.  Some lawyers stand behind a lectern and kind

20  of read, deliver a closing --

21    MR. RUSH:  I don't do that.

22    THE COURT:  -- others are more conversational.

23    MR. RUSH:  I'm more conversational.  I can't

24  read a whole speech.  I could, I suppose.

25    THE COURT:  That's fine.  Just trying to work

1    off notes, but -- and so if you do that, just to make

2    sure, I usually try to keep attorneys essentially at least

3    three feet away from the jury box.

4            MR. RUSH:  Very good, Your Honor.

5            Will we be able to turn this lectern in some

6    way?

7            THE COURT:  I hope so.  Experiment with that

8    after we're done.

9            I got a note from Mr. Black that says:  We still

10   need copies of Exhibits 504, 507, 511C, and 607.  607

11   needs to be in color.

12           Can you work with Mr. Black following this?

13   That would be great.

14           Anything else to take up at this point?

15           We'll plan to get together 8:30, our usual

16   morning start time, in case there's anything extra to iron

17   out.  Over the weekend you should have what is the

18   final -- what is the expected final version of the

19   instructions.

20           Thank you all.

21               (Proceedings adjourned at 12:21 a.m.)

22

23

24

25

1

2                     C E R T I F I C A T E

3

4       RE:   COLON, ET AL. V. METRO-NORTH COMMUTER RAILROAD

5             COMPANY, ET AL., NO. 3:13CV325(JAM)

6

7            I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 1783 through 1885 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                          _____/s/_____

18                          DIANA HUNTINGTON, RDR, CRR
                             Official Court Reporter
19                          United States District Court
                             141 Church Street
20                          New Have, Connecticut 06510
                             (860) 463-3180
21

22

23

24

25